

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 JUL 16  PM 4: 57

LORETTA G. WHYTE
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

---

JOHN THOMPSON,

        Plaintiff,

    v.

HARRY F. CONNICK, in his official
capacity as District Attorney and in his
individual capacity, ERIC DUBELIER, in
his official capacity as Assistant District
Attorney, JAMES WILLIAMS, in his
official capacity as Assistant District
Attorney, EDDIE JORDAN, in his official
capacity as District Attorney, ORLEANS
PARISH DISTRICT ATTORNEY'S
OFFICE, JANE AND JOHN DOES 1-25,
ABC INSURANCE COMPANIES 1-10,

        Defendants.

Civil Action No. **03-2045**

**SECT. J MAG. 5**

**JURY TRIAL DEMANDED**

---

## COMPLAINT

For his Complaint against Defendant Harry F. Connick in his individual and official

capacities, Defendant Eddie Jordan in his official capacity, Defendant Eric Dubelier in his

official capacity, Defendant James Williams in his official capacity, Defendant Orleans Parish

District Attorney's Office, Defendants Jane and John Does 1-25, and Defendants ABC Insurance

Companies 1-10, Plaintiff John Thompson, through his undersigned attorneys, avers as follows:

### INTRODUCTION

1.    This civil action seeks money damages for the extraordinary injuries and losses

suffered by Plaintiff John Thompson ("Thompson"), who was convicted wrongfully of two

Fee_____
Process_____
X  Dktd_____
CtRmDep_____
Doc. No._____

crimes, sentenced to death, nearly executed, and incarcerated for over eighteen years before being exonerated of both crimes. At various times since 1985, Defendants Harry Connick ("Connick"), Eric Dubelier ("Dubelier"), James Williams ("Williams") and Orleans Parish District Attorney's Office ("OPDA"), as a matter of official policy and practice, wrongfully concealed exculpatory evidence, deprived Mr. Thompson of his constitutional right to testify in his own behalf, and maliciously prosecuted Mr. Thompson in violation of his rights under the Constitution of the United States and the constitutional and statutory authorities of the law of the State of Louisiana.

## THE PARTIES

2.      Plaintiff John Thompson is an adult resident of the Eastern District of Louisiana.

3.      Defendant Harry F. Connick was, at all times prior to January 2003 pertinent to this Complaint, the District Attorney for Orleans Parish, which is located within the Eastern District of Louisiana. Defendant Connick is being sued in his individual capacity as well as his official capacity because at times relevant to this Complaint, he was a final policymaker responsible for his own actions and the actions of his subordinate employees of the Orleans Parish District Attorney's Office, and was acting in an administrative capacity with respect to certain matters alleged herein.

4.      Defendant Eric Dubelier was, at times pertinent to this Complaint, an Assistant District Attorney for Orleans Parish, which is located within the Eastern District of Louisiana. Defendant Dubelier was Chief of the Screening Division of OPDA, the third highest-ranking position in the office, and was Special Prosecutor in the 1985 criminal prosecutions against Mr. Thompson. Defendant Dubelier is being sued in his official capacity because at times relevant to this Complaint, he was a final policymaker responsible for his own actions and the actions of his

subordinate employees, and his policymaking and direct actions violated the constitutional rights of Plaintiff.

5.     Defendant James Williams was, at times pertinent to this Complaint, an Assistant District Attorney for Orleans Parish, which is located within the Eastern District of Louisiana. Defendant Williams was Chief of Homicide Screening in OPDA and was a Special Prosecutor in the criminal prosecutions against Mr. Thompson.  Defendant Williams is being sued in his official capacity because at times relevant to this Complaint, he was a final policymaker responsible for his own actions and the actions of his subordinate employees, and his policymaking and direct actions violated the constitutional rights of Plaintiff.

6.     Defendant Eddie Jordan is the current District Attorney for Orleans Parish, which is located within the Eastern District of Louisiana.  Defendant Jordan is being sued solely in his official capacity as the successor in office and liability to District Attorney Connick for the damages caused by the official policy and/or practices of the Orleans Parish District Attorney's Office while Connick was the District Attorney.

7.     Defendant Orleans Parish District Attorney's Office is a local government entity of Orleans Parish, Louisiana, and is located within the Eastern District of Louisiana.

8.     At all times relevant to this Complaint, Defendants Connick, Dubelier, Williams Jordan, and OPDA acted under color of state law.

9.     Defendants John and Jane Does 1-25 are yet unknown individuals who, upon information and belief, participated in or are responsible for the actions that are subject to this lawsuit.  To the extent any of them can be said to be policymaking authorities whose actions represent the official policy of the governmental entities they represent, they are sued in their official capacities.

3

10.     Defendant ABC Insurance Companies 1-10 are yet unknown insurance companies who, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more the of the Defendants named herein.

## JURISDICTION AND VENUE

11.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over the claims arising under state law is invoked pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

12.     Venue in the Eastern District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b), because it is the district in which many defendants reside, and because a substantial part of the events or omissions giving rise to the claims occurred within the Eastern District of Louisiana.

## FACTUAL ALLEGATIONS

### *The Murder of Raymond T. Liuzza, Jr.*

13.     In the early morning hours of December 6, 1984, Raymond T. Liuzza, Jr., the son of a prominent hotel executive and a prominent businessman in his own right, was gunned down and killed as he was leaving his car and crossing the street to his home.

14.     The murder of Mr. Liuzza sparked a public outcry about safety in New Orleans.

15.     The murder of Mr. Liuzza put enormous pressure on law enforcement to capture a suspect and secure a conviction, and two separate reward funds were established.

16.     Nearly six weeks later, and based on the tips of two informants--who, Plaintiff years later learned, had either made reward claims or had been promised reward money--Plaintiff John Thompson and Kevin Freeman were identified as suspects, arrested and charged with the murder.

4

17.     Freeman promptly denied involvement in the murder.  Immediately after his arrest, Freeman told police that although he was present before the shooting occurred, he was not involved in the murder and that Plaintiff was the shooter.

18.     Assistant District Attorney Eric Dubelier and Assistant District Attorney James Williams, who were high-ranking attorneys of the Orleans Parish District Attorney's Office, were named as Special Prosecutors in the murder prosecution against Plaintiff.

