UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN THOMPSON                                    CIVIL ACTION

VERSUS                                           NO. 03-2045

HARRY CONNICK, ET AL.                            SECTION "J" (5)

### ORDER AND REASONS

Before the Court is Defendants' **Motion for Summary Judgment**
(Rec. Doc. 39).  The motion is opposed.  After considering the
motion, opposition, and the applicable law, the Court finds that
the motion should be GRANTED regarding Plaintiff's state law tort
claims, and DENIED as to all other claims.

### BACKGROUND

On April 11 and 12, 1985, Plaintiff was prosecuted in
Orleans Parish Criminal District Court and convicted of attempted
armed robbery.  Then, on May 5-8, 1985, Plaintiff was tried,
convicted and sentenced to death for First Degree Murder, again
in Orleans Parish Criminal District Court.  Plaintiff exhausted
his post-conviction relief available in state court and, on
February 27, 1997, he filed a habeas corpus action in the United
States District Court, Eastern District of Louisiana.  After

1

conducting an exhaustive review of the state court pleadings and records available at that time, the district court denied Plaintiff's application for habeas relief.  Plaintiff appealed the district court's decision, which was affirmed by the Fifth Circuit.

In April, 1999, the state trial court set Plaintiff's execution date for May 20, 1999.  On April 29, 1999, Plaintiff's counsel met with Orleans Parish Assistant District Attorneys and were provided with documents regarding blood evidence in the attempted armed robbery case, which had not been turned over before trial.  On May 2, 1999, the District Attorney's Office and Plaintiff's counsel jointly sought a stay of execution.  On May 5, 1999 Plaintiff's blood was tested and determined to be different than the blood of the assailant in the armed robbery case.  Consequently, the trial court conducted an evidentiary hearing and, on June 29, 1999, the court vacated the attempted armed robbery conviction.

Plaintiff then filed for additional post-conviction relief with respect to his murder conviction.  On October 26, 2000, the trial court conducted a hearing and reversed Plaintiff's death sentence, but did not award him a new murder trial.  Plaintiff appealed and, on July 17, 2002, the Louisiana Fourth Circuit Court of Appeal reversed Plaintiff's conviction and sentence and

remanded the case for a new trial.  A new murder trial was conducted in May of 2003, which resulted in Plaintiff's acquittal of the murder charges.

On July 16, 2003, Plaintiff filed the above-captioned lawsuit under 42 U.S.C. §§ 1983, 1985 and 1986 against the defendants, Harry Connick, Eric Dubelier, James Williams, Eddie Jordan, and the Orleans Parish District Attorney's Office (collectively "the DA Defendants").  Plaintiff also named Jane and John Does 1 to 25 and ABC Insurance Companies 1 through 10. Plaintiff has asserted claims of malicious prosecution, intentional and/or reckless infliction of emotional distress, and deprivation of his constitutional and civil rights.  Arguing that they are entitled to summary judgment, the DA Defendants filed the present motion.

## LAW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Little Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(citing Fed. R. Civ. Pro. 56(c)).  The moving party bears the initial burden of demonstrating to the court that there is an absence of genuine

factual issues.  Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992).  Once the movant meets that burden, the non-moving party must produce evidence sufficient to establish that there is a genuine issue of material fact in dispute.  Id.  Accordingly, a factual controversy exists when both parties have submitted evidence of contradictory facts.  Little, 37 F.3d at 1075.  On summary judgment, factual controversies are resolved in favor of the non-moving party.  Id.

### DISCUSSION

In the summary judgment motion presently before the Court, Defendants argue that they are entitled to summary judgment because (A) Plaintiff's claims arising from the armed robbery conviction have prescribed, (B) the numerous prior decisions pertaining to Plaintiff's claims of prosecutorial misconduct and impropriety have a collateral estoppel and/or res judicata effect on this matter, (C) the individual Defendant, Connick, has absolute and/or qualified immunity from the federal claims, (D) Plaintiff is unable to prove essential elements of his claims, and (E) all Defendants have immunity from the State law claims. Each of the Defendants' contentions are addressed below.

**A.   Prescription of Plaintiff's Claims Arising from the Armed Robbery Conviction**

In Heck v. Humphrey, 512 U.S. 477, 486 (1994), the United States Supreme Court held that a section 1983 plaintiff seeking

4

to recover money damages for an allegedly unconstitutional or unlawful conviction, in which the alleged unlawfulness would render the conviction invalid, must prove that the conviction has either been reversed on appeal or called into question by the issuance of a writ of habeas corpus.  The Heck Court's holding grew out of a concern that a prisoner should not be permitted to collaterally attack a conviction by the means of a civil suit brought under section 1983.  Id. at 482.

> Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

Id. at 487.  In other words, there is a proscription against allowing a civil tort suit to cast doubt on a criminal conviction.  However, when no conflict exists between the

5

conviction and the claims involved in the civil complaint, the
section 1983 suit should be allowed to proceed.  Id.

