1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

    ****************************************************************
4

5   JOHN THOMPSON

6                              CIVIL ACTION NO. 03-2045 "J"
    V.                         NEW ORLEANS, LOUISIANA
7                              MONDAY, FEBRUARY 5, 2007, 1:45 P.M.

8   HARRY F. CONNICK, ET AL.

9
    ****************************************************************
10

11                          **VOLUME I**
                   TRANSCRIPT OF TRIAL PROCEEDINGS
12            HEARD BEFORE THE HONORABLE CARL J. BARBIER
                   UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15

16  FOR THE PLAINTIFF:      MORGAN, LEWIS & BOCKIUS, LLP
                            BY:  J. GORDON COONEY, JR., ESQUIRE
17                               MICHAEL L. BANKS, ESQUIRE
                                 S. GERALD LITVIN, ESQUIRE
18                          1701 MARKET STREET
                            PHILADELPHIA, PENNSYLVANIA, 19103
19

20  FOR THE DEFENDANT:      GOINS AARON, PLC
                            BY:  RICHARD GOINS, ESQUIRE
21                               WILLIAM D. AARON, ESQUIRE
                                 MARK C. CARVER, ESQUIRE
22                          1010 COMMON STREET, SUITE 2600
                            NEW ORLEANS, LOUISIANA  70112
23

24
    ALSO PRESENT:           HARRY CONNICK
25                          EDDIE JORDAN

```
1   OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RPR, CRR
                                  500 POYDRAS STREET, ROOM B406
2                                 NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7779
3

4   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **I N D E X**

2

3    Examinations                                         Page

4    OPENING STATEMENT BY MR. COONEY........................   5

5    OPENING STATEMENT BY MR. AARON.........................  24

6    STIPULATED FACTS.......................................  42

7    **JAMES WILLIAMS**.........................................  54

8    DIRECT EXAMINATION BY MR. BANKS........................  55

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      P-R-O-C-E-E-D-I-N-G-S

 2                  MONDAY, FEBRUARY 5, 2007

 3                 M O R N I N G   S E S S I O N

 4                      (In Open Court)

 5

 6           THE DEPUTY CLERK:  All rise.

 7           THE COURT:  Good morning, everyone.  Please be seated.

 8   Call this case.

 9           THE DEPUTY CLERK:  Civil Action #03-2045, *John Thompson*

10   *v Harry Connick, et al.*

11           THE COURT:  All right.  Counsel, please make your

12   appearances and introduce your clients.

13           MR. BANKS:  Your Honor, Michael Banks.  I'm co-counsel

14   with Gordon Cooney and Jerry Litvin, and our client is

15   John Thompson.

16           THE COURT:  All right.  Very well.

17           MR. AARON:  I'm Bill Aaron on behalf of the defendants.

18   Joining me is my partner Richard Goins and my associate

19   Mark Carver.  One of the named defendants in the case is

20   Harry Connick.  Another named defendant in the case is

21   Eddie Jordan.  There are two other defendants that will be coming

22   in later.  One is coming from out of town.

23           (WHEREUPON, the jury was selected and a recess was taken

24   until 1:45 p.m.)

25           THE DEPUTY CLERK:  All rise.
</pre>

1           (WHEREUPON, the jury panel enters the courtroom.)

2           THE COURT:  Good afternoon.  Please be seated.  I hope

3    everyone finds the temperature a little bit more comfortable.

4    Hopefully it won't get too hot.  Usually we swing from one

5    extreme to the other around here, but we'll see what we can do.

6    Who is going to make the --

7           MR. COONEY:  I will, Your Honor.

8                        OPENING STATEMENT

9    BY MR. COONEY:

10          May it please the Court and ladies and gentlemen of the

11   jury, on April 19, 1999, John Thompson, was sitting in his 6-foot

12   by 9-foot prison cell on death row at the Louisiana State

13   Penitentiary in Angola.  Fourteen years earlier, prosecutors had

14   charged and convicted John of two crimes, a December 6, 1984,

15   murder, and a December 28, 1984, attempted armed robbery, which

16   was used by the prosecutors strategically as part of the murder

17   case.  Mr. Thompson at that point had been in prison for

18   14 years, since January of 1985, and had been on death row since

19   1987.

20          As he sat in his cell, he learned that there were two

21   visitors that had come to see him, and he was escorted into a

22   room where he met with his two lawyers.  His lawyers told him

23   that all of his appeals had been exhausted and that the Court had

24   signed a writ of execution calling for his death in one month, on

25   May 20, 1999.

1    Now, John had endured the fear and the uncertainty of six
2  prior death warrants in the case and so he asked his lawyers
3  about the possibility of a stay.  The lawyers told Mr. Thompson
4  that all appeals had been exhausted and although they were
5  working on something, some things, John Thompson had to prepare
6  himself to die in one month.
7    John asked, "What's the date?  "May 20th," replied his
8  lawyers, and John's head sunk.  John's youngest son John Jr., who
9  was three years old when John went to prison in 1985, was
10 scheduled to graduate from high school the next day, on May 21,
11 1999.
12   So John spent the remainder of the time that afternoon
13 talking to his lawyers and getting them to promise him that they
14 would look after his sons after he was gone.
15   Literally later that day, after John was back in his jail
16 cell on death row, a private investigator who had been hired by
17 John's lawyers had uncovered evidence that had been concealed by
18 the prosecutors in 1985, and ladies and gentlemen that evidence
19 broke the case open.
20   The armed robbery conviction was dismissed, and although it
21 took another four years, Mr. Thompson received a new murder trial
22 in 2003.  When that occurred, it took the jury only 35 minutes to
23 acquit Mr. Thompson, and on May 9, 2003, John Thompson walked out
24 of prison a free man for the first time in 18 years.
25   And so, ladies and gentlemen, this case is about a

1   prosecutor's obligation to produce evidence that's favorable to

2   the accused in a criminal case.  And it's about the prosecutor's

3   pattern in this case of failing to disclose favorable evidence to

4   John Thompson from both cases back in 1985.  And it's about the

5   policies and the practices of the District Attorney's Office that

6   caused that to happen.

7       Now, who are the parties in the case?  Well, first,

8   Mr. Thompson, who has been introduced to you.  As I mentioned, he

9   spent 18 years of his life in prison.  Since he's been out of

10  prison, he married, became a homeowner, held two steady jobs

11  before Katrina and has started two businesses since Katrina.

12      Back in 1984 or 1985, however, John made his living on the

13  street buying and selling stolen property and involving himself

14  in some small-time marijuana and PCP transactions.  And you'll

15  hear that that is how he found himself in the prosecutor's

16  crosshairs in this case.

17      The defendants in the case are the Office of the District

18  Attorney and several individual prosecutors.  First, a man by the

19  name of Eric Dubelier, who you will hear was the third highest

20  ranking prosecutor in the District Attorney's Office at the time.

21  He was the lead prosecutor in the murder case.  He was also

22  involved in the armed robbery case against Mr. Thompson.

23      Mr. Williams, who is sitting at counsel table here, who was

24  also one of the prosecutors in both of the criminal cases against

25  Mr. Thompson, he was a senior homicide prosecutor in the office

1    at the time.

2         Mr. Connick, who was the district attorney in Orleans Parish

3    at the time and Mr. Jordan, who is the current district attorney

4    and has been sued as the successor to Mr. Connick.

5         And what do we say happened in this case, ladies and

6    gentlemen?  We say that in violation of the law, the prosecutors

7    handling John's case withheld critical favorable evidence from

8    him and his lawyers at the time of the 1985 trial.

9         And Mr. Dubelier, Mr. Williams and other members of the

10   District Attorney's Office were directly involved in the

11   withholding of that evidence.  And that the District Attorney's

12   Office had adopted certain policies that caused those actions to

13   be taken and had failed to implement the necessary training and

14   emphasis on the importance of producing favorable evidence that

15   also caused this to occur.

16        Now, let me take a step back for a second and talk about the

17   history of the prosecution so that you understand it.  In the

18   very early morning hours of December 6, 1984, a man by the name

19   of Raymond Liuzza, Junior, who was the son of a very prominent

20   New Orleans hotel executive was killed outside his home near

21   Josephine and Baronne Streets here in New Orleans.

22        The murder of Mr. Liuzza sparked a loud public outcry about

23   safety in New Orleans.  It prompted two separate award funds and

24   put an enormous amount of pressure on the prosecutors and all law

25   enforcement to apprehend the perpetrator.

1    Nearly six weeks after the murder, on January 17, 1985, a

2  man by the name of Kevin Freeman and John Thompson were arrested

3  and indicted for the Liuzza murder.

4    Immediately after the arrest, Mr. Freeman said, although he

5  was there, his story was, Mr. Thompson had done the shooting and

6  he, Freeman, just fled the scene as soon as he realized something

7  bad was happening.

8    Three weeks after the murder, December 28, 1984, and three

9  weeks before the arrest, there was a completely unrelated

10 carjacking that took place outside the Superdome.  Three

11 children, the LaGarde children, an older brother, a younger

12 brother and a younger sister, were getting into their car when a

13 young man carjacked them or attempted to carjack them.

14   They managed to get away from the carjacker.  There was

15 actually a struggle in the car, and the older brother managed to

16 fend off the carjacker and the carjacker fled.  There were no

17 suspects identified at that time.

18   Let's go back then to the date that John's arrested,

19 January 17th.  The murder is December 6th, the carjacking is

20 December 28th, John is arrested on January 17th.  The next

21 morning, January 18th, Mr. Thompson's picture appeared on the

22 front page of the *Times-Picayune* as the suspect in the murder

23 case.  And the father of the three LaGarde children sees the

24 picture of the murder suspect in the newspaper and asks his

25 children, Is this murder suspect the man that tried to carjack

1   you?  And two of the three children tentatively identified

2   Mr. Thompson from that picture as the perpetrator of the

3   carjacking case, and the father called the District Attorney's

4   Office.

5        As a result, John was charged with the carjacking of the

6   LaGarde children, the armed robbery of the LaGarde children.  The

7   same assistant district attorneys, Mr. Dubelier and Mr. Williams,

8   were assigned as special prosecutors in both the murder case and

9   in the carjacking case.

10       These men, Dubelier and Williams, managed to convince the

11  original trial judge to reverse the order of the trials so that

12  the carjacking case would be tried first and the murder case

13  would be tried second.  And you will hear these defendants admit

14  that the prosecution of the carjacking, or armed robbery case,

15  was an important strategic part of their murder prosecution, and

16  what they were trying to do was two things, they will admit this,

17  what they were trying to do was get a conviction in the

18  carjacking case so it would be very difficult or impossible for

19  John Thompson to get on the witness stand and defend himself in

20  the murder case.

21       Secondly, what they wanted to do, if they could get a

22  conviction on guilt in the murder case, they wanted to use the

23  carjacking conviction to argue to the jury that John Thompson

24  should die.

25       Now, before the armed robbery trial, Mr. Thompson's lawyers

1  asked for the production of any evidence that was favorable to

2  Mr. Thompson, including any scientific evidence.  The defendants

3  admit that the prosecutors didn't produce any scientific evidence

4  from the carjacking case.  In fact, however, the prosecutors had

5  obtained and actually tested blood evidence from the armed

6  robbery crime scene.

7       As I mentioned to you, there was a struggle between the

8  older brother and the perpetrator, and the perpetrator bled on

9  the pant leg of the older brother.  And the crime scene

10 investigators took a swatch of the pant leg from the older

11 brother with the perpetrator's blood on it.

12      Defendant Dubelier, Williams and other assistant district

13 attorneys, we will show you, all knew about the blood evidence.

14      Two days before the armed robbery trial, the District

15 Attorney's Office received a crime lab report which showed to a

16 scientific certainty that the armed robber had type B blood.  It

17 is also undisputed, ladies and gentlemen, that John Thompson has

18 type O blood.  John Thompson could not have been the perpetrator

19 in the armed robbery.

20      And we'll show you a picture of the crime lab report.

21      This is the crime lab report.  It's dated April 9, 1985, two

22 days before the armed robbery trial.  It's addressed to the

23 District Attorney's Office, attention Mr. Bruce Whittaker, and it

24 says down here in the middle that "The specimen 1 yielded

25 positive serological results for Group B human blood."

1     As I said, without question, John Thompson had type O blood,

2   and he could not have been the robber.

3     You're going to hear that Mr. Whittaker, who received this

4   report in the District Attorney's Office, placed the report on

5   Mr. Williams's desk right before the armed robbery trial, and

6   despite their legal obligation to produce that evidence to the

7   defense, it was never produced, ladies and gentlemen.

8     Unimaginably, the prosecutors went forward with the armed

9   robbery case anyhow, and on April 12, 1985, even though

10  John Thompson, to a scientific certainty, was not the armed

11  robber, John was convicted of attempted armed robbery and was

12  sentenced to forty-nine-and-a-half years without the possibility

13  of parole.

14    Now, before talking about the murder trial for a second, let

15  me just talk for a minute about the nature of the legal

16  obligation that prosecutors have with regard to the production of

17  evidence in criminal cases.  This constitutional duty, and it's

18  under the Constitution, the legal duty that we're talking about

19  here is a duty that arises under the U.S. Constitution.

20    This constitutional duty is sometimes called the *Brady*

21  doctrine.  You'll hear the term *Brady* from time to time

22  throughout the trial.  The reason for that is *Brady* is the name

23  of a case from the United States Supreme Court in 1963, entitled

24  *Brady v Maryland*.  And the *Brady* doctrine, ladies and gentlemen,

25  is basic to the fairness of our criminal justice system.

1    Although a prosecutor acts as an advocate for the
2  government, he really has a greater responsibility than just as a
3  mere advocate.  Under the *Brady* doctrine, the prosecutor has an
4  obligation to produce to the defense all evidence that would be
5  favorable to the defense, and that would mean evidence that might
6  be used to help he exculpate or show that the defendant is not
7  guilty, evidence that could be used to cross-examine the
8  government's witnesses to show that those witnesses have a motive
9  or might be lying or not telling the truth, evidence that's
10  favorable to the accused.

11    And the reason for that is the job of the prosecutor is not
12  simply to get convictions, the job of the prosecutors is to make
13  sure that justice is done, based on all of the evidence.

14    You're also going to hear that *Brady* is an evolving body of
15  law.  You can't just go to this 1963 Supreme Court case and know
16  what *Brady* requires.  There are cases that are decided over the
17  years by different courts that explain and clarify the obligation
18  on the part of the prosecutors to produce favorable evidence.

19    So let's go back now to the 1985 murder trial.  John's
20  lawyers didn't know about the hidden blood evidence, but there
21  are other issues for appeal with regard to the carjacking case,
22  and so one of the things that the lawyers did at that time was to
23  ask the judge to keep out of evidence in the murder case any
24  evidence that related to the carjacking conviction.  But because
25  the court, too, didn't know about the hidden blood evidence, the

1  judge denied that request and ruled that the state would be
2  allowed to offer evidence about the armed robbery/carjacking
3  conviction if John testified in his own defense.

4      So what that meant as a practical matter was that
5  John Thompson could not take the stand in the murder case and
6  explain to the jury he wasn't the murderer and he wasn't even
7  there.

8      The prosecutors thus succeeded in their first strategic
9  objective, they kept John Thompson off the witness stand.

10      John's lawyers tried to show in 1985, ladies and gentlemen,
11  that there had only been one perpetrator at the scene and that
12  the real killer was Freeman, but they didn't have the hard
13  evidence in the state's possession that would have helped them to
14  make that point.  And John was unable to explain that he was not
15  the murderer because of the carjacking conviction.  And so John
16  Thompson was convicted of murdering Raymond Liuzza.

17      Now, you'll hear that in capital cases, cases involving the
18  death penalty, the trial is divided into two parts:  There is the
19  guilt phase and then if the defendant is found guilty, there is
20  the penalty phase.

21      And in the penalty phase, it doesn't matter whether the
22  defendant has taken the stand or not, if there are prior
23  convictions, that's something that the jury is entitled to see.
24  So based on the armed robbery conviction, Mr. Williams put on the
25  witness stand and had the jury hear the testimony of a little

1   girl who was in the car when it was carjacked say several times

2   that Mr. Thompson was the one that carjacked her and unless her

3   older brother had been a hero, there would be three more dead

4   people.

5        And Mr. Dubelier argued in front of the jury that John

6   Thompson had already gotten a sentence for forty-nine-and-a-half

7   years without possibility of parole and that the only way the

8   jury could punish him for the murder of Mr. Liuzza was to kill

9   him, and the jury voted to sentence John Thompson to death.

10       For the next 14 years, ladies and gentlemen, John's lawyers

11  filed a series of appeals, and during this 14-year time period,

12  there were six death warrants entered against John Thompson.

13       As I mentioned, by April 1999, however, all appeals had been

14  exhausted, and on April 16, 1999, the court signed the seventh

15  and what seemed to be final death warrant in the case.

16       As I mentioned, right at that time, 14 years after

17  John Thompson had been charged and put away in prison, a private

18  investigator found a copy of the blockbuster crime laboratory

19  report showing to scientific certainty that John Thompson was not

20  the robber.

21       After discovering that report, John's lawyers located a

22  former assistant district attorney by the name of

23  Michael Riehlmann who had information about the blood evidence.

24  And in an affidavit, Mr. Riehlmann said -- it's probably hard to

25  read from here but what he said is, Gerry Deegan was a close,

1    personal friend of mine and he was also an assistant district

2    attorney between 1984 and 1987.  He and Jim Williams were the

3    trial attorneys in the armed robbery trial of John Thompson.  At

4    some point prior to 1994 and after 1985, the late Gerry Deegan

5    said to me that he had intentionally suppressed blood evidence in

6    the armed robbery trial of John Thompson that in some way

7    exculpated the defendant.

8        Mr. Thompson's lawyers presented that evidence of

9    Mr. Thompson's innocence and of the prosecutorial misconduct to

10   the district attorney, and Mr. Connick had little choice but to

11   file a motion with the court seeking to dismiss the armed robbery

12   charge.

13       John's life literally was saved by the investigator finding

14   that crime laboratory report.  The May 20th execution was stayed,

15   and ultimately the armed robbery conviction was thrown out.

16       Given this revelation regarding the blood evidence in the

17   armed robbery case, John's lawyers got greater access to the

18   district attorney's and the police's files in the murder case

19   where additional favorable evidence regarding the murder case was

20   discovered.  And even though the armed robbery case and the

21   murder case involved the same two prosecutors, and that the armed

22   robbery case was a strategic part of the murder case,

23   Mr. Connick, the district attorney, saw no reason to see whether

24   there were problems with the murder evidence, and he opposed all

25   of John Thompson's efforts to secure a new murder trial.  And so

1  John remained in prison.

2      Nearly three years later, in the summer of 2002, John has

3  been in jail now 17 years, the Louisiana Court of Appeals

4  reversed John Thompson's murder conviction and gave him a new

5  trial.  Mr. Connick didn't accept that conclusion and filed an

6  appeal to the Louisiana Supreme Court, so John remained in prison

7  further.  But in May 2003, after more than 18 years in prison,

8  John Thompson finally got his full day in court.  With the armed

9  robbery conviction vacated, John was able to testify on his own

10 defense, telling the jury he didn't kill Mr. Liuzza.

11     His lawyers were also able to present the testimony of

12 witnesses who are identified in police reports that were never

13 provided to the defense, and also were able to use a number of

14 documents that were in the possession of the state that tended to

15 show that John Thompson was not the perpetrator and that

16 Mr. Freeman was.

17     On May 8, 2003, as I said, the jury found John Thompson not

18 guilty of the Liuzza murder, and it took them only 35 minutes to

19 reach that conclusion.  So let's just talk for a second about

20 some of the concealed evidence in the case.

21     First, we have the crime lab report, which you've seen

22 before.  And there's absolutely no dispute that that was not

23 produced to the defense.  The defendants may try to tell you that

24 the concealment of this blood report was an isolated bad act by a

25 rogue district attorney by the name of Gerry Deegan, who was

1   assisting Mr. Williams with the robbery trial.

2       If you look at the documents in the case, however, the

3   documents will show that Assistant District Attorneys Whittaker,

4   Williams, and Dubelier all knew that there was blood evidence

5   taken from the crime scene, Mr. Whittaker received the crime lab

6   report and put it on Mr. Williams's desk, and Dubelier, who was

7   initially the lead prosecutor in the robbery case, received a

8   memorandum from Whittaker suggesting that they test the blood.

9   Ladies and gentlemen, Deegan, a junior district attorney in these

10  very high-profile cases, did not act alone.

11      You'll also see from the way the witnesses were questioned

12  in the armed robbery case by both Deegan and Williams that these

13  lawyers were very careful not to ask any questions in the robbery

14  trial that would suggest the existence of blood, even though a

15  bloody struggle between the perpetrator and one of the victims

16  would have made powerful evidence to present to the jury.  And

17  indeed, Mr. Williams has admitted that he stayed away from the

18  blood evidence or any evidence regarding, or issues regarding

19  blood in the armed robbery case.

20      Secondly, just as an example, there was evidence regarding

21  the description of the perpetrator in the murder case, and you'll

22  see that the concealment of the crime laboratory report with

23  regard to the blood is simply a part of the pattern of

24  concealment that was involved in this case.

25      I want to give you two examples.  There was a witness at the

1    crime scene in 1984, at the murder crime scene named

2    Paul Schliffka.  And Paul Schliffka gave a description of the

3    perpetrator to the police, and there are several police reports

4    that contain Schliffka's description.

5        Let me give you two examples.  First, a supplemental police

6    report which contains Schliffka's description of the perpetrator

7    in the following way:  "Negro male, early 20s, six feet tall,

8    slim, dark complexion, close-cut hair -- close-cut hair --

9    wearing a black nylon jacket and dark pants, possibly blue

10   jeans."  That was from December 6, 1984.

11       Another police report, if we could go to Exhibit 5, James,

12   which contains Schliffka's description in very similar terms,

13   "Black male, early 20s, six feet tall, dark complexion, short

14   hair, wearing a nylon jacket and dark colored pants.

15       These reports were favorable to Mr. Thompson for two

16   reasons:  First, height and second, hair length.  It's undisputed

17   that Mr. Freeman, who was also charged with Mr. Thompson, was

18   six feet tall and went by the nickname of "Kojak" because of his

19   short hair.

