1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3
    ****************************************************************
4

5   JOHN THOMPSON

6                          CIVIL ACTION NO. 03-2045 "J"
    V.                     NEW ORLEANS, LOUISIANA
7                          TUESDAY, FEBRUARY 6, 2007, 8:30 A.M.

8   HARRY F. CONNICK, Et Al.

9
    ****************************************************************
10

11                        **VOLUME II**
                  TRANSCRIPT OF TRIAL PROCEEDINGS
12         HEARD BEFORE THE HONORABLE CARL J. BARBIER
                  UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15

16  FOR THE PLAINTIFF:      MORGAN, LEWIS & BOCKIUS, LLP
                            BY:  J. GORDON COONEY, JR., ESQUIRE
17                               MICHAEL L. BANKS, ESQUIRE
                                 S. GERALD LITVIN, ESQUIRE
18                          1701 MARKET STREET
                            PHILADELPHIA, PENNSYLVANIA, 19103
19

20  FOR THE DEFENDANT:      GOINS AARON, PLC
                            BY:  RICHARD GOINS, ESQUIRE
21                               WILLIAM D. AARON, ESQUIRE
                                 MARK C. CARVER, ESQUIRE
22                          1010 COMMON STREET, SUITE 2600
                            NEW ORLEANS, LOUISIANA  70112
23

24
    ALSO PRESENT:          HARRY CONNICK
25                         EDDIE JORDAN

```
1   OFFICIAL COURT REPORTER:        CATHY PEPPER, CCR, RPR, CRR
                                    500 POYDRAS STREET, ROOM B406
2                                   NEW ORLEANS, LOUISIANA 70130
                                    (504) 589-7779
3

4   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
5
```

1                              **I N D E X**

2

3  Examinations                                          Page

4

5  **EDDIE JORDAN** (VIA VIDEOTAPED DEPOSITION)..............  157

6  **ERIC DUBELIER** (VIA VIDEOTAPED DEPOSITION).............  167

7  **HARRY CONNICK** (VIA VIDEOTAPED DEPOSITION)............  174

8  **NANCY WOHL**..........................................  192

9  DIRECT EXAMINATION BY MR. LITVIN.....................  193

10  CROSS-EXAMINATION BY MR. CARVER......................  211

11  REDIRECT EXAMINATION BY MR. LITVIN...................  217

12  **JOHN THOMPSON**.......................................  219

13  DIRECT EXAMINATION BY MR. BANKS......................  220

14  CROSS-EXAMINATION BY MR. GOINS.......................  298

15  REDIRECT EXAMINATION BY MR. BANKS...................  308

16  **BRUCE WHITTAKER**.....................................  311

17  DIRECT EXAMINATION BY MR. BANKS......................  311

18  CROSS-EXAMINATION BY MR. GOINS.......................  333

19  **JAMES WILLIAMS** (Continued)..........................  345

20  CROSS-EXAMINATION BY MR. CARVER......................  345

21  REDIRECT EXAMINATION BY MR. BANKS...................  379

22  **VAL SOLINO** (VIA DEPOSITION)..........................  405

23

24  (Index Continued)

25

1

**I N D E X** (Continued)

2

3    Examinations:                                               Page

4

5    **JOSEPH F. LAWLESS** ....................................   410

6    VOIR DIRE EXAMINATION BY MR. COONEY...................   411

7    TRAVERSE EXAMINATION BY MR. AARON.....................   419

8    VOIR DIRE (RESUMED) BY MR. COONEY.....................   421

9    DIRECT EXAMINATION BY MR. COONEY......................   425

10   CROSS-EXAMINATION BY MR. AARON........................   439

11   REDIRECT EXAMINATION BY MR. COONEY....................   455

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P-R-O-C-E-E-D-I-N-G-S**

TUESDAY, FEBRUARY 6, 2007

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning, everyone.  Let's bring in the jury.

MR. COONEY:  Your Honor, we're going to offer the video testimony of Mr. Jordan.

THE COURT:  How long is that going to take?

MR. COONEY:  Less than 10 minutes.

THE COURT:  Then who?

MR. COONEY:  The videotaped deposition of Mr. Dubelier, which will also take that amount of time.  And the video testimony of Mr. Connick, which takes a little longer than that, about 20 minutes.  And you have a live witness.

MR. BANKS:  Then hopefully Mr. Williams will be back.

THE MARSHAL:  All rise.

(WHEREUPON, the jury panel enters the courtroom.)

THE COURT:  Good morning, ladies and gentlemen, you may have a seat.  I hope everyone had a pleasant evening.  We're going to resume and we still have to finish the testimony of Mr. Williams, who was on the stand yesterday.  But he's going to be a little bit later this morning and we'll take the rest of his

1    testimony.  So we're going to proceed with other evidence right

2    now.

3              Mr. Cooney, are you going to proceed?

4              MR. COONEY:  Yes, Your Honor, the plaintiff would offer

5    the videotaped deposition testimony of Mr. Eddie Jordan.

6              THE COURT:  Ladies and gentlemen, let me just briefly

7    explain.  A deposition simply means that some time before trial

8    the lawyers, the parties got together, they had a court reporter

9    present, and they took the sworn testimony of this witness in

10   advance of trial, and they are going to play a portion of that

11   for you here today.  You're to consider and judge it just as you

12   judge any other testimony, okay?

13             MR. BANKS:  Your Honor, does the Court want a printed

14   copy for the record or is that not necessary?

15             THE COURT:  No.  Our court reporter may want it.

16             (WHEREUPON, the videotaped deposition of Eddie Jordan

17   was played as follows:)

18   Q.   I take it you're familiar with the *Brady* rule?

19   A.   Yes.

20   Q.   What is your understanding of the *Brady* rule?

21   A.   That a prosecutor has an obligation to turn over exculpatory

22   evidence.

23   Q.   When you say exculpatory, what do you mean by that?

24   A.   It's evidence that would tend to -- to negate that person's

25   guilt, the defendant's guilt.

1 Q.    In your view, did your predecessor's office have a

2 reputation for fairness and integrity?

3 A.    You know, I think that there was some questions raised about

4 specific cases, and I -- I knew that that had happened so I --

5 I -- I'm not willing to say that he -- what -- what his

6 reputation was.

7         I know that on those cases, there were -- there were

8 some fair questions about whether evidence had been disclosed

9 properly, and I know that later on there was at least a report

10 indicating that the office had -- had failed to disclose *Brady*

11 material on several occasions.

12 Q.    Are you -- when you -- before you took office -- or let's

13 say as of the time you took office, did you have a view as to

14 whether your predecessor's office had displayed fairness and

15 integrity in dealing with criminal defendants?

16 A.    You know, that was one of the issues that came up during

17 the -- the -- the political race.  I think that some of the

18 candidates, including myself, raised questions about whether --

19 whether the office had done all that it could do to ensure

20 that -- that evidence that defendants were entitled to was turned

21 over.

22         So my sense is that -- is that several of us thought

23 that -- that more could be done.  And that's -- and that's what I

24 tried to do when I became district attorney.

25 Q.    What led you to conclude that?

1  A.   These cases that -- that I can't remember by name, I knew

2  that there were several cases that had been reversed.

3  Q.   Can you think of any disadvantages to a prosecutor of having

4  open-file discovery, other than protection of witnesses and

5  people associated with the victim?

6  A.   Well, I -- I don't know of any -- any great disadvantages.

7  I -- I think that some prosecutors perhaps want to -- they want

8  an element of surprise, I guess, to some degree, and I don't

9  know, maybe that -- that's their way of ensuring that there --

10 there's some surprise there.

11 Q.   Would you agree that open-file discovery is a good way to

12 help the truth come out in criminal cases?

13 A.   I think so.

14 Q.   Is it a good way to minimize *Brady* violations?

15 A.   I think so.

16 Q.   In a complicated criminal case where there are lengthy

17 supplemental police reports and pages and pages of police

18 dailies, many witness statements and other materials that are

19 available to the prosecutor, how is a prosecutor supposed to

20 determine what is *Brady* material and what should be produced if

21 there's not open-file discovery?

22         MR. AARON:  Your Honor, Your Honor.

23         THE COURT:  Wait, stop.

24         (WHEREUPON, the videotape was stopped.)

25         MR. AARON:  May we stop the tape a minute?  May we

1  approach?

2          (WHEREUPON, there was a bench conference.)

3          MR. AARON:  This has absolutely nothing to do with what

4  happened in 1985.  Mr. Jordan didn't take office until 2003.

5  They are asking him all of these hypothetical questions but

6  they --

7          THE COURT:  Wait a minute.  I thought this was

8  designated and there was no objection to it by you.  It's

9  designated in advance of trial.  That's the whole point.

10          MR. AARON:  My point is even though it's designated, you

11  can make objections.

12          THE COURT:  But my instructions specifically said you

13  were to voice any objections, I think it was five working days

14  before trial is my standard order.

15          MR. BANKS:  It's already admitted into evidence.

16          THE COURT:  So as far as I'm concerned, there is no

17  objection.  Let's go.

18          (WHEREUPON, the bench conference concluded.)

19          THE COURT:  Can you back up just a few questions.

20  Something is missing.

21          (WHEREUPON, playing of the videotape was resumed.)

22  Q.    In a complicated criminal case where there are lengthy

23  supplemental police reports and pages and pages of police

24  dailies, many witness statements and other materials that are

25  available to the prosecutor, how is a prosecutor supposed to

1  determine what is *Brady* material and what should be produced if

2  there's not open-file discovery?

3  A.   Well, I guess he could raise those questions with the

4  supervisor.

5  Q.   But in the course of a trial, if a witness says something

6  that's inconsistent with a reference on page 26 of a 40-page

7  supplemental police report, how is a prosecutor supposed to be

8  able to remember that and at that point identify it to the

9  defense?

10 A.   I think it's difficult.

11 Q.   Is that one of the reasons why open-file discovery is a good

12 idea, because it's inherently difficult otherwise to manage the

13 obligations under *Brady*?

14 A.   I think that's true.

15 Q.   Are you aware of any studies --

16        (WHEREUPON, the videotape was stopped.)

17        MR. CONNICK:  Your Honor, may I approach the bench?

18        THE COURT:  No, no.  No, please, Mr. Connick.

19        MR. CONNICK:  This is --

20        THE COURT:  Mr. Connick, you need to sit down.  You're

21 not an attorney of record.  You're a party to the case.  Please

22 don't interrupt.  Okay.  Start that question over, please.

23        (WHEREUPON, playing of the videotape was resumed.)

24 Q.   Are you aware of any studies or analyses or memoranda

25 discussing the extent to which the Orleans Parish District

1  Attorney's Office has complied with its obligations under *Brady*

2  and other related cases?

3  A.   I know there was a report that came out.  Some kind of

4  national group or national report that was looking at district

5  attorneys' offices across the country, and I -- I don't remember

6  the name of that organization, but it came out in the newspaper.

7  It seems like I recall seeing -- seeing a short summary of what

8  they found in terms of the Orleans Parish DA's Office.

9  Q.   What's your recollection of what they found in this national

10 report?

11 A.   Well, they found that -- that -- that this office, the

12 Orleans Parish DA's Office, had one of the -- one of the worst

13 records, I think, in terms of *Brady*.  So they did find that out.

14 Q.   I'm going to show you a document we'll mark as Jordan

15 Exhibit 1.  It's a two-page letter dated January 5, 1998, from

16 Judge Calvin Johnson to Mr. Connick.

17        Would you take a moment to review that and just tell me

18 when you've done so.

19        Have you had a moment to review it?

20 A.   Yes, I have.

21 Q.   Have you ever seen this letter before?

22 A.   No, I haven't.

23 Q.   Have you ever heard about it?

24 A.   No, I have not.

25 Q.   Would you agree with me that a letter like this from a judge

1  to a district attorney or U.S. Attorney is an unusual or

2  extraordinary event?

3  A.   Yes.

4  Q.   And you'll note though on the second page that Judge Johnson

5  appears to have copied the other criminal court judges and a

6  number of assistant district attorneys.  Have you ever heard of a

7  judge doing anything like that before?

8          MR. AARON:  Your Honor, may I approach?

9          (WHEREUPON, the videotape was stopped.)

10          THE COURT:  No.

11          MR. AARON:  I found the objections.

12          THE COURT:  Don't interrupt again, please.  Let's

13  continue playing it.

14          (WHEREUPON, playing of the videotape was resumed.)

15  Q.   After describing on the first page of this letter what Judge

16  Johnson says he witnessed and then the rules that pertain to

17  *Brady* and the production of evidence to the defense, he says on

18  the top of the second page, "Many of the discovery problems

19  concerning exculpatory material could be solved by having an

20  open-file discovery procedure."

21          Do you agree with that statement?

22  A.   Yes.

23          (WHEREUPON, the videotape was stopped.)

24          THE COURT:  Is that the conclusion of it?

25          MR. COONEY:  It is, Your Honor.

1          THE COURT:  Okay.

2          MR. COONEY:  Plaintiff would offer the videotaped

3    deposition of Mr. Eric Dubelier, Your Honor.  Portions of that

4    deposition.

5          THE COURT:  Before you start playing that, Counsel

6    approach the bench for a second.

7          (WHEREUPON, there was a bench conference.)

8          THE COURT:  You know, guys, all of this was supposed to

9    be sorted out before trial.  That's the reason.  You told me

10   there was no objection, then you stand up in the middle, after

11   three-fourths of the deposition is played and you said there were

12   objections.

13         MR. AARON:  No, there were objections to certain parts.

14   Where he referenced that national study, that was objected to.

15         THE COURT:  Where was the objection?

16         MR. CARVER:  It's in the pretrial order, Judge.

17         THE COURT:  I'm not talking about the pretrial order.

18   I'm talking about you were supposed to file your objections with

19   me.  My standing order requires you to file it what, five days.

20         When they designate parts of a deposition, you've got

21   to file objections to that.  That's what our standing order says:

22   Five days before trial.

23         MR. AARON:  I'm sorry, Judge.  Like I said, the pretrial

24   order we objected.

25         THE COURT:  You guys objected to a lot of things.  And

1  you stipulated to things as being admissible and then you object

2  to them.  You know, it's been thoroughly confusing this entire

3  case, I can tell you, the way this was done.

4       MR. AARON:  I apologize.

5       THE COURT:  I don't know what I can do.  That's why I

6  asked you to go through this exercise, so we could sort all of

7  this out.  We can't have people jumping up during a video

8  deposition.  That's the reason I asked you to do it in advance,

9  so this is all sorted out, any objections.  I want to rule on the

10  objections before the video is played so that none of this stuff

11  goes on, okay?

12       So what's next?  Now you're telling me this was already

13  in evidence?

14       MR. BANKS:  Well, because it wasn't objected to,

15  Your Honor.  Then we have Mr. Dubelier's excerpt that we just

16  handed up.

17       THE COURT:  Was there any objections voiced to any of

18  these designations?

19       MR. COONEY:  There were no objections in response to

20  your Your Honor's order.  And the only thing the defendant said

21  in the pretrial order about an objection to depositions was

22  simply that.

23       THE COURT:  Just defendants object to any depositions as

24  not admissible unless otherwise admissible pursuant to -- that

25  was your objection?

1          MR. AARON:  Not just on that.  We had hearsay

2     objections.

3          MR. COONEY:  Your Honor, they objected to certain

4     exhibits but not to the deposition Your Honor.

5          MR. AARON:  Judge, we had specific objections to every

6     exhibit.  What was referred to in the videotape was an exhibit

7     which was the national study which we said was hearsay.  That

8     was, and the Calvin Johnson letter which was hearsay.

9          MR. BANKS:  You didn't move them into evidence.

10         MR. AARON:  But the video referred to them, Judge, and

11     we objected to what was referred to in the video.  That was my

12     point.  And it's specifically listed on there.  It wasn't the

13     video.  It was the document itself.

14         THE COURT:  All I can tell you, here is what I've got to

15     base it on.  I've got a specific instruction in my standing

16     pretrial instruction, and it says that with regard to depositions

17     that are going to be used at trial, any objections to the

18     depositions have to be made five days before trial.  I believe

19     that's what it says.  I'm pretty sure it's five working days

20     before trial.

21          They designate their part, you designate the part, you

22     make your objections, they make their objections.  I never got

23     any of that in this case.  So as far as I'm concerned, they are

24     unobjected to.

25         MR. AARON:  All right.  Your Honor, can I at least for

1  the record note my objection?

2          THE COURT:  Yes.

3          MR. AARON:  Thank you.

4          (WHEREUPON, the bench conference concluded.)

5          THE COURT:  Who is the next witness?

6          MR. BANKS:  Your Honor, the videotaped excerpts from

7  Mr. Dubelier.

8          THE COURT:  And this is about 10 minutes?

9          MR. BANKS:  A little bit less perhaps.

10          THE COURT:  Turn it on.

11          (WHEREUPON, the videotaped deposition of Eric Dubelier

12  was played as follows:)

13  Q.   Mr. Dubelier, it's correct that you were one of the

14  prosecutors that tried John Thompson for the first-degree murder

15  of Raymond Liuzza; is that right?

16  A.   That's correct.

17  Q.   And Mr. Thompson was convicted in 1985 of that crime?

18  A.   He was convicted.  If you say it was 1985, I'm certain that

19  it was.

20  Q.   Okay.  And in that case you argued that Mr. Thompson should

21  be sentenced to death; correct?

22  A.   Yes.

23  Q.   And, in fact, Mr. Thompson was sentenced to death in 1985;

24  correct?

25  A.   If it was 1985, that's correct.

1    Q.    And is it also true that you were involved, at least for

2    some period of time, in the armed carjacking case against

3    Mr. Thompson involving the LaGarde family?

4    A.    Let me say that I don't remember that case being referred to

5    as a carjacking in the past because I don't know that it -- I

6    have no independent recollection of it involving -- being

7    involved, or involving an automobile.

8    Q.    Okay.

9    A.    But yes, I had some involvement in an armed robbery case.

10   Q.    Do you know how long Mr. Thompson was in jail for the Liuzza

11   murder?

12   A.    No, I do not.

13   Q.    Okay, do you know how long he was on death row in Angola?

14   A.    No, I do not.

15   Q.    What were the responsibilities of the chief of screening

16   when you held that position?

17   A.    I had multiple lawyers working for me.  I think it was ten

18   or more.  There were specialized screeners who did homicide, sex

19   offenses, armed robbery and narcotics.

20         Then there were general screeners who did all of the

21   other offenses.  And then I think -- I think maybe for a period

22   of time even the magistrate lawyers reported to me.

23         So I -- I think that was the structure.  I also had

24   investigators and secretarial and other support staff.

25   Q.    Can you describe where the chief of screening fit in the

1  overall hierarchy of the District Attorney's Office?

2  A.   I never saw a flow chart or if I did, I can't remember.  So

3  I think this is probably where you sit is how you viewed that.

4         But I think the hierarchy was you had the district

5  attorney, you had the first assistant district attorney and then

6  below the first assistant district attorney, you had the chief of

7  trials, the chief of screening.  There was someone who ran the

8  nonsupport division.  There was someone who ran the juvenile

9  division.  There was a chief investigator.

10  Q.   So there were -- a small number of people that -- that had

11  the Number 3 position, if you will, in the office, beneath the

12  first assistant and the DA?

13  A.   Yeah, again, I can't remember whether, I know at one time

14  there was a chief of magistrate.  I don't know whether that

15  person reported, when there was, whether that person was

16  reporting to me or reporting directly up, but it was something

17  like that.

18  Q.   I would like you to describe for me, just generally, the

19  training that took place at the District Attorney's Office when

20  you were there.

21  A.   I don't remember.

22  Q.   Do you recall frequent -- how frequently there were training

23  sessions?

24  A.   No, I don't.

25  Q.   Do you remember what subjects were covered in training?

1  A.   No, I don't.

2  Q.   Do you recall any specific *Brady* training?

3  A.   I don't recall specifically any training.  I'm sure there

4  was training.  I just can't remember.

5  Q.   Okay.  Do you recall whether Mr. Connick himself provided

6  any training to the district attorneys?

7  A.   I can't recall.

8  Q.   Do you recall whether there was somebody there that was

9  responsible for providing training?

10 A.   No, I don't -- I don't know.  There may have been, but I

11 don't know.

12 Q.   Was there any division of responsibility, however, between

13 what the junior district attorney would do and what the senior

14 district attorney would do?

15 A.   Not really, other than that the senior person was

16 responsible for everything that went on.  So to the extent the

17 junior person was doing something, the senior person would be

18 responsible for making sure, you know, it was done right on

19 any -- in any particular matter.

20 Q.   Who was -- would you agree with me that paragraph 1 of

21 Mr. Thompson's Motion for Production of Exculpatory Evidence

22 asked you, the prosecutor, to identify eyewitnesses who gave

23 physical descriptions of the killer?

24 A.   That's the plain language of it, yes.

25 Q.   Would you agree with me that the police report, which has

1  been marked as Dubelier Exhibit 4, shows that Mr. Schliffka gave

2  a physical description of the perpetrator?

3  A.    The motion asks for physical descriptions of the killer

4  which are inconsistent with the defendant's appearance.  I agree

5  that the police report contains a description of Mr. Thompson.

6  Q.    And would you agree that that description of Mister -- of --

7  of the perpetrator in the police report is inconsistent with the

8  picture that we've previously shown, that was in the possession

9  of the state in December of 1984?

10  A.    No, I would not.

11  Q.    You would not?

12  A.    No.

13  Q.    You think that the picture of Mr. Thompson, let's make sure

14  that we're completely clear on this -- the picture of

15  Mr. Thompson, which is Exhibit 6, that that picture is consistent

16  with the description by Mr. Schliffka of a person, Negro male,

17  unknown age, 6 feet tall, slim build, dark complexion, close-cut

18  black hair, wearing a black jacket and blue jeans.  You think

19  that Exhibit 6 shows somebody with close-cut black hair?

20  A.    I don't believe the picture is inconsistent with the

21  description.

22  Q.    You don't believe, that's your testimony to the jury?

23  A.    That's right.

24  Q.    You don't believe that Exhibit 6 is inconsistent with the

25  description --

1              THE COURT:  Stop it for a second.

2              (WHEREUPON, the videotape was stopped.)

3              THE COURT:  Does anybody in the courtroom have a cell

4    phone that's turned on?  Because something is interfering with

5    our sound system and a cell phone will do that.

6              If you have a cell phone, you have to turn it off, not

7    just on vibrate or anything because it will interfere with the

8    this electronic stuff.

9              THE CLERK:  Or even a Blackberry.

10             THE COURT:  Or even a Blackberry or anything like that.

11   If you have it, turn it off, please, because something is

12   interfering with our sound here.

13             MR. BANKS:  It's possible, too, Your Honor, that that is

14   on the audiotape from the deposition that maybe --

15             THE COURT:  Well, it could be, but it started all of a

16   sudden.  It wasn't there at the beginning, and now all of a

17   sudden, it just began.  I don't know.  Okay.  Thank you.  We can

18   continue.

19             (WHEREUPON, playing of the videotape was resumed.)

20   Q.   That's your testimony under oath?

21   A.   Mr. Cooney, I have no idea on the night of this incident

22   what Mr. Thompson's hair looked like.  You're showing me a

23   picture taken days after the incident.  I don't know whether the

24   hair was styled, whether it had something in it, whether it was

25   combed down.  The description from the witness, as far as I can

1  tell, from looking at the police report -- and I'm not trying to

2  argue with you, what I'm telling you is, the description by the

3  witness was at -- after midnight, in the dark, of an individual

4  running some distance away.

5       The significance of the details of that description,

6  could that fit the description of Mr. Thompson?  Yes, it could.

7  Could it not be Mr. Thompson?  Maybe not.  I don't know the

8  answer to that question.  I don't know what John Thompson looked

9  like when Mr. Schliffka saw him.

10      I think the fact that there's a picture with his hair

11 messed up and not appearing to be combed in any way doesn't mean

12 that his hair didn't appear to the witness that night to be close

13 cropped.

14 Q.   Mr. Dubelier, I'm asking you, based on your own independent

15 understanding of *Brady* and looking at Exhibit 4, which is the

16 police report, and the description given by Mr. Schliffka, which

17 is accounted in there, and Exhibit 6, which is the picture of

18 Thompson, do you believe that that information, those two

19 documents should have been provided to the defense under *Brady*?

20 A.   I don't believe that the law obligated us in 1985 to produce

21 that information.  Had I do -- if I had it to do all over again,

22 would I have produced it?  I would have produced everything in

23 the file.  I would have let everyone look at every piece of paper

24 in the file.  Unfortunately I can't go back and do that, and I'm

25 sorry.

1  Q.   And based on what you've seen here today in terms of what

2  was produced and what was not produced, do you continue to

3  believe that the steps that you took in 1985 were consistent with

4  the policy of the Orleans Parish District Attorney's Office?

5  A.   Yes, I do.

6       And again, Mr. Cooney, I'm not trying to argue with

7  you.

8       (WHEREUPON, playing of the videotape was concluded.)

9       THE COURT:  All right.  Who is your next witness?

10      MR. COONEY:  Your Honor, the plaintiff would offer the

11  excerpts of the videotaped testimony of Mr. Connick.

12      THE COURT:  All right.

13      (WHEREUPON, the videotaped deposition of Harry Connick

14  was played as follows:)

15 Q.   Good afternoon, Mr. Connick.  My name is Gordon Cooney and

16 along with Mr. Banks we represent Mr. Thompson in a lawsuit filed

17 against you, Jim Williams, Eric Dubelier, Eddie Jordan, and the

18 Office of the District Attorney, which is pending in the

19 United States District Court for the Eastern District of

20 Louisiana.

21      What types of things did you discount because you had

22 no knowledge of?

23 A.   About, about facts of cases and, and appeals and such as

24 that.  If you understand the way the office operated, I, I was

25 not practicing law there.  I was running an office.  It was a big

1  staff of well over 200 people.  And I stopped reading law books

2  when I was -- when I became the DA, and looking at opinions.  And

3  my concern was the operation, the total operation of the office.

4         So you were asking about civil suits that were filed, I

5  didn't know until some of them were over with that we, that I had

6  even been sued.  It was just something that I didn't do in the

7  office and they were picked up by the people who were responsible

8  for that, and they represented the office and concluded them.

9  Q.   Are you specifically aware of any office policy manual that

10 preceded 1987?

11 A.   Not really.

12 Q.   Mr. Connick, how long were you the district attorney of

13 Orleans Parish?

14 A.   I started in April of '74 and left in January of 2003,

15 almost 29 years.

16 Q.   Did you handpick prosecutors for any high-profile cases?

17 A.   Sometimes I did.  Sometimes I did.

18 Q.   Would you characterize the Liuzza murder as a high-profile

19 case?

20 A.   I would say it was among that -- that category of cases that

21 would fit that description.

22 Q.   What we've marked for identification as Connick Exhibit 1 is

23 a report dated May 19, 2005, entitled "Toward a Fully Integrated

24 Criminal Justice System:  Step One, Refocusing and Restructuring

25 the DA's Office as Prelude to Systematic Coordination with the

1   Police."

2           Mr. Connick, have you ever seen this document before?

3   A.    No.

4   Q.    You haven't?

5           Were you aware of the fact that Mr. Jordan was

6   conducting an analysis of his own office?

7   A.    No.

8   Q.    I would like you, if you would, to take a look at page 2 of

9   the report.

10  A.    (Witness complies.)

11  Q.    It's really the first page that says "purpose" at the

12  tops -- the top.  And it reads in that first paragraph:  "The

13  purposes of this plan of action is to present an assessment of

14  operations and resource needs of the Orleans Parish District

15  Attorney's Office, to chart the changes the district attorney is

16  taking to restructure practices to deliver the greatest possible

17  operating efficiencies and effectiveness within current resource

18  constraints, and to frame the debate for increased support."

19          Do you see that under the statement of purpose?

20  A.    Yes.

21  Q.    And down under Structure, in the last paragraph, one of the

22  things it refers to is that, "The DA's office's culture has been

23  scrutinized by interviewing individually or in focus groups more

24  than 100 members of the Office, both legal and non-legal staff,

25  analyzing the responses to a confidential questionnaire completed

1  by 66 of 89 ADAs, a response of 74%."

2          Do you see that?

3  A.   Yes.

4  Q.   I would like you to go to page 94 of the report, if you

5  could.

6  A.   (Witness complies.)

7  Q.   And I'm going to ask you a question about the first sentence

8  that appears on page 94, so if you want to read over that

9  sentence and the page or so that precedes it just to familiarize

10  yourself with that, that would be fine.

11  A.   (Witness complies.)

12          I read it.

13  Q.   Okay.  Do you see where on page 94 it says, "Over half of

14  the ADAs responding to the survey -- 52.3% -- agreed with the

15  statement, 'I have not had the training to do the job that is

16  expected of me.'"

17          Do you see that?

18  A.   Yes.

19  Q.   If your assistants had been asked whether they thought they

20  received sufficient training or were asked the question that this

21  group was asked, the assertion was, "I have not had the training

22  to do the job that is expected of me," what percentage of them do

23  you think would have agreed or disagreed with that statement?

24  A.   That's conjecture.

25  Q.   Do you recall being -- I think at the beginning of this

1  deposition, you testified that you recalled at some time that you

2  were deposed in the Shareef Cousin case; is that right?

3  A.    I was what?

4  Q.    You were deposed in the Shareef Cousin case?

5  A.    Yeah.

6  Q.    Okay.

7  A.    This is that case?

8  Q.    Right.

9  A.    Okay.  I do recall it now.

10  Q.    I would like to, in the interest of saving some time, refer

11  you to page 7 and 8 of your transcript.  And I direct your

12  attention to page 7, line 5, and ask you to read page 7, line 5

13  through page 8, line 17.  And why don't we just read through it

14  while we're doing it.

15         The question that was asked, "And what is your

16  understanding of a prosecutor's obligation under *Brady* and all of

17  its progeny?"

18         "Answer:  To turn over exculpatory evidence that we are

19  aware of to the defendant."

20         "And by exculpatory evidence, what do you mean by

21  that?"

22         "Answer:  Evidence that demonstrates that he's not

23  guilty of the crime with which he is charged."

24         "Would you agree that it would be more broad than that,

25  that it would include all evidence that is favorable to the

1  accused on --"

2  "Answer:  Well, I'm not aware that *Brady* says that."

3  "Question:  So you would limit it only to evidence that

4  proved that the individual is innocent of the charge?"

5  "Answer:  Well, not necessarily.  It would depend on

6  what the evidence is."

7  "Question:  And *Brady versus Maryland,* was as I am sure

8  you will recall, a case involving the death penalty where the

9  issue is whether you should turn over evidence favorable to the

10  question of punishment.  Do you recall that?"

11  "Answer:  No."

12  "Question:  Would you agree, though, as a principle

13  that it is important to turn over all evidence that's favorable

14  to the accused to the issue of punishment?"

15  "Answer:  Well, I agree that we're supposed to turn

16  over evidence that exculpates the accused, and I know that there

17  are decisions that have amplified that and perhaps broadened

18  that.  But -- and aware of some of those decisions and the

19  general obligation to make sure that we don't prosecute the wrong

20  individual."

21  Do you see that?

22  Did you see that testimony?

23  A.   Yes, I do.

24  Q.   Is that still your view about what *Brady* requires?

25  A.   No, I read this too and I would amplify that a little bit

1  more to -- to say that it should be broader --

2  Q.   Why do --

3  A.   -- than that.

4  Q.   In what respect should it be broader?

5  A.   Well, it, I think, I mean, I can't give you a law school

6  definition of it, but I think that it has to, to support in some

7  way the position that the accused has towards innocence, and I

8  think it has to be material to some extent.  Generally speaking,

9  that -- that would be it.  But I do know that courts have

10 interpreted it broader.  And whatever that interpretation is,

11 that's what we're obliged to, to turn over.

12 Q.   Why is it that you didn't give that testimony back in 2001?

13 A.   I don't know.  That was my reaction to the question.

14 Q.   That was your best recollection in 2001, correct?

15 A.   Why didn't I give a different answer when I was --

16 Q.   My question was:  This was your best recollection in 2001,

17 correct?

18 A.   Well, I wouldn't regard it as the best.  I think I could

19 have done better by that, but, but that's what I said.

20 Q.   This was the answer you gave in 2001?

21 A.   That's what I'm saying.

22 Q.   After you gave that answer, did somebody point out to you

23 that *Brady* was actually broader than that?

24 A.   No, I read it myself.  And, and I don't know why I said it

25 that way because it should have been -- as I said before, should

1   have -- it's not a law school definition and it should have been

2   a little broader.

3           And it's an elastic thing, according to some of the

4   justices too, and that makes it a little more difficult to find

5   a -- a standing definition of what *Brady* is.  It depends on the

6   evidence, I guess, but primarily the interpretation of *Brady* by

7   judges.

8   Q.   How about any reprimands, can you recall any instances where

9   somebody in your office was reprimanded for failing to turn over

10  *Brady* information?

11  A.   No.  Let me explain something to you, too, Mr. Cooney, about

12  that.  It's difficult to reprimand someone who doesn't work for

13  you anymore.  And only in rare instances does someone who is

14  employed stay with us after -- is with us after this decision

15  comes down because it's sometimes years, and they are well on

16  their way after that.

17          So if you can tell me that this assistant failed to do

18  this and what did I do in response to that, I'd be happy to try

19  to answer your question.  But as it's put to me, it's virtually

20  impossible for me to give you a -- an answer.

21  Q.   But you, you can't identify, sitting here today, any

22  instance where you've reprimanded somebody in your office for

23  failing to turn over *Brady* information?

24  A.   No.

25  Q.   Okay.  Can you identify anybody in your office who was fired

1  as a result of failing to turn over *Brady* information?

2  A.   No.  Again, Mr. Cooney, I cannot fire someone who is not

3  working for me.  And in very few instances, as I said, where

4  someone was still on my payroll, when the case came down, if, if,

5  any instances, I recall Mr. Eddie -- Mr. Jordan was one.  I

6  questioned him.  He had a hearing before the ethics board, and I

7  queried him extensively about what happened.  I even forget what

8  his answer was.  But he explained it to me, and I and others,

9  apparently the disciplinary board was satisfied with the way he

10  handled it.

11  Q.   What is your recollection of what state versus Curtis *Kyles*

12  involved?

13  A.   I think what sticks out in my mind most is it wasn't a *Brady*

14  case.

15  Q.   That it was not a *Brady* case?

16  A.   That's my recollection of it.  But -- but I remember that

17  his claim was denied by the United States Court of Appeals.

18  Q.   You also remember that his claim was found to be meritorious

19  by the United States Supreme Court?

20  A.   What -- is there another end of that statement?

21  Q.   Do you, do you recall that his claim was found to be valid

22  by the United States Supreme Court?

23  A.   Not really.

24  Q.   Not really?  What's your understanding of what the United

25  States Supreme Court held in the *Kyles* case?

1    A.   I don't -- I stated earlier, and I repeat, that -- that I

2    really haven't studied the case.  I wasn't familiar with the

3    facts.  I didn't prosecute it.  I didn't write the brief.  I did

4    argue the case.  And if I read the decision, I have no recall of

5    the details about it.

6    Q.   Am I correct, Mr. Connick, this was a case in the United

7    States Supreme Court regarding one of the prosecutors in your

8    office, correct?

9    A.   I don't -- I don't see any names here about who did it.  I

10   assume you're correct.

11   Q.   Jim Williams.  Do you recall that Jim Williams was the

12   prosecutor in the Curtis *Kyles* case?

13   A.   Jim who?

14   Q.   Williams?

15   A.   Oh, no, I don't recall that.  I don't recall that.

16   Q.   You don't recall that Jim Williams was the prosecutor in the

17   Curtis *Kyles* case?

18   A.   I don't recall that Mr. Williams was the prosecutor in that

19   case.

20   Q.   Did you instruct that any changes take place in your office

21   as a result of the state versus Curtis *Kyles* case?

22   A.   No.  I told them that the existing policies and provisions

23   should be carefully followed and that the -- the law on discovery

24   had to be carefully followed.

25            I didn't want to change that.  I was satisfied with

1  what our policy was.  I'm not satisfied always with the

2  implementation of the policy, but I was satisfied with the

3  policy.

4  Q.   Now, do you recall any discussion at that meeting whether it

5  would have been unlawful for the prosecutors to fail to turn over

6  the blood report if they did not know Mr. Thompson's blood type?

7  A.   Regardless of the blood type, they should have turned --

8  whatever the results of the blood test, they should have turned

9  that over.

10  Q.   And why is that?

11  A.   Well, with my poor -- my poor evaluation of *Brady*, I think I

12  know enough to know that if they have some blood evidence, it has

13  to be turned over.  And that, certainly, the defendant is

14  entitled to.

15  Q.   All right.  You don't recall raising questions during the

16  meeting about whether or not there was a *Brady* violation in the

17  absence or proof that the prosecutors knew Mr. Thompson's blood

18  type?

19  A.   No.

20  Q.   Do you recall that Eric Dubelier and Jim Williams tried the

21  murder case?

22  A.   They may have.  They were both sort of equal position in the

23  office, and that wouldn't surprise me.  But I'm not saying they

24  did.  I just don't know.

25  Q.   And do you recall that Mr. Williams tried the arm robbery

1  case against Mr. Thompson?

2  A.    I recall that, yeah.

3  Q.    Do you recall that at one point in the armed robbery

4  prosecution against Mr. Thompson, Mr. Dubelier was involved in

5  that prosecution as well?

6  A.    I don't recall any specifics about that involvement.  I know

7  that there's some discussion that he was, but to what extent, I

8  don't know.

9  Q.    Taking you back to 1999, you learned that some very

10  important exculpatory blood evidence had not been produced in the

11  armed robbery case, right?

12  A.    I'm aware of that, yeah.

13  Q.    The prosecutors that were involved in the, in the armed

14  robbery case were the same prosecutors that were involved in the

15  murder case, correct?

16  A.    Some of them.

17  Q.    Did you not think that it was appropriate to determine, in

18  light of the fact that there was evidence hidden in the armed

19  robbery case against Mr. Thompson, to determine whether there had

20  been evidence hidden in the murder case?

21  A.    I'm not aware that any evidence was hidden in the murder

22  case.

23  Q.    My question is whether you thought it was appropriate to

24  even ask the question back in 1999?

25  A.    No.  Because there was no reason to ask a question out of

1   the blue on the -- on that issue.

2   Q.   Would you agree with me that the prosecution of the armed

3   robbery case was a part of the strategy of prosecuting

4   Mr. Thompson for the murder?

5   A.   Yes.  Yes.

6   Q.   And you didn't think that the hiding or the failure to

7   disclose blood evidence in the robbery case, which was a

8   strategic part of the murder case, didn't justify asking the

9   question of whether there was nondisclosure of *Brady* evidence in

10  the murder case?

11  A.   Mr. Cooney, I'm sorry to tell you that -- that I didn't at

12  that time.

13  Q.   Mr. Connick, I'm going to place before you what was marked

14  in Mr. McElroy's deposition yesterday McElroy Exhibit 9, which is

15  the New Orleans Police Department supplemental police report for

16  the Thompson case.

17          And I would like you -- the Thompson murder case.  I

18  would like you to turn to page 7 of 35, right here, and

19  familiarize yourself with that.

20  A.   (Witness complies.)

21  Q.   You can keep it.  First of all, do you recognize that as a

22  supplemental police report for the Liuzza murder?

23  A.   I have no idea what this is.  I've never seen it.  And I

24  don't know whether it's a supplemental report or not.

25  Q.   Does it appear to be -- to you to be the form of a

1  supplemental police report that was used by the --

2  A.   Mr. Cooney, I read these documents from the police from time

3  to time, but I don't -- I would have to have something tell me

4  this is an incidental report or a supplemental report.

5  Q.   If you want to flip to the front page, maybe that will help

6  you, at the top.

7  A.   I don't know what it is.  I'll take your word.  If you say

8  it's a supplemental report -- I see that.

9  Q.   Is there any reason that you have to believe that it's not a

10  supplemental police report for the Liuzza --

11  A.   No.

12  Q.   Okay.  On page 7, would you read into the record the

13  description that was, that is put in the police report that was

14  given by Mr. Paul Schliffka to the investigating detectives?

15  A.   "Negro male, unknown age, 6 foot tall, slim build, dark

16  complexion, close-cut black hair, wearing a black jacket and blue

17  jeans.  The subject was armed with a large blue steel revolver

18  with a long barrel which he held in his right hand.  This

19  description was later broadcast."

20  Q.   Can we mark that for identification also as Connick

21  Exhibit 11.  So let's double sticker that one if we can.

22        MR. COONEY:  I would like to mark this next document as

23  Connick Exhibit 12.  It was identified yesterday as McElroy

24  Exhibit 10.

25                    EXAMINATION

BY MR. COONEY:

Q.   Mr. Connick, I've placed before you a mug shot of
Mr. Thompson.  And I will represent to you that that is the mug
shot that was taken of Mr. Thompson following the arrest of
Mr. Thompson on December 12, 1984.  I will further represent to
you that that is six days after -- after the Liuzza murder.

Looking at that photograph, would you say that the
individual in that photograph has close-cut hair?

A.   No.

Q.   In your view, in light of what is in the supplemental police
report and that photograph of Mr. Thompson, would you regard
those two documents as *Brady* material?

A.   Yes.  I think photographs and police reports, whether the
original or supplemental, should be shown to the defense.

Q.   If those two documents that we've just marked as Connick
Exhibit 12 and Connick Exhibit 11 had not been produced to the
defense, do you believe that would have been a violation of your
office's policies?

A.   It would have been a violation of the law and the policy,
but you have to keep in mind that -- that it would have been a
violation of the policy if they had done it intentionally.  I
think you have to make a distinction between the inadvertent
conduct of assistant under pressure with a lot of case load doing
something and someone purposefully saying, This is *Brady,* and I'm
not going to give it to them.  I'm going to deny that it exists.

1    That would be clearly a violation and contrary to the law.  That

2    would be clearly a violation and contrary to my policy.

3    Q.    Would you agree that a policy of not producing police

4    reports can lead to *Brady* violations, that if an office has a

5    policy of not producing police reports, that that can lead to

6    *Brady* violations?

7    A.    Yeah.  Among other things, yes.  But -- but it -- but it

8    doesn't follow that it will.  But you are predicating the failure

9    to turn over *Brady* evidence.  It depends on something that

10   perhaps they don't have to turn over.

11   Q.    Mr. Connick, I've placed before you what has been marked as

12   Connick Exhibit 13, which is entitled, Motion for Production of

13   Exculpatory Evidence, Connick Exhibit 14, which is entitled,

14   Answer to Motion for Production of Exculpatory evidence and

15   Connick Exhibit 15, which is Amended Answer to Motion for

16   Production of Exculpatory Evidence.

17            I want to focus on a couple of the requests in here and

18   ask you a couple of questions about that.  If you look first at

19   paragraph Roman numeral one of Mr. Thompson's Motion for

20   Production of Exculpatory Evidence, what that asks for are the

21   names of any eyewitnesses and copies of any statements made by

22   them.  And it elaborates:  "This request is based on newspaper

23   articles obtained by the defense which indicate that eyewitnesses

24   gave a physical description of the killer which is inconsistent

25   with the defendant's appearance; do you see that?

1    A.    Yes, I do.

2    Q.    So what the defense has done here is not just ask for the

3    names of eyewitnesses, but to say that it was the defense's

4    understanding, based on newspaper articles, that the state might

5    have in its possession descriptions of the killer by eyewitnesses

6    that were inconsistent with Mr. Thompson's appearance; am I

7    right?

8    A.    Yes.

9    Q.    Okay.  And I would like you to take look at the Answer for

10   the Motion of Production of Exculpatory Evidence, and

11   unfortunately the only copy that we have is unsigned.

12   A.    I saw that.

13   Q.    Would you agree with me that based on your review of the

14   police report and Mr. Thompson's photograph, that that police

15   report included a description, a physical description of the

16   killer which was inconsistent with Mr. Thompson's appearance?

17   A.    I read the report and I'm not familiar with all of the

18   physical descriptions at that time, except what you've shown me.

19   And I will agree that some are different than what the witness

20   said.

21   Q.    Somewhat different?

22   A.    Different.  Not entirely different but different.

23   Q.    The photograph of Mr. Thompson which was in the state's

24   possession, that's not somebody with close-cut hair, is it?

25   A.    Again, as I said before, no, it's not someone with

1  close-cropped hair.

2  Q.   Let's take a look at Exhibit 15.  And do you recognize

3  Mr. Dubelier's signature at the bottom?

4  A.   Not really.

5  Q.   You don't recognize that as E.A. Dubelier?

6  A.   Not really.

7  Q.   Okay.  The first paragraph provides a description by

8  Mr. Schliffka, and it says, "Mr. Paul Schliffka described a man

9  leaving the vicinity of the crime as being approximately 6 feet

10 tall.  Additionally, Mr. Schliffka failed to make an

11 identification from a photo lineup conducted on January 17,

12 1985."

13          Do you see that?

14 A.   Yes.

15 Q.   Do you see any reference to the hair length in that

16 description?

17 A.   No.

18 Q.   Do you think that the description that the prosecutor gave

19 in Exhibit 15 is a full and complete and fair description of what

20 was in the police report?

21 A.   No.

22 Q.   Were you aware of any rule of law that allows a prosecutor

23 to give an incomplete description of the perpetrator?

24          MR. GOINS:  Objection.  Assumes facts not in evidence.

25          THE WITNESS:  I'm unaware of many Rules of law, but I

1   don't know of any -- I don't know how fully you have to give a

2   description of someone.  As a reasonable person, I would say you

3   have to give a complete description.  But reason is not always

4   part of the law.

5                              EXAMINATION

6   BY MR. COONEY:

7   Q.   What was Mr. Dubelier's position in the office in 1985?

8   A.   He was chief of screening, I think.

9   Q.   And would you agree with me that that would be the

10   third-highest position in the office, along with a number of

11   other people that had that same tier of responsibility?

12   A.   Well, we never, we never defined it as a tier of

13   responsibility.  I didn't.  There was -- there was the DA and the

14   first assistant.  But I would say that that could be considered

15   by the chief of screening to be the third most important

16   position.  Chief of trials may have thought the same thing.

17         (WHEREUPON, playing of the videotape was concluded.)

18         THE COURT:  All right.  Who is your next witness?

19         MR. LITVIN:  Nancy Wohl.

20         THE DEPUTY CLERK:  Please raise your right hand.

21                **NANCY WOHL,**

22   was called as a witness and, after being first duly sworn by the

23   Clerk, was examined and testified on her oath as follows:

24         THE DEPUTY CLERK:  Please state your name for the

25   record.

```
 1            THE WITNESS:  Nancy Wohl, N-A-N-C-Y, W-O-H-L.

 2                       DIRECT EXAMINATION

 3  BY MR. LITVIN:

 4  Q.   Morning, Mrs. Wohl.  There is a microphone in front of you.

 5  Would you please try to speak into it so everyone can hear you.

 6  A.   Yes, I will.  Can you hear me now?

 7  Q.   Now, I can.

 8            Mrs. Wohl, where do live?

 9  A.   I live at 1601 First Street in New Orleans, Louisiana.

10  Q.   And how long have you lived there?

11  A.   Since the storm.  Since January 2006.

12  Q.   And where did you live before the storm?

13  A.   I lived at 5533 South Galvez, also in New Orleans.

14  Q.   Are you married?

15  A.   I am married.

16  Q.   Is that your husband in the courtroom?

17  A.   Holding my purse, yes.

18  Q.   Do you have some children?

19  A.   I have three daughters.

20  Q.   Were you unable to stay in your home after Katrina?

21  A.   Yes.  My home was virtually destroyed.

22  Q.   How long have you lived in New Orleans?

23  A.   Since 1983.  24 years.

24  Q.   And are you employed?

25  A.   I am employed.
```

1  Q.   Would you tell us, please, what your occupation is?

2  A.   I'm a high school English teacher.  I teach at the Academy

3  of the Sacred Heart in New Orleans.

4  Q.   I don't know if the jury can hear you, but could you maybe

5  pull the mic a little bit closer so it would be easier for us?

6  A.   Is that better?

7  Q.   It sure is.  Thank you.

8            How long have you taught that there?

9  A.   I've also taught there since the storm.  November 2005.

10  Q.   And where did you teach before Katrina?

11  A.   I taught at Archbishop Chapelle High School out in Metairie.

12  Q.   Just briefly, what level of education are you involved with

13  and what subjects do you teach?

14  A.   This year I teach 9th and 10th grade English literature and

15  writing composition.

16  Q.   And have you been pretty much an English teacher all of your

17  professional career?

18  A.   All of my career.

19  Q.   Do you know John Thompson?

20  A.   I do know John Thompson.

21  Q.   And would you tell us, please, how, about when you first

22  came in contact with John Thompson and under what circumstances

23  you got to meet him or got to know him.

24  A.   About 1990, I was asked to go to a meeting where Sister

25  Helen Prejean was giving a talk about prisoner rights and

1    prisoner issues.  I went with a friend.  While I was there,

2    someone asked me if I would be interested in writing to someone

3    on death row, which I kind of wasn't.

4    Q.    You weren't interested?

5    A.    I was not interested in writing to someone on death row.

6    You know, I think we see these women on *Oprah* that write to

7    prisoners and fall in love and leave their husbands and all that,

8    and I never pictured myself as being a prison penpal, as it were.

9            But I took the address.  I guess I didn't have enough

10   nerve to say no.  I took the address.  I kept it for about a

11   month.  Honestly, I didn't know what to write about.  I didn't

12   know what we would even talk about or what we would even have in

13   common.  And I didn't want to give him my home address in case he

14   broke out of prison and, you know, came and murdered my whole

15   family.

16           I mean there were all of these fears that go into, you

17   know, putting yourself out there, I guess, for someone, who is an

18   inmate on death row.

19   Q.    Well, before you had some contact with Mr. Thompson, did you

20   know anything about him other than the fact that he was an inmate

21   on death row?

22   A.    I knew absolutely nothing about him.

23   Q.    Now, did there come a time when you did write to him or

24   communicate with him in some fashion?

25   A.    After about a month, I finally broke down and wrote him a

1  letter and told him who I was, and, you know, a very brief note

2  that I would be interested in writing to him if he were

3  interested.

4  Q.   Can you tell us when or what year about when it was that you

5  first contacted him by writing?

6  A.   September 1990.

7  Q.   And from September 1990, until May of 1999, when he left

8  Angola and came back to a prison in New Orleans, during that

9  nine-year period, roughly, would you please tell us what

10  communications, what contacts, and what went on between you and

11  John Thompson during those years.

12  A.   We start --

13  Q.   Excuse me, that's a big question, and I will interrupt you

14  from time to time, but tell the members of the jury and His Honor

15  how you became, how you got to know John Thompson and what form

16  of relationship developed from that?

17  A.   Well, when we first started writing, luckily we were both

18  Saints fans, and so that was a pretty easy topic for us to

19  discuss.  One of the things John told me in the beginning was

20  that he couldn't talk about his case and I was grateful because I

21  didn't want to hear about his case.

22          So we did.  We went through a Saints football season,

23  and there was the final four.  Both of us are sports fans.  It

24  gave us, you know, something easy that we could talk about over

25  the beginning parts of our relationship.

1          Gradually, because John knew I had kids and he had

2    kids, he would talk to me about his kids, and he was worried

3    about them in what ways that I thought he could be a better

4    parent even though he was incarcerated.

5          Or we talked about, you know, some of his life at

6    Angola, what that was like, and we, I guess, over a two- or

7    three-year period, our conversations or our letters became more,

8    I don't want to say intimate because they are not intimate, but

9    more serious.

10   Q.   Let me interrupt you by asking you, you say, was this still

11   correspondence or did there come a time when you spoke to him or

12   you saw him, and if so, when did that come about?

13   A.   We only corresponded by mail for, I would guess, the first

14   couple of years.  And then he wanted me to come and visit him.

15   Which was, honestly, the last thing I wanted to do was to go to

16   Angola.  I think Angola is a scary place, and I really didn't

17   want to go.

18          But we kind of went back and forth about that.  He

19   really wanted me to bring his mother and his kids and his

20   half-sister.  So he, I think through selling off some of his

21   possessions managed to scrape together some money.  I wasn't

22   working at the time.  I was a stay-at-home mom.  I had small

23   children, so he came up with enough money, almost enough, not

24   quite, to rent a car and, you know, help me pay for the gas so

25   that I could bring his family members up to see him.

Q.   Would you give us, please, some idea as to how far Angola is
or how long it took for you to drive yourself and his mother and
his children or whoever you brought, how long did it take one way
for you to get from your home in New Orleans, pick them up and
get out to Angola?

A.   Well, we always left really early because visiting hours
start at 10:00.  And John's family lives all over the city, so
that, you know, I think I probably leave my house at 6:00 in
morning and drive to various parts of the city, picking up his
family members.

It's a good four-and-a-half hour drive to Angola.  You
have to stop.  Usually we would get there about 10:30 or 11:00.
By the time you get through the check-in process, and that's
considerable, we would spend, you know, a few hours there and
then we would come back.

Q.   So it was an all-day trip?

A.   It's an all-day experience.

Q.   When you visited -- well, let me jump ahead for a moment and
then we'll come back.  Over the course of time, after a couple of
years, you said in addition to writing, you began to visit John
at his request and bring his mother or other family members up.

About how many times did you make the trip alone or
with other members of his family where you drove them up to
Angola to visit with John?

A.   I would say anywhere between a dozen and 20 times.  12 to

1  20, 15 to 20.

2  Q.   Now, when you got to Angola and went through the process of

3  screening or whatever was required to get into the prison and see

4  him, were you able to see him, sit down, talk to him, shake his

5  hand?

6  A.   For the first few years, no.  At Angola, in those days,

7  there was a thick wire mesh that you really couldn't see through.

8  And John couldn't see us and we couldn't see him.  That, I would

9  say that was probably for the first three, four, five years that

10 I went.

11        Toward the end, the warden began to allow contact

12 visits, and I don't know, I think that's probably not the case

13 anymore, but toward the end of the time, we were able to do that.

14 Q.   Now, during those dozen or 20 or whatever the number of

15 trips you made during those years, to Angola, did you come to

16 know John better?

17 A.   I did come to know John better.  You know, we never

18 discussed his case, but I did understand what he was going

19 through in his daily life, mostly with his sons, that he was

20 very, very worried about.  And, you know, trying to help him out.

21 And his mother and his grandmother who was ill.

22 Q.   Did you ever take his grandmother up to Angola?

23 A.   No, his grandmother was never able to go, unfortunately.

24 Q.   Did you know or did you come to find out in your

25 conversations with Mr. Thompson what his grandmother meant to his

1  life and how he had raised him and what the relationship was?

2  A.   I think she was almost really his mother, and she was

3  devoted to him and he to her.  I think that was maybe one of the

4  real sorrows of this is that he wasn't there when she died and he

5  missed out on the last parts of her life.

6           She was on a fixed income.  She didn't have much money.

7  And every time I took John's half-sister, his grandmother would

8  try to give me gas money, $5, $10.  It was really important to

9  her that he know that she still cared about him and that she was,

10  she wanted him to know she still loved him and still cared about

11  him.

12  Q.   To your knowledge, Mrs. Wohl, did the grandmother ever visit

13  John once he was in jail?

14  A.   I don't think so.  I don't think he was able to.  She was in

15  fairly poor health.

16  Q.   Would you now tell us some of the things that John discussed

17  with you in terms of his feelings of what was going on with him

18  emotionally, mentally, during those years that you corresponded

19  with him and visited him -- and before you answer my question,

20  did you also receive telephone calls from John?

21  A.   I did receive telephone calls, maybe in the last couple of

22  years that he was at Angola.  When an inmate on death row is able

23  to make a phone call, it's not regular.  Sometimes it's 2:00 in

24  the morning.  It just depends on when they are able to get out of

25  their cell, whatever time that is, so I was maybe one of the only

1  people who could take a collect call and who would take it at an

2  odd time of the night or morning.  Just so he could vent some of

3  his frustrations of what was going on.  So I would say maybe a

4  half a dozen times at least he called me in the last couple of

5  years.

6  Q.   And going back to the question that I interrupted before I

7  let you answer, I think it was this:  Would you tell His Honor

8  and the members of the jury, please, what sort of matters John

9  discussed with you and what he said in terms of what was going on

10  with him and his own concerns or his own emotions, if any, what

11  did he tell you?  What did he talk about?

12  A.   Obviously after a couple of years, we moved on from talking

13  about sports, although we still talked about it occasionally.

14  You know, his case was a very big concern.  He was frustrated.

15  He felt like it was moving slowly.  He felt like it was moving

16  slowly, that he wasn't being heard.  Death row is a scary place

17  to live.  The frustrations of being on death row.  Sometimes the

18  rules are rather draconian.  They are changed for no apparent

19  reason.  Visitation is changed for no apparent reason.

20          MR. CARVER:  Your Honor, objection, I don't know what

21  the foundation is for this witness to speak on such --

22          MR. LITVIN:  I'm sorry.

23          MR. CARVER:  Lack of foundation.

24          THE COURT:  Ma'am, are you basing that on what you

25  experienced when you went there to visit?

1          THE WITNESS:  Some when I went to visit at times, yeah.

2          THE COURT:  I think you need to limit it to that and not

3    what you were told by someone else.

4          MR. LITVIN:  Yes.  I'm sorry, I didn't understand the

5    objection.  I apologize.

6                              EXAMINATION

7    BY MR. LITVIN:

8    Q.   Mrs. Wohl, what I would like you to do is tell us, obviously

9    this is over a period of many years, but your recollections of

10   some of the things that John Thompson discussed with you, what he

11   said to you, what he asked you, which may have been indicative of

12   what his concerns and feelings were.

13   A.   I would say -- sometimes it was about the legal process and

14   how frustrated he was by that.  But for the most part, it was

15   about his sons.  His sons were teenagers at that time, you know,

16   one of them was struggling.  The older one was struggling a bit

17   with school and was getting into some trouble.

18          And John didn't, you know, didn't have a lot of

19   parenting skills.  He had not had an opportunity to be a parent.

20   And so not -- combined with the frustration of not being able to

21   talk with his son face-to-face or even talk to his son whenever

22   he wanted to, really, really was, you know, was something he had

23   to struggle with.

24          And so he would call me, try and, you know, and I had,

25   or he would write to me and I would have to, you know, use

1  whatever parenting skills that I have to try to help him help his
2  kids.  And there was that.
3       I mean, there were obviously fear of dying.  What
4  happens if he dies and what happens to the boys after that?  What
5  happens to his mother, who was also not in particularly good
6  health?
7       I think he felt a responsibility for the members of his
8  family that he's responsible for.
9  Q.   When you visited John at Angola State Penitentiary, did you
10 have some sort of a title?
11 A.   After a few years, after my first visit, John asked me if I
12 would consider being his spiritual advisor.  And there is an
13 application process.  I had to have a recommendation from my
14 priest, from people who knew me.  I had to be approved by the
15 chaplain at Angola.  That would entitle me to more visitation and
16 most importantly that I would be present with him at his
17 execution.
18 Q.   Spiritual advisor, were you an active religion leader of
19 some sort?
20 A.   No.  And when he asked me, I almost said, Are you sure,
21 because I'm not someone that can quote a lot of bible scripture
22 or sit with someone and pray.  I take my faith fairly personally.
23 And so I wasn't sure that that's what, if he knew what he was
24 getting.
25       And I think that I was really more of a big sister to

1  him.  I think he looked at me as a big sister.  I think he still

2  looks at me as his big sister, someone that he can count on, and

3  I think that was the reason that he asked me.

4  Q.  Now, from time to time, and the jury, I believe, has already

5  heard some references to this, John was informed that he had an

6  execution date.  When those situations -- and there were a number

7  of them, six or seven, whatever the number was, when John was

8  advised by the system or his lawyers or whomever that he had an

9  execution date, a date when he was going to be put to death, did

10 he discuss those things with you?

11 A.  He called me and asked me if -- it was very short notice and

12 we didn't usually do this on short notice because just getting

13 everybody together to drive up to Angola was kind of a

14 production.  But he asked me if I could bring his family up the

15 next weekend, and I did.  I did not have that information.  I did

16 not know that he was in danger of being executed at that time.

17 And on the way up there, the family knew.  And I kept saying, No,

18 no.  It's going to be all right.  We're going to be okay.

19      And when we got there, I realized from talking to John,

20 who was very serious about speaking to each one of us separately,

21 and I was the last person he talked to and one of the things --

22 Q.  Excuse me.  I apologize for interrupting again, but my

23 question had to do with execution dates.  Are you now talking

24 about the last execution date --

25 A.  Yes.

1  Q.    -- when he was told he was going to be killed, executed in

2  May of 1999?

3  A.    Yes.

4  Q.    I'm sorry for the interruption.

5  A.    That's okay.  Because that was a very different experience

6  for all of us than any of the other execution dates that had been

7  set previously.  And so he did speak to each of us separately.  I

8  don't know what he said to anyone else, but he spoke to me last.

9  And I think his most, his greatest concern was that I wouldn't be

10 able to go through with it.

11 Q.    Go through with what?

12 A.    Witnessing his, being there when he was executed.  That it

13 would be too hard for me.  And I guess -- it took me by surprise

14 because up until that moment, it hadn't occurred to me that I was

15 actually going to have to do that.

16       But all along, I wanted him to have who he wanted with

17 him.  Because if he felt more comfortable having someone who

18 maybe was a minister or someone like that, I wanted him to have

19 that person with him.  But, and I told him that.

20       And he said, I want you.  You've been there for me and

21 I want you to be there with me.  If you can do it, I want you to

22 be there with me.

23 Q.    In other words, be with him when he was executed?

24 A.    Yes.  It's more involved than that.  You know, I would go up

25 maybe two days before the execution and spend time with him in

1   the death house.  So it's not just showing up for the execution.

2   It's an involved process.

3   Q.   May we assume from what you've just said that you agreed to

4   do that?

5   A.   I did agree to do it.

6   Q.   You were aware of the fact that in May of 1999, because of

7   discovery of what evidence, whatever, the jury has heard some of

8   this, that he was returned to New Orleans?

9   A.   Yes.

10  Q.   And when he was returned to New Orleans, he was returned to

11  jail in New Orleans; is that correct?

12  A.   That's correct.

13  Q.   That's the county prison?

14  A.   Yes, it is.

15  Q.   And the jury has heard or will hear in the testimony that

16  from May of 1999 until he was freed in May of 2003, for about

17  four years, he remained in prison in New Orleans?

18  A.   Yes.

19  Q.   You're aware of that?

20  A.   Yes.

21  Q.   Now, Number 1, did you continue to communicate, see, write

22  or have any contact with John during those four years?

23  A.   Yes, I did.

24  Q.   Did you visit him at the county prison?

25  A.   Yes, I did.

1   Q.  And will you tell at the members of the jury --

2        THE COURT:  Mr. Litvin, it's parishes here.  It's Parish

3  Prison.

4        MR. LITVIN:  The problem is when I say Parish Prison, I

5  get those, but I'll try.

6                   EXAMINATION

7  BY MR. LITVIN:

8   Q.  At Paris --

9        THE COURT:  It's parish.  Think of church parishes.

10       MR. LITVIN:  I know the word.

11                  EXAMINATION

12  BY MR. LITVIN:

13   Q.  At Parish Prison, would you describe briefly what that was

14  like in terms, comparing it to Angola?

15  A.  I think we thought it might be easier than having a day trip

16  to Angola, but in many ways, Parish Prison, if you have to visit

17  a prisoner there, is harder.

18        You have to get, there is only one day, I think it's

19  one day a month that you can visit.  You can only have two people

20  on your visiting list.  I was on it and John's mother was on it.

21  And we would have to, it was, our day was Wednesday.  And we had

22  to get there very, very early and stand in line.

23        They only let -- by early I mean maybe 4:00 in the

24  afternoon.  I don't think they opened until 6:00.  We had to

25  stand in line and wait.  They only let certain, you know, a

1   certain number of people in at a time.

2           Once you got inside, the waiting was long and tedious.

3   I guess it's, after being at Angola, which is fairly immaculately

4   clean, Parish Prison is fairly filthy.

5           You know, we went to see him.  There were no contact

6   visits.  We spoke on --

7   Q.   Excuse me.  Tell me again.  What do you mean there were no

8   contact visits?  What kind of visits were there?

9   A.   We had to, when we talked to him, and we had to take turns

10  doing this, he had a phone and there was a window, but it was

11  paned.  It was dark.  We could barely see him, even though it was

12  clear glass.

13          We had a very short visitation time because I guess

14  there is so many who want to visit.  It was, we always let, you

15  always left there feeling like you needed to be sprayed with

16  Lysol.  Both his mother and I said that.  It was, you know,

17  unbelievably worse than Angola.

18  Q.   And to the extent that you saw him in prison, you were able

19  to communicate through this glass under the limitations you've

20  just described.  What sort of things did John talk to you about

21  that may have been reflective of what he was thinking and feeling

22  and how he was handling that situation for four years?

23  A.   On those visits, not much, because we didn't have much time,

24  but he did write to me and he did call me.  And there was, there

25  were many problems.  He had high blood pressure, and we had a

1  hard time getting him blood pressure medicine.  He needed sheets.
2  We had to get sheets to him.  He needed towels.  He needed
3  pajamas.  And all of this, I mean, when you send someone, to
4  someone who is incarcerated, you can't just walk in and give it
5  to him.  It has to come through approved places.
6          I'm sure all of these rules have logic behind them, but
7  they are hard to deal with when you're trying to help someone
8  out.  I would say most of the time when he was at Parish Prison
9  we communicated over the phone.
10 Q.   And approximately how often did he see you during those four
11 years?
12 A.   I would say at least once a month.
13 Q.   Were you still his spiritual advisor?
14 A.   I was still his spiritual advisor.
15 Q.   And were you still his big sister?
16 A.   I'm still his big sister.
17 Q.   I would like to now ask you some questions about the last
18 three-and-a-half years since Mr. Thompson has been free and out
19 of prison.  Have you continued to have any dealings with him in
20 terms of seeing him, speaking with him, or any other
21 communications or contacts?
22 A.   Mostly we communicate over the phone.  He calls me
23 periodically to check on me.  I think he's still checking on his
24 big sister.  After the hurricane, his house ended up better off
25 than mine, so he tracked me down in Houston just to check on me

1  and see how I was doing, see if I needed anything, see if he

2  could help me with anything.

3          So periodically we've communicated.  Mostly I think he

4  wants me to know that he's doing okay.  That he's, his life is on

5  track and that he's all right.

6  Q.  Mrs. Wohl, has he, over the last three-and-a-half years that

7  he's been a free man, has he told you about what kind of work

8  he's doing, what activities he's doing, what his goals are, what

9  he's trying to do with his life?

10 A.  Yes, every time he's changed jobs, every time he's gotten a

11 new opportunity, he tells me about it.

12 Q.  Are you aware of what he's doing now?  He hasn't testified

13 yet, so we're not going to go into detail at the moment, but in

14 terms of what the jury is going to hear about today or tomorrow,

15 has he discussed with you what his present goals are in terms of

16 employment and in terms of what he wants to do with his life?

17 A.  Well, he's had steady employment, I believe, since he, since

18 he was released.  And now he's working on a foundation to help

19 inmates after they are released from prison.  And one of the

20 things, I think he's worried about me needing money because he

21 offered me a job tutoring inmates after work.

22          So he's very, I think he's very conscious of what

23 inmates go through when they are released and trying to help them

24 get back into society and become productive members of society.

25          MR. LITVIN:  Thank you very much, Mrs. Wohl.  That's all

1  I have, Your Honor.

2          THE COURT:  Mr. Carver.

3                        CROSS-EXAMINATION

4  BY MR. CARVER:

5  Q.   Good morning, Ms. Wohl.

6  A.   Good morning.

7  Q.   By way of introduction, my name is Mark Carver.  I'm an

8  attorney.  I represent the defendants, Harry Connick and the

9  District Attorney's Office.

10          Now, Ms. Wohl, I understand a little bit about your

11  background.  You are against the death penalty, correct?

12  A.   That's correct.

13  Q.   And you would consider yourself an activist against the

14  death penalty?

15  A.   Yes.

16  Q.   So it's fair to say you have a certain agenda with respect

17  to the death penalty?

18  A.   I don't know what you mean by that.

19  Q.   Well, you're trying to accomplish the abolishment of the

20  death penalty, correct?

21  A.   I've given up on that one.

22  Q.   But in any event, do you hold, you hold some personal grudge

23  against the Government or prosecutors who impose the death

24  penalty on convicted criminals, correct?

25  A.   No.

1  Q.   You said originally that you were, that when you first

2  started corresponding with Mr. Thompson, you were afraid to give

3  him your home address, correct?

4  A.   That's correct.

5  Q.   And why is that?

6  A.   Because I had every stereotype anybody has about inmates in

7  prison, particularly inmates on death row.  I had no idea what

8  his crime was.  As far as I knew he could be a serial killer.

9  Just like anybody else, it's only through getting to know him

10 that I realized that, that I was wrong, that those people are

11 human beings and they deserve to be treated with dignity.

12 Q.   Let me ask you.  You also said while John was in prison, he

13 was able to provide you or provide his mother with money to rent

14 an automobile so they can come visit you; is that correct?

15 A.   That's correct.

16 Q.   And John was in prison when he got this money, correct?

17 A.   That's right.

18 Q.   Do you know how a prisoner earns enough money?

19 A.   Yes, he sold off his personal belongings.  He sold his

20 whatever it was he had:  His radio, his CD player, whatever it

21 was that he had.  Those are his assets to raise money.

22 Q.   You also described Angola as being cleaner than Orleans

23 Parish Prison, correct?

24 A.   That's correct.

25 Q.   And you said that while at Orleans Parish Prison, he

1  couldn't get medication, sheets and towels, correct?

2  A.   That's correct.

3  Q.   But Angola was able to get that, those things?

4  A.   I have no idea for sure.  I can only assume.  He didn't ask

5  me --

6  Q.   He didn't ask you, correct?

7  A.   That's correct.  I'm not the only person he knows.

8  Q.   When you went to visit John at prison, while he was in

9  Angola, did that change his attitude or cheer him up any?

10  A.   I think so.

11  Q.   So he enjoyed your visits?

12  A.   Yes.

13  Q.   Did he enjoy the visits with his mother?

14  A.   Yes.

15  Q.   Did he enjoy his visits with his son?

16  A.   Yes.

17  Q.   Did John have other visitors that you're aware of, other

18  than yourself, the mother and his two sons?

19  A.   Not that I'm aware of.

20  Q.   So obviously, John did have contact with his family while

21  still in prison?

22  A.   Yes.

23  Q.   While John was in prison, did he talk to you about his hopes

24  and aspirations?

25  A.   In regard to what?

1   Q.   In regard to what he would do with his life if he had to do

2   it over again or if he had got out of prison?

3   A.   As best as I can recall, in that regard what we talked about

4   was him surviving.   I don't think we ever, we ever really

5   discussed what his -- I think we were pretty focused on, you

6   know, keeping him alive.

7           When he was at Parish Prison, then we had, there was

8   some light at the end of the tunnel, and I think he did talk

9   about things he would like to do.

10  Q.   And what were those things that he would like to do?

11  A.   Mostly travel.   As you can imagine, anybody who has been

12  incarcerated.   He talked briefly about becoming a truck driver

13  just to see parts of the world that he hadn't been able to do.

14  Q.   And you have had an opportunity to be with John Thompson

15  after he's gotten out of prison, correct?

16  A.   Correct.

17  Q.   Based on your observations of John Thompson, does he appear

18  to have, you know, confidence in himself and a good self-esteem

19  about himself?

20  A.   Yes.

21  Q.   In fact, right after -- well, soon after he got out of

22  prison, he got married, correct?

23  A.   That's correct.

24  Q.   I think before he got out of prison, he actually had a job

25  waiting for him; is that correct?

```
 1   A.    That's -- I don't know that for a fact.
 2   Q.    After getting out of prison, do you know what jobs he's
 3   held?
 4   A.    I know that -- yes, I do know what jobs he's held.
 5   Q.    What jobs has he held?
 6   A.    He worked briefly for Nick Trenticosta in a paralegal
 7   capacity.  I think he's in charge, I don't know what his title
 8   is, but in charge of maintenance at a church he attends.  He's
 9   had a coffee shop.  He tried to run a coffee shop for a while.
10   And now he's involved with starting his foundation.
11   Q.    Was he successful in those jobs, working as a paralegal?
12   A.    I think he was successful.  It was hard for him because he
13   had to deal with friends of his who were still on death row.
14   Q.    Was he successful in his job working at the coffee shop?
15   A.    I think it only lasted a year, so probably not, but he
16   tried.
17   Q.    And has he been successful in his new endeavor working with
18   inmates?
19   A.    I think it's in the beginning stages, so it's hard to say.
20   Q.    When John got out of prison, are you aware that Habitat for
21   Humanity bought John a house?
22   A.    Yes.
23   Q.    And when did John, well, did John find religion, as we use
24   the term?
25   A.    Did he find religion?
```

1    Q.    Did he became spiritual?

2    A.    I don't know.

3    Q.    You would agree, though, however, getting a new wife, new

4    house, new jobs, those are pretty good things, correct?

5    A.    Yes.

6    Q.    And John doesn't try to avoid his experiences or his time

7    that he spent in jail, correct?

8    A.    I'm not sure I understand what you mean.

9    Q.    Well, does he avoid talking about it?

10   A.    No, in fact, he spoke to the students at the school I teach

11   at.

12   Q.    So he embraces that experience and he shares it with others,

13   correct?

14   A.    Embraces that experience, I don't know, but he does share.

15   Q.    He doesn't avoid that experience?

16   A.    Correct.

17   Q.    When John shares his experience with others, do you know how

18   that makes him feel?

19   A.    No.

20   Q.    Does John, when you're with him, does he show love for his

21   children?

22   A.    I mean, I've been with him when he's been with his children.

23   Q.    Does he say he loves his children?

24   A.    Yes, he does express love for his children and concern.

25   Q.    So he's capable of showing love?

1  A.    Right.

2  Q.    And this is both in prison and out of prison?

3  A.    Yes.

4  Q.    Do you know now, while out of prison, does John engage in

5  using drugs or alcohol to excess?

6  A.    Not in my presence.

7  Q.    You say John is taking good care of himself?

8  A.    I think so.

9  Q.    And John -- and you enjoy John's company?

10 A.    I do enjoy John's company.

11 Q.    And John Thompson is friendly with you?

12 A.    Yes.

13 Q.    And John Thompson has a lot of support from family and

14 friends, correct?

15 A.    I don't know the answer to that.

16 Q.    Well, from your experience with John Thompson, does it

17 appear to you that he's doing pretty good emotionally?

18 A.    Yes.

19         MR. CARVER:  That's all the questions I have.

20         THE COURT:  Any redirect?

21         MR. LITVIN:  Yes.  One area, Your Honor.

22                  REDIRECT EXAMINATION

23 BY MR. LITVIN:

24 Q.    Mrs. Wohl, a few minutes ago, Mr. Carver asked you about

25 speaking and you made a reference to his -- he asked you about

1  speaking to others about prison and you said, yes, he spoke at

2  your school.

3  A.    Yes.

4  Q.    Would you tell us what that was all about.

5  A.    The archdiocese schools are required to have one day that

6  deal with pro-life issues, and many people at work know of my

7  relationship with John, and asked me if I would consider having

8  him come and speak to the girls about his experiences.

9         I was, I was a little leery, but not because of John,

10  just because I teach in a very affluent high school and I didn't

11  think --

12  Q.    You mean like rich people?

13  A.    Yes.  And I was afraid that they wouldn't treat him with the

14  respect I think he deserves.  And he came, and he spoke candidly.

15  He answered questions.  Many of them support the death penalty.

16  He answered questions about that.  And at the end they gave him a

17  standing ovation.

18         So it was a very successful experience.  At least on my

19  side.  I hope it was for him too.

20  Q.    Other than discussing the death penalty, what was the

21  message?  What was he telling the youngsters in your high school

22  class.

23  A.    I think he talked about mistakes he had made as a teenager

24  and ones he hoped that they would avoid.  And peer pressure.  He

25  spent a lot of time talking to them about that.  And his own

1  regrets of mistakes he had made as a young man.

2  Q.   And how did, other than the children, how did you react to

3  his speech or his --

4  A.   I was really proud of him.  He did a terrific job and he had

5  a lot of poise and he handled it beautifully.

6          MR. LITVIN:  Thank you, Mrs. Wohl.

7          THE COURT:  Okay.  You can step down, ma'am.

8          (WHEREUPON, the witness was excused.)

9          THE COURT:  Who is your next witness?

10         MR. BANKS:  Your Honor, may we approach the bench to

11  talk about a scheduling issue?

12         THE COURT:  Okay.

13         (WHEREUPON, there was a bench conference outside of the

14  presence of the court reporter.)

15         (In open court.)

16         THE COURT:  Call your next witness.

17         MR. BANKS:  Your Honor, at this time we would call the

18  plaintiff, John Thompson.

19         THE COURT:  All right.

20         THE DEPUTY CLERK:  Please raise your right hand.

21                         **JOHN THOMPSON,**

22  was called as a witness and, after being first duly sworn by the

23  Clerk, was examined and testified on his oath as follows:

24         THE DEPUTY CLERK:  Please speak directly into the

25  microphone, state your name and spell it for the record.

```
 1              THE WITNESS:  John Thompson, J-O-H-N, T-H-O-M-P-S-O-N.
 2                           DIRECT EXAMINATION
 3   BY MR. BANKS:
 4   Q.    Good morning, Mr. Thompson.
 5   A.    Good morning.
 6   Q.    Where do you live, sir?
 7   A.    2429 Marie.
 8   Q.    In New Orleans?
 9   A.    New Orleans, Louisiana.
10   Q.    How long have you lived in New Orleans?
11   A.    All my life.  Other than when I was in jail.  At 7 --
12   Q.    You were born here?  I'm sorry, I didn't mean to cut you
13   off, sir.
14   A.    At age 7, 7 or 8, I think, somewhere up in that area, I went
15   to California for one year.  Other than that --
16   Q.    With your mom?
17   A.    Yeah, with my mom.  Other than that, I've been here.
18   Q.    Are you married?
19   A.    Yes, sir.
20   Q.    What's your wife's name?
21   A.    Laverne Thompson.
22   Q.    Is Mrs. Thompson -- does she go by Mrs. Thompson?
23   A.    Yes.
24   Q.    Is she here?
25   A.    Yes.
```

1  Q.   Would you show the jury -- Mrs. Thompson, would you stand up
2  please?  That's your wife, Laverne?
3  A.   Yes, sir.
4  Q.   Now, do you have children from before you and Mrs. Thompson
5  were married?
6  A.   Yes, sir.
7  Q.   How many children do you have?
8  A.   I have two sons.
9  Q.   What are their names and what are their ages?
10 A.   John Jr. is 26, and Dedrick Wes is 29, 28 going on 29.
11 Q.   Do you have any grandchildren?
12 A.   What do you mean by that?  All my grandchildren?
13 Q.   Well, I know Mrs. Thompson has some grandchildren, but I
14 mean children by Dedrick or John?
15 A.   Yes, sir, I have one and one on the way.
16 Q.   How old is the one?
17 A.   One is one and three months.
18 Q.   Is that Dedrick's son?
19 A.   That's Dedrick's daughter.
20 Q.   John has a child on the way?
21 A.   Yes.
22 Q.   When were you arrested and charged with the murder of
23 Raymond Liuzza?
24 A.   January 17, 1985.
25 Q.   How old was John Jr. at that time?

1  A.    Three, going on four.

2  Q.    I call him "John Jr."  Is that what you called him or did he

3  have any nicknames?

4  A.    I called him "Tiger."

5  Q.    You called him "Tiger" back then?  Why?

6  A.    Well, next door to my mother, there was a little guy, a

7  little kid I used to be crazy about, and that was his name,

8  "Tiger," and for whatever reason, the first thing I seen my son,

9  I said I want to call him "Tiger" too.

10  Q.    Do you still call John Jr., "Tiger"?

11  A.    Still call him "Tiger."

12  Q.    Did you get to spend much time with your sons before you

13  went to jail?

14  A.    Yes, sir.

15  Q.    You said John Jr. Was three going on four; Dedrick must have

16  been about six?

17  A.    Yes, sir, he was six.

18  Q.    What kinds of things did you do with your sons before you

19  went to jail?

20  A.    I was, I was like, to me, it was very important that, you

21  know, I just love kids.  It would be due to the fact that my

22  grandmother raised me, my little sisters and brothers, I loved to

23  take kids places and do things with them.

24         So we designated a particular day for to spend with our

25  sons, and I would take them to Audubon Park, City Park, they had

1  rides at City Park.  Audubon Park.  John and them really loved to

2  go to Audubon Park because they had this duck pond where we feed

3  the ducks and just play.  Let them run wild and have fun.

4  Q.   I would like to show you a picture of you and your son,

5  Exhibit 92.

6        MR. BANKS:  Your Honor, may we put that up there, the

7  picture of Mr. Thompson and his son, John Jr.?

8                            EXAMINATION

9  BY MR. BANKS:

10  Q.   It says from 1983, so he was just a baby then?

11  A.   Yes, he was maybe about 7 months or 8 months.

12  Q.   Incidentally, I notice in this picture, it was a couple of

13  years before your arrest still, but you had your hair kind of

14  big; is that how you wore it back then?

15  A.   That's how I always wore it.

16  Q.   Is that how you wore it in December of 1984, too?

17  A.   Yes, sir.

18  Q.   You didn't slick it down or anything like that, did you?

19  A.   No, sir.

20  Q.   Why did you wear it like that?

21  A.   It always grow fast and I just kept it trimmed.  That's it.

22  Q.   Who was John Jr.'s mother?  The mother of John Jr.?

23  A.   Denise Williams.

24  Q.   And did you have an ongoing relationship with Ms. Williams?

25  A.   Yes.  I was with her all the way until my arrest.

1   Q.   When did you start to have a relationship with Ms. Williams?

2   A.   I was young.  I was, like, 17.

3   Q.   Did that continue until you were arrested at age 22?

4   A.   Yes.

5   Q.   Now, I don't want to get you into any trouble with your

6   wife, who is here, and I know that she'll understand that that

7   was a very long time ago, but will you tell us what your

8   relationship was like with Denise Williams back from the time you

9   were 17 until you were 22.

10  A.   You know, Denise was like a totally, when I first started

11  with my relationships, learning about girls and stuff, I got in

12  trouble right away.  I was, you know, I was a father at a very

13  young age.  Me and the mother really didn't have nothing in

14  common.

15  Q.   This is Dedrick's mother?

16  A.   Yes.  This is Dedrick's mother.

17         And so when I ran across Denise, me and her was living

18  in the projects.  I was on one side; she was on the other side.

19  And we went to Booker T. Washington and I used to go to

20  cosmetology, because they had a place where you could go in there

21  and the girls would wash your hair, do everything, do your

22  fingernails, give you a manicure.

23  Q.   That's cosmetology?

24  A.   Yeah, at the school.  Yeah, that's how I met her and it was

25  a totally different experience with her because it was almost

1   like she had a vision of where she wanted to go and what she

2   wanted to do at an early stage.

3            And me and her just connected.  I thought she was like

4   the love of my life.  It was, like, everything that I was looking

5   for.

6   Q.   Did you have plans with Denise before you were arrested?

7   A.   Yeah.  We were planning on getting married.

8   Q.   Any other plans?

9   A.   I know she was, her whole thing was she wanted to finish her

10  cosmetology hours to get her own hairdresser.

11  Q.   Did you want to have more kids?

12  A.   I wanted to have more kids.  I love kids, yes.

13  Q.   Was being a father a lot of responsibility for you at that

14  young age?

15  A.   Yeah.  Yes.  It was a lot.  The first, my first son was

16  born, like I say, when I was 16.  I believe she was, she became

17  pregnant when I was 15.  My mother, my mother, my mother was,

18  like, I would take care of your first child, I just want you to

19  finish school.

20           But once Denise came along and Denise got pregnant, my

21  mother said, Oh, no, you, you want to be a man, you're going to

22  get a job.  And that's when all the complications came in.

23  Q.   How old were you when you dropped out of school to take care

24  of your two kids?

25  A.   17.  17.

1  Q.    Did you ever go back to school after that?

2  A.    No, sir.

3  Q.    Before you started taking care of your kids, from 17 to 22,

4  had you ever had any experience taking care of someone who needed

5  your help?

6  A.    No, sir.

7  Q.    How about your mom?

8  A.    Yeah.  My mother caught a stroke when I was real young.  I

9  was, like, 12, 11 or 12, 13, somewhere in that age.  It left her

10 totally paralyzed on the left side of her body.  And I'm her only

11 child.  So, you know, I had to move in, I had to leave my

12 grandmother and move back in with her to teach her, help her

13 rehabilitate herself, learn how to use her arms and legs again.

14 Q.    You mentioned little sisters before, little sisters and

15 brothers, but you just said you were an only child; would you

16 explain?

17 A.    Yeah.  My mother have six children all together.  I'm the

18 oldest.  Most of them, well, four of us was from different

19 mothers, and my grandmother is our, our heaven place where

20 everybody do get a chance to get together and be together when we

21 all go by my grandmother's.

22           And my grandmother, just as she raised me, she raised

23 my little brother and my little sister, my youngest brother and

24 my youngest sister.  And just as from my age bracket to maybe 17,

25 15, from that 15 range to that 22 range area when we mostly was

1    living with my grandmother.

2    Q.    Where did you grow up in New Orleans?  What part of town?

3    A.    It's known as the Third Ward:  Uptown area in New Orleans.

4    Q.    Were you in the same house the whole time growing up?

5    A.    For the most part, yeah.

6    Q.    Whose house was it?

7    A.    My grandmother's.

8    Q.    You lived with your grandmother instead of your mother?

9    A.    Yes.

10   Q.    Now, your grandmother, was that your mother's mother or your

11   father's mother?

12   A.    My father's mother.

13   Q.    Why were you living with your grandmom instead of your mom?

14   A.    My mother was, like, I'm her only child; she was 15 years

15   old when she had me.  I believe my grandmother only had, I know

16   my grandmother only had one child, too, my father.  And I believe

17   my grandmother just, you know, wanted to have another

18   opportunity.  She knew my mother was too young.  She wanted to

19   have another opportunity to raise someone, I guess.

20   Q.    I'll come back to some questions about your grandmother.  I

21   just wanted to know a little bit about growing up.  What kind of

22   things did you do?  Did you play sports?  What did you do with

23   your free time?

24   A.    From what age?

25   Q.    Oh, just as a kid, when you were 10, 12, 13 years old?

1   A.   Well, that was the only way I got a chance to get out the

2   house, to go play sports.  You have sandlot ball parks, where

3   they are little league baseball, basketball, football.  I

4   participated in all that.  That was an activity for us to, once

5   we get home, you get a chance to go outside.

6   Q.   Before you dropped out to take care of your kids, before you

7   dropped out of school, did you play any school sports?

8   A.   Yes, sir.

9   Q.   What?

10  A.   Baseball mostly.

11  Q.   Were you any good at it?

12  A.   I would like to think I was, you know.

13  Q.   How about your father, where was your father when you were

14  growing up, Mr. Thompson?

15  A.   My father was in and out of jail all my life.  I believe

16  maybe, out of the 22 years that I was on the streets before I was

17  arrested, I believe I might have had maybe a good three years

18  here and there of a relationship with him.  Even from when I was

19  small, I could remember my grandmother bringing me to see him in

20  jail.  So me and him didn't really have a father and son

21  relationship.  We just had, I didn't know he was my father.

22  Q.   During the little bits of time when he was out of jail, did

23  you do things with him or see him?

24  A.   Yeah.  My father was an athlete, an athlete himself.  He

25  played high school ball.  And they have a league here that is for

1  adults, but it's like different barrooms.  And you get this

2  softball league and they played baseball against each other.  One

3  of the things I can remember is always going to watch him play,

4  going to his games.  He taking me and my little brother, my

5  brother under me to these games to watch him play.

6  Q.   You mentioned dropping out of school to take care of your

7  sons.  Did you get jobs?

8  A.   Yes.

9  Q.   What kind of jobs did you have between the time you dropped

10  out of school at 17 and when you went to jail at 22?

11  A.   Well, my mother, excuse me.  My mother worked at a jewelry

12  store.  Excuse me.  My mother worked at a jewelry store since I

13  was a baby.  And when she caught her stroke, well, when our

14  school was getting out, sometime when I was living with my

15  mother, the bus would drop me off directly in front of the

16  jewelry store and I would go into the jewelry store.

17         So I was pretty much familiar with, you know, about

18  going there so much when I was younger.  She used to teach me

19  certain things that she was doing.

20  Q.   Like what?

21  A.   Polishing and cleaning jewelry.  She was working for a

22  jewelry store.  It was a manufacturer of jewelry.  They

23  manufactured jewelry for Zales and all of these smaller jewelry

24  stores in the area.

25         And basically I just learned how to do it from seeing

1   her doing it.  It was just basically a machine with two arms on

2   it and they had different pads that you put on both sides of it.

3   And you either, when the jewelry is coming out freshly done, you

4   have to polish it up, shine it up, sand it down, things of that

5   nature.

6          So when my mother caught her stroke and her boss was

7   always coming there and seeing her and she was telling her boss

8   that I don't want to go to school, I'm messing up in school, and

9   he offered me a job.  He just say, Why don't you come and do what

10  your momma been doing.

11  Q.   So you worked in the jewelry store?

12  A.   Yes, sir.

13  Q.   What other jobs did you have between the time you finished

14  high school and when you were arrested at the age of 22?

15  A.   I had a, I worked around my house.  We had guys that had a

16  roofing company.  I did roofing work.  I worked in the Fairmont

17  in the Blue Room.

18  Q.   I'm sorry?

19  A.   In the Fairmont Hotel.

20  Q.   Doing what?

21  A.   I was a busboy working in the Blue Room.  I believe that

22  was, like, one of the second jobs that I had, at the Fairmont.

23          And I went to, I went to at least two different jewelry

24  stores because there was a family that owned the jewelry store,

25  and once their father died, they, like, split it up.  And they

1  knew me ever since I was a baby so it was easy for me to go from

2  one brother to another brother to work.

3  Q.   Did you work any of the carnivals or balls or Mardi Gras

4  they have down here?

5  A.   Yes, sir.  Well, when me and Denise got together and our son

6  was born, her father and them, he really respected me because I

7  didn't run away from my responsibilities as being a father, and a

8  young father at that.

9         He just tried to help me out, help us out as a whole

10  because if he helped me, it was helping his daughter.  So he

11  brought me to the carnival balls.  What they do there, the

12  paraders that ride the floats and stuff, we'd dress them, help

13  them get dressed, put on the costume, take off the costume, put

14  on tuxedoes, things of that nature.

15  Q.   Did you support your sons throughout the five years after

16  you dropped out of high school?

17  A.   Yes.  To the best I can.

18  Q.   Were you with Denise Williams during that whole time?

19  A.   Yes, sir.

20  Q.   You mentioned before going back and forth between your

21  mother and grandmother, mostly with your grandmother but

22  sometimes with your mother, where did you want to be?

23  A.   With my grandmother.

24  Q.   Why is that?

25  A.   It was momma.  That's who raised me.  My mother would get

1  these, she would get these urges, I guess, to play mother.  And I

2  believe I heard the defense mention about me going from one place

3  to another.  But what it was when I was like about, I think, six

4  or seven, we came back and my mother married a man, and she just

5  come in one day and took me from my grandmother.

6  Q.    So you had a stepfather?

7  A.    My stepfather.

8  Q.    For a while?

9  A.    Yes, and she just come and took me and I lived with them.

10  Q.    How was that?

11  A.    Well, that was rough.

12  Q.    Why?

13  A.    Because I believe she come and took me for reasons that I

14  really don't understand, so, you know, I was rebellious at that.

15  That was, like, one of the most miserable times of my life,

16  really.  I was in, like, second grade.  I mean, that's the first,

17  I even got kept back that year in school because I was just that,

18  you know, was trying to rebel against, I just couldn't understand

19  why she would take me.  All them years I had lived with my

20  grandmother, that was my mother.

21  Q.    How did you get along with your stepfather?

22  A.    He was, I believe he was, like, he was, he had kids his

23  self, and he was married before, and none of his kids liked him,

24  I believe, because he was very strict.

25  Q.    How did he treat you?

1   A.   You know, other than, you know, I think he was, you know, he

2   whupped me, he chastised me.

3   Q.   What do you mean he whupped you?

4   A.   I guess like any kid get whupped, you know, you whup them.

5   I'm thinking it's, now that I look back over it, what he used,

6   the things, he would whup me with an extension cord, he would

7   whup me with a belt.  He would whup me with anything he had.

8          It was just because, I don't know, I guess I was

9   rebelling because I didn't want to be there and that made him mad

10  and that made him do things, you know, I don't know.

11  Q.   How long was he in the picture?

12  A.   It wasn't long.  He had whupped me one time and put, whupped

13  me with an extension cord and put all of these bruises all on my

14  leg and my back.  And my grandmother and my grandfather told me,

15  This ain't going to happen.  He turned me back over to my --

16  Q.   Back to your grandmother.

17          Tell me about your grandmother a little bit or tell the

18  jury a little about your grandmother.  What was she like?

19  A.   She was amazing.  My grandmother was this little very, very

20  small, small lady.  And, I don't know, she just, she just was

21  remarkable.  She was everything to me.  You know, she was --

22  Q.   Excuse me.  Pull the microphone a little bit closer, if you

23  would.

24          There you go, thank you.

25          Keep going.

1   A.   She, she was, you know, she was my heart.  She was, you

2   know, she was everything.  She was like any other person that

3   loved their mother, how they looked at their mother; that's how I

4   looked at her.

5   Q.   Did she take you places?  Did you go to church with her?

6   A.   I went to church, but it wasn't, my grandmother was Catholic

7   and they used to send us to Catholic church.  It wasn't no if's

8   and but's about whether you getting up to go to church in the

9   morning.  Did she actually come and sit in church with me?  No.

10  Q.   She made sure you were there, though?

11  A.   Well, yeah.  I know, my grandmother had some

12  Indian-American, American Indian in her.  I don't know exactly

13  what tribe it was, but every one of these old ladies in the

14  neighborhood looked like they was from that same area.  They must

15  have come from that same place.  We all went to church every

16  Sunday.

17  Q.   Did your grandmother have a nickname for you?

18  A.   Yeah.

19  Q.   What was it?

20  A.   She had one for me.  Which one?  The nickname?

21  Q.   Yeah?

22  A.   Well, the nickname that she gave me was "Kenussi"

23  [phonetic].

24  Q.   "Kenussi"?

25  A.   Yeah.

1   Q.    What's that?

2   A.    It was a chief that came from one of these tribes that they

3   all admired and respected.  But nobody could pronounce it.

4   Everybody was saying everything but "Kenussi."  So that's what

5   made her settle for them just calling me "Nue."

6   Q.    N-U-E?

7   A.    That's another one.  Because everybody thought when they

8   call me and speak to me they say "Nut," "Nut," "Nut."  Like the

9   nut.

10  Q.    Like N-U-T?

11  A.    Yeah.  And when I was writing, I'm thinking it was N-U-T all

12  along myself.  But when I, I remember, recall writing her from

13  jail, and signing, you know, signing "Nut" and she just, like,

14  "Where you learned how to spell your own name?"

15              I said, "What is you talking about?"

16              She said, "Your name is N-U-E."

17              I said, "N-U-E?"  I was trying to pronounce it in my

18  head.  "Nook, Nuck?  What that is?"

19              She said, "No, that's 'Nue.'"

20              And I just left it like that.

21  Q.    John, when is the last time that you saw your grandmother?

22  A.    January 17, 1985.

23  Q.    When did she die?

24  A.    My father died, like, a month apart, a year apart.  I

25  can't -- she died in 1995.

1   Q.   Did she come visit you in jail?

2   A.   My grandmother was sick.  She was sick.  She was getting to

3   the sick stages before I was arrested.

4   Q.   What was wrong with her?

5   A.   She had emphysema.  That's what you call it when you can't

6   breathe.  She had complications with her breathing.

7   Q.   Before you were arrested on January 17, 1985, how often did

8   you see your grandmother?

9   A.   There wasn't a day go by that I didn't see her.

10  Q.   What did you do when you visited?

11  A.   Anything she needed me to do.  Help clean up the house.  If

12  she needed something from the store, go to the store and get it

13  for her.

14  Q.   Did you call her on the phone from jail?

15  A.   As much as I possibly could.

16  Q.   We'll come back to how often you were allowed to use the

17  phone.  Were you allowed to make calls whenever you want, though?

18  A.   In Angola?  You know, things changed there.

19       But in Orleans Parish Prison, the first, the first,

20  like, two-and-a-half years, I think I, when, it was 1987,

21  September of '87 when I left Orleans Parish Prison, so them first

22  two-and-a-half years, you might get a call every three or four

23  months.  You might get a little two-minute call and that's

24  whenever people would come and get you to make that call, you

25  would have to write a request for a phone call back then.

1          And when you write the request, they got to go through
2     the chain of commands.  And when you're granted, they might come
3     get you 2:00 in the morning.  That's what Miss Wohl was talking
4     about:  2:00 in the morning to make a phone call.
5     Q.    So when you, when your grandmother died, you had not seen
6     her in 10 years?
7     A.    Yes, sir.
8     Q.    How did you learn that she died?
9     A.    How that process go is, I guess someone from outside
10    contacts the warden's office and the warden's office contacts the
11    chaplain of that particular area, and bring forth the message.
12    Q.    Did they let you out to go to her funeral?
13    A.    No, sir.
14    Q.    When you talked to your grandmother on the telephone, did
15    the two of you talk about the possibility that you would be put
16    to death?
17    A.    My grandmother, my grandmother was, was the most, I don't
18    know, she had this insight on, on, on, I don't know, she just had
19    this deep feeling in her heart that I wasn't going to be
20    executed.  I shouldn't be worried about nothing that's going on
21    around me.
22          I remember this one particular time I was feeling bad
23    because a guy had been executed, and I called her, and she must
24    have knowed why I was calling her, and she just dumped it off to
25    me, like, you know, Don't let that get to you.  They ain't going

1    to do you nothing.

2              I'm like, Momma, they is.  They are executing everybody

3    around me.  This is serious.

4              She said, They ain't going to do it to you.

5              She just always had that belief that, you know, that I

6    wasn't going to be executed.

7    Q.   In late 1984, 1985, in the weeks and months before you were

8    arrested, were you doing any kinds of things you shouldn't have

9    been doing?

10   A.   Yes.

11   Q.   What were you doing, John?

12   A.   I was selling drugs.

13   Q.   Like what?

14   A.   Marijuana, PCP.

15   Q.   Were you a big dealer?

16   A.   No.

17   Q.   Mr. Aaron, in his opening statement, said something about

18   you had people like Kevin Freeman and "Funk" Perkins working for

19   you, that they were your employees.  Were they working for you?

20   A.   At this time, like I say, I was young.  I was stupid.  I was

21   doing crazy things.  The most drugs I ever had in my life as far

22   as trying to deal, would be a, maybe a pound of weed.  Maybe

23   about $200 of PCP.

24             And what I would do is, I might give them $100 worth of

25   drugs, and we split it up.  So, you know, if that make me a big

1  drug dealer, I guess, I'm sorry, you know.

2  Q.   Well, Mr. Thompson, you're not suggesting that that was okay

3  because you only had a couple hundred dollars at a time?

4  A.   Yeah.  You know, I would say it wasn't where I was making no

5  hundreds of thousands of dollars.

6  Q.   Are you proud what you did back then?

7  A.   No.  No.  Back then, I was still naive, so back then, you

8  know, I just didn't understand what I was doing.  I didn't

9  understand the effect of what I was doing.  I didn't understand

10  the positions was putting myself in.  Now I look at it and say I

11  was stupid.  I was crazy.  You know, I put myself in some crazy

12  positions.

13  Q.   How did you know Kevin Freeman?

14  A.   From living around the way.

15  Q.   Did he live near you?

16  A.   Yeah, he lived, well, in the, he lived in the area where we

17  lived at, where my grandmother and them lived at.  He lived

18  around me, like, he was a block or two.  But he growed up with

19  us.  He went to school.  He knowed my little brother.

20  Q.   Did he have a nickname that he used to call him or other

21  people used to call him?

22  A.   Yes, Kojak.

23  Q.   What was his hair like back then?

24  A.   It was not like mine:  Bald, bald, but he kept it low cut

25  and kept it clean to a point where he had his head showing.  It

1  wasn't like he was shaved clean bald.

2         And I guess at times he'd let it, he said it never

3  really growed.  He had this little problem with his hair, getting

4  it to grow to a little length.

5  Q.   Did you ever buy things from Kevin Freeman?

6  A.   Yes.

7  Q.   Stolen property sometimes?

8  A.   Yes.

9  Q.   Before January 17, 1985, before the police came and arrested

10 you, did you have any reason to think you were a suspect in the

11 murder of Raymond Liuzza?

12 A.   No.  I know I wasn't a suspect.

13 Q.   Where were you when you were arrested?

14 A.   At my grandmother's house.

15 Q.   What time of day did the police actually come and take you

16 away?

17 A.   I could clearly remember the Young and the Restless music

18 coming on, the theme song, so I know it had to be around 11:00.

19 Q.   The Young and Restless was on?

20 A.   Yeah.  The theme song, you know how it come on.  At least

21 leaving out the door.

22         THE COURT:  Mr. Banks, now might be a good time.  You're

23 moving into another area.  Let's take about a 10- or 15-minute

24 recess.

25         MR. BANKS:  Yes, Your Honor, thank you.

```
1              THE COURT:  Please leave your notebooks in your chairs
2    or under your chairs.
3              THE MARSHAL:  All rise.
4              (WHEREUPON, the jury panel leaves the courtroom.)
5              THE COURT:  You need to contact your witnesses and make
6    sure you get witnesses here.  I don't want to run out of
7    witnesses.
8              MR. BANKS:  We won't have a problem, Your Honor.  If
9    Mr. Williams comes back, we're going to finish Mr. Thompson
10   first, right?
11             THE COURT:  We'll see.  Yes, we'll probably finish him.
12   How long do you anticipate that his direct will take?
13             MR. BANKS:  My guess is I will have about another
14   hour-and-a-half with him, Your Honor.  Maybe less, but that's my
15   best guess.
16             THE COURT:  I imagine cross will be a while.
17             MR. GOINS:  I don't know, Judge, he's covering a lot of
18   things I intended to ask him.
19             (WHEREUPON, at this point in the proceedings, there was
20   a short recess.)
21             THE DEPUTY CLERK:  All rise.
22             (WHEREUPON, the jury panel enters the courtroom.)
23             THE COURT:  Please be seated.  All right.  Mr. Banks,
24   you may resume.
25             MR. BANKS:  Thank you, Your Honor.
```

1                          EXAMINATION

2  BY MR. BANKS:

3  Q.   Mr. Thompson, before the morning break, we were talking

4  about the morning of your arrest in January 1985, and I believe

5  you said the Young and the Restless was on TV when the police

6  came by?

7  A.   Yes.

8  Q.   Who was in the house with you when the police came to arrest

9  you at your grandmother's house?

10  A.   Me, my grandmother, John Jr., my baby, and Denise.

11  Q.   When the police came in, did you know why they were there?

12  Other than to talk to you, do you know what they were there to

13  talk to you about?

14  A.   No.  Well, earlier that morning, I believe it was, like,

15  about 3:00 in the morning or 4:00 in the morning, my grandmother

16  called me and said the police have been to her house and said

17  they wanted to question me and they left her a phone number.

18           About an hour after that, I would guess, my mother

19  called me and told me the same thing.  The police had been in her

20  house, tore up her house and say they want to talk to me about

21  something.

22  Q.   When they came later to your grandmother's house to arrest

23  you when you were there, did they tell you why they were there?

24  A.   Yeah, at the time that they came through the door they said,

25  You are under arrest for the murder of Raymond Liuzza.

1  Q.   Did you know what they were talking about?

2  A.   No, sir.

3  Q.   What did they do?

4  A.   They put the handcuffs on me and put me in the, some kind of

5  van and rushed me off to homicide division.

6  Q.   Did you have a chance to tell Denise or your mother or your

7  little son that you didn't murder anybody, that you didn't know

8  what this was about?

9  A.   Yes.

10 Q.   Did you tell them when the police came?

11 A.   No, I ain't had a chance because they just come straight in

12 the door, handcuffed me and rushed me out.

13 Q.   After you were charged and booked, you were in

14 Orleans Parish Prison until the trial?

15 A.   Yes, sir.

16 Q.   Where in Orleans Parish Prison did they keep you while you

17 were awaiting the two trials?

18 A.   OPP.

19 Q.   Okay, OPP, Orleans Parish Prison has a bunch of different

20 sections, right?

21 A.   Yes, sir.

22 Q.   Where were you?

23 A.   I was on, in the, where they got an area where they house,

24 it depends on your crime that you're being charged with, they

25 place you in certain type of environments.  You put all the hard

1  charges in one area and the lighter charges in the other areas.

2  Q.   So you were in the part with the hard charges or the light

3  charges?

4  A.   Hard charges.

5  Q.   And what was the setup back there?  Were you in a cell?

6  Were there other people in the cell?  Tell us a little about

7  that, please.

8  A.   They have a thing called receiving tiers and that's where

9  they place everyone who is fresh coming in off a charge that they

10 think would not make bond.  They put you on this receiving tier.

11 It's an open flat tier.  This was where, there is no cells.  It's

12 two sections.  There is a section off the right side and the left

13 side.  East side have maybe 60 people on it.

14          Until you go to court, you go through the process and

15 then they move you to different levels of the tiers then, and

16 they have, they have different wings.  Like in OPP, they have,

17 like, a four-wing tier that's A, B, C, D, which on each wing they

18 have four or two on each side, two separate on each side.  So

19 it's like, they got an open flat, like D tier might be an open

20 flat.  All four wings got D-1, D-2, D-3, D-4 is an open flat.

21 You know, it's like this here with bunk beds.  That's for, like,

22 the less violent crimes.

23 Q.   How about in the area where you were?

24 A.   The area where I were, it was four-man cells.  When you're

25 lucky, it's four-man cells.  Most of the time it stayed

1   overcrowded, so they had five in a cell.  Everybody that have

2   life sentences and 99 years and up.  That's what these cells was

3   designed for.  It was their way of, I guess, call themselves

4   trying to keep down as much confusion as possible.

5   Q.   What was it like in there with these other people?

6   A.   You're around, some of the guys that you be around, you

7   know, sometime they have younger guys, like myself was, but a lot

8   of time you're around guys that had been to prison before and

9   understand where they are going and understand what's going on,

10  where they are going.

11        And so that made things kind of like, you know, when

12  you're dealing with a person that have a life sentence or

13  250 years or 300 and 400 years, those guys are on a level where

14  they don't care no more.

15  Q.   So what were they doing?

16  A.   What they wasn't doing.  I done seen rapes.  I done seen all

17  kind of stuff.  Extortion.  It's just no limit to what really go

18  on inside a prison, especially in a parish prison, because a

19  parish prison would separate the parish prison from Angola.  A

20  lot of time, once you get to Angola, you would have been already,

21  a decision has been pretty much made on your life in a sense.

22        That decision is whether you're going to be a man or

23  you're going to be a coward or whatever to whatever type of

24  circumstances because you is in this closed environment where you

25  can't move, you can't run, you can't get too much of help.

1          To do it in Angola, it would be complicated because

2    they have, it's a more open and a more manpower for security and

3    everything.

4          So how they think is, if they could catch someone in

5    the parish jail and, say, rape them or whatever, or make them pay

6    drafts -- that going to carry you wherever you go at.  That's

7    going to be on you.  In the sense it would be like whoever that

8    person was who dominated you in that manner, when you go to

9    Angola, you already established as to who you belong to, and all

10   these type of things.  So that's why they try to make it happen

11   there before you make it, before you make it to Angola.

12   Q.   Were you scared?

13   A.   Yes.  Yes, I was scared.  I ain't never been around an

14   environment of that nature before.

15   Q.   Had you been in jail before, John?

16   A.   Yeah.  Juvenile.  At age, I mean, my oldest son was, like,

17   3 months, years old.  When I was trying to be with the

18   neighborhood crowd, I went, committed a burglary, and I got

19   caught.  That was the first time I ever been in trouble.  The

20   judge gave me six months in juvenile institution.  Before my son

21   even started walking, I was back home again.

22          That was my only real experience.

23   Q.   Was it anything like what you saw at OPP?

24   A.   No.  They ain't had knives, there wasn't nobody getting

25   raped, no.  Wasn't nothing like that.

1  Q.   Were all the other people in there with you juveniles as

2  opposed to grown men convicted and sentenced to long terms in

3  jail?

4  A.   Yes, sir, everybody was juveniles.

5  Q.   We saw a photograph up of you there that showed a picture of

6  you from December 12th.  It was a mug shot from six days after

7  the Liuzza murder.  What was that for?  Where did they send you?

8  A.   That's what the defense was speaking in terms of, I guess he

9  was trying to establish that I was used to this type of thing.

10  That was a misdemeanor traffic violation.  I was driving and I

11  had left my, I had got some tickets, I believe, and I never went

12  to court about it.

13  Q.   So you never paid your tickets?

14  A.   Never paid the tickets, and one day the police stopped, ran

15  a check, and arrested me and during that time you just, I think I

16  stayed in jail maybe a week.

17  Q.   Was it like where you were when you were waiting trial for

18  murder and carjacking?

19  A.   No, they had me in tent city.  What happened was the jails

20  was overcrowded at the time.  Even the temporary, even the little

21  small parts of the jail, so they built all these tents, and they

22  was housing everybody who had misdemeanor charges and was putting

23  us in tents.

24  Q.   I would like to go forward from the time you were arrested

25  and in jail in OPP to the first trial.  The first trial was the

1  carjacking case; right?

2  A.    Yes, sir.

3  Q.    Did you understand why that was being tried first, even

4  though the carjacking itself had occurred three weeks after the

5  murder?

6  A.    I was, I was real, real, real naive of, of the, of the

7  system, how it worked.  It really didn't matter to me because I

8  knew I was innocent of both.

9  Q.    Did you expect in the carjacking case that you were going to

10  be found guilty?

11  A.    No.  Why should I?  I didn't do it.

12  Q.    What was your reaction then in the carjacking case when

13  those kids got up on the stand and said you tried to rob them?

14  A.    I think my reaction was way before that.  When, it's kind of

15  hard to explain, but when I was first arrested for the murder,

16  they would come and get me off the tiers like at 2:00, 3:00 in

17  the morning, bringing me to homicide, asking me to tell them what

18  happened about a murder.

19         And over the course of the period that I, I'm telling

20  them I don't know nothing about a murder.  I can't tell you

21  something I don't know.  They put, one time they come and get me,

22  and I wouldn't talk, the next thing I know I was in central

23  lockup again being rebooked on another charge.

24  Q.    That was the carjacking?

25  A.    Well, it was more than a carjacking, I think.  I think it

1   was several other charges they just booked me on.  I think there

2   was a number of them, but the carjacking happened to be one of

3   them.

4   Q.   Did they just try to charge you with a bunch of things?

5   A.   I don't know what they was trying to do.  I just know that's

6   what they did.

7   Q.   Did they try you on anything other than the carjacking and

8   the murder case?

9   A.   No, sir.  But what you were saying earlier, when I went,

10  when I was arrested for the murder, my first trial appearance was

11  with my attorneys and it was, I'll never forget it, it was a

12  Motion to Suppress evidence in my murder case.

13          And when I walked in the courtroom, my attorneys was

14  there, and Mr. Williams was in there.  And Mr. Williams made this

15  statement on record and it was, like, blew me away.  He said

16  something like, Your Honor, I would like the record to reflect

17  there was an open-court identification of Mr. Thompson in the

18  carjacking robbery.

19          And I just looked and I was feeling like, I was hurt, I

20  was feeling set up.  I didn't know what was going on because I am

21  figuring, like, how, when I walk in court by myself, someone is

22  going to sit up in court and say I'm the one that robbed them.  I

23  just didn't understand it.

24  Q.   At any time, Mr. Thompson, before that carjacking case went

25  to trial, did you know that the district attorneys and the police

1  had blood evidence?

2  A.   No, sir.

3  Q.   Did you know it was tested?

4  A.   No, sir.

5  Q.   Did you know that a report was delivered to the district

6  attorneys showing that the blood of the perpetrator, the robber

7  was type B?

8  A.   No, sir.

9  Q.   Do you remember at the end of the carjacking case the jury

10 was sent out to deliberate as they do in all trials?

11 A.   Yes, sir.

12 Q.   Where were you waiting when the jury was deliberating?

13 A.   In the back of the judge's chambers they had, how the, how

14 the, how, how the parish, our old parish jail, OPP is hooked into

15 the courthouse.  And so in the back of the parish prison, it's

16 the back of the courthouse, and that's how they transferred the

17 inmates from one area to another area without exposing them to

18 outside.

19        And in the back of each judge's chambers is a little

20 holding cell where they keep everybody that's going backwards and

21 forward to, in the court.  So they take everybody out of, off the

22 docks where they put everybody, like 3:00 or 4:00 in the morning

23 they'll come and get you and put on you the dock, and you'll have

24 to stay there until your section is ready to get open.

25        What they'll do is call everybody's name that goes to

1  this particular section and they'll bring you and sit you in the
2  back of the judge.
3  Q.   So you're in this room.  Is there a cell within the room?
4  A.   Yes.  It's really probably no more than like, if this is the
5  door right here, it's just this little area, probably as close to
6  the judge is where everybody sit.
7  Q.   Did anyone, this is while the jury was deliberating in the
8  carjacking?
9  A.   Yeah.  Unless, I can't say how long they would have held me
10  there, but I'm assuming that from my murder trial and from my
11  robbery trial, they let me stay back there all that time while
12  the jury was out deliberating.  So I guess he would rather hold
13  you right there unless it get too late in the morning that he
14  might retire the jury or something, they keep you back there.
15  Q.   During that time when you were back in this room when the
16  jury was deliberating, did anybody come back there?
17  A.   Yes.   Jim Williams.
18  Q.   He was the lead prosecutor in the carjacking case?
19  A.   He was the lead prosecutor in the case.
20  Q.   Was there coffee or anything like that back there that a
21  prosecutor would come back there for?
22  A.   Yes.  That's what, back there, not only was, it was, it was
23  a door right there that leads straight into the judge's chambers
24  where the judge be at.  Right outside it, it had a refreshment
25  stand like where you can get water, coffee, and whatever.  That's

1    what they had up there.

2    Q.    Did Mr. Williams say anything to you when he came back

3    there?

4    A.    Yes.

5    Q.    What did he say, John?

6    A.    He was like, I mean, me and him just had a bad, bad verbal

7    exchange.

8    Q.    Tell me what Mr. Williams said to you.

9    A.    He came and he said something like, I might not get you on

10   this one but I got a lot more of them where that came from.  I'm

11   going to fry you.  You will die in the electric chair.  He just,

12   from that point on, it just was like me and him translating

13   different words.  I was trying to say anything and everything I

14   can to hurt him.

15   Q.    Did anyone intervene, John?

16   A.    Yes, Judge Patrick Quinlan.  He heard how loud had we had

17   got.  We was right outside his door.  He opened the door and seen

18   what was going on and he ran Jim Williams from back there.

19   Q.    The jury came back with a guilty verdict?

20   A.    Yes.

21   Q.    In the carjacking case?

22   A.    Yes.

23   Q.    How did that, how did that make you feel?  I mean, you knew

24   you were innocent of the carjacking.  The jury came back with a

25   guilty verdict.

1   A.   It destroyed me.  It tore me down.  When I was arrested on

2   all of these charges and I know I didn't do it, I just automatic

3   thought, When I go to court, the jury will hear it, I'll be free.

4            That brought a quick reality to me that, you know, this

5   is bigger than that.  I might be in some serious trouble.

6   Q.   Did you know when they came back with a guilty verdict what

7   your sentence would be?

8   A.   At that time, I had started reading law cases, started

9   looking at the Criminal Code of Procedures and started

10  understanding that, yeah, what my sentence could possibly be.

11  Yeah, I know what the maximum was anyway.

12  Q.   The maximum for -- it was an attempted armed robbery

13  conviction, right?

14  A.   Yeah, that's what the jury came back with, attempted armed

15  robbery.

16  Q.   There was an armed robbery, but they only found attempted?

17  A.   Well, yeah.  Yes.  I went to trial for armed robbery.  The

18  jury came back attempted armed robbery.

19  Q.   What was the sentence the judge gave you for that?

20  A.   The maximum.

21  Q.   Which was what?

22  A.   Forty-nine-and-a-half years.

23  Q.   With or without parole?

24  A.   Without parole.

25  Q.   And so what did that mean if you were later acquitted in the

1  murder case?

2  A.   I still had forty-nine-and-a-half years to do, however much

3  time I did.

4  Q.   -- arrested --

5  A.   Yes.

6  Q.   Did that hit you hard, that sentence?

7  A.   Yeah.  It hit me hard because it gave me that, that reality

8  that I wasn't going to be there for my children.

9  Q.   Did you understand after you got that carjacking conviction

10  against you what impact that might have in the murder case?

11  A.   Not really, because I still wanted to take the stand.  So

12  not until he really broke it down to me and explained to me

13  that --

14  Q.   Mr. Thompson, the law usually doesn't want people to talk

15  about discussions with their lawyers, so I'm going to stay away

16  from that, about legal strategy, but did you understand that if

17  you took the stand in the murder case and testified and said you

18  weren't guilty and told that jury what you bought from

19  Kevin Freeman, that the prosecutors could come in and tell the

20  jury about the carjacking conviction?

21  A.   Yes.

22  Q.   You knew that, right?

23  A.   Yes.

24  Q.   And you knew they could use it in the penalty phase of the

25  murder case, that even if you didn't get on the stand, they could

1  get up and tell the jury in the penalty phase about your

2  carjacking conviction?

3  A.   I didn't know that.

4  Q.   You found that out, though, right?

5  A.   I found that out.  Yeah, I didn't know that aspect of it.

6  Because then I said, well, if that was the case, I could have

7  taken the stand from the get-go.

8  Q.   After the jury found you guilty of the murder of Ray Liuzza,

9  there was a penalty phase where Marie LaGarde, one of the kids

10  from the carjacking case testified, right?

11  A.   Yes.

12  Q.   How old would you say she was, John?

13  A.   15, 16.

14  Q.   So she got up on the stand.  This was the second time you

15  saw her up on the stand.  The first was at the carjacking trial?

16  A.   (Witness nods head affirmatively.)

17          Yes.  It was the second time.

18  Q.   Do you remember who questioned her?

19  A.   Jim Williams.

20  Q.   The same guy who questioned her in the carjacking case?

21  A.   Yes.

22  Q.   I guess there was no mention of blood evidence at that time

23  either, was there?

24  A.   No, sir.

25  Q.   Did Marie LaGarde tell the jury that you had robbed her even

1  though you hadn't?  I'm not blaming Marie LaGarde, mind you.

2  A.   Yes, sir.

3  Q.   What was she like when he was testifying?  Was she happy,

4  sad, upset?

5  A.   I guess it was a replay to her of what had happened.

6  Without a doubt, you can tell that she did went through some

7  trauma.  You could tell that she was hurt, and yes, she let it

8  show, the emotions of her reliving that scene.  It must have

9  frightened her.

10 Q.   Was she crying, John?

11 A.   Yes, she was.

12 Q.   After she was done testifying in the penalty phase of the

13 murder case, the jury came back with a verdict, right?

14 A.   Yes, sir.

15 Q.   What was the verdict, John?

16 A.   Death.

17 Q.   That you would be executed?

18 A.   That I would be executed.

19 Q.   How were they executing people back then?  It was death by

20 what?

21 A.   Electric -- electric.  They put you in the electric chair.

22 Q.   They put you in the electric chair?

23 A.   Yeah.

24 Q.   That was the sentence that you got?

25 A.   Yes, sir.

1   Q.   When the jury came back with its verdict of the death

2   sentence in the murder case, was any of your family in the

3   courtroom?

4   A.   All my family.

5   Q.   Who was there, John?

6   A.   Everybody with the exception of my grandmother.

7   Q.   Why wasn't she there?

8   A.   Her health just had, you know, really deteriorated.  She

9   just couldn't walk, and they had a lot of steps to walk up.  She

10  could have caught a ride maybe to the courthouse but getting her

11  up the steps, it would have been just too much on her.

12  Q.   So your mom was there?

13  A.   My mother was there.

14  Q.   Denise?

15  A.   Denise was there.

16  Q.   Your son?

17  A.   My sons was there.  Both my sons.  Denise was there and my

18  older son's mother was there.

19  Q.   Your sons were four and six at the time?

20  A.   Four and six.

21  Q.   After the verdict was read, what happened?

22  A.   They rushed me out the court.

23  Q.   Were you already in handcuffs?

24  A.   I was already in handcuffs, yeah.

25  Q.   How about your feet?

1    A.    Not in the courtroom.  I was just shackled by my feet.

2    Q.    So they took you away, right away?

3    A.    Right away, because the emotions of the judge was more

4    concerned about the emotions of the court, how people was, the

5    reactions, so he wanted to hurry up and get me out of there.

6    That was just his thing.

7    Q.    What were you thinking when that verdict came back and they

8    were hustling you out of the courtroom?

9    A.    My thoughts was, I wanted to talk to my sons for sure

10   because I know this was like real, real hard on them.  My mother

11   understood what was going on.

12        It was just, I just wanted to be the first one to try

13   to explain to my sons what was going on because they was, like,

14   all the while I was in court, they kept calling me, Daddy, Daddy,

15   Daddy.  You know, they was just, like, glad to see me.

16        And to have them take me away the way they took me away

17   and hurry up and rush me out of court, it might have given them

18   the wrong impression that something was going to happen to me

19   right then and there, and they didn't know why.  And they was

20   crying, so my thoughts was basically, I need to talk to my sons,

21   let me talk to my sons.

22   Q.    So from the time you were arrested on January 17th until

23   your sons were there during the penalty phase of the murder

24   trial, had you seen them?

25   A.    No more than when I appeared in court.

1   Q.   Just in the courtroom?

2   A.   Just in the courtroom.  Back then we wasn't allowed

3   visitors, children to visit you in Parish Prison.

4   Q.   Were you allowed to go over to your sons and talk to them

5   and tell them what was happening, tell them you would be okay?

6   A.   No, sir.

7   Q.   Where did they take you after you were sentenced to death?

8   A.   In OPP.  Back to OPP.

9   Q.   Orleans Parish Prison?

10  A.   Yes, sir.

11  Q.   How long did you spend in Orleans Parish Prison after you

12  were sentenced to death?

13  A.   Everything happened so fast.  You know, I was arrested

14  January 17th.  By that May the 12th, I had done been through two

15  trials.  That was, like, totally unheard of that someone would go

16  through two trials in less than 120 days of their arrest.

17  Q.   So they took you to OPP.  Where in OPP were you during the

18  two-and-a-half years between the time of your conviction in 1985

19  and in 1987 when they moved you to Angola?

20  A.   B-1.

21  Q.   What's B-1, John?

22  A.   B-1 is the tier I was speaking in terms of, it's where they

23  had B-1 and A-1.  A-1 and B-1 consist of everybody with 99 years

24  or more.

25  Q.   People with sentences of 99 years or more?

1   A.    Yes.

2   Q.    I guess forty-nine-and-a-half without parole, plus a death

3   sentence is considered more than 99?

4   A.    Uh-huh (affirmative response).

5           Yeah, because they had, you know, other guys in there

6   for attempted armed robbery for 49.  Like I told you, it was

7   sectioned.  It was different tiers.  They had a whole A side, a

8   whole B side, a whole D side and a whole C side.

9   Q.    So how was B-1 laid out?

10  A.    Cells.

11  Q.    You had your own cell?

12  A.    Seven cells on each side with four members in each cell.

13  Q.    Was B-1 different from where you had been before the trial?

14  I know it's a different place but was it any different in terms

15  of the kind of people there, the environment or living

16  conditions?

17  A.    Yes.

18  Q.    How is it different, John?

19  A.    It was different, as I explained earlier to you, you got an

20  environment here where guys almost come to the point of they

21  never going home again in life.  They is in this netted

22  environment where, really, they don't care.  It's a totally

23  different atmosphere.  A totally different environment.

24  Q.    What was going on?

25  A.    The rules, everything changed.

1  Q.    What was going on in B-1?

2  A.    Everything.  It would depend on what you allowed to go on.

3  To me it was, it was, it was, it was like the Sampson and Delilah

4  type thing:  The strong survive.

5        With a system that the parish, the people that was

6  running the parish, they knew they had problems with inmates,

7  certain inmates that had been, experienced inmates, put it like

8  that.  Inmates that had done did time before, maybe did 5 years,

9  10 years, had been through the ropes, and now was sentenced to do

10  a large amount of time.

11        You had problems with them raping on other tiers.

12  Putting them on other tiers and taking advantage of them.  They

13  had trouble with them.  So what they do is they put them in one

14  area, you put all of them in one area and say, Now, you-all fend

15  for you-all's selves.  You-all want to live like animals, we're

16  going to put you-all all in one section and let you do whatever

17  you want to do to each other.

18  Q.    Where did they put them?

19  A.    On B-1.

20  Q.    With you?

21  A.    With me.

22  Q.    How many men were in your area in B-1?

23  A.    Each side, you know, you have seven cells.  Each cell holds

24  four men so that was, like, 28 men to each side on A and B side.

25  So that's what?

1  Q.    56?

2  A.    56 people altogether.

3  Q.    Out of those 56 men, you mentioned before that there were

4  prisoners being raped.  How many men would you say were a victim

5  of that?

6  A.    Over the period I was there?

7  Q.    Just at any time out of 56 people?

8  A.    To me, if I see homosexual activity, I would automatically

9  feel like that person is not doing it because he want to do it.

10  So me personally, I will consider that as rape, whether he was

11  already homosexual or not.  It's hard to really tell.  So it was

12  a real practice activity that a lot of them participated in.

13  Q.    Were inmates made sex toys?

14  A.    Yes.  In any prison around the United States.

15  Q.    Is that scary for you?

16  A.    Yeah.  In a sense, yeah.  You know, it's a lot of different

17  things play into that scenario.  It's not just something that --

18  they would have had to kill me, put it like that, before I would

19  let something of that nature happen to me.  So I feel like the

20  next man should have had that same mentality but they didn't.

21        And so a lot of times, them guys was putting themselves

22  in positions for that to happen, when for instance, you know,

23  just, you know, it's a four-man cell, the man come on the tier

24  every day to call roll, it's different things they could have did

25  to prevent it, to me.  And for whatever reasons, whether it was

1  fear, because it wasn't too many places you could run.  The most

2  they can do is put you on A-1.

3         You can leave from B-1 to A-1 because both tiers

4  consist of long-timers, hard people that are doing hard time.  So

5  if I was to try to run from A tier to B tier, the only thing was

6  word come over why I'm running from A tier to B tier.

7  Q.   John, were you getting visitors on B-1?  Were you allowed to

8  get visitors?

9  A.   Yeah, you're allowed to get visitors.

10  Q.   How often would you get visitors?

11  A.   You get a visitor once a week.

12  Q.   How many visitors a week were you allowed?

13  A.   Three.

14  Q.   Who came to see you during those two-and-a-half years?

15  A.   My mother, Denise, sometime my stepmother.

16  Q.   Did Denise bring any news for you?

17  A.   Yeah.

18  Q.   What?

19  A.   That she pregnant.

20  Q.   She came to you and told you that she was pregnant?

21  A.   Right during, right after I was sentenced to

22  forty-nine-and-a-half years.  So 3 months later, 2 months later,

23  after my arrest.

24  Q.   Were you the dad?

25  A.   She tried to tell me I was.

1  Q.   Were you?

2  A.   I guess she just didn't want to hurt me.  No, I wasn't.

3  Q.   Was that hard for you?

4  A.   Yes.  This woman, you know, I thought, you know, I thought

5  was my life.  Yes, it was hard for me.

6  Q.   Did she get remarried while you were in jail?

7  A.   Yes, she did.

8  Q.   So she moved on?

9  A.   Yes, she did.

10  Q.   That must have been hard for you, too?

11  A.   Yeah.  What made it real hard was she allowed her husband to

12  cut off my communication with my son.

13  Q.   With John Jr.?

14  A.   With John Jr.  I believe that's what, I believe so much of

15  her moving on with her life, that was hard to accept.  But what

16  was more harder to accept -- that was understandable -- what

17  wasn't understandable and what I couldn't accept is her trying to

18  cut off my communication with my son.

19  Q.   When you were in OPP during that time, how much were your

20  kids allowed to visit you?  How much contact did you have?

21  A.   In OPP?  No contact at all.  Once a year, at that time, once

22  a year for the Christmas holiday, I think that one week in

23  Christmas, in December, they allow you to bring a kid in.

24  Q.   So once a year?

25  A.   Once a year.

1  Q.    So in the two-and-a-half years you were in OPP after your
2  conviction you saw your sons twice?
3  A.    Twice.
4  Q.    When did you go to Angola?  You said September of '87?
5  A.    September 1, 1987.
6  Q.    Why were you moved there?  Do you know?
7  A.    I would have liked to have said it was because of my
8  appeals, my first round of appeals was finally denied, but I
9  don't really know.
10 Q.    What's up at Angola that they don't have at OPP?  At the
11 time?
12 A.    What's up in Angola?
13 Q.    Electric chair, right?
14 A.    Electric chair, many things, really, to be honest.
15 Q.    Is that where death row was for the State of Louisiana?
16 A.    Yes, sir.
17 Q.    Were all the people on death row in Angola?
18 A.    Yes, sir.
19 Q.    Is that a big place, Angola State Penitentiary?
20 A.    Yes.
21 Q.    Nancy Wohl told us it was about, I think she said about four
22 hours from New Orleans.  Does that sound about right?
23 A.    That's about right.
24 Q.    It must have been hard for your family to get there, even
25 when they had visits?

1  A.   Yes.   None of my family had cars.

2  Q.   Where was death row at Angola?

3  A.   It was here and there.   When I first got to Angola, death

4  row was being housed at a place they called camp J.   Camp J is a

5  restriction camp.   It's where they put all the guys in the prison

6  that, that they can't control, that have behavior problems.   It's

7  a restriction tier.   They don't give you nothing.   No type of

8  books, no TV, it's just a restriction tier.   It's when you've

9  been misbehaving yourself.

10 Q.   When you first got to Angola, I take it they took you to a

11 cell, right?

12 A.   Yes.

13 Q.   What did you notice when you got to the cell?

14 A.   Someone, someone else's belongings in it.

15 Q.   Like clothing, what kind of stuff?

16 A.   Clothing, paper, books, you know, when you, when you're

17 being, traveling as a death row inmate, they shackle your hands

18 to your feet, and so, you know, you're, like, scooting by.

19        In other words, you know, this is my first time in

20 Angola, so they just opened the cell and, you know, as I'm going

21 into the cell I see all these belongings and stuff in this one

22 bed, so I was thinking they was placing me in somebody else's

23 cell by mistake.   You know, I was like, Somebody else's

24 belongings in here.

25        And they said, Oh, don't worry about that.   Just get on

1    in there.

2            And I was like, I'm not going into somebody else's

3    cell.

4            They say, You're going to go where we're telling you to

5    go.  You're going in that cell.

6            So as I got in that cell, someone on the tier that was

7    out from the Parish Prison, his name was John Brown, he hollered

8    down to me and told me that, Oh, don't worry about that stuff in

9    that cell.  He ain't coming back no more.

10   Q.   What did that mean?

11   A.   He was, this guy was executed a few days before I arrived.

12   Q.   His stuff was still there?

13   A.   His stuff was still in the cell.

14   Q.   Did that hit you in any way, John?

15   A.   Yeah, reality.

16   Q.   What way?

17   A.   Well, even though I was sentenced to death in the Parish

18   Prison in '87, that was one of the, that was one of the, probably

19   the worst time of executions in the State of Louisiana during

20   this time, like, from '85 to, like, '87.  Our system was, like,

21   on a roll with executing people.  So we, like, in the period of

22   time I think we might have executed maybe about 10 or 11 people

23   in that period of time.  I mean, right back to back.

24           And that reality really hit you hard then when you're

25   being put in a cell where they are telling you that this person

1   had just been executed.

2   Q.   How big was your cell?

3   A.   About six by nine.

4   Q.   Six by nine.  I'm just going to do my best guess here:  From

5   the jury box, maybe six feet is to about here, would you say?

6   About that wide?

7   A.   Yeah.  It was almost like I could have really stretched

8   maybe, yeah, it was about that wide.

9   Q.   And the length of it may be from this podium to the jury

10  box?  About right?  Maybe where I'm standing?

11  A.   Yes.

12  Q.   That's the whole cell?

13  A.   The whole cell.  With a bunk bed in it.  With a sink in it.

14  Q.   So you had a bed, a sink, what else?

15  A.   Your locker where you keep your supplies in.

16  Q.   Locker.

17  A.   And you had a little table hooked to the wall where you

18  could, you know, do your writing and reading or whatever.

19  Q.   And a toilet?

20  A.   And a toilet.

21  Q.   So there must not have been a lot of room to move around

22  when you have this 6-by-9-foot cell with all of those things in

23  it?

24  A.   No room.  No room to move in.

25  Q.   What were the sides of the cell?  Was it bars, glass, walls?

```
 1  A.    Three walls and bars.

 2  Q.    Three walls.  Were there windows?

 3  A.    No, sir.

 4  Q.    And then the front was the bars?

 5  A.    The front was the bars with the little food tray where your

 6  food could come through the door.

 7  Q.    You ate your meals in this little cell?

 8  A.    Yes.

 9  Q.    How did they get them to you?

10  A.    They cook them, put them in a heating pan and they bring it

11  to you.  And they present it in to your tray hole, they call it a

12  little tray hole.

13  Q.    A slot in the bars you could slide the tray through?

14  A.    Yeah.

15  Q.    No windows?

16  A.    They have windows, but the windows wasn't in our cell.  The

17  windows was maybe from me to you.

18  Q.    But in the three walls, they were just solid walls?

19  A.    Just solid walls.

20  Q.    How many hours a day were you in that cell when you were on

21  death row?

22  A.    23.

23  Q.    23 hours a day in that little space with those things around

24  you?

25  A.    23.  Yes, sir.
```

1  Q.   No other inmate in there with you?

2  A.   No.

3  Q.   And unless someone was, well, let me ask you:  Is this like

4  a tier, a long tier with cells stacked side by side?

5  A.   Yes.  This was a totally different setup from the parish

6  jail.  This was just like them rows of chairs right there, that's

7  how the cells was.

8  Q.   Unless someone was walking down the tier, down the hall,

9  could you see any other inmates?

10  A.   Unh-unh (negative response).

11  Q.   You couldn't see any live human beings unless they were

12  walking by you?

13  A.   Yes, sir.

14  Q.   Or you were out of the cell?

15  A.   Or I was out of the cell.

16  Q.   Now, the one hour a day, the one hour a day you were allowed

17  out, what did you do?  What were you allowed to do?

18  A.   It depended on, on, on, on, on what was important to me at

19  that particular time.  I had a, I was able to, mostly I used to

20  love to exercise.  I used to love to run.  So what I'd do is I'd

21  come out on my hour, I'd put all of my shower stuff right by the

22  shower, and I'd try to run for 45 minutes or so, up and down the

23  hallway to get the exercise.

24  Q.   How long was this hallway, John?

25  A.   Give and take that they had, on this particular tier, at

1   camp J, they had 13 cells, but when they moved us to the hill, we

2   had 15 cells, so give and take that other than the shower, I

3   think it was maybe 85, 90 feet.  Maybe from here to the end of

4   the courtroom.

5   Q.   So from the back wall, maybe the length of this courtroom?

6   A.   Yes.

7   Q.   And what was it, a concrete floor?

8   A.   Concrete.

9   Q.   So you just, for 40 or 45 minutes, you would just run back

10  and forth like this?

11  A.   Yeah.  I put on my headphones, yeah.  And just get into a

12  little zone.

13  Q.   And that was your exercise?

14  A.   Yes.  That was my exercise.

15  Q.   What else did you do during at that hour, the one hour of

16  the day you were out of the 6-by-9 cell?

17  A.   I guess it would depend on what their move was.  Three or

18  four days I would dedicate to that running.  They had other

19  things you could do, though.  I would come out my cell, if

20  someone I know that I really associated with, and I loved, I love

21  a challenge as to chess, scrabble, I would sit in front of your

22  cell, probably, and play a game of chess with you.

23  Q.   So you could walk in front of another inmate's cell during

24  your time off and play chess?

25  A.   Yes.  Or you could play chess from your cell too.

1   Q.   How could you do that if you couldn't even see the people?

2   A.   Well, you know, you got time to think, so you come up with

3   all kind of good things.  We got a checker board and we just

4   numbered each block 1 to 60 or whatever the number it was, and

5   you just say, Queen to whatever number you place your piece on.

6   Q.   What, you'd shout it out?

7   A.   Yeah.

8   Q.   What if the guy wasn't right next to you?

9   A.   I played with guys that was seven and eight cells down from

10  me.

11  Q.   You just shouted to them?

12  A.   Yeah.  It's, it was, you know, you have three TVs going, you

13  know, you had everybody in their own little thing.  You know,

14  some people listening to music and some people looking, trying to

15  watch TV, some people holding conversations.  So yeah.  You know,

16  it's like, it wasn't a big or a bad thing to play.

17  Q.   What was the noise level there?

18  A.   Ridiculous.

19  Q.   Why?

20  A.   Because all these activities was trying to go on at one

21  time, and not only did you have our tier, you had another tier

22  directly behind us, and, you know, it was a way of doing things.

23  That's the way they were doing it when I got there.

24  Q.   TVs, people shouting all day?

25  A.   All day.  Not to even mention the mentally disturbed ones.

1   Q.   What do you mean?

2   A.   They shout all night while you sleep.

3   Q.   Were there mentally disturbed people on death row?

4   A.   Yes.  Yes.  Each tier probably had about three or four on

5   them.  Yes.  Guys that really had some serious, serious, serious

6   mental problems.

7   Q.   What did they do?

8   A.   What do you mean, in a sense of?

9   Q.   Anything they did that was either disruptive or noisy or

10  offensive or bothersome?

11  A.   They wasn't even, I mean, we couldn't even predict what they

12  would do.  It was like an adventure every day to see which one of

13  them was going to do something else more crazier than what they

14  did before, from taking human waste and throwing it on the guard

15  or one of the female deputies.  I mean they just click at any

16  moment.

17         What they would do to try to keep this under as much

18  control as possible was they would come up there and give them

19  these shots of Haldol or anything that could keep them calm and

20  keep them quiet.  They'll walk around like a zombie for about

21  three or four days and when that medication wore off of them, it

22  was right back to the same thing.

23         And at that time, they ain't had no particular place

24  where they set them.  They ain't had no place isolated for the

25  mentally disturbed, so you had to live with that.

1    I've been pepper sprayed and gas sprayed because of my

2   close living, like, for instance, I never liked to be way in the

3   back of the tiers because it's real hot, and when you at the

4   front of the tiers, when the man open up the doors that lead

5   outside, the air come whooshing in and gushing in, so you can

6   feel that little comfort.

7    So I try to stay up in that area range, but that was at

8   a consequence because they had to keep the mentally ill, the

9   first three bars, the first three cells was designed for people

10   that get execution dates.

11    I mean, the way these bars were designed in these first

12   three cells was, they wouldn't have to worry about you trying to

13   hang yourself or nothing up there.  It was equipped where you

14   couldn't do none of these things.

15    So that's where they kept them at most of the time.

16   And by me being up there, every time one of them would go off

17   into one of these panic modes, they, like, maybe come spray,

18   pepper spray them down, just to try to calm them down to get them

19   they Haldol shot because they really just didn't want to go in

20   there on them without subduing doing them first.

21   Q.   Was it air-conditioned?

22   A.   No.  No.

23   Q.   Did you have fans in your cell?

24   A.   No.

25   Q.   No windows, no fans, no air-conditioning?

1  A.   No.  When I first got to Angola, they had one fan trying to
2  keep 13 cells cool.
3  Q.   How hot would it get in the summer in those cells?
4  A.   You talking about concrete and iron.  You're talking about
5  where everybody on the tier is walking around in their underwear.
6  No shirt, no socks, no nothing on them, just to try to keep cool.
7  Q.   24 hours a day?
8  A.   24.  The only time we was allowed, when we was supposed to
9  put on some clothes is when, if a nurse was coming down the tier,
10  they'll tell everybody, Y'all get dressed.  A lady coming down
11  the tier.
12        Other than that, that's how we living.  That's how we
13  walked.
14  Q.   Did it go over 100 degrees?
15  A.   Yes, indeed.  Angola is in, like, a wide open area where it
16  was once a plantation.  It get extremely hot, and it get
17  extremely cold when it's cold because it's a river right there,
18  too.
19  Q.   How was the heat in the winter?
20  A.   In the wintertime, they had this, like, I don't know, we was
21  in, the building that we was in, camp J, was supposed to have
22  been one of the oldest buildings in the prison system.  So they,
23  you know, they, the building should have probably been condemned.
24  So they had generators where they'll try to, when the heater go
25  out, they'll try to turn on the generator to try to keep us warm.

1       We just had problems.  That's why, as you recall, I

2  think, in 1990, they moved us out of this building because this

3  building was just that messed up.  And they put us in a building

4  that they was in before, at the beginning of the prison, that

5  they had redid it in a sense.  We didn't have central air but we

6  had a better heating ventilation.

7  Q.   What did it smell like on death row, John?

8  A.   That was kicks because I was listening to my spiritual

9  advisor, Nancy, just now.  I was listening to her and that's the

10  trick about Angola, too.  When you visiting, you had areas where

11  you just walk in the beginning of the, of this particular cell

12  block.  This, where we was at was death row, so you had this area

13  where the visitors come in at.

14       In that first area right there, it is brand-new, it

15  look like brand-new money.  It smelled, you know, you could

16  probably get a little whiff or something but nine time out of ten

17  you ain't going to smell nothing because it's totally out of the

18  way from where the prisoners are actually kept.

19       So when she was describing Angola as being cleaner than

20  the Parish Prison, I was thinking, Yeah.  Because she really just

21  was only speaking in terms of what she seen when she come there.

22  But she didn't know what was going on behind.

23       And behind, like I say, we had mentally ill people, we

24  had just some nasty people.  Some of them wanted to take showers,

25  some of them didn't want to take showers.  You know, if they get

1  mad with each other, you know, they all, you know, you got a TV,

2  you got four people trying to watch TV and just never going to go

3  along.  Everybody is going to want to watch different things.  So

4  mostly arguments, mostly everything happened behind that TV.  We

5  used to call it the one-eyed monster because it caused more

6  problems than anything.

7         And due to the fact that physically you couldn't get to

8  no one, no matter how mad you'd get, you couldn't get to them

9  physically.  The only thing they could fall back on is either

10  trying to throw something on you, you know, and they used some

11  crazy stuff as ways of retaliation, you know, from human waste to

12  urine and anything else if they could get their hands on it, you

13  know, once a week, they bring you, like, bleach, any type of

14  chemicals that you could use to clean yourself and the

15  environment, them guys save it and hide it and then they'll boil

16  some water with it and throw it on you.

17         It was kind of like a real bad thing but, you know,

18  some guys would be walking around, you know, they would have to

19  come and pull them out the cell to make them come go take showers

20  because they get it on themselves and don't want to change, so it

21  was kind of, you know, a nasty environment, a real nasty

22  environment.

23  Q.   Did you make any friends on death row?

24  A.   You don't have no choice.

25  Q.   What do you mean?

1   A.    What?

2   Q.    What do you mean?

3   A.    You're in an environment, just, you know, try to get a juror

4   an understanding:  If y'all was, with y'all living with each

5   other every day, you know, you're, no matter if you hate her or

6   don't like her, eventually y'all are going to develop a

7   relationship.

8   Q.    I don't think they'll be together 18 years, John.

9   A.    I know, but just a year.  Just out of 365 days a year, if

10  being in that one vicinity around the same people, eventually

11  y'all are going to start talking, even though it, you might not

12  understand what they are being accused of, here I am, I know I

13  was innocent, so I wasn't going to try to place blame and say,

14  Oh, yeah, you're guilty, oh, yeah, you're guilty.  That wasn't my

15  job.  I couldn't do that because if I was to do that to them,

16  they should have had that same opportunity to do it to me.

17  Q.    Who were you friendly without there?

18  A.    I had a lot.

19  Q.    We saw Mr. Connick was testifying about the Shareef Cousin

20  case?

21  A.    Shareef was like, basically just like my son.  When Shareef

22  came to death row, he was 17.  He had just turned 17.  He was the

23  youngest man placed on death row, and they placed him right next

24  to me.  Right next door to me.

25            And it just so happened that Shareef and my oldest son

1   was friends off the streets.  So once we developed that, and we,

2   I understood that he was with my son, I mean, you know, I just

3   opened up and took him on as my son and tried to, you know, do

4   whatever I can for him and help him adjust to --

5   Q.   What happened to Shareef?

6   A.   His case was overturned.

7         THE COURT:  Mr. Banks, Counsel, approach the bench for a

8   second.

9         (WHEREUPON, there was a bench conference.)

10        THE COURT:  There haven't been any objections and I've

11  let it go on, but I think you need to focus this and we've got to

12  break for lunch.  You have to finish this examination before we

13  break for lunch.

14        MR. BANKS:  What time do you plan to break, Your Honor?

15        THE COURT:  Well, 12:30 at the latest.

16        MR. BANKS:  I'll certainly be done by then.

17        THE COURT:  You need to focus this.  Your witness tends

18  to ramble a lot.  I know he has a lot he wants to say and I'm not

19  trying to cut him off on things that he thinks are important.  A

20  lot of it is getting repetitive.  I don't know why we need to

21  hear what happened to Shareef Cousins, for example.

22        MR. BANKS:  I'll move on, Your Honor.

23        THE COURT:  You just need to focus it.

24        MR. BANKS:  I'll do that, Your Honor.

25        (WHEREUPON, the bench conference was concluded.)

1                          EXAMINATION

2    BY MR. BANKS:

3    Q.    John, did you get visitors in Angola?

4    A.    Yes.

5    Q.    How often?

6    A.    In a year?

7    Q.    I'm sorry?

8    A.    I was just really trying to average it out.  You know, I was

9    good for a visit from my mother, my mother was on a fixed income

10   so she could only, you know, visit me at times.  And when she

11   would come, she would try to bring my son.  So between my mother

12   and my sons, I might have seen them once every three months or

13   four months, so I might have got a chance to see them maybe three

14   or four times a year.

15   Q.    Did you get to touch them or hug them?

16   A.    After 1995, yes.

17   Q.    How about between 1987 and 1995, did you have any physical

18   contact with your sons or your mother?

19   A.    No, sir.

20   Q.    Why not?

21   A.    We wasn't allowed contact visits at that time.

22   Q.    Did you talk to your sons when they were up there and what

23   was that like?

24   A.    It was easy at the beginning, because they were still young

25   and they was basically just glad to see me.  But as they went to

1   getting older and understanding a little more and then the
2   questions really started setting in to them as to if I'm coming
3   home or if I'm going to be executed like the guy they seen on TV,
4   things of that nature.
5   Q.   What did you say to them?
6   A.   I told them I couldn't, first, it was kind of hard to try to
7   establish what the death penalty and when they changed it to the
8   lethal injection, that's what caught my son's attention at that
9   point because it was a big old thing and he must have seen it on
10  the news or at school or whatever.  And then he realized what
11  really, what I was sentenced to.  I think that's when the reality
12  really started hitting on him.
13  Q.   Were you able to be the kind of father that you wanted to be
14  for him when you were in jail?
15  A.   No.
16  Q.   Why not?
17  A.   Because I was away from him.  I wasn't able to participate
18  in the things a father and son is supposed to participate in.
19  Q.   I want to move ahead a little bit to 1999.  Do you remember
20  when we, the blood evidence was discovered in the carjacking
21  case, right?
22  A.   Yes.
23  Q.   Before the blood evidence was discovered, your appeals had
24  run out, right?
25  A.   Yes.

1  Q.    There was a final death warrant signed for you?

2  A.    Yes.

3            MR. BANKS:  Would you put that up on the screen.  That

4  would be Exhibit 91.

5            Can you make that a little clearer.

6                        EXAMINATION

7  BY MR. BANKS:

8  Q.    It's a warrant for execution of person condemned, signed by

9  the Judge Patrick Quinlan in your case, right?

10  A.    Yes, sir.

11  Q.    And it's signed, if you look in the lower right, April 19,

12  1999?

13  A.    Yes, sir.

14  Q.    And it says you were going to be executed on May 20th of

15  1999?

16  A.    Yes, sir.

17  Q.    How did you find out about that final death warrant,

18  Mr. Thompson?

19  A.    Through y'all.  Through my attorneys.

20  Q.    Mr. Cooney and me?

21  A.    Yes, sir.

22  Q.    We came to jail?

23  A.    Yes, sir.

24  Q.    I want to focus on that discussion a little bit.  What do

25  you remember saying to us when we came to visit you in jail to

1  tell you that a final death warrant had been signed and that your

2  appeals had run out?

3  A.   The first thing I recall is asking y'all what the date of

4  the warrant and when y'all told me --

5  Q.   Keep your voice up, Mr. Thompson.

6  A.   Yes, sir.

7       The first thing I remember was asking y'all when the

8  date is for.  And when y'all told me when it was for, you know, I

9  just sit back and the only thing I could ask y'all was, Can you

10  get me a stay?  And I explained to y'all why.  Y'all told me no.

11 Q.   Why were you looking to change the date from May 20th, the

12 scheduled date, to some other date?

13 A.   Because my youngest son was getting ready to graduate from

14 high school the next day.

15 Q.   When?

16 A.   The day after my execution.

17 Q.   May 21st?

18 A.   May 21st, yes.

19 Q.   What did that mean to you?

20 A.   That mean I didn't want to take a happy moment in my son's

21 life and give him something to remember the rest of his life,

22 that his father was executed the day before he graduated, the day

23 before it was supposed to be his happy day in his life.

24 Q.   Was there any prospect or chance of moving the day because

25 your son was going to be graduating the next day?

1  A.    No.

2  Q.    Is there anything you asked us to do when we came to jail to

3  tell you about this final death warrant?  Anything you asked

4  Mr. Cooney and me to do?

5  A.    Yeah.  Well, when y'all told me, when we went through the

6  process of it's totally impossible, that, you know, they would

7  understand or try to worry about whether your son graduating, and

8  when you went to the point of saying this is it, the only thing I

9  could think about is what it's going to do to them.

10          And over the years, I know I came to respect y'all, and

11  I know y'all were fully aware of my sons, so the only thing I was

12  really worrying about, somebody being there for them.  I wanted,

13  I know I remember asking y'all, could y'all go to his graduation?

14  I remember I was with the thought of, I know John was a smart

15  little boy so I wanted, I was hoping that I could convince one of

16  y'all to help him to go through college or get him into college.

17  I just asked y'all to be there for him for me.  I know that had

18  meant a lot to him and it sure would have meant a lot to me.

19  Q.    Did you ask us to be at your execution?

20  A.    Yes.

21  Q.    We found out about the blood evidence shortly after that,

22  right?

23  A.    Yes.

24  Q.    And the execution was set aside; there was a stay?

25  A.    Yes.

1  Q.   Now, for a while, the death sentence was lifted but you were

2  still in jail, right?

3  A.   Yes.

4  Q.   You were still, had a murder conviction but no death

5  sentence?

6  A.   Yes.

7  Q.   Now you had the prospect of spending the rest of your life,

8  you were what, 37 years old?

9  A.   I was 37.

10  Q.   So another 30 or 40 or 50 years in jail rather than being

11  executed, right?

12  A.   Yes.

13  Q.   Was that a good thing?  Was that a positive development,

14  Mr. Thompson?

15  A.   No, that was a bad thing to me.

16  Q.   Why?  What do you mean?

17  A.   A lot of people have it, I could not see myself spending the

18  rest of my life in jail.  Under that environment, under the

19  circumstances, I couldn't see myself spending the rest of my life

20  in jail.

21  Q.   Given a choice between execution by lethal injection at that

22  time, and the rest of your life in jail?

23  A.   It could have been by electrocution.  My choice was, you

24  know, I rather get this over with.  It's kind of hard to, you

25  know, prison life is just not, it's just not me.  It's just not

1  something I could have seen myself living with or accepting.  And

2  I know I probably couldn't deal with it.  So I would have

3  welcomed the opportunity, you know, to continue with the death

4  penalty other than to take a life sentence.

5  Q.   You spent four more years in jail after that until you got a

6  new trial in the murder case?

7  A.   Yes.

8  Q.   Where did you spend those four years?

9  A.   Back in Parish Prison.

10  Q.   After the death sentence was lifted, they moved you back to

11  OPP?

12  A.   Yes.  I believe they brought me back to take some blood and

13  then I stayed.

14  Q.   Were you back in B-1?

15  A.   Back then, everything had changed around.  You know, they

16  was running, you know, just like a whole 10 years later, 15 years

17  later, they are running it a whole different way now.

18        No, it wasn't, I wound up back on B-1, but not right

19  away.  As a matter of fact, I went to the, it was weird, because

20  I went to the first tier that I was on when I first was arrested.

21  Q.   Four years later, you did get your new trial?

22  A.   Yes, sir.

23  Q.   And you were acquitted?

24  A.   Yes, sir.

25  Q.   You walked out of jail a free man and you're innocent?

1  A.    Yes, sir.

2  Q.    Who was there when you got out of jail, John?

3  A.    My two sons, my mother, my sister, all my friends.

4  Q.    When they let you out of jail after 18 years with your two

5  convictions behind you and you now an innocent man, did they give

6  you any money?

7  A.    No.

8  Q.    Did they give you some clothes to change into when the

9  clothes you were wearing that day got dirty?

10  A.    No.

11  Q.    Did they give you a place to stay?

12  A.    No.

13  Q.    Did you have anything?  Did you have a bank account?

14  A.    No.

15  Q.    Driver's license?

16  A.    No.  Didn't have nothing.

17  Q.    Toothbrush?

18  A.    No.

19  Q.    You had your sons though, didn't you?

20  A.    Yes, I had my sons.

21  Q.    Did they want to spend time with you after you got out of

22  jail?

23  A.    Couldn't get rid of them.

24  Q.    How much were they around you?

25  A.    For that first two weeks, we stayed in the hotel room.  I

1  mean, the youngest one actually slept in the same bed with me.

2  And it was weird, you know, it was that connection.  It was just

3  that bond we have.  He didn't want to go.  He was supposed to be

4  back in Kansas.

5  Q.   Is that "Tiger"?

6  A.   Yeah, John Jr.  He was in the military at the time.  And he

7  came down.  And he was supposed to go back.  He asked them for

8  permission just to come for my trial.  He didn't want to leave

9  and go back.  Because it was like, you know, our dreams.  But it

10  had a chance to manifest.

11  Q.   Did "Tiger" leave your side for the next two weeks?

12  A.   I couldn't go nowhere without him.  Even when I went to

13  work.

14  Q.   You're not complaining now that you got to spend two weeks

15  with "Tiger" by yourself?

16  A.   No, indeed.  I'm waiting for the next two weeks now.

17  Q.   You got out of jail on a Friday.

18  A.   Yes, sir.

19  Q.   Was there anything special about the next Sunday, the Sunday

20  two days later?

21  A.   Mother's Day.

22  Q.   Mother's Day 2003, who did you spend it with?

23  A.   My mother.

24  Q.   The first Mother's Day with her since 1984, right?

25  A.   Since 1984, yes.  That was like a blessing to her.  I come

1  home on a Mother's Day to be with her.  That was really, really

2  remarkable.

3  Q.   Where did you go with her that morning?

4  A.   She was kind of, I didn't go nowhere with her, really, that

5  morning.  She was kind of upset because while I was in jail,

6  another one of my good friends came along.  James.

7  Q.   James Watts.  Did he visit you in jail?

8  A.   Yeah, in Angola and in the parish.  But in the parish, by

9  the time I made it back to the parish, it was that steady

10 conversation I had on the phone.  I could call and talk to him,

11 and he was, you know, his thing is God.  He's totally dedicated

12 to God, so his thing was, you know, trying to get me spiritually

13 ready.

14 Q.   He was your best friend from when you were about 14 years

15 old, right?  Or younger than that?

16 A.   He was my best friend since I was a baby.

17 Q.   What does he do?

18 A.   He's a minister.  He's a pastor.

19 Q.   Did he get you back into church?

20 A.   He didn't get me back in church.  I was already into church,

21 but I wasn't, I was like, really, still fighting it because I

22 was, like, how can God let this happen to me.  It was kind of

23 like, you know, he was bringing me through the turmoil of telling

24 me why.  It doesn't matter.  We go through experiences.  Life is

25 an experience.  And you know, he really pushed, pushed, pushed it

1   down my throat and really it was totally not what I wanted to

2   hear coming from him.  A childhood friend that we had our first

3   little girlfriends together and we did all of this together and

4   he come up here telling me all of this --

5         MR. GOINS:  Your Honor, at this point I'm going to

6   object to the responsiveness of his answer.  A lot of his answers

7   tend to ramble and they are not responsive.

8         THE COURT:  Yes, they do a little bit.  Try to confine

9   your answers to your lawyer's questions.

10                         EXAMINATION

11  BY MR. BANKS:

12  Q.   Did you start going to church after you got out of jail?

13  A.   Yes.

14  Q.   How often do you go?

15  A.   Twice a week.

16  Q.   Since you got out?

17  A.   Yes.

18  Q.   Now, I understand that one of the, the church you went to

19  after you got out, there was a woman named Laverne who was at

20  that church?

21  A.   Yes, my wife.

22  Q.   You met Laverne through church?

23  A.   Yes.

24  Q.   And you got married when?

25  A.   44 days after I was home.

1  Q.   44 days.  So that's July of 2003?

2  A.   July 20th.

3  Q.   Married ever since?

4  A.   Ever since.

5  Q.   Happily?

6  A.   Happily.

7  Q.   You got out of jail on a Friday?  When did you go to work?

8  A.   That Monday morning.

9  Q.   The next Monday?

10  A.   Yes.

11  Q.   Where?

12  A.   The Center for Equal Justice.

13  Q.   What's the Center for Equal Justice?

14  A.   It's an attorney that represent clients on death row.

15  Q.   So you went to work helping a lawyer who was representing

16  other people on death row?

17  A.   Yes.

18  Q.   That was Nick Trenticosta?

19  A.   Yes.

20  Q.   You knew him from when you were in jail, right?

21  A.   Yes.

22  Q.   He used to visit you?

23  A.   Yes.

24  Q.   And then he hired you?

25  A.   Yes.

1  Q.    What did you do for Mr. Trenticosta in the Center for Equal
2  Justice?
3  A.    Paralegal, investigation.
4  Q.    How long did you work there?
5  A.    Close to two years, if not two.
6  Q.    Why did you stop?
7  A.    It just got, it just got a little too overbearing for me.
8  On a constant basis, people called from death row, called his
9  office because he represent a lot of them on death row to who all
10 I knew.  I just couldn't handle it.  I just couldn't handle the
11 fact that there really wasn't nothing I could do for them as much
12 as I wanted to do.
13 Q.    Where did you go to work next?
14 A.    At the church.
15 Q.    By the way, at Center for Equal Justice, were there any
16 money problems?
17 A.    Yeah, yes.
18 Q.    It was nonprofit?
19 A.    Yes, the Center for Equal Justice is a nonprofit
20 organization.  They live off of grants and --
21 Q.    They had some trouble paying you?
22 A.    Well, yes.
23 Q.    Is that one of the reasons you left, too?
24 A.    Yeah, because I thought it was really a burden on my wife.
25 My wife was basically taking care of us from the moment me and

1  her got together.

2          Working with Nick, I was maybe getting a thousand

3  dollars a month.  And I just felt that when the job opportunity

4  came open with my wife and they, I was able to help, you know,

5  bring us up to another level, with better pay, it was steady pay,

6  so.

7  Q.   What was your next job?  It was at the church?

8  A.   At the church, yes, in the maintenance department.

9  Q.   How long did you work for the church?

10  A.   A good year.

11  Q.   Did you get promoted?

12  A.   I got promoted to supervisor, yes.

13  Q.   Did Katrina hit in the middle of that?

14  A.   Yes.

15  Q.   Where did you go?

16  A.   To Alexandria, Louisiana, the only place I knew, really.

17  Q.   How long were you in Alexandria?

18  A.   Maybe a month, two.

19  Q.   What did you do while you were there?

20  A.   Found me a job.

21  Q.   You've had a job since you got out of jail, right?

22  Different jobs, but you've been working the whole time?

23  A.   Yes, sir.

24  Q.   What did you do in Alexandria?

25  A.   Me and my wife went to the unemployment office, and we was

1   filing for unemployment and unemployment say, Well, look here, we

2   have jobs available to people that want to get jobs and working

3   and paying y'all whatever y'all was making on the job, you know,

4   that was before y'all left.  So me and my wife took a job in the

5   library instead of, you know, unemployment.

6   Q.    You worked in the library while you were in Alexandria?

7   A.    Yes, inventorying the books.

8   Q.    You came back here in December, January, something like

9   that?  After the storm?

10   A.    No, I came back here in, like, October, November, somewhere

11   up in that area.

12   Q.    Did you back to work in the church?

13   A.    I went back to work in the church, yes.

14   Q.    Where were you living?

15   A.    Hotels.

16   Q.    I'm sorry, when you came back?

17   A.    In hotels.

18   Q.    Until your house was ready?

19   A.    Until our house was ready, yeah.

20   Q.    You heard Mr. Aaron ask Nancy Wohl about a house you got.

21   How did you get a house?

22   A.    It was just, I know, to me, I feel blessed in a sense

23   because when I worked for Nick Trenticosta at the Center for

24   Equal Justice, Habitat just happened to be in that same

25   particular building.  And when all them heard about my story,

1  they asked me, they heard me and my wife was getting married, he

2  asked, you know, told me, Come fill out an application for the

3  house.  And I filled out the application, me and my wife, and we

4  was blessed.

5  Q.   What did you do after the church, John?

6  A.   Well, after the church, you know, me and my wife had always

7  wanted to have our own business.  So, you know, we was really

8  trying to find the ideal type of situation that we would venture

9  off in together.  And, you know, we found a little sandwich shop

10  inside a hotel.  And we thought that was, this was it.  You know.

11  Q.   Gave you a chance to work together?

12  A.   Gave us a chance to work together.

13  Q.   How did that go?

14  A.   It was an experience.

15  Q.   Why?  What do you mean?

16  A.   I guess the first year of a business, and we was being new

17  to it, we just, I don't, you know, things was going good at first

18  because they had by us being inside a hotel, they had FEMA people

19  that was coming back, so the hotel stayed crowded.  And so we did

20  good.  But once FEMA decided to stop paying for the people's

21  hotel rooms, everybody left out the hotel.

22          And then, we was going through that process of trying

23  to understand how to market our shop because now we're not

24  dealing with somebody that's just sitting in one place.  Now

25  we're dealing with only people that might be passing, going to

1  lunch because it was inside the CBD district so we had to try to

2  learn how to operate and try to, you know, try to learn how to

3  bring some of that customers in.  And before we could really get,

4  you know, adopted to what was going on, the guy who owned the

5  hotel decided he wanted to sell the hotel.  And so now, you know,

6  we had to, he didn't want to renew our lease.  He --

7  Q.    So the coffee shop is closed?

8  A.    So now the coffee shop is closed.

9  Q.    What are you doing now?

10  A.    Well, all the while, while, you know, especially right after

11  the hurricane, before the hurricane, we had, you know, it's a,

12  you know, I know y'all hearing my case now, but it's a whole lot

13  of reasons out there.  But most of them wasn't as fortunate as I

14  was.

15        So we go to meetings, we have these meetings where we

16  get together and we try to talk and we try to help each other

17  out.  And I realized that what was being done, I could do a lot

18  better for them.  I could network a lot better than what was

19  being done, and I thought we could put a program together that

20  would help people be more accountable for their actions and give

21  them that transition period that they need in life.

22        That was one of the most important things that happened

23  to me when I come home.  I had Nick Trenticosta at the Center for

24  Equal Justice give me a job.  And that was a big difference.  And

25  my wife.  I had a job and I had a better environment, a clean

1   environment.

2            And that's what I think everybody that's coming home

3   from jail need that same opportunity, need that same type of

4   chemistry to which they are not going, which they is not getting

5   out there right now.

6   Q.   What is the name of your organization?

7   A.   It's Resurrection After Exoneration.  I'm trying to tell

8   them it's life after death.  You know, even though you was placed

9   in a position where you thought you was going to die at, when you

10  come home again, you can't allow yourself to fall victim, so this

11  is a life.  It is a lot of things out there that we can do if we

12  give an opportunity.

13  Q.   Are you trying to get funding for this?

14  A.   I'm trying to get funding for it.  I have some support, but

15  it's really in the early stages.  I really just started

16  developing it but I'm doing pretty good.

17  Q.   Are you committed to this, John?

18  A.   All the way.

19  Q.   Helping other people?

20  A.   Yes.  Yes.

21            MR. BANKS:  I don't have anything further, Mr. Thompson.

22  Thank you.

23            THE COURT:  All right.  Why don't we recess for lunch

24  now, rather than let you, you're going to be a while, I assume?

25  Right?

1          MR. GOINS:  I don't think I'm going to take that long,

2     Your Honor.

3          THE COURT:  Okay.  Let's go for it.  Are you-all okay

4     for lunch?  Let's go a few more minutes before we start our lunch

5     recess.  Okay.

6          Go ahead, Mr. Goins.

7                         CROSS-EXAMINATION

8     BY MR. GOINS:

9     Q.   Good evening, Mr. Thompson.

10    A.   Good evening.

11    Q.   When you were being questioned about your incarcerations,

12    did you leave out any incarcerations?

13    A.   What do you mean, leave out?

14    Q.   Were you ever incarcerated for 30 days for possession of an

15    illegal weapon?

16    A.   Yes, I was.  I don't think the question was asked.

17    Q.   Was that the only time that you were ever arrested for

18    possession of a weapon?

19    A.   I would think so, yes, sir.  When you're speaking of in

20    terms of from adult age to when I was arrested at 22?

21    Q.   Was there ever a point in time where you were arrested for

22    possession of a sawed-off shotgun?

23    A.   Yes, sir.

24    Q.   And was there ever a time that you were arrested for

25    possession of marijuana?

1  A.    Yes, sir.

2  Q.    And did you spend any time in Parish Prison for possession

3  of marijuana?

4  A.    Yes, sir.

5  Q.    Did you plead guilty and spend three months in Parish

6  Prison?

7  A.    Yes, sir.

8  Q.    So in addition to the time that you spent in tent city, you

9  also spent a number of months in Parish Prison for marijuana and

10 for possession of a weapon?

11 A.    Yes, sir.

12 Q.    Did you also sell, buy and sell weapons?

13 A.    Yes, sir.

14 Q.    And how often did you buy and sell weapons?

15 A.    It was probably on a, at a moment thing.  If someone come

16 around and if I thought I could buy it and sell it for a higher

17 price, I would do it.  At that time I was young.

18 Q.    And so it was a regular thing that you did, buying and

19 selling weapons?

20 A.    Not, no.  You act like it was a, like I was running a

21 firearm exchange.  No, it wasn't like that.  It happened, you

22 know, a few times, I believe, maybe two or three times at the

23 most.

24 Q.    You were asked with regard to the individuals that sold

25 drugs for you.  Isn't it true that a host of individuals sold

1   drugs for you in addition to Kevin Freeman and Perkins?

2   A.   I don't know about a host.  What do you mean by that?  A

3   host?  I mean, I'm trying to understand what you're saying.  A

4   host could be a lot of things.

5   Q.   Were there more people than Kevin Freeman and Perkins that

6   sold drugs for you?

7   A.   You know, if, if, if, if, if I had, if I had some drugs and

8   one of my friends would come by and say, I need to make some

9   money, it wasn't like I had a lot of friends that I was doing

10  that with.  They might have had one or two other people that I

11  would do that with.  I don't know.

12  Q.   One or two other people.  But there were more that, it was

13  more than just Kevin Freeman and Perkins?

14  A.   I don't know, it's kind of hard to say yeah.  But at one

15  time, I ain't had that much drugs to give out.  What are you

16  speaking in terms of maybe this time it's Kevin and maybe next

17  time it's somebody else.  If I knowed them, Yeah.  Yes, sir.

18  Q.   Going back to your youth, you said that you were rebellious.

19  Didn't you have problems in your high school as well with regard

20  to rebellion?

21  A.   When I said rebellion, I was speaking in terms of being

22  taken from my mother, from my grandmother to my mother.  I was

23  six.  That's just a word I used to describe it.  I was six or

24  seven and I know I was mad.  What kind of rebellion are you

25  speaking of in terms of school?

1  Q.    Did you have problems in terms of missing school and being

2  disciplined in your school?

3  A.    What school?  Junior high?

4  Q.    Junior high school.

5  A.    All right.  Yeah.  I guess, I guess I was going through that

6  transitional period as a youngster.

7  Q.    And did there come a time when your uncle disciplined you?

8  A.    Yeah, when my mother had a stroke, my, the only man figure

9  was my uncle, and he would try to come and keep me in line, yes.

10 Q.    And when he disciplined you, what did he hit you with?

11 A.    My uncle disciplined me one time, I think, when we had the

12 deposition, I think you might have taken this out of proportion.

13 Yes, one time I was supposed to be home.  I wasn't home.  My

14 youngest, my oldest son was born and I snuck around by my girl

15 house, and he come home and I wasn't home.  He would come around,

16 and yes, he would beat me.  He beat me with a stick.

17 Q.    So you were beaten by your stepfather and you were beaten by

18 your uncle; is that right?

19 A.    These are years apart, but yes, that's right.

20 Q.    And you were also beaten by your mother, were you not?

21 A.    Yes, I was.

22 Q.    And these were all traumatic experiences for you, weren't

23 they?

24 A.    I know everybody I seen in my neighborhood catch whuppings

25 so, you know, I just thought it was a part of what parents

1  supposed to do.  I don't know.  If that's what you want to call

2  it, traumatic.

3  Q.   And it was traumatic to be passed back and forth between

4  your mother and your grandmother, wasn't it?

5  A.   It was disappointing, yes, I would say it was disappointing,

6  it was to me because I loved my grandmother and I thought I

7  should have stayed with her.

8  Q.   You were also shot at one point in time, were you not?

9  A.   Yes, sir.

10  Q.   And you were shot with a shot gun; is that correct?

11  A.   Yes, sir.

12  Q.   And do you know why it was that you were shot?

13  A.   Not really, no, sir.

14  Q.   Were you shot in the neighborhood where drugs were being

15  sold?

16  A.   I was shot 20 feet or 25 feet from my house, yes.  The

17  neighborhood, all around my neighborhood was drug infested, yeah.

18  Q.   Now, when you went to prison, did you ever seek out the help

19  of any physicians?

20  A.   We didn't have to seek them out.  They come to us.

21  Q.   You had pretty regular medical care, did you not?

22  A.   It depend on, they have rules and regulations.  They have a

23  call-out sheet you could fill out and when they examined it, if

24  they think it's serious enough they would call you in, you know,

25  that you come to the doctor.

1          Most of the time, yeah, I would say yeah, you have a
2    call-out sheet you fill, but most of the time you get to the
3    doctor, you'll be all right.  You'll be healed up if you had the
4    flu or cold.
5    Q.   Whenever you needed a dentist, you were able to go to the
6    dentist; isn't that correct?
7    A.   True.  In Angola.
8    Q.   And you didn't experience that at all before you went to
9    prison?
10   A.   What do you mean, going to the doctor?
11   Q.   You didn't see doctors or dentists before you went to
12   prison?
13   A.   Why I didn't?
14   Q.   Excuse me.
15   A.   Why I didn't?  You just said I was shot.  You're saying did
16   I see doctors or anybody before I went to prison?  So I'm trying
17   to understand what it is you're saying.  Yes, I did.  I went to
18   prison, and when I was shot, I went to the doctor.  I went to the
19   dentist when I was young.  I went to doctors as a kid getting
20   shots.  I'm trying to understand what it is you're saying, sir.
21   Q.   Okay.  Now, did you ever talk to any type of mental help
22   therapist while you were in jail?
23   A.   Yes.
24   Q.   And how often did you talk to a therapist?
25   A.   In our jail at Angola, they have some type of rule where

1  they have to come by every so many days.  I think it's every

2  90 days or something like that just to give you these routine

3  questions:  Do you feel like you're going to kill yourself,

4  things of that nature.  So I would guess that consists of me

5  talking to them, yes.

6  Q.   And so you had to see a psychiatrist pursuant to the rules

7  of the prison; is that right?

8  A.   Well, I would guess, I would say that the psychiatrist came

9  around to everybody's cell and asked a question.  I'm assuming it

10  must have been routine because it happened regularly.  So to that

11  extent, yes, sir.

12  Q.   Did you ever seek out psychiatric help?

13  A.   Once, I believe.  As a matter of fact, it was during the

14  time of my last execution date.  I was, like, I was really kind

15  of getting to the point where I was losing it because after my

16  lawyers had done came in and talked to me, you know, I just, I

17  don't know, my body was going through something, and somebody

18  told me it was stress.  And I don't know, the paramedics had came

19  to give me a check.  They said I had an irregular heartbeat.

20       And the next thing I know, I went to see the

21  psychiatrist and she just said, You're too stressed out.  Here,

22  take this little pill.  She gave me this little pill and that was

23  it.  It kind of like calmed me down and stressed me out and I was

24  straight.  I never seen him after that or before that.

25  Q.   And after leaving prison, you haven't sought out any type of

1  psychiatric care, have you?

2  A.    No, sir.

3  Q.    Have you sought out physicians for any type of help after

4  leaving prison?

5  A.    I went to, I just seen the doctor the other day.  His wife

6  got killed.  I went to this doctor, a Dr. Leonard (phonetic),

7  just to try to get some, my high blood pressure medicine.  My

8  pressure, I got this messed up pressure with my family.  My

9  mother have it, so every now and then my pressure will get high

10 and it started getting kind of bad and I started getting a little

11 scared of it and I went on the strength of my wife and them, I

12 went to see the doctor.  He give me a prescription of pills for

13 my pressure.

14 Q.    Have you seen anyone with regard to adjustment after prison?

15 A.    What do you mean adjustment after prison?  You mean life

16 after prison?

17 Q.    Life after prison.

18 A.    Exoneration.  Yes, they have a program to which we just

19 really convert the program that I was speaking in terms of

20 Resurrection After Exoneration.  There was a program before that;

21 it's called Inside Out.

22        Yes, I went through Inside Out.  I told you, we get

23 together, we all talk about it.  We try to work through the

24 stress and the problems, and we try and see how we can make a

25 better way for each other.

1   Q.   And you have adjusted after leaving prison, have you not?

2   A.   Yes.

3   Q.   Now, this foundation that you run, where do you get the

4   funds for the foundation?

5   A.   We don't have no funds right now.

6   Q.   Have you signed a movie deal at this point in time?

7   A.   Yes, I did.

8   Q.   And are you using those funds for the foundation?

9   A.   No, sir.

10  Q.   Well, what are you using the funds that you got from your

11  movie deal for?

12  A.   My house.  My house was a little damaged.  I started a

13  business.  Most of it went into the business trying to be a

14  first-time business owner.  I didn't understand the fullness.  I

15  just told you about the people was in the hotel, so they had a

16  dry period.  A hotel is a seasonal thing.  I ain't understood

17  that.  Nobody done tell me that when I got into it.  So we wound

18  up pumping just about all of the money we received from the movie

19  deal into trying to make this business survive, so we lost mostly

20  all of the money I did receive in this business.

21  Q.   What is the movie supposed to be about?

22  A.   It's supposed to be about my life story and what happened.

23  Q.   Your life story, going to jail; is that right?

24  A.   I would assume.  I never seen a script yet, so I can't

25  answer.

1  Q.   So if you hadn't gone to jail, you wouldn't have had that

2  movie deal, would you?

3  A.   True.

4  Q.   Now, when you were in prison, you took advantage of every

5  type of religious service that there was; did you not?

6  A.   Yes.

7  Q.   And before you went to prison, you were not attending

8  religious services?

9  A.   Are you asking me was I?  Yes, I was attending service,

10 church.

11 Q.   And you were attending service on a regular basis before you

12 went to prison?

13 A.   No, not on a regular basis.  You asked me, you say you were

14 not.  I was.  It wasn't just like I am now.  Like I understand

15 what God have did for me in my life now, in my transition period.

16 Now I understand God more now, and I understand more what I'm

17 supposed to do.  Back then, I was 22 years old.

18 Q.   You were rehabilitated; is that correct?

19 A.   How could, how could, you know, that word, rehabilitation

20 from death row, how can I be rehabilitated on death row?  I don't

21 think death row had nothing to do with me being rehabilitated.

22 Q.   What about all the religious services that you went to when

23 you were in prison?

24 A.   I think it served a purpose.  I think most of the time, it

25 was a way out of the cell.  You're in the cell 23 hours a day.

1  If someone come up there and say, We're going to have a spiritual

2  revival and you're going to be out of your cell for three days

3  for eight hours, you're going to go after that.  It was a release

4  period.  It was a chance to feel like a part of something for a

5  minute.

6  Q.   At this point in time, most of your friends that you knew

7  before you went to prison are dead; isn't that correct?

8  A.   Yeah.  A few of my friends was dead; a few of my friends was

9  in jail, yes, sir.

10  Q.   And the ones that are not dead or in jail have alcohol or

11  substance abuse problems; is that correct?

12        MR. BANKS:  Your Honor, I object.

13        THE COURT:  Wait a minute.  Sustained.

14                     EXAMINATION

15  BY MR. GOINS:

16  Q.   You, however, are still alive; are you not, Mr. Thompson?

17  A.   Sir?

18  Q.   You are still alive?

19        THE COURT:  I don't think he needs to answer that

20  question.  I think the jury can observe that.

21        BY MR. GOINS:  I have no further questions.

22        THE COURT:  Okay.  Any redirect?

23        MR. BANKS:  Just a couple, Your Honor.

24                REDIRECT EXAMINATION

25  BY MR. BANKS:

1  Q.   Mr. Thompson, these things that Mr. Goins asked you about,

2  some arrests, some selling marijuana, two or three times that you

3  mentioned about a gun, they were all when you were in your teens

4  or maybe early 20s?

5  A.   Mostly all my early teens.  I think the gun, I think it was,

6  like, I was 17.  I had just turned 17.  The marijuana, you know,

7  it was just one police officer, every time he see me, he was just

8  hacking me up.  So I went, he brought me to jail maybe twice.

9  One time for littering, the next time he found a marijuana joint

10  in my pocket.

11  Q.   Since you were released from jail in 2003, have you had any

12  problems with the law?

13  A.   No, sir.

14  Q.   Mr. Goins asked you about a movie deal.  How much money have

15  you made from agreeing to have a movie made about your life?  You

16  personally?

17  A.   What do you mean?  How much money I stand to make?

18  Q.   How much money have you received as a result of agreeing to

19  have a movie made about it?

20  A.   I think it was 30, about $31,000, $32,000, somewhere in that

21  area.

22  Q.   Is that what you used to help start the coffee shop you

23  mentioned?

24  A.   Yeah.  To start the shop.  To keep the shop surviving, just

25  to, yeah, yes, sir.

1          MR. BANKS:  Thank you, Your Honor, I don't have anything
2     further of Mr. Thompson.
3          THE COURT:  Okay.  Step down, Mr. Thompson.  Thank you.
4          (WHEREUPON, the witness was excused.)
5          THE COURT:  All right.  Ladies and gentlemen, we're
6     going to recess for lunch now.  It's just about 12:30.  I would
7     ask you again to close your notebooks and leave them on your
8     chairs or under your chairs, and remember my admonition when
9     you're outside the courthouse not to discuss the case with
10    anyone, and let's resume back in an hour and fifteen minutes, so
11    that will put us at 1:45.
12         THE DEPUTY CLERK:  All rise.
13         (WHEREUPON, the jury panel leaves the courtroom.)
14         THE COURT:  Who is going to be your first witness when
15    we get back from lunch?
16         MR. BANKS:  Mr. Whittaker, I believe, Your Honor.
17         THE COURT:  You can tell him to just make sure he's back
18    here for 1:45.
19         MR. AARON:  I personally talked to him.  He was in here.
20         THE COURT:  What about Mr. Williams?  Has anybody seen
21    him?  Has he returned?
22         MR. AARON:  I haven't seen him yet, Judge.
23         THE COURT:  All right.  We'll see everybody at 1:45.
24         (WHEREUPON, at 12:30 p.m., the Court took a luncheon
25    recess.)

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                  TUESDAY, FEBRUARY 6, 2007

3                A F T E R N O O N   S E S S I O N

4                   (COURT CALLED TO ORDER)

5

6           (WHEREUPON, the proceedings resumed at 1:45 p.m. after

7    the luncheon recess.)

8           THE DEPUTY CLERK:  All rise.

9           (WHEREUPON, the jury panel enters the courtroom.)

10          THE COURT:  Please be seated.  Call your next witness.

11          MR. BANKS:  The plaintiff calls Bruce Whittaker.

12          THE DEPUTY CLERK:  Please raise your right hand.

13                    **BRUCE WHITTAKER,**

14   was called as a witness and, after being first duly sworn by the

15   Clerk, was examined and testified on his oath as follows:

16          THE DEPUTY CLERK:  Please be seated.  Please speak

17   directly into the microphone, state your name and spell it for

18   the record.

19          THE WITNESS:  My name is Bruce Whittaker,

20   W-H-I-T-T-A-K-E-R.

21                   DIRECT EXAMINATION

22   BY MR. BANKS:

23   Q.   Good afternoon, Mr. Whittaker.  I understand you're more

24   accustomed to being where I am.  You're a trial lawyer, sir?

25   A.   Yes, I am.

1  Q.    How long have you been a practicing attorney?

2  A.    Since 1980.  I was sworn in October 1980.

3  Q.    And you were also an assistant district attorney in

4  Mr. Connick's office?

5  A.    I was.

6  Q.    When did you start as a district attorney or an assistant

7  district attorney in the Orleans Parish District Attorney's

8  Office?

9  A.    It was around '82 to around '85.  Maybe about a three-year

10  period, kind of late '85 maybe, but it started, I think, in '82.

11  Q.    I'm just confused for a moment.  Those are the three years

12  that you were an assistant district attorney?

13  A.    Right.

14  Q.    So around '82 to '85?

15  A.    Through '85.

16  Q.    And now you've left the office?

17  A.    Correct.

18  Q.    When in '85 did you leave the office?

19  A.    I don't remember.

20  Q.    It was after Mr. Thompson was prosecuted?

21  A.    Yes.

22  Q.    Before 1982, did you have any experience in the field of

23  criminal law?

24  A.    I was an assistant DA for a year and a half in Monroe,

25  Louisiana, and I worked at the Louisiana Supreme Court central

1   staff, which basically dealt with criminal writs and appeals.

2   Q.   What positions did you hold in the Orleans Parish District

3   Attorney's Office?

4   A.   I was a, in magistrate court for a little while.  Then I was

5   a senior in a couple of sections.  Then I was a general screener.

6   Then I was an armed robbery screener.  Then I was a narcotics

7   screener.

8   Q.   That's a lot of screening.  What does a screener do?

9   A.   The police arrest somebody, write a police report, send it

10  to the District Attorney's Office.  The District Attorney's

11  Office looks at the report, and basically makes a judgment:  Is

12  there a case here against that person?  And then files a piece of

13  paper accordingly.  That's what screening is.

14  Q.   And that piece of paper is a Screening Action Form?

15  A.   You fill out a Screening Action Form in the process of

16  screening a case, that's correct.

17  Q.   So you get the materials from the police.  The police

18  reports, crime scene technician reports, other reports and

19  documents showing what happened in the crime?

20  A.   You get whatever they give you.  The way it happens is if

21  you're screening, all of a sudden it will show up a stack of

22  Screening Action Forms, stapled to a report or reports depending

23  on the case, depending on what they have.  And that's what you

24  work from.

25  Q.   And your job was to decide whether you thought a prosecution

1  was warranted?

2  A.   Correct.

3  Q.   And in addition to deciding whether the prosecution is

4  warranted, you might make some suggestions about things that the

5  DAs handling the case could do?

6  A.   Sometimes, yes.

7  Q.   What did you do with the Screening Action Form once you

8  finished filling it out?

9  A.   You passed it on to somebody.  I forget who.  I think

10  actually it was checked off on by the chief of screening, to see,

11  I guess, if the boxes had been filled out, if it made sense or

12  whatever.  I don't know what they looked for.

13        And then I think it went from them to a typist who

14  typed up a Bill of Information.  That's the actual piece of paper

15  that charges the person.

16  Q.   And did your Screening Action Form then go to the district

17  attorneys who would be handling and trying the case?

18  A.   Yeah, as I recall, it would be part of the DA's file on the

19  case.  That plus the reports that were attached to it.

20  Q.   In 1985, let's say the first half of '85 when you left,

21  whenever that was, when you were in screening, who was the chief

22  of screening?

23  A.   I'm not certain.  I think it was Dubelier for some part of

24  my screening experience.  I think he was chief of screening.

25  When that was, I don't know.

```
 1   Q.    Eric Dubelier?
 2   A.    Eric Dubelier, correct.
 3   Q.    When you did the screening in connection with the carjacking
 4   case brought against Mr. Thompson, am I right that Mr. Dubelier
 5   was the chief of screening?
 6   A.    I think that's right, yes.
 7   Q.    So you reported to him?
 8   A.    He was my supervisor, correct.
 9   Q.    Were you generally familiar with the way the office
10   operated?
11   A.    I think that's the right word.  Generally.  I was, yeah.
12   Q.    You knew who the big boss in the office was?
13   A.    Mr. Connick, yes.
14   Q.    He set policies for the office and rules?
15   A.    He was the boss, correct.
16   Q.    And you tried to follow the rules set by the boss?
17   A.    Correct.
18   Q.    As a matter of fact, in everything you did, you followed the
19   rules set by the boss to the best of your knowledge?
20   A.    I think that's true, yes.
21   Q.    You never had a case that you were handling where you said,
22   I don't care if these are Harry Connick's rules, I'm doing it my
23   way?
24   A.    No.
25   Q.    You tried your best to follow the rules?
```

1  A.    Yes.

2  Q.    The job of a prosecutor in Mr. Connick's was office was to

3  get convictions, right?

4  A.    Part of it, yeah, sure.

5  Q.    Did that mean not always disclosing everything the

6  prosecutor had to the defense?

7  A.    It depends on how you mean that.  Under the law, the defense

8  was entitled to certain things.  We were not to withhold anything

9  they were entitled to, if that's what you're driving at.

10 Q.    But there were some things that you didn't produce in the

11 ordinary course?

12 A.    That's correct.

13 Q.    Like police reports and witness statements?

14 A.    They didn't get much.  The state of the law was such that

15 the defense did not get much.

16 Q.    It was not just the state of the law.  That was the policy

17 set by Mr. Connick, right?

18 A.    We pretty much followed what the law required us to turn

19 over and not much more; that's true.

20 Q.    Mr. Connick -- there was no legal restriction.  Mr. Connick

21 could have said, Turn over police reports or turn over witness

22 statements, if he wanted?

23 A.    I think that's true.  I think that's true.

24 Q.    Let's talk about the Thompson case for a minute.  You knew

25 there was blood evidence in the Thompson case, right?

1  A.   Correct.  Yes.

2  Q.   How did you know that?

3  A.   I think there was some reference to it in the police reports

4  that I received.

5  Q.   I want to go back for a minute because there was something I

6  forgot to ask you.  I was talking about when you started in the

7  office and what you understood about the policies.  Did you get

8  any training when you started?

9  A.   Not that I recall.  It was on-the-job training, to my

10  recollection.

11  Q.   On-the-job meaning you learned how to do it as you were

12  doing it?

13  A.   Right.  I mean somebody might have showed me how to fill out

14  a Screening Action Form.  I don't recall, like, sitting down in a

15  class on how to do stuff like that.  I think we would have

16  meetings with more senior people, trial lawyers on how to deal

17  with evidence.  I recall that kind of stuff.  I don't recall

18  anything on a formal training basis.

19  Q.   So they didn't sit down and do a little seminar for you on

20  what *Brady* was and how to live with it?

21  A.   Not that I recall.

22  Q.   You would agree with me that under *Brady* there can be some

23  gray areas?

24  A.   Correct.

25  Q.   Sometimes it's not crystal clear whether a document or piece

1  of information has to be turned over to the defense or not?

2  A.   That's true.

3  Q.   And the cases interpreting *Brady* from courts like this Court

4  and appellate courts sometimes refine those rules?

5  A.   True.

6  Q.   It would have been helpful to have a little training,

7  wouldn't it, to kind of show you when you started what the *Brady*

8  rule was so you could deal especially with those gray areas?

9  A.   I think it would be a good thing, yes.

10  Q.   Because there wasn't training, young DAs like yourself were

11  trying cases on their own, right?  You would be out trying cases

12  right away sometimes?

13  A.   Depending on your level of experience.

14  Q.   And decisions on whether to produce *Brady* material, whether

15  material was *Brady* material and had to be produced, those kinds

16  of decisions would sometimes get made by inexperienced lawyers,

17  just a few weeks out of law school with no training?

18  A.   I imagine that's certainly possible, yes.

19  Q.   It was your practice also not to turn over supplemental

20  police reports and witness statements generally, right?

21  A.   I think so.  When I was in the trial section, I think that's

22  probably correct.

23  Q.   And you were following the policies established by

24  Mr. Connick on that, correct?

25  A.   Correct.

1  Q.   Now, I asked you, you were the screener on the Thompson
2  carjacking charge, right?
3  A.   Yes.
4  Q.   So you would have gotten files from the police department
5  about this carjacking charge that was being brought against
6  Mr. Thompson?
7  A.   It was actually an armed robbery, and file is just kind of
8  broad, but I received reports.
9  Q.   But everything in the police file was available to you if
10 you wanted to review it?
11 A.   I received, what I received I assumed was everything that
12 the police had on the case.
13 Q.   And if for any reason you thought you hadn't gotten the
14 whole file, you could always ask the police or take a walk over
15 there, right?
16 A.   Correct.
17 Q.   You worked cooperatively with the police?
18 A.   Yes, I think we did.
19 Q.   You never had a time when you asked the police to see
20 something and they would say no?
21 A.   Not that I recall.
22 Q.   I would like to show you a Screening Action Form from the
23 Thompson case.
24        MR. BANKS:  Mr. Vincent, can we put Exhibit 33 up there.
25                         EXAMINATION

BY MR. BANKS:

Q.   The jury has seen this before.

A.   Is it in this book, may I ask?

Q.   Actually it's in the book there so you'll have a copy, but it's pretty small.  Do you have it?

A.   No.  Which exhibit is it?

Q.   33.  There's a tab there.

A.   I'm sorry.

Q.   That's all right.

A.   I have it now.

Q.   Okay.  This is the Screening Action Form that you did.

A.   Correct.

Q.   In fact, if we look, oh, in the center a few lines down, there's a name there, Whittaker; that's you?

A.   That's me.

Q.   There's a date next to that, date screened, it looks like, 2/25/85?

A.   Correct.

Q.   That would be the date you filled out this report?

A.   Correct.

Q.   Now, we've heard in this case, you may not remember, but Mr. Thompson was arrested for the murder case on January 17th; does that sound about right?

A.   I don't remember that, but that, I have no reason to disagree with that.

1  Q.   So he had been in jail at that point for about a month and

2  eight days?

3  A.   On the murder charge you're saying?

4  Q.   Right.  And this Screening Action Form that you've prepared

5  would have been based on the evidence you saw from the police?

6  A.   Correct.

7  Q.   And you wrote here some information, you wrote that it was

8  an armed robbery, right?

9  A.   Correct.

10  Q.   And the victim was Stewart LaGarde.

11  A.   Correct.

12  Q.   Property stolen was a wallet?

13  A.   (Witness nods head affirmatively.)

14       Yes.

15  Q.   And a .357-magnum revolver was involved.  That means that's

16  what was recovered from the scene?

17  A.   Right.  Those are the elements, as I understood it, of an

18  armed robbery.  You had to name a victim, what was the subject of

19  the theft, and what was the dangerous weapon that was used.

20  Q.   Now, about three-quarters of the way down the page --

21  incidentally, it's your handwriting on the form, right?

22  A.   Correct.

23  Q.   You wrote, "Follows first in B, Eric Dubelier, special

24  prosecutor."

25       What does that mean, Mr. Whittaker?

1  A.   What that means is he had a first-degree case in section,

2  which had been allotted to section B.  Cases are allotted

3  randomly.  The first-degree murder went to B.  First-degree

4  murder is a first-class case, so any other case against that

5  defendant would follow the first-class case.

6          It would control, it would trump any other case.  If it

7  was a marijuana or burglary or armed robbery, any other case

8  would have gone to B, and that's what I was telling whoever was

9  going to get this case, because this was going to be allotted,

10 and it might have go to G, C, whatever.

11         This was telling the new assistant DA when this armed

12 robbery thing got allotted to your section and you got that file,

13 you opened it up and you saw it's not my problem, it's a B case,

14 let Dubelier handle it.  Next.

15 Q.   So this was going to be attached or tied in some way to the

16 murder case that Mr. Dubelier was already in charge of?

17 A.   It was going to be in the same section, and handled by the

18 same guy.

19 Q.   Did Mr. Dubelier ordinarily prosecute armed robbery cases at

20 that time?

21 A.   Ordinarily he prosecuted whatever he wanted to.  I don't

22 think he ordinarily prosecuted armed robberies, no.

23 Q.   But it says here, "special prosecutor."  What was a special

24 prosecutor?  Was that someone appointed specifically?

25 A.   Sort of.  The way things normally would go is, the case

1  would be allotted to your section.  Every case that got allotted

2  to your section was your case.  Pretty much.  Back then, as I

3  recall.  I don't know about capital cases but I think you handled

4  capital cases, too, first-degree murders.

5         But sometimes a case would come along and you wouldn't

6  get to handle it.  One of the supervisors, in this case, Dubelier

7  would say, I want to handle that case, so he had apparently said,

8  I'm going to handle the first-degree murder case.

9  Q.   So he was now in charge of both?

10  A.   Correct.  Correct.  Well, at least he was in charge --

11  right.  He was in charge of the first degree and in this case

12  followed it.

13         MR. BANKS:  Let's go to the bottom.  Maybe we can pull

14  up the bottom part.

15                         EXAMINATION

16  BY MR. BANKS:

17  Q.   "Gun same make and model as Liuzza weapon."

18         That means that the gun recovered was the same make and

19  model, right?

20  A.   I think that's what I meant.

21  Q.   That was the gun used to kill Mr. Liuzza?

22  A.   Ray Liuzza in the murder case.

23  Q.   That doesn't mean it was tested and yielded the same

24  results; it just means it was the same kind of gun?

25  A.   Correct, a .357 magnum.  I think it was a Smith and Wesson,

1   I think there was a special name for it, but it was a .357
2   magnum.  Right.  It had not been tested to determine that, no.
3   Q.   Now, underneath you wrote, "Victim made photo ID.  Will be
4   in town 3/11/85, if physical desired."
5        That means Stewart LaGarde was going to be in town?
6   A.   Correct.
7   Q.   There was some sort of hearing in the case that you were
8   expecting to take place, I guess, about two weeks after the
9   Screening Action Form?  Right?  Because the Screening Action Form
10  was February 25th?
11  A.   Right.  What happens is when I filled this out and passed it
12  on, I'm telling the assistant DA who is going to get it pretty
13  soon that LaGarde is going to be in town on 3/11, if they want to
14  do a physical lineup.  I don't know about a hearing but --
15  Q.   So Mr. LaGarde could then look at witnesses in a lineup and
16  pick out whether Mr. Thompson was someone he recognized?
17  A.   Right.  He had looked at a photo lineup, and I was saying if
18  you want to do a physical lineup, he was going to be in town
19  March 11th.  He went to school in Virginia at the time of that
20  screening.
21  Q.   You wrote, "May wish to do blood tests."
22  A.   Correct.
23  Q.   That's because you knew there was blood evidence, right?
24  A.   Correct.
25  Q.   And where you got that was probably from something like the

1  crime scene technician report?

2  A.   Right.

3  Q.   Let's go to that.  It's Exhibit 22.  Your copy is almost

4  impossibly small in that book in the print and it may be easier

5  to read on the screen.  Whatever works for you.

6  A.   I think I can probably make it out here.

7  Q.   This is a crime scene technician report, right?  If you look

8  at the top?

9  A.   It is hard to read.

10  Q.   Yeah.

11  A.   Item, I see and then I see something I can't quite make out,

12  but I'll follow your lead.

13          MR. BANKS:  And let's go to page 4, Mr. Vincent.

14                          EXAMINATION

15  BY MR. BANKS:

16  Q.   Now, I know, it isn't necessarily easier to read on the

17  screen, but I'm just going to read it to you and ask you if this

18  looks consistent with what you see.

19          "One tennis shoe, white, right shoe, make FootJoy, with

20  blood gathered from victim on scene."

21          Look about right?

22  A.   Hold on one second.

23  Q.   You're right it does say left.

24          THE COURT:  You have that exhibit?

25          THE WITNESS:  Yes, I do Judge, I'm having trouble

1    reading it on here.  Let me look on the screen.  One tennis shoe,

2    okay.  I see what you're talking about.

3    Q.   And then beneath that it says, "One piece of victim's right

4    pant leg with blood collected from victim on scene."

5    A.   Okay.

6    Q.   That would clue you in that there was blood evidence?

7    A.   I'm assuming that's what clued me in, yes.

8    Q.   It told you as a screener that the crime scene technician

9    took a piece from the victim's, from Stewart LaGarde's pant leg

10   and cut it off, brought it in?

11   A.   That's what it looks likes, yes.

12   Q.   You would expect that the crime screen technician was going

13   to the cut some pieces off of Stewart LaGarde's pant leg, that he

14   must have had at least some belief that that was the

15   perpetrator's blood?

16   A.   I'm assuming, yes.

17   Q.   Because there would be no need to cut up Stewart LaGarde's

18   pants unless --

19   A.   Certainly you want to find out one way or the other, yeah.

20   Q.   That's why you wrote, "May wish to do blood test."  You were

21   following up on the evidence?

22   A.   I would assume, yes, correct.

23   Q.   You actually talked to Stewart LaGarde when you did the

24   photo ID, right?  You sent him a photo ID in the mail?

25   A.   Yeah, we didn't talk much, as I recall, we didn't talk a lot

1  about the facts on the phone because we were doing it long

2  distance.  And so, you know, what I was talking to him about

3  wasn't recorded.  I wanted to do it by letter.  I think I told

4  him I was going to be sending him something.  I don't know if we

5  talked too much about the facts of the case I guess is what I'm

6  driving at.

7  Q.   But you would have been able to find out from him whether

8  there was any reason to believe whether that was his blood or the

9  perpetrator's blood?

10 A.   Oh, yeah, I certainly talked to him.  No question about it.

11 Q.   Sure.  And blood evidence, on the pant leg that may come

12 from the perpetrator, that's really important evidence in a case

13 like this, right?

14 A.   It could very well be, yes.

15 Q.   I mean, if it matched Mr. Thompson, that's good evidence?

16 A.   It could very well be very important evidence, yes.

17 Q.   But of course, if it didn't match Mr. Thompson, it might

18 prove that he was innocent?

19 A.   Correct.

20 Q.   It was an easy matter to get blood tested, wasn't it?

21 A.   I would think so.  I think the crime lab could do that quite

22 easily.

23 Q.   We now know the blood evidence in this case actually was

24 tested, right?

25 A.   Correct.

1           MR. BANKS:  Would you go to Exhibit 45.

2                        EXAMINATION

3   BY MR. BANKS:

4   Q.   This is another hard-to-read document, but, and we've seen

5   it before.  It's an April 9, 1985, crime lab report, and it's in

6   your book, sir.

7   A.   I've got it.

8   Q.   You've got it there?

9   A.   Yes.

10  Q.   And you can see it's addressed to "District Attorney's

11  Office, Attention:  ADA Bruce Whittaker."

12  A.   Correct.

13  Q.   So they tested this blood evidence that you had read about.

14  April 9, 1985, was two days before the trial?

15  A.   Okay.

16  Q.   Right?  We've stipulated in this case.

17  A.   I don't doubt, I have no reason to disagree with that.

18  Q.   So if you get something like this, a blood report that shows

19  that the blood was tested and you see down on the page, it was

20  tested to be type B blood on the pant leg?

21  A.   Correct.

22  Q.   That's something that's just two days before the trial.

23  You're not just going to drop that in the mail.  You're going to

24  want to make sure the DA who is trying the case has it.

25  A.   You're asking me?  Yes.  Correct.

1  Q.   I mean, you're not just going to leave it somewhere or put
2  it in the interoffice mail.  That's why, am I right, that what
3  you did is you took this report that was addressed to you and you
4  brought it to Mr. Williams' office, and you put it right on his
5  desk?
6  A.   That's my recollection, correct.
7  Q.   In the middle of the desk?
8  A.   That's my recollection.
9  Q.   Not under a bunch of stuff or with junk mail or --
10 A.   I could have put it in an in-box you but certainly didn't
11 put it under stuff.  My recollection is I put it right on his
12 desk.
13 Q.   He was a friend of yours, right?
14 A.   Correct.  A colleague.
15 Q.   He worked right near you?
16 A.   Correct.
17 Q.   So he could have asked you about it if he had any questions
18 about it?
19 A.   Correct.
20 Q.   Do you recall saying to him, Hey, Jim, did you get that
21 blood report or --
22 A.   I do not.
23 Q.   You just don't remember?
24 A.   I don't recall any conversation like that, no.
25 Q.   You just don't recall one way or the other?

1  A.    No.

2  Q.    But you can't deny that you might have talked to him about

3  it?

4  A.    No, it's quite possible, yes.  I don't know.  I don't

5  remember.

6  Q.    You actually testified in the carjacking case, right?

7  A.    About the photo lineup, right.

8  Q.    You appeared and he was there?

9  A.    Correct.  He prosecuted it.

10 Q.    And you don't recall whether at the trial of the carjacking

11 case, you and he had any discussions about this very important

12 blood evidence?

13 A.    I don't recall any conversation about it, no.

14 Q.    But you can't deny that you had a conversation.  You may

15 have forgotten?

16 A.    Anything is possible.  I do not recall a conversation about

17 the blood evidence with Williams.

18 Q.    You knew that Mr. Thompson was convicted of this, right?  Of

19 the carjacking?

20 A.    Correct.  Again, armed robbery.  I think it came back

21 attempted armed robbery, yes.

22 Q.    The screening form that you wrote, "May wish to do blood

23 test," that would have gone from you to Mr. Williams or

24 Mr. Dubelier or both?

25 A.    It should, it should have been in the armed robbery file

1    that they had in April when they tried the case.  I screened it

2    in February; it was tried a couple of months later.  They should

3    have had it.

4    Q.    Did you know Mr. Thompson's lawyer in the carjacking case,

5    Numa Bertel?

6    A.    I knew him, yes.

7    Q.    Did you work with him, I mean, against him from time to

8    time?

9    A.    I think a little bit, probably very little.

10   Q.    Did you do anything to bring to Mr. Bertel's attention that

11   there was blood evidence in the case?

12   A.    No, I was not involved in the case at that point.  Once I

13   filled out the Screening Action Form, it was not my case.

14   Q.    When you testified, though, at the carjacking or armed

15   robbery trial, Mr. Bertel cross-examined you?

16   A.    That's what the records show, correct.

17   Q.    There was no question of you by Mr. Williams about this

18   blood evidence or the blood report when you were on the stand,

19   was there?

20   A.    I believe I've reviewed that, and I think you're correct.

21   Q.    And you certainly didn't do anything on the stand to bring

22   it up?

23   A.    I answered whatever questions were asked of me.  No, I don't

24   recall that being an issue.

25   Q.    You knew that Mr. Thompson was convicted in the armed

1  robbery case, didn't you?

2  A.   Yes, I did.

3  Q.   And you knew they were going to use that in the murder case?

4  A.   I can't say I knew that, but they did.

5  Q.   That's what made it so important to get this blood evidence

6  on a timely basis, April 9th, carjacking trial starting

7  April 11th.  I mean, time was of the essence here, wasn't it?

8  A.   For what purpose, I don't know.  I know things moved along

9  quickly in this case.

10  Q.   You knew that the carjacking conviction was used against

11  Mr. Thompson in the murder trial?

12  A.   Correct.

13  Q.   Did you know that Mr. Williams put Marie LaGarde, the

14  16th-year-old victim of the armed robbery on the stand at the

15  penalty phase of the murder case?

16  A.   I did not know that.

17  Q.   You wouldn't be surprised to learn it, though?

18  A.   I take your word for it.  I didn't know that.

19  Q.   That's something a zealous prosecutor might do to help try

20  to get the death sentence?

21  A.   Yes.  Yes.

22          MR. BANKS:  Your Honor, may I have just one moment?

23          I don't have any further questions of Mr. Whittaker,

24  thank you; although, defense counsel may.

25          THE COURT:  Mr. Goins.

CROSS-EXAMINATION

BY MR. GOINS:

Q.    Mr. Whittaker, prior to joining the Orleans Parish District Attorney's Office, you worked for another district attorney, correct?

A.    Correct.  For a year and a half in Monroe, Louisiana.

Q.    What training did you get in Monroe, Louisiana?

A.    I don't recall anything other than on-the-job training.

Q.    And you also worked for the Supreme Court for a period of time?

A.    Correct.

Q.    And you handled criminal --

A.    Writs and appeals.  We did advisory memos to the Court.

Q.    And what training did you get there?

A.    On the job.  I mean, they showed me what a format was like to do a memo, and you follow the format.

Q.    Now, in your job at the Supreme Court, did you have occasion to research or address the *Brady* issue in any of the writs and appeals that you were faced with?

A.    I'm sure I did.  I don't recall a specific one, but I'm sure I did.

Q.    And you did that for how many years?

A.    For one year.

Q.    And then in your job at, I think it was the Fourth Judicial District; is that right?

1  A.   That's Monroe, correct.

2  Q.   In your job for one-and-a-half years at the Fourth Judicial

3  District, did you have occasion to address *Brady* issues?

4  A.   I recall one case where I did a brief on that, yes.  So I

5  know I did at least once deal with it, but, you know, actually

6  sit down and study it.

7  Q.   In law school, is the *Brady* issue addressed at all in any

8  course that you might have taken?

9  A.   To be honest with you, I don't remember.  They might have

10  said *Brady v Maryland* but I think we dealt more with criminal

11  procedure rather than, you know, the substantive defining what is

12  and what is not *Brady*.  I don't recall that.

13  Q.   By the time you got to the Orleans Parish District

14  Attorney's Office, you were familiar with *Brady*, were you not?

15  A.   But I was familiar with it, yes.

16  Q.   You spent at least two-and-a-half years and possibly some

17  time at law school looking at *Brady* issues?

18  A.   I had some familiarity with it, yes.  No question.

19  Q.   And you researched one issue?

20  A.   Correct.

21  Q.   When you came to the District Attorney's Office, what

22  position did you obtain?

23  A.   I was initially in magistrate court for a brief period of

24  time, and I was a senior in section C.

25  Q.   How long did it take for you to become a senior?

1  A.    It was very quick because I had been with a DA's office in

2  another parish for a year and a half, which was, that was not the

3  typical person.  Usually you spend maybe a year, six months in

4  magistrate court.  Then you're a junior.  Then you're a senior.

5  So it might take you a year to go through that process.  I had a

6  year and a half already as assistant DA, so they made me a senior

7  quicker than most.

8  Q.    And you also had a year working for the Supreme Court?

9  A.    Correct.

10  Q.    Would that be about the time, two-and-a-half years or so of

11  experience, that it would take for an individual to become a

12  senior in the Orleans Parish District Attorney's Office?

13  A.    Or even, they could even do it quicker, but yeah, a year,

14  year-and-a-half, two years, yeah.

15  Q.    So you had more experience than a new lawyer coming to work

16  for the District Attorney's Office?

17  A.    More than the typical, at that time, assistant DA walking in

18  the door, yes.

19  Q.    And you ultimately became a screener by the time that

20  Mr. Thompson became embroiled in the situation that we're now

21  addressing?

22  A.    Correct.

23  Q.    And a screener generally is more experienced than the other

24  lawyers in the office; isn't that correct?

25  A.    I think that's the way it was set up.  They wanted attorneys

1   who had tried cases to screen cases, so I think that's true.

2   Q.   Now, a screener plays a role in the determination of whether

3   or not there is any exculpatory evidence that has to be provided

4   to a defendant; isn't that correct?

5   A.   I don't know if that's the case because the screener screens

6   the case and doesn't make any decisions on what to turn over or

7   not.  Screener typically screens the case without regard to who

8   the trial attorneys are.

9        As in this case, the case is screened, the Screening

10  Action Form is filled out, and that's the end of it.  Insofar as

11  the screening is process is concerned, it's then in a trial

12  section, handled by a trial lawyer.

13  Q.   What happens with evidence that's collected by the police

14  department?  Where does that evidence, where is that evidence

15  ultimately deposited?

16  A.   Central Evidence and Property.

17  Q.   Is it ever, is it ever turned over to the clerk of criminal

18  court?

19  A.   Sometimes it ends up there, yeah.  I forget why some go,

20  some -- but, yes.

21  Q.   Is an attorney for a defendant, is that attorney permitted

22  to review that evidence?

23  A.   Yeah.  Generally speaking, an attorney can go look at what

24  evidence is being held in a case against his client.

25  Q.   So was there any prohibition from the attorney in the

1   Thompson case from reviewing the evidence that had been collected

2   by the Police Department?

3   A.    Specifically you're talking about the clothing and such?   I

4   don't believe there was any prohibition, no.

5   Q.    And there is reference to blood with regard to the evidence

6   that was ultimately collected by the police department?

7   A.    In that report, yes.

8   Q.    In that report.

9         Now, once you screened the case, who then received the

10   screening report?

11   A.    Again, by, by, it went to, I think it was typed up as a Bill

12   of Information.   Then it went to the allotment people.   I think.

13   That's my recollection.

14         Once it was allotted, it would go first to the section

15   that it was allotted to, and then in this case, the DA in that

16   section would have been told, This case is trumped by a higher

17   class case.   Your file goes to section B.

18         Does that answer your question about the process?

19   Q.    Did ultimately Mr. Dubelier become responsible for the

20   handling of this case?

21   A.    I believe so, yes.

22   Q.    And did you communicate at all with Mr. Dubelier in the

23   handling of the Thompson case?

24   A.    Not that I recall.   You know, we may have had a conversation

25   at some point.   I don't recall any conversations about how it's

1  going to be handled, no.

2  Q.   How did you come to request the blood -- the testing of the

3  blood evidence?

4  A.   I don't know.  I don't recall.  It could be that I just

5  noticed it in the report and said, Let me do that.  And that's

6  why it came to my attention.

7  Q.   Did you ever talk to Mr. Dubelier about testing the blood

8  evidence?

9  A.   Not that I recall.  No.

10  Q.   Do you know why it is that the blood evidence was not tested

11  until two days before the trial?

12  A.   No.  I have no idea.  I don't know what their protocol was

13  on time, how long it took.  I don't know what the turnaround was.

14  I don't know.

15  Q.   Were you handling any other matters at the same time that

16  you received this screening -- this blood report?

17  A.   I only remember this because I've looked at it since all of

18  this happened, but I was in the middle, I was trying a case in, I

19  think the same section of court maybe, but I was trying a murder

20  case.  I was in the middle of a murder trial that week myself,

21  and I think it overlapped with the armed robbery, like, Monday,

22  it took a day from my trial, then the other, it was a mess but I

23  was in the middle of a murder trial.  I was prosecuting a murder

24  case.

25  Q.   Norris Vessel?

1   A.   Norris Vessel.  It was an old murder case that had been

2   reversed for some reason, and it was a second-degree murder case,

3   as I recall, and I prosecuted it.

4   Q.   Who was trying that case with you?

5   A.   Gerry Deegan.

6   Q.   And who tried the case with Mr. Dubelier?

7   A.   I think that was also Deegan.  I don't recall for sure.

8   Q.   So Deegan was handling two high-profile cases back to back?

9   A.   I think he was the junior in that section.  I don't know if

10  there was a senior in that section.  There was something going

11  on.  I think that Judge Quinlan might have been new on the bench.

12  There was some, maybe turmoil, in his section at the time.  He

13  was trying to get cases moving or trying to get his docket

14  current.

15         Norris Vessel was an old case.  It had been reversed.

16  It had been tried by Judge -- I think he's dead now.  I forget

17  his name.  But and so I was handling that case.  They may have

18  asked me, somebody might have asked me to try it, because I was

19  an armed robbery screener.  I was not assigned to a section.  I

20  think somebody asked me, Would you try this old dog?

21         I said, Okay.

22         I think Deegan was the junior in B, so he was going to

23  assist in all of those cases, I think.

24  Q.   So the very day that you put the report of the testing of

25  the blood evidence on the desk of Mr. Williams, you and

1  Mr. Deegan were trying a murder case?

2  A.   Possibly.  I don't know, I don't know what day I put it on

3  his desk.  I know I put it on, my recollection is I put it on his

4  desk the day I got it.  When that day was, I don't know.  I do

5  know that week I was trying the Norris Vessel case.  For some of

6  those days.

7  Q.   Did you ever have a conversation with Mr. Deegan about the

8  blood evidence?

9  A.   No.  Not that I recall.

10  Q.   To the best of your recollection, while you were working for

11  Mr. Connick, was there any pressure on any of the DAs to get

12  convictions?

13  A.   I think there is pressure on DAs to get convictions, yes.  I

14  think there was.  If the case is accepted, it's the belief of the

15  office that it is a triable case.  A winnable case.  You wouldn't

16  accept it unless you thought you had enough evidence to get a

17  verdict proof beyond a reasonable doubt, guilty as charged.

18        So I guess in that sense certainly there was pressure.

19  We filled out trial report forms.  I don't know who looked at

20  those, but you filled out a form at the end of a trial which

21  would indicate whether or not you won or lost, so I guess there

22  was that pressure to win, of course.

23  Q.   Who screened the armed robbery case, I'm sorry, the murder

24  charge?

25  A.   I don't know.

1  Q.   Do you know whether or not it was Mr. Williams who screened

2  that?

3  A.   I don't know.  It would have been Grand Jury indictment.

4  Who brought it to the Grand Jury, I don't know.

5  Q.   Do you know who the murder screener was?

6  A.   I know for a time, Jim Williams was the homicide screener.

7  Was he the homicide screener on this case?  I don't know.

8  Q.   And who was the chief of screening?

9  A.   At that time, I believe it was Eric Dubelier.

10  Q.   And again, the screeners are the more experienced lawyers in

11  the office?

12  A.   I think that was the judgment of the office, yes.

13  Q.   When you were a screener, what was your desire?  Was it more

14  important to get the screening done properly or to get it done

15  quickly?

16  A.   Well, you wanted to move them, but you wanted to do it

17  properly of course.  I think you were doing both.  You had,

18  typically, you had time restrictions on how long you could take

19  to screen a case.  A guy could be released if you didn't screen

20  it in a timely fashion.

21       They, as I recall, the office kept track of how slow

22  you were on screening.  They didn't want you to have too many

23  cases that were getting old, unscreened.  So there was a pressure

24  to do it promptly.  Of course, do it properly.

25  Q.   Are there any other crimes that Mr. Thompson could have been

1  charged with in addition to the armed robbery in the screening

2  that you performed?

3          MR. BANKS:  Your Honor, I object to that.

4          THE COURT:  What's the basis of the objection?

5          MR. BANKS:  Your Honor, he's asked about other crimes

6  for which Mr. Thompson could have been charged.  There is no

7  foundation.

8          THE COURT:  Sustain the objection.

9                          EXAMINATION

10  BY MR. GOINS:

11  Q.   Were there any other policy makers in the Orleans Parish

12  District Attorney's Office?

13  A.   Well, I mean, Harry Connick was the boss.  He said, he ran

14  the show, as far as I knew.

15  Q.   So there was no one else that was making policy in that

16  office?

17  A.   I don't know.  I had, I wasn't involved in policymaking.

18  There may have been committees doing stuff.  I have no idea.  He

19  was the boss that I knew about that ran the show.

20  Q.   Did you know Mr. Thompson's blood type at the time that the

21  report was obtained?

22  A.   No.

23  Q.   Do you know whether or not either Mr. Deegan or Mr. Williams

24  knew Mr. Thompson's blood type?

25  A.   No.

1  Q.   Now, in the Orleans Parish District Attorney's Office, was
2  there a practice of pre-trying a case before it went to trial?
3  A.   Yes.
4  Q.   And what exactly was that?
5  A.   As I recall, it's been a long time and I don't know if I did
6  it as often as I was supposed to do it, but you were to meet with
7  maybe the chief of trials so that the chief of trials could
8  determine whether or not you were ready to go to trial on a
9  particular case.

10      I don't think it was done in every case.  Possession of
11  dope, burglary, stuff like that.  I know I didn't do it on every
12  case.  I think you were, certainly it would be wise to do it on
13  your more serious cases.  I know that on a case-by-case basis, I
14  would go seek out the counsel of a more, a more experienced trial
15  lawyer, it might be my chief of trials.  If it was an aggravated
16  rape and there was some issue that I was concerned about.

17      But to answer your question, there was a policy of
18  pre-trying cases.  You were supposed to do that, yes.
19  Q.   Was *Brady* evidence one of the issues that would be addressed
20  in the pretrial of the case?
21  A.   I would imagine so, yes.
22  Q.   And did all juniors have to go through the pretrial of their
23  cases?
24  A.   I think so, yes.  Certainly if they didn't do it with the
25  chief of trials, I think their senior, you know, might make sure

1  that they were doing their job.

2  Q.   Were there any meetings on a regular basis of the trial

3  division in the Orleans Parish District Attorney's Office?

4  A.   There were meetings on -- regular -- I would say irregular,

5  on an irregular basis there were meetings.

6  Q.   And what would be discussed at those meetings?

7  A.   Policies, how, you know, filling out forms.  There was a lot

8  of, a lot of tracking of files.  That seemed to be a constant

9  bone of contention in the office so there might have been

10  discussion about that.  But --

11  Q.   To the best of your knowledge, was *Brady* discussed in any of

12  those meetings?

13  A.   Not that I recall.  May have been.  I don't recall.  I don't

14  know.

15  Q.   Now, you were questioned with regard to Mr. Connick's policy

16  as it related to *Brady* material.  And to the best of your

17  recollection, what was that policy?

18  A.   Follow the law.  Turn it over.  If it's *Brady* material, you

19  give it to the defense.

20          MR. GOINS:  I have no further questions.

21          THE COURT:  Any redirect?

22          MR. BANKS:  No, Your Honor.

23          THE COURT:  Okay.  Thank you, Mr. Whittaker.

24          THE WITNESS:  Thank you, Judge.

25          (WHEREUPON, the witness was excused.)

 1            THE COURT:  Who is your next witness?

 2            MR. BANKS:  Your Honor, Mr. Williams is here.

 3            THE COURT:  Do y'all want to call him now?

 4            MR. BANKS:  We can proceed with our case but

 5  Mr. Williams is going to testify on our case on their

 6  questioning, if they are not going to question him, that's their

 7  prerogative.

 8            THE COURT:  It's their choice.  They know what his

 9  circumstances are if they want to take him.

10            MR. CARVER:  Your Honor, we'll take Mr. Williams now.

11            THE COURT:  Okay.

12            (WHEREUPON, the witness takes the stand.)

13            THE COURT:  Mr. Williams, you're still under oath.

14            THE WITNESS:  Thank you, Judge.

15            MR. CARVER:  Your Honor, during my examination of

16  Mr. Williams, I will be referring to some exhibits.  I would like

17  to hand a copy of those exhibits to the witness, and I'll also

18  hand a copy to plaintiff's counsel.

19            THE COURT:  All right.  Thank you.  Are these from the

20  books that are already in evidence?

21            MR. CARVER:  Yes, Your Honor.

22            THE COURT:  Okay.

23                      CROSS-EXAMINATION

24  BY MR. CARVER:

25  Q.   Mr. Williams, can you tell us what your occupation is.

1   A.    I'm an attorney.

2   Q.    And describe for us the education that you have gone through

3   in your life.

4   A.    Well, I graduated from LSU.  I went to law school at LSU.

5   When I finished law school in '77, I took the Bar exam in, I

6   believe, February of '78, passed the Bar.  I practiced for a

7   brief period of time in Baton Rouge.  I moved to New Orleans in

8   1980 and began working in August of 1980 in Harry Connick's

9   office.

10  Q.    Let's kind of work backwards.  You said you were an

11  attorney.  What kind of law do you practice now?

12  A.    Right now, my practice is about 90 percent criminal defense,

13  10 percent personal injury, various little domestic law.

14  Q.    When you say criminal defense, what do you mean by criminal

15  defense?

16  A.    Well, I represent persons charged with crimes.

17  Q.    And how long have you been doing that type of criminal

18  defense work?

19  A.    Ten years.

20  Q.    Prior to that, at some point in time you began to work for

21  the Orleans Parish District Attorney's Office, correct?

22  A.    That's correct.

23  Q.    And tell us, when was that again?

24  A.    I started in August of 1980.

25  Q.    And how long have you worked for the District Attorney's

1  Office?

2  A.   I worked for Mr. Connick for 10 years, until 1990.  I left

3  and went into private practice until 1992.  Then I went to work

4  at the District Attorney's Office in Jefferson Parish for five

5  years.  And I combined being assistant DA in Jefferson Parish

6  with a private practice.

7  Q.   And for the 10 years you worked at the District Attorney's

8  Office in New Orleans, who was the DA during that time period?

9  A.   Harry Connick.

10 Q.   When you worked at the District Attorney's Office underneath

11 Harry Connick, did the District Attorney's Office have certain

12 policies that you had to follow?

13 A.   Yes.

14 Q.   Who established those policies?

15 A.   Mr. Connick.

16 Q.   Did Mr. Connick have a policy with respect to disclosing

17 what we call *Brady* evidence to the defendant?

18 A.   Yes.

19 Q.   Can you tell the jury what Mr. Connick's policy was with

20 respect to disclosing *Brady* evidence to a defendant?

21 A.   Well, everyone who worked in that office who was an attorney

22 knew the requirements of *Brady*, and you were expected to follow

23 that not only because it was office policy, it was the law and it

24 was what would have been considered an ethical breach to depart

25 from that law.

1  Q.   And you've kind of jumped ahead of me on my next question.
2  What would happen to you if you failed to follow Harry Connick's
3  policy?
4  A.   You would be fired.
5  Q.   Other than disciplinary action by Mr. Connick, what other
6  deterrents were there for you to ensure you followed
7  Harry Connick's policy?
8  A.   Well, Mr. Carver, I was an attorney.  I was licensed to
9  practice law in the state.  There are certain responsibilities
10 and obligations that any attorney has practicing law, and one of
11 them is to follow the law.  And to do otherwise would be to
12 jeopardize your meal ticket.
13 Q.   What do you mean by jeopardizing your meal ticket?  Meaning
14 what?
15 A.   Well, if, if someone were to break the law, not follow the
16 law, break the rules of Mr. Connick, I mean, you know, that
17 person would likely lose their job.
18 Q.   If you, a person did that, could they still practice law?
19 A.   Well, being fired wouldn't necessary keep you from
20 practicing law; however, there was the Bar Association
21 disciplinary committee, and if they found, just like in medicine,
22 if you don't abide by your oath, then you run the risk of losing
23 your license to practice law.
24 Q.   While you worked for Harry Connick, what policy did you
25 follow?

1  A.    I followed his policy.

2  Q.    What was Harry Connick's policy with respect to disclosing

3  statements of witnesses?

4  A.    Well, the law of Louisiana and the Louisiana Code of

5  Criminal Procedure was written down under the discovery articles.

6  There were certain requirements that we had as prosecutors and

7  what evidence we had to turn over, if it was requested.

8         Back in 1985, the rules were that the statement of the

9  defendant would need to be turned over if one existed.  The gist

10  of any oral statement a defendant made would have to be turned

11  over.  Scientific evidence would be required to be turned over.

12  Inculpatory evidence, *Brady* material (indicating), would be

13  required to be turned over.

14  Q.    What about statements of eyewitnesses?

15  A.    Not required to be turned over unless there was a hearing

16  and a judge ordered them to be turned over.  I mean, from time to

17  time, statements were turned over, but basically the policy of

18  Mr. Connick was to follow the law, and the law did not require

19  that all witnesses' statements be turned over.

20  Q.    What were Mr. Harry Connick's policies with respect to

21  disclosure of supplemental police reports?

22  A.    Again, that was not an item that was required to be turned

23  over by law.  And it was the policy of the office that those

24  would not be turned over unless a judge ordered them to be turned

25  over.

1              And if I can amplify on that, there were certainly

2    many, many, many occasions where a defense lawyer, if they

3    suspected that there might be something in a police report that

4    would assist their case, they could always ask for a judge to

5    review that report.  And if a judge agreed, then the judge could

6    order a report to be turned over.

7    Q.   What authority did you have to change Mr. Connick's policy?

8    A.   None.

9    Q.   In 1985, were you a supervisor?

10   A.   No.

11   Q.   There's a witness who may testify in this case who was named

12   on the witness list for the plaintiffs named Laurie White.  Do

13   you know Laurie White?

14   A.   I do.

15   Q.   How do you know Laurie White?

16   A.   She and I worked together in Harry Connick's office.  We're

17   friends.  We've known each other since sometime in the mid-80s

18   when she started working for Mr. Connick.

19   Q.   Have you ever prosecuted a case with Laurie White?

20   A.   I specifically recall one murder case that she and I tried

21   together.  She asked me to help her with it.

22   Q.   In the 10 years that you worked at the DA's office, how many

23   cases have you worked, prosecuted with Laurie White?

24   A.   The only one I recall is State versus *Gerald Baker*.  It was

25   a second-degree murder case.

Q.   Just briefly, because Mr. Whittaker took us through some of it, but what is the process of how a person is actually screened and charged with a crime?

A.   When the police, generally, because some, some cases could be initiated by a Grand Jury proceeding, but generally 98 percent of the time, a case began by the police making an arrest. Whether it's NOPD, state police, an arrest made in Orleans Parish.

When an arrest is made in Orleans Parish, the police would generate a police report. That police report would be forwarded to the District Attorney's Office. It would come to the screening office, which was manned by, as I said yesterday, a staff of probably 20, 25 people, probably about 10 lawyers. Depending upon what kind of case it was.

If it was a shoplifting or a burglary or a forgery, something like that, it would go to what was known as a general screener.

A sex offense case, there was a specialty prosecutor, a sex offense prosecutor. A homicide case would come to the homicide screener. An armed robbery or an arson case would come to the armed robbery/arson screener. A narcotics case would go to the narcotics screener.

Once the police report would come in, the assistant DA who had the case assigned to him would review the case, read the police report. Sometimes, generally in narcotics cases, cases

1    were screened just by reading the police report.

2            In another case, generally the screener could, would

3    send letters to have the witnesses come into the office and they

4    would be interviewed.

5            Occasionally, persons who were charged had already

6    hired attorneys.  Sometimes those attorneys would call the

7    screener and say, Look, I have some information that I want to

8    bring to you, and I'm sure 99 percent of the time the screening

9    DA would welcome that information.

10           So at that point, the screening DA takes the police

11   report, their own investigation, whether it was sending a DA

12   investigator out to do more work or interviewing witnesses, which

13   generally happened in every instance, eyewitnesses, victims,

14   et cetera.

15           At that point, the screening DA would make a decision.

16   That decision would be to accept the charge against that

17   particular person or a lesser charge or sometimes a greater

18   charge, or refuse the charges.

19           The office policy was that if the charges were refused,

20   there would be a form that was used.  The reasons for the refusal

21   would be written on the form.  That case would then go to the

22   chief of screening.  The chief of screening would review every --

23   it was the office policy that the chief of screening would review

24   every single case that was dropped.

25           So there was the screening DA who made a decision, did

1  an investigation.  That went to the chief of screening, who would
2  review that decision.

3        And more than once, the chief of screening might
4  decline to refuse the charge.  He may say, I think there's enough
5  evidence to go forward with this case.  On occasion, cases would
6  be reviewed by other supervisors.  I'm sure there were many, many
7  cases that Mr. Connick and whoever the first assistant was, would
8  review a decision made on a case.

9        So if a case was accepted, generally the chief of
10 screening would not review that decision.  That case would then
11 go into the allotment at Tulane and Broad at the Criminal
12 District Court and would be randomly allotted to one of the
13 divisions of court.
14 Q.  Would you talk a little bit about supervisors and review.
15 Can you give us just a brief explanation of what the different
16 levels of supervision and review were and what the different
17 roles of the supervisors were.
18 A.  Well, there were the two main, there are actually four
19 divisions of the District Attorney's Office.  There was the trial
20 division, the assistant DAs who were assigned to be in the
21 courtrooms trying the cases.  There was the screening division,
22 which I've just described, which was in charge of making
23 decisions about what cases to accept and what cases to refuse.
24 There was a nonsupport division, which handled nonsupport
25 matters.  There was an appellate division, which handled appeals.

1   And then there were, there was the magistrate section, which

2   handled first appearances, and there was the juvenile division.

3   Each one of those divisions that I've mentioned had a chief who

4   was in charge of the division.  And those were the supervisors in

5   the office.

6           In addition, in the trial division, depending upon what

7   year we're talking about, there were either one, two, sometimes

8   more chiefs of trial or deputy chiefs of trial.

9   Q.   I want to focus, the relative time period for this is 1985?

10  A.   Right.

11  Q.   Obviously the relevant issue is a trial, an armed robbery

12  and a murder.  What levels of supervision and review were there

13  in the District Attorney's Office during that time period with

14  respect to, you know, prosecuting and trying an armed robbery

15  case or a murder case?

16  A.   Okay.  Generally, almost always, an armed robbery or murder

17  case would be handled by one of the senior assistants.  In each

18  division of court, there were two assistant district attorneys

19  assigned to handle the cases.  One was referred to as the senior

20  and the other was the junior.

21          Generally, almost always, the junior was the less

22  experienced.  Generally, the junior, you know, you paid your

23  dues.  You were a go-fer.  You did a lot, a lot, a lot of work.

24  Did a lot of paperwork.  But generally the senior assistant was

25  the attorney in charge of the cases.

1          Now, if a case, such as a murder or an armed robbery,

2     was going to go to trial, 99 percent of the time, that senior

3     attorney would be meeting with his or her supervisor, the chief

4     of trials.  And going over the case, talking about the issues

5     that were in the case.

6          As time went on, there was more attention paid to every

7     case.  Back when I started in the DA's office, back in 1980, it

8     was stocked with, you know, just about every single attorney in

9     there was very, very, very experienced attorneys.  All of them

10    had been there for quite a long time.  And there wasn't as much

11    supervision as there was around the time that I came along in the

12    '80s and mid-80s.  And that supervision continued.

13         So the answer to your question is, if I'm in a section

14    of court and I'm going to try a murder case, I'm going to meet

15    with my supervisor for a lot of reasons, because, you know, that

16    supervisor was more experienced than I was, and if there was an

17    issue in the case and I had discussed that issue with my

18    supervisor and something went wrong, one way or another, then I

19    would have had the benefit of having discussed that with the

20    chief of trials.  So, you know, if I got called into Harry's

21    office, I would have company instead of coming in by myself.

22    Q.   In December of the 1984 time frame, 1985 time frame, what

23    was your position at the District Attorney's Office?

24    A.   I was the homicide screener.

25    Q.   Mr. Whittaker had testified previously to you that typically

1  the screeners were the most experienced attorneys in the office?

2  A.   That's correct.  Mr. Connick's policy, the progression in

3  the office was when you generally started out, you were placed in

4  either the magistrate court, the juvenile court or the nonsupport

5  court because those matters, they were all serious, anything that

6  came to the District Attorney's Office was serious, less serious

7  than a homicide trial.

8       Once you were in those divisions for a period of time,

9  generally the next level progression was as a junior assistant in

10 the trial division.  If you did well there, then more than likely

11 you would be promoted to becoming a senior assistant with a whole

12 lot more responsibility.

13      After you did a certain amount of time at the trial

14 division, the next level of promotion was in the Screening

15 Division.  And the reason for that, and it was a great reason,

16 was that the most important job, one of the most important jobs

17 in the office was the decision-making process on whether or not

18 to accept a case or refuse a case.

19      And it certainly was better for there to be someone who

20 had tried cases knowing what happens in court to be making those

21 decisions as opposed to someone who had never tried a case.

22 Q.   Well, the system you just described whereby getting the most

23 senior experienced people in the screening division, who

24 developed that system?

25 A.   Mr. Connick did.

1  Q.   Now, I thought you were the screener of homicides.  How did

2  you get involved in the armed, in prosecuting the armed robbery

3  case of John Thompson?

4  A.   Mr. Dubelier asked me to.

5  Q.   Mr. Dubelier, what was his position at the time?

6  A.   He was the chief of screening.

7  Q.   If he was the chief of screening, did he have more

8  experience than you?

9  A.   No.

10  Q.   I'm going to back up a little bit and first ask you some

11  questions about your education.  You mentioned you went to law

12  school.  What are some of the basic subjects that you were taught

13  in law school?

14       Or if that's too broad, let me narrow it for you.  Do

15  you recall what subjects there were in law school that were

16  applicable to your duties as a DA, assistant DA?

17  A.   Yeah, there was criminal law, there was criminal procedure.

18  There was constitutional law.  There was trial advocacy.  That

19  pretty much covered being a prosecutor.

20  Q.   You obviously graduated law school and then the next thing

21  to become a lawyer is take a Bar exam, correct?

22  A.   Yes.

23  Q.   What is a Bar exam?

24  A.   That's the test that anyone who wants to become a lawyer has

25  to pass.  And generally, it's always after you graduate from law

1  school.  It's a brutal, I can assure you I still have nightmares

2  about it, test over five days, where on three alternating days

3  you spend eight hours a day taking an exam on various subjects.

4  Q.   The subjects that you have previously alluded to, criminal

5  law, constitutional law, criminal procedure, are those subjects

6  on the Bar exam?

7  A.   Criminal law and criminal procedure were together under the

8  criminal part of the exam, and constitutional law was a separate

9  part of the exam.

10  Q.   You obviously passed the Bar exam; correct?

11  A.   Thank goodness.

12  Q.   When did you first learn that there was a legal requirement

13  to disclose what we call *Brady* for exculpatory evidence to a

14  defendant?

15  A.   I don't remember.  Probably at some point during one of the

16  criminal procedure courses that I took.

17  Q.   Referring to law school?

18  A.   Yes.

19  Q.   So this is something you would have learned in law school?

20  A.   Yes.

21  Q.   And just to make sure we're talking on the same page here,

22  when I say *Brady*, what am I referring to?  Do you have an

23  understanding?

24  A.   Yes.

25  Q.   Can you explain to me what *Brady* is?

1   A.   *Brady* material is material which would tend to show that

2   someone was innocent of a charge they were accused of.  It would

3   be evidence that would be favorable to someone charged with a

4   crime.

5   Q.   Why do we call this *Brady*?

6   A.   Because probably, I haven't read that, a man named Brady was

7   convicted for something that he didn't do, and that came to the

8   light of the courts of appeal, and they rendered an opinion which

9   said this is the kind of evidence that has to be turned over to

10  the defense.

11  Q.   Is it fair to say that *Brady* is named after a Supreme Court

12  decision?

13  A.   Yes, that's correct.

14  Q.   In 1985, how would you quantify your experience as a

15  prosecutor?

16  A.   I'd been working there for five years.  I had tried a lot of

17  cases.  I had been assigned to a particular judge, Matthew

18  Brandt, who was a tough judge.  Very few people pleaded guilty in

19  his division of court, and as a result of that, I tried a lot, a

20  lot of cases.

21  Q.   While you were working at the DA's office, what type of

22  guidance or instructions did you receive on your obligations

23  under *Brady*?

24  A.   Well, I can't specifically tell you that I remember that

25  there was a specific meeting about:  This is the requirements

1   under *Brady*.

2            Everybody knew what *Brady* was.  Okay.  Most attorneys,

3   I mean, you know, they kept up with what the law was.  I know in

4   the appellate division, every so often, every term, there would

5   be advance sheets which were the opinions of the Fourth Circuit

6   Court of Appeals, opinions of the Louisiana Supreme Court.

7            And I know I read those, I read what the law was.  I

8   mean, I suppose it's a lot like a doctor.  You read medical

9   journals.  Now there's a requirement that even, all attorneys,

10  including assistant DAs have to get continuing legal education.

11  But back in '85, I don't think that that was a requirement.  But

12  for me, I read the decisions that applied to what I did.  I read

13  all of them.

14  Q.   Now, just for, you know, the jury and the nonlawyers in

15  attendance, when you say opinions, what are these opinions, how

16  did these opinions --

17  A.   Any time, for example, someone goes to trial on an armed

18  robbery case, and let's say they are convicted of that case, they

19  have a constitutional right to an appeal, whether they can afford

20  it or not.  If they can't afford it, a lawyer is appointed for

21  them.

22           And back then, when, let's say I'm defending somebody

23  accused of an armed robbery.  During the course of the trial, if

24  I think something is improper, I'm going to object to it.  Okay.

25           And it used to be, a long time ago, you had to note an

1    exception to preserve your right to appeal.  I don't think you
2    have to do that any more.  But as a defense lawyer, if I think
3    something is improper, I'm going to object to it.  And the judge
4    is either going to grant my objection and grant me relief, or
5    he's going to deny my objection.
6           Once an objection is denied, it's preserved for appeal.
7    So it could be hundreds of different reasons why somebody would
8    object to something in a criminal crime.  Once you object, it's
9    preserved for appeal.
10          If my client is convicted of armed robbery, then he has
11   a constitutional right to appeal that conviction.  And whatever I
12   objected to is going to be an issue on appeal.
13          And in addition, the courts of appeal also will read a
14   transcript to see if there is something that the lawyer missed.
15   Reviewing the record.
16          That's the first level of appeal.
17          There is a second level of appeal; it is what they call
18   post-conviction relief.  You may have heard that term.  Generally
19   post-conviction relief occurs when a person convicted of a crime
20   claims that there was a constitutional error in his trial.
21          By far, the most post-conviction release involves
22   allegations of ineffective assistance of counsel.  My lawyer
23   didn't know what he was doing.  I didn't, I didn't receive full
24   benefit of my constitutional rights to fair representation.  My
25   lawyer didn't know what he was doing.  So there is a lot of

1  appeals that go on.

2  Q.   If I followed you, is it fair to say that if there is an

3  error in a trial court, it goes up to a higher court, the court

4  of appeals?

5  A.   If the lawyer doesn't object, it still goes up because the

6  transcript of the entire proceeding is preserved, transcribed and

7  goes up to the Court of Appeal.

8  Q.   In the course of reviewing that decision, they issue an

9  opinion, a written opinion, correct?

10  A.   That's correct.  What will happen is that I'm representing

11  somebody on an armed robbery charge.  My client is convicted.  I

12  continue to represent my client on appeal.  I file an appeal.  In

13  Orleans Parish, that would go to the Fourth Circuit Court of

14  Appeals, which is in New Orleans.

15       I write a memorandum of law stating what I think the

16  problem was.  I cite cases about, you know, this is why the

17  conviction should be thrown out.  The state also is a party to

18  this.  The state files a response.  And then the --

19       MR. BANKS:  Your Honor, excuse me.  This has been going

20  on for a while.  I object to the relevance.

21       THE COURT:  You seem to be getting a little far afield.

22  Try to focus in to what's important.  Just try to focus,

23  Mr. Carver.

24                         EXAMINATION

25  BY MR. CARVER:

1   Q.   You were referring to advance sheets on getting your

2   guidance on *Brady*.

3   A.   Yes.

4   Q.   Let me ask you for your opinions that develop in the court

5   of appeals?

6   A.   Yes.

7   Q.   What type of training was there at the DA's office regarding

8   *Brady* material?

9   A.   Again, I don't recall any specific training.  I mean, I knew

10  what *Brady* material is.  I would assume every attorney in that

11  office knew what *Brady* material was.  And we understood our

12  responsibility to follow the law, follow the ethics of our

13  profession.

14  Q.   With respect to the blood evidence in the John Thompson

15  armed robbery trial, you were aware that blood evidence existed?

16  A.   Yes.

17  Q.   How did you become aware of the existence of the blood

18  evidence?

19  A.   My recollection is that Mr. Dubelier asked me to do the

20  Motion to Suppress the identification hearing in the armed

21  robbery charge against Mr. Thompson.

22        I reviewed the file on the Screening Action Form.

23  Mr. Whittaker had noted that blood evidence or something about,

24  You may want to take John Thompson's blood.  And I'm certain that

25  I probably looked through the file and saw from the crime scene

1    technician's report that some blood was recovered.

2    Q.   With respect to that knowledge that you got from reviewing

3    the file, what did you do to disclose the existence of that blood

4    evidence?

5    A.   Well, as I said yesterday, at the conclusion of the Motion

6    to Suppress hearing, I announced to the Court that the state

7    would want to take the blood from John Thompson.

8    Q.   Let's look at the first document I have there.  It's

9    Exhibit 40.  Would you agree with me that that's the transcript

10   of the Motion to Suppress hearing that you are referring to?

11   A.   Yes.

12   Q.   And what's the date of that hearing?

13   A.   March 11, 1985.

14   Q.   How many months before the trial was this hearing?

15   A.   When was the trial?

16   Q.   April 11th.

17   A.   Okay.  A month.

18   Q.   Who was present at that hearing?

19   A.   I was representing the state.  Numa Bertel and Jim Welch for

20   the defense.

21   Q.   Numa Bertel and Jim Welch were Mr. Thompson's lawyers?

22   A.   Right.

23   Q.   Turn the page.  Can you read that for us, what I

24   highlighted?

25   A.   "By Mr. Williams:  Your Honor, also it's the state's

1    intention to file a motion to take a blood sample from the

2    defendant and we will file that motion, have a criminalist here

3    on the 27th."

4    Q.    When you made that statement, where were John Thompson's

5    attorneys, Numa Bertel and James Welch?

6    A.    Probably standing right next to John Thompson.

7    Q.    After you made that statement, what did Numa Bertel ask of

8    you?

9    A.    I don't remember.

10   Q.    Did you talk to Numa Bertel after that hearing?

11   A.    I don't remember.

12   Q.    Do you recall getting any response from Numa Bertel after

13   that hearing?

14   A.    I don't remember.

15   Q.    As a defense attorney, if you were in court and you heard

16   the state say, We want to take the blood of your client, what

17   would you have done?

18   A.    I would have spoken to the DA about what they had.

19   Q.    Do you know if Numa Bertel did this?

20   A.    I don't recall.

21   Q.    Would you turn to page number 4, at the bottom there.  For

22   your reference, at the right-hand corner, I've numbered the pages

23   for you so it would be easy to follow along.

24   A.    You said 144?

25   Q.    Page 4.  It's the Motion for Discovery and it's Exhibit 41.

1  Do you see that?

2  A.   Yes.

3  Q.   And I'll tell you that's a Motion for Discovery filed by

4  Numa Bertel in the armed robbery case.

5  A.   Yes.

6  Q.   Just very briefly, what is the purpose of a Motion For

7  Discovery and Inspection when it's filed by a defendant?

8  A.   The Louisiana Code of Criminal Procedure required that all

9  requests for discovery and inspection had to be in writing and

10  they had to be pursuant to the codal articles.  And in this

11  motion, he requested all of the information that the Louisiana

12  Code of Criminal Procedure would allow to be received from the

13  state.

14  Q.   And specifically, looking at number 3, he's obviously

15  requesting tangible evidence, correct?

16  A.   Yes.

17  Q.   Along with other things, scientific photographs, and the

18  document speaks for itself?

19  A.   Yes.

20  Q.   And that written request by John Thompson's attorney

21  continues on to the next page, and he's asking for additional

22  information, correct?

23  A.   Yes.

24  Q.   Asking for to reproduce, it's hard to read.  "To permit and

25  inspect photograph, reproduce any reports, physical tests or

1  experiments."

2  A.   Yes.

3  Q.   Now, when the state gets these written motions, what is,

4  what is the procedure for responding?

5  A.   We would answer them in writing.

6  Q.   If you will turn to Exhibit 43, which is number 7, is that

7  the answer that you're referring to?

8  A.   Yes.

9  Q.   I'll submit to you this is the answer that the District

10  Attorney's Office provided to John Thompson's attorneys when he

11  made that request for tangible and other evidence.

12        How did the state, with respect to three and four, the

13  requests made for the tangible physical evidence, what was the

14  district attorney's response?

15  A.   "Inspection to be permitted."

16  Q.   What does the phrase, "Inspection to be permitted," mean?

17  A.   It means that we will comply with your request and allow you

18  to inspect all the evidence that we have in our possession.  That

19  was requested.  Scientific evidence, examinations, reports,

20  copies, experiments.

21  Q.   After you, and just as general procedure, after the District

22  Attorney makes this response to the defendant saying, inspection

23  to be permitted, the evidence, just reference, what usually

24  occurs next?

25  A.   Well, you get together with the defense lawyer, you select a

1  time that's convenient for both to go over the evidence.

2  Q.   Who initiates that contact?

3  A.   Generally the defense lawyer.

4  Q.   What arrangements did John Thompson's attorney take to

5  initiate that contact?

6  A.   Nothing with me.  But I have to say that as soon as I

7  finished this motion hearing, I turned the file back over to

8  Mr. Dubelier.  It was his case.

9  Q.   Do you know if Numa Bertel ever made any requests to inspect

10  the evidence?

11  A.   I don't know.

12  Q.   Turn to Exhibit 17, which is number 8.  This is the evidence

13  property card regarding the armed robbery.  You could read it

14  here or from your paper.  What evidence was in the possession of

15  the state regarding the armed robbery of John Thompson?

16  A.   ".357 blue steel revolver, one bullet core, one bullet

17  jacket, five cartridges, one casing, one piece of victim's right

18  pants leg with blood, one tennis shoe, make FootJoy, with blood

19  on shoe."

20  Q.   If John Thompson's attorney, Numa Bertel, had requested to

21  inspect the evidence, is that the evidence Numa Bertel would have

22  inspected?  Is that the evidence that would have been made

23  available to Mr. Bertel for inspection?

24  A.   Yes.  But the evidence was in possession of the evidence

25  room.  And probably the blood evidence may have been at the crime

1  lab, but that's a public record.

2  Q.   Would that document have been available for Mr. Bertel's

3  inspection?

4  A.   Yes.

5  Q.   Were you trying to hide blood evidence from John Thompson's

6  attorneys?

7  A.   No.

8  Q.   Prior to John Thompson's armed robbery trial, did you know

9  whether or not the bloody shoe and pants leg had been tested?

10  A.   No.

11  Q.   Did you ever request a test of the shoe and pants leg?

12  A.   No.

13  Q.   Prior to the armed robbery trial of John Thompson, had you

14  ever seen the laboratory report for the blood test?

15  A.   Prior to?  No.

16  Q.   When was the first time you had seen the laboratory report?

17  A.   I think back in 1999.

18  Q.   And what were the circumstances of that?

19  A.   When Mr. Connick filed a motion to, I don't remember how it

20  was styled, dismiss the charges against him.

21  Q.   Mr. Connick filed charges to dismiss the armed robbery

22  charges --

23  A.   Yes.

24  Q.   -- against John Thompson?

25  A.   Or something to that effect.

1   Q.   Was that because of the discovery of this lab report?

2   A.   Yes.  And also the testing of the LaGarde kids and

3   Mr. Thompson.

4   Q.   Had you been aware of the existence of the laboratory report

5   prior to the armed robbery trial, would you have disclosed that

6   to John Thompson's attorneys?

7   A.   Certainly.

8   Q.   Let's switch gears from the armed robbery trial and focus on

9   the murder trial of John Thompson.

10         Exhibit 34, which is number 10, what is that document?

11   A.   Motion for Production of Exculpatory evidence.

12   Q.   This is basically another written request now by

13   John Thompson's attorneys in the murder trial asking for evidence

14   from the state, correct?

15   A.   Yes.

16   Q.   Specifically, what are they asking for in number 1?

17   A.   "The names of any eyewitnesses and copies of any statements

18   made by them.  This request is based on newspaper articles

19   obtained by the defense which indicate that eyewitnesses gave a

20   physical description of the killer which is inconsistent with the

21   defendant's appearance."

22   Q.   You told us earlier the state responded back in writing,

23   with a written response, correct?

24   A.   Mr. Dubelier did.

25   Q.   Exhibit 36, which is number 12, is that the written

1  response?

2  A.   Yes.

3  Q.   What eyewitness did the state disclose to John Thompson's

4  attorneys?

5  A.   Paul Schliffka.

6  Q.   Why was Paul Schliffka disclosed, the identity of

7  Paul Schliffka disclosed to John Thompson's attorneys?

8  A.   This is all based upon recently refreshing my memory by

9  reading the transcripts.   Mr. Schliffka told NOPD that he saw one

10  person leaving the scene of the homicide who was about 6 feet

11  tall and had, I think, short-cropped hair, which was in conflict

12  with the description of Mr. Thompson.

13  Q.   Do you know what John Thompson's hair was on the night of

14  Liuzza's murder?

15  A.   No.   There was descriptions given by other witnesses, I

16  think, by Mr. Freeman, regarding the description that were at

17  odds with what Mr. Schliffka said.

18  Q.   Were you trying to hide the existence of Paul Schliffka from

19  John Thompson's attorneys?

20  A.   No.

21  Q.   You were present at the murder trial of John Thompson

22  because you participated in the, in that murder trial, correct?

23  A.   I did.

24  Q.   If you turn to page 13, is Exhibit 137.   I tell you it's the

25  opening statements from John Thompson's attorneys.   Before we

1   look at this, I apologize, I'll take it down for a second.  Very

2   briefly, what is the purpose of an opening statement when it's

3   given by the defendant to a jury?

4   A.   To tell the jury what you expect that your evidence would

5   show and what, that's it.

6   Q.   Let's take a look at what John Thompson's attorneys told the

7   jury what he expected the evidence to show.  Why don't you go

8   ahead and read that aloud for us?

9   A.   "Mr. Schliffka will testify that he was there, that he was

10  there.  He saw one man, not two.  One.  That that one man had

11  short-cropped hair, that he was about 6 feet tall and that the

12  hair was not bushy.

13       "You will see Kevin Freeman, you will hear testimony

14  that when John went to jail on January 17th, and you will also

15  hear testimony that prior to this incident he had a large bush of

16  hair.  Kojak doesn't, and you will see that.  Mr. Schliffka saw

17  one man run away."

18  Q.   Prior to the murder trial, when he was making this

19  statement, opening statement to the jury, how did John Thompson's

20  attorneys know that Paul Schliffka was going to testify there was

21  a man with short-cropped hair?

22  A.   Well, I don't know.

23       MR. BANKS:  Objection, Your Honor, this calls for

24  speculation.  Unless the witness has personal knowledge.

25       THE COURT:  Sustained.

1                           EXAMINATION

2    BY MR. CARVER:

3    Q.    Page 14, and this is, again, transcripts from the murder

4    trial.  This is the testimony of Paul Schliffka.  Can you read

5    the portion highlighted.

6    A.    "He looked about 6-foot and had short hair."

7    Q.    So obviously Paul Schliffka testified the perpetrator had

8    short hair?

9    A.    That was his testimony.

10   Q.    During the murder trial?

11   A.    Actually, I don't think you have it up there, he later

12   testified during redirect examination that he used his hands to

13   describe the hair.  And that was before the jury as well.  And I

14   believe that was under my redirect examination.

15         And he also changed, originally he said it was 6-foot

16   and on redirect examination I believe he said, 5'10" to 6-foot.

17   This is Mr. Schliffka.

18   Q.    During the murder trial of John Thompson, did the state hide

19   evidence that an eyewitness saw a perpetrator 6 feet tall with

20   short hair?

21   A.    No.

22   Q.    On page 15, and again, this is opening statements by

23   John Thompson's attorneys to the jury before trial got started,

24   can you go ahead and read that for us.

25         MR. BANKS:  Page?

1      MR. CARVER:  It's page 34 on Exhibit 137 on page 15 --

2      THE WITNESS:  "The conversation with Richard Perkins,

3  you will have to judge Mr. Perkins' motivation.  You will have to

4  judge what $15,000 in reward money means to a person."

5                          EXAMINATION

6  BY MR. CARVER:

7  Q.   Who is Richard Perkins?

8  A.   Was a fellow in the trial.  His nickname was "Funk."

9          If I'm not mistaken, John Thompson sold him a gun and a

10  ring that was taken from Mr. Liuzza for $25 and a bag of dope.

11  Q.   Is it fair to say that John Thompson's attorneys are

12  suggesting to the jury that Richard Perkins' motivation for

13  testifying is suspect because he may be getting a $15,000 reward?

14  A.   Yes.

15  Q.   Did the state try to hide evidence that Perkins may be

16  interested in a reward?

17  A.   If we did, we didn't do a very good job of it.

18  Q.   Obviously being sarcastic.

19  A.   I apologize, but, no, we did not hide any evidence at any

20  time.

21  Q.   Exhibit 5, which starts on page 16, is it fair to say that

22  is an NOPD daily police report?

23  A.   Yes.

24  Q.   And if you will flip and turn to page 3 of that report,

25  first paragraph, can you read that for us.

1  A.   "On Saturday, December 8th, 1984, 2:00 p.m., Detective

2  Curole met and interviewed Ms. Sherri Hartman, white female,

3  9/24/49, residing 2031 Baronne Street, Apartment 2.  Ms. Hartman

4  told Detective Curole that while in her apartment, at about

5  12:30 a.m., she heard six distinct gunshots fired outside on

6  Baronne Street.  Ms. Hartman first looked out her side window,

7  which faces Josephine Street.  But upon seeing nothing, ran to

8  the front of her apartment.  Ms. Hartman walked out onto her

9  balcony and observed a blonde-haired man who she stated lives

10  across the street, kneeling over a body on the side of the house

11  at 2031 Baronne Street.  Ms. Hartman then ran downstairs to the

12  scene and realized that the victim was Mr. Liuzza.  She stated

13  that she never saw anyone else near the scene or fleeing the

14  scene after hearing the shots fired.  Ms. Hartman had no further

15  information to lend to this information."

16  Q.   According to this report, the paragraph you just read, what

17  is the description of the perpetrator given by Sherri Hartman?

18  A.   There is no description.

19  Q.   What did you understand your *Brady* obligation to be with

20  respect to this report?

21  A.   There wasn't anything in that paragraph that suggested that

22  John Thompson didn't commit that crime.

23  Q.   And based upon that, what was your obligation to do with

24  this report?

25  A.   If I understand your question --

Q.    Were you obligated to give it to John Thompson's attorneys?

A.    No.

Q.    Turn to Exhibit 4, which is page 19.  Again, that's another daily police report, correct?

A.    Yes.

Q.    Would you read out loud the highlighted portions?

A.    Yes.  "At 2103 Baronne," I think this is a report on canvassing that was done of the neighborhood, "multi-apartment building at apartment 1.  Spoke with Stephen McAlister, white male, 33, home phone 522-2178, business phone 522-0548. McAlister stated he was awakened by gun fire.  Heard what he believed to be six shots and he ran to the front window almost immediately, but he only saw the victim laying on the corner. McAlister stated he could see the victim because of a security light which was on the side of the building, 2032 Baronne, and the light was aimed in the direction of the victim.  McAlister stated that he did not see the perpetrator.  Also, from apartment 1, Rosemary Cash, white female, 24, business phone 282-4455, who stated she was awakened by gun fire, heard six shots and then she heard someone saying, No, no.  She heard the same person yelling something else but she could not be sure what he was saying.  She did not see the perpetrator."

Q.    According to this report, what did Steve McAlister say the perpetrator looked like?

A.    Didn't see the perpetrator.

1   Q.   According to this report, what did Rosemary Cash say the

2   perpetrator looked like?

3   A.   She did not see the perpetrator.

4   Q.   According to this report, what does Stephen McAlister say

5   about an automobile?

6   A.   Nothing in there about seeing an automobile.

7   Q.   What did he say about hearing an automobile?

8   A.   Nothing in there except hearing gunshots.

9   Q.   What did Rosemary Cash say about hearing an automobile?

10  A.   Nothing in there about hearing an automobile.

11  Q.   What does Stephen McAlister say about hearing footsteps?

12  A.   Nothing in there.

13  Q.   What does Rosemary Cash say about hearing footsteps?

14  A.   Nothing.

15  Q.   What did you understand your *Brady* obligation to be with

16  respect to disclosing this report to John Thompson's attorneys?

17  A.   There wasn't anything in there that would tend to show that

18  John Thompson didn't commit that crime.

19  Q.   Therefore, no obligation to disclose this report to

20  John Thompson's attorneys, correct?

21  A.   No, sir.

22  Q.   When you say, no, sir, you mean you're agreeing with me,

23  correct?

24  A.   I agree.

25  Q.   This is the last exhibit I want to show you.  It's

1  Exhibit 23.  And again, that's another daily police report,
2  correct?

3  A.   Yes.

4  Q.   Let's turn to the last page of that report.  Would you read
5  that highlighted portion.

6  A.   "Freeman told Perkins that they were out looking for someone
7  to rob and that he knew Thompson had the gun but didn't think he
8  would shoot anyone.  They purposely cruised the St. Charles
9  Avenue area looking for a white man to rob because they believed
10 the people in that area were rich and carried a lot of cash.
11 When he realized that Mr. Thompson intended to shoot Liuzza, he
12 left and ran to his vehicle.  As he reached his vehicle, he heard
13 several gunshots, at which time he entered his vehicle and drove
14 away.  Freeman now believes that Thompson wants to kill him to
15 keep him from telling the police about the robbery.  Freeman also
16 told Perkins that a woman saw him driving away from the scene."

17 Q.   Who is Kevin Freeman?

18 A.   Kevin Freeman was the co-defendant of John Thompson, who was
19 also indicted for first-degree murder.

20 Q.   Kevin Freeman testified at the murder trial, correct?

21 A.   He did.

22 Q.   And he testified he was at or near the murder scene,
23 correct?

24 A.   Yes.

25 Q.   I mean, that fact wasn't hidden from the jury, correct?

1  A.    I believe the defense had Mr. Freeman's statement.

2  Q.    And that statement and his testimony were consistent,

3  Freeman admitted he was at the murder scene, in the area,

4  correct?

5  A.    Yes.

6  Q.    According to this report, what is the name of the woman that

7  allegedly saw Kevin Freeman?

8  A.    In that paragraph, there is no name.

9  Q.    What did you understand your *Brady* obligations to be with

10  respect to disclosing this report to John Thompson's attorneys?

11  A.    There was no obligation to disclose that report.

12        MR. CARVER:  That's all the questions I have,

13  Your Honor.

14        THE COURT:  Okay.  Redirect, Mr. Banks?

15        MR. BANKS:  Yes, sir.  Thank you.

16        THE COURT:  Let me ask you, do you think you'll be a

17  while?

18        MR. BANKS:  I would say about 15 minutes probably.

19        THE COURT:  All right.  Did you say 10 minutes?

20        MR. BANKS:  About 10 to 15 minutes.

21        THE COURT:  Okay.  Let's go.  Is everybody okay on the

22  jury?

23        MR. BANKS:  Would you put up the last page he had on the

24  screen.  Maybe we'll take that middle paragraph that he had up.

25                    REDIRECT EXAMINATION

1   BY MR. BANKS:

2   Q.   This is what Mr. Carver just showed you, Mr. Williams?

3   A.   Yes.

4   Q.   This is from one of the police daily reports?

5   A.   Yes, sir.

6   Q.   And you said this isn't *Brady* material?

7   A.   No.

8   Q.   I'm sorry, I thought Mr. Carver asked you whether you were

9   obligated to produce this under *Brady*?

10   A.   I don't believe that I was.

11   Q.   Maybe I'm mistaken.  You think it is *Brady* material?

12   A.   No.

13   Q.   Well, let's go through.  Am I correct that *Brady* material

14   includes documents in the possession of the district attorney

15   that could be used to impeach a witness, to show that he's lying?

16   A.   No.

17   Q.   You don't think that's right?

18   A.   No.  I believe that *Brady* material is evidence which would

19   tend exculpate a person charged with a crime.

20   Q.   So if Judge Barbier, and it's not our job to tell the jury

21   what the law is, if Judge Barbier were to tell the jury that

22   *Brady* requires you to turn over material that could be used to

23   impeach a witness who is testifying against the defendant, you

24   would disagree?

25        MR. CARVER:  Your Honor, I object.

 1              THE COURT:  Overruled.  The witness can handle that

 2    question.

 3              THE WITNESS:  I would not disagree with that.

 4                          EXAMINATION

 5    BY MR. BANKS:

 6    Q.   Now, you've got me very confused.  Does *Brady*, in your view,

 7    require the prosecutor to turn over evidence that could be used

 8    by the defense at a criminal trial to show that the witness at

 9    the criminal trial is testifying in a way that's false or

10    inaccurate?

11    A.   I guess we're quibbling over words.  My understanding of

12    what *Brady* says, is that it would be evidence that would tend

13    exculpate a person charged with a crime or would be favorable.  I

14    wouldn't --

15    Q.   I'm sorry, keep going.

16    A.   I wouldn't necessarily disagree with what you said.  I'll

17    change what I said.

18    Q.   Now, Kevin Freeman was a critical witness against

19    Mr. Thompson in the murder case, right?

20    A.   He was.

21    Q.   But his story was entirely different from what it says in

22    this paragraph, wasn't it?

23    A.   I don't recall exactly what his story was.

24    Q.   Well, we have his transcript in there and we can always read

25    that to the jury but I'll just tell you this says, "Freeman told

1  Perkins that they were out looking for someone to rob."

2        That's not what Freeman said at trial, was it?

3  A.   I don't recall what he said at trial.

4  Q.   It says they purposely cruised the St. Charles Avenue

5  looking for a white man to rob.  Freeman said something entirely

6  different than that at trial, didn't he?

7  A.   I don't recall what he said.  What he said was on the

8  record.

9  Q.   It says here that Freeman ran back to his vehicle and

10  entered his vehicle and drove away.  But isn't it true that at

11  trial Freeman testified that he ran away, that he didn't run to

12  his car, that his car had run out of gas?

13  A.   I remember him having, his car was low on gas.

14  Q.   Okay.  And it also says here Freeman told Perkins that a

15  woman saw him driving away from the scene.  He didn't say

16  anything about that at trial?

17  A.   I don't recall whether he did or not.

18  Q.   Now, if those four or five things that Freeman testified to

19  at trial were different from what's in the police report.  This

20  police report would be *Brady* material, wouldn't it?

21  A.   That's hard for me to say.

22  Q.   Why, you didn't understand *Brady*, you weren't trained well?

23  A.   No, I was trained very well.  Not every single discrepancy

24  rises to the level of **Brady** material.

25  Q.   There is gray area?

1  A.    Yes, sir.

2  Q.    Training myself then, right?

3  A.    My answer was, there is gray areas.

4  Q.    Even though you went to law school and you read case reports

5  and you read opinions as they came out, there were still gray

6  areas to an educated lawyer such as yourself?

7  A.    Yes.

8  Q.    You didn't turn this report over to the defense, did you?

9  A.    I don't, I didn't turn anything over to the defense,

10  Mr. Banks, in the case.  I sat second seat.  Mr. Dubelier was in

11  charge of this case; he made decisions, and all of this was done

12  before I was even on the case.  So what he turned over and didn't

13  turn over, probably he's in a better position to answer that.

14  Q.    You know there is a stipulation that this wasn't turned over

15  to the defense, don't you?

16  A.    If that's the stipulation, it is the stipulation.

17  Q.    Let's just get the exhibit number here, because we read it

18  before, we read the stipulation.  Trial Exhibit 23.  You'll defer

19  to the stipulation on that, right?

20  A.    Yes.

21  Q.    Now, we talked a little bit about this issue of

22  Mr. Schliffka and short hair.  And you were shown some documents

23  on that by Mr. Carver?

24  A.    Yes.

25  Q.    One of the documents that Mr. Carver showed, I believe, was

1  a discovery item, something that came out in discovery, and let

2  me just get the exhibit number and maybe we can put it up there.

3  Bear with me for a moment.  I don't know if I wrote down the

4  exhibit number.  But I have it here.  Hold on.  Someone has to

5  put it up on the screen.

6        MR. BANKS:  Here it is, Exhibit 36.  Could we put that

7  up, Mr. Vincent.

8        And can we go to Exhibit 36, the numbered paragraph 1

9  and blow that up.

10                      EXAMINATION

11  BY MR. BANKS:

12  Q.   This was the written response to discovery that Mr. Carver

13  showed you, right?

14  A.   Yes.

15  Q.   Paul Schliffka described a man leaving the vicinity of the

16  crime scene as being approximately 6 feet tall.  That's what

17  Mr. Dubelier put in this response and that's what he signed?

18  A.   That's correct.

19  Q.   Your leader in the case, the guy above you?

20  A.   Yes.

21  Q.   Would you say that's the most accurate, complete description

22  you could give of the description that was provided by

23  Mr. Schliffka?

24  A.   No.

25  Q.   Can you think of any justification, any reason for leaving

1  out the reference to the hair length completely if you weren't
2  trying to mislead the defense?
3  A.   No, I don't believe that, because apparently the defense was
4  in possession of the description of short hair because Mr. Couhig
5  referenced it in his statement.
6  Q.   Referenced it in his opening statement, and he made a
7  discovery request talking about, this request is based on
8  newspaper articles obtained by the defense, right?
9  A.   Yes.
10 Q.   That's what he said there, newspaper articles.  Not a
11 discovery response, not something that you said or Mr. Dubelier
12 said, but a newspaper article?
13 A.   My answer to that, Mr. Banks, it may very well be that
14 Mr. Dubelier turned over Mr. Schliffka's statement because they
15 had it at trial.
16 Q.   It may be that he wrote 6 feet tall, left out the hair
17 length completely, but then turned over the statement, maybe?
18 A.   I think he would be in the best position to answer that
19 question.
20 Q.   You would just be guessing on it?
21 A.   I didn't answer that.
22 Q.   Now, when you go to question a witness at trial and maybe
23 try to question the witness and pin him down or impeach the
24 witness, in a criminal case like this, you could use the police
25 report?

1  A.    Yes.

2  Q.    You could use the witness statement?  Right?

3  A.    Yes.

4  Q.    If the witness gave a witness statement, you could use that?

5  A.    Yes.

6  Q.    You could use the police daily, the things you didn't

7  produce, you could use to question Paul Schliffka, right?

8  A.    Yes.

9  Q.    You can't use a newspaper report very effectively, can you?

10 A.    Sure.  Why not?

11 Q.    Is it the same force, though?  When you find a newspaper

12 report saying something about the hair length of the perpetrator,

13 an undefined thing in a newspaper report, would you find that as

14 effective as a written statement signed by Paul Schliffka?

15 A.    I may.  It's up to what the jury thinks.

16 Q.    What did the newspaper report say?

17 A.    I have no recollection.

18 Q.    It's not in evidence in this case, is it?

19 A.    Apparently the, Mr. Thompson's attorneys saw fit not to put

20 it into evidence.

21 Q.    So today we don't know what was in the newspaper, whether

22 it's said short hair, close-cut hair, small Afro or anything like

23 that?

24 A.    I don't recall what was in the newspaper.

25 Q.    You would agree with me, though, that if Mr. Dubelier wanted

1  to provide the most complete and accurate description that

2  Mr. Schliffka gave to the police, it would have been a very easy

3  matter for him to write in 6 feet tall with close-cut hair?

4  A.   That would have been very easy to do.

5  Q.   Now, when Mr. Schliffka testified at trial, Mr. Carver

6  showed you one of the things he said.  After Mr. Schliffka got up

7  and talked about close-cut hair -- incidentally, you questioned

8  Mr. Schliffka, right?

9  A.   I did.

10  Q.   And then you called him on what's called redirect.  You got

11  to ask him some more questions?

12  A.   Yes.

13  Q.   Let me give you Exhibit 50.

14        MR. BANKS:  May I approach, Your Honor?

15                        EXAMINATION

16  BY MR. BANKS:

17  Q.   That's Exhibit 50.  That has some of the trial testimony.

18  Would you turn to page 103.

19        This is the start of your questioning of Mr. Schliffka,

20  right?

21  A.   Yes.

22  Q.   You said, "All right, Mr. Schliffka, you're still under

23  oath.  Now, could you describe, well, let me ask you this

24  question first:  You've previously testified that the person you

25  saw had an Afro-type hair cut; is that correct?"

1              And he said, "yes."

2    A.   Yes.

3    Q.   Did you try to steer him off of that short hair back to the

4    word Afro?

5    A.   I don't agree with your characterization of what I did.

6    Q.   But Afro wasn't in the police report.

7    A.   I spoke with Mr. Schliffka before --

8    Q.   After --

9    A.   May I answer the question, please.

10   Q.   Yes, you may.  Please.

11   A.   While I don't have an independent recollection of doing

12   this, in the transcript, it's apparent that Mr. Dubelier and I,

13   and I'm sure we did, both questioned him and we talked to him

14   about what he saw.

15              And it may very well be that during the course of that

16   conversation, he told us Afro.  When we said, Describe the hair.

17   Short hair, like short, cropped, bald.  But I don't recall that.

18   Q.   One thing a defense lawyer would want to do is bring it

19   back, not from Afro but to what Mr. Schliffka told the police

20   when he was questioned right after the murder.  A good defense

21   lawyer would want to do that, right?

22   A.   I agree.

23   Q.   And a good defense lawyer can't do that here without the

24   description that Mr. Schliffka gave to the police at the time, on

25   December 6th of 1984?

1  A.   Well, I will answer your question, I don't know.  I don't

2  recollect what's in Mr. Schliffka's statement which was turned

3  over to him.   If he said Afro, short hair or whatever.

4  Q.   But we saw what was in the police report.

5  A.   And you have a copy of his statement.   It may very well be

6  that Afro is in that statement.   I don't recall that.

7  Q.   Let's start with the carjacking.   No, I want to stick with

8  the murder trial for a moment.

9        You mention a reward.   Mr. Carver asked you about the

10  reward issue, right?

11  A.   Yes.

12  Q.   And he pointed out that in the opening statement given by

13  Mr. Couhig, Mr. Couhig suggested to the jury they might hear

14  something about reward, right?

15  A.   No, that's not what he said.

16  Q.   What did he say, to the best of your recollection, you

17  summarize it for me.

18  A.   I'll read, what he said.

19  Q.   I think we have it right here.  Here it is, 34, you go ahead

20  sir.

21  A.   Mr. Couhig said, "The conversation with Richard Perkins, you

22  will have to judge Mr. Perkins' motivation.  You will have to

23  judge what $15,000 in reward money means to a person," and the

24  rest of it.

25  Q.   Now, that reward that was posted, the $15,000 reward, that

1   was public, right?

2   A.   That was, yes.

3   Q.   A lot of people knew about that?

4   A.   Yes.

5   Q.   But if Mr. Couhig didn't have the information that

6   Mr. Perkins was promised a reward by a DA, he couldn't do

7   anything with that, could he?  All he could do is raise it in his

8   opening?

9   A.   Well, Mr. Couhig, on his direct examination, or

10  cross-examination brought that up again and chose not to pursue

11  those questions.  I asked two questions about the reward money.

12  Now, if I could further answer your question, Mr. Banks.

13  Q.   Yes.

14  A.   As far as the reward money, you know, one of the policies of

15  Mr. Connick was that we absolutely would in no way, shape or

16  form, ever get involved in reward money, who deserves it, who

17  should get it.  Anything like that.

18          My recollection, I have no recollection of what, who

19  got reward money or didn't get reward money.  All I know is that

20  Mr. Couhig knew about the reward money, suggested, must have

21  known that Perkins had made an inquiry about the reward money,

22  but decided during the trial not to question Mr. Perkins about

23  the reward money.

24  Q.   Because Perkins denied it and Couhig couldn't prove it when

25  you guys denied him the information he needed, right?

1  A.    I don't recall Mr. Perkins denying anything about reward

2  money.

3  Q.    But you did.  You got up in your closing and you told the

4  jury, if there was something about reward money, you would have

5  heard about it.

6  A.    Mr. Banks, what I said in my closing argument, when you take

7  it in its context, was that there was no evidence about reward

8  money at the trial.  And since there was no evidence, it would be

9  unfair for the jury to speculate about what happened with the

10  reward money.

11  Q.    In the stipulation that we filed in this case, the

12  uncontested facts, it points out that some of the things that the

13  DAs had that were not produced were audio tapes of interviews

14  with Richard Perkins?

15        MR. CARVER:  Objection, Your Honor.  That's not an

16  accurate characterization of the stipulation.

17        THE COURT:  Overruled.  The stipulations were read to

18  the jury.  They will be in evidence.  So jury can make --

19                        EXAMINATION

20  BY MR. BANKS:

21  Q.    Mr. Whittaker?

22  A.    I don't recollect about those audio statements.

23  Q.    You certainly didn't do anything to bring that out to the

24  defense that there were audio tapes in the district attorney's

25  possession?

1  A.    I don't know what audio tapes you're talking about.

2  Q.    Would you agree with me, sir, that to impeach a witness you

3  need facts to work with?

4  A.    Yes.

5  Q.    I want to talk about the blood evidence a little bit.  I

6  think you told Mr. Carver that if you had had this report that

7  Mr. Whittaker says he left on your desk in the middle of the

8  desk, you would have turned it over?  The blood report?

9  A.    What I would have done, if I had seen that report at that

10 point in time, I would have turned it over, yes, sir, I would

11 have.

12 Q.    Because it was *Brady* material?

13 A.    Not necessarily.

14 Q.    Might be?

15 A.    No, because I didn't know what the blood type of

16 Mr. Thompson was, and I didn't know what the blood type of

17 Mr. LaGarde was.

18 Q.    Why would you have turned that lab report over then?

19 A.    Because that was a written report that was generated in

20 connection with this case.  Just as the crime scene technician's

21 report was.

22 Q.    But you already had a written report.  You had the crime

23 scene technician report.  You had written documents showing that

24 there was blood evidence.  You didn't hand those over to the

25 defense?

A.   Well, that's because I made it clear at the motion hearing
that that was going to be an issue, and that was the end of my
involvement with that case.  At that point.

Q.   If you made it so clear at the motion hearing, why did you
need to turn over the blood report at all?  If you did your job
at the motion hearing by saying, We may file a motion to take
blood evidence, why would you have turned the blood report over
if you had seen it?

A.   I didn't see -- I don't recall seeing a blood report.

Q.   I understand that.  But you said if you had seen it.  If you
had seen that blood report, you would have turned it over?

        Why, if you did your job at the motion hearing when you
dropped a hint, why would you have had to do any more?

A.   Because the law compelled me to.  That was a written report
generated during the case.  I was duty bound to turn that over.

Q.   What about the Screening Action Form?  Wasn't that a written
report generated in the case?

A.   It wasn't a public record.

Q.   What about the crime scene technician report?  Wasn't that a
report generated in the case?

A.   It wasn't a report that was subject to discovery under the
discovery articles.

Q.   Does *Brady* limit your obligation to turn things over to
public documents as you understood it?

A.   No, sir.

Q.   If you had evidence that could exculpate Mr. Thompson and prove him guilty, you were obligated to turn it over whether it was a public document or not, right?

A.   Absolutely correct.

Q.   Now, you say this was, what, Mr. Bertel's fault that he didn't figure out the hint you dropped at the hearing?

A.   No, I didn't say it was his fault.

Q.   When you said, We may wish to file a motion, we may file a motion and the motion would ask the Court to take blood, is that when you felt you discharged your full *Brady* obligation at that point?

A.   There was no *Brady* issue at that point in time.

Q.   But what was that like dropping a hint?

A.   You can say it however you want to say it, Mr. Banks.  All I can tell you is that at that point in time, I was asked by Mr. Dubelier to do the Motion to Suppress the evidence.  The trial was coming up.  I read the note from Mr. Whittaker in open court with Mr. Bertel present.

          MR. BANKS:  Mr. Vincent, would you please put Exhibit 43 up on the screen.  Can we blow that up a little.

                         EXAMINATION

BY MR. BANKS:

Q.   This is the discovery response where Mr. Dubelier signed off and said, "Inspection to be permitted."

A.   Yes, it is.

1  Q.   It was a request for scientific evidence, and Dubelier said,

2  "Inspection to be permitted."

3  A.   That's correct.

4  Q.   And let's go to three to four.  That's where it is.  You see

5  that, right?

6  A.   Yes.

7        MR. VINCENT:  Now, Mr. Vincent, I'm actually going to

8  ask this witness because I don't think we can see from this.  Is

9  there a date on this?  I see.  There it is.  It's the file date.

10 Just a little lower on the report.

11                    EXAMINATION

12 BY MR. BANKS:

13 Q.   It's April 3, 1985, right?  That's when that report was

14 filed?  Excuse me, the discovery response was filed?

15 A.   Yes.

16 Q.   Exhibit 43.  You see it?

17 A.   Yes.

18 Q.   On the left side?  April 3, 1985?

19 A.   Yes.

20 Q.   So it would be some time after April 3, 1985, when that

21 discovery response was served that you would expect Mr. Bertel to

22 have walked over to the evidence locker and checked out the

23 evidence if he was doing his job, right?

24 A.   What was the date of the motion hearing?

25 Q.   The date of the motion hearing was March 11th, but this

1   discovery response, "Inspection to be permitted," was served
2   April 3rd.
3   A.   Okay.
4   Q.   Okay.  So this --
5   A.   I can now answer your question.
6   Q.   Right?
7   A.   I wasn't sure about the dates.  I would have expected
8   Mr. Bertel, given that this was a matter that could be involved
9   in a death penalty case, to go to Eric Dubelier and ask him, What
10  evidence do you have?  Let me inspect it.
11  Q.   After getting this, right?
12  A.   Yes.
13  Q.   He also could have walked over to the evidence locker as you
14  said, what is it called?  Central Evidence and Property?
15  A.   Yes, in the basement of the courthouse.
16  Q.   He could have seen whatever evidence was in there?
17  A.   He could have.
18          MR. BANKS:  Now, let's go to Exhibit 17, please,
19  Mr. Vincent.  Can you blow that up a little.
20                      EXAMINATION
21  BY MR. BANKS:
22  Q.   This is what Mr. Carver showed you, the New Orleans Police
23  Department evidence property card.  This tracks the evidence in
24  the case, right?
25  A.   Yes.

1   Q.   In the carjacking case?

2   A.   Yes.

3          MR. BANKS:  Go to page 2 please.

4                        EXAMINATION

5   BY MR. BANKS:

6   Q.   Now, let's look up at the top.  Chain of custody.  This is

7   what they did with evidence.  They had a card like this that

8   showed when it was in the locker and when it was checked out,

9   correct?

10  A.   Yes.

11  Q.   Chain of custody.  If we look here, the first entry looks to

12  me that this blood evidence was checked out of the locker.

13  Something was checked out of the locker, right, on April 4th?

14         MR. BANKS:  Can you pull up, right in the middle.

15         THE WITNESS:  I see April 4th.

16                        EXAMINATION

17  BY MR. BANKS:

18  Q.   You see April 4th.  Evidence was checked out on April 4th.

19  That's when the blood evidence was taken by a district attorney

20  to the crime lab to be tested, right?

21  A.   I don't know that.

22  Q.   You don't know that?

23  A.   No.  I don't, I don't see that up there.

24  Q.   The next date we see below that is April 11th.  See that?

25  A.   I see April 11th below April 4th.

1  Q.   So if the blood evidence was checked out on April 4th and

2  returned on April 11th --

3  A.   That's not correct.

4  Q.   Okay, well, tell me what's correct.  Tell me when the blood

5  evidence was checked out.  Help me understand this.

6  A.   I'm not sure, but you have outgoing and then you have

7  incoming.

8  Q.   I see.  You're right.  You're right.  Outgoing, April 4th.

9  There is evidence being checked out on April 4th, right?

10 A.   Yes.

11 Q.   And actually, look at the right side.  It came back in on

12 April 10th.  I was mistaken.  Right?  Isn't that correct?

13 A.   I'm not sure.

14 Q.   Well, that's the date under incoming?

15 A.   Well, I'm not sure if that, who got what because the

16 April 10th goes down across two different persons.  It's not

17 very, it's not done very well.

18 Q.   Well, we know that blood evidence was checked out of this

19 Central Evidence and Property and tested, right?

20 A.   Right.

21 Q.   Sometime before April 9th, the date of the blood report?

22 A.   Also, if I'm not mistaken, and I'm sorry to interrupt you, I

23 think there is a copy of the chain of custody that remains, like

24 a, not a Xerox copy, what do you call it when there is a two or

25 three copies that it goes through, whatever.

1  Q.   Let's just focus on this for a minute.

2  A.   I'm sorry.  Go ahead.

3  Q.   Let me just cover this.  The blood evidence was, the blood

4  report was dated April 9th, right?

5  A.   I'll take your word for it.

6  Q.   And something was checked out on April 4th and something was

7  brought back on April 10th.  Right?  That's what that report

8  shows?

9  A.   I'm not clear on this.

10 Q.   If that's right, that means that during the period of time

11 starting the day after Mr. Dubelier's discovery response saying,

12 "Inspection to be permitted," and up until the day before the

13 trial, the blood evidence would have been gone?  It would have

14 been with the crime lab?

15 A.   Well, like I said, I'm certain that there is a copy of that

16 chain of custody which remains, which would have been available.

17 All that does is shows who has the object.  But --

18 Q.   You don't know when or whether Mr. Bertel walked over there,

19 do you?

20 A.   I don't know that he ever did.

21       MR. BANKS:  I would like to approach the witness and

22 show him Exhibit 64.

23                        EXAMINATION

24 BY MR. BANKS:

25 Q.   Do you recall testifying at a hearing in the carjacking case

1    in June of 1999, after the blood evidence surfaced?

2    A.   Yes.

3    Q.   Mr. Bertel testified in that hearing, too, didn't he?

4    A.   He did.

5    Q.   If you turn to page 99, I would like to take a look at his

6    testimony, which is already in evidence here.

7         He was asked after he got the document, the discovery

8    response, that he go over.  And if you look down to line 27, he

9    says, "Went down to the evidence room and checked all of the

10   evidence, asked them for any reports and we didn't get it."

11        "Question:  You didn't see anything in the evidence

12   room in connection with this case at all, the gun?"

13        "Answer:  No, no.  We didn't get any blood evidence in

14   the evidence room."

15        "Question:  Who did you see there?"

16        "Answer:  The clerk who maintains the evidence."

17        "Question:  Do you remember who that was?"

18        "Answer:  No, I don't remember his name."

19        "Question:  Did you personally go up there?"

20        "Answer:  Sure."

21        He continues, I'm going to skip down a few lines.

22        Question on line 13:  "And they didn't have anything

23   over there?"

24        "Answer:  They didn't have any blood evidence."

25        You don't have any reason to dispute that testimony

1  under oath by Mr. Bertel, do you?

2  A.   As I read it, Mr. Bertel said, We went to check out the

3  evidence, and we didn't get it.  That doesn't mean it didn't

4  exist.  That means he didn't get it.

5  Q.   And you certainly didn't tell him about it?

6  A.   Well, other than what I said in open court that we wanted to

7  take the blood of Mr. Thompson, I don't recall having any

8  conversations with Mr. Bertel after that about blood evidence.

9  Q.   You told us a little bit in the beginning of your testimony,

10 the questioning by Mr. Carver about what you understood the law

11 to be, what you understand *Brady* to be, right?

12 A.   Yes.

13 Q.   You said you knew that from law school and from reading

14 cases; is that correct?

15 A.   Yes.

16 Q.   I think you said something about state law only requiring

17 certain things to be turned over?

18 A.   You would have to refresh my memory.

19 Q.   Well, it was just a little while ago when you answered

20 Mr. Carver's questions.  You said there was some Louisiana

21 criminal procedure rules or state law back in 1985 that didn't

22 require supplemental police reports to be turned over.

23 A.   The Louisiana Code of Criminal Procedure.

24 Q.   And it didn't require witness statements to be turned over,

25 except a statement of the defendant himself or a codefendant?

1  A.   Unless, unless it would be favorable to the defendant.

2  Q.   Those set minimum standards, right?  I mean, those set

3  certain things that had to be turned over?

4  A.   Well, that's one way to characterize it.  It was the

5  standard.  It wasn't a minimum or a maximum.  It was the

6  standard.

7  Q.   But there was nothing in that Louisiana Code of Criminal

8  Procedure that says if you have an exculpatory blood report, you

9  have to turn it over, is there?

10 A.   No.

11 Q.   There was nothing in there that said that if you have a

12 witness statement that shows the witness is lying on the stand at

13 the murder trial you have to turn that over?

14 A.   That's implicit within those articles.

15 Q.   There is nothing in there that says you have to turn over a

16 police report if the police report contains descriptions of a

17 perpetrator that are different from the descriptions given in

18 discovery responses by a district attorney?  That's not in the

19 state rules of procedure, is it?

20 A.   It is.

21 Q.   It's *Brady* that requires you to turn something over.  That's

22 a federal constitutional case, right?

23 A.   That is, indeed.

24 Q.   And that's the law that obligated you and Mr. Connick and

25 everyone else in the office to turn over evidence that was

1   favorable to the defense?

2   A.   And I followed that law.

3   Q.   State law didn't trump *Brady*?

4   A.   Well, we could have an argument about that for quite a long

5   time.

6   Q.   I don't want to have an argument, sir.  Would you agree with

7   me that whatever Judge Barbier tells this jury to have been the

8   obligations of a prosecutor under federal law to turn something

9   over that was favorable to the defense that that's the law that

10  controls?

11  A.   I would agree with Judge Barbier's jury charge 100 percent.

12          MR. BANKS:  Excuse me, Your Honor, may I just confer for

13  a minute?

14           I don't have anything further of Mr. Williams.  Thank

15  you.

16          THE COURT:  Thank you, Mr. Williams.

17          THE WITNESS:  Thank you, Judge.

18          (WHEREUPON, the witness was excused.)

19          THE COURT:  All right.  Let's take about a 15-minute

20  recess.  Close your notebooks and put them on your chairs or

21  under your chairs, and please don't discuss the case while you're

22  out of the courtroom.

23          (WHEREUPON, the jury panel leaves the courtroom and a

24  brief recess was taken.)

25          (WHEREUPON, the jury panel enters the courtroom.)

1      THE COURT:  Please be seated, ladies and gentlemen.  And

2  the next witness for the plaintiff is?

3      MR. BANKS:  Val Solino.

4      THE COURT:  By deposition, as I understand it.

5      MR. BANKS:  Yes, sir.

6      THE COURT:  Ladies and gentlemen, this is another

7  deposition, excerpts from another deposition.  The difference

8  here is, as I understand, this is not a video deposition.  There

9  is a transcript, a written transcript.  And what we do in that

10  situation is one of the lawyers for the plaintiff, in this

11  instance, is going to play the role of the witness, so to speak,

12  just for purpose of reading the answers.  So Mr. Cooney will be

13  reading the questions.  Mr. Banks, you're going play the witness,

14  right?

15      MR. BANKS:  Yes, Your Honor.

16      THE COURT:  And the witness is Val Solino?

17      MR. BANKS:  Right, he's the designated representative of

18  the District Attorney's Office.

19      THE COURT:  And just remember what I told you earlier:

20  This is just like sworn testimony.  The witness was sworn, the

21  court reporter was present, the lawyers for both sides were

22  present.  And so you should judge it just as you judge any other

23  testimony.  Okay.  Mr. Cooney.

24      MR. COONEY:  Thank you, Your Honor.

25      (WHEREUPON, the deposition transcript of Val Solino was

1  read as follows:)

2                          DIRECT EXAMINATION

3  BY MR. COONEY:

4  Q.    Good morning, Mr. Solino.  When did you graduate from law

5  school?

6  A.    In 1982.

7  Q.    What was your first legal job after graduating?

8  A.    I worked for a solo practitioner who was doing basically

9  insurance defense but would do anything that walked in the door.

10  Q.    How long were you with the sole practitioner?

11  A.    13, 14 months.

12  Q.    What was your next job?

13  A.    The next job was at the District Attorney's Office in

14  September of '85.

15  Q.    In Orleans Parish?

16  A.    That's correct.

17  Q.    Did you get any training when you started the job?

18  A.    Well, the job was on-the-job training.

19  Q.    Meaning what?

20  A.    Meaning I met with the supervisor for several hours the

21  first day, who explained to me, you know, what needed to be done,

22  how best to prepare for it, the first day, the next day, and

23  perhaps the day after that.

24          One of the, there was the first day I would have met

25  with the chief of juvenile who kind of ran everything down to me.

1  Like, the second day, and perhaps a hunk of the third day or as

2  much as you needed, but quite frankly, I didn't need any more

3  than the first day's help.  And once they could see you had it

4  pretty much under control, you were allowed to handle the docket

5  yourself and just pre-try the issues the day before so that you

6  could be ready for the next day's court.

7  Q.   Outside of juvenile court, if you look back to 1985, what

8  kinds of cases generally were being pre-tried in the District

9  Attorney's Office?

10 A.   Every case.  It was clearly, my understanding was a trial

11 attorney did not take a matter to trial unless it was pre-tried

12 and signed off on by a trial chief or a deputy chief.

13 Q.   Suppose someone like Mr. Dubelier, who was the prosecutor,

14 the lead prosecutor in the murder case had been preparing for

15 Mr. Thompson's murder trial.  Who would have pre-tried that?

16 A.   He probably would not have pre-tried.  Somebody with, at the

17 supervisory level he was at probably would not -- would not have

18 been expected to pre-try a case.

19 Q.   Because he was at a high enough level within the office to

20 be deemed supervisory?

21 A.   He was the chief of screening and designated as a special

22 prosecutor, and he would not have been pre-trying cases.

23 Q.   So he was high enough to be deemed a supervisor himself,

24 right?

25 A.   Well, not only deemed, he was, in fact, a supervisor.  And I

1    think at the time he probably was considered to be like the

2    Number 3 guy in the office.

3    Q.    So then Harry Connick, the first assistant, and then

4    Eric Dubelier as a practical matter?

5    A.    I wouldn't know because I wasn't in the chain, but I believe

6    Eric considered himself to be the third in line behind the first

7    assistant, yes.

8    Q.    Today that would be consistent with your understanding that

9    he was roughly the third in line behind Mr. Connick himself and

10   the first assistant, right?

11   A.    Yes.

12   Q.    Mr. Williams was the lead prosecutor on the armed robbery

13   case against Mr. Thompson, right?

14   A.    That's correct.

15   Q.    With whom would he have been expected to pre-try, if anyone?

16   A.    Because of the interconnection between Eric Dubelier and

17   with Jim Williams' stature within the office, the fact that the

18   armed robbery was interconnected or made to interconnect with the

19   homicide, it would not surprise me that Jim Williams did not

20   pre-try, but I do not know.

21          I don't know what the chief of trials considered Jim's

22   stature to be at the time.  I know he was respected, but whether

23   the chief of trials would have expected Jim Williams to get her

24   signature on his file before he proceeded to trial, I do not

25   know.

1  Q.    Would it have been appropriate for Mr. Williams to pre-try

2  it with Mr. Dubelier?

3  A.    They may very well have discussed the case.   What I'm

4  telling you is, I don't know what freedom Jim Williams was given

5  in September, October, whenever, in 1985, but he may have been

6  allowed to try cases without pre-trying.   I don't know.

7            Oh, I'm sorry, it's still me.

8            Now, what I'm telling you is that Jim may very well

9  have had stature within the office.   He may have been one of two

10 or three people that the chief of trials may have had such

11 confidence in that she felt that she did not need to pre-try the

12 cases with him and that he could go off and do the cases on his

13 own.   And it very well may have been that in this case, because

14 being special prosecutors, these two cases would never have been

15 the responsibility of the trial division, so the trial chief

16 would not have been looking to have any participation in these

17 two cases.   But to say that Jim would have felt a necessity to go

18 to Eric for authority on the armed robbery case, I do not know.

19 Q.    Other than the pre-trial process, which was typically done

20 with the chief of trials, the deputy chief, was there any

21 formalized mechanism for the higher level people in the office to

22 determine whether a trial lawyer, prosecutor assigned to a case

23 had complied with *Brady* obligations?

24 A.    No, that possibility was placed on the trial attorney.

25 Q.    In your view, if a prosecutor has information that a witness

1  in a criminal case is attempting to claim a reward and that that

2  individual may stand to receive a reward if convicted, if a

3  conviction is obtained, is that *Brady* material that is supposed

4  to be produced to the defense?

5  A.    If I would, you're asking me my personal opinion?

6  Q.    I am.

7  A.    If I were handling a case and I had a witness who had made a

8  claim for a reward and/or paid a reward and was promised a

9  reward, I would reveal the deal to the other side and hope to

10  have that aired out before the jury.

11  Q.    Yeah, okay, but here's my question.  Just based on your

12  understanding of the *Brady* rule, if the prosecutors in the armed

13  robbery case had the crime laboratory report but did not know

14  whether it matched Mr. Thompson's blood type, would they have

15  been obligated to turn it over to the defense?

16  A.    Your question is to use me as an example.  If I'm holding a

17  crime lab report that says blood on a shoe is B, and I have some

18  reason to believe that the blood on the shoe came from the

19  perpetrator, and I don't know what the perpetrator's blood type

20  is, do I feel I have a legal requirement at that point to

21  disclose that lab report?  No.  When it comes to my attention

22  that the other guy's blood is different, then yes.

23         Do I have a responsibility to advise the defense

24  attorney that blood or something that could be tested exists?  If

25  he doesn't already know that, I would hope that a prosecutor

1  would bring that to the defense attorney's attention.

2          (WHEREUPON, the recitation of the deposition ended.)

3          THE COURT:  All right.  Thank you.  Who is your next

4  witness?

5          MR. COONEY:  Your Honor, the plaintiff calls Joseph F.

6  Lawless, Esquire.

7          Your Honor, can we approach?

8          (WHEREUPON, there was a bench conference.)

9          THE COURT:  I think just as other witnesses have

10 generally said what his understanding of what *Brady* is and

11 requires, that's fine, but I don't want an hour lecture on *Brady*.

12         MR. COONEY:  The focus of his testimony is going to be

13 training, policies, practice; I mean, there may be some

14 questions --

15         MR. AARON:  He's going to go on qualifications and throw

16 to me to question him on qualifications.  Is that the way you

17 want to do?

18         THE COURT:  Yes, you qualify him, tender him, and then

19 you can traverse.

20         (WHEREUPON, the bench conference concluded.)

21              **JOSEPH F. LAWLESS,**

22 was called as a witness and, after being first duly sworn by the

23 Clerk, was examined and testified on his oath as follows:

24         MR. COONEY:  Your Honor, may I approach the witness?

25         THE COURT:  Sure.

1           MR. COONEY:   I want to hand him some documents that we

2   may use in his testimony.

3                        VOIR DIRE EXAMINATION

4   BY MR. COONEY:

5   Q.   State your name for the record, please, Mr. Lawless.

6   A.   Joseph F. Lawless, L-A-W-L-E-S-S.

7   Q.   And what do you do, Mr. Lawless?

8   A.   I'm a practicing attorney, and I'm an author in the area of

9   criminal law and criminal procedure.

10  Q.   Can you explain to the jury your educational background,

11  please.

12  A.   Yes.  I'm a 1973 graduate of St. Joseph's College in

13  Philadelphia, now St. Joseph's University.  I'm a 1976 graduate

14  of Villanova University Law School with a JD degree.

15  Q.   Can you tell the jury about your experience in the area of

16  criminal law and procedure, Mr. Lawless?

17  A.   Yes, sir.  I've been a practicing criminal attorney for

18  30 years.  From 1976 to 1979, I was an assistant district

19  attorney in Chester County, Pennsylvania.  That's one of the

20  suburban counties outside of Philadelphia.

21          In that capacity, I investigated and prosecuted crimes

22  ranging from simple assault to narcotics offenses, robbery, armed

23  robbery, rape, aggravated assault, homicide, police corruption,

24  white-collar crime.

25          At the end of that period, which was '76 to '79, I then

1    spent time working for two Philadelphia area law firms, one of

2    which was the firm of Sprague and Sprague, which was run by the

3    former first assistant district attorney of Philadelphia, a

4    gentleman by the name of Richard Sprague, and I started to

5    develop my criminal practice.

6            During that period of time, I was also an assistant

7    special prosecutor in the investigation and prosecution of the

8    president of the United Mine Workers union, a gentleman named

9    Tony Boyle, for the assassination murder of his union rival, a

10   gentleman named Jack Yablonski, Mr. Yablonski's wife and

11   daughter.

12           At the same time, I also was an assistant special

13   counsel for the Pennsylvania Judicial Inquiry and Review Board,

14   which is the body that polices judicial misconduct in

15   Pennsylvania.  And I was involved in the investigation and

16   prosecution for judicial code violations of a sitting

17   Pennsylvania Supreme Court justice.

18   Q.   And have you had a private practice since that time,

19   Mr. Lawless?

20   A.   Since that time I've been practicing continuously, and my

21   practice focuses primarily on criminal litigation in Pennsylvania

22   and other jurisdictions around the country.

23   Q.   And during the course of your practice, have you become

24   familiar with the principles under the Constitution governing a

25   prosecutor's duty to produce favorable evidence to the defense?

1   A.    Yes, I have.

2   Q.    And during the course of your practice, have you also become

3   familiar with the standards or the principles applied by

4   prosecutors' offices to adhere to that obligation?

5   A.    Yes.

6   Q.    Have you written any books or articles in the field of

7   criminal law and procedure?

8   A.    Yes.  I'm the author of a law book titled, *Prosecutorial*

9   *Misconduct, Law, Procedure, Forms,* which was first published in

10  1985 and is now in its third edition.

11  Q.    Is this a copy of your book, Mr. Lawless?

12  A.    Yes, it is.

13  Q.    Can you describe the book for the jury, please, Mr. Lawless.

14  A.    *Prosecutorial Misconduct* is a comprehensive analysis of

15  every possible area of misconduct by prosecutors.  It's a book

16  for practicing criminal defense lawyers.

17          And it starts with the earliest stages of a criminal

18  case, beginning with the investigation, the pretrial stage, the

19  discovery period, opening statements, trial, closing arguments,

20  appellate misconduct.  The entire gamut of possible prosecutorial

21  misconduct.

22          It attempts to provide not just a scholarly analysis of

23  what the law is, but it also attempts to give kind of a practical

24  bend to it.  We include motions and briefs that were filed in

25  actual criminal cases around the country.  We have transcripts of

cross-examination, arguments that were made by well-known lawyers
in well-known cases, to give a practicing attorney not only an
analytical framework for what the law is, but how to do it when
you get down into the courtroom, how to find it, what to do about
it, how to raise it and how to combat it.

Q.   How did you go about writing the book, Mr. Lawless?

A.   My publisher told me to simply start at the beginning.  So
the first thing that I did was basically get out a yellow legal
pad and draw on my own experience as, first, a prosecutor and a
criminal defense lawyer, and just start from the beginning and
make an outline of every area that I had ever encountered, again,
as a prosecutor or a defense lawyer.

Once I had that basic framework, it gave me a structure
to work from.  And then there are certain cases in varying areas
of law that are almost iconic in nature.  Everyone has heard of
*Miranda v Arizona*.  Everyone has heard of *Brady v Maryland.*

So there are certain general cases that you can start
at as a basis to research.  You look at, say, a major Supreme
Court case, and then you look at the other cases that interpret
that case.  And this was in the days before legal research was
computerized, so what it really entailed was sitting in a library
and pulling the books off the shelves and actually reading them.

From there, you would go to articles written by law
professors or the top law students in the country.  They are
called law review articles, and they would provide, again, a

1  broader analysis of an area, and then it would break it down into

2  individual cases that looked at that area.

3           Once I had all the research done and had it organized,

4  I would then start and try to put it in a narrative form so that

5  it would make sense to a practitioner to read it and index it,

6  look at it and determine, you know, here is the problem, how do

7  you deal with it.

8  Q.   Is your book used at any law schools to teach?

9  A.   Yes.  It's used at Harvard Law School in their class on

10 legal ethics and tactics for the criminal lawyer.

11 Q.   And is it used in any other defender services?

12 A.   Yes.  It's used by the administrative office of

13 United States courts in their defender training program, which is

14 the training program for federal public defenders.  It's one of

15 their recommended texts.

16 Q.   Is your book present in any law schools around the country

17 besides Harvard?

18 A.   Yes, it is.  I understand, anyway, it's in 140 law libraries

19 around the country.  Harvard, Yale, Georgetown, Loyola University

20 here in New Orleans, LSU Law School, Duke, USC, University of

21 Arizona.

22 Q.   Does your book cover the principles governing prosecutors'

23 duties with regard to the production of evidence that's favorable

24 to the accused?

25 A.   Yes, it does.

1  Q.    And in the course of your researching the book, Mr. Lawless,

2  did you research the standards or principles employed by

3  prosecutors' offices to ensure adherence to those principles?

4  A.    Yes, I did.

5  Q.    Have you appeared on television as an authority on criminal

6  law and procedure?

7  A.    Yes, I do.

8  Q.    Can you just, without getting into any great detail, talk

9  about some of the networks that you have appeared on?

10  A.    I am a legal commentator and legal analyst on *CNN Headline*

11  *News*, the *FOX News Channel*, *Comcast*, *CN8*, and *Court TV*.

12  Q.    Have you given any lectures regarding criminal law and

13  procedure?

14  A.    Yes, I was a lecturer in the National College of Advocacy

15  for the Association of Trial Lawyers of America for six or seven

16  years.  And then, I've given a number of lectures to Bar

17  associations and continuing legal education seminars in states

18  around the country, Pennsylvania, Kentucky, California, pretty

19  much all over the country.

20  Q.    In what jurisdictions, Mr. Lawless, are you admitted to

21  practice law?

22  A.    I'm a member of the Bar of the United States Supreme Court,

23  the Supreme Court of Pennsylvania, the United States Court of

24  Appeals, which are the federal Court of Appeals for the Third

25  Circuit, which is the Philadelphia area, the Fourth Circuit and

1   the sixth circuit.

2           I'm a member of the United States District Court for

3   the Eastern District of Pennsylvania, the United States Tax

4   Court, and then I've been admitted on a case-by-case basis in

5   other courts around the country.

6   Q.   Are you a member of any professional associations?

7   A.   I'm currently a member of the Pennsylvania Bar Association,

8   the American Bar Association, and the National Association of

9   Criminal Defense Lawyers.

10  Q.   And have you had any titles in those associations?

11  A.   I was a member, when I was a member of the Association of

12  Trial Lawyers of America, I was the chairman of the criminal law

13  section of ATLA's criminal law section.

14          MR. COONEY:  Mr. Vincent, can I ask you to put up

15  Exhibit 79, please.

16                          EXAMINATION

17  BY MR. COONEY:

18  Q.   And Mr. Lawless, I'm showing you Exhibit 79; I believe there

19  is a copy in front of you.

20          Is this a copy of your curriculum vitae or your resume,

21  if you will?

22  A.   That's the first page of it, yes, sir.

23  Q.   Can you identify, Mr. Lawless, what body or bodies of the

24  law governs a prosecutor's duty to disclose evidence that's

25  favorable to the accused?

1  A.   Well, state and federal law would apply, but under something

2  called the Supremacy Clause of the Constitution of the

3  United States --

4          MR. GOINS:   Excuse me, Your Honor, may we approach?   I

5  thought I was going to get him on qualification before he went

6  into his substantive testimony.

7          MR. COONEY:   Your Honor, I think this testimony does go

8  to qualification.

9          THE COURT:   Okay, let's go.

10         THE WITNESS:   Can you repeat the question, please.

11                              EXAMINATION

12  BY MR. COONEY:

13  Q.   Sure the question was:   Can you identify what body or bodies

14  of law governs a prosecutor's duties to disclose evidence that's

15  favorable to the accused.

16  A.   Yes, state and federal law would generally apply because of

17  the Supremacy Clause of the Constitution of the United States.

18  The U.S. Constitution and the court cases interpreting the

19  U.S. Constitution would provide the minimum standard for a

20  prosecutor's duty to disclose favorable evidence.   So it would be

21  United States constitutional law and then the cases that actually

22  interpret the Constitution.

23  Q.   Your Honor, Mr. Thompson offers Mr. Lawless as an expert in

24  criminal law and procedure, including the standards and practices

25  of prosecutors' offices to ensure compliance with obligations

1   under federal law to produce evidence favorable to the accused.

2         THE COURT:   Okay.   Mr. Aaron, you have questions on his

3   qualifications?

4         MR. AARON:   Yes, Your Honor.

5                        TRAVERSE EXAMINATION

6   BY MR. AARON:

7   Q.   You currently are a sole practitioner?

8   A.   Yes, sir.

9   Q.   And your office is where?

10  A.   Newtown Square, Pennsylvania.

11  Q.   Are you a member of the Louisiana Bar?

12  A.   No, sir.

13  Q.   Have you ever been admitted to practice in this Court?

14  A.   The District Court for Louisiana, federal court?   No, sir.

15  Q.   Have you ever been admitted to practice in the United States

16  Court of Appeals for the Fifth Circuit, which is the court that

17  is above this Court?

18  A.   No, sir.   I'm a member of the Bar in the Third, Fourth and

19  Sixth Circuits.

20  Q.   But not the Fifth?

21  A.   No, sir.

22  Q.   Have you ever served on the full-time faculty of any law

23  school?

24  A.   No.

25  Q.   Your curriculum vitae says that you have served as an

1   instructor at the Wider University.  That's a college, that's not

2   a law school, is it?

3   A.   Right.  I taught criminal law and corporate law at the

4   undergraduate level.

5   Q.   But that's not a law school, is it?

6   A.   Oh, no.  No.

7   Q.   Let's turn a little bit to your book.  You are the author of

8   the book, right?

9   A.   Yes, sir.

10   Q.   There is a, I recall, a foreword in the book?

11   A.   Yes, sir.

12   Q.   And the foreword was written by Allen Dershowitz?

13   A.   Yes, sir.

14   Q.   You mentioned earlier that your book was used at Harvard Law

15   School.

16   A.   That's correct.

17   Q.   If my memory serves me correctly, Allen Dershowitz is on the

18   faculty at Harvard Law School?

19   A.   You would be correct there, too.

20   Q.   He was also on the defense team for O.J. Simpson?

21   A.   That's correct.  Among others.

22   Q.   Are you familiar in any way with the rules of professional

23   conduct that govern Louisiana lawyers?

24   A.   I'm generally familiar with them.  I've read them.  I

25   certainly don't hold myself out to be an expert in them.

1  Q.    So you do not hold yourself out to be an expert as to the

2  Louisiana rules of professional conduct?

3  A.    No, I do not.

4  Q.    Would you hold yourself out as an expert with respect to the

5  Louisiana Code of Criminal Procedure?

6  A.    I've read it.  I'm familiar with it, but no, I would not

7  hold myself out as an expert in the Louisiana Code of Criminal

8  Procedure.  No, sir.

9  Q.    Have you ever been qualified to testify as an expert in

10  Louisiana before?

11  A.    No.

12  Q.    Have you ever been qualified to testify as an expert in

13  Pennsylvania?

14  A.    Never.

15  Q.    Have you ever been qualified to testify as an expert in any

16  court anywhere in the world?

17  A.    No.

18  Q.    So if you were to be qualified to testify as an expert in

19  this case, this would be the first time you've ever testified as

20  an expert, correct?

21  A.    That's correct, yes.

22          MR. AARON:  That's all I have, Your Honor.

23          MR. COONEY:  A couple quick questions, Your Honor.

24                          EXAMINATION

25  BY MR. COONEY:

1  Q.    Mr. Lawless, have you ever been asked to testify as an

2  expert previously?

3  A.    No.

4  Q.    So you don't make a living testifying as --

5  A.    Actually, Mr. Cooney that's not true.  I have been asked on

6  one or two occasions, and I've turned it down.  I'm a practicing

7  lawyer and I wasn't interested in doing it.

8  Q.    Have you ever been offered in court as an expert before?

9  A.    No.

10  Q.    And so you don't make your living giving testimony as a

11  professional, do you?

12  A.    No, sir, I'm a trial lawyer.  I'm a practicing attorney.

13            MR. COONEY:  Thank you, Your Honor.

14            THE COURT:  All right.  Counsel approach the bench.

15            (WHEREUPON, there was a bench conference.)

16            THE COURT:  Tell me exactly what he's going to testify

17  about.

18            MR. COONEY:  He's going to talk, well, Your Honor, when

19  we talked to you the other day, there were several grounds that

20  we offered.  The ground that Your Honor was focused on as being

21  potentially permissible to talk about, the standards and policies

22  that prosecutors' offices can use to ensure compliance with

23  *Brady*.  For example, he will talk about the existence of

24  open-file discovery and what that --

25            THE COURT:  I don't think that's an issue in the case

1   that they could have done that.  The question is whether that's

2   required or mandated under the Constitution.  It's clearly not.

3          MR. COONEY:  But I think the way that that analysis

4   goes, Your Honor, it's clearly a policy choice whether or not to

5   do open-file discovery.

6          THE COURT:  But that's not the issue, that's not what's

7   at issue in the case.  It's not an issue of whether they could

8   have done more or maybe even should have as a policy matter.

9   It's whether they followed the Constitution.

10          MR. COONEY:  But I think the point, Your Honor, is --

11          THE COURT:  But you can't argue to the jury that

12   Mr. Thompson's rights were violated somehow because they didn't

13   have an open-file policy.

14          MR. COONEY:  Here is the point that I'm trying to make

15   that there is a policy decision to make whether to file an

16   open-file discovery or not if --

17          THE COURT:  That's already been established.

18          MR. COONEY:  But if the district attorney chooses not to

19   follow up open-file discovery, there is a strong burden that is

20   imposed upon the prosecutor to have guidance, to have training,

21   to make sure that the prosecutors in that office understand what

22   the rules are and how important it is, and I think that is an

23   appropriate subject for expert testimony.

24          The jury should know that the decision of whether or

25   not -- let me finish please -- the jurors should know whether or

1   not that the decision whether or not to file an open-file

2   discovery is a policy choice and if the highest executive chooses

3   not to do so, there is a burden imposed upon him to make sure

4   that the people in the office are adequately trained and have

5   adequate guidance.  That is a policy issue.

6          MR. AARON:  All I was going to say, Judge, is that I

7   think for the whole trial we have been going back and forth on

8   whether there is training, what kind of training was it, was

9   there supervision, so I think the jury is hearing from fact

10  witnesses, which I think is important.  They've got to decide

11  factually, not from some conceptual level.

12         THE COURT:  I'll let him testify, but you need to limit

13  it, I think, to what the last thing you just said, that it's a

14  policy choice but if you don't have the open file, this is what

15  you should do, if that's what his testimony is going to be.

16         MR. COONEY:  Okay.  And then he'll testify, Your Honor,

17  about his opinion concerning the training that was provided.

18         THE COURT:  Okay.

19         (WHEREUPON, the bench conference concluded.)

20             VOIR DIRE EXAMINATION (RESUMED)

21  BY MR. COONEY:

22  Q.   I want to ask you some questions, Mr. Lawless, about what

23  you have reviewed in this case.  Did you review any of the prior

24  trial testimony from the earlier proceedings against

25  Mr. Thompson?

1       THE COURT:  By the way, let me just state this for the

2   benefit of the jury.  I'm going to allow Mr. Lawless to testify

3   as what's called an expert in the case.  Ordinarily a witness is

4   not permitted to give opinion testimony.  They can only testify

5   to facts that they know from their own personal knowledge or

6   observance.

7       In the case of an expert witness where someone is

8   qualified by reason of education, training, or experience or a

9   combination thereof, the Court, I mean, that person may be

10  allowed to testify as to opinions based on other information that

11  is given to them or furnished to them.

12      So that's what it means to testify as an expert.  And

13  I'll give you more guidance on that when we give the final legal

14  instructions.  Go ahead.

15      MR. COONEY:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17  BY MR. COONEY:

18  Q.   So did you review any of the prior trial testimony involving

19  the prosecutions against John Thompson?

20  A.   Yes, sir, I did.

21  Q.   What did you review?

22  A.   I reviewed the 1985 armed robbery/carjacking trial and I

23  reviewed Mr. Thompson's 1985 murder conviction.  I then reviewed

24  the transcript of the retrial of the murder conviction and the

25  transcripts of the various hearings that were held between the

1    first murder conviction and Mr. Thompson's second trial and

2    acquittal.  I believe it was two or three proceedings.

3    Q.   Did you review any deposition transcripts in the case,

4    Mr. Lawless?

5    A.   Yes, I did.

6    Q.   Whose depositions did you review, if you can recall?

7    A.   I reviewed the depositions of the defendants, Mr. Connick,

8    Mr. Williams, Mr. Dubelier, I also reviewed the depositions of

9    Mr. Whittaker, who testified earlier today.  I reviewed the

10   deposition of a gentleman named Val Solino.  I reviewed the

11   deposition of an individual, I believe was the first assistant

12   district attorney, Mr. McElroy.  And I reviewed the deposition of

13   a gentleman named Jerry Glas.

14   Q.   Did you review any documents in preparing for your

15   testimony?

16   A.   Yes, I reviewed the blood test that's been marked as an

17   exhibit in this case, and the file jacket that was with the blood

18   test.  I reviewed a number of police reports, the police

19   supplemental reports, the homicide dailies, all the deposition

20   exhibits that were attached to the depositions of the witnesses

21   that I read.  And pretty much reviewed everything you have down

22   there in those big thick binders.

23   Q.   Have you been in court listening to the testimony of the

24   witnesses since Monday?

25   A.   Yes, I have.

1   Q.   And finally, have you considered any of the stipulated or

2   undisputed facts in this case?

3   A.   Yes, I did.

4   Q.   Mr. Lawless, can you tell the jury what open-file discovery

5   is?

6   A.   Open-file discovery is what it sounds like.  The prosecutor

7   comes in, can meet with the defense lawyer and literally open the

8   file for him to read it or can simply Xerox the contents of it

9   and turn it over to the defense lawyer for his review.

10  Q.   And what are the benefits of open-file discovery?

11  A.   The primary benefit, in my opinion, is that the defendant

12  gets a fair trial based on all the evidence.  There is no

13  gamesmanship.  There is no hiding of evidence or only turning it

14  over in dribs and drabs.  The criminal defendant gets a fair

15  trial based on all of the evidence.

16  Q.   Is the district attorney required under the law to implement

17  open-file discovery?

18  A.   No.  That's a policy decision that the district attorney,

19  the elected district attorney, the head man, that's a policy

20  decision he makes.

21  Q.   And has the American Bar Association issued standards for

22  criminal justice?

23  A.   Yes, it has.

24  Q.   And can you talk just for a minute about how those standards

25  were developed and what they are?

1   A.   In 1974, the American Bar Association standing committee on

2   criminal justice standards undertook to come up with

3   comprehensive and a consensus set of appropriate standards of

4   behavior for everybody in the criminal defense system, both

5   prosecutors and defense lawyers.

6           And the committee that made up the standards, that

7   drafted them, was made up of prosecutors, defense lawyers and

8   judges.   The end result being a set of standards that are set up

9   as a guide to appropriate professional conduct and behavior by

10  both prosecutors and defense lawyers.

11  Q.   And just on timing again, can you tell the jury when those

12  standards were developed?

13  A.   The first standards were developed and released in 1974.

14  And then in 1980, they were revised and a second set of standards

15  was promulgated.

16  Q.   Now, did the ABA standards, the American Bar Association

17  standards, do they address pretrial production by prosecutors?

18  A.   Yes, they do.

19  Q.   And is there a particular section that does that?

20  A.   May I refer to my report just to refresh my recollection?

21  Q.   Yes.   And you're referring to your report, which has been

22  marked as Exhibit 78, without objection; is that right?

23  A.   Yes, sir.

24  Q.   Okay.

25  A.   The American Bar Association discovery standard 11-2.1 on

1  prosecutorial disclosure addresses what the ABA standards suggest

2  to be the proper standard for pretrial disclosure by prosecutors.

3        MR. COONEY:  Mr. Vincent, can you put that up for one

4  second so the jury can see that.

5                      EXAMINATION

6  BY MR. COONEY:

7  Q.   Mr. Lawless, that identifies a number of things that the

8  prosecutors, at least under the ABA standard, should provide; is

9  that correct?

10 A.   Yes, sir.

11 Q.   Now, is a district attorney required to follow the ABA

12 standards?

13 A.   No.  Again, that's a policy decision that the district

14 attorney, the elected district attorney, the head guy, that's a

15 policy decision the district attorney has to make.

16 Q.   Now, based on your review of the evidence in this case, has

17 the Orleans Parish District Attorney, under Mr. Connick, did they

18 have an open-file discovery approach?

19 A.   No, they did not.

20 Q.   Did they follow the American Bar Association standards?

21 A.   No, they did not.

22 Q.   Now, if a district attorney does not follow open-file

23 discovery, doesn't follow the ABA standard, is there anything in

24 terms of a standard that he is required to do?

25 A.   The district attorney is or would be required to have a very

1  clear statement of what his policy was.  He would have to make

2  the *Brady* obligations of the individual prosecutors very clear to

3  them in terms of what specifically they were.  And he would have

4  to emphasize in the strongest possible terms that the office

5  takes the *Brady* obligations of a prosecutor seriously.

6          He would have to be looking him in the eye and

7  essentially saying, We really mean this.  This is something you

8  have to do.

9  Q.   Now, if you're not going to have open-file discovery, why

10 would you, as the DA, have to do that?

11 A.   Because every district attorney knows that at some point in

12 a prosecutor's career they are going to come into possession of

13 evidence that tends to be exculpatory of a defendant or tends to

14 impeach other witnesses.  And they also understand that failure

15 to turn that information over under *Brady* is going to result in a

16 serious constitutional violation of a criminal defendant's

17 rights.

18         They also should know that if they don't have an

19 open-file policy, then there's an obligation to make sure that

20 those individual assistant DAs are very carefully schooled in

21 what their *Brady* obligations were.  They should know that *Brady*

22 is an evolving concept.  It's not just one case; it's one case

23 and other subsequent cases that interpret that.

24         So the prosecutor, if you're not going to simply turn

25 the file over to the defense lawyer, the head prosecutor has to

1  make sure that the individual prosecutors know exactly what it is
2  they have to do.
3  Q.   In your opinion, would a policy of instructing assistant
4  district attorneys to, quote, follow the law, be sufficient?
5  A.   Absolutely not.
6  Q.   Why?
7  A.   Because it doesn't really give them any guidance on what
8  that law is.  It simply says, You're on your own, figure it out
9  for yourself.
10          And by doing it that way, you're not emphasizing the
11  importance of actually doing it.  It's almost dismissive:  Follow
12  the law.
13  Q.   Now, based on your review of the evidence, Mr. Lawless, do
14  you have an opinion about the adequacy of the guidance and the
15  training that was given to the prosecutors in the Orleans Parish
16  District Attorney's Office at the time of Mr. Thompson's
17  prosecutions in 1985?
18  A.   Yes, I do.
19  Q.   And what is that opinion?
20  A.   It's my opinion that the training and guidance that was
21  given was completely inadequate.
22  Q.   And what do you base that on?
23  A.   Well, a number of things.  There were, first of all, there
24  were stipulations in this case.
25  Q.   Let me stop you there for a second so we can take this piece

1  by piece?

2       MR. COONEY:  Mr. Vincent, could you put up uncontested

3  facts TT and UU.

4                              EXAMINATION

5  BY MR. COONEY:

6  Q.  And Mr. Lawless, could you take a look at the single listing

7  of uncontested facts in front of you and read from uncontested

8  material facts TT and UU, please.

9  A.  I'll have to read from the screen I don't have them in front

10  of me.  TT says, "Defendants have not provided or identified any

11  written policy promulgated the District Attorney's Office

12  concerning *Brady* that predates a February 1987 policy manual

13  other than the Code of Professional Responsibility which concern

14  *Brady* and which had been in existence since 1970."

15       UU states, "None of the district attorney witnesses

16  recall any specific training session concerning *Brady* prior to or

17  at the time of the 1985 prosecutions of Mr. Thompson."

18  Q.  So one of the things that you base your opinion on is from

19  those stipulated facts?

20  A.  That's correct.

21  Q.  Now, did you also base your opinion on any of the testimony

22  in the case?

23  A.  Yes, both Mr. Williams and Mr. Dubelier, the deposition of

24  Mr. Dubelier indicated they had no recollection of any kind of

25  *Brady* training at all.

1  Q.    Okay.

2  A.    There was also earlier today, if you recall the testimony of

3  Mr. Whittaker, Bruce Whittaker, who said that in *Brady* there was

4  a lot of gray area and to have more training about what that gray

5  area was would have been a help.

6        There was also very marked differences and sometimes

7  just complete errors among high-ranking individuals in the

8  Orleans Parish District Attorney's Office as to what *Brady*

9  required them to do.

10       For example, if you recall, Mr. Connick was testifying

11 about one of the police reports that gave the description of the

12 perpetrator as 6 feet tall, dark complected and close-cropped

13 black hair.  And then he was, in the deposition, was shown the

14 mug shot picture of John Thompson with the Afro.  Mr. Connick

15 looked at that and immediately concluded that that police report

16 giving a different description than the picture would be *Brady*

17 and should be turned over.

18       If you recall, and I recall very clearly, Mr. Dubelier

19 being asked the same question, and he looked at the picture and

20 considered the contents of the report.  Again, 6 feet tall,

21 close-cropped hair, dark complected, African-American male, and

22 didn't think that there was any inconsistency in appearance, and

23 basically did a dance and hypothecated a scenario where, well,

24 maybe the picture didn't exactly represent the way the individual

25 looked, so in his mind, Mr. Dubelier didn't believe that that was

1  *Brady*.

2       So here you have the number 1 guy in the office saying,

3  yes, it's *Brady*, then you have the number 2 person in the office,

4  and quite frankly it shocked me, saying that it wasn't *Brady*.

5       We then have the testimony of Mr. Williams yesterday

6  who testified that if he had had the blood report, that the blood

7  report should be turned over.

8       And I believe we just had, I think it was Mr. Solino,

9  the testimony where Mr. Banks was reading it, testifying that if

10  they had the blood report but he didn't necessarily know the

11  blood type of the perpetrator that that wouldn't be required to

12  be turned over as *Brady* material.

13  Q.   So is it your conclusion from that testimony that A,

14  prosecutors didn't understand *Brady*, and B, that reflected on the

15  quality of the training?

16  A.   Absolutely.

17  Q.   Does the ABA standard, Mr. Lawless, also address the issue

18  of providing guidance to assistant district attorneys through a

19  handbook given by a district attorney to assistants?

20  A.   Yes, it does.

21       MR. COONEY:  Mr. Vincent, would you be good enough to

22  put up section 3-2.5.  I think actually, that's another.

23       THE WITNESS:  Mr. Cooney, would you like to use my copy

24  of the report?

25                      EXAMINATION

 1  BY MR. COONEY:

 2  Q.   Well, would you refer to your copy of the report,

 3  Mr. Lawless?

 4  A.   Certainly.

 5  Q.   And I'm directing your attention to page --

 6  A.   29?

 7  Q.   29 of your report.  Can you explain to the jury about

 8  section 3-2.5 of the ABA standards with regard to the

 9  prosecutor's handbook?

10  A.   Yes.  What the standard says, and excuse me for reading, it

11  says that, "Each prosecutor's office should develop a statement

12  of general policies to guide the exercise of prosecutorial

13  discretion and procedures of the office.  The objectives of these

14  policies, as to discretion and procedures, should be to achieve a

15  fair, efficient and effective enforcement of the criminal law."

16       And then standard 3-2.5(B) states, "In the interest of

17  continuity and clarity, such statement of policies and procedures

18  should be maintained in an office handbook.  This handbook should

19  be available to the public except for subject matters declared

20  confidential when it is reasonably believed that public access to

21  their contents would adversely affect the prosecution function."

22       The commentary to that, which is in an explanatory

23  section that follows the standard says, regarding an office

24  handbook, "The articulation of policies and procedures should be

25  preserved in a handbook or manual that reflects current rules,

1  statutes and judicial decisions.  It should also contain detailed

2  descriptions of the criteria governing the principal duties of

3  the office.  Highly useful manuals have been established in many

4  prosecutors' offices.  They serve to maintain consistent

5  practices and continuity despite changing personnel and tend to

6  assure that the policies adopted at the highest levels of the

7  office are observed by the staff.  Perhaps of equal importance is

8  the function of such a handbook as a teaching tool by which the

9  accumulated experience of many is preserved and transmitted."

10  Q.    Now, Mr. Lawless, am I correct that that standard was

11  articulated by the American Bar Association in about 1980?

12  A.    Well, I believe it was first articulated in 1974, and then

13  it was reiterated in 1980.  I don't believe that changed at all

14  from the first to the second set.

15  Q.    At the time of the prosecutions against Mr. Thompson in

16  1985, did the Orleans Parish District Attorney's Office have a

17  handbook?

18  A.    No, it did not.

19  Q.    What was the first year that the Orleans Parish District

20  Attorney's Office had a handbook?

21  A.    My understanding is the first year they had a handbook was

22  1987, which would have been two years after Mr. Thompson's

23  trials.

24        MR. COONEY:  And Mr. Vincent, can you now put up section

25  5.25.

1                          EXAMINATION

2  BY MR. COONEY:

3  Q.   This is the section of the Orleans Parish District Attorney

4  handbook, Exhibit 51, from 1987.  Have you reviewed that section,

5  Mr. Lawless?

6  A.   Yes, I have.

7  Q.   Now, does that section provide any guidance to prosecutors

8  as to what is and is not *Brady* material?

9  A.   No.  It just says that the duty to produce it is ongoing.

10  It doesn't give any guidance at all as to what it is or what has

11  to be produced.

12  Q.   And it says in most cases in response to the request of the

13  defense attorneys, and it's talking about the, in response to a

14  request as opposed to an initiation?

15  A.   Correct.

16  Q.   By the DA?

17  A.   That's correct.

18  Q.   The judge orders the state to produce so-called *Brady*

19  material.  "That is information in the possession of the state

20  which is exculpatory regarding a defendant."

21        Do you see that?

22  A.   Yes.

23  Q.   Let me ask you a couple of questions about that.  Is *Brady*

24  limited to situations where there is A, a request from the

25  defense, and B, the judge orders the prosecutors to turn over the

1   information?

2   A.   No, it isn't.

3   Q.   And is *Brady* limited, Mr. Lawless, to information which is

4   simply exculpatory regarding a defendant?

5   A.   No.

6   Q.   Is it allowed to include impeachment evidence?

7   A.   It was expanded shortly thereafter in a case called

8   *United States v Giglio*, which says that *Brady* material is not

9   only evidence that tends to show a defendant is innocent,

10  exculpatory, but evidence which impeaches the credibility of

11  witnesses who are testifying against the defendant.

12  Q.   In the *Giglio* case, what year was *Giglio* decided?

13  A.   I believe it was within four to five -- it might even have

14  been within two to three years after *Brady*, but it was very

15  shortly thereafter.

16  Q.   Would 1972 refresh your recollection?

17  A.   Yeah, it would.  Thank you.  I didn't memorize the year.

18  Q.   Then it goes on to say, "The duty to produce *Brady* material

19  is ongoing and continues throughout the entirety of the trial.

20  Failure to produce *Brady* material has resulted in mistrials and

21  reversals as well as extended court battles over jeopardy

22  issues."

23          Does it say anything in that policy about the impact on

24  the Defendant of failing to produce *Brady* material?

25  A.   No, it does not.

1  Q.    It then goes on to say, "In all cases, a review of *Brady*

2  issues, including apparently self-serving statements made by the

3  defendant, must be included in a pretrial conference and each

4  assistant must be familiar with the law regarding exculpatory

5  information possessed by the state."

6          Is that what that says?

7  A.    That's what it says.

8  Q.    So it tells the DAs they have to go out and figure it out?

9  A.    Yes.

10  Q.    Based on your experience, Mr. Lawless, did the 1987 handbook

11  give proper guidance to the assistant district attorneys in the

12  Orleans Parish District Attorney's Office?

13  A.    No, it did not.

14          MR. COONEY:  I have no further questions, Mr. Lawless.

15  Thank you.

16          THE COURT:  All right.  Mr. Aaron.

17                    CROSS-EXAMINATION

18  BY MR. AARON:

19  Q.    You said a lot in a short time.  Open-file discovery.  You

20  mentioned benefits.  Are there any downsides to it?

21  A.    Well, I believe you had mentioned it in your opening

22  statement, Mr. Aaron.  One of the arguments that's frequently

23  made against open-file discovery are supposed threats or concern

24  for witnesses' safety.

25          As a practical matter, however, in 1975, when the House

1  Judiciary Committee was examining expanding the federal rules of

2  criminal procedure, they accepted testimony and concluded that in

3  practice, that wasn't as broad a problem as is perceived and that

4  in the isolated cases where that was an issue, there were steps

5  that could be taken to ensure there wasn't witness retaliation by

6  redacting statements or editing out that kind of information.

7  It's an argument, but it's not as broadly perceived as thought.

8  Q.   Would you agree that the concern would be greater in an

9  urban area that has a history of witnesses being killed before

10 they could come to testify?

11 A.   I would think it's a significant concern anywhere.

12 Q.   Have you been keeping up with what goes on in the

13 New Orleans area with respect to witnesses having been killed in

14 this local area?

15 A.   You mean just recently?

16 Q.   I'll give you a range.  Let's say 1985?  1984, 1985, do you

17 know?

18 A.   No, I don't.

19 Q.   Let's say currently.  Do you know?

20 A.   No, I don't.

21 Q.   Now, the ABA standards that you're talking about, you used

22 the word in your testimony, you said guidelines, right?

23 A.   Yes.  I think I said guidelines.

24 Q.   A guideline is something that you can refer to.  It's

25 suggestive but it's not mandatory, is it?

1  A.   No, the ABA guidelines are not mandatory; of course not.

2  Q.   So if a district attorney does not follow them, that in and

3  of itself is not wrong, is it?

4  A.   No, it's a policy decision that the district attorney makes.

5  It's certainly not inherently wrong.

6  Q.   And you would agree that an elected district attorney should

7  have the right to make his own policy, shouldn't he?

8  A.   I believe an elected district attorney has the right to make

9  his own policies within the context of the applicable law that

10  applies to each policy.  Absolutely.

11  Q.   Now, the State of Louisiana has a 64 parishes.  Not all

12  parishes have district attorneys.  So let's assume that there are

13  at least 40 different district attorneys serving parishes in

14  Louisiana.  Okay.  Other than Orleans Parish, what other district

15  attorneys' offices in Louisiana have you studied?

16  A.   I haven't studied any other district attorneys' offices in

17  any of the parishes.  Parishes, right?

18  Q.   Parishes.  Right.  Not counties.

19  A.   I have the same problem as Mr. Litvin.

20  Q.   Okay.  So you wouldn't know one way or the other whether the

21  other, let's say, 40 district attorneys have an open-file policy

22  or they don't, would you?

23  A.   No, but I would know that they are governed by the

24  principles of *Brady* and the cases interpreting *Brady*.  That's

25  true across the country in every state, in every parish or

1  county.

2  Q.   You talked about the Supremacy Clause, right?

3  A.   Yes, sir.

4  Q.   Now, the Supremacy Clause in and of itself doesn't just say

5  that state laws are automatically invalid, right?  It says that

6  they are only invalid to the extent that they conflict with

7  federal law, right?

8  A.   Or violate it.

9  Q.   Or violate it.  So you could have state law coexisting with

10 federal law, couldn't you?

11 A.   I happens all the time.

12 Q.   Happens all the time.  Now, let me put up on the screen and

13 ask you some questions about the Louisiana Code of Professional

14 Responsibility, specifically article D.R. 7-103 as it existed in

15 1985 and as it governed Louisiana attorneys.

16      You want to read that part out loud.

17 A.   You're assuming I can actually see it.  Hang on.

18 Q.   If it was *CNN,* I would give you a monitor.

19 A.   The TelePrompTers are much closer.

20      "Code of Professional Responsibility -- thank you --

21 disciplinary rule 7-103, performing the duty of public prosecutor

22 or other government lawyer.

23      "(A), a public prosecutor or other government lawyer

24 shall not institute or cause to be instituted criminal charges

25 when he knows or it is obvious that the charges are not supported

1  by probable cause."

2  Q.   Stop.  Do you agree with that?

3  A.   Yes.

4  Q.   Keep going.

5  A.   "(B), a public prosecutor or other government lawyer in

6  criminal litigation shall make timely disclosure to counsel for

7  the defendant or to the defendant if he has no counsel.   The

8  existence of the evidence known to the prosecutor or other

9  government lawyer that tends to negate the guilt of the accused,

10  mitigate the degree of the offense, or reduce the punishment."

11  Q.   Do you agree with that?

12  A.   Sure.

13  Q.   Would you agree that if that is part of the Code of

14  Professional Responsibility governing Louisiana lawyers, it is a

15  law in Louisiana?

16  A.   Well, it's a code of professional conduct.  I don't know if

17  you could necessarily equate it with a law.  But it certainly

18  would govern the practice conduct of lawyers in the practice of

19  law.

20  Q.   Do you see anything so far in this rule that conflicts with

21  federal law, in your opinion?

22  A.   Well, it would appear to me that section B is an attempt to

23  restate the prosecutor's obligation under *Brady*.

24  Q.   That wasn't my question.  Do you view this as being in

25  conflict with federal law?

1  A.    No.

2  Q.    Fine.   Now, so if a Louisiana attorney were to follow this

3  rule which, and we agree if they are a Louisiana attorney, they

4  had to, right?

5  A.    Yes.

6  Q.    In following this, they would not be in conflict with

7  federal law in your professional opinion, as an expert?

8  A.    If they followed it to the limited extent of paragraph B in

9  terms of what they disclosed to the defense lawyer or the

10  defendant, they would be in conflict because the obligation to

11  disclose information under *Brady* is broader than that.

12  Q.    And you would say it's broader because in your opinion it

13  includes impeachment?

14  A.    It's not my opinion, sir, it's the opinion of the United

15  States Supreme Court in *Giglio*.

16  Q.    Can we agree that you would say that the distinction of that

17  does not reference impeachment?

18  A.    It clearly does not reference impeachment.

19  Q.    Now, but as written, it does not conflict with federal law?

20  A.    No.

21  Q.    Now, so if Mr. Connick were to say to his assistants, Follow

22  the law, which he meant to include federal law as you talk about,

23  and the rules of professional conduct governing Louisiana

24  lawyers, where is the problem, sir?

25  A.    Well, by simply following the law, and as I recall the

1  testimony, it was follow the law, follow *Brady*.  And that was the

2  extent of it.  It didn't really articulate to the prosecutors

3  what *Brady* was, what their obligations were, what their duty was

4  to seek out exculpatory material or material that impeaches

5  defense witnesses.  Or the affirmative obligation they have to

6  comply with *Brady.*  It simply says, Follow *Brady*.  That, to me,

7  would be the first problem.

8          The second problem, and just follow *Brady*, the

9  prosecutor has to say more than just, Follow the law, wink.  He

10 has to emphasize the importance of it.  And by simply saying,

11 Follow the law, you're almost minimizing it.  So in terms of that

12 as a directive I don't think that --

13 Q.   Let me ask you the reverse question.

14 A.   Okay.

15 Q.   Is there in anything in the policy that said, Don't follow

16 the law?

17 A.   I'm sorry, I'm not sure --

18 Q.   Is there anything in the policy that you reviewed that says,

19 Don't follow the law?

20 A.   Is there anything in Mr. Connick's policy that says, Don't

21 follow the law?  Not those terms.  Of course not.

22 Q.   Let me ask you this:  A policy is a written document

23 generally speaking, isn't it?  As distinguished from a custom or

24 practice?

25 A.   Generally speaking, yes, but there are also, you know,

1  verbal policies as well.

2  Q.   Have you ever seen, with your own eyes, a written policy

3  issued by Harry Connick's office saying, Do not turn over *Brady*

4  materials.  Do not follow the law.

5       Have you ever seen anything like that?

6  A.   No, and quite frankly, I don't think that would be something

7  that would be reduced to writing even if it did exist.

8  Q.   In your discussions with former employees of the District

9  Attorney's Office, did any of them tell you or did you read in

10 their depositions that they knew of a policy saying, Do not

11 follow *Brady*.  Don't obey the law?

12 A.   I didn't have any discussions with any of them other than to

13 say hello to one of them in the hallway.  In terms of the

14 depositions, I know there was a policy in Mr. Connick's office

15 not to turn over witness statements, not to turn over Grand Jury

16 material, not to turn over police reports.

17       And to the extent that's their only policy and that's

18 all they are told to do, that could very well be a violation of

19 *Brady* because by simply saying, Don't turn over the statements,

20 don't turn over the Grand Jury material, you're allowing the

21 assistant DA to just make the blanket decision, Okay, here are

22 the statements.  I'm not going to turn them over.  And you're

23 eliminating the prosecutor's duty to look at those statements in

24 the context of the entire case and see if there is anything in

25 there that's exculpatory or impeachable.  It's just a blanket

1    statement, and that to me, does violate the principles of *Brady*,

2    certainly.

3    Q.   Let me ask you this:  Are you aware of the fact that in

4    1985, there were approximately 70 assistant district attorneys

5    working for Harry Connick?

6    A.   I'll take your word for it, sure.

7    Q.   Of the 70 assistant district attorneys working for

8    Harry Connick in 1985, how many of them did you personally speak

9    to and question about *Brady* before rendering your opinion in this

10   case?

11   A.   Mr. Aaron, you know I didn't speak to any of them.

12   Q.   You spoke to no one?

13   A.   No, sir.  And I didn't purport to.

14   Q.   So it's fair to say that your opinion is based upon the

15   handful of responses in depositions that you read?

16   A.   Well, and the testimony that I saw today.  And if I could

17   give an example, Mr. Williams just now on the witness stand, to

18   me, in my opinion, he is still not sure what his obligations were

19   under *Brady*.

20        At one point, he testified that it didn't include

21   impeachment testimony and at another point he testified that it

22   did.  He was waffling all around.  And here is a man who was a

23   high-ranking official in that the office who claimed to know what

24   his *Brady* obligations were.  And at one point, he was just flat

25   out wrong.

1   Q.   Let me say this:   A lot of the testimony in this case is,

2   What do you recall from 1985, right?

3   A.   Yes.   Under oath, of course.

4   Q.   So isn't it fair to say that because 1985 was over, what,

5   20-something years ago, that people might not remember

6   everything?

7   A.   No.   But Mr. Williams today was testifying about his present

8   understanding, which I would have thought would have been even

9   better having had the training.

10   Q.   Please be responsive to my question.

11   A.   I am sorry.

12   Q.   I'm asking you about 1985 and people's recollections?

13   A.   I think people --

14   Q.   Let me finish my question.

15   A.   Okay.

16   Q.   A lot of questioning in the deposition was, What do you

17   recall about the *Brady* training in 1985; isn't that correct?

18   A.   Correct.

19   Q.   Isn't it fair to say that most people would not have total

20   recall as to what they remember happening back in 1985?

21   A.   My recollection of the testimony, at least with respect to

22   Mr. Dubelier, Mr. Williams, and Mr. Whittaker, wasn't that they

23   didn't remember one way or another, it was that they didn't

24   recollect any training about *Brady,* period.

25   Q.   Do you recall, and you sat through the testimony, I watched

1  you sit here, that most people said they had on-the-job training.

2  The defense has never contended that there was formal training

3  with a professor standing up.  Is that what you were looking to

4  see?

5  A.   I'm sorry, I don't know if I understand your question.  I

6  wanted to hear what the testimony was going to be.  I wasn't

7  really looking for anything in particular.  But if you're talking

8  about on-the-job training on an issue like *Brady*, which is a

9  pretty nuanced legal principal subject to interpretation, if it's

10  on-the-job training or if it's being trained by a supervisor who

11  hasn't had any training either, then the training, in my opinion,

12  would be inadequate.

13  Q.   But you would be speculating because you did not interview

14  every supervisor, did you?

15  A.   No.

16  Q.   From 1985?

17  A.   No, but I did hear the testimony of Mr. Whittaker, and I do

18  recall very clearly his deposition testimony, where he said that

19  you had assistant DAs, some with experience, some with 6 weeks

20  out of law school who were making *Brady* decisions without ever

21  having been schooled in what *Brady* is.

22       That's a pretty serious thing.

23  Q.   You also heard testimony, I think you heard it anyway, that

24  every junior reports to a senior and they both reported to the

25  chief of trials.

1  A.   I'm sorry, he coughed.

2  Q.   Every junior ADA reported to a senior, and both of them

3  reported to the chief of trials.  You did hear that?

4  A.   Yes, I did.  But Mr. Aaron --

5  Q.   Wait.  Let me stop.  That was my question.  Yes or no.

6  A.   Okay.

7  Q.   Now, in formulating your opinion in this case, did you ever

8  personally talk to the chief of trials from 1985?

9  A.   Personally, no.

10  Q.   So you wouldn't know whether or not they know *Brady* as you

11  know *Brady* or not, would you?

12  A.   The chief of trials was Mr. Dubelier?

13  Q.   No.  Mr. Dubelier, got to keep up with this.  Mr. Dubelier

14  was the chief of screening.

15  A.   Okay.

16  Q.   Chief of trials was a different position.

17  A.   Who was the chief of trials?  Would you refresh my

18  recollection?

19  Q.   I don't know.  I'm asking you if you knew.  There were a

20  number of them in '85.  I was asking, did you speak to anybody?

21  A.   No.

22  Q.   Now, let me put up an exhibit which is an excerpt from the

23  Louisiana statutes, in particular, article 723 of the Louisiana

24  Code of Criminal Procedure.

25           Prior to formulating your opinion in this case, had you

1  ever seen that provision?

2  A.   Yes.

3  Q.   Would you read it, the text.

4  A.   Starting with the word "except"?

5  Q.   Yes.

6  A.   Okay.   "Except as provided in article 716, 718, 721 and 722,

7  this chapter does not authorize the discovery or inspection of

8  reports, memoranda, or other internal state documents made by the

9  district attorney or by agents of the state in connection with

10  the investigation or prosecution of the case or of statements

11  made by witnesses or prospective witnesses, other than the

12  defendant, to the district attorney or to agents of the state."

13  Q.   All right, now, you see at the bottom it says, "Added by

14  acts, 1977"?

15          In Louisiana, what that means is that that came into

16  law here in 1977.

17  A.   Okay.

18  Q.   Now, that was the law in Louisiana governing criminal

19  prosecutors in 1985.  Are you aware of that?

20  A.   Yes.

21  Q.   Do you know of any court decision declaring that

22  unconstitutional?

23  A.   No.

24  Q.   In preparing your opinions for the jury here, did you ever

25  research that issue, the question I just gave you?

1   A.   I don't know whether I did or I didn't.  I know that it

2   doesn't preclude the turning over of what we would call *Brady*

3   material.  It just says that it's not authorized under that

4   statute.

5        If it said that you cannot turn over discovery

6   material, that is within the confines of *Brady;* it would be

7   unconstitutional.  But that's not what the statute says.

8   Q.   So if Harry Connick and his assistants followed this law, in

9   your expert opinion, they would not be violating the

10  Constitution, correct?

11  A.   That's not what I said.

12  Q.   Well, tell us what you said.

13  A.   If they followed that law and used that law as an excuse to

14  circumvent their obligations under the federal Constitution, they

15  absolutely would be violating *Brady* and the constitutional rights

16  of a criminal defendant.

17       Can I finish?

18  Q.   Sure.

19  A.   To simply say, We're going follow this statute and ignore

20  *Brady* is just, they can't do that.

21  Q.   The problem I have with your hypothet is that your hypothet

22  assumes a sinister motive.  So let's assume the motive is not to

23  violate *Brady*.

24  A.   I'm not assuming anything sinister, Mr. Aaron, really.

25  Q.   Your comment was, if they were going to use this to violate

1  *Brady* or get around *Brady*.  That assumes a sinister motive.

2  A.   Well, you can draw your own conclusions.  I am not assuming

3  anything sinister about Mr. Connick or any of these individuals.

4  Q.   Prior to rendering your opinions, did you ever have a

5  conversation with Mr. Connick?

6  A.   I had about a 10-second conversation with a man out in the

7  hall.  He came over to me, introduced himself, asked me who I

8  was.  I told him.  He asked me if I was a witness.  I said yes.

9  He asked for who, for us or for them?  I said for them.  And he

10 said, Oh, well, it's nice to meet you anyway.  And I said that it

11 was nice to meet him.  I was sorry it was under these

12 circumstances.

13 Q.   I've read through your opinion, and I, aside from noticing

14 what's there, I noticed what wasn't there.

15 A.   Okay.

16 Q.   As you are aware, one of the issues in this case is whether

17 or not James Williams was a policy maker and whether or not the

18 bad conduct in this case was as a result of James Williams'

19 policies.

20      I've read through your report.  You have no opinion

21 with respect to whether or not James Williams was a policy maker.

22 Am I reading your report correctly?

23 A.   May I take a look to refresh my memory?

24 Q.   Take a look.  It's your report.

25 A.   (Witness reviews the document.)

1          To answer your question, Mr. Aaron, I do not believe I

2    made any reference to whether or not James Williams was a policy

3    maker.

4    Q.   So the answer to my question is yes, you have no opinion in

5    here about James Williams?

6    A.   No, I don't.

7    Q.   Okay.  Now, are you familiar with the case of Shareef

8    Cousins versus Anthony Small, et al.?

9    A.   Yes, I am.

10   Q.   That was a case rendered by the U.S. Fifth Circuit Court of

11   Appeals?

12   A.   That is correct.

13   Q.   Do you have a copy?

14   A.   Mr. Aaron, I should add that I'm familiar with it to the

15   extent that I know what it's about generally.  I recall reading

16   it.  I haven't committed it to memory.

17   Q.   Do you recall in that case the U.S. Fifth Circuit Court of

18   Appeals specifically addressed the issue of whether or not

19   Harry Connick was deliberately indifferent?

20        THE COURT:  Wait a minute.  Come up to the bench,

21   counsel.

22        (WHEREUPON, there was a bench conference.)

23        THE COURT:  Where you are going with this?  You can't

24   tell the jury what some other case had in another court in an

25   unrelated case whether or not --

1          MR. AARON:  It was --

2          THE COURT:  No, no, we're not going there.

3          MR. AARON:  I didn't think you would let me go there.

4          THE COURT:  No, that's ridiculous.  Absolutely not.

5          MR. AARON:  Actually it was not.  I handled the Cousins

6    case.

7          THE COURT:  It's over.

8          MR. AARON:  Fine, Judge.

9          (WHEREUPON, the bench conference concluded.)

10                         EXAMINATION

11   BY MR. AARON:

12   Q.   Mr. Lawless, you're being compensated, I mean by that you're

13   being paid for your testimony here today?

14   A.   I'm being paid for my time, yes, sir.

15   Q.   And how much are you being paid?

16   A.   I'm being paid at an hourly rate of $350 an hour.

17          MR. AARON:  No further questions, Your Honor.

18          THE COURT:  All right.  Any redirect?

19          MR. COONEY:  A limited redirect, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. COONEY:

22   Q.   Mr. Lawless, what rate do you charge your clients with

23   regard to your legal practice?

24   A.   $525 an hour.

25   Q.   If the blood evidence in this case, the crime lab report,

1  had been given to John Thompson's lawyers, would there have been

2  anybody endangered by that?

3  A.    No.

4  Q.    If the information in the police reports setting forth the

5  hair length had been disclosed, would anybody have been

6  endangered by that?

7  A.    No.

8  Q.    Mr. Schliffka had been identified to the defense, correct?

9  A.    Yes.

10  Q.    In your opinion, Mr. Lawless, if the assistant district

11  attorneys in the Orleans Parish District Attorney's Office simply

12  followed the rule of professional conduct that Mr. Aaron showed

13  you, referring only to exculpatory evidence, would they know from

14  reading that to produce impeachment evidence?

15  A.    No.

16  Q.    And under your, in your opinion, is impeachment evidence

17  required to be produced under the *Brady* documents?

18  A.    Not just my opinion, Mr. Cooney, under the United States

19  Supreme Court precedents it absolutely is.

20  Q.    Mr. Aaron asked you some questions about whether you talked

21  to any district attorneys from the Orleans Parish District

22  Attorney's Office.  Did you review Mr. Williams' deposition in

23  the case?

24  A.    Yes.

25  Q.    Did you listen to him testify at trial?

1  A.    Yes.

2  Q.    Did you review Mr. Whittaker's deposition in the case?

3  A.    Yes.

4  Q.    Did you listen to him testify in the trial?

5  A.    Yes.

6  Q.    Did you review Mr. Dubelier's deposition in this case?

7  A.    Yes.

8  Q.    Did you review Mr. Connick's deposition in this case?

9  A.    Yes.

10 Q.    Do you review Mr. Solino's deposition in the case?

11 A.    Yes.

12 Q.    Did you review Mr. McElroy's deposition in this case?

13 A.    Yes, I did.

14 Q.    Would you agree with me that if you are a District Attorney

15 and you're relying on a system of supervision, your supervisors

16 have to understand *Brady*?

17 A.    Mr. Cooney, there is an expression, the blind leading the

18 blind.  Yes, the supervisors have to understand *Brady* or it makes

19 no sense to go to a supervisor and ask a *Brady* question.

20 Q.    Based on what you've seen in this case, did Mr. Dubelier

21 understand the *Brady* obligation?

22 A.    Mr. Cooney, I was absolutely shocked at Mr. Dubelier's

23 response.  Mr. Dubelier had no understanding of his obligations

24 under *Brady* whatsoever.

25 Q.    Mr. Lawless, did Mr. Williams -- did you listen to

1  Mr. Williams testify?

2  A.    Yes.

3  Q.    Did he have an understanding of his obligations under *Brady*?

4  A.    I don't believe he did, no.

5  Q.    Did Mr. Whittaker have a full understanding of obligations

6  under *Brady*?

7  A.    No.  The only thing Mr. Whittaker really had an

8  understanding of is that he didn't have enough training in the

9  first place and he would have found it helpful.

10 Q.    Under *Brady* and under federal law, Mr. Lawless, can a

11 District Attorney's Office avoid compliance with *Brady* and

12 federal law simply by following the state rules of procedure?

13 A.    No.

14 Q.    Why is that?

15 A.    Because as I said, under the Supremacy Clause, the

16 U.S. Constitution and the cases that interpret the Constitution

17 interpose a greater obligation.  The state rules in Louisiana, at

18 least as I read them, provided a minimal amount of disclosure.

19 But every prosecutor in every country in America -- every city in

20 America is obligated to follow the U.S. Constitution.  I mean,

21 it's basic.

22         MR. COONEY:  Thank you, Mr. Lawless.

23         THE COURT:  All right.  You can step down, sir.

24         THE WITNESS:  Thank you, Your Honor.

25         (WHEREUPON, the witness was excused.)

1        THE COURT:  All right.  Ladies and gentlemen, it's
2   almost 5:30, so we're going to recess for the evening.  I ask you
3   to close your notebooks again and leave those in your chairs or
4   under your chairs.  I'll remind you of my earlier admonition
5   about not discussing the case with anyone when you go home this
6   evening.

7        And remember, should there be any, and I'm not
8   predicting this, but should there be any sort of media reports or
9   coverage of this case, you should avoid reading, watching, or
10  listening to any such media reports.

11       And we'll start at 8:30 again in the morning.

12       THE DEPUTY CLERK:  All rise.

13       (WHEREUPON, the jury panel leaves the courtroom.)

14       THE COURT:  What's your plan for the morning?  What
15  witnesses are you going to have for tomorrow?

16       MR. BANKS:  James Wise will likely be our first witness.
17  He'll be a very brief witness, Your Honor.

18       THE COURT:  Wise?

19       MR. BANKS:  Yes, sir.  We expect his direct will be
20  approximately 15 minutes.

21       THE COURT:  Who is James Wise?

22       MR. BANKS:  James Wise was identified by Mr. Thompson, a
23  longstanding friend of Mr. Thompson, who visited him in prison
24  and has known him since childhood.  His testimony will be brief.

25       THE COURT:  What's the nature of that?

1          MR. BANKS:  It's about visiting John Thompson in jail

2    and his experience with John Thompson and watching John Thompson

3    change and grow during his time in jail.

4          THE COURT:  Who else are you going to have tomorrow?

5          MR. BANKS:  Nick Trenticosta, who was discussed in

6    chambers.  He'll also be a fairly brief witness.  Then we

7    understand Mr. Dubelier will be here.  And Mr. Dubelier will be

8    our next witness.

9          MR. CARVER:  Your Honor, Mr. Dubelier, I think he told

10   me his flight leaves out of here tomorrow at 5:30, so if we can

11   finish him in time.

12         MR. BANKS:  We won't be long with Mr. Dubelier.

13         THE COURT:  You plan on finishing your case tomorrow,

14   right?

15         MR. COONEY:  Absolutely, Judge.

16         THE COURT:  Just make sure he's out of here.  What time

17   is his flight?

18         MR. CARVER:  He advised me his flight was at 5:30.

19         THE COURT:  Just remind me about that tomorrow.

20          So you've got Wise, Trenticosta, Dubelier.

21         MR. BANKS:  And then our expert psychiatrist,

22   Dr. Grassian and that will be our last witness, I expect.

23         THE COURT:  So you've got four more witnesses?

24         MR. BANKS:  Yes, sir.

25         THE COURT:  When do you have Dr. Grassy?

1          MR. BANKS:  He's coming tonight, so he'll be available
2     any time tomorrow.
3          THE COURT:  Good, because it sounds like we'll get to
4     him in the morning, either him or Mr. Dubelier.
5          MR. BANKS:  We'll get to Dr. Grassian either late
6     morning or early afternoon.
7          THE COURT:  So the defendant should have your witnesses,
8     some witnesses lined up for tomorrow.  Sounds like we're going to
9     start your case tomorrow.
10         MR. GOINS:  Yes, Your Honor.
11         THE COURT:  All right.  Anything else?
12         MR. BANKS:  Just a question, Your Honor.  I know that
13    the Court gave us the proposed jury instructions.
14         THE COURT:  Yes, that was mine and Clay's first crack at
15    it.  We just gave it to you early so you could be looking at it.
16    I would like you to give feedback to Clay.
17         MR. BANKS:  When would like us to do that?
18         THE COURT:  Whenever you have it.  You can do that right
19    now if you have it or in the morning --
20         MR. BANKS:  I was going to suggest if we could get here.
21         THE COURT:  Clay is here at least by 8:00.
22         MR. BANKS:  Okay.
23         THE COURT:  If you want to come at 6:00, you could meet
24    me at the gym.  I'm here at 6:00.  He's here at 8:00.
25              I was going to say the way I usually do this is unless

1   it becomes necessary at some point, I don't always hold formal

2   charge conferences.  I just let the lawyers go back and forth

3   with Clay and then he brings it to me.  And we either say yea or

4   nay and then we keep modifying it, and at some point, I'll let

5   you, of course, put any remaining objections on the record.

6          MR. BANKS:  When, Judge Barbier, do you expect the

7   formal verdict sheets to be out, because that obviously or

8   potentially interplays with the instructions?

9          THE COURT:  Well, have we worked on that yet?

10         MR. BANKS:  No.  I'm not trying to cross-examine.  I'm

11  just trying to give comments to both to Clay.

12         THE COURT:  We've talked about it generally but we don't

13  have a draft of that yet.  Of course to some extent, it depends

14  on the evidence, you know, in terms of what goes to the jury.

15          I can tell you this, though -- Mr. Aaron, you should

16  hear this -- I can promise you it's not going to be a

17  47-question, 16-page verdict form that you proposed.  Okay.  That

18  I can promise you.

19         MR. AARON:  Judge, you know, I'm going to go over it

20  again.

21         THE COURT:  It's going to be a lot simpler and shorter

22  than that but I don't have it to give you.

23         MR. BANKS:  Thank you, Your Honor.

24         THE COURT:  That's about the longest verdict form I've

25  seen, I've got to tell you, for essentially a one-defendant civil

1   case, you know.

2           MR. AARON:  Judge, it's my defense mentality.  You know,

3   if I were a plaintiff, it would have said, Who wins.

4           THE COURT:  I notice you don't have a lot of lines for

5   damages, though.

6           MR. AARON:  Hey, Judge, I tell you what, my client

7   doesn't have very much money, you know.

8           THE COURT:  All right.  Everyone have a good evening.

9           (WHEREUPON, at 5:32 p.m., on Tuesday, February 6, 2007,

10  the proceedings were concluded.)

11                              *    *    *

12

13

14                      REPORTER'S CERTIFICATE

15
       I, Cathy Pepper, Certified Realtime Reporter, Registered
16  Professional Reporter, Certified Court Reporter, Official Court
    Reporter, United States District Court, Eastern District of
17  Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and understanding,
18  from the record of the proceedings in the above-entitled and
    numbered matter.

19

20

21

22                              _____
                                Cathy Pepper, CCR, RPR, CRR
23                              Official Court Reporter
                                United States District Court

24

25