19.     Ultimately, after Freeman testified against Plaintiff, the charges against Freeman were reduced to accessory after the fact, to which Freeman pleaded guilty and received a one-year prison sentence.  This deal between Freeman and the State of Louisiana was out of the ordinary, particularly because Freeman's trial testimony for the State suggested that he did no wrong, and there was no evidence presented by the State during the murder trial suggesting that Freeman was an accessory after the fact.

20.     Freeman's plea and sentence in the murder proceedings, however, were but a small part of the contrivance to secure the execution of Plaintiff.

### *The Armed Car-Jacking*

21.     On December 28, 1984, three weeks after the Liuzza murder, a college student and his two younger siblings were victims of an attempted car-jacking and robbery at gunpoint outside the Superdome in New Orleans.

22.     Three weeks later, on January 18, 1985, the day after Plaintiff's arrest for Mr. Liuzza's murder, THE NEW ORLEANS TIMES-PICAYUNE carried a front-page picture of Mr. Thompson, identifying him as the suspect in the murder.

23.     The father of the three youths who had been car-jacked showed the picture of Mr. Thompson to his children and asked them if Mr. Thompson was the man who had robbed them.

5

24.     Two of the children tentatively identified Mr. Thompson as the possible car-jacker, after which the father contacted law enforcement.

### *The State's Strategy of Using the Car-Jacking as Part of the Murder Prosecution*

25.     Mr. Thompson was charged with armed robbery in connection with the car-jacking.

26.     The prosecutors treated the armed car-jacking prosecution as part of the murder case and used the armed car-jacking strategically to secure a conviction and death penalty in the murder case.

27.     The same assistant district attorneys leading the murder prosecution, Defendants Dubelier and Williams, were assigned to be Special Prosecutors in the armed car-jacking prosecution against Plaintiff.

28.     Defendants then successfully moved to reverse the order of the murder and the armed car-jacking trials so that the armed car-jacking trial would be held first.

29.     At the armed car-jacking trial, Plaintiff took the stand in his own defense.  During cross-examination, Defendant Williams asked Plaintiff where he was on December 6, 1984, the date of the murder of Raymond Liuzza, Jr.

30.     On April 12, 1985, based exclusively on the purported eyewitness identification by the youths, Plaintiff was convicted of attempted armed robbery and was sentenced to 49½ years at hard labor.

### *The Concealed Blood Evidence*

31.     Prior to the armed car-jacking trial, the defense moved for the production of any evidence favorable to the accused, including any scientific evidence.

32.     The prosecution failed to produce any scientific evidence or tangible evidence that could be tested scientifically.

6

33.     In fact, however, the prosecutors had obtained tangible evidence from the car-jacking crime scene and had received a scientific blood report, dated two days before trial, that showed, to a scientific certainty, that Plaintiff was not the perpetrator of the armed car-jacking. Despite the constitutional obligation to produce the report to Mr. Thompson's counsel, Defendants withheld the blood report, and concealed the physical evidence.

34.     In 1999, as Mr. Thompson's execution was imminent, a private investigator engaged on Plaintiff's behalf combed through the dormant files of the New Orleans Police Department and Crime Laboratory for lost or hidden evidence that might confirm Mr. Thompson's innocence in either the car-jacking or murder case.

35.     On April 20, 1999, literally weeks before Plaintiff was to be executed, the investigator located the concealed evidence.

36.     The tests of the blood demonstrated conclusively that Plaintiff could not have been the car-jacker.

37.     The existence of the blood evidence was known to the prosecution prior to Plaintiff's car-jacking trial, but the evidence was deliberately concealed from the defense.

38.     The first reference in the Court records to possible blood evidence was in February 1985, when the district attorney's internal Screening Action Form in the car-jacking case noted that the district attorney "may wish to do a blood test."

39.     Recognizing that he had a swatch of bloody clothing containing the car-jacker's blood, Defendant Williams stated at a March 11, 1985 hearing that the State intended to file a motion to obtain a blood sample from Plaintiff.  No explanation was provided at the time, nor was it revealed to the defense that blood evidence had been obtained.

7

40.     Several weeks later, the bloody swatch from the victim's pant leg was removed by an assistant district attorney from the Police Department's Central Evidence and Property and delivered by that assistant district attorney to the Police Crime Laboratory for testing.

41.     The Crime Lab Report was delivered to the OPDA on April 9, 1985, two days before the car-jacking trial, and placed on Defendant Williams' desk.

42.     As noted, the test results and the bloody swatch were not disclosed to the defense.

43.     On April 11, 1985, the day of the car-jacking trial, the bloody swatch and other pieces of physical evidence were checked out of the Central Evidence and Property Room by an assistant district attorney.

44.     The other physical evidence was returned to Central Evidence at the conclusion of the car-jacking trial, but the bloody swatch was not returned, and never surfaced again. The evidence was destroyed, as was the copy of the Crime Lab report that was delivered to Defendant Williams, which has never been found in the files of the OPDA.

45.     The prosecution, however, failed to destroy one remaining source of the evidence: the microfilm files of the Police Crime Laboratory, where the life-saving copy was located by Plaintiff's investigator.

46.     Michael Riehlmann, a former assistant district attorney of the OPDA, confirmed in an affidavit that prosecutors at the armed car-jacking trial had intentionally concealed the blood evidence from the defense:

> Gerry Deegan [an assistant district attorney working with
> Defendants Williams and Dubelier on the armed robbery case] was
> a close personal friend of mine, and he was also an assistant
> district attorney between 1984-1987. He and Jim Williams were
> the trial attorneys in the armed robbery trial of John Thompson.
>
> That at some time prior to 1994 and after 1985, the late Gerry
> Deegan said to me that he had intentionally suppressed blood

8

> evidence in the armed robbery trial of John Thompson that in some
> way exculpated the defendant. I remembered this conversation
> when I recently discussed with my law partner, Bruce Whittaker,
> the impending execution of John Thompson and a conference that
> he (Whittaker) had with the attorneys representing Thompson in
> post-conviction relief proceedings. Mr. Whittaker indicated to me
> that he had spoken with these attorneys specifically about some
> blood evidence that had recently surfaced in the armed robbery
> case. It was this information that caused me to remember my
> conversation with Gerry Deegan.