The DA Defendants assert that Plaintiff's allegations with
respect to the armed robbery conviction began to run from the
time Plaintiff's armed robbery conviction was reversed, not from
the time his murder conviction was reversed.  The DA Defendants
contend that the armed robbery conviction was not in any way
related to the murder conviction.  Plaintiff argues that the
alleged prosecutorial misconduct in the armed robbery proceeding
was used by the prosecutors in the murder case.  Specifically,
Plaintiff alleges that the prosecutors sought to have the armed
robbery trial held first in order to prevent Plaintiff from
taking the stand in his own defense at the murder trial. Further,
Plaintiff contends that the prosecutors had an independent and
continuing duty to produce exculpatory blood evidence in the
murder case.

The question becomes whether the improper conduct which
ultimately resulted in Plaintiff's conviction for attempted armed
robbery had sufficient bearing on his conviction for murder.  If
so, under Heck Plaintiff could not bring a civil action
challenging the DA Defendants' conduct until his murder
conviction had been invalidated.  Had Plaintiff filed a civil
suit under section 1983 for constitutional violations in his

6

armed robbery prosecution, he would have been implying, by way of a civil suit, that his murder conviction was invalid.

A determination that the armed robbery conviction was used to influence the proceedings in the murder trial has already been made by the Louisiana Fourth Circuit Court of Appeal.  As explained the by Fourth Circuit in <u>State v. Thompson</u>, 2002-0361 (La. App. 4 Cir. 7/17/02), 825 So. 2d 552, 557, Plaintiff

> was denied his right to testify in his own behalf [in the murder trial] based upon the improper actions of the State in the [armed robbery] case.   Indeed, the [Plaintiff's] case is more egregious in that it was the State's intentional hiding of exculpatory evidence in the armed robbery case that led to his improper conviction in that case and his subsequent decision not to testify in the [murder] case because of the improper conviction.

Thus, the alleged improper conduct on the part of the DA Defendants in the armed robbery case is related to the murder conviction.  Consequently, Plaintiff's section 1983 suit regarding the murder trial was not ripe under <u>Heck</u> until July 17, 2002, the day the appellate court reversed his murder conviction. Therefore, the DA Defendants' argument based on prescription fails.

**B.   Res Judicata and/or Collateral Estoppel**

According to the Fifth Circuit, res judicata applies where "(1) the parties to both actions are identical (or at least in privity); (2) the judgment in the first action is rendered by a court of competent jurisdiction; (3) the first action concluded with a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits." Procter & Gamble Co. v. Amway Corp., 376 F.3d 496, 499 (5th Cir. 2004). If all four of these conditions are satisfied, all claims or defenses arising from a "common nucleus of operative facts" are merged or extinguished. Id. Under federal law, "the doctrine of collateral estoppel has three requirements: (1) the prior federal decision resulted in a judgment on the merits; (2) the same fact issue must have been *actually litigated in the federal court*; and (3) the disposition of that issue must have been necessary to the outcome of the prior federal litigation." American Home Assur. Co. v. Chevron, USA, Inc., 400 F.3d 265, 272 (5th Cir. 2005). Further, Louisiana law also limits the doctrine of collateral estoppel to issues actually litigated in a prior proceeding. Id.

The DA Defendants contend that the doctrine of res judicata, or alternatively collateral estoppel, acts to merge the treatment of the present claims, which arise out of the same nucleus of operative fact as the prior claims, with the judgment of those prior claims. Plaintiff argues that the significant Brady

material revealed after 1999 was not available to the reviewing courts.  Therefore, Plaintiff did not have a full and fair opportunity to litigate the issues in the prior pleadings.

The Complaint in the present lawsuit involves claims distinct from those asserted in Plaintiff's post conviction criminal case.  Further, considering the facts in a light most favorable to the Plaintiff, the same fact issues could not have been "actually litigated in federal court" because Plaintiff did not discover them until after the district and appellate courts had ruled on his habeas petition.  Accordingly, the doctrines of res judicata and collateral estoppel do not apply to the instant matter.

## C.   Individual Liability of Connick

Defendant Connick is sued in his individual capacity as well as his official capacity. Connick seeks summary judgment denying the individual claims based on immunity and on Plaintiff's inability to prove essential elements of the claims.