20       Mr. Thompson is five feet, was five-foot-eight, and the

21   District Attorney's Office had this picture of Mr. Thompson that

22   was taken less than a week after the murder.  That picture with

23   that hair, the District Attorney's Office had that picture with

24   that hair, and they also had descriptions from Mr. Schliffka that

25   described the perpetrator as having close-cut hair or short hair.

1    And ladies and gentlemen, there is no dispute, those police

2    reports weren't provided to the defense.

3        And you'll see that this was not inadvertent, ladies and

4    gentlemen.  The prosecutors went to great lengths to hide the

5    hair-length defense from John's lawyers at the time of trial.

6        And the first thing that happened in this regard, and I'll

7    just give you a quick overview, was that John's lawyers asked the

8    prosecutors to provide information regarding any eyewitnesses who

9    may have had a description of the perpetrator.  The first

10   response from the District Attorney's Office was not to identify

11   Mr. Schliffka at all.  They went back and amended their response

12   and what they said was, Paul Schliffka described a man leaving

13   the vicinity of the crime as being approximately six feet tall.

14   No mention about hair length.  Additionally, Mr. Schliffka failed

15   to make an identification from a photo lineup conducted on

16   January 17, 1985.  No mention of hair length.

17       This pattern of concealment, concealing the hair length

18   issue, continued through trial.  Mr. Dubelier, one of the

19   defendant prosecutors in this case, called police officer David

20   Carter, who went to the crime scene in 1984.  And he claimed

21   Schliffka's description of the perpetrator was a black male

22   described as being about six feet tall, he was wearing a black

23   leather jacket and dark pants.  He was also dark complected.  No

24   mention of the hair length.

25       On cross-examination, Mr. Thompson's lawyers asked Officer

1    Carter, Did you have any information about the hair length?

2    Carter's first response, I don't remember.

3        John's lawyer, not having the police report, said to the

4    judge, Judge, would you ask the police officer to go consult

5    whatever police reports he had and come back and tell us whether

6    there is anything in the police report about hair length.

7        So Carter goes and huddles with the prosecutors and they

8    look at these reports and they come back and what he said was,

9    the hair was black and short, Afro style.

10        You will not see the phrase Afro style, ladies and

11   gentlemen, in any of the police reports at issue in this case.

12   The prosecutors let the witness add a completely new phrase to

13   the description, which totally changed the identification of the

14   description of the witness.  And the prosecutor did not give the

15   defense the document that would have been necessary and helpful

16   to show that, no, the description that was given when the event

17   took place on December 6, 1984, was close-cut or short hair.

18   There was no reference to Afro style and this suggestion of Afro

19   style didn't even happen until they had to identify John Thompson

20   as the suspect, whom they know had longer hair.

21        Ladies and gentlemen, you will hear Mr. Dubelier, who is not

22   in this courtroom today but one of the defendants, try to defend

23   even to this day in the depositions in this case that there is no

24   inconsistency between that description of short hair or close-cut

25   hair and that photograph.  And he will also tell you that

1   withholding description was consistent with the policy of the

2   office at the time.

3        I'm not going to go into the other favorable evidence.

4   You'll hear that during the course of the trial.  But I wanted to

5   give you an example of some of the kinds of things that were not

6   produced to John's defense at the time of these two prosecutions.

7        So how did this all happen?  First, you're going to hear

8   that the Office of the District Attorney did not file something

9   called open-file discovery, under which a district attorney

10  provides full access to everything in the state's possession.

11       You'll also hear that they did not follow the standards and

12  policies laid out by the American Bar Association in 1980.

13       And third, you'll hear that although it should have been

14  apparent to Mr. Connick, that there was a need for training and

15  guidance and emphasis to his prosecutors on the need to

16  scrupulously follow training.  There was simply inadequate

17  training and inadequate emphasis on the obligations of the

18  prosecutor and how they have to comply with the *Brady* obligation.

19       Now, what was the impact that all of this had on

20  John Thompson?  John spent 18 years of his life in jail, mostly

21  on death row at Angola.  And you're going to hear about life as a

22  death row inmate.  The 6-foot by 9-foot jail cell for 23 hours a

23  day.  The stench on death row.  The cold in winter.  The

24  sweltering heat in summer.  The noise.  The fear.  And the

25  feeling, as one by one, a procession of other inmates around him

 1   are led off to their death.

 2        And you'll hear about the events in John's life that he

 3   missed:  Being there while his sons grew up.  Learning that his

 4   girlfriend had gone off to get married.  The death of his

 5   grandmother who had raised him.  The death of his father.  His

 6   youngest son's graduation from high school.  And you'll hear

 7   about how John Thompson had to deal with seven writs of execution

 8   and the prospect of facing first the electric chair and then

 9   lethal injection.

10        One or two quick words about procedure before I sit down.

11   Some of the evidence that you're going to hear in this case is

12   going to come from the form of undisputed or stipulated facts.

13   And the parties have agreed to these facts and that they are

14   going to be read to you.  We do this to try to save your time, to

15   simplify matters, and to not waste the Court's time as well.

16   It's important for you to remember, however, that you should

17   accept those facts as true because the parties have agreed to

18   them as true.

19        Secondly, it's already been determined that John Thompson

20   was not guilty of the two crimes for which he was charged in

21   1985.  And as Judge Barbier will explain to you at the close of

22   the evidence, these determinations are final and the purpose of

23   this trial is not to re-examine those conclusions.

24        You will hear portions, about portions of the evidence from

25   1985 and later procedures, just so you have some context for

1    understanding the concealed evidence or the withheld evidence in
2    this case, but you're not going to hear all of the evidence from
3    the earlier prosecutions.
4        Ladies and gentlemen, at the end of the case we're going to
5    have another opportunity to address you after all the evidence is
6    in.  You can't give John Thompson back the 18 years that he lost
7    in prison.  And you can't erase the horrors that he endured.
8        What you can do, ladies and gentlemen, is to award him
9    damages to compensate him for what he suffered.  And we will ask
10   you at the close of the evidence to award him a very significant
11   amount of damages for the horror he endured.
12       Thank you very much.
13           THE COURT:  All right.  Thank you, Mr. Cooney.
14   Mr. Aaron.
15                   OPENING STATEMENT
16   BY MR. AARON:
17       Ladies and gentlemen, after I finish you're going to think
18   that my opponents and I are involved in two different cases.  The
19   evidence will show that Harry Connick served as the elected
20   district attorney for the Parish of Orleans for 29 years.  He was
21   elected by the people of Orleans Parish six times.
22       The evidence will show, ladies and gentlemen, that in a
23   District Attorney's Office there was only one policymaker.  Why?
24   There was only one person every six years that had to stand
25   before the voters and get elected.  The evidence will show,

1   ladies and gentlemen, that Mr. Dubelier and Mr. Williams were

2   assistant district attorneys and their job was to follow the

3   policies set by Harry Connick.

4        What were the policies?  Well, with respect to the turnover

5   of evidence, ladies and gentlemen, the evidence will show that

6   Harry's policy was quite simple.  Obey the law.  If the law

7   requires you to turn over evidence, turn it over.  Simple.

8        Now, what has been suggested by my opponent is that

9   Mr. Connick should have had what's called an open-file policy.

10  It's a matter of preference by different district attorneys.

11  Some district attorneys, as you will hear, have what's called an

12  open-file policy.  They simply say, Here's my file, whatever is

13  in it, take a look at it.

14       Well, ladies and gentlemen, there is a problem sometimes

15  with that because in cities, in urban areas such as New Orleans,

16  quite frequently if the names of certain witnesses get out, they

17  might not be alive by the time they get to trial.  So there are

18  some down sides to the concept of the open file.

19       The other thing, ladies and gentlemen, as the evidence for

20  this case will show is that if the District Attorney's Office

21  never gets a report from the police department, you could have

22  all the open files in the world; it's not going to help because

23  the district attorney just doesn't have the document in the file.

24       Now, yes, John Thompson was incarcerated for 18 years.  I'm

25  not going to stand here and tell you, ladies and gentlemen, that

1    being incarcerated for 18 years is a good thing.  Obviously it's
2    not.

3         But this is a civil rights case, ladies and gentlemen, it
4    differs from an automobile accident case.  In an automobile
5    accident case, you simply show that the car that the driver was
6    driving belonged to a company and the company is guilty.  That
7    doesn't work this way.

8         Yes, there was one assistant district attorney who has been
9    alluded to named Gerry Deegan.  He was a rogue assistant district
10   attorney.  The evidence will show clearly, unequivocally, ladies
11   and gentlemen, that he violated not only the policies of
12   Harry Connick, he violated the law.

13        Now, in a civil rights case, it has to be shown that the
14   harm suffered, going to jail, occurred not just because an
15   assistant district attorney did something wrong, ladies and
16   gentlemen, but it has to be shown that he did something wrong
17   because it was his boss's policy to do something wrong.

18        The evidence will show and you will hear a number of
19   witnesses, and they all will say the policy was if the law
20   requires you to turn it over, turn it over.

21        Now, the evidence will show, ladies and gentlemen, that
22   Harry Connick, over 29 years of being district attorney handled
23   tens of thousands of cases.  The evidence will show, ladies and
24   gentlemen, that out of tens of thousands of cases, sometimes a
25   case falls through the crack.  That does not mean, ladies and

1   gentlemen, that Mr. Connick is not on his job.  It just simply
2   means that people are human and sometimes bad things happen, even
3   though the boss attempts to do the right thing.

4       Now, what is contended here is truly outrageous.  What is
5   contended is that Harry Connick, a person who was a law
6   enforcement officer for much of his adult life, had a policy to
7   break the law.  Aside from being outrageous, ladies and
8   gentlemen, I would think that the local newspaper, I would think
9   that the voters would have voted him out if he had a policy to
10  break the law and he was the district attorney.

11      They go on to suggest, ladies and gentlemen, that his
12  assistants made their own policies up.  When witnesses take the
13  witness stand, you're going to hear that Harry Connick ran that
14  office.  If you, if you disagreed with Harry Connick's policies,
15  you were adios.  Out of here.

16      So to suggest that assistant district attorneys made their
17  own policies makes absolutely no sense, and when those witnesses
18  take the witness stand over there, ladies and gentlemen, they are
19  going to tell you just that:  Harry was the policy maker.

20      Now, Harry Connick took over from, as district attorney,
21  from a person called Jim Garrison.  There was a movie made about
22  Jim Garrison.  He was the guy in search of the conspiracy that
23  killed John Kennedy.  And my opponents have alluded to
24  conspiracy.  There is no conspiracy in this case, ladies and
25  gentlemen.

1    The evidence will show that Gerry Deegan did a bad thing and

2    he acted alone and he gave a confession to his best friend and in

3    the confession he said, I did it.  He never said there was a

4    group of people that did it.  He said, I did it.

5    Now, when Mr. Connick took over from Mr. Garrison, he did a

6    couple of things in terms of reorganization.  One of the things

7    Mr. Connick noticed was that in terms of screening cases, and

8    that's the process of determining what cases does a district

9    attorney accept or not accept, his predecessor took every case

10   that came in.

11   What happened by doing that, ladies and gentlemen, was a lot

12   of people sat in jail that shouldn't have sat in jail until the

13   district attorney finally figured out, Oh, we shouldn't have

14   charged you.

15   What Mr. Connick did was he set up a network of screening.

16   He had a chief screener and then underneath that screener, he had

17   homicide screeners, armed robbery screeners, he had a screener

18   for each type of case.

19   Interestingly enough, within a very short period of time,

20   the number of cases accepted by the District Attorney's Office

21   dropped from 80 percent down to 40 or 50 percent, protecting,

22   ladies and gentlemen, the rights of criminal defendants.

23   Now, why would Mr. Connick, a prosecutor, have any interest,

24   ladies and gentlemen, in protecting the interests of criminal

25   defendants?  When he takes the stand, he's going to tell you,

1    ladies and gentlemen, that before he became the district

2    attorney, he served as a legal aid lawyer representing primarily

3    poor criminal defendants.  He also had a criminal practice with

4    his private practice.  He was very sensitive, ladies and

5    gentlemen, to the constitutional rights of defendants.

6         Now, in this case, and they didn't make very much mention of

7    it in opening statement, but one of the things they are alleging

8    is that Harry Connick was indifferent to the training needs, the

9    monitoring needs and the supervisory needs of his staff.

10        The evidence will show, ladies and gentlemen, that one of

11   the other things that he did in terms of reorganizing the office

12   was to set forth various levels of supervision.  You will hear

13   people testify, ladies and gentlemen, that you had Mr. Connick,

14   you had a first assistant underneath Mr. Connick, you had a

15   number of division chiefs, and then you had -- in each section of

16   court what Mr. Connick did was, rather than do like his

17   predecessor did, send an inexperienced lawyer into court,

18   Mr. Connick made every section of court have a junior attorney

19   and a senior attorney.

20        So in terms of supervision, ladies and gentlemen, the

21   evidence will show that there was supervision on a daily ongoing

22   basis.  And there were multiple levels of supervision.  And a

23   junior assistant reported not only to the senior in the section

24   but there was a chief of trials.

25        The evidence will show, ladies and gentlemen, that before

1   any attorneys were able to go to trial, they had to pretry the

2   case before the chief of trials and explain to the chief of

3   trials what the case was about, what evidence was involved, and,

4   ladies and gentlemen, get a bit of training, if you will, on

5   whether or not certain evidence should be turned over to the

6   defense.

7       Now, let's talk a little bit about Mr. Deegan.  The evidence

8   will show, ladies and gentlemen, that Mr. Deegan did a bad thing.

9   The evidence will show that a lab report came back in two days

10   before trial and Mr. Deegan trashed it.  You will hear from

11   Mr. Dubelier and Mr. Williams who will tell you they didn't know

12   anything about the report.  They didn't get it.

13       Now, let me clarify something that my opponent suggested.

14   He said blood evidence was hidden.  Not true, ladies and

15   gentlemen.  The evidence will show that when the crime scene

16   technician went to the crime scene of the attempted carjacking,

17   armed carjacking, he took several pieces of evidence.  One was a

18   .357 revolver, one was the casing, that's the part that stays in

19   the bullet after it's shot, one was a bullet fragment, and a left

20   tennis shoe -- and as I recall, I think the brand was FootJoy --

21   that was worn by one of the teenagers in the car, and the

22   teenager at the scene noticed some blood on his pants and so the

23   crime scene tech cut out a piece of pant leg.

24       Now, the procedure at the police department, you will hear,

25   was to do this:  The evidence was tagged, the evidence was placed

1  for security in the central evidence and property room of the

2  police department.

3      And the evidence will show, ladies and gentlemen, that those

4  things that were seized by the police at the crime scene stayed

5  in the police department, not in the control of the district

6  attorney.  They stayed under the control of the police department

7  for not one, not two, three months.

8      Now, we've all watched TV, and watching TV we see criminal

9  defense lawyers, we see *Matlock*, we watch *The Practice*, we watch

10 all, and one of the things we noticed is that the criminal

11 defense lawyer is usually pretty aggressive.  He doesn't just sit

12 back.  He goes and finds whatever evidence is going to what?  Get

13 his client acquitted.

14     The evidence in this case will show with respect to the

15 armed carjacking, ladies and gentlemen, that although the blood

16 evidence was not hidden, and sat in the police department's

17 property and evidence room for three months, the court-appointed

18 attorneys for Mr. Thompson did nothing.  Now, what could they

19 have done?  Evidence will show they simply could have gone over

20 to the property room, showed a Bar card, I'm a lawyer card, and

21 been able to take a look at it.  If they told him, No, they could

22 have asked the judge, I want to see it.

23     But the evidence will show, ladies and gentlemen, that the

24 original court-appointed attorneys for Mr. Thompson did

25 absolutely nothing.  It they just sort of sat back, let's wait

1  and see what the other side does.  But, ladies and gentlemen,

2  it's incorrect to state that the blood evidence itself, the

3  tennis shoe, and the swatch of pants was hidden.  Never was.

4  What was hidden was the lab report that came back.

5      Now, so far, ladies and gentlemen, we have two bad actors.

6  We've got the defense attorney, who sort of sat on his hands and

7  did absolutely nothing, and it has been suggested that he didn't

8  know about the blood evidence.  Well, it was his job to go find

9  out.

10     In addition to that, ladies and gentlemen, the evidence will

11 show that at a Motion to Suppress hearing held on March 11, 1985,

12 one of the defendants in this case, I believe it was

13 Mr. Williams, stood up in front of the judge and said,

14 Your Honor, we want to test the blood of John Thompson.

15     Now, Numa Bertel, a criminal defense lawyer, was sitting

16 right there.  You would think, light bulb, maybe blood is

17 important.  Maybe if I get the blood tested, I get my client

18 exonerated.  The evidence will show Mr. Bertel did absolutely

19 nothing.

20     Too bad actors, Mr. Bertel, Mr. Deegan.

21     I suggest to you that the greater harm to Mr. Thompson is by

22 his criminal defense attorney, ladies and gentlemen, who sat on

23 the evidence.

24     Now, there is a third bad actor here.  Mr. Deegan's best

25 bud, Michael Riehlmann.  You're going hear from him.

1  Michael Riehlmann.  That's the one with the affidavit they showed
2  up, that he signed this weird affidavit that says, Somewhere
3  between 1984 and 1994, my buddy told me that he hid evidence.
4       I suggest to you, ladies and gentlemen, that if
5  Mr. Riehlmann had come forward with that, as the ethics rules
6  governing lawyers require, Mr. Thompson would not have sat in
7  jail for 18 years.
8       Now, why did Mr. Thompson get out?  He got out because he
9  got a new set of lawyers who hired an investigator and the
10 investigator did what?  He went and looked at the police
11 department records and said, You know, there is a lab report.
12 All right.  As late as 1999, ladies and gentlemen, nobody knew
13 what John Thompson's blood was, so to suggest that the
14 prosecutors knew in 1985, there is just simply no evidence.
15 Mr. Thompson's new lawyers didn't even know what his blood type
16 was until 1999.
17      And the evidence will show, ladies and gentlemen, that what
18 they did was, they got the lab report, they got Mr. Thompson's
19 blood type, and they went to the District Attorney's Office and
20 they said, Look, lab report says type B.  Our guy is type O, and
21 not only is our guy type O, the victim, Mr. LaGarde, all the way
22 back, he's type O.
23      Now, the evidence will show that once Mr. Connick was
24 apprised of the fact that one of his employees had done something
25 wrong many years before, what Mr. Connick did was this:

1   Mr. Connick filed a motion to have the execution stopped.

2        The evidence will show, ladies and gentlemen, in the past

3   30 years, no other district attorney has ever done that.  And

4   they will have to admit that there was a joint motion sent to the

5   court saying, A bad thing was done, and let's right the wrong.

6        Remember, ladies and gentlemen, the job of a prosecutor is

7   not merely to put people in jail.  The job of a prosecutor is to

8   see that justice is done.  The evidence will show, ladies and

9   gentlemen, that once Mr. Connick was apprised of the fact that

10  some assistant of his had done something wrong, Mr. Connick got

11  his staff together and they did two things.  Filed a motion to

12  have the stay set aside and Mr. Thompson was taken immediately

13  off of death row.

14       They did another thing.  They asked that there be a new

15  trial given.  A new trial was given, a full hearing was held in

16  June of 1999, several witnesses testified and at the conclusion,

17  Judge Patrick Quinlan of the Criminal District Court for

18  Orleans Parish, entered a ruling vacating the armed robbery

19  conviction.

20       Now, there is a saying that sometimes goes, No good deed

21  ever goes unpunished.  That basically means if you do something

22  good, somebody sort of kicks you in the teeth.  Well, ladies and

23  gentlemen, as a reward for Mr. Connick doing the right thing, we

24  got this lawsuit.  We got sued.

25       Now, with respect to the issue of training, I mentioned

 1  before that Mr. Connick's office had on-the-job training where he
 2  paired a junior assistant with a more senior assistant district
 3  attorney.
 4      He did something else about training, too.  When he set up
 5  his chiefs of various divisions, he set up a chief of trials and
 6  a chief of appeals.  Each one of those persons was charged with
 7  the responsibility of summarizing on a regular basis any new
 8  cases, case law that came out, and sending it in the form of a
 9  memo to everybody in the office.  Dealt with criminal law,
10  criminal procedure.
11      Now, my opponents want to suggest that in 1985, Mr. Connick
12  should have had some formal training program, I guess bringing
13  professors in or whatever.  Well, the evidence will show, ladies
14  and gentlemen, that not even the Louisiana State Bar Association
15  required formal continuing legal education training until 1990,
16  five years after this event.  Now, ladies and gentlemen, yes, all
17  lawyers have to go in for continuing legal education and the
18  current requirements are twelve-and-a-half hours a year, which
19  includes one hour of ethics and one hour of professionalism.
20      Now, it has been suggested that evidence was withheld in the
21  armed robbery.  And I told you, one piece:  The lab report.
22      With respect to the murder case, the evidence will show,
23  ladies and gentlemen, a couple of things.  One, certain pieces of
24  evidence that they say the District Attorney's Office didn't turn
25  over, the record will reflect the district attorney didn't have

1    it so they couldn't turn it over.

2         The other thing, let's talk about some of these witnesses.

3    At Mr. Connick's -- I'm sorry, at Mr. Thompson's second murder

4    trial, they heard testimony from a lady named Sheri Hartman

5    Kelly.  Ms. Kelly lived within eye view of where Mr. Liuzza was

6    killed.  At the second criminal trial, she testified that from

7    her balcony, she saw the perpetrator.  She further testified that

8    the perpetrator was not Mr. Thompson.

9         The evidence will reflect, ladies and gentlemen, that in the

10   original police report, in the possession of the District

11   Attorney's Office, a statement was received from Ms. Kelly and

12   she said and I quote, "I didn't see anything."

13        I suggest to you, ladies and gentlemen, the law requires

14   that you turn over something that's favorable to the defendant

15   saying.  Saying I didn't see anything is not favorable.

16        There is two other witnesses, which I'll call fear

17   witnesses.  One is named Steve McAlister and the other is called

18   Rosemary Cash.  In the original police department report, ladies

19   and gentlemen, they said they only heard gunshots.  And the

20   evidence will reflect that there were at least five bullets that

21   went into the body of Ray Liuzza, Junior.

22        At trial, in the second criminal trial, they took the stand

23   and said, No, we heard something else, the Police Department's

24   report has it wrong.  We not only heard gunshots, we heard a car

25   door slamming and we heard one set of footsteps.

1   All right, I suggest to you, ladies and gentlemen, that this
2   evidence that they say was withheld was, A, not exculpatory or
3   alternatively the District Attorney's Office just didn't have it.