47.     After discovering the hidden blood evidence, Plaintiff presented it to the district

attorney, and demanded a stay of execution and dismissal of the armed car-jacking charges,

Defendant Connick and Defendant OPDA appeared before the Court and requested the dismissal

of the armed robbery charges. In so arguing, Defendant Connick and Defendant OPDA admitted

that the prosecution had received scientific evidence proving Plaintiff's innocence, admitted that

the prosecutors had failed to produce the evidence to the defense, and admitted that it should

have been provided to the defense. Defendants are estopped from contesting these essential

facts.

48.     In 1985, however, with the bogus attempted armed car-jacking conviction in hand

and the blood evidence establishing Plaintiff's innocence seemingly destroyed, the prosecutors

had achieved two critical strategic objectives in the murder case: (a) they eliminated the ability

of Plaintiff, now a convicted armed robber, to testify in his own behalf in the murder case; and

(b) they created compelling "facts" on which to argue for Plaintiff's execution at the penalty

phase of the trial.

### *The First Murder Trial*

49.     Prior to the murder trial, the defense moved, in limine, to preclude the prosecution

from using the armed car-jacking conviction because that matter was on appeal. Because it, too,

had been deceived by the State and did not know that the armed car-jacking conviction was false

9

and contrived, the Criminal District Court denied the defense's motion and ruled that the State would be allowed to question Mr. Thompson about his armed car-jacking conviction should he take the stand in his own defense.

50.     Because of the threat of impeachment with the April 1985 armed car-jacking conviction, Plaintiff could not and did not exercise his constitutional right to testify in his own behalf three weeks later at his murder trial.

51.     In reversing Plaintiff's murder conviction in July 2002, the Court of Appeals for the Fourth Circuit specifically found:

> Here, the relator was denied his right to testify in his own behalf based upon the improper actions of the State in the [armed car-jacking] case. Indeed, the relator's case is even more egregious in that it was the State's intentional hiding of the exculpatory evidence in the armed robbery case that led to his improper conviction in that case and his subsequent decision not to testify in the instant case because of the improper conviction.

State v. Thompson, 825 So.2d 552, 557 (La. App. 4 Cir. 2002).

52.     Defendants are bound by principles of res judicata and collateral estoppel from contesting these findings.

53.     In 1985, however, having neutralized Plaintiff as a witness at the murder trial, the State primarily relied upon the testimony of a limited number of witnesses and one document to secure Plaintiff's conviction for first-degree murder.

54.     The State's primary witness was Freeman, who had been indicted with Mr. Thompson for the Liuzza murder. During the murder trial, Freeman testified that he was driving Mr. Thompson in Freeman's car on Josephine Street when the car ran out of gas, and that he parked the car on Josephine Street, near Carondelet, several blocks river-side before Mr. Liuzza was shot and killed. Freeman testified further that he and Mr. Thompson were walking from this

location when they saw Mr. Liuzza getting out of his car in front of his home.  According to Freeman, when Mr. Thompson said he was going to rob Mr. Liuzza, Freeman ran away and was blocks from the scene when he heard the first shot.  Freeman told the jury that he continued to run from the scene and did not come back to get his car until the next day.  Freeman testified that he later learned that Mr. Thompson had taken a wallet and a ring from Mr. Liuzza.

55.     The State also presented the testimony of Richard "Funk" Perkins.  At one point, Perkins had been in possession of the gun that the State claimed to be the murder weapon. Perkins claimed at trial that only after the police found him at his home on January 16, 1985 and advised him that they knew he sold the murder weapon, did he tell them about the murder. Perkins testified at the May 1985 trial that Mr. Thompson had admitted to killing Mr. Liuzza, that Perkins obtained the murder weapon from Mr. Thompson, and that Perkins had obtained a copy of a letter that Mr. Thompson wrote to a man named Julius "Big Daddy Red" Morgan. That letter asked Morgan to come to court and testify that Morgan had seen Plaintiff purchase the victim's ring from Freeman.  The State argued that the letter was an admission of guilt by Mr. Thompson.  Perkins also suggested that the did not have knowledge about the $15,000 reward that had been offered, and more specifically that he was never promised a reward.

56.     The State also offered the testimony of Kenneth Carr, who claimed that after the reward had been announced and while alone and drinking a single beer at Harry's Bar at 1:30 a.m. on New Year's Eve, he overheard someone he later identified as Plaintiff make inculpatory statements.  Like Perkins, Carr suggested that he was not a financially-motivated citizen.

57.     Based on this evidence, the prosecutors were able to secure a jury verdict against Plaintiff of first-degree murder.

11

58.     During the sentencing phase, the prosecutors offered the testimony of a teenage girl, one of the victims in the armed car-jacking case, who testified tearfully that she and her brothers were nearly killed by Plaintiff.  In 1999, after the blood evidence surfaced, this young woman explained that she and her brothers had asked a prosecutor what had happened to the blood evidence and that they informed her, falsely, that it was "inconclusive."

59.     Based on the bogus armed robbery conviction, prosecutors also argued that since Plaintiff already was incarcerated for 49½ years without the possibility of parole, the only way to punish him for the murder was to kill him.

60.     The jury sentenced Plaintiff to death.

61.     The Louisiana Supreme Court affirmed the conviction, and the United States Supreme Court denied certiorari.

### *The Concealed Exculpatory Evidence in the Murder Proceedings*

62.     As to the testimony of Perkins and Freeman, the prosecutors failed to produce documents, audiotapes, and other information in the possession of the State that revealed:

(a)     That Perkins had not been approached by police near his house, but, to the contrary, Perkins had initiated contact with law enforcement, and the original police officer that Perkins met thought that he was interested only in a reward;

(b)     That Perkins actively sought a Crimestoppers reward;

(c)     That, after his initial account had been rejected by the police as only being motivated by a reward, Perkins sought out the victim's family and offered his "help" in exchange for their "help";

12

(d)    That, after this meeting, the Liuzza family helped Perkins to obtain employment in the hotel business;

(e)    That Perkins was told by the prosecutors, before he testified during the trial, that he would be paid a reward;

(f)    That prior to his arrest, Freeman had given Perkins several accounts of the murder that differed significantly from Freeman's statement after his arrest and that differed significantly from his testimony at trial;

(g)    That, shortly before the murder trial, the prosecutors placed Freeman and Perkins in a room together and told them to get their stories straight because, among other things, the evidence pointed to them; and

(h)    That Perkins collected $10,500.00 in reward money shortly after trial and was instructed by the State not to tell anyone about the reward.