### 1.   Absolute Immunity

In order to determine whether Connick is entitled to absolute immunity this Court must undertake a functional analysis to determine whether the actions complained of were within the quasi-judicial prosecutorial role. See, Burns v. Reed, 500 U.S. 478, 486 (1991). As an official seeking absolute immunity,

9

Connick "bears the burden of showing that such immunity is
justified for the function in question....The presumption is that
qualified rather than absolute immunity is sufficient to protect
government officials in the exercise of their duties." Id.
(citing Forrester v. White, 484 U.S. 292, 224 (1988); Malley v.
Briggs, 475 U.S. 335, 340 (1986); Harlow v. Fitzgerald, 457
U.S.800, 812 (1982); Butz v. Economou, 438 U.S. 478, 506 (1978)).
As a result, "state prosecutors are not entitled to absolute
immunity when they perform functions other than their quasi-
judicial functions of 'initiating prosecutions and presenting the
State's case.'" Marrero v. City of Hialeah, 625 F.2d 499, 507
(5th Cir. 1980) (quoting Imbler v. Pachtman, 424 U.S. 409, 431
(1976)). The first step in the functional analysis is to "isolate
the particular prosecutorial conduct of which [plaintiff]
complain[s]." Id. at 505.  The second step is to determine
whether the conduct falls under the "Imbler umbrella" protecting
the quasi-judicial activity of the prosecutor as an advocate for
the State. Id.

The complaint against Connick in his individual capacity is
that he trained his assistants to disregard their constitutional
duties, or that he failed to train and supervise them adequately,
despite the obvious need. See, Complaint (Rec. Doc. 1) ¶¶ 131-32.
Thus, the conduct complained of took place (or failed to take

place) not in relation to the prosecution of any particular case
for the State, but in running the District Attorney's Office as
an administrator and supervisor. The Supreme Court in <u>Imbler</u>
recognized the possible difficulty in distinguishing
prosecutorial conduct as an advocate from conduct as an
administrator where the conduct takes place before initiating
prosecution or outside of the court room, <u>Imbler</u>, 424 U.S. at 430
n.33. This case, however, presents little difficulty. <u>Imbler</u>
offers an illustrative list of the types of activities that could
lead to a gray area between advocacy and administration.

> A prosecuting attorney is required constantly, in
> the course of his duty as such, to make decisions
> on a wide variety of sensitive issues. These
> include questions of whether to present a case to
> a grand jury, whether to file an information,
> whether and when to prosecute, whether to dismiss
> an indictment against particular defendants, which
> witnesses to call, and what other evidence to
> present. Preparation, both for the initiation of
> the criminal process and for a trial, may require
> the obtaining, reviewing, and evaluating of
> evidence. At some point, and with respect to some
> decisions, the prosecutor no doubt functions as an

> administrator rather than as an officer of the
> court.

Id. The list demonstrates that the borderline activities are those made outside court or before prosecution, in relation to a case, or, as the Court stated elsewhere in the opinion, "both in deciding which suits to bring and conducting them in court." Id. at 424. Connick has failed to meet his burden of establishing that decisions regarding training and supervision as a general policy matter, rather than decisions pertaining to the initiation and presentation of individual cases, fall within the ambit of this list, and so are "intimately associated with the judicial phase of the criminal process," Imbler, 424 U.S. at 430. Accord, Carter v. City of Philadelphia, 181 F.3d 339, 353 (3d Cir. 1999) (holding that "local policies relating to training, supervision and discipline, rather than decisions about whether and how to prosecute violations of state law" are administrative rather than prosecutorial). Connick has failed to present, and this Court fails to see, any argument for regarding the complained of conduct as advocacy rather than administration.[1]

---

[1] See also, King v. Timmoney, 2003 WL 21246490 (E.D. Pa., 2003) (Absolute immunity does not extend to allegations that district attorney's office failed to establish proper training, supervision and discipline policies which would reduce likelihood that false information would be introduced as evidence at trial.); McClendon v. May, 37 F. Supp. 2d 1371 (S.D. Ga. 1999) (considering district attorney's failure to train as within scope of discretionary activity, and subject to qualified immunity);

This determination is bolstered by reference to the justifications for prosecutorial absolute immunity. These are: 1) concern that subjecting the prosecutor to personal liability would interfere with the effective functioning of the criminal judicial system to the extent that the prosecutor plays an integral role in the judicial process, and 2) that "'the safeguards built into the judicial system tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct.'" Marrero, 625 F.2d at 508-09 (quoting Butz v. Economou, 98 S.Ct. 2894, 2914 (1978).

The first justification, that prosecutors will hold back on prosecuting for fear of a retaliatory or burdensome private suit, see, id., does not apply here. Being subject to liability for unconstitutional training and supervision of the District Attorney's Office as a matter of general policy in no way interferes in the prosecutor's quasi-judicial role of "deciding which suits to bring and conducting them in court." Id. at 508 (quoting Imbler, 424 U.S. at 424). The Fifth Circuit has made

_____

Barbera v. Smith, 654 F.Supp. 386 (S.D.N.Y., 1987) (United States Attorney was not protected by absolute immunity in connection with alleged failure to provide assistant with training and supervision, resulting in murder of government informant who had been denied protection.). Connick's reference to numerous cases where absolute immunity applied to the suppression of Brady material is off point. The conduct complained of in the individual capacity action was the training and supervision of assistants, not the suppression of Brady material by those assistants.

clear that "'the concern with litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process.... That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.'" Hughes v. Tarrant County Texas, 948 F.2d 918, 922 (5th Cir. 1991) (quoting Burns, 500 U.S. at 494.)