4       Now, in the murder trial, Mr. Thompson had a different set
5   of court-appointed attorneys.  He had a guy by the name of
6   Rob Couhig and a guy by the name of Patrick Fanning.  The
7   evidence will show, ladies and gentlemen, that in his opening
8   statement to the jury, Mr. Couhig said, and I quote,
9   "John Thompson had a big bush of hair.  Kevin 'Kojak' Freeman had
10  short hair."
11      Now, they also suggested that picture they showed with the
12  big hair on Mr. Thompson, that the defense didn't have it.  The
13  evidence will show, ladies and gentlemen, that Mr. Couhig had the
14  photograph.  He didn't want it to go to the jury because it had
15  those little numbers on the bottom suggesting that Mr. Thompson
16  might be a criminal.
17      Now, also, the evidence will show, ladies and gentlemen,
18  that with respect to the alleged coverup of the description of
19  the perpetrator, six-foot tall, remember, short hair, the
20  evidence will show that the District Attorney's Office sent
21  written correspondence saying six-foot tall.
22      At the trial, ladies and gentlemen, it's obvious that
23  Mr. Couhig knew that Mr. Schliffka, which is the witness' name,
24  had said that the person had short hair.  Plus the record will
25  reflect, ladies and gentlemen, that Mr. Schliffka actually

1   testified and he said six-foot tall, short hair and the jury

2   still found Mr. Thompson guilty.

3       Now, I suggest to you, ladies and gentlemen, that their

4   contention that somehow the criminal trial the first time ended

5   the way it ended because of some shenanigans on the part of the

6   District Attorney's Office is just not true.  We admit with

7   respect to the armed robbery, Gerry Deegan did a bad thing:  He

8   stole a lab report.  But I suggest to you, ladies and gentlemen,

9   that in a tug of war, which is a trial, the main fault was with

10  Numa Bertel who did not follow up on the evidence.

11      Now, let's talk a little bit about damages.  Just a little

12  bit.  Obviously the defense is of the position that the policies

13  did not cause this, and Mr. Connick was not deliberately

14  indifferent; hence, plaintiff should get zero.

15      Now, in voir dire I threw out a question about posttraumatic

16  stress disorder and I thought they were going to mention it in

17  opening but they didn't.  One of the things that the doctor who

18  is going to testify for Mr. Thompson is going to say is that

19  because of his incarceration for so many years, he suffered from

20  posttraumatic stress disorder.  And he also suffers from

21  isolationism because he had no human contact, et cetera.  I just

22  want to address that just a little bit, ladies and gentlemen.

23      You have to go back and look at the life of John Thompson

24  from age 1 to age 22.  The evidence will show, ladies and

25  gentlemen, that Mr. Thompson grew up in a very dysfunctional

1   household.  His mother was 15 at the time of his birth and didn't

2   want to be a mother.  He will admit that.  He was shuttled back

3   and forth amongst relatives, back and forth to his grandmother

4   primarily and then back to his mother.

5       The evidence will show, ladies and gentlemen, that once she

6   reached 21, Thompson's mother decided to get married.  She

7   married somebody who wasn't his biological father and that

8   person, ladies and gentlemen, beat Mr. Thompson frequently,

9   severely.  Beat him with sticks, beat him with belts, beat him

10  with extension cords.  The evidence will show, ladies and

11  gentlemen, that at times, his mother did the same thing to him.

12      John Thompson grew up in a rough section of uptown

13  New Orleans.  The schools that he went to service three of the

14  largest projects in the City of New Orleans.

15      Now, I say that not to put down projects or low income or

16  whatever.  I say that to say, ladies and gentlemen, that they

17  were traumatic experiences in his life.  The evidence will show,

18  ladies and gentlemen, that Mr. Thompson started smoking marijuana

19  in middle school.  By the time he got to high school, he was

20  selling drugs.  He was selling marijuana, he was selling PCP.

21  For those of you who don't know what PCP is, it's angel dust.

22  Not only was Mr. Thompson selling it -- I think in opening it was

23  suggested that it was just something a little minor.  No, he had

24  employees.  He had Kevin Freeman, he had Richard Perkins out on

25  the street selling drugs for him.

1      Now, those two names are important because at the murder

2  trial, they testified, the first murder trial, they testified

3  against Mr. Thompson.  And his good buddy and employee who sold

4  drugs for him, Kevin Freeman, took the stand and said,

5  Mr. Thompson was the trigger man.

6      Now, interestingly enough, by the time the second trial came

7  along, Mr. Freeman couldn't testify.  He was dead, and other

8  witnesses were not available.  The gun was not available.

9      Now, let's talk a little bit more about this whole idea of

10  the dysfunctional aspects of his life.  Mr. Thompson became a

11  father himself at age 15 for the first time, became a father for

12  the second time at age 17.  At age 19, he was the victim of a

13  drive-by shooting.  He was shot by someone with a shotgun who

14  approached him as he was getting into his car, the gun comes out

15  the window, ladies and gentlemen, Mr. Thompson starts running,

16  and they shoot him and the shotgun pellets hit him in the leg.

17      I think that's a little traumatic.  The evidence will also

18  show, ladies and gentlemen, that Mr. Thompson, while a young

19  teenager, his mother suffered not one but two strokes and he was

20  required to go live with yet another family member, an uncle.

21  The evidence will show that uncle beat him as well.

22      Now, Mr. Thompson served periods of incarceration at least

23  twice before he went to jail.  And I think those were somewhat

24  traumatic.  As a juvenile he was incarcerated.  He was also

25  incarcerated as an adult.

1    He served some time in what was called Tent City over at

2    Parish Prison in New Orleans.  It was called Tent City, ladies

3    and gentlemen, because they didn't have enough room inside the

4    building, so they had so many prisoners that they put them in a

5    tent outside.  And he was forced to live with large numbers of

6    people.  And I think he probably witnessed things that people

7    probability shouldn't see.  And I suggest to you, ladies and

8    gentlemen, that those things were also traumatic.

9        Now, in terms of isolation, obviously, you're on death row,

10   they put you in a cell by yourself is not a great thing.

11       But the evidence will show, ladies and gentlemen, that he

12   wasn't on death row or in solitary for 18 years.  I think he was

13   for approximately 13.  The evidence will show that the first two

14   years, he served in Parish Prison, and that's usually while your

15   appeals are going and you stay in Parish Prison.  And in Parish

16   Prison he wasn't in a cell by himself.  He was in the general

17   population.  He was allowed to watch TV, he was allowed to play

18   basketball, he was allowed to have phone conversations, he was

19   allowed to have visitors, et cetera.

20       The evidence will show, also, ladies and gentlemen, that

21   even while at Angola, he had visitors, et cetera, and he and the

22   other prisoners were able to communicate with one another.  The

23   evidence will show that they played chess, they played scrabble,

24   I'm not saying it was a wonderful place but I'm saying, ladies

25   and gentlemen, the evidence will show that he was not in total

1  isolation as they would suggest.

2      Now, as the Judge told you, this is a civil rights case.

3  Remember, ladies and gentlemen, the fact that an employee of the

4  District Attorney's Office did something bad does not make them

5  win.  They have to show that he did the bad thing in furtherance

6  of a policy of Harry Connick.  They also have to show, ladies and

7  gentlemen, that Harry Connick was deliberately indifferent to the

8  needs of the staff training, the needs for monitoring and

9  supervision.

10      The evidence will show that there were multiple layers of

11  monitoring, there was ongoing day-to-day supervision, and there

12  was training, ladies and gentlemen.  So I suggest to you that in

13  this particular situation, yes, the man stayed in jail for

14  18 years, yes, his convictions were overturned, but, no, ladies

15  and gentlemen, you should not award sums of money against the

16  District Attorney's Office.

17      Thank you.

18          THE COURT:  Mr. Cooney, who is your first witness?

19          MR. BANKS:  Your Honor, at this point we would like to

20  read some of the stipulated facts, the facts on which the parties

21  agree, Your Honor.

22          THE COURT:  All right.  Ladies and gentlemen, we're

23  going to pass -- I meant to do this earlier but we'll pass out

24  the notebooks now.

25          And do we have any witnesses who are in the courtroom

1   who are not parties?

2          MR. BANKS:  Just parties and experts, Your Honor, I

3   believe.

4          THE COURT:  Are there witnesses out in the hallway?

5          MR. BANKS:  I don't know if they are out the hallway but

6   they are not in here.

7          THE COURT:  Can our court security officer see if there

8   is anybody in the hallway who might be a witness in this case and

9   ask them to step in for a second, please.

10          I'm going to ask the attorneys to -- there is none?

11   You-all know who your witnesses are better than I do, obviously,

12   so make sure your witnesses stay outside of the courtroom and

13   instruct them not to discuss the case with anyone except for the

14   attorneys in the case.

15          MR. BANKS:  We will, Your Honor, thank you.

16          I would like at this point to read some of the facts on

17   which the parties have agreed.

18          THE COURT:  All right.  Let me just explain to the jury

19   briefly, again, I told you earlier that one, the evidence can

20   take several forms:  It can be a live witness, it can be a

21   deposition, prior testimony, it can be a document.  It can also

22   be what's called stipulations, and this is where the parties have

23   gotten together in advance of the trial and agreed upon certain

24   things as proven facts without the need to introduce any witness

25   or any document to prove these facts.  And some of these are

1    going to be read to you at this time.  And I understand you're

2    going to get these in written form for purposes of your

3    deliberations.

4         MR. BANKS:  Yes, Your Honor.  Thank you.

5         THE COURT:  Go ahead.

6         MR. BANKS:  Thank you.  I'm going to read them in serial

7    fashion.  Raymond T. Liuzza, Junior, was shot and killed at

8    approximately 12:40 a.m. near the 1700-block of Josephine Street

9    in New Orleans, Louisiana.

10        NOPD detectives conducted the Liuzza murder

11   investigation prior to the arrest of Messrs. Freeman and

12   Thompson.  Soon after the investigation began, a public

13   announcement was made that a reward of $15,000 would be paid for

14   information leading to the arrest and conviction of the murderer

15   of Mr. Liuzza.

16        An eyewitness, Paul Schliffka, was standing on the

17   corner of Josephine and Baronne Streets as the perpetrator ran by

18   him, gun in hand, moments after the shooting of Mr. Liuzza.

19        Mr. Schliffka described the perpetrator to police as

20   "six feet tall with close-cut hair," a description that was

21   included in the police reports.

22        On January 17, 1985, the District Attorney's Office

23   sought and received indictments of Kevin Freeman and

24   John Thompson for the first-degree murder of Raymond T. Liuzza,

25   Junior.

 1          The day after Mr. Thompson's arrest for the murder of
 2   Mr. Liuzza, his photograph appeared in the New Orleans
 3   *Times-Picayune*.  A father of three youths who had been robbed in
 4   a carjacking outside the Superdome on December 28, 2004, [sic]
 5   saw the photograph, and surmised that Mr. Thompson may have been
 6   the perpetrator of the armed robbery.  The father showed the
 7   photograph to two of his children, who indicated that the man in
 8   the photograph might have been the carjacker.

 9          The father contacted the Orleans Parish District
10   Attorney's Office and reported the possibility that Mr. Thompson
11   may have been the perpetrator of the December 28, 2004, [sic]
12   armed robbery.

13          Mr. Dubelier and Mr. Williams secured an indictment of
14   Mr. Thompson for armed robbery, and decided to use the armed
15   robbery charge to the state's advantage in the murder case.

16          Mr. Dubelier, who was appointed as a special prosecutor
17   in the armed robbery case, decided that a conviction of
18   Mr. Thompson on the armed robbery charge would effectively
19   preclude Mr. Thompson from taking the witness stand in his own
20   defense at the murder trial, and that the armed robbery
21   conviction could be used in the penalty phase of the murder trial
22   to obtain a death sentence.

23          Accordingly, Mr. Dubelier and Mr. Williams moved to
24   reverse the order of the trials so that the armed robbery trial
25   would be held approximately three weeks before the murder trial.

1      Prior to the armed robbery trial, the defense moved for

2   the production of any evidence favorable to the accused,

3   including scientific evidence.  Prior to the armed robbery trial,

4   the prosecutors did not produce any scientific evidence or blood

5   evidence.

6      At that time, however, the state had blood evidence

7   from the armed robbery.  The driver of the car, Stewart Jay

8   LaGarde, had struggled with the perpetrator, kicking him in the

9   face.  The police cut a bloody swatch from LaGarde's pant leg

10  containing the perpetrator's blood.

11     Shortly before the armed robbery trial, a prosecutor

12  checked the bloody swatch out of the evidence locker and

13  delivered it to the police crime lab for testing.  Two days

14  before the trial, the crime lab prepared and delivered to the

15  District Attorney's Office a report which showed that the

16  perpetrator had type B blood.  Mr. Thompson has type O blood.

17     Prior to the armed robbery trial, Mr. Thompson and his

18  attorneys were not advised of the existence of the blood

19  evidence, that the evidence had been tested, that a blood type

20  was determined definitively from the swatch obtained from the

21  driver of the car, that the blood was that of the perpetrator.

22     On the morning of the first day of the armed robbery

23  trial, Gerry Deegan, a prosecutor assigned to the plaintiff's

24  armed robbery trial, had checked the blood evidence out of the

25  evidence locker along with other physical evidence, including the

1  gun that had been recovered from the scene of the crime.  After

2  the trial, the gun and other physical evidence were checked back

3  into central evidence and property, but the physical blood

4  evidence was never returned.

5        On April 11th and 12th, 1985, Mr. Thompson was tried

6  and convicted of attempted armed robbery based solely on the

7  descriptions of the victims.

8        Defendants Dubelier and Williams were involved in

9  reviewing the police reports and evidence, preparing the murder

10 case against Mr. Thompson for trial, handling pretrial discovery

11 and pretrial motions, interviewing witnesses and presenting the

12 case on behalf of the State of Louisiana against Mr. Thompson at

13 trial.

14       Mr. Thompson's attorneys in the murder case moved to

15 preclude the prosecutors from using the attempted armed robbery

16 conviction to impeach Mr. Thompson's testimony in the murder

17 trial, but the state opposed the motion, and the motion was

18 denied.

19       On May 6th to 8th, 1985, Mr. Thompson was tried and

20 convicted for the first-degree murder of Raymond T. Liuzza,

21 Junior.  As a result of his conviction three weeks earlier for

22 attempted armed robbery and the denial of the motion to preclude

23 the introduction of such evidence, Mr. Thompson did not take the

24 witness stand and deny his guilt in the murder case.

25       At plaintiff's murder trial, Freeman testified that he

1   was driving Mr. Thompson in Freeman's car when the car ran out of

2   gas, and that he parked the car on Josephine Street near

3   Carondelet, several blocks river side of the location where

4   Mr. Liuzza was shot and killed.  Freeman testified that he and

5   Mr. Thompson began walking from this location when they saw

6   Mr. Liuzza get out of his car.

7          The jury found Mr. Thompson guilty of the murder of

8   Mr. Liuzza and voted to impose a death sentence.  Mr. Thompson

9   was formally sentenced to death, and his conviction and sentence

10  were affirmed on direct appeal by the Louisiana Supreme Court.

11         In February 1989, Mr. Thompson filed a Petition for

12  Post-Conviction Review of his convictions in the attempted armed

13  robbery and murder cases.  Between 1989 and 1999, Mr. Thompson's

14  attorneys sought review of both of those convictions based on

15  arguments, among others, that the state had failed to produce to

16  Mr. Thompson original evidence that was favorable to the defense.

17         In early 1999, Mr. Thompson's state and federal

18  challenges to his convictions were exhausted unsuccessfully.  In

19  April 1999, a final execution warrant was signed by Judge Patrick

20  Quinlan, scheduling Mr. Thompson's execution for May 20, 1999.

21         In the weeks before Mr. Thompson's scheduled execution,

22  a private investigator engaged on Mr. Thompson's behalf, combed

23  through the dormant files of the New Orleans Police Department

24  and crime laboratory for evidence.

25         The investigator located a microfiche copy of a report

1  in the files of the New Orleans police crime laboratory showing

2  that the blood evidence from the pant leg of the armed robbery

3  victim was tested at the request of the Orleans Parish District

4  Attorney's Office.

5          As a result of the discovery of the crime lab report, a

6  hearing was held before Judge Patrick Quinlan who vacated the

7  attempted armed robbery conviction.

8          After the defense presented the evidence establishing

9  Mr. Thompson's innocence in the armed robbery case, Harry Connick

10  filed a Motion to Vacate the armed robbery conviction, and

11  Harry Connick chose not to retry him for the armed robbery.

12         Judge Quinlan also granted a request by Mr. Thompson

13  for a hearing in the murder case, at which time Mr. Thompson

14  would be given an opportunity to present evidence -- including

15  evidence newly gathered since prior proceedings and hearings --

16  bearing on his conviction and sentencing in the murder case.

17         On October 16, 2000, after additional investigations by

18  Mr. Thompson's attorney, the trial court heard Mr. Thompson's

19  additional Post-Conviction Relief application.  At the hearing,

20  Mr. Thompson testified for the first time regarding the murder

21  case.

22         Additionally, testimony was presented from

23  Sheri Hartman Kelly, Stephen McAlister, and Rosemary Cash

24  McAlister, each of whom had been interviewed by the police as

25  witnesses in the murder investigation.  Mr. Thompson's new murder

1  trial commenced on May 6, 2003, and continued until May 8, 2003.

2         On May 8, 2003, a jury found Mr. Thompson not guilty

3  for the murder of Raymond T. Liuzza, Junior.  The jury

4  deliberated for approximately 35 minutes.

5         On May 9, 2003, after serving more than 18 years of

6  imprisonment, Mr. Thompson was released from prison.

7         The following exhibits were not provided by the state

8  to Mr. Thompson or his lawyers in the 1985 criminal prosecutions

9  against Mr. Thompson:  Exhibit 4, New Orleans police daily report

10 number 4662.

11        Exhibit 5, New Orleans police daily report number 4700.

12        Exhibit 17, New Orleans Police Department evidence

13 property card.

14        Exhibit 22, Crime Scene Technician Report -- armed

15 robbery case.

16        Exhibit 23, New Orleans police daily report number

17 5066.

18        Exhibit 25, photograph of John Thompson.

19        Exhibit 26, mug shot of Kevin Freeman.

20        Exhibit 30, New Orleans Police Department supplemental

21 incident report by Detective Donald Curole.

22        Exhibit 31, Office of the Orleans Parish District

23 Attorney screening action form.

24        Exhibit 32, letter from Bruce Whittaker to Jay LaGarde

25 regarding armed robbery lineup.

1           Exhibit 33, screening action form prepared by

2  Bruce Whittaker.

3           Exhibit 45, Police Department of New Orleans report of

4  the crime laboratory.

5           Exhibit 96, reward notice regarding the murder and

6  armed robbery of Ray T. Liuzza.

7           Exhibit 97, Crime Stoppers press release regarding the

8  rewards established in the Liuzza case.

9           Exhibit 98, Crime Stoppers questionnaire number 292.

10          Exhibit 103, audio tapes of meetings with Perkins at

11  the International Hotel.

12          The state did not provide Mr. Thompson with information

13  that Sheri Hartman, Rosemary Cash and Steve McAlister saw and/or

14  heard events in connection with the Liuzza murder.

15          The following exhibits were not produced to

16  Mr. Thompson or his lawyers until after his 1985 armed robbery

17  trials and murder trials had been completed:

18          Exhibit 22, crime scene technician report -- armed

19  robbery case.

20          Exhibit 30, New Orleans Police Department supplemental

21  incident report by Detective Donald Curole.

22          Exhibit 103, audio tapes of meetings with Perkins at

23  the International Hotel.

24          The following exhibits were not produced to

25  Mr. Thompson or his lawyers until 1999, after Mr. Thompson's

1  defense team located Exhibit 45, Police Department of

2  New Orleans report of the crime laboratory:

3          Exhibit 4, New Orleans police daily report number 4662.

4          Exhibit 5, New Orleans police daily report number 4700.

5          Exhibit 17, New Orleans Police Department evidence

6  property card.

7          Exhibit 23, New Orleans police daily report number

8  5066.

9          Exhibit 26, mug shot of Kevin Freeman.

10          Exhibit 31, Office of the Orleans Parish District

11  Attorney screening action form.

12          Exhibit 32, letter from Bruce Whittaker to Jay LaGarde

13  regarding armed robbery lineup.

14          Exhibit 33, screening action form prepared by

15  Bruce Whittaker.

16          Exhibit 96, reward notice regarding the murder and

17  armed robbery of Ray T. Liuzza.

18          Exhibit 97, Crime Stoppers press release regarding the

19  rewards established in the Liuzza case.

20          Exhibit 98, Crime Stoppers questionnaire number 292.

21          The following exhibits were used by Mr. Thompson during

22  the May 2003 murder retrial of Mr. Thompson:

23          Exhibit 4, New Orleans police daily report number 4662.

24          Exhibit 5, New Orleans police daily report number 4700.

25          Exhibit 7, mug shot of John Thompson.

1              Exhibit 23, New Orleans police daily report number

2    5066.

3              Exhibit 24, Richard Perkins' statement to the police,

4    homicide division.

5              Exhibit 25, photograph of John Thompson.

6              Exhibit 26, mug shot of Kevin Freeman.

7              Exhibit 27, Kevin Freeman's statement to the police,

8    homicide division.

9              Exhibit 30, New Orleans Police Department supplemental

10   incident report by Detective Donald Curole.

11             Exhibit 96, reward notice regarding the murder and

12   armed robbery of Ray T. Liuzza.

13             Exhibit 97, Crime Stoppers press release regarding the

14   rewards established in the Liuzza case.

15             Exhibit 98, Crime Stoppers questionnaire number 292.

16             Exhibit 103, audio tapes of meetings with Perkins at

17   the International Hotel.

18             When John Thompson was prosecuted in 1985, *Brady* had

19   been in existence for 22 years.

20             None of the district attorney witnesses recalled any

21   specific training session concerning *Brady* prior to or at the

22   time of the 1985 prosecutions of Mr. Thompson.

23             Those are the stipulations, Your Honor, that we would

24   read at this time.

25             THE COURT:  Thank you, Counsel.  Who is your first

1  witness?

2          MR. BANKS:  Mr. Williams, Your Honor, James Williams.

3          THE COURT:  Okay.

4          MR. BANKS:  I'm just going to turn this podium, if I

5  may.