63.    Moreover, because Plaintiff had been unconstitutionally deprived from taking the witness stand to explain why he wrote the letter to Morgan, the jury was left with an erroneous but unrebutted argument that the letter was an admission of guilt.

64.    The State also concealed that Carr, too, had been promised reward money. Indeed, a short period after the murder trial, Carr was paid $3,500.00 and, like Perkins, instructed not to tell anyone about the reward.

65.    In addition to Defendants' acts unconstitutionally depriving Plaintiff of his constitutional right to testify in his own defense and their unconstitutional acts of concealing favorable evidence that rebutted or impeached the testimony of the State's witnesses, the State also withheld witness information that would have established Plaintiff's innocence, specifically including:

(a)     That disinterested witnesses on the scene had identified only one perpetrator, described as a black male, six feet tall, with close-cropped hair, a description that fit Kevin Freeman perfectly but that was inconsistent with that of Plaintiff, who is only five feet, eight inches tall, and who had a very large "Afro" at the time;

(b)     That police, in fact, had a mug shot of Plaintiff, concerning an unrelated misdemeanor, taken a mere six days after the Liuzza murder and depicting Plaintiff's large "Afro";

(c)     That an eyewitness, Sheri Hartman Kelly, who lived across the street from the crime scene, told police that she had seen the perpetrator, made eye contact with him, and that the perpetrator was a big man with close-cropped hair; and

(d)     That two additional witnesses, Stephen McAlister and Rosemary Cash McAlister, told police that they heard one set of footsteps running after the gunshots towards a car outside their apartment. This location was consistent with where Freeman told Perkins he left his car but different from where Freeman testified that he parked the car. The McAlisters then heard one car door open and close, the engine start, and the car drive off.

66.     Ms. Kelly's testimony was corroborated by concealed documents in the possession of the State, reflecting that Freeman told Perkins that Freeman knew he had been seen leaving the crime scene by a woman.

67.     The McAlisters' observations refuted Freeman's trial testimony about where he left his car and how he left the scene, but were completely consistent with concealed documents

14

in the possession of the State reflecting that Freeman told Perkins that Freeman parked his car near the McAlisters' apartment (rather than the location Freeman told the jury in 1985), and that he drove from the scene (rather than the story he told the jury in 1985 of running home and returning for the car the next morning).

68.     In fact, the withheld information in the possession of the State contradicted Freeman's trial testimony in virtually every respect.  The evidence showed that Freeman told divergent stories about how he supposedly came to pick up Plaintiff on the night of the murder, where Freeman parked his car on the night of the murder, whether Freeman obtained any of the victim's property, and whether Freeman drove or ran away from the scene.  Indeed, the withheld evidence strongly demonstrated that Kevin Freeman was the actual perpetrator of the murder.

69.     Defendants and at least one police witness made other efforts to hide exculpatory facts relating to the number of perpetrators identified by eyewitnesses and the hair length of the perpetrator.  For example, although the withheld police reports affirmatively described a sole perpetrator as "6' tall" with "close cut black hair," Police Officer David Carter denied under oath that they were looking for a single perpetrator with close-cut hair.  The prosecutors, Defendants Dubelier and Williams, even showed Officer Carter the police report to refresh his recollection, without revealing to the defense significant information in the report that could have been used to impeach Officer Carter's testimony.

70.     Similarly, prosecutors misled the jury about witnesses' interest in reward money, affirmatively arguing to the jury that there was no evidence of the witnesses' interest in a reward, despite the evidence in the State's possession and despite the fact that the prosecutors told at least one of the witnesses before trial that he would get a reward.

15

71.     Finally, given the concealed blood evidence demonstrating Plaintiff's innocence in the armed car-jacking case, the prosecutors improperly used the conviction, sentence and victims of that crime to secure the death penalty.

### *Post-Conviction Proceedings*

72.     Between 1989 and 1999, Mr. Thompson litigated a number of post-conviction matters in state and federal courts.

73.     On April 19, 1999, the original trial court signed what appeared to be a final writ of execution, calling for Plaintiff's execution on May 20, 1999.

74.     As appellate options were narrowing, a private investigator was engaged to comb through dated records of the police department and crime laboratory. After months of hard work, the defense investigator uncovered the above-described concealed blood evidence.

75.     On May 2, 1999, just eighteen days before Plaintiff's scheduled execution, Defendant Connick, the OPDA and Plaintiff's counsel jointly sought a stay of execution.

76.     Thereafter, Defendant Connick convened a grand jury, purportedly to investigate the circumstances relating to the concealment of the blood evidence by prosecutors in his office.

77.     On information and belief, the grand jury was convened by Defendant Connick for the improper purposes of: (a) shielding from the defense, under principles of "grand jury secrecy," any information the OPDA and its prosecutors might obtain concerning the circumstances relating to the concealment and the conspiracy to convict Plaintiff of crimes without due regard to Plaintiff's rights; and (b) generating favorable publicity for Defendant Connick.

78.     On May 13, 1999, Assistant District Attorney John Jerry Glas, who had been appointed by Defendant Connick to lead the grand jury investigation, abruptly quit the OPDA. It

was reported that Glas said that his departure was "related to the Thompson grand jury probe," and that he quit as "a matter of principle[.]" Rhonda Bell, *Connick Shrugs Off Exit of Aide*, THE NEW ORLEANS TIMES-PICAYUNE, at 1999 WL 4417220 (May 15, 1999).

79.    To this date, Plaintiff remains unaware of what information was unearthed during the grand jury proceedings.

80.    On May 20, 1999, based on the conclusive information supplied by Plaintiff concerning his innocence, the OPDA moved to overturn the car-jacking conviction.