Neither does the second justification apply. Absent a private action challenging it, any possible unconstitutionality of Connick's conduct in training and supervising would never be subject to "the watchful eye of the judge" as conduct in court would, nor to the rigorous testing of the adversary process. See, Marrero, 625 F.2d at 509. Training and supervising the office, not in relation to a particular prosecution, but as a matter of policy, is simply not subject to the judicial safeguards that justify absolute immunity.

Because absolute immunity in this situation fulfills neither of the justifications for its existence, because Connick has failed to come forward with an argument that promulgating training policy is quasi-judicial, and in light of the presumption against absolute immunity in favor of qualified

immunity, this Court cannot dismiss Plaintiff's claims based on absolute immunity.

### 2.  Qualified Immunity

To the extent that Connick is authorized, as part of his discretionary duties, to create and maintain policy on training and supervision, he is entitled to assert a qualified immunity defense in section 1983 actions challenging those policies. See, id. A defendant asserts qualified immunity by pleading his good faith and establishing that he was acting within the scope of his authority. Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992). Upon properly pleading qualified immunity, the burden shifts to the plaintiff to establish that the official's conduct violated clearly established law. Id. (citing Whatley v. Philo, 817 F.2d 19, 20 (5th Cir. 1987)). The question of whether qualified immunity applies is a purely legal question. Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998) (quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The issues and standards of a qualified immunity defense are distinct from those of the merits of a section 1983 individual liability claim. See, Thompson v. Upshur County, 245 F.3d 447, 459-60 (5th Cir. 2001). (explaining the difference between the two standards and how they are often confused).

Connick pleaded that he was a prosecutor and acted in good

15

faith. <u>See</u>, Defs' Answer (Rec. Doc. 11), 2nd Defense. Therefore, the burden is upon Plaintiff to establish that the defense is not available. <u>See</u>, <u>Thompson</u>, 245 F.3d at 457. The first step in the qualified immunity analysis is to determine whether plaintiff has alleged violation of a clearly established federal constitutional right. The second step is to determine whether defendant's conduct was objectively reasonable in light of the clearly established law at the time of the conduct. <u>Id.</u>

Plaintiff has alleged that the prosecutors violated his Fourteenth Amendment right to Due Process by failing to turn over <u>Brady</u> evidence.[2] <u>See</u>, <u>Brady v. Maryland</u>, 373 U.S. 83, 86 (1963). The right to have evidence beneficial to the criminal defendant turned over by the prosecution upon request is clearly established. <u>See</u>, <u>id.</u>

Connick's conduct is to be held reasonable "unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." <u>Thompson</u>, 245 F.3d at 457 (emphasis in original).

---

[2] Plaintiff also alleges violation of rights guaranteed by the 4th, 5th, 6th, and 8th amendments. Complaint ¶ 135. To the extent that these amendments apply to the states, it is through the 14th amendment's due process clause. <u>See</u>, 16A Am. Jur. 2d Constitutional Law § 404 (Thompson /West 2005).

Plaintiff has alleged that Connick ordered his assistants to conduct their investigations and prosecutions without regard for the constitutional duties imposed by Brady. See, Complaint (Rec. Doc. 1) ¶ 131. Plaintiff has alleged in addition that Connick failed to train and supervise his assistants as to what Brady requires despite the obvious need for training. *Id.* at ¶ 132. The legal issue before this Court is whether *all* reasonable district attorneys would have realized at the time of this prosecution that it violated the federal Constitution to compel assistant district attorneys to disregard Brady requirements or to fail to train them as to its requirements in the face of an obvious need for training. Considering the fact that Brady had been established precedent for twenty years, this Court finds that all district attorneys would so have realized, and that the conduct alleged by plaintiff is objectively unreasonable in light of clearly established law. Therefore, defendant Connick may not rely on qualified immunity to dismiss the individual claims against him.

3.   **The Merits of the Individual Supervisory Liability Claim Under Section 1983**

Although Defendants' arguments somewhat confuse qualified immunity with failure to raise a triable issue on the merits, it seems clear from the legal memoranda that Connick seeks summary

judgment on the basis of both.[3]

"'Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability. However, a supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation'" Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987)(citations omitted)). Plaintiff has not alleged that Connick was personally involved in Plaintiff's constitutional deprivation. To show "a sufficient causal connection" despite this, Plaintiff must demonstrate that "(1) the supervisor failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998). "For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837

---

[3] Cousin v. Small, 325 F.3d 627, 637-38 (5th Cir. 2003), heavily relied on by Defendants, also jumps this analytical track between immunity and the merits of the claim. As noted above, it is a common mistake.

(1994)).  Resolving all factual controversies in favor of the
non-moving party, this Court finds that Plaintiff has raised
genuine issues of material fact with respect to each of these
elements.