6          THE COURT:  Yes.  I'm just going to ask the jury.  Do

7  you need a break of 10 or 15 minutes first or do you want to keep

8  going?  Everybody okay?

9          THE DEPUTY CLERK:  Please raise your right hand.

10

11                      **JAMES WILLIAMS,**

12  was called as a witness and, after being first duly sworn by the

13  Clerk, was examined and testified on his oath as follows:

14          THE DEPUTY CLERK:  Please be seated.  Please speak

15  directly into the microphone, state your name for the record.

16          THE WITNESS:  James Williams.

17          MR. BANKS:  Your Honor, I've prepared just a smaller

18  notebook of some of the exhibits that we would likely use with

19  Mr. Williams.  May I hand it to the witness?

20          THE COURT:  Sure.

21          MR. AARON:  Your Honor, can we get a copy of what he's

22  handing to the witness?

23          MR. BANKS:  They are all marked exhibits, Your Honor,

24  everybody has the bigger volumes.  I just thought it would be

25  easier with the witness.  I can show you which ones they are.

1          MR. AARON:  It would be easier instead of looking
2     through a big stack.
3          THE COURT:  Do you have an extra book like that that you
4     can give to Mr. Aaron?
5          MR. BANKS:  He can use mine, Your Honor.
6          THE COURT:  Okay.
7                         DIRECT EXAMINATION
8     BY MR. BANKS:
9     Q.   Good afternoon, Mr. Williams.
10    A.   Good afternoon.
11    Q.   You're a lawyer, sir?
12    A.   I am.
13    Q.   How long have you been a member of the Bar?
14    A.   Since February of 1978.
15    Q.   So about 28 years?  29 years?
16    A.   Almost 29.
17    Q.   When were you hired by the Orleans Parish District
18    Attorney's Office?
19    A.   In August of 1980.
20    Q.   Was that your first experience in the area of criminal law?
21    A.   Yes.
22    Q.   You had never worked in a prosecutor's office before that?
23    A.   I clerked when I was in law school at LSU at the East Baton
24    Rouge Parish District Attorney's Office.
25    Q.   But from the time you graduated law school and became a

1  lawyer, the Orleans Parish District Attorney's Office was your
2  first job in the field of criminal law?
3  A.   Yes, sir.
4  Q.   How long did you work there?
5  A.   Ten years.
6  Q.   So from 1980 to 1990, correct?
7  A.   Yes, sir.
8  Q.   And am I right that you were one of the prosecutors in both
9  the carjacking trial of Mr. Thompson in April of 1985 and the
10  murder trial of Mr. Thompson a little less than a month later?
11  A.   Yes, sir.
12  Q.   You were the lead prosecutor in the carjacking case?
13  A.   Yes.
14  Q.   And in the murder case, you were the second behind
15  Eric Dubelier; is that right?
16  A.   That's correct.
17  Q.   When you started --
18       THE COURT:   Excuse me.   Mr. Williams, pull that
19  microphone a little closer to you, please.   Thank you.
20                          EXAMINATION
21  BY MR. BANKS:
22  Q.   When you started in the District Attorney's Office in 1980
23  as a brand-new prosecutor, they didn't give you training on
24  criminal law and procedure, did they?
25  A.   Yes.   That's not true.   I received training on a daily

1 basis.

2       MR. BANKS:  May I show Mr. Williams his deposition

3 transcript, Your Honor?

4       I'm going to put in front of him -- does the Court wish

5 a copy of the deposition transcript?

6       THE COURT:  No, just give it to the witness page and

7 line.

8       MR. BANKS:  I'm going to put in front of him volume one

9 and volume two.  And, Your Honor, I would like to direct

10 Mr. Williams to page 25 of his deposition transcript from the

11 first day.  And I'm going to ask to show the jury Mr. Williams'

12 testimony on this point from the first day of his deposition?

13       THE COURT:  Let's let him read it first.

14                     EXAMINATION

15 BY MR. BANKS:

16 Q.   Page 25, lines 14 to 20.  Why don't you take a look at that,

17 Mr. Williams.

18 A.   (Witness reviews the document.)

19       Okay.

20 Q.   Mr. Williams, you do recall that I took your deposition,

21 that is, I asked you some questions under oath earlier in this

22 case when a jury was not present?

23 A.   Correct.

24       MR. BANKS:  May we show the jury, Your Honor, what

25 Mr. Williams said at his deposition?

1          THE COURT:  Sure.

2          (WHEREUPON, the videotaped deposition of James Williams

3   was played as follows:)

4                              EXAMINATION

5   BY MR. BANKS:

6   Q.   As a new assistant district, when you arrived at the office,

7   did they have any kind of orientation for you?

8   A.   No.

9   Q.   Did they give you any training on criminal law and

10  procedure?

11  A.   No.

12          (WHEREUPON, the videotape was stopped.)

13                              EXAMINATION

14  BY MR. BANKS:

15  Q.   So, no was the answer at your deposition as to whether they

16  gave you training on criminal law and procedure; is that correct,

17  sir?

18  A.   That is correct, and I believe your question to me was did I

19  receive any training.  I did receive training at that office on

20  what my job was in the magistrate court.

21  Q.   But not on criminal law and procedure?

22  A.   I don't recall there being specifically any training on

23  criminal law and procedure, no, sir.

24  Q.   The district attorney, the top guy in the office at that

25  time was Harry Connick, correct?

1  A.    He was.

2  Q.    He was the DA, the top DA during the entire time you were in

3  the Orleans Parish District Attorney's Office, right?

4  A.    That's correct.

5  Q.    And he made policies for the office as the district

6  attorney?

7  A.    Yes, sir.

8  Q.    Sometimes he talked about those policies at meetings he held

9  with assistant district attorneys such as yourself?

10  A.    Yes, sir.

11  Q.    Did he hold these meetings often, sir?

12  A.    I don't recall.

13  Q.    Would you say at these meetings that he held with assistant

14  district attorneys he was acting primarily as a cheerleader

15  giving a go-get-them type talks and the fire and brimstone?

16  A.    Sometimes.

17  Q.    The training that you got or any training that you got was

18  really through doing things, from working as a prosecutor and

19  trying cases, right?

20  A.    That's part of it, yes, sir.

21  Q.    Was it a hard job being a prosecutor?

22  A.    A very hard job.

23  Q.    A lot of work to do?

24  A.    Yes.

25  Q.    When you had cases like the Thompson case, that was a big

1  case, right?

2  A.   It was a capital murder case.

3  Q.   So you worked hard on that, you did your homework?

4  A.   Yes.

5  Q.   Homework that you did meant looking through the files?

6  A.   Yes.

7  Q.   For example, you would get files from the police that you

8  would look through to learn the facts that they uncovered in the

9  course of their investigation?

10  A.   Are you talking about the Thompson case?

11  Q.   Yeah, let's talk about the Thompson case.  Is that right?

12  A.   I would have reviewed with Mr. Dubelier the facts of the

13  case and the police reports.

14  Q.   You'd certainly want to know those backwards and forwards

15  before you go to trial, right?

16  A.   Yes.

17  Q.   I mean, for example, in those files you got from the police,

18  in those police reports were summaries of what witnesses told the

19  police, right?

20  A.   Yes.

21  Q.   References to the physical evidence?

22  A.   Yes.

23  Q.   Actual witness statements signed by people who would be

24  testifying on the witness stand at trial?

25  A.   Yes.

1   Q.   You would review crime scene technician information,

2   documents prepared by people from the police department who took

3   physical evidence?

4   A.   I will answer yes, but subject to I do not recollect what

5   reports that I reviewed specifically in that particular case.

6   Q.   Would you say you worked with the police from time to time?

7   A.   Absolutely.

8   Q.   It was a cooperative endeavor between you and the police

9   department?

10  A.   Yes, sir.

11  Q.   Early in the case, once a case went to the District

12  Attorney's Office, am I right that police files would usually be

13  delivered to the District Attorney's Office?

14  A.   That's correct.

15  Q.   And from that point forward, they were all available to you,

16  whatever the police had, you could see?

17  A.   Whatever the police delivered to me, I had available.

18  Q.   But if you wanted to go over to the police office and see if

19  there was anything else that they hadn't delivered in a big case

20  like the Thompson case, you could do that?

21  A.   Yes, absolutely.

22  Q.   No one from the police ever said, No, Mr. Williams, or any

23  assistant district attorney, you are not allowed to look in our

24  files?

25  A.   That's true.

1  Q.   That's because you worked together in the job of prosecuting

2  people?

3  A.   Yes, sir.

4  Q.   And what they had was helpful to you in your efforts to get

5  convictions in those cases, right?

6  A.   They were helpful in determining whether or not to even take

7  a case.

8  Q.   But those files that you got from the police department, the

9  files that contained descriptions of, given by witnesses and

10  physical evidence, those weren't just turned over to the defense,

11  were they?

12  A.   No, sir.

13  Q.   For example, things like witness statements, things that

14  witnesses told to the police that were written up and the

15  witnesses signed, those were not typically turned over, were

16  they?

17  A.   That's correct.

18  Q.   And police reports, things like police reports that would

19  show the history of the police investigation from the time the

20  police started looking at the crime, up through the time of the

21  arrest, those reports could be quite lengthy, right?

22  A.   Yes.

23  Q.   In a case like the Liuzza case, for example, a supplemental

24  police report could be 25, 30, 35 pages of single-spaced typed

25  information?

1  A.    Could be.

2  Q.    And would have a lot of facts, things they learned that

3  didn't go anywhere or things that might lead them to a suspect?

4  A.    That's correct.

5  Q.    But those kind of things typically were not turned over to

6  the defense by the Orleans Parish District Attorney's Office,

7  were they?

8  A.    In 1985, that's correct.

9  Q.    And that was because of the policy set at the top of the

10  office by Mr. Connick as the district attorney, right?

11  A.    That's correct.

12  Q.    When you had those kinds of things, though, when the police

13  took police reports and they brought them over to the District

14  Attorney's Office, you found those things helpful in your

15  preparation for trial?

16  A.    Yes, sir.

17  Q.    Same thing with the witness statements, you wouldn't just

18  put a witness on the stand without reading his statement.  You

19  would want to know what that witness said when he or she was

20  interviewed by the police?

21  A.    Mr. Banks, are we talking about the Liuzza case or in

22  general, because --

23  Q.    Let's say generally?

24  A.    Would you ask the question again.

25  Q.    Yes.  Generally, when you got witness statements, statements

1  signed by witnesses that the police delivered to you, you would

2  want to read them so you could know what that witness told the

3  police before the witness took the stand?

4  A.   I would want to read that report before I had the witness

5  come in and be interviewed by me.  Way before the case was

6  accepted.

7  Q.   And then you would look at them again in preparing for the

8  trial because the trial might be months later, right?

9  A.   If the case was accepted, yes, sir, absolutely.

10 Q.   In a case like the Thompson case, where the arrest was made

11 in January and referred to the District Attorney's Office and the

12 trial didn't happen until May, you would certainly want to look

13 at the witness statements again before you put the witnesses on

14 the stand at trial, right?

15 A.   Certainly.

16 Q.   Those witness statements also, though, those weren't turned

17 over to the defense in 1985?

18 A.   Are you speaking in the Liuzza case?

19 Q.   Let's start with the Liuzza case.

20 A.   I don't have a recollection of which statements were turned

21 over or not in the Liuzza murder case.

22 Q.   In the ordinary course, though, generally, witness

23 statements obtained by the police were not turned over to the

24 defense around at that time, were they?

25 A.   Generally, no, they were not.

1  Q.   And that, too, just like the police reports, that was

2  because of a policy set at the top by Mr. Connick, right?

3  A.   That's correct.

4  Q.   Do you recall the police preparing what we've referred to

5  sometimes in this case as daily reports?

6  A.   Yes, sir.

7  Q.   What are daily reports?

8  A.   Daily reports are piecemeal accounts of investigations in

9  particular cases.

10  Q.   So unlike a supplemental police report which might be, say,

11  a 20- or 30- or 40-page piece that was typed up at the end of a

12  police investigation, the daily reports are kept by them each

13  day, right?

14  A.   I don't know if it's on an actual 7-day-a-week basis, but

15  those are what they call dailies because they were generally a

16  small part of the entire case.

17  Q.   But if we take something like the Liuzza murder, for

18  example, that was a widely publicized crime in New Orleans,

19  right?

20  A.   It was.

21  Q.   Front page of the newspaper?

22  A.   It was.

23  Q.   There was a reward posted?

24  A.   Yes, there was.

25  Q.   In a crime like that, you would expect the police to be

1   producing daily reports showing the progress of their

2   investigation, maybe not every day but day by day?

3   A.    I think daily reports were generated in every single

4   homicide case.

5   Q.    Because the investigation of a homicide case is very

6   important, right?

7   A.    Yes.

8   Q.    The thoroughness is very important?

9   A.    Yes.

10  Q.    And to the extent the police are going out and collecting

11  real facts, the daily reports are a good place to look to see

12  what kinds of facts the police are collecting, right?

13  A.    Yes, sir.

14  Q.    And you as a prosecutor, if you were getting ready for

15  trial, let's say when you were getting ready for trial in

16  Mr. Thompson's case, when Mr. Thompson was charged with murder,

17  you certainly would have looked at the police daily reports?

18  A.    I don't have a recollection of whether I did that or not.

19  Q.    Generally speaking, would you say you looked at the police

20  daily reports before trying a significant case such as a homicide

21  case?

22  A.    More than likely, yes.

23  Q.    And if you didn't have a supplemental police report yet,

24  then you would certainly be more likely to look at the daily

25  reports, right?

1  A.   Generally, the daily reports were just an account of the
2  information that had been developed.  A lot of the dailies were
3  just a matter of we went to, knocked on this door, you know,
4  nobody had any information, knocked on this door, it was just the
5  work that was being done up until the police presented us with a
6  supplemental report.
7  Q.   Let me ask generally about the policies of the office then.
8  In 1985, the daily reports, like witness statements, and like the
9  bigger police reports, those typically were not turned over to
10 the defense in 1985, correct?
11 A.   That's correct.
12 Q.   And again, that was because of a policy set by Mr. Connick
13 as the district attorney, the top guy in the office?
14 A.   That's correct.
15 Q.   I would like to talk a little bit about the two prosecutions
16 of Mr. Thompson and how they related to each other.  Would you
17 agree with me that the armed robbery prosecution of Mr. Thompson
18 was used as part of the murder case?
19 A.   Yes.
20 Q.   That prosecution, the two prosecutions --
21 A.   Let me say that it was our intention, if the jury returned a
22 guilty verdict, guilty as charged, that we would attempt to use
23 that conviction in the penalty phase to show the defendant's
24 character and propensity.
25 Q.   But the carjacking case was treated as part of a homicide

1  case, wasn't it?

2  A.    No.

3  Q.    Would you turn to your deposition at page 48.  I would like

4  you to look at line 9 for a moment.  Tell me when you are there.

5          Are you there, sir?

6  A.    Yes.

7  Q.    I would like you to look from line 9 to page 49, line 14,

8  and then I'm going to ask my friend here, Mr. Vincent, to play

9  that video clip for the jury as well.  Tell me when you've looked

10 through it.

11 A.    How far on page 49?

12 Q.    Through line 14.

13 A.    Okay.

14       MR. BANKS:  Mr. Vincent, can we show Mr. Williams his

15 testimony there.

16       (WHEREUPON, the videotaped deposition of James Williams

17 was played as follows:)

18                          EXAMINATION

19 BY MR. BANKS:

20 Q.    How about the carjacking?  Was that one of his cases?

21 A.    That was part of the homicide case.

22 Q.    The carjacking was part of the homicide?

23 A.    Yes.

24 Q.    Why do you say that?

25 A.    Because it followed -- there's a second charge.  In other

1  words, if someone were charged with a particular crime and then

2  other charges involved that same defendant, more than likely,

3  they would all be handled by the same person.

4  Q.   And you wanted to coordinate the prosecution of those two

5  related cases, right?

6  A.   Yes.

7  Q.   And that's, in fact, how it was handled with the prosecution

8  of Mr. Thompson, the cases were seen as -- as intertwined and the

9  prosecution of both was coordinated, right?

10  A.   Yes.

11  Q.   And that's why there was, among other reasons, the same

12  special prosecutor on both, Mr. Dubelier?

13  A.   Yes.

14  Q.   He was the special prosecutor for both cases, wasn't he?

15  A.   Yes.

16          (WHEREUPON, the videotape was stopped.)

17                          EXAMINATION

18  BY MR. BANKS:

19  Q.   Does this help you recall, Mr. Williams, that the carjacking

20  trial was part of the homicide case?

21  A.   Yes, and if I can explain my answer, it was not only the

22  office policy but it was a rule of court that if a defendant were

23  charged in another case, then that case would follow any other

24  cases that someone had in the court for judicial economy.

25  Q.   I asked you before though whether that was part, whether the

1  carjacking was part of the homicide case.  Had you forgotten that

2  rule of court?

3  A.   No, I just probably misunderstood what you were asking for.

4  Q.   The murder took place, the murder of Ray Liuzza took place

5  on December 6, 1984; is that consistent with your recollection?

6  A.   I don't have a recollection.  I trust that's when it was.

7  Q.   If I told you the carjacking took place on December 28,

8  2004, [sic] about three weeks later, right?

9  A.   Right.

10 Q.   And you do know that Mr. Thompson was arrested first for the

11 murder and then charged after his arrest on the murder with the

12 carjacking?

13 A.   Yes.

14 Q.   But the order of the trial was switched, right?  The trials

15 were switched so the carjacking would go first?

16 A.   Correct.

17 Q.   And you said before, that's so you could try to get a

18 conviction in the carjacking case and then use it against

19 Mr. Thompson in the murder case, right?

20 A.   That's correct.  That's correct.

21 Q.   Now, in the carjacking, the most you could get, if you got a

22 conviction of Mr. Thompson, was 99 years.  That was the maximum

23 sentence for armed robbery, right?

24 A.   Yes, that's correct.

25 Q.   But in the murder case, you could actually get a death

1   sentence or at least life in prison, a greater sentence?

2   A.   Yes.

3   Q.   That's why you do the carjacking first to use in the murder

4   case and not vice versa?

5   A.   The reason that we used the carjacking case was that so the

6   jury that heard this case could hear everything there was to hear

7   about John Thompson.

8         At that point in 1985, I don't believe that it was

9   allowed to use unadjudicated crimes in the penalty phase.  I

10   think that came later.  And I think that was a case that I was

11   involved in, state versus *John Brooks*.  So before we could have

12   used the information in the carjacking, we would had to have

13   obtained a conviction.  I'm pretty sure about that.

14   Q.   So you wanted in the murder case the jury to hear, what did

15   you say, everything it could about John Thompson?

16   A.   That's correct.

17   Q.   You didn't want them to hear his blood type, did you?

18   A.   I did not know what his blood type was.

19   Q.   Oh, okay.  But did you do anything to bring out his blood

20   type at the carjacking trial or in the murder case?

21   A.   I brought it out at the motion hearing.

22   Q.   At the motion hearing on March 11, 1985, you heard Mr. Aaron

23   refer to that in his opening statement, right?

24   A.   Yes, sir.

25   Q.   You stood up and you said at that motion hearing to

1  Judge Quinlan at the close of the hearing, something like, We may

2  want to test the defendant or take blood from the defendant?

3  A.    I think I said we planned to do that.

4  Q.    But you didn't do it?

5  A.    I did not.

6  Q.    So you don't know what signal the defense lawyer for

7  Mr. Thompson took from that because you never went forward and

8  got his blood?

9  A.    Mr. Banks, if I can explain, first off, to digress a little

10  bit, at that point in time, I was not the special prosecutor on

11  the Thompson murder case.  I was asked by Mr. Dubelier to handle

12  a Motion to Suppress the identification hearing on an attempted

13  armed robbery.

14       Mr. Dubelier was unavailable for one reason or another.

15  I think actually it was because he was about to get married.  So

16  I told him I would be happy to handle that motion.  It was a

17  Motion to Suppress.  I had probably done hundreds of them before

18  that.  The issue was whether or not any of the police officers

19  had suggested to one of the LaGarde children who to pick out.  I

20  think we had one or two witnesses.

21       At that point in time, on the screening action form,

22  which was on the front page of our file, Bruce Whittaker had

23  written, You may want to take the blood type of John Thompson.

24  Having read that in open court at the conclusion of the motion

25  hearing, I announced to the court what Mr. Whittaker had advised

1  we needed to do.  Let's take the blood of John Thompson.

2  Q.  But you never did?

3  A.   No.  You didn't let me finish, sir.  When I finished doing

4  that, Mr. Bertel was there in open court.  He heard that.  Now,

5  what happened after that, I have no idea, because I turned the

6  file back over to Mr. Dubelier.

7  Q.  Mr. Williams, would it be a slightly more accurate version

8  of what you said before to this jury if we changed it as follows,

9  if we changed it to say, I wanted the jury to know everything it

10  could about John Thompson except his blood type and except that

11  there was blood evidence in the carjacking case, would that be a

12  more accurate way to put it, sir?

13            MR. CARVER:  Objection, Your Honor, argumentative.

14            THE COURT:  Overruled.

15            THE WITNESS:  That's not true.

16                              EXAMINATION

17  BY MR. BANKS:

18  Q.  Mr. Williams, you knew in 1985 there was blood evidence,

19  didn't you?

20  A.   Yes.

21  Q.  You knew that before the carjacking trial?

22  A.   I reading what was on the screening action form.  I surmised

23  that Bruce Whittaker had knowledge that there could possibly be

24  blood evidence.

25            MR. BANKS:  Let's take a look at the screening action

1  form.  Would you put Exhibit 33 up, Mr. Vincent.

2                          EXAMINATION

3  BY MR. BANKS:

4  Q.   It's in your book, if you wish to see it, but you'll also

5  see it on the screen here if that's easier for you, Mr. Williams.

6           This is Exhibit 33.  This is a screening action form,

7  isn't it?

8  A.   Yes.

9  Q.   Okay.  And a screening action form, let's just explain what

10  that is.  There is a person, a district attorney who is assigned

11  to a case when it is comes over from the police department, and

12  that's called a screener?