81.    On June 29, 1999, the trial court held a full evidentiary hearing on OPDA's motion. At the hearing, the State conceded that the blood evidence was not provided to Plaintiff's counsel during the armed robbery proceedings. Neuma Bertel, Mr. Thompson's defense counsel in the armed robbery case, testified that he made a discovery request for scientific evidence and tangible objects but that the blood-stained clothing and lab report were never produced. Defendant Williams, Defendant Dubelier and several other former prosecutors also testified.

82.    At the conclusion of the hearing, the court vacated the attempted armed robbery conviction and noted the shameful conduct of the OPDA with regard to this matter.

83.    Plaintiff's vindication was not complete, however, as he remained incarcerated as a result of the murder conviction.

### *The Renewed Investigation of the Murder Investigation and Prosecution*

84.    The discovery of evidence exonerating Plaintiff in the attempted armed robbery led to a renewed investigation of the facts of the murder case.

85.    In July 1999, the State provided access to its files, leading to a renewed investigation of the murder proceedings. Because Plaintiff was prosecuted in the murder case by

17

the same assistant district attorneys who were responsible for the armed robbery case, the investigation focused on whether the prosecutors had concealed, destroyed or failed to reveal other evidence that might establish Plaintiff's innocence.

86.     Based on the renewed investigation and defense counsel's earlier investigation, Plaintiff amassed the significant evidence described above that had been unconstitutionally concealed from him and his counsel.

87.     On October 26, 2000, in a hearing before the trial court, Plaintiff presented the significant new exculpatory evidence that the jury in the first murder trial had not had the opportunity to consider due to the prosecution's concealments and misconduct.  Plaintiff presented the testimony of the three new ear- and eye-witnesses who were at or near the scene of the crime, and whose first-hand observations contradicted the prosecution's factual premise regarding the murder of Mr. Liuzza.  Plaintiff also testified during this hearing and addressed and refuted the evidence against him.  In addition, the defense offered the items of concealed documentary evidence that impeached the trial testimony of the State's witnesses and corroborated the concealed witnesses' testimony.

88.     Unfortunately, two other key trial witnesses could not be questioned at the October 2000 hearing.  Freeman, who testified at the murder trial that he ran from the scene in fear when he learned that Plaintiff had a gun and was contemplating a robbery, was later shot to death in 1995.  Schliffka, the neighbor who saw the perpetrator and whose testimony during the first murder trial matched Sheri Hartman Kelly's account, also died after the 1985 trial.

89.     On May 29, 2001, the Criminal District Court reversed Mr. Thompson's death sentence, but did not award him a new murder trial.

18

90.    On July 17, 2002, the Louisiana Fourth Circuit Court of Appeals reversed the trial court and ordered a new murder trial, based on the determination that the State's intentional hiding of the exculpatory evidence in the armed robbery case led to his conviction in that case and his subsequent decision not to testify in the murder proceeding.  See State v. Thompson, 825 So.2d 552, 557 (La. App. 4 Cir. 2002).  Because the Fourth Circuit granted a new murder trial on the ground that Mr. Thompson was denied his constitutional right to testify on account of the State's misconduct, the court did not rule on whether the cumulative effect of the withheld evidence in the murder proceedings entitled him to a new trial under Brady v. Maryland, 373 U.S. 83 (1963).  See Thompson, 825 So.2d 552, 555-57 (La. App. 4 Cir. 2002).

91.    On November 15, 2002, the Louisiana Supreme Court denied the State's request to review the Fourth Circuit's decision.

### *The Murder Re-Trial*

92.    Plaintiff's new trial in the murder case commenced on May 6, 2003 and continued until May 8, 2003.

93.    The newly-uncovered exculpatory evidence, denied to the defense in the first murder trial, made a material difference in the second trial.  On May 8, 2003, a jury found Mr. Thompson not guilty for the murder of Raymond T. Liuzza, Jr.  The jury deliberated for a mere 35 minutes.

94.    On May 9, 2003--after serving more than eighteen years of imprisonment for crimes for which he was wrongly convicted, and after having been nearly executed--Plaintiff was released from prison.

95.    Until Plaintiff's acquittal of the murder charge, he could not seek legal redress, as a matter of law or fact, for the harms he suffered as a result of Defendants' actions.

19

96.     Indeed, filing suit prior to his acquittal would have jeopardized seriously his efforts to secure his freedom.

### The Conspiracy to Convict and Execute Plaintiff for the Murder of Raymond Liuzza, Jr.

97.     The highly publicized murder of Mr. Liuzza prompted intense pressure upon the prosecution to secure a conviction.

98.     This pressure to blame someone for the death of Mr. Liuzza led to the prosecution of Plaintiff without careful regard for Plaintiff's innocence, and without regard for the constitutional protections guaranteeing Plaintiff's right to testify in his own behalf and to be provided with evidence that was favorable to him.

99.     Upon information and belief, in furtherance of the goal to prosecute and convict Plaintiff with the most final and ultimate punishment, Defendants orchestrated a scheme amongst themselves and with others, whereby Plaintiff would be convicted of a separate criminal offense (the armed car-jacking), and subsequently be prosecuted for murder, so that the prior offense could be used to prevent Plaintiff from testifying in the murder trial and support the imposition of a death sentence.

100.    The armed car-jacking prosecution and conviction were part and parcel of the prosecution's overall goal of convicting Plaintiff for the murder and having him sentenced to death.

101.    Upon information and belief, the prosecutors tried the armed car-jacking case first, despite the fact that Plaintiff was scheduled initially to be tried first in the murder case, in order to hamper Plaintiff's ability to defend himself in the murder proceedings. This conclusion is supported by, inter alia:  (a) the assignment of the same assistant district attorneys to otherwise unrelated crimes; (b) moving to try the armed car-jacking before the murder, despite the fact that

chronologically, the murder occurred first and the murder trial was originally scheduled to be held first; (c) during the armed car-jacking trial, asking Plaintiff where he was on the night of Mr. Liuzza's murder; (d) using the armed robbery conviction as a means to keep Plaintiff from testifying and as a powerful circumstance in the penalty phase; and (e) upon information and belief, justifying the concealment of the blood evidence in the armed car-jacking on the grounds that it served a greater good:  Plaintiff's murder conviction and execution. See *Revelations in Case of Homicide Land Connick in Hot Seat*, THE BATON ROUGE ADVOCATE, at 1999 WL 6107718 (June 2, 1999) (reporting on Deegan's confession to Riehlmann regarding the concealment of the blood evidence, and quoting Riehlmann: "[Deegan] was remorseful, but he felt like, although what he had done was wrong, he was serving some greater good," which was to convict Plaintiff for murder and have him pay the ultimate price).