>    *a.  Did Connick Fail to Train?*

Connick presents evidence in the form of an affidavit that
informal training on <u>Brady</u> matters was periodically held in the
office during the relevant period.  <u>See</u>, Connick Aff. at ¶ 9.  The
record contains other evidence that the assistant district
attorneys did receive training.[4]  To raise a fact issue,
Plaintiff presents evidence in the form of deposition testimony
of the assistant district attorneys who prosecuted Plaintiff that
they received "on-the-job" training by trying "not to make the
same mistake twice," Williams's Depo. at 99:3-10, and "on-the-
job" training "learning as we go," Dubelier Depo. at 72:3-10.[5]

_____

[4] <u>See</u>, Connick Depo., at 27: 9-11("We had ongoing training
sessions in-house and out of house."); Dubelier Depo., at 71:8-10
("I don't recall specifically any training. I'm sure there was
training. I just can't remember."); Solino Depo., at 233: 10-16
("I vividly remember training sessions....And there was no doubt
in anybody's mind what their responsibility was to turn over
exculpatory evidence."); McElroy Depo., at 116: 3-5 ("All of what
I have discussed with you in terms of lessons, instructions, all
were occurring during this time period.").

[5] <u>See also</u>, Glas Depo., at 49:11-15, 50:21-25 ("I don't know
that I remember any formal trainings...I think it was mainly on-
the-job training."); Whittaker Depo., at 158:1-3, 159:1-5 ("I
don't recall ever being schooled on policies regarding evidence,
how to handle things like that....I don't recall there ever being
training on that. I don't recall there being training period. It

Neither party's evidence is conclusive of the issue of whether or how Connick trained his assistants regarding *Brady* materials.

### b.   Was There A Causal Link?

Connick argues that because no amount of training or supervision can ensure that <u>Brady</u> violations do not occur, Plaintiff cannot demonstrate the second element, a causal link. Def's Support Memo at 19. Connick points to no case law requiring such strict causation. Plaintiff indicates a list of <u>Brady</u> evidence that was not produced. Decisions subsequent to Plaintiff's prosecution have confirmed that this material should have been produced and, in fact, that the material exculpated Plaintiff. <u>See</u>, Complaint ¶¶ 62-71. This Court finds that, considering the evidence of inadequate training and supervision in the light most favorable to the plaintiff, a material issue exists as to whether a proper policy of training and supervision would have prevented some or all of the violations of Plaintiff's constitutional rights.

### c.   Was There Deliberate Indifference?

To establish deliberate indifference sufficient to support individual liability, Plaintiff must present evidence that Connick not only knew enough facts to infer the risk of constitutional violations, but also that he actually made the

---

was pretty much on-the-job- training.")

inference. <u>Smith</u>, 158 F.3d at 911-12. The record indicates that facts existed that would allow Connick to infer a substantial risk of <u>Brady</u> violations and that Connick in fact made the inference. Connick's own affidavit demonstrates that there were from 30 to 90 assistant district attorneys in his office screening between 12,000 and 17,000 charges a year and prosecuting approximately half of these, and that "it is often difficult for prosecutors as well as trial and appellate judges to distinguish that which is <u>Brady</u>." Connick Aff. ¶¶ 3,4,13. At the time Plaintiff's case was prosecuted, no formal policy on <u>Brady</u> had been promulgated, but within two years a policy manual was created to explain to assistants the office's policy. <u>Id.</u> ¶ 6. According to Connick, training was informal at the time Plaintiff was prosecuted, but within two years Connick established formal training classes at least once a year (some of which, he indicates, included <u>Brady</u> instruction). <u>Id.</u> ¶ 9. Interpreting this testimony in the light most favorable to Plaintiff, a jury could find that Connick had inferred that there was a substantial risk of <u>Brady</u> violations. Yet, Plaintiff has offered the deposition evidence cited above indicating that, at the time Plaintiff was prosecuted, training on the matter was minimal to non-existent. Thus, a genuine issue exists as to whether Connick exhibited deliberate indifference in failing to

21

train or supervise his assistants.

Because genuine issues of material fact exist as to each element of Plaintiff's section 1983 claim against Connick in his individual capacity, Connick's motion for summary judgment cannot be granted.

**D.    <u>Monell</u> Liability of the District Attorney's Office**

Plaintiff has named as defendants Harry Connick, Eric Dubelier, James Williams, and Eddie Jordan in their official capacities. The claims against Defendants in their official capacities are, in effect, claims against the District Attorney's ("DA's") office as an entity. <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985). Immunity defenses available to defendants sued in their individual capacities are not available to an entity. <u>Id.</u> Only sovereign immunity that the entity could claim as an entity, such as Eleventh Amendment immunity, is available. <u>Id.</u> DA's offices in Louisiana are local government entities not entitled to Eleventh Amendment immunity. <u>Burge v. Parish of Tangipahoa</u>, 187 F.3d 452, 466 (5th Cir. 1999).