13  A.   Correct.

14  Q.   Mr. Dubelier, the lead prosecutor on the Thompson case, he

15  was the chief of screening at the time, right?

16  A.   He was.

17  Q.   And tell us how the screening process works when the file

18  comes over from the police department to the screener?

19  A.   Well, that's not quite the way that it works.  The

20  initiation of the screening process begins when there is an

21  arrest made by the NOPD.  At that point in time, generally, a

22  screener is assigned to the case.  There were several different

23  departments in the screening division.  Mr. Dubelier was the

24  chief of screening.  There was a narcotics screener that was, who

25  had handled, pardon me, narcotics cases.  At that time, I was the

1    homicide screener.  I handled homicides.  I think Mr. Whittaker

2    handled armed robberies.  There was also a sex crime screener and

3    there were several general screeners.

4           This screener --

5    Q.   I'm sorry --

6    A.   You asked me to --

7    Q.   Please.

8    A.   When a police report would come over, it would be affixed to

9    the screening action form.  Information would be entered on

10   there.  Generally there was an investigator in the screening

11   division who handled that aspect of the job.  At the point in

12   time when we received a police report, whether we were a general

13   screener or a specialty screener, we would review what's in the

14   police report.

15          And at that point in time, if we felt like we needed

16   more information or we wanted to interview witnesses, generally

17   witnesses were interviewed.  We tried to get as much information

18   as we could, which, on occasion, attorneys would call us and say,

19   I represent someone and I have information that I would like to

20   bring to your attention.  So basically, the screening was the

21   first stop for an arrest for review by the District Attorney's

22   Office.

23   Q.   You wanted to get as much information as you could, right?

24   A.   Yes.

25   Q.   That's what you just said?

1   A.    That's correct.

2   Q.    You didn't want to turn as much as you could over to the

3   defense, you just wanted to get it so you could use it.

4   A.    At this point in time, Mr. Banks, no charges had been

5   accepted.  As a matter of fact, to answer your question, I can

6   tell you, and I believe I told you this before, that on many,

7   many occasions, when I was the homicide screener, and also when I

8   was the armed robbery screener before that, if I had something in

9   a report that didn't sit right, I often called the, if someone

10  didn't have an attorney, I would call Mr. Bertel's office and

11  advise him, Look, would you go talk to this person who apparently

12  doesn't have a lawyer, because I have some unanswered questions

13  that perhaps you can help me with.  I did that all the time.

14  Q.    But not with this report?

15  A.    Well, this report was screened by Mr. Whittaker.

16  Q.    But you got it.  You saw it, right?

17  A.    I did see it.

18  Q.    You didn't call up Mr. Bertel and say, Hey, I've got this

19  report.  You might want to take a look at it, did you?

20  A.    I advised the court, in open court, with Mr. Bertel standing

21  three feet away from me that we, we wanted to draw blood from

22  John Thompson.

23  Q.    Did you call Mr. Bertel and tell him he might want to take a

24  look at this report, the way you said you did sometimes with

25  other information?

1   A.   I did not.

2   Q.   Let's look at some pieces of this report.

3        MR. BANKS:  Mr. Vincent, can you blow up some pieces on

4   the top and bottom.

5                        EXAMINATION

6   BY MR. BANKS:

7   Q.   This shows, this is the top of the screening action form and

8   you see that Mr. Thompson's name is up there.  Do you see where

9   it says, John Thompson?

10  A.   Yes.

11  Q.   And beneath that, there is a name, Whittaker.  Who is that?

12  A.   Bruce Whittaker.

13  Q.   Bruce Whittaker was the screener on this case, right?

14  A.   Bruce Whittaker screened armed robberies and arsons.

15  Q.   So that means in Mr. Thompson's armed robbery case,

16  Bruce Whittaker got a file from the police department, would have

17  reviewed it and then would have written up this screening action

18  form?

19  A.   Yes, sir.

20  Q.   Let's go down to the bottom, please.  So this refers to some

21  of the physical evidence that Mr. Whittaker read about in the

22  file, right?

23  A.   Yes, sir.

24  Q.   First it says, "The gun was the same make and model as the

25  Liuzza weapon."  Right?

1    A.    Yes.

2    Q.    Now, again, this would have been some time after

3    Mr. Thompson was arrested and charged with murder, right?

4    A.    There is a date on there.  I'm sure that the date

5    screened --

6    Q.    The date at the top, 2/25/85, it says date screened?

7    A.    That's correct.

8    Q.    Okay.  So this was after Mr. Thompson was already under

9    arrest?

10   A.    For the murder, yes, sir.

11   Q.    In fact, this was about two months after the carjacking

12   occurred, if, as I told you the carjacking occurred on

13   December 28th, right?

14   A.    Yes, sir.

15   Q.    Now, let's go to the bottom.  "Victim made photo ID.  Will

16   be in town 3/11/85 if physical desired.  May wish to do blood

17   test."

18          That's what clued you in at that point that there may

19   be a need to take blood, and that's what caused you to make a

20   comment at the March 11th hearing?

21   A.    Yes, sir.

22   Q.    In addition to this form, Mr. Williams, did you also see

23   something known as the crime scene technician's report?

24   A.    I don't recall.

25          MR. BANKS:  Let's put up the crime scene technician's

1    report.  It's Exhibit 22.  Put up page 1 of that first.

2                              EXAMINATION

3    BY MR. BANKS:

4    Q.   Now, let me just ask you, have you seen reports like this

5    before?

6    A.   Yes, sir.

7    Q.   The crime scene technician, is that the person who goes to

8    the scene of the crime and takes physical evidence?

9    A.   Yes.

10   Q.   So if there are gunshots, the crime scene technician may

11   take casings or slugs from a wall or, God forbid, a body or

12   whatever it is, right?

13   A.   Yes.

14   Q.   He could dust for fingerprints?

15   A.   Yes, sir.

16   Q.   He could take blood evidence?

17   A.   Yes, sir.

18   Q.   He could take photographs?

19   A.   Yes, sir.

20   Q.   That's what a crime scene technician does?

21   A.   Yes, sir, that's correct.

22   Q.   And that person is often a witness at a trial of a case.  A

23   crime scene technician might come in and testify at a trial?

24   A.   That's right.

25   Q.   And you might put a person on when you were an assistant

1  district attorney and say, Tell us what evidence you've got?

2  A.   Yes.

3  Q.   Now, this crime scene technician report, you can tell says,

4  "Victim, Stewart LaGarde," about four lines down.  Do you see

5  that?

6        I know it's hard to read.  It's also in your book if

7  that's easier.

8  A.   I see it.

9  Q.   So this is the carjacking case that Mr. Thompson was charged

10  with?

11  A.   Yes.  It appears to be.

12       MR. BANKS:  Now, let's go to page 4 of this document,

13  Mr. Vincent.

14                          EXAMINATION

15  BY MR. BANKS:

16  Q.   I know this is very hard to read, so I'm just going to read

17  it to you.  It's in your book, too, and if it sounds like it's

18  hard to follow or if you need to correct me, you can.

19  A.   What page?

20  Q.   It's Exhibit 22, page 4.  It may be easier to see on the

21  screen than in the book, sir.

22       But it looks to me like the first entry says, "One

23  tennis shoe, white, left side, make FootJoy," that's what

24  Mr. Aaron told us, that it was a FootJoy shoe?

25  A.   Yes.

1  Q.   "With blood collected from victim on scene."

2       And the second one seems to say, "One piece of victim's

3  right pant leg with blood collected from victim on scene?"

4  A.   Yes, sir.

5  Q.   Anyone reviewing this report would understand that the crime

6  scene technician went to Stewart LaGarde and cut a swatch out of

7  his pants that had some blood on it?

8  A.   Yes, sir.

9  Q.   Now, you would expect if the person, the crime scene

10  technician, could cut the pant leg off with blood, the crime

11  scene technician must have at least suspected that that blood

12  could have come from the perpetrator?

13  A.   It was evidence at the scene of a crime.

14  Q.   There would be no evidence reason to cut up Mr. LaGarde's

15  pants and take a swatch back to the evidence room if, in fact, it

16  was Mr. LaGarde's blood, right?

17  A.   I couldn't speak to that.

18  Q.   With that swatch, that bloody swatch of pant leg, the crime

19  scene technician had collected something that was potentially a

20  very valuable piece of evidence, right?

21  A.   That's correct.

22  Q.   Because that could be tested?

23  A.   Possibly.

24  Q.   They didn't do DNA testing back then?

25  A.   Back then they did not, no.

1  Q.   But you could test that bloody swatch and try to see if it's

2  type B or O or A or AB; that was around?

3  A.   That's correct.

4  Q.   And that was a very easy test to do?

5  A.   I don't know about that.  I wasn't involved in that.  But I

6  know it was a test that was done.

7  Q.   As a prosecutor who is involved in prosecuting people

8  charged with violent crimes, this wasn't the first time that

9  blood evidence was tested for blood type in your experience?

10  A.   No, sir.

11  Q.   You knew that was something the police crime lab could do?

12  A.   Yes.

13  Q.   And you would have known that if that bloody swatch of pant

14  leg had a blood type that did not match Jay LaGarde and did not

15  match John Thompson, that might be very helpful in proving

16  Mr. Thompson's innocence?

17  A.   Yes.

18  Q.   On the other hand, if the bloody swatch had a blood type

19  that matched Mr. Thompson, that might be evidence you could use

20  in your case trying to get a conviction?

21  A.   Yes, sir.

22  Q.   And you could have used that to get that conviction and then

23  use it at the penalty phase of the murder case?

24  A.   Yes, sir.

25  Q.   Without that blood evidence, the evidence against

1    Mr. Thompson in the carjacking case was witness identification,

2    right?

3    A.    Yes.

4    Q.    In your experience as both a prosecutor, and now you're a

5    defense lawyer, right?

6    A.    That's correct.

7    Q.    Witness identifications sometimes get challenged, right?

8    A.    In almost every instance.

9    Q.    Every instance, sometimes they are right, sometimes they are

10   not?

11   A.    Right.

12   Q.    In fact, months after the fact, witnesses sometimes give

13   descriptions of perpetrators that don't even match what they said

14   the day after the crime, right?

15   A.    Sometimes.

16   Q.    And a defense lawyer works hard to challenge convictions

17   based solely on witness identification?

18   A.    I work hard as a criminal defense lawyer to challenge

19   state's evidence in every case.

20   Q.    In the LaGarde carjacking case, there were three children in

21   the car when someone jumped in late at night outside the

22   Superdome, right?

23   A.    Yes.

24   Q.    It's a tough identification:  Late at night, in a car,

25   during a struggle.

1          MR. CARVER:  I object, argumentative.

2          THE COURT:  Overruled.

3          THE WITNESS:  It could have been.  I don't recall the

4    lighting conditions, but I can say that the perpetrator was

5    within a few inches, the face was within a few, this wasn't a

6    case where somebody was walking down the street or a distance

7    away.  In this case, he was very close.

8                              EXAMINATION

9    BY MR. BANKS:

10   Q.   But certainly the blood evidence, if it matched

11   Mr. Thompson, would have been helpful to add to that witness

12   identification?

13   A.   Yes, sir, that's correct.

14   Q.   So it was either going to make a conviction more likely,

15   which was good for the prosecutors, or possibly prove

16   Mr. Thompson's innocence?

17   A.   It might have.

18   Q.   That blood evidence was tested, wasn't it?  There was a

19   crime lab report showing that the blood evidence was tested?

20   A.   That's correct.

21   Q.   Even if you as a prosecutor did not know Mr. Thompson's

22   blood type, did not know that he was type A, would you agree with

23   me that you were under an obligation to turn over that blood

24   evidence and the report showing the testing of the blood

25   evidence, if you had known about it?

1  A.    If I had been the lead prosecutor on this case, I was not,

2  Mr. Dubelier was, I would have done exactly what Mr. Dubelier

3  did.  Discovery was filed by the defense seeking production of an

4  examination of any exhibits, any scientific samples that we had.

5         My recollection is that Mr. Dubelier answered that

6  question, Will be allowed at defendant's convenience or however

7  he answered.  My answer, had I been in Mr. Dubelier's position, I

8  would have done the same thing.

9  Q.    Meaning sit on it and not show it to the defense?

10 A.    No, I answered discovery that any exhibits that we had would

11 be available to the defense.

12 Q.    To your knowledge, did Mr. Dubelier ever show it to the

13 defense?  I'm not asking what he wrote on a piece of paper.  Did

14 he ever go to Mr. Thompson's lawyer and say, Here it is?

15 A.    I don't know.

16 Q.    Did you?

17 A.    I did not.

18 Q.    So you did the same thing you think Mr. Dubelier would have

19 done?

20 A.    Well, you have to understand, Mr. Banks, at that point in

21 time, Mr. Dubelier was my supervisor.  He was handling both the

22 homicide case, and I'm not trying to put off on him, I'm just

23 explaining to you the way things worked with him.  Those were his

24 cases.  At that point in time that I received that case, I was

25 there to do the motion hearing, which I did.  I didn't receive

1  that case until literally the few days before the trial.

2  Q.   Mr. Dubelier was pretty high up in the office, wasn't he?

3  A.   Mr. Dubelier at that time was the chief of screening.

4  Q.   And he reported to the first assistant to Mr. Connick,

5  right?

6  A.   Yes.

7  Q.   And the first assistant reported to Mr. Connick?

8  A.   Yes, sir.

9  Q.   So the level he was at was just two down from Connick:

10  Connick, chief of trials, then Dubelier, right?

11  A.   I'm not certain of that.  Mr. Connick would be in a better

12  position to answer that.

13  Q.   How many assistant district attorneys were there in the

14  office at that time?

15  A.   The number 63 sticks in my head at that time.  Right around

16  that time.  It was, I would say between 50 and 70.

17  Q.   So Mr. Dubelier was pretty high up in that pecking order of

18  63 people?

19  A.   He was.

20  Q.   Would you agree with me, though, that if you have evidence,

21  if you knew at the time of the carjacking trial that the blood

22  evidence had been tested and that a result came back showing that

23  the blood evidence was not only tested but a positive result was

24  received, that it was type B, that you would have to turn that

25  over to the defense?

1  A.    Yes.

2  Q.    Why?  Why, sir?

3  A.    Well, if I understand your question, if you have evidence,

4  scientific evidence that indicates that a blood sample from a

5  scene could not possibly have been the person who was suspected

6  of committing that crime, that would be *Brady* material and it

7  would absolutely need to be turned over.

8  Q.    Suppose you have that report and that report shows type B

9  and you don't know that Mr. Thompson is type O.  You don't know

10  if he's type O or type B or type AB, you still have to turn that

11  over, don't you?

12  A.    You have to turn over any scientific evidence that you have,

13  so I would agree, yes.

14  Q.    Because otherwise, you might be convicting the wrong man?

15  A.    That's possible.

16  Q.    And that's a bad thing?

17  A.    That is a bad thing.

18  Q.    And if you're convicting the wrong man, if Mr. Thompson is

19  not the carjacker and you convict him, that means the real

20  carjacker is still out there, right?

21  A.    Yes, that's correct.

22  Q.    So you would have done two bad things by convicting the

23  wrong man.  One, you put a potentially innocent man in jail,

24  actually three bad things.  Two, you would use it against him in

25  the murder case.  And three, the real carjacker would still be

1  running around, and that's all bad, isn't it?

2  A.   I agree with you a hundred percent.

3  Q.   Do you recall that just a few days before the carjacking

4  trial of Mr. Thompson that that bloody swatch that's referred to

5  in the crime scene technician report was checked out of the

6  evidence locker; did you know that?

7  A.   No.

8  Q.   Do you know now that it was checked out of the evidence

9  locker by one of the prosecutors and taken to the crime lab?

10 A.   Yes.

11 Q.   The test that was done on that bloody swatch of fabric, you

12 say that test was directed by Mr. Dubelier or Mr. Whittaker,

13 correct?

14 A.   I didn't direct it.

15 Q.   You said it was directed, you know that it was directed by

16 Mr. Dubelier or Mr. Whittaker, right?

17 A.   Since 1999, I have come to learn to that.

18 Q.   You learned that it was Dubelier or Whittaker, you don't

19 know which one?

20 A.   I'm not sure.

21 Q.   You now know, of course, that that crime lab report did come

22 back and it did show a definitive test of type B.

23 A.   Yes.

24 Q.   Let's take a look at that.

25        MR. BANKS:  Would you put Exhibit 45 up, Mr. Vincent.

EXAMINATION

BY MR. BANKS:

Q.   There we go.  This is the hard-to-read crime lab report.

MR. BANKS:  I want to ask Mr. Vincent to pull out a couple of portions of it.  The top part.

EXAMINATION

BY MR. BANKS:

Q.   Let's start with the top part.

A.   Where would that be in my book, Mr. Banks?

Q.   I am sorry.  It is Exhibit 45.  Do you have that, Mr. Williams?  Again, some of these documents are easier to read on the screen than in the book.

A.   I got it.

Q.   Now, whichever you look at, the book or the screen, the date of this report, April 9, 1985, that's the date the report was released by crime lab, right?

A.   Yes, sir.

Q.   That's two days before the carjacking trial?

A.   If you tell me the carjacking trial was April 11th, okay.

Q.   I'll tell you that.  I actually read a stipulation that said it was April 11th and 12th.

A.   All right.

Q.   So for this to be going on just two days before the trial, Mr. Dubelier and Mr. Whittaker, whichever of them directed the test, must have wanted to use it for the trial, right?  That's

1  what you would expect?

2  A.   Yes.

3  Q.   It says here, To -- you see where it says that on the left

4  there, "To:  District Attorney's Office."

5        That's where you were, right?  "To District Attorney's

6  Office."

7  A.   I see that, right.

8  Q.   "Attention:  ADA Bruce Whittaker."

9  A.   Yes.

10 Q.   Mr. Whittaker was sent this report, according to what it

11 says here?

12 A.   Yes.

13 Q.   And he had been the screener on the case?

14 A.   That's correct.

15 Q.   He was also a good friend of yours, right?

16 A.   He was.

17 Q.   I mean, he worked with you in the office and he socialized

18 with you?

19 A.   Yes.

20 Q.   His office was just a few doors down from yours, right?

21 A.   He was next to my office.

22 Q.   You talked to him all the time?

23 A.   Yes.

24 Q.   He was also a witness at the carjacking trial?

25 A.   Yes.

1  Q.   You're aware, aren't you, that Mr. Whittaker has testified
2  that he took that report and he put it on your desk?
3  A.   Yes.
4  Q.   Let's look at the bottom of the report.  Under results.
5  "Stains on specimen 1 yielded positive serological reactions for
6  Group B human blood."
7       Do you see that?
8  A.   Yes.
9  Q.   That's a fancy way of saying the bloody swatch that was
10 tested was type B?
11 A.   I'm not an expert in serological reactions.  It's very
12 confusing, but I would agree that Group B is B.
13 Q.   Isn't that how you would have read it, sir?  We tested this
14 swatch and it's type B?
15 A.   Yes.
16 Q.   That would tell you that if this is the perpetrator and you
17 know the perpetrator is type B, the only thing you need to know
18 is Mr. Thompson's blood type and possibly we could rule him out
19 completely?
20 A.   That's correct.
21 Q.   Did Mr. Whittaker come to you at any point after he put the
22 report on your desk and say, Hey, Mr. Williams, or he probably
23 would have said, Hey, Jim, what did you think of that report?
24 A.   I don't recall him doing that.
25 Q.   He was a witness during the trial, right?  In the LaGarde

1  carjacking trial?

2  A.   I don't recall.  I know he showed the pictures or put

3  together the pictures to send to one of the children in Virginia,

4  as I recollect, but I think he testified at the motion hearing.

5  I don't remember if he testified at the trial or not.

6  Q.   And you know he testified at least at the motion hearing?

7  A.   I'm pretty sure that, yes, I know that he did.

8  Q.   If I told you that he actually showed up at the trial and

9  testified again about the photo array he gave to the LaGarde

10 children, would you have any reason to disagree with that?

11 A.   Certainly not.

12 Q.   Do you think you would have talked to him before the trial

13 about his testimony?

14 A.   I remember talking to him about his testimony during the

15 motion hearing.

16 Q.   Do you think he would have brought up anything about the

17 report that he remembers putting on your desk?

18 A.   If he did, I don't recollect it.

19 Q.   You would agree with me, though, that this crime lab report

20 dated April 9, 1985, did not do anything to cause you or the

21 attorney who was assisting you in this case, Mr. Deegan, to say

22 anything to Mr. Thompson's lawyer at the trial about the blood

23 evidence?

24 A.   Mr. Banks, I don't recall ever seeing that report until

25 1999.

1   Q.   At any time, though, prior to the armed robbery trial, did

2   you tell Mr. Bertel, Mr. Thompson's lawyer, that there was blood

3   evidence, that the evidence had been tested, that a blood type

4   had been determined definitively from the swatch and that the

5   blood was that of the perpetrator?

6   A.   I couldn't have told him that because I never saw the

7   report.

8   Q.   So you didn't even know it?

9   A.   I did not know about that report until sometime in 1999.

10  Q.   Mr. Williams, you said this carjacking case was important in

11  the murder case, right?

12  A.   Yes.

13  Q.   And a carjacking of three teenagers is a big thing, right?

14  A.   Yes.

15  Q.   And you worked hard to prepare for your cases to get

16  convictions?

17  A.   Yes.

18  Q.   So what were you, just proceeding in some sort of blissful

19  ignorance about the blood evidence?  It was just going to be out

20  there but you didn't care where it was?

21  A.   I did not follow up on that.  My recollection, again, we're

22  talking 22 years ago, okay, and I don't remember much about this

23  case.  I have previously told you what I remember about the case.

24  I remember we had three positive identifications.  The decision

25  was made, you know, to prosecute this case.

1          We were, you know, we had interviewed those children.

2  They were very good witnesses.  And that's the way the case was

3  tried.

4          And also, I got this case very late in the day before

5  trial, so to speak.  And I went with what we had.

6  Q.   So you didn't have time to do your customary thorough

7  preparation?

8  A.   I went with what we had.

9  Q.   Late in the day, like a day before the trial, two days

10 before the trial?