### *History of Prosecutorial Misconduct Under Connick*

102.    Under Connick, the OPDA was plagued with prosecutorial misconduct involving the failure to reveal exculpatory evidence to the defense.  For example, it was reported that after being convicted and imprisoned in 1975, Gregory Bright and Earl Truvia recently were released from prison after their convictions were thrown out on account of the failure of prosecutors from the Orleans Parish District Attorney's Office to turn over exculpatory evidence. See *No Retrial for Two Freed from Prison in 1975 Case*, THE BATON ROUGE ADVOCATE, at 2003 WL 4877582 (June 25, 2003).  Published findings of Brady violations have been numerous under Connick's leadership.  See, e.g., Kyles v. Whitley, 514 U.S. 419, 453-44 (1995); Cousin v. Small, 325 F.3d 627, 630 (5th Cir. 2003) (noting that the lower court found that the prosecutor in Connick's office had withheld obviously exculpatory material in obtaining the conviction and death sentence of the sixteen-year old defendant); State v. Knapper, 579 So.2d 956, 961 (La. 1991);

State v. Rosiere, 488 So. 2d 965, 971 (La. 1986); State v. Perkins, 423 So.2d 1103, 1108 (La.

1982); State v. Curtis, 384 So.2d 396, 398 (La. 1980); State v. Falkins, 356 So.2d 415, 419 (La.

1978); State v. Carney, 334 So.2d 415, 419 (La. 1976); State v. Lee, 844 So.2d 970, 974 (La.

App. 4 Cir. 2003) (noting and not disturbing the trial court's finding that the State had concealed

Brady material); State v. Oliver, 682 So.2d 301, 311-312 (La. App. 4 Cir. 1996); State v. Smith,

591 So.2d 1219 (La. App. 4 Cir. 1991).  Cf. In re Lionel "Lon" Burns (State v. George Lee, III),

800 So.2d 833, 844 (La. 2001) (affirming the conviction of Burns, a prosecutor in Connick's

office, for constructive contempt for failing to disclose the discovery of evidence (not

exculpatory), which failure caused a mistrial in an important criminal prosecution).

103.    Connick's office was beset by accusations and findings of prosecutorial

misconduct, which included the OPDA's practice of concealing exculpatory evidence from the

accused.  See Gwen Filosa, *Harry Bids Adieu*, THE NEW ORLEANS TIMES-PICAYUNE, at 2002 WL

3090621 (March 28, 2002) (reporting that Denise LeBoeuf characterized Connick's office as

being "nationally known for misconduct"); Doug Simpson, *Crooning DA Criticized for Injustice*

*in the Name of Justice,* THE BATON ROUGE SUNDAY ADVOCATE, at 2001 WL 3862148 (June 10,

2001) (quoting a former prosecutor as stating, "Harry's problem is, he presses his people to

obtain convictions without instructing them that they have to play with a fair hand" and noting

that Connick recently had to defend three of his prosecutors on charges of misconduct);

*Revelations in Case of Homicide Land Connick in Hot Seat*, THE BATON ROUGE ADVOCATE, at

1999 WL 6107718 (June 2, 1999) (stating that "[t]he latest revelation of apparent misconduct has

stirred long-standing allegations that District Attorney Harry Connick's assistants have

frequently skirted the constitutional provision which requires them to turn over any evidence that

could be favorable to the accused").

104.    Defendant Connick has been vocal in the support of subordinates who have committed prosecutorial misconduct, and has discounted the seriousness of such unlawful conduct by dismissing findings of misconduct or laying blame elsewhere. See Gwen Filosa, *Jail Time for N.O. Prosecutor Voided; Justices Don't Find Evidence Tampering*, THE NEW ORLEANS TIMES-PICAYUNE, at 2001 WL 26217005 (Nov. 29, 2001) (after the Louisiana Supreme Court voided a finding that Assistant District Attorney Lionel Lon Burns planted evidence, Connick "stood by Burns" and portrayed the Supreme Court's ruling as "vindication," and a crowd of assistant district attorneys gave Burns a round of applause, despite the fact that the Supreme Court upheld the determination that Burns had wrongfully withheld his knowledge of evidence from the defense); Alan Syre, *High Court Overturns Prison Term for Prosecutor*, THE BATON ROUGE ADVOCATE, at 2001 WL 3877101 (Nov. 30, 2001) (while Connick acknowledged that Assistant District Attorney Lionel Lon Burns did not share evidence with defense attorneys, Connick blamed the New Orleans police for not finding the evidence themselves and said that the trial judge was biased against Burns); Doug Simpson, *Crooning DA Criticized for Injustice in the Name of Justice,* THE BATON ROUGE SUNDAY ADVOCATE, at 2001 WL 3862148 (June 10, 2001) (in defending three prosecutors, the first of whom was sentenced to jail for evidence tampering and the failure to turn over exculpatory evidence, the second of whom was charged by the Louisiana Attorney Disciplinary Board for allegedly withholding exculpatory evidence, and the third of whom was allegedly recorded instructing a witness to lie on the stand, Connick denied all the charges and stated that the blame lay elsewhere).

105.    Public media reports also reveal that newly-elected District Attorney Jordan has criticized how investigators were managed under the direction of former District Attorney Connick. See Michael Perlstein, *Jordan Unveils New Team, Goals: Investigators to Work Crime*

*Scenes, Funerals,* THE NEW ORLEANS TIMES-PICAYUNE, at 2003 WL 3990172 (June 30, 2003).

It was reported that the new district attorney was surprised that Connick did not establish a

mission statement or specific job objectives for the investigative unit.  Id.