An entity may only be held liable under section 1983 for the constitutional torts of its agents when an official policy of the entity itself caused the deprivation of plaintiff's rights. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 477-78 (1986) (quoting <u>Monell v. Department of Social Services</u>, 436 U.S. 658,

691 (1978)). The "official policy" requirement serves to distinguish acts of the entity from acts of its employees. Id. 479-80. Only the former are actionable. Three methods of establishing "official policy" have developed since Monell. These are: (1) where the appropriate officer promulgates a generally applicable statement of policy and the act complained of is simply an implementation of that policy; (2) where no rule has been announced as "policy" but the act of the policymaker itself violated federal law, such that policy and implementation are one; and (3) where the official policymaker has failed to act at all when the need is so obvious and the failure to act so likely to result in violation that the failure to act rises to a deliberate indifference tantamount to intent. Board of County Com'rs v. Brown, 520 U.S. 397, 418-19 (1997). Plaintiff's complaint alleges, alternatively and cumulatively, all three grounds for finding that the DA's office caused Plaintiff's rights to be violated. See, Complaint, (Rec. Doc. 1) ¶¶ 123-38.

## 1.   Implementation of Promulgated Official Policy

Plaintiff alleges that the DA's office had "maintained an official policy, practice, and/or custom of ordering and compelling assistant district attorneys of [the DA's office] to proceed with and maintain the investigation and prosecution of Plaintiff without concern for his constitutional rights." Id. ¶

23

131. The DA's office seeks summary judgment on this allegation based on evidence that, in fact, the DA's office's policy at all times was that assistants were to comply with the requirements of Brady and that no policy of withholding Brady evidence ever existed. See, e.g., Connick Aff. ¶¶ 7, 14; Dubelier Aff. ¶¶ 8-10; Williams Aff. ¶¶ 8-10, 13. In response, Plaintiff attempts to raise an issue of material fact regarding a generally applicable policy of non-production, which assistants Dubelier and Williams were simply implementing. Plaintiff does this by reference to deposition testimony indicating that Supplemental Police Reports and witness statements were rarely, if ever, turned over. See, Whittaker Depo. at 163-64; Williams Depo., Vol. I, at 97, 103-04, 170-71. However, each of these deponents was clear that he understood that he should produce the minimum materials required by law. See, Dubelier Depo., at 76-79; Williams Depo., Vol. II, at 359; see, also, Glas Depo., at 52; Whittaker Depo. at 160-61.

    This evidence bolsters the DA's office's version of the policy in place. The contention that assistant district attorneys were deciding for themselves what constituted Brady material supports the claims that they were themselves policymakers and/or that they were not trained. It does not necessarily point to a generally applicable official policy of withholding Brady material. The record, taken as a whole, tends to foreclose the

possibility that a reasonable trier of fact could find that the DA's office promulgated an official policy of non-production of <u>Brady</u> materials, which Williams and Dubelier implemented in prosecuting Plaintiff. However, the Court need not rule on this particular basis for official liability because, as discussed below, Plaintiff can defeat summary judgment by relying on the other bases.

### 2.  Violation by the Policymaker

In the absence of an official policy, the official policymaker's own violation of the law creates entity liability. Plaintiff does not claim that Connick withheld <u>Brady</u> material, but he does claim that assistants Dubelier and/or Williams were delegated final policymaking authority such that their failure to produce <u>Brady</u> material creates liability for the DA's office.

Entity liability may be established by a single act of a final policy maker. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority" <u>Id.</u> at 483. However, de facto policymaking authority is not enough. <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 131 (1988) (plurality opinion); <u>see also</u>, <u>Flores v. Cameron County</u>, 92 F.3d 258, 269-70 (5th Cir. 1996). Plaintiff must show that the official policymaker actually

25

delegated final policymaking authority to his officers. <u>See</u>, <u>Jett v. Dallas Ind. Sch. Dist.</u>, 7 F.3d 1241, 1251 (5th Cir. 1993).

In Louisiana, by legislative enactment a district attorney is the independent and final official policymaker for all prosecutorial and administrative functions of the DA's office. <u>See</u>, <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 469 (5th Cir. 1999). Therefore, if the district attorney delegated the final policymaking authority to his assistants to set forth the nature of <u>Brady</u>, then the violations of <u>Brady's</u> requirements by those assistants would subject the DA's office to section 1983 liability. That the district attorney may delegate final policymaking authority under Louisiana state law seems clear. <u>See</u>, La. Const. Art. 5 § 26(B) ("[A] district attorney, *or his designated assistant*, shall have charge of every criminal prosecution by the state in his district") (emphasis added); La. R.S. 16:1(C) (same, specific to Parish of Orleans). <u>See, also</u>, <u>Mairena v. Foti</u>, 816 F.2d 1061, 1065 (5th Cir. 1987) (finding that the trial division chief under the district attorney was himself delegating policymaking authority to lower level assistants for purposes of section 1983 liability).