11 A.   Well, the trial was on a Monday.  I spoke to Eric about the

12 case probably, he said I, would you handle the case for me?  I

13 can't do it for one reason or another, and I agreed to do that.

14 Q.   He didn't say anything like, We have this really big

15 carjacking case, and we need it to set up a death penalty in the

16 murder case, so just go in and wing it.  You don't need to

17 prepare at all?

18 A.   Mr. Banks, every single case that I took to a jury when I

19 was an assistant DA was a big case to me.

20 Q.   At least in the moments, the hours, the day before the

21 carjacking trial, you would have looked at the file?

22 A.   Certainly.

23 Q.   You would have known the screener was Bruce Whittaker?

24 A.   Certainly.

25 Q.   So you could have walked, you said it was just a couple

1   doors down to Mr. Whittaker's office and said, Hey, Bruce, there

2   is something in here about blood evidence.  What's going with

3   that?  Did you do that?

4   A.    I don't recall doing that.

5   Q.    Do you think maybe you did and you just forgot?

6   A.    That could be.

7   Q.    But you certainly knew there was blood evidence; anyone knew

8   that from the file?

9   A.    I was the one who announced in open court that blood was

10  going to be an issue in this case.

11  Q.    Well, let's talk about open court, Mr. Williams.  Would you

12  agree with me you did everything you could during that carjacking

13  trial to stay away from the topic of blood evidence because

14  Mr. Thompson and his lawyer couldn't know there was blood

15  evidence?

16  A.    Well, Mr. Banks, as I've told you before, my best

17  recollection, and I have absolutely nothing to base that on other

18  than having worked in that office, having dealt with those

19  lawyers, Mr. Bertel on literally a daily basis, that the fact

20  that Mr. Bertel did not follow up on this, to me indicated to me

21  and I may have discussed this with the other lawyers, that

22  Thompson admitted to him that he did the crime.

23         I cannot fathom how it is that when it's announced in

24  open court that there is blood evidence that may be relevant that

25  a defense lawyer, because that's what I do now, wouldn't have

1    followed up on it.

2    Q.   You didn't say there was blood evidence, sir.  You told us

3    what you said in court on March 11th was, We may need to take

4    blood, and then you never took it; is that right?

5    A.   I stand by my answer.

6    Q.   You gave the opening statement in the carjacking case.  You

7    stood up just like Mr. Cooney did in this trial, Mr. Aaron did on

8    this trial, and you outlined what you intended to prove?

9    A.   The record reflects that.

10   Q.   And in that opening statement, you talked about the struggle

11   between Jay LaGarde and that carjacker, whoever it was.  You told

12   them there was a struggle?

13   A.   Okay.

14   Q.   You didn't mention anything about blood in there.  You

15   stayed away from it, didn't you?

16   A.   I don't recall what I said or why I did it.  Other than I

17   dealt with what I had.

18   Q.   Why don't you look at page 224 of your transcript, sir?

19   A.   Of my deposition?

20   Q.   Yes.  Line 2.  Tell me when you're there, please.  I want

21   you to read from line 2 through line 10.

22   A.   Okay.

23        MR. BANKS:  Can we show this video, Mr. Vincent.  Page

24   224, lines 2 through 10.

25        (WHEREUPON, the video deposition of James Williams was

1  played as follows:)

2                              EXAMINATION

3  BY MR. BANKS:

4  Q.   That section of the transcript from your opening statement

5  in the carjacking trial describes the struggle between Jay

6  LaGarde and the perpetrator of the carjacking?

7  A.   Yes.

8  Q.   Is there any reference in there to blood?

9  A.   No.

10 Q.   So in your opening, in describing the struggle, you stayed

11 away from blood?

12 A.   Yes.

13 Q.   And then when you questioned Mr. LaGarde, you didn't ask

14 Mr. LaGarde anything about blood or cutting the pant leg or the

15 perpetrator bleeding on his pant leg, did you?

16 A.   I'm sure that I didn't.

17 Q.   You stayed away from it?

18 A.   I don't recall what my reason was.  If I didn't ask about

19 it, I didn't ask about it.

20 Q.   But you don't recall why?

21 A.   No.

22 Q.   I mean, part of what you're trying to do here is you're

23 trying to get a conviction of someone that was accused of being a

24 carjacker, right?

25 A.   Yes.

Q.   A violent struggle is something you would want the jury to
know, right, ordinarily?

A.   Mr. LaGarde testified regarding the violent struggle.

Q.   But you didn't ask him anything about the blood?

A.   If, again, I'll go by what's in the record.  I don't recall
much about this case.

Q.   Mr. Williams, Jay LaGarde was an important witness in that
case, right?

A.   He was a victim.

Q.   You wouldn't just put him on the stand cold?

A.   Of course not.

Q.   You talked to him.  You prep him?

A.   Of course I did.

Q.   During the course of that discussion, do you remember Jay
LaGarde asking you, Mr. Williams, What about that blood evidence?
Whatever happened with that?  What about the piece of swatch that
they cut out of my pant leg?

A.   I don't remember any part of, any conversation that I had
with any of those children in trial prep.

Q.   You told him that it was tested and inconclusive, didn't
you, sir?

A.   I don't recall what I told him, Mr. Banks.

Q.   If you told him that, that would have been untrue, wouldn't
it?

A.   Well, that, I don't know what I told him.

1  Q.   That would have been untrue if you said that, right?

2  A.   If I had said what?

3  Q.   That they tested the blood evidence and the test was

4  inclusive.  That would have been untrue?

5  A.   That's not true because I had no idea that any blood had

6  been tested.

7  Q.   Mr. Williams, Mr. Deegan assisted you with the trial.  He

8  was your number 2?

9  A.   That's correct.

10  Q.   You sat here in openings and you heard Mr. Aaron describe

11  this process where there was a lead prosecutor in the case and a

12  junior prosecutor.  You were the lead?

13  A.   I was.

14  Q.   You were the experienced guy then?

15  A.   I was more experienced than Gerry Deegan.

16  Q.   Mr. Deegan was, what do they call them, juniors?

17  A.   Yes.

18  Q.   He questioned the crime scene technician, Mr. Cusimano, who

19  had taken the swatch from Mr. LaGarde's pant leg, right?

20  A.   Again, if the record reflects that.

21  Q.   Why don't we look at page 226 of your transcript.  We don't

22  need to put anything up on the screen, if that will help you

23  refresh your recollection.

24       Actually it starts at the bottom of page 225, line 20.

25  I asked you, "One of the other witnesses in the trial was the

1  crime scene technician, Anthony Cusimano."

2          Do you see that?

3  A.   Yes.

4  Q.   And the next page, on 226, on line 8, I asked you, "The

5  direct examination was conducted by Mr. Deegan?"

6          And you answered, "Yes."

7  A.   Yes.

8  Q.   But you were there the whole time.  You didn't get up and

9  leave the courtroom?

10  A.   No, I didn't do that.

11  Q.   So you heard Mr. Deegan ask Officer Cusimano what he did

12  when he went to the scene, right?

13  A.   Yes.

14  Q.   And is it officer or detective, I don't know that what they

15  call Cusimano?

16  A.   Probably officer.

17  Q.   Officer Cusimano described how he took photos of the scene

18  and he dusted for fingerprints, and he collected a gun that the

19  carjacker had, right?

20  A.   Yes.

21  Q.   But he wasn't asked a thing about the blood evidence.  He

22  wasn't asked about cutting a swatch out of Mr. LaGarde's leg, was

23  he?

24  A.   Again, if you have a copy of the transcript, I'll take your

25  word for it that that wasn't asked.

1    Q.   Let's look at your deposition transcript.   Page 228.   I

2    asked you, line 6, "But there's no question to Mr. Cusimano about

3    the blood evidence that he took?"

4            And your answer was, "That's correct."

5            Right?

6    A.   Again, the record of the trial will speak for itself.

7    Q.   Did you lean over to Mr. Deegan at that point and say, Hey,

8    Jerry, you forgot to ask him about the blood evidence?

9    A.   I don't remember what I did.

10   Q.   Isn't it true, sir, that you and Mr. Deegan did everything

11   you possibly could during this trial to stay away from the topic

12   of blood evidence so that you could avoid tipping off

13   Mr. Thompson and his lawyer?

14   A.   I can't say that that's true or not.   I can only say that

15   Mr. Thompson's lawyer was already aware of blood.

16   Q.   Turn to page 229, please, of your transcript, sir.   Lines 4

17   to 10.   Tell me when you're there.   This is your prior sworn

18   testimony, Mr. Williams?

19   A.   Yes.

20          MR. BANKS:   Can we play this video excerpt for the jury.

21          (WHEREUPON, the videotape deposition of James Williams

22   was played as follows:)

23                              EXAMINATION

24   BY MR. BANKS:

25   Q.   Let me ask you again.   Was there an attempt by you and

1  Mr. Dugan, Deegan to stay completely away from the blood evidence

2  in the opening and the questioning of all the witnesses?

3  A.   I don't recall.  Obviously we did.

4         (WHEREUPON, the videotape was stopped.)

5                      EXAMINATION

6  BY MR. BANKS:

7  Q.   Obviously we did, sir.  You stayed away from the blood

8  evidence, didn't you?

9  A.   Look, if I can explain that, if questions were not asked

10 about blood evidence, then they weren't asked.  Now, can I now

11 recollect why we did or didn't do that?  I cannot.

12 Q.   Can you think of any reason why maybe you didn't?

13 A.   It could be that we weren't aware at the time that a test

14 had been done and that if we started asking about blood evidence

15 not knowing what the results were, that we could start creating

16 reasonable doubt in the case.

17 Q.   Creating reasonable doubt.  That would be a terrible thing,

18 wouldn't it, to create reasonable doubt by suggesting that there

19 was blood evidence that might not match Mr. Thompson?  Would that

20 be a bad thing?

21 A.   Well, those are your words, Mr. Banks.  We -- this case was

22 tried based upon the evidence that we had.  I was not aware of

23 any blood test that had been done.  Now, when I think back on

24 that and I look through all the documents, I know for a fact that

25 Mr. Bertel was aware.  And I know for a fact that there was a

1   report.   I know for a fact that there was an evidence card which

2   was available to the public which showed that there was blood

3   evidence in this case.   And I know for a fact that Mr. Bertel was

4   one of the finest lawyers that I ever had the privilege of trying

5   a case.   I used to learn from him.

6   Q.    He was a friend of yours, too?

7   A.    I thought the world of Mr. Bertel.   Still do.

8   Q.    But you got along with him.   He was not just an adversary

9   you fought with, he was a friend?

10  A.    When the light came on at a trial, he did his job and I did

11  my job.

12  Q.    Why didn't you go to your friend?   This wasn't about getting

13  a conviction.   This is about potentially convicting an innocent

14  man.   Why didn't you go to your friend, a man you knew, a man you

15  respected, a man you thought of as a great lawyer and say, Hey,

16  Numa, there is blood evidence here.   I don't know what it is, but

17  there is blood evidence here.

18  A.    Mr. Banks, I already did that.   I did that.

19  Q.    You did that by saying you may wish to take blood from

20  Mr. Thompson; is that what you're referring to?

21  A.    Yes, absolutely.

22  Q.    The March 11th hearing?

23  A.    Yes.

24  Q.    The one you didn't follow up on?

25  A.    Yes.

1  Q.   Mr. Williams, if there was a deliberate decision not to use
2  blood evidence in the Thompson case, not to refer to it, to stay
3  away from it, that wouldn't have been your decision alone, would
4  it?  Dubelier would have been involved in that?
5  A.   If Mr. Dubelier and I had discussed this case, and I have no
6  recollection of that, I am not saying it didn't happen, I don't
7  remember.  I just don't remember.
8  Q.   Would you turn to page 235 of your transcript.  This is not
9  for the big screen.
10 A.   Okay.
11 Q.   I'm sorry.  I said 235.  234.  I gave you the wrong page.
12 A.   Okay.  Which line?
13 Q.   Wait a minute.  I'm sorry.  It's bottom of 234, line 24, I
14 ask you, "Based on your knowledge of how the carjacking was
15 staffed on the prosecution side, if a deliberate decision was
16 made not to use the blood evidence in the case, you would expect
17 that decision to have been made by Mr. Dubelier, correct?"
18         And what was your answer, sir?
19 A.   My answer was yes.
20 Q.   We've already established he was one of the top prosecutors
21 in the office, right?
22 A.   He was.
23 Q.   Did the blood evidence surface after 1985 during the rest of
24 the time you were an assistant district attorney?
25 A.   Not that I can recall.

1  Q.    You knew when Mr. Thompson was convicted of murder and
2  sentenced to death it would be years of appeals, didn't you?
3  A.    Yes.
4  Q.    That's the way it worked in murder cases, right?
5  A.    Yes.
6  Q.    From 1985 to 1999, did you do anything over those 14 years
7  to bring out the fact that there had been blood evidence in the
8  Thompson case?
9  A.    Other than to announce at the motion hearing that blood
10 would be an issue.
11 Q.    At some point, in cases like this, when someone is convicted
12 of murder, if a court doesn't overturn the death sentence or the
13 murder conviction, the appeals run out and the defendant is
14 executed, right?
15 A.    That's correct.
16 Q.    You knew that the appeals ran out for Mr. Thompson in 1999,
17 didn't you?
18 A.    No, I'm not sure when they ran out.
19 Q.    You knew that he was scheduled to be executed in May of
20 1999, didn't you?
21 A.    I know that now.  I didn't know it then.
22 Q.    You know that today, that as of 1999, his appeals had run
23 out?
24 A.    Yes.
25 Q.    Do you recall in the weeks or months before Mr. Thompson was

1   scheduled to be executed after having spent 14 years in jail, you

2   got a call from my partner, Mr. Cooney?  Do you recall that?

3   A.    I do.

4   Q.    Mr. Cooney told you at that time that Mr. Thompson appeals,

5   Mr. Thompson's appeals had run out and that the execution was

6   coming up?

7   A.    I don't remember him saying that.

8   Q.    You understood a date was set for the execution at that

9   point that he called you, didn't he?

10  A.    I don't remember that.

11  Q.    Turn to page 134 of your transcript, sir.  Tell me when you

12  are there.

13  A.    Which line?

14  Q.    Here it is.  It's line 8.

15          "Do you recall him telling you that a date had been set

16  for Mr. Thompson's execution or would be set shortly?"

17          And your answer was, "I don't recall that."

18          But the next question was, "You understood that that

19  was the situation when the call was made?"

20          And your answer was, "Yes."

21          So you understood from that call that this was a

22  last-ditch effort by Mr. Thompson's lawyers to try to find out

23  some facts in the case before the execution occurred, didn't you?

24  A.    I seem to remember Mr. Cooney asking me about the case.  I

25  remember telling him that the only thing that I remembered about

1  that case was when Numa Bertel cross-examined the youngest

2  LaGarde child.

3          That was literally the only recollection.  I remember

4  Mr. Cooney asking me about blood evidence, and I remember telling

5  him, I don't have any recollection about any blood evidence.

6  That's what I seem to recall.

7  Q.   You told him that there was no blood evidence?

8  A.   He asked me about blood evidence and I seem to recall

9  telling him that I don't have a recollection.  And at that point

10 in time, I did not.

11 Q.   You told him you didn't recall or you said there was no

12 blood evidence?

13 A.   I don't recall exactly the words that I used.  I remember

14 him asking me something about blood evidence and I remember

15 telling him I didn't have a recollection that blood evidence

16 played a part in either case.

17 Q.   Let's go a little bit further down that page.  Are you on

18 page 134?

19 A.   134 or 234?

20 Q.   Question --

21 A.   I'm sorry, what page?

22 Q.   134, line 15.  "And do you remember Mr. Cooney asking you

23 whether there had been any blood evidence in the carjacking?"

24          "Answer, Yes."

25          "Question:  What did you tell him?"

1      "Answer:  I probably told him no."

2   A.   Yes.

3   Q.   Not I don't recall, no.  Mr. Williams, you sat here and said

4   you knew in 1985 there was blood evidence.  It was all over the

5   documents.

6   A.   Mr. Banks, in 1999, when your partner called me, if he was

7   your partner then, I answered his questions.  At that point in

8   time, I had no recollection of blood evidence.  I had no

9   recollection of standing in open court and saying that we may

10  want to take the blood of John Thompson or we need to take the

11  blood.

12      All of that came to light after I reviewed transcripts

13  and talked to other people.  So my answer is that at the time I

14  talked to Mr. Cooney, I literally didn't remember anything about

15  the case.  I can remember I wished him good luck with whatever

16  was left to do.  And that's about it.

17  Q.   So it was like, Good luck, Mr. Cooney, but there was no

18  blood evidence?

19  A.   Mr. Banks, again, my answer is that at that point in time, I

20  didn't remember anything about that case other than what I've

21  already told you.  I didn't remember if there was blood evidence

22  or not blood evidence.  I just didn't remember.

23  Q.   Mr. Williams, let's go back to 1985.  We've talked a lot

24  about the carjacking case.  I want to discuss briefly the murder

25  case.

1  A.    Okay.

2  Q.    You knew that once Mr. Thompson was convicted of a

3  carjacking, it was unlikely that he would take the stand in his

4  own defense to testify in the murder case, right?

5  A.    Yes.   That's true.

6  Q.    In fact, Mr. Thompson's lawyers deliberately asked the

7  judge, they filed a motion in the court, meaning a request to the

8  criminal court judge, to ask the judge not to allow you and

9  Mr. Dubelier to bring up anything about the carjacking conviction

10  if Mr. Thompson took the stand in the murder case?

11  A.    Again, I don't have an independent recollection of that, but

12  if you tell me that was done, I would agree with you.

13  Q.    Well, let's look at the stipulation, just paragraph P.   It

14  was one of the stipulations I read to the jury.   I'll see if this

15  helps refresh your recollection.

16           Mr. Thompson's attorneys in the murder case moved to

17  preclude the prosecutors from using the attempted armed robbery

18  conviction to impeach Mr. Thompson's testimony in the murder

19  trial, but the state opposed the motion, and the motion was

20  denied.   Those are facts we've all agreed on.

21  A.    Okay, that's fine.

22  Q.    And the state.   That's you.   That's you and Mr. Dubelier?

23  A.    That's correct.

24  Q.    You're the ones who opposed that?

25  A.    That's correct.

1  Q.   So you made it very clear to the court, and the court agreed
2  with you because the court didn't know about the blood evidence,
3  that if Mr. Thompson took the stand to tell the jury in the
4  murder case that he didn't do it and to explain evidence, you
5  were going to get up and you were going to tell that jury that
6  Mr. Thompson had just been convicted three weeks before of
7  carjacking three children, right?
8  A.   We would have done that.
9  Q.   In first-degree murder cases, trials are split into two
10  portions, right?
11  A.   That's correct.
12  Q.   First the jury hears the guilt phase, they hear the
13  questions about whether the defendant is guilty or innocent,
14  correct?
15  A.   That's correct.
16  Q.   And in doing that, they then have to render a verdict on
17  guilt or innocence first before they decide anything about the
18  penalty?
19  A.   That's correct.
20  Q.   Then if they find the defendant guilty of first-degree
21  murder, more evidence is presented to the jury, which has to
22  decide whether to sentence him to death or life in prison.
23  A.   Evidence which would show his character and propensities and
24  any aggravating circumstances.
25  Q.   One of the things that happens at that stage, at that second

1  stage, is the prosecutors try to put on evidence of what's called

2  aggravating factors.  You're familiar with that, right?

3  A.   Yes.

4  Q.   An aggravating factor is something used to show the jury

5  that this particular defendant is especially worthy of being put

6  to death?

7  A.   It is a factor for the jury to consider, along with

8  mitigating circumstances and any other circumstances on what

9  their verdict should be.

10  Q.   The carjacking conviction was something you could use as an

11  aggravating factor, right?

12  A.   I believe the law was that it was an attempted armed robbery

13  and that would have been an aggravating circumstance.

14  Q.   Even if Mr. Thompson didn't take the stand at stage two, the

15  penalty phase, you could tell that jury about the carjacking.

16  The jury wouldn't have heard about it at stage one if he didn't

17  testify.  But at stage two, they could hear all about it?

18  A.   Yes.

19  Q.   You didn't just tell them about it, though, did you?  I

20  mean, you didn't just get up and say, Oh, by the way, members of

21  the jury, Mr. Thompson was convicted three weeks ago.  You used

22  some evidence from the carjacking case?

23  A.   I recollect that we called one of the children.

24  Q.   You didn't use the blood evidence from the carjacking case,

25  of course, you called one of the children?

1    A.    That's correct.

2    Q.    16-year-old Marie LaGarde, who was in the car with her two

3    brothers when the car was carjacked, you brought her back three

4    weeks after the carjacking trial and put her on the stand in the

5    penalty phase of the case, right?

6    A.    Yes, sir.

7    Q.    And you asked Ms. LaGarde to describe in detail what

8    happened that night in the car?

9    A.    I'm certain that we did.

10   Q.    You asked her to tell the jury how the robber was holding

11   the gun in the car and about how her brother deliberately crashed

12   that car into another car and wrestled the gun away from this

13   perpetrator?

14   A.    Yes, sir.

15   Q.    And you asked her to tell the jury what the robber said at

16   that point.  She testified the robber said, "You're a fool.  I'm

17   going to kill you."

18   A.    Okay.

19   Q.    Do you want to look at the transcript?  Would that help you?

20   A.    I'm certain that's true.

21   Q.    It's Exhibit 50, page 406, if that would help.  Do you want

22   to look down on the lower part of that page?  That's what she

23   told the jury, right?

24   A.    Yes, it is.

25   Q.    She told the jury that Mr. Thompson said that, not knowing

1  that he wasn't the carjacker, right?

2  A.    That's what she said.

3  Q.    Okay.  You even showed her the gun that you said

4  Mr. Thompson was holding at the carjacking to dramatize that

5  event, didn't you?

6  A.    Yes.

7  Q.    You made the jury believe --

8  A.    Let me -- if I might, to dramatize it, to, I mean, it was

9  our obligation, the prosecution was to prove our case beyond a

10  reasonable doubt.  And in the penalty phase, we had the same

11  burden of proof:  To prove beyond a reasonable doubt the

12  character and propensities.  And that was relevant evidence and

13  yes, sir, we did use it.