106.     The pattern of constitutional violations for failing to turn over exculpatory

evidence to defendants and for maliciously prosecuting individuals without regard to guilt or

innocence was known by Connick, or should have been known by him, such that there was an

obvious need to take some action to control, supervise, discipline, train, investigate, or intervene

so that these constitutional violations would cease to occur.  The failure of Connick to take

appropriate action to control, supervise, discipline, train, investigate, or intervene with respect to

the prosecutors amounted to a deliberate indifference to the unconstitutional practices of these

prosecutors, in failing to turn over exculpatory evidence, and maliciously prosecuting individuals

without due regard for guilt or innocence.  Indeed, the constitutional violations in this case were

the direct result of Defendants' general policy of securing convictions through overly aggressive

tactics and a specific policy in this case of doing whatever was necessary to secure a conviction

and death sentence motivated by the prominence of the victim.

107.     The unwritten practice of Connick and the OPDA led to the deprivation of

Plaintiff's constitutional rights by the concealment of crucial evidence in the criminal

proceedings against him.

## COUNT I

### *Claim for Malicious Prosecution Against Defendants Connick, Dubelier, Williams, Jordan, and OPDA Under Louisiana State Law*

108.     All of the foregoing are incorporated by reference and realleged as though fully

set forth herein.

24

109.    Defendants Connick, Dubelier, Williams, and the OPDA charged Plaintiff with the murder of Raymond Liuzza, Jr. and the armed robbery of the LaGarde children.

110.    Despite having within its possession exculpatory evidence that proved Plaintiff's innocence of the crimes or cast serious doubt as to Plaintiff being the perpetrator of the crimes, Defendants Connick, Dubelier, Williams, and the OPDA caused the prosecution of Plaintiff for armed robbery and murder.

111.    Had the concealed exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff on the charges.

112.    Plaintiff eventually was vindicated of both crimes.  The armed car-jacking conviction was vacated, and Plaintiff was found not guilty in his murder retrial.

113.    In prosecuting Plaintiff for the armed car-jacking and for murder, Defendants Connick, Dubelier, Williams, and the OPDA acted against Plaintiff with malice.

114.    The actions of Defendants Connick, Dubelier, Williams and the OPDA constitute malicious prosecution of Plaintiff in violation of the laws of the State of Louisiana.

115.    As a successor in office and liability to District Attorney Connick, current Orleans Parish District Attorney, Eddie Jordan, is liable in his official capacity for the damages caused by the malicious prosecution of Plaintiff by Connick and the OPDA.

## COUNT II

### *Claim for Intentional and/or Reckless Infliction of Emotional Distress*
### *Against Defendants Connick, Dubelier, Williams, Jordan, and OPDA*

116.    All of the foregoing are incorporated by reference and realleged as though fully set forth herein.

117.    Defendants Connick, Dubelier, Williams, and the OPDA did intentionally, maliciously, and with reckless disregard and deliberate indifference to Plaintiff's rights, engage

in extreme and outrageous conduct in connection with the prosecution of Plaintiff, including but

not limited to, engaging in deficient investigations and prosecutions of Plaintiff; proceeding with

the prosecutions of Plaintiff without probable cause; illegally destroying and concealing

exculpatory evidence; and presenting false and misleading argument and evidence to courts and

to juries.

118.    The unlawful activities of Defendants Connick, Dubelier, Williams, and the

OPDA were performed for the purpose of ensuring that Plaintiff was arrested, indicted,

convicted, imprisoned, and sentenced to death, so that Defendants Connick, Dubelier, Williams,

and the OPDA could secure a victory in the high-profile Liuzza murder.

119.    Defendant Connick did intentionally, maliciously, and with reckless disregard and

deliberate indifference to Plaintiff's rights, engage in extreme and outrageous conduct in

connection with the prosecution of Plaintiff, including but not limited to, convening a grand jury

for improper purposes, which included the deprivation of Plaintiff's rights by shielding him from

information regarding the concealment of the blood evidence and the conspiracy to convict him

of the armed car-jacking and the murder without due regard to his innocence.

120.    Defendants Connick, Dubelier, Williams, and the OPDA desired to inflict severe

emotional distress on Plaintiff and/or knew that severe emotional distress would be certain or

substantially certain to result from their conduct.

121.    As a direct and proximate result of Defendants' Connick, Dubelier, Williams, and

the OPDA's extreme and outrageous behavior, Plaintiff suffered severe and emotional distress

for which he is entitled to damages.

122.    As a successor in office and liability to District Attorney Connick, current Orleans

Parish District Attorney, Eddie Jordan, is liable in his official capacity for the damages caused by

the intentional and/or reckless infliction of emotional distress by Defendants Connick, Dubelier, Williams, and the OPDA.

## COUNT III

### *Claim Under 42 U.S.C. § 1983 Against*
### *Defendants Connick, Dubelier, Williams, Jordan, and OPDA*

123.    All of the foregoing are incorporated by reference and realleged as though fully set forth herein.

124.    Defendants Connick, Dubelier, Williams, and the OPDA charged or indicted Plaintiff with the murder of Raymond Liuzza, Jr. and the armed robbery of the LaGarde children.

125.    Despite having within their possession exculpatory evidence that proved Plaintiff's innocence of the crimes or cast serious doubt as to Plaintiff being the perpetrator of the crimes, Defendants Connick, Dubelier, Williams, and the OPDA caused the prosecution of Plaintiff for the armed car-jacking and for the murder.

126.    Had the concealed exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff on the charges.

127.    Plaintiff eventually was vindicated of the crimes of the armed car-jacking and of the murder.  The armed robbery conviction was vacated and Plaintiff was found not guilty of the Liuzza murder.

128.    In prosecuting Plaintiff for the armed robbery and for the murder, Defendants Connick, Dubelier, Williams, and the OPDA acted against Plaintiff with malice.

129.    The actions of Defendants Connick, Dubelier, Williams, and the OPDA constitute malicious prosecution in violation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983.

130.    Defendants Connick, Dubelier, Williams, and the OPDA failed to disclose crucial exculpatory evidence to Plaintiff prior to or during the armed robbery trial and/or the first murder trial. The concealed exculpatory evidence was material, and the failure to turn over the evidence gave rise to constitutional violations of Plaintiff's rights under Brady.