The DA's office contends that because the district attorney, Connick, established the DA's office's policy on <u>Brady</u>, which Williams and Dubelier were simply following, they cannot be

considered final policymakers responsible for setting forth the nature of <u>Brady</u>. <u>See</u>, Def. Reply at 18. Connick testified that the only policy regarding <u>Brady</u> in the DA's office was that later formalized in Section 5.25 of the Policy Manual. Connick Aff. ¶ 7. Section 5.25 reads:

5.25  <u>PRE-TRIAL – BRADY MATERIAL</u>

In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so called <u>Brady</u> material - - - that is, information in the possession of the State which is exculpatory regarding defendant. The duty to produce <u>Brady</u> material is ongoing and continues throughout the entirety of the trial. Failure to produce <u>Brady</u> material has resulted in mistrials and reversals, as well as extended court battles over jeopardy issues. In all cases, a review of <u>Brady</u> issues, including apparently self-serving statements made by the defendant, must be included in a pre-trial conference and each Assistant must be familiar with the law regarding exculpatory information possessed by the State.

<u>Id.</u> Ex. A.

Plaintiff has adduced evidence that there was no written <u>Brady</u> policy at the time of the prosecution and perhaps no policy

at all that was communicated to the assistants. See, § C.3.a. supra. Plaintiff argues that even if section 5.25 does reflect the policy of the office at the time, it offers no guidance on the substance of prosecutors' duties under Brady. See, Pl.'s Opp. at 32. Plaintiff has adduced evidence that Williams and Dubelier were not required to receive pre-trial supervision. See, Solino Depo. at 67, 72. Finally, Plaintiff argues that the policy as later formalized in section 5.25 is an incorrect statement of the duties of a prosecutor under Brady in that it limits Brady material to exculpatory material. Pl.'s Opp. at 14.

A genuine issue of material fact exists as to just what the DA's policy on Brady materials was at the time of Plaintiff's prosecution. In addition, this Court finds that the DA's contention that Williams and Dubelier were simply following the policy later set forth in section 5.25 glosses over the level of generality of the "final" policy. When coupled with Plaintiff's evidence of a lack of training and supervision (considered true for purposes of this motion), the policy amounts to little more than "obey the law as you understand it." Indeed, the deponents testified that this was their understanding of the DA's policy. See, Dubelier Depo., at 76-79; Williams Depo., Vol. II, at 359; see, also, Glas Depo., at 52; Whittaker Depo. at 160-61. Under this scenario, the policy is itself an actual delegation of

policymaking authority to those implementing it. The assistant DA's were authorized to create the office's policy on the nature of <u>Brady</u> duties. As noted above, a single act by a policymaker can subject the entity to section 1983 liability. "[A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." <u>Pembaur</u>, 475 U.S. at 481. Considering the foregoing, Plaintiff has raised sufficient material fact issues about whether Williams and Dubelier were final policymakers to survive summary judgment.

### 3.  Failure to Act Rising to the Level of Deliberate Indifference

Where the need to act and the likelihood of violation from inaction are exceedingly obvious, the official policymaker's "deliberately indifferent" failure to act creates entity liability. The deliberately indifferent standard is more stringent than any form of negligence; rather it is "a lesser form of intent." <u>Doe v. Taylor Independent School Dist.</u>, 15 F.3d 443, 453 n.7 (5th Cir. 1994)(en banc). The "deliberately indifferent" standard for entity liability as followed in this

circuit was established in <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989), and is basically the same as the standard for individual liability. <u>See</u>, <u>Doe v. Taylor Ind. School Dist.</u>, 15 F.3d at 453-54. "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." <u>Thompson</u>, 245 F.3d at 459. However, "[s]uch a policy choice may be inferred even without a pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference." <u>Board of County Com'rs  v. Brown</u>, 520 U.S. at  418 (citing <u>City of Canton</u>, 489 U.S. at 390 n.10); <u>see also</u>, <u>Grandstaff v. City of Borger</u>, 767 F.2d 161 (1985) (finding a single egregious violation with no corrective measures afterward sufficient to support knowledge and acquiescence by the policymaker) <u>abrogated on other grounds by</u>, <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 167 (1993).

In <u>Canton</u>, the Supreme Court gave the following example of the level of obviousness needed to establish deliberate indifference absent a pattern: "For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its

officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." <u>City of Canton</u>, 489 U.S. at 390 n.10 (citation omitted).

Plaintiff presents the following evidence to support his claim of deliberate indifference:

1) that the DA's office knows that <u>Brady</u> issues are complex and ambiguous;

2) that the DA's office had no written policy manual addressing <u>Brady</u> or other issues despite an ABA standard calling for such a manual;

3) that the DA's office cannot produce or identify any written guidance on <u>Brady</u> compliance from the period of plaintiff's prosecution;

4) that the later-written policy identified by the DA's office mistakenly limits <u>Brady</u> material to "information that is exculpatory regarding the defendant";

5) that the later-written policy manual gives little guidance on complying with <u>Brady</u>;

6) that no deponent could identify any training sessions on <u>Brady</u>;

7) that several deponents conceded that they were not formally trained, and that no one in the office received formal training;

8) that Judge Calvin Johnson of the Criminal District Court for the Parish of Orleans felt it necessary to write a letter of concern to the DA's office regarding the failure to turn over Brady material;

9) that numerous cases have established Brady violations by the DA's office; and

10) that the DA's office was unable to identify any corrective measures taken in response to Brady violations identified by the courts.