14  Q.    And you wanted that jury to believe that John Thompson had

15  threatened to kill 16-year-old Marie LaGarde and her two

16  brothers, right?

17  A.    What Ms. LaGarde said, if the jury believed it, would

18  indicate that, yes.

19  Q.    So that you could get a death sentence?

20  A.    Mr. Banks, my job as a prosecutor was to present the

21  evidence to the jury.  Okay.  The fact of the matter is, yes, I

22  felt like that in that particular case, that the person deserved

23  the death penalty because if I didn't, I wouldn't be doing those

24  kinds of cases.

25  Q.    I thought I heard Mr. Aaron say in his opening that the job

1  of a prosecutor was to do justice --

2  A.   That's correct.

3  Q.   -- do you agree with that statement?

4  A.   And at that point, I felt like someone who had been

5  convicted of first-degree murder that the death penalty was

6  justice.

7  Q.   You've told this jury, whether they agreed or not, that you

8  felt Mr. Bertel had heard something about blood evidence on

9  March 11, 1985, at this hearing where you said you wanted to test

10 the defendant, right?

11 A.   I'm certain that he heard.

12 Q.   What about the lawyers who were defending Mr. Thompson at

13 the murder trial?  Were they at that hearing on March 11th?

14 A.   I don't know.

15 Q.   That hearing on March 11th was in the carjacking case?

16 A.   That's correct.

17 Q.   What did you do to make sure the lawyers in the murder

18 trial, when Mr. Thompson was on trial for his life, what did you

19 do to make sure that they knew about the blood evidence before

20 you put 16-year-old Marie LaGarde on the stand, sir?

21 A.   Mr. Banks, I didn't need to do anything with regard to those

22 two attorneys.  It was Pat Fanning, who was as fine a lawyer as

23 I've ever tried a case against and Rob Couhig.  And believe you

24 me, they did their homework in that case.

25 Q.   Did they say anything about blood evidence at the murder

1  trial?

2  A.   They did not.

3  Q.   Did you do anything to bring it to their attention, sir?

4  A.   I did not.

5  Q.   Was Marie LaGarde crying when you had her on the stand?

6  A.   I don't recall.

7  Q.   Her testimony must have been a powerful moment in front of

8  that jury, wasn't it?

9  A.   In virtually every single penalty phase that I've been

10  involved in as a prosecutor and as a defense lawyer, victim

11  impact testimony, whether it be from the family of the accused or

12  the family of the victim, is the most powerful evidence that I've

13  ever seen.

14  Q.   It's powerful whether they are accusing the right person or

15  not, isn't it?

16  A.   That would always be true.

17  Q.   After all the evidence was presented at the penalty phase of

18  the trial, you stood in front of that jury and you asked them to

19  vote to put John Thompson to death, didn't you?

20  A.   Yes, sir.

21  Q.   Based on a number of things, including the testimony of

22  Marie LaGarde accusing John Thompson of robbing her?

23  A.   Mainly based upon the testimony of the witnesses in the

24  homicide case, because he wasn't on trial for the attempted armed

25  robbery.  He was on trial for the homicide.

1   Q.   But you gave a closing argument, didn't you?

2   A.   I probably did.  I did.

3   Q.   And in that closing argument, you talked about the

4   carjacking case, didn't you?

5   A.   I'm sure that I did.

6   Q.   You told them that he was already effectively in jail for

7   life.  He was in jail already for 49-and-a-half years for a

8   carjacking, and that during that time, if they didn't sentence

9   him to death, that he would be having visits from his family and

10  playing softball in a prison yard; do you remember saying that?

11  A.   Unfortunately, I said things like that that are probably

12  very inappropriate.

13  Q.   And after you finished, Mr. Dubelier got to argue, too.  You

14  finished and Mr. Thompson's lawyer argued and then Mr. Dubelier

15  got to argue, right?

16  A.   I don't recall.  If you say Eric did the rebuttal, then I

17  mean, it is what it is.

18  Q.   Well, this is on page -- excuse me, Exhibit 50 in your book.

19  This is what Mr. Dubelier argued.  You were there when he gave

20  the rebuttal argument, right?

21  A.   I was.

22  Q.   He said, "But for a slit second would there be three more

23  murder victims?"  This is page 451.  "Would this be his second

24  murder trial?  I think so, because Mr. Thompson has a little

25  signature that he uses, a .357 magnum.  That's his signature.

1  This one almost killed three kids."

2          That was a reference to the carjacking case.  He was

3  arguing that to the jury as a reason to ask them to vote to put

4  Mr. Thompson to death, right?

5  A.   Yes.

6  Q.   Were you nodding while Mr. Dubelier was saying that?

7  A.   No, I was probably listening.

8  Q.   You agreed with me, though, that a trial is about the truth?

9  A.   Yes, absolutely.

10  Q.   You ask a jury to find the truth based on the facts or all

11  of the evidence?

12  A.   Yes.

13  Q.   That's what we want to happen here in this trial.  We want

14  this jury to find the truth based on all of the evidence?

15  A.   Yes.

16  Q.   Would you agree with me, though, that the jury can't find

17  the truth if they don't have all of the evidence?

18  A.   Absolutely I agree with you.

19  Q.   You're a defense lawyer now, Mr. Williams, right?

20  A.   I am.

21  Q.   How long have you been a defense lawyer?

22  A.   Since 1997.

23  Q.   That means for the last 10 years you've been defending

24  people charged with crime, right?

25  A.   Yes, sir.

1  Q.   And as a defense lawyer, you want to get every fact that you

2  can of the prosecutors?

3  A.   Yes, sir.

4  Q.   Because sometimes witnesses for the prosecution may be

5  lying?

6  A.   Yes.

7  Q.   Sometimes, not always.  And you want evidence to show that

8  they are lying, right?

9  A.   Yes.

10  Q.   I mean, if you can get evidence that's in the police files

11  that show, for example, that a witness said different things at

12  different times, that's favorable and helpful to you as a defense

13  lawyer?

14  A.   Certainly.

15  Q.   Sometimes witnesses who testify are motivated by things

16  other than the truth, right?

17  A.   Yes.

18  Q.   Money, it could be motivated by a reward?

19  A.   Many, many different motivations.

20  Q.   And if you're a defense lawyer and you have reason to

21  believe that a witness is motivated by a reward or in it for the

22  money rather than the truth, you're going to show that?

23  A.   I'm going to, absolutely.

24  Q.   That's important to your defense?

25  A.   Absolutely.

1  Q.    In all these violent crime cases, whether cases you

2  prosecuted as an assistant district attorney or as a defense

3  lawyer, the investigations are usually done mostly by the police,

4  right?

5  A.    Yes.

6  Q.    They gather a lot of facts in a murder or carjacking case?

7  A.    Yes.

8  Q.    And we talked about the kinds of reports they prepare,

9  supplemental police reports that could be 20, 30, 40 pages long

10 and police daily reports and witness statements.  Right?

11 A.    Yes.

12 Q.    That's the kind of stuff that you as the prosecutor saw?

13 Right?

14 A.    Yes.

15 Q.    You said in your practice as a district attorney you

16 typically didn't turn that stuff over because of the policy that

17 was set from the top, Mr. Connick; is that right?

18 A.    I can answer the question that the policy was to follow the

19 law.  The policy was to follow the Louisiana Code of Criminal

20 Procedure.

21 Q.    And --

22 A.    If I can finish.

23 Q.    Certainly.

24 A.    The Louisiana Code of Criminal Procedure did not mandate

25 that we had to turn over police reports or witnesses' statements,

1    and that's a fact.

2              Now, there came a time, and before I testified here

3    today, I was trying to recollect when it was when the Louisiana

4    Supreme Court said you have to turn over initial police reports

5    because it was a public record.  And at that point in time, that

6    became Mr. Connick's office policy.  We followed what the law

7    mandated us to do.

8    Q.   We're in this federal civil rights case in federal court,

9    right?

10   A.   Yes, sir.

11   Q.   And you would agree with me that it's not for you or me to

12   tell the jury what the law is and what prosecutors have to turn

13   over.  That's for Judge Barbier, right?

14   A.   Certainly.

15   Q.   And we're not there at that part of the case yet.  That

16   usually happens at the end, right?

17   A.   I don't understand.

18             MR. CARVER:  Your Honor, I object.  The witness has an

19   opportunity to explain what he understood the law to be so he can

20   make those decisions.

21             THE COURT:  All right.

22             MR. BANKS:  Your Honor, I'll withdraw the question.

23             THE COURT:  Okay.

24                            EXAMINATION

25   BY MR. BANKS:

 1  Q.   Would you agree, though, that the witness --

 2           THE COURT:  Mr. Banks, are you close to wrapping up

 3  here?

 4           MR. BANKS:  I probably have, I think I have some more,

 5  Your Honor, a good bit more.  Would the Court wish to take a

 6  break?

 7           THE COURT:  Well, approach the bench.

 8           (WHEREUPON, there was a bench conference out of the

 9  presence of the court reporter.)

10           (In open court.)

11           THE COURT:  Let's take a 10- or 15-minute recess.  It's

12  a good idea to write your name on the outside of the book and you

13  can just close them and leave them in your chair or right under

14  your chair.  They will be there when you return.  We'll be back

15  in about 15 minutes.

16           THE DEPUTY CLERK:  All rise.

17           (The jury panel leaves the courtroom.)

18           (WHEREUPON, a brief recess was taken.)

19           THE DEPUTY CLERK:  All rise.

20           (The jury panel enters the courtroom.)

21           THE COURT:  Please be seated.  Mr. Banks, you may

22  resume.

23           MR. BANKS:  Thank you.  Your Honor, I would like to hand

24  the witness Exhibit 40.  It's a premarked exhibit but I don't

25  think it's in his book.

1            THE COURT:  Okay.

2            MR. BANKS:  I have a copy, Mr. Aaron, if that would be

3  helpful.

4                          EXAMINATION

5  BY MR. BANKS:

6  Q.    Before our break, Mr. Williams, you talked some about this

7  hearing that took place on March 11, 1985.

8  A.    Yes, sir.

9  Q.    In the carjacking case.  This is some of the transcript of

10 that hearing?

11 A.    Yes, sir.

12 Q.    Let's go to the second page of the document.  These are some

13 statements by you and Mr. Bertel with the Court at the end of

14 that March 11, 1985, hearing?  It's the last page of the

15 transcript.

16 A.    Yes.

17 Q.    Okay.  The last statement there by you, after saying, "Yes,

18 sir, thank you," or before saying, "Yes, sir, thank you,

19 Your Honor," is as follows:  This is the statement that you're

20 referring to when you said you referred to the blood evidence,

21 right?  The middle of the page?

22 A.    Yes, that's correct.

23 Q.    You said, "Your Honor, also, it's the state's intention to

24 file a motion to take a blood sample from the defendant, and we

25 will file that motion, have a criminalist here on the 27th."

1  A.    That's what I said.

2  Q.    You didn't say there was blood evidence or there wasn't

3  blood evidence.  You just said, We're going to file a motion?

4  A.    That's what I said.

5  Q.    And you never filed one?

6  A.    That's correct.  Well, I didn't.  That's correct.

7  Q.    Let's go to the murder trial for a moment.  We talked at the

8  beginning of your testimony about supplemental police reports,

9  right?

10 A.    Yes, sir.

11 Q.    You told us how they can be lengthy, single-spaced, typed

12 long documents with lots of facts from the police investigation?

13 A.    Yes.

14 Q.    In your book, sir, is Exhibit 30.

15        MR. BANKS:  And I'm going to ask Mr. Vincent just to put

16 the first page of Exhibit 30 up so we can see what a supplemental

17 police report looks like.  Okay.  I don't know if you can make

18 that any bigger.  Okay.

19                        EXAMINATION

20 BY MR. BANKS:

21 Q.    This is the first page of a supplemental police report in

22 the Thompson murder case, right?

23 A.    Yes.

24 Q.    Or we should call it the Liuzza murder case, right?

25 A.    Yes.

1  Q.   In these reports, they often describe the crime that

2  occurred and the evidence recovered from the scene?

3  A.   Yes.

4  Q.   They describe the witnesses the police interviewed and

5  things the police heard from the witnesses?

6  A.   Yes.

7  Q.   All right.

8        MR. BANKS:  Let's go to page 7 of this report,

9  Mr. Vincent.

10                    EXAMINATION

11 BY MR. BANKS:

12 Q.   If you'll look at the top, it says --

13        MR. BANKS:  Can you just cull out the top left?

14                    EXAMINATION

15 BY MR. BANKS:

16 Q.   It says, 7 of 35, so we have a 35-page report, and this is

17 page 7.

18 A.   Got it.

19 Q.   Now, the bottom paragraph has in it --

20        MR. BANKS:  I'm going to ask Mr. Vincent to pull up some

21 of that bottom paragraph.

22                    EXAMINATION

23 BY MR. BANKS:

24 Q.   A description of an interview with a witness,

25 Paul Schliffka.  He was the eyewitness who testified in the

1  murder case, right?

2  A.   Right.

3  Q.   Mr. Schliffka, well, the police report says as follows:

4  "During an interview, Mr. Schliffka provided Officers Carter and

5  Angelo with the following description of the suspect:  Negro

6  male, unknown age, six feet tall, slim build, dark complexion,

7  close-cut black hair, wearing a black jacket and blue jeans."

8        Right?

9  A.   Right.

10  Q.   Now, at the time of Mr. Thompson's arrest, I guess six weeks

11  after the murder, the clothing wouldn't be that useful as

12  evidence maybe unless you found a black jacket or blue jeans,

13  right?  I mean, that's fairly routine clothing?

14  A.   Correct.

15  Q.   Six feet tall, that would be good to know.  You could rule

16  out perpetrators who are five feet tall and seven feet tall,

17  right?

18  A.   We should be able to.

19  Q.   Close-cut hair, that's the kind of thing, close-cut black

20  hair, that you would want to know, I mean, if you're a defense

21  lawyer, you'd want to know that, right?

22  A.   I want to know everything I can get my hands on.

23  Q.   Every fact you can get your hands on.  And this is what

24  Mr. Schliffka told the police when he was interviewed right after

25  the shooting, when his memory was fresh, right?

1  A.    That's what the report says.

2  Q.    As a prosecutor and as a defense lawyer, would you agree

3  with me that those kinds of witness descriptions made right after

4  the witness saw something are the best ones, more important than

5  the ones months later?

6  A.    More reliable.

7  Q.    Let's take a look at Exhibit 5.  This is a police daily

8  report.  You told us about police daily reports, right?

9  A.    Right.

10 Q.    Now, this is a police daily report.

11        MR. BANKS:  Can we just look at the top just so we can

12 see what it is.

13                        EXAMINATION

14 BY MR. BANKS:

15 Q.    And this is really hard to read, but I want to represent to

16 the jury here there is a date, it says "Victim, Ray Liuzza."

17        This is the police daily report for the Liuzza murder

18 investigation?

19 A.    It is.

20        MR. BANKS:  Let's go down to page, James, to the

21 description there again.

22                        EXAMINATION

23 BY MR. BANKS:

24 Q.    This police daily report has the same description from

25 Mr. Schliffka, doesn't it.  Six feet tall, slim build, dark

1    complexion.  Here it doesn't say close-cut hair, it says short

2    hair.

3    A.    Yes.

4    Q.    Those are consistent, short hair and close-cut hair?

5    A.    Yes.

6    Q.    I would like to show you a picture of Kevin Freeman.  You

7    know who Kevin Freeman is, right?

8    A.    I do.

9    Q.    He was indicted along with Mr. Thompson and charged with the

10   robbery initially?

11   A.    That's correct.

12   Q.    And he testified, though, at Mr. Thompson's trial that he

13   just saw Mr. Thompson do it and he ran away?

14   A.    I believe he did.

15   Q.    And you're aware that at the 2003 retrial Mr. Thompson

16   testified that he bought the gun and a ring from Mr. Freeman, but

17   that Mr. Thompson had nothing to do with it.  He wasn't there

18   that night?

19   A.    I am not aware of any of the contents of that trial.

20   Q.    All right.  Let's go to the picture of Kevin Freeman.

21            MR. BANKS:  That's Exhibit 26.  Can we put that up.

22                         EXAMINATION

23   BY MR. BANKS:

24   Q.    Do you recognize that to be Kevin Freeman?

25   A.    No.

1  Q.   Will you accept my representation?

2  A.   Yes.

3  Q.   If you look at that hair, would you say that's close-cut

4  black hair in 1985?

5  A.   No.

6  Q.   You wouldn't say that's close-cut?

7  A.   No.

8  Q.   How would you describe it, sir?

9  A.   I would take close-cut as shaved.  Not bald, but shaved

10  close to the skin.

11  Q.   Shaved.  Did you know what Mr. Freeman's nickname was?

12  A.   Yes.

13  Q.   What?

14  A.   Kojak.

15  Q.   Kojak.  You remember the police show, Kojak, don't you?

16  A.   Surely.

17  Q.   I don't know if all of our jurors remember it, but what do

18  you remember about the police detective Kojak?

19  A.   He always had sucker in his mouth and he was bald.

20  Q.   He was bald?  You don't think Mr. Freeman got the nickname

21  Kojak because he was a detective, do you?

22  A.   I don't know when Mr. Freeman got that nickname, what his

23  hairstyle was when he got that nickname, so I don't know.  I

24  can't comment.

25  Q.   Do you think maybe he got the nickname Kojak from the

1   hairstyle?

2          MR. CARVER:  Your Honor, assuming facts not in evidence.

3          MR. BANKS:  Fair enough.  I'll withdraw that.

4                          EXAMINATION

5   BY MR. BANKS:

6   Q.   How about Mr. Thompson?  How tall was --  How about

7   Mr. Freeman?  Do you know how tall Mr. Freeman was?

8   A.   I believe he was six feet tall.

9   Q.   Okay.

10          MR. BANKS:  Go to Exhibit 53, please, Mr. Vincent.

11                          EXAMINATION

12   BY MR. BANKS:

13   Q.   This is Mr. Freeman's rap sheet.  There is another picture

14   of him, right?

15   A.   Looks like a different person.

16          MR. BANKS:  Well, can you go to the top, Mr. Vincent.

17                          EXAMINATION

18   BY MR. BANKS:

19   Q.   It's Kevin Freeman's rap sheet, right?

20   A.   Okay.

21   Q.   And his height was six feet tall?

22   A.   Right.

23   Q.   So you're not sure about the hair length but at least the

24   height matches the description that Mr. Schliffka gave; is that

25   right?

1  A.    Yes.

2  Q.    Now, Mr. Thompson, how tall is Mr. Thompson?

3  A.    From reports, I believe he was around 5'8".

4  Q.    So about four inches shorter than the person that

5  Mr. Schliffka described?

6  A.    Yes.

7  Q.    Did Mr. Thompson have close-cut hair in 1984, around the

8  time of the crime?

9  A.    I remember seeing the photo that you displayed earlier.

10 Q.    Why don't we show that again.

11       MR. BANKS:  Can we go to Exhibit 7, Mr. Vincent.

12                        EXAMINATION

13 BY MR. BANKS:

14 Q.    This is a photograph of Mr. John Thompson and --

15       MR. CARVER:  Your Honor, we object.  The photograph does

16 not depict Mr. Thompson the day of the murder or at the time of

17 the murder.  We don't know how Mr. Thompson wore his hair at that

18 time.

19       THE COURT:  When was that taken?

20       MR. BANKS:  December 12th, six days after the murder,

21 Your Honor.

22       MR. CARVER:  Your Honor, hairstyles that --

23       THE COURT:  Overrule the objection.  That's six days

24 after?

25       MR. BANKS:  Yes.

1          THE COURT:  That is right?  Okay.

2                    EXAMINATION

3   BY MR. BANKS:

4   Q.   You didn't see anything in the police report about

5   Mr. Thompson's hair growing faster than most people, did you?

6   A.   No.  But in my experience, young men like that would wear

7   their hair down.  It could be plaited down, it could be plaited.

8   That could be a comb out.  I don't know.

9   Q.   Did you ever see Mr. Thompson around that time in December

10  of '84, with hair other than this?

11  A.   I don't have a recollection of that.

12  Q.   Just confirm the date.

13          MR. BANKS:  If you would look at the placard,

14  Mr. Vincent, on the lower right.

15                    EXAMINATION

16  BY MR. BANKS:

17  Q.   Do you see that, 12/12/84?  That's the date the photograph

18  was taken, right?

19  A.   Yes, sir.  That's what it says.

20  Q.   It's a Police Department of New Orleans photograph.

21  A.   It is.

22  Q.   Right.  Sometimes we call those mug shots?

23  A.   Yes.

24  Q.   Is that what you call it, too?

25  A.   We used it call it BFI.

1    Q.    But it's not close-cut or short hair, is it?  You wouldn't

2    describe it that way?

3    A.    That, no, absolutely not.

4    Q.    As a defense lawyer, now that you are one, would you agree

5    with me that having a description of the perpetrator as six feet

6    tall with close-cut black hair or short hair and knowing that

7    Mr. Thompson six days after the murder was five feet, eight

8    inches tall with hair like that, that's important?

9          MR. CARVER:  Objection, Your Honor, the witness did not

10   say --

11         THE COURT:  Overrule the objection.

12

13                        EXAMINATION

14   BY MR. BANKS:

15   Q.    Mr. Williams?

16   A.    The answer to that would be the difference between

17   five-foot, eight and six-foot tall is about that much

18   (indicating).

19         And as a defense lawyer, I've had that thrown back in

20   my face, that, and it would depend upon where the witnesses view

21   the person.  Were they close, far away, second story, first

22   story.  So the height wouldn't mean that much to me.  The hair

23   style --

24   Q.    You would use that?

25   A.    -- more so than the height.

1  Q.    So if you had the police report, as a defense lawyer, in

2  your hands, at the trials of Mr. Thompson, with that description

3  from Mr. Schliffka, you would definitely use that in your

4  questioning of the witnesses?

5  A.    If I did, absolutely, of course I would.

6  Q.    That's because it's favorable to the defense, right?

7  A.    I would agree with that.

8  Q.    And if the defense lawyer had been given the supplemental

9  police report, the defense lawyer would have known before the

10 trial exactly how Mr. Schliffka described the perpetrator.