131.    Through his direct actions and decisions as the final and official policymaker for the Orleans Parish District Attorney's Office, Defendant Connick intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's rights, either participated in the withholding of the exculpatory evidence and/or created and maintained an official policy, practice, and/or custom of ordering and compelling assistant district attorneys of his office to proceed with and maintain the investigation and prosecution of Plaintiff without concern for his constitutional rights.

132.    In addition to or in the alternative, Defendant Connick, acting in his final policymaking authority and under color of law, created and maintained an official policy, practice, and/or custom of failing adequately to train, monitor and supervise the employees of the Orleans Parish District Attorney's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations.

133.    The general practice of withholding exculpatory evidence, even if not authorized by officially adopted or promulgated policy, was so common and well-settled as to constitute an official policy that fairly represented the Orleans Parish District Attorney's Office's official custom, policy, and/or practice.

134.    Through their direct actions and decisions as final and official policymakers for the Orleans Parish District Attorney's Office, Defendant Dubelier and Defendant Williams

intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's rights, participated in the withholding of the exculpatory evidence.

135.    Defendants' actions and the official policy, practice, and/or custom  resulted directly in the constitutionally deficient investigation and prosecutions of Plaintiff and abridged his rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

136.    In this case, the official policy, practice, and/or custom resulted not only in constitutional <u>Brady</u> violations, but additionally, the concealment of blood evidence in the bogus armed car-jacking case led to the deprivation of Plaintiff's fundamental, constitutional right to testify in his own defense.

137.    The official policy, practice, and/or custom of concealing exculpatory evidence and maliciously prosecuting individuals, without regard to guilt or innocence, proximately and directly caused Plaintiff injury, including great distress, physical pain, anguish, fear, suffering, loss of companionship, and monetary damages.

138.    As a successor in office and liability to District Attorney Connick, current Orleans Parish District Attorney, Eddie Jordan, is liable in his official capacity for the damages caused by the failures to disclose exculpatory evidence in violation of Plaintiff's constitutional rights.

## COUNT IV

### *Civil Conspiracy Claim Under 42 U.S.C. § 1985(3) Against* *Defendants Connick, Dubelier, Williams, Jordan, and John Does 1-25*

139.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

140.    Defendants Connick, Dubelier, Williams, and the OPDA, acted in concert and with other individuals, and, conspiring amongst themselves and with others, intentionally,

29

maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution:

      (a)    Withheld exculpatory evidence, and made false arguments to the courts and to juries in order to ensure the conviction, incarceration, and execution of Plaintiff; and

      (b)    Imprisoned and continually detained Plaintiff for eighteen years, without probable cause or other legal justification, and on the basis of unlawful convictions.

141.    In conducting these acts, Defendants Connick, Dubelier, Williams, and the OPDA were acting pursuant to official policy.

142.    Defendants' conspiracy amongst themselves and with other unnamed individuals proximately and directly caused Plaintiff injury, including great distress, physical pain, anguish, fear, suffering, loss of companionship, and monetary damages.

143.    As a successor in office and liability to District Attorney Connick, current Orleans Parish District Attorney, Eddie Jordan, is liable in his official capacity for the damages caused by Defendant Connick and Defendant OPDA for the conspiracy to deny Plaintiff his constitutional rights.

## COUNT V

### *Direct Action Pursuant to Louisiana Revised Statute § 22:655*
### *Against Defendant ABC Insurance Companies 1-10*

144.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

145.    Defendant ABC Insurance Companies 1-10, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants named herein.  For valuable consideration received, these policies obligated Defendant ABC Insurance Companies 1-10, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay Plaintiff.

146.    By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries Plaintiff has suffered as a result.  Upon information and belief, Defendant ABC Insurance Companies 1-10 are contractually obligated to pay these sums on behalf of the insured Defendant(s) or are obligated to indemnify the insured Defendant(s) for these sums.

147.    Upon information and belief, Defendant ABC Insurance Companies 1-10 are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

148.    Pursuant to Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendant ABC Insurance Companies 1-10 to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## DAMAGES

149.    The actions of Defendants, jointly and severally, constituted torts of malicious prosecution and intentional infliction of emotional distress.

150.    The actions of Defendants, jointly and severally, deprived Plaintiff of his constitutional and civil rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, sections 2, 4, 16, 20, 22, and 24 of the Louisiana State Constitution.

151.    As a direct and proximate cause of Defendants' acts, Plaintiff served eighteen years in prison and was nearly executed.

152.    As a direct and proximate cause of Defendants' acts, Plaintiff served fourteen of those eighteen years on Death Row, at the Louisiana State Penitentiary, at Angola, under the belief that he would be executed.

153.    Plaintiff suffered a loss of job training, employment, and wages during his eighteen-year incarceration.

154.    Plaintiff lost the friendship and companionship of others, including his family.

155.    Plaintiff has suffered mental and psychological stress as a result of being publicly and falsely prosecuted for armed robbery and for murder, and as a result of a well-founded fear that he would be wrongfully executed for a murder he did not commit.

156.    As a direct and proximate result of Defendants' acts, Plaintiff suffered damages and injuries for which he is entitled to compensatory damages in an amount to be determined at trial.

157.    Defendants' acts were intentional, malicious, deliberate, reckless, wanton, and/or cruel, such as to justify an award of punitive damages to Plaintiff.

158.    Plaintiff furthermore suffered other injuries as set forth in the other paragraphs of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Thompson requests the following relief:

A.   An award of compensatory damages to Plaintiff John Thompson and against

Defendants, jointly and severally, in an amount to be determined at trial;

B.   An award of punitive damages to Plaintiff John Thompson and against

Defendants, jointly and severally, in an amount to be determined at trial.

C.   An order for injunctive relief against Defendants and their employees from

retaliating against Plaintiff John Thompson, or those representing him in this case;

D.   An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or

any other applicable law; and

E.   Any other relief to which Plaintiff is entitled.

## JURY TRIAL DEMAND

John Thompson hereby demands trial by jury of all issues properly triable to a jury.

Dated:  July 16, 2003

Carol A. Kolinchak (#22495)
633 Carondelet Street
New Orleans, LA  70130
504-525-1020

Robert Glass (#6050)
GLASS & REED
530 Natchez Street
New Orleans, LA  70130
504-581-9083

Michael L. Banks
J. Gordon Cooney, Jr.
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
215-963-5000