Defendants argue that the Fifth Circuit's decision Cousin v. Small, 325 F.3d 627, 637-38 (5th Cir. 2003), forecloses Plaintiff's section 1983 claim. In Cousin, the Court of Appeal upheld the district court's finding that citation to a small number of cases involving Brady violations out of the "tens of thousands" of cases handled by the DA's office over the period was insufficient to raise a triable issue of fact with respect to deliberate indifference. Id. Defendants argue that Cousin upholds a district court adjudication "fully analyzing the entire breadth of Connick's term in the OPDA and finding no pattern, no custom, no failure to train or supervise." Def.'s Reply at 11.

This Court does not read Cousin so expansively as having decided as a matter of law that the DA's office was not deliberately indifferent during Connick's entire term with respect to training and supervision regarding Brady duties. Unlike in Cousin, Plaintiff in this case does not attempt to establish a de facto pattern by way of a statistical analysis of Brady reversals.[6] Although the numerous cases where courts have found Brady violations clearly constitute "proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights," Thompson, 245 F.3d at 459, they may or may not establish a "pattern." However, as demonstrated in Canton, a pattern is not necessarily required when the need to train and supervise is "so obvious."

Following Canton's "so obvious" standard, and viewing the evidence in the light most favorable to plaintiff, the DA's office knew to a moral certainty that assistants would acquire Brady material, that without training it is not always obvious what Brady requires, and that withholding Brady material will virtually always lead to a substantial violation of

---

[6] Defendants do offer the statistic that six additional cases pointed out by Plaintiff only raise the frequency of possible Brady reversals during the 25 year period 0.2%. Def.'s Reply at 13. The statistic is, of course, meaningless in that the number of reversals does not indicate the number of violations or, as the Fifth Circuit pointed out, deliberate indifference. This Court cannot rely on inexpert statistical analysis that does little more than divide one incidental number by another.

constitutional rights. A reasonable jury could find that the need for training in this situation is so obvious that the failure to offer it could properly be characterized as "deliberate indifference," which caused plaintiff's injury. Compare, Walker v. City of New York, 974 F.2d 293, 300 (2d Cir. 1992) (applying the same analysis to reach the same conclusion).

**E.    STATE LAW CLAIMS**

**1.    Malicious Prosecution**

The elements for malicious prosecution are:  "(1) the commencement or continuance of an original criminal or civil proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for the original proceeding; (5) the presence of malice therein; and (6) damage resulting to the plaintiff." Plessy v. Hayes Motor Co., Inc., 742 So. 2d 934, 938 (La. App. 2 Cir. 1999). As indicated by the first element, Plaintiff's claim for malicious prosecution concerns the commencement of the prosecution against him, not an action for failure to train or supervise, or for a "malicious" policy. In Knapper v. Connick, 681 So. 2d 944, 950 (1996), the Supreme Court of Louisiana held that prosecutors are absolutely immune from liability for actions that "fall within the scope of the prosecutor's role as an advocate for the state

34

and are intimately associated with the conduct of the judicial phase of the criminal process." The Court followed <u>Buckley's</u> functional analysis to determine the scope of the immunity. <u>Id.</u> The conduct of Defendants in "the commencement or continuance" of Plaintiff's prosecution falls squarely within the traditional role of a prosecutor as advocate for the state. Therefore Defendants are immune under Louisiana law, and summary judgment dismissing this claim is appropriate.

### 2.    Intentional Infliction of Emotional Distress

The elements for Intentional Infliction of Emotional Distress are: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that the defendant knew that severe emotional distress would be certain or substantially certain to result from his conduct. <u>Darden v. Smith</u>, 879 So. 2d 390 (La. App. 3 Cir. 2004). Plaintiff seeks damages for this tort in connection with the Defendants' conduct in prosecuting Plaintiff. <u>See</u>, Pl. Complaint ¶¶ 116-22. As explained above, Louisiana grants absolute immunity for prosecutorial advocacy.

<b>CONCLUSION</b>

For the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Rec. Doc. 39) is **GRANTED IN PART** regarding the Plaintiff's State

35

law claims of Malicious Prosecution and Intentional Infliction of Emotional Distress.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Rec. Doc. 39) is **DENIED IN PART** regarding the remainder of Plaintiff's claims.

New Orleans, Louisiana, this <u>15th</u> day of November, 2005.

CARL J. BARBIER
UNITED STATES DISTRICT COURT