11 A.    The defense lawyer did know.

12 Q.    Before the trial, did the defense lawyer have that

13 supplemental police report, sir?

14 A.    My recollection is that the defense lawyer had

15 Mr. Dubelier's discovery, which indicated that Mr. Schliffka had

16 given that particular description.

17 Q.    Well, you heard Mr. Cooney talk about that in his opening.

18 Are you certain the written description given in discovery in the

19 murder case said anything at all about the hair length?

20 A.    I remember looking through some documents at the trial, and

21 the discovery, one of them was that Schliffka gave a description

22 different, and that was turned over to the defense.

23 Q.    Schliffka said, in the -- strike that.

24         In the discovery that was produced to the defense, it

25 said Schliffka described the perpetrator as six feet tall but

1   said nothing about his hair.  Isn't that right, Mr. Williams?

2   A.   I don't remember.  If you have it, it speaks for itself.

3   Q.   All right.  We'll see if we can find that.  Maybe Mr. Cooney

4   or one of my friends back there can see if they can find that and

5   we'll come back to it.

6         You certainly had that information though.  You had the

7   police report and you had the police dailies, right?

8   A.   Yes.  We had those reports.

9   Q.   In preparing the murder trial against Mr. Thompson, you

10  looked at those things?

11  A.   I'm sure that I did.

12  Q.   And you would agree with me that Exhibit 5, which is the

13  police daily I just referred you to, and Exhibit 30, the

14  supplemental police report, were not turned over to the defense?

15  A.   I can't argue with that.  I don't have a recollection yes or

16  no.

17        MR. BANKS:  Your Honor, may I approach the witness to

18  show him the discovery request and the response?

19        THE COURT:  Yes.  Is that marked as an exhibit already?

20        MR. BANKS:  It is, Your Honor.  We have Exhibit 34 as

21  the motion making the request and Exhibit 36 as the response.

22                         EXAMINATION

23  BY MR. BANKS:

24  Q.   Do you recognize Exhibit 34, Mr. Williams, as a discovery

25  request from the defendant or at least is that what it appears to

1 be to you in the murder case?

2 A.   Yes.

3 Q.   Let's take a look at Exhibit 36.  I want you to read the

4 discovery response signed by Eric Dubelier.  Paragraph one, what

5 he told the defense about the description from Mr. Schliffka.

6 A.   "Mr. Paul Schliffka described a man leaving the vicinity of

7 crime scene as being approximately six feet tall.  Additionally

8 Mr. Schliffka failed to make an identification from a photo

9 lineup conducted on January 17th."

10 Q.   There is something missing there from Mr. Schliffka's

11 description that he gave the police, isn't there?

12       Hair length?

13 A.   Yes.

14 Q.   It doesn't appear anywhere in that discovery response?

15 A.   No, it does not.

16 Q.   Thank you, sir.

17       Hair length was an issue in both the carjacking and the

18 murder case, wasn't it?

19 A.   I don't remember.

20 Q.   I beg your pardon, sir?

21 A.   I don't remember.

22 Q.   You remember that one of the things that prompted the

23 LaGarde family to call either the police or district attorney and

24 identify Mr. Thompson was the photograph of Mr. Thompson that

25 appeared in the newspaper when he was arrested and charged with

1  murder?

2  A.   That's correct.

3        MR. BANKS:  Let's look at that Exhibit 29, please.

4                        EXAMINATION

5  BY MR. BANKS:

6  Q.   Now, it just so happens the one on the top right is Little

7  Richard.  I'm not going to ask you about that one.

8        The one underneath, the bottom right, that's

9  Mr. Thompson's photograph, right?  I know it's awfully hard to

10 see.

11 A.   I agree.

12 Q.   Someone looking at that photograph in the newspaper could

13 immediately see a man with large hair, right?

14 A.   Yes.

15 Q.   And it was that photograph that was shown to the LaGarde

16 children to ask them if the carjacker that they remembered looked

17 similar to that?

18 A.   I'm not sure I understand your question.  Shown by the

19 District Attorney's Office?

20 Q.   Well, by the father of the LaGarde children who showed it to

21 them first.  Do you recall that?

22 A.   I seem to recall that he showed them the picture that was in

23 the *Times-Picayune*.

24 Q.   That picture.  You questioned Mimi LaGarde at the carjacking

25 trial, right?

1  A.   I don't recall that.  If it's in the record --

2  Q.   It's in your book there as Exhibit 46, if you want to take a

3  look at that.

4  A.   I don't have any reason to disagree.

5  Q.   Let's just go to that page.  Just bear with me for a minute.

6  Do you have it there, page 30?  The start of that questioning?

7  A.   I have it.  The first page is 36.

8  Q.   Let me just show you --

9       MR. BANKS:  Your Honor, may I approach the witness to

10  show him this page?

11                        EXAMINATION

12  BY MR. BANKS:

13  Q.    You see there sir, page 30, direct examination by

14  Mr. Williams begins, "Mimi, I want you to speak up."

15        Mimi is Marie LaGarde, right?

16  A.   Yes.

17  Q.   You questioned her during that case, and if you go to

18  page 36 in there, you asked her to describe the perpetrator of

19  the carjacking and she said, "He was about 5'9" with an Afro

20  sticking up."

21        Right?

22  A.   "He had an Afro.  It was kind of sticking up."

23  Q.   Go to the next page.  You see, she says he's about 5'9".

24  Page 37?

25  A.   "When you say small, what do you mean?"

1           "Maybe 5'9".  He wasn't a fat man.  He wasn't a big

2    muscular guy."

3    Q.   Jay LaGarde also testified that he remembered the carjacker

4    as someone who was about 5'7", right?

5           Take a look at Exhibit 46, at page 112.

6    A.   Yes.

7    Q.   So you've got descriptions 5'7" and 5'9", average them out,

8    about 5'8".  Mr. Thompson was consistent with that, right?

9    A.   Okay.

10   Q.   And they described an Afro sticking up, or Marie LaGarde

11   did.  That was consistent with the photograph of Mr. Thompson, an

12   Afro sticking up?

13   A.   I think she said "kind of an Afro."

14   Q.   So you brought that out at the trial.  You made sure the

15   jury knew that that description matched Mr. Thompson.

16   A.   I'm sure I did.

17   Q.   But in the murder case, tried just three weeks after that,

18   where the perpetrator was seen fleeing with a gun by

19   Mr. Schliffka, where he described the perpetrator as six feet

20   tall with close-cut hair, you guys accused Mr. Thompson of being

21   that guy, too.  Right?

22   A.   I didn't accuse anybody of doing anything.  The witnesses

23   testified.  The defense lawyers had all of that information

24   before the trial, and they based their defense upon the

25   discrepancies, and the jury heard all of that.

1    Q.   Help me understand that.   In the carjacking case, where the
2    description was 5'7", 5'9" with long hair, you use that against
3    Mr. Thompson.   But in the murder case where the description was
4    six feet tall with close-cut hair, you hid half of that on
5    Mr. Thompson, right?
6    A.   I didn't hide anything, Mr. Banks, Number 1.   Number 2, I
7    don't know what I said.   If you have a copy of what my argument
8    was to the jury, that's what I said to the jury.   These are
9    witnesses' accounts of what they told the jury.
10   Q.   Were there things in the supplemental police report that
11   would have been helpful to Mr. Thompson's defense if they had
12   been produced?
13   A.   Based upon my recollection -- are you talking about in the
14   murder case?
15   Q.   Yes.
16   A.   They had just, they had everything.
17   Q.   The police report identified some people who lived in the
18   area:   The names Sheri Kelly, Rosemary Cash, and Steve McAlister.
19   Do you remember their names being in the police report?
20   A.   From looking briefly through the transcript this weekend,
21   yes.
22   Q.   They testified in the 2003 retrial, right?
23   A.   I have no idea who testified in that trial.
24   Q.   I'll just show you the stipulation that all of the parties
25   agreed to.

1  A.   I'll agree with that.  But I have no personal recollection
2  of anything that happened.
3  Q.   We'll put it up there.  So you testified at the retrial,
4  right?
5  A.   Yes.
6  Q.   And at the 2000 hearing?
7  A.   Yes.
8  Q.   If the defense counsel had seen their names in the police
9  report, the defense lawyer might have been able to go interview
10 them and hear what they actually heard, right?
11 A.   I don't know that that didn't happen but certainly that
12 would be your job.
13 Q.   Well, you know the police report wasn't produced, don't you?
14 That was one of the stipulations we read.
15 A.   That's correct.
16 Q.   As a defense lawyer, you would want to know the names of the
17 people the police interviewed, wouldn't you?
18 A.   Yes.
19 Q.   Even if the police report itself doesn't indicate that those
20 witnesses are necessarily helpful, a good, hard-working defense
21 lawyer would want to know who the police talked to?
22 A.   Would want to know everybody.
23 Q.   And if that report is not produced to the defense, the
24 defense can't know who the police talked to, true?
25 A.   That's true.

1  Q.   Did you know at the retrial that Sheri Kelly said, and there

2  was some reference to this by Mr. Aaron, that she saw the fleeing

3  perpetrator run right by her window, and it was not Mr. Thompson?

4  A.   I won't disagree with whatever it was she said.

5  Q.   Do you know that in the police report there was a statement

6  in there saying that Mr. Freeman had told -- excuse me, yes,

7  Kevin Freeman had told someone that he was seen running from the

8  crime scene by a woman?

9  A.   When was that said?

10 Q.   In the police report.

11 A.   The supplemental --

12 Q.   Excuse me, one of the police dailies.

13 A.   Okay.

14 Q.   Did you know that?

15 A.   It is what it is.  I have no recollection of that.

16 Q.   Okay.  I'm going to just turn to that police daily for a

17 minute, if you'll bear with me, Mr. Williams.  Do you know what,

18 I'm going to come back to that because I don't have that right in

19 front of me.

20      That's the kind of thing a defense lawyer would want to

21 know, isn't it?  If a witness like Mr. Freeman told someone that

22 he was seen by a woman running from the scene, you as a defense

23 lawyer would want to know that?

24 A.   Yes.  And to further amplify, I would want to know

25 everything, every report, every interview that was generated.

1  Q.   Because if you knew that Freeman told someone that he was

2  seen running by a woman, you would try to find that woman, right?

3  A.   Yes.

4  Q.   Maybe that woman would be Sheri Hartman Kelly who turned out

5  to be a witness who said that the person she saw running away

6  wasn't Mr. Thompson?

7           MR. CARVER:  Objection, argumentative.

8           THE COURT:  Overruled.

9           THE WITNESS:  That's possible.

10                          EXAMINATION

11  BY MR. BANKS:

12  Q.   That's why these kinds of things, like supplemental police

13  reports, are good to give to the defense so they can check out

14  those facts?

15  A.   Absolutely true.

16  Q.   Absolutely true.  You said before that another thing you

17  might do if you were a defense lawyer in the Thompson case and

18  that you do now is sometimes to show if a witness is motivated by

19  something other than truth, like money, right?

20  A.   Yes.

21  Q.   If you have reason to believe as a defense lawyer that a

22  witness is motivated by a reward, you're going to want to bring

23  that up?

24  A.   Absolutely.

25  Q.   But to bring it out effectively, you need to have the

1  evidence showing that the witness was motivated by a reward?  It

2  makes it more effective, right?

3  A.    Certainly.

4  Q.    One of the witnesses against Mr. Thompson in the murder

5  trial was a fellow by the name of Richard Perkins, who went by

6  "Funk" Perkins; do you recall that?

7  A.    I do.

8  Q.    Did you know that "Funk" Perkins, Richard Perkins, testified

9  at a hearing in 1995?

10  A.    No.

11        MR. BANKS:  I'm going to ask to show the witness

12  something, Your Honor, if I may approach?  This is that, this

13  paper I referred to before that I didn't have in front of me from

14  Exhibit 23.  May I approach, sir?

15        THE COURT:  Okay.

16        MR. BANKS:  Thank you.

17                     EXAMINATION

18  BY MR. BANKS:

19  Q.    This is a police daily report, Mr. Williams.  You see it's a

20  police daily report?

21  A.    Yes.

22  Q.    In the Thompson case?  And it says here, the last line of

23  this third paragraph from the bottom, "Freeman also told Perkins

24  that a woman saw him driving away from the scene."

25        You see that?

1  A.    Yes.

2  Q.    You don't know of any woman who saw Mr. Freeman driving away

3  from the scene other than Ms. Kelly, do you?

4  A.    Mr. Banks, I don't have any recollection of that.  It could

5  have been.  I don't remember the trial.

6  Q.    Let's get back to Mr. Perkins.

7  A.    Okay.

8  Q.    There was a hearing in this case, and it's one of the

9  exhibits admitted into evidence, a hearing in 1995, when

10  Mr. Thompson was trying to get a new trial; do you recall that?

11  A.    No.

12  Q.    You weren't involved in that at all?

13  A.    I was not.

14  Q.    Would you go to Exhibit 55, which is in evidence.

15       MR. BANKS:  Exhibit 55, I would like you to turn to

16  page 94 first, Mr. Vincent.

17       THE WITNESS:  Okay.

18       MR. BANKS:  Make that little bigger just to show what's

19  going on there.

20                      EXAMINATION

21  BY MR. BANKS:

22  Q.    This is questioning of Richard Perkins who was called as a

23  witness by the defense.  Do you see where that cursor is?

24  A.    Yes.

25  Q.    That's the same Richard Perkins who testified in the murder

1  case?

2  A.    Okay.

3         MR. BANKS:  Can we go to page 96, lines 11 through 25.

4                          EXAMINATION

5  BY MR. BANKS:

6  Q.    Mr. Perkins was asked, "What did you-all discuss with the

7  district attorney?"

8         His answer was, "I don't remember what we discussed."

9         He was asked, "Did a discussion come up about a

10  reward?"

11         He said, "They mentioned something about it."

12         "Question:  Do you remember what they said?"

13         "Answer:  They said something about you're entitled to

14  one."

15         Let me just ask you:  Was that a reference to you or

16  Mr. Dubelier or you don't know?

17  A.    I have absolutely no recall of that.

18  Q.    So he then goes on to say, "The district attorney?"

19         "Answer:  I told them I wasn't there for the reward,

20  but they told me you were entitled to some reward."

21         Do you remember telling Mr. Perkins that?

22  A.    No.

23  Q.    Let's go to the next page.  Mr. Perkins was asked, "Did you

24  receive any money?"

25         "Answer:  Yes, sir."

1          "Question:  How much money did you receive?"

2          "Answer:  10-05."

3          "Question:  Is that $10,500?"

4          "Answer:  Yes."

5          That's the kind of information a defense lawyer would

6    find helpful in defending a murder case, right, if a witness was

7    promised money?

8    A.    Yes, absolutely.

9    Q.    In fact, the district attorney in this case had tape

10   recordings of Perkins and of his approach to the Liuzza family to

11   get a reward, didn't they?  It was part of the stipulation I read

12   to the Judge, to the jury in the beginning, right?

13   A.    Okay.

14   Q.    But none of that was turned over the defense.  That was also

15   a stipulation?

16   A.    Well, it must have been.

17   Q.    Why do you say it must have been?

18   A.    Because that was part of the defense.  And that came out at

19   the trial.  And there was questioning as I recall.  I don't have

20   any independent recollection but I was reading that in the

21   transcript.

22   Q.    So the stipulation that we've all agreed to in this case,

23   you think is wrong?

24   A.    Of course not.

25   Q.    You tried to make it sound to the jury in the murder case

1  like Mr. Perkins was never promised a reward, didn't you?

2  A.   I don't recall.

3  Q.   Well, let's go to part of your closing argument.

4         MR. BANKS:  Your Honor, I'm going to ask to approach the

5  witness again.  Your Honor, may I approach?

6         THE COURT:  Yes.

7                          EXAMINATION

8  BY MR. BANKS:

9  Q.   This is your closing argument, Mr. Williams, from the guilt

10  phase of the murder case.

11  A.   Okay.

12  Q.   Would you go to page 353.  I'm going to read what you argued

13  to the jury as part of your closing.  And you can tell me whether

14  I'm getting this right.  You argued as follows:  "Let's talk

15  about the reward money.  You've heard that talked about mostly

16  out of lawyers' mouths.  Ladies and gentlemen, not one single

17  person came and took that stand and told you anything about any

18  reward money.  There's not one word that is in evidence in this

19  case from people who took this stand regarding reward money.  If

20  there had been, you would have heard them put somebody on and

21  say, This person has made a claim on the money."

22         There was then an objection and you continued, "So when

23  you're in the back, ladies and gentlemen, you talk about, Well,

24  this guy wants to get the money and this guy wants to get the

25  money, I submit to you that you will do something that you

1  promised us you wouldn't do during voir dire, that you would go

2  outside the scope of the evidence that was presented at trial.

3  All this reward money is just hearsay.  There's been no direct

4  evidence."

5          Did I read that correctly?

6  A.    Yes.

7  Q.    You wanted this jury to believe in the carjack -- excuse me,

8  in the murder trial when Mr. Thompson was on trial for his life,

9  that there was no reward issue?  That's what you were trying to

10 tell them, wasn't it?

11 A.    Well, again, and I apologize that I don't recall much of

12 anything about that trial.  My argument speaks for itself.

13 Q.    Mr. Williams, were you good at what you did as a prosecutor?

14 A.    I worked very hard at it.

15 Q.    You had tried a lot of criminal cases, right?

16 A.    I did.

17 Q.    How many homicide cases would you say you tried while you

18 were in Mr. Connick's office?

19 A.    About 150.

20 Q.    One of the reasons that Mr. Connick looked to you in the

21 Thompson case and other homicide cases was because you believe he

22 knew you did a good job and worked hard, right?

23 A.    I would hope so, yes, sir.

24 Q.    In all these prosecutions and in Mr. Thompson's prosecution,

25 would you say that you followed Mr. Connick's policies?

A.    Absolutely.

Q.    Everything you did in the Thompson case, you were following

policies that had been set by Mr. Connick; is that right?

A.    That's correct.

Q.    You always complied?

A.    Yes.

Q.    In both the carjacking and the murder case, whatever you

did, it was following the policies set by Mr. Connick?

A.    To the best of my ability.

        MR. BANKS:  I don't have any further questions of

Mr. Williams, Your Honor.

        THE COURT:  All right.  Thank you.

         Mr. Carver, do you have any questions?

        MR. AARON:  Your Honor, why don't we wait until

tomorrow.

        THE COURT:  We can do that.  Mr. Williams, the other

side has some questions of Mr. Williams, but he has a doctor's

appointment in the morning, right?

        THE WITNESS:  That's correct.

        THE COURT:  What time?

        THE WITNESS:  9:00.

        THE COURT:  And what time do you estimate you can be

here?

        THE WITNESS:  It's for some testing for surgery.

        THE COURT:  We'll have other witnesses.  Why don't you

1    just get back here as soon as you can.

2            THE WITNESS:  I'll call and let you know.

3            THE COURT:  Does the plaintiff have a 10- or 15-minute

4    witness or something we can do for 10 or 15 minutes?

5            MR. AARON:  Your Honor, they indicated to me they had a

6    video that was 7 minutes long.  Your Honor, may we approach the

7    bench on this?

8            (WHEREUPON, there was a bench conference outside of the

9    presence of the court reporter.)

10           (In open court.)

11           THE COURT:  Ladies and gentlemen, we're going to recess

12   for the evening right now, so I'm going to ask you to close your

13   notebooks again and leave them on your chairs or under your

14   chairs.  We lock up the courtroom at night.  They'll be there

15   when you return in the morning.

16           Remember my admonition when you go home this evening

17   not to discuss the case with anyone.  Also avoid reading,

18   watching or listening, should there be any news media reports

19   about this case.  And we'll see you back here in the morning.

20   Please make an effort to get here on time so that we can try to

21   start promptly at 8:30.

22           Okay, thank you.  Have a good evening.

23           THE DEPUTY CLERK:  All rise.

24           (WHEREUPON, the jury panel leaves the courtroom.)

25           THE COURT:  We've got two bench books of exhibits that

1   were submitted pursuant to the Court's instructions as exhibits

2   to be admitted without objection.  What I would propose we do is

3   to say that all of these exhibits, which are trial exhibits 1

4   through 91, apparently --

5          MR. BANKS:  Yes, Your Honor.

6          THE COURT:  -- are admitted subject to them being used

7   at trial, used during the trial.  In other words, what I don't

8   want to do, and I've seen this happen before, people introduce a

9   book of exhibits like this and you only use 20 pages during the

10  trial and we send this big book back to the jury, and you know

11  what I get, I get a question, what are we supposed to do with

12  this book?

13          They don't know if they are supposed to start reading

14  the book or what.  So you have to make some use or reference to

15  the exhibit during the trial, and you guys should keep track of

16  what you you're using and coordinate that with Eileen and if it's

17  something, you know, not used during the trial, we would pull it

18  out of the book before it goes into the jury room.

19          MR. BANKS:  Your Honor, if an exhibit is admitted now as

20  the Court has and we only refer to it in closing, that's still

21  considered use, though, right, as opposed to if a witness

22  testifies?

23          THE COURT:  Yes, but you need to mention it during the

24  trial somehow.

25          MR. BANKS:  I understand.  Thank you, Your Honor.

1        THE COURT:  Keep track of what you use or mention, both

2  sides, okay?

3        MR. BANKS:  We will.

4        THE COURT:  All right.  Have a good evening, everyone.

5        (WHEREUPON, at 5:16 p.m., on Monday, February 5, 2007,

6  the proceedings were concluded.)

7                          *    *    *

8

9

10                      REPORTER'S CERTIFICATE

11

12     I, Cathy Pepper, Certified Realtime Reporter, Registered

13  Professional Reporter, Certified Court Reporter, Official Court

14  Reporter, United States District Court, Eastern District of

15  Louisiana, do hereby certify that the foregoing is a true and

16  correct transcript, to the best of my ability and understanding,

17  from the record of the proceedings in the above-entitled and

18  numbered matter.

19

20

21                        _____

22                        Cathy Pepper, CCR, RPR, CRR

23                        Official Court Reporter

24                        United States District Court

25