1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3
****************************************************************
4

5   JOHN THOMPSON

6                          CIVIL ACTION NO. 03-2045 "J"
    V.                     NEW ORLEANS, LOUISIANA
7                          WEDNESDAY, FEBRUARY 7, 2007, 8:30 A.M.

8   HARRY F. CONNICK, et al.

9
****************************************************************
10

11                          **VOLUME III**
                TRANSCRIPT OF TRIAL PROCEEDINGS
12          HEARD BEFORE THE HONORABLE CARL J. BARBIER
                 UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15

16  FOR THE PLAINTIFF:      MORGAN, LEWIS & BOCKIUS, LLP
                            BY:  J. GORDON COONEY, JR., ESQUIRE
17                               MICHAEL L. BANKS, ESQUIRE
                                 S. GERALD LITVIN, ESQUIRE
18                          1701 MARKET STREET
                            PHILADELPHIA, PENNSYLVANIA, 19103
19

20  FOR THE DEFENDANT:      GOINS AARON, PLC
                            BY:  RICHARD GOINS, ESQUIRE
21                               WILLIAM D. AARON, ESQUIRE
                                 MARK C. CARVER, ESQUIRE
22                          1010 COMMON STREET, SUITE 2600
                            NEW ORLEANS, LOUISIANA  70112
23

24
    ALSO PRESENT:          HARRY CONNICK
25                         EDDIE JORDAN

1   OFFICIAL COURT REPORTER:        CATHY PEPPER, CCR, RPR, CRR
                                    500 POYDRAS STREET, ROOM B406
2                                   NEW ORLEANS, LOUISIANA 70130
                                    (504) 589-7779
3

4   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
5

1                          **I N D E X**

2

3       Examinations                                    Page

4

5       **JAMES WISE**..........................................   469

6       DIRECT EXAMINATION BY MR. LITVIN.....................   469

7       CROSS-EXAMINATION BY MR. CARVER......................   486

8       REDIRECT EXAMINATION BY MR. LITVIN...................   491

9       **ERIC DUBELIER**......................................   493

10      CROSS-EXAMINATION BY MR. COONEY......................   493

11      DIRECT EXAMINATION BY MR. CARVER.....................   571

12      RECROSS-EXAMINATION BY MR. COONEY....................   599

13      **NICHOLAS J. TRENTICOSTA** ...........................   614

14      DIRECT EXAMINATION BY MR. LITVIN.....................   614

15      CROSS-EXAMINATION BY MR. GOINS.......................   636

16      REDIRECT-EXAMINATION BY MR. LITVIN...................   639

17      **STUART GRASSIAN, M.D.** .............................   640

18      VOIR DIRE EXAMINATION BY MR. LITVIN..................   640

19      TRAVERSE EXAMINATION BY MR. AARON....................   646

20      DIRECT EXAMINATION BY MR. LITVIN.....................   649

21      CROSS-EXAMINATION BY MR. AARON.......................   677

22      **MICHAEL RIEHLMANN**..................................   715

23      DIRECT EXAMINATION BY MR. AARON......................   715

24      CROSS-EXAMINATION BY MR. BANKS.......................   726

25      REDIRECT EXAMINATION BY MR. AARON.................... 735

1   **TIMOTHY McELROY**....................................... 736

2   DIRECT EXAMINATION BY MR. GOINS........................ 736

1                      **P-R-O-C-E-E-D-I-N-G-S**

2              WEDNESDAY, FEBRUARY 7, 2007

3                M O R N I N G   S E S S I O N

4                  (COURT CALLED TO ORDER)

5

6          THE COURT:  Good morning, everyone.

7          (WHEREUPON, the jury panel enters the courtroom.)

8          THE COURT:  Good morning, everyone.  Please have a seat.

9  We'll pick up where we left off yesterday, and the plaintiff can

10 call their next witness.

11         MR. LITVIN:  May I proceed, Your Honor?

12         THE COURT:  Yes.

13         MR. LITVIN:  James Wise.

14                       **JAMES WISE**

15 was called as a witness and, after being first duly sworn, was

16 examined and testified on his oath as follows:

17         THE WITNESS:  James, J-A-M-E-S, Wise, W-I-S-E.

18         MR. LITVIN:  May I proceed, Your Honor?

19         THE COURT:  Yes.

20                   DIRECT EXAMINATION

21 BY MR. LITVIN:

22 Q.   Good morning, sir.  Would you tell the jury first where you

23 live.

24 A.   907 Flanders Street in New Orleans.

25 Q.   And how long have you lived in New Orleans?

1    A.    All my life.

2    Q.    And how old are you?

3    A.    46 years.

4    Q.    46?

5    A.    Yes.

6    Q.    What is your present occupation?

7    A.    Pastor at a local church in Metairie area.

8    Q.    And what church is that?

9    A.    Victory Fellowship.

10   Q.    And how long have you been a pastor at that church?

11   A.    About seven years.

12   Q.    Do you know John Thompson?

13   A.    Yes, I do.

14   Q.    Would you tell us, please, when you first met or got to know

15   John Thompson.

16   A.    John moved in my neighborhood, I think I was about, between

17   the age of 12, 10, something like that, and John was two years

18   younger than me.  And he moved in the neighborhood and I was the

19   youngest of five kids.  And John moved in the neighborhood.  He

20   didn't have brothers and sisters.  And in my neighborhood, coming

21   up as a kid, you know, it was a very strict neighborhood, and it

22   was just mostly elderly people lived in that block.  And we was,

23   my grandmother raised us not to go out the block.  And at that

24   time, you know, John's grandmother was pretty strict too, so we

25   basically used to stay in the front yard.  And I got to look over

1  at him and he looked over at me, so we decided to try to hook up

2  between the fences and we decided to start playing marbles

3  together.

4  Q.   What?

5  A.   Marbles, marbles, shooting marbles.   And, you know, we

6  decided to start hanging out together and we became real close

7  friends.

8  Q.   Let me interrupt you for a minute.   Can you spend just a

9  moment or two and tell us what kind of street it was and what

10  kind of neighborhood you lived with, you with your grandmother,

11  he with his grandmother.   What kind of neighborhood was it?

12  A.   Are you speaking of the specific street or the entire

13  neighborhood?

14  Q.   Well, your street and then the other streets nearby.

15  A.   Okay.   The street that I lived on, like I said earlier, it

16  was mostly elderly people lived on there.   It was very quiet

17  neighborhood, you know, not too much activity at all.   But the

18  surrounding streets around the area was a lot of activity going

19  on.

20  Q.   What do you mean by activity?

21  A.   Well, I mean, I always wondered why my grandmother used to

22  always tell me she don't want us leaving out the block, so I was

23  wondering what was going on on the other blocks where she don't

24  want us to go out the block.   So it was a point in time when John

25  and I was curious about the other blocks.   And I always was one

1   that cahoozed to him a lot.  I said, well, hey, man, I'm going to

2   hop the back fence in the yard.  I want to see what's going on in

3   the other blocks.  So we'd go on the other blocks, you know, and

4   you see a lot of activity that we didn't see in our blocks, as

5   far as a lot of guys playing ball on the street.  You see a lot

6   of girls, you see drug activities, things like that.  And that

7   was all strange to us because we wasn't exposed to that type of

8   activity, you know.  And I got familiar with one of the young

9   ladies in the next block because I was one that always would hit

10  the fence and go, to go over on the other blocks and I got

11  familiar with her family, but it was all girls.

12  Q.   Let me interrupt you for a moment.  You said, I think, that

13  when you first met John, he was about eight years old and you

14  were about ten?  You were two years older?

15  A.   About ten.  Yeah, ten years old.

16  Q.   Before we get to the girls and your going over the fence or

17  through the fence, what age -- well, first of all, how far was

18  his grandmother's house from where you were raised by your

19  grandmother?

20  A.   One door.  One house.

21  Q.   Next door?

22  A.   My house here, one house here, and the next house is his.

23  Q.   During those years from the time John Thompson moved in with

24  his grandmother, and you got to know him, to your knowledge, did

25  he have a closer friend than you?

1   A.   Not that I know of, no.

2   Q.   Did you -- I know you're two years older, but did you take

3   him to school?  Did you go to school?

4   A.   Yeah, we went to school together.  His grandmother would

5   send him with us.  You know, we walked to school together.

6   Q.   He has told the jury that he was raised by his grandmother

7   as Catholic.  Were you Catholic or some other religion?

8   A.   Well, we was raised -- we was sent off to a Catholic school.

9   Q.   I'm only talking now at that time, when you were young.

10  A.   Yes.

11  Q.   Now, I interrupted you.  Would you tell us, please, how old

12  you were when you started to climb fences and to get to the

13  girls?

14  A.   I would barely say between the age of 14, 13, 14, something

15  like that, 15.

16  Q.   So you got out, you started at that age to get away from

17  your block and to get through the fences and go to other streets?

18  A.   Yes, sir.

19  Q.   Was there any particular street nearby where a lot of bad

20  things were happening?

21  A.   No, that was just a street that we went on, Baronne Street.

22  Q.   Now, when you started to have contact with girls, with young

23  women, John was two years older (sic).  Did he go with you or was

24  he not ready for that?

25  A.   Not right away.  You know, I went on my own and I come back

1  and I told him a lot about it, you know.  And then he was curious
2  about going.
3  Q.   You told him about what?
4  A.   I told him about the girls on the other street.  He was
5  curious about going.  So when I told him about it, I said, "Well,
6  man, you know, all we got to do is hit the back fence.  We'll be
7  back before our grandmothers, you know, notices we're gone."
8  Q.   Pastor Wise, I would like to ask you now about the next few
9  years, that is, after John was 12 or 13, and you were two years
10 older, and started to get involved with girls and whatever else
11 you did, would you tell the Members of the Jury, please, over the
12 next few years when he was 14, 15, 16, what was going on then?
13 Was he still going to school?  Was he getting into trouble?  What
14 were you and he doing during those early teen years and middle
15 teen years?
16 A.   Well, we were going to school, but, you know, school wasn't
17 really fun.  We just got exposed out there in the streets, you
18 know.  We were sent off to school, but sometimes we wouldn't make
19 it to school.  You know, we got --
20 Q.   What do you mean by that?
21 A.   Well, just stop and hanging off in the neighborhood in the
22 blocks where we hitting the fence going in, you know, hanging
23 around the girls.  We got exposed to marijuana.  Started using
24 marijuana and just started hanging out.
25 Q.   Well, I'm going to jump ahead for a moment to the time John

1  was arrested for murder in late -- well, in early January of

2  1985.  From the time you and John were teenagers until he was

3  arrested at age 22 and charged with murder, did you continue to

4  have contact with him on a regular basis during those years?

5  A.   Not on a regular basis.  I mean, at that time John had moved

6  to another area, and, you know, I had kind of -- can I go back a

7  little bit before?

8  Q.   Sure.

9  A.   I was getting into trouble, and I was faced with a

10  probation, so I decided to try to get some help.  So I decided to

11  go to Job Corps, sign up for Job Corps.

12  Q.   How old were you when you went away to Job Corps?

13  A.   I think I was about 19, close to 20.  Probably 20.

14  Q.   I don't want to go into the specifics of what kind of

15  trouble you got into, but was it -- are you talking about selling

16  drugs?

17  A.   Yeah, selling drugs, I mean, breaking in cars and crazy

18  stuff like typical kid stuff, you know.

19  Q.   Typical kid stuff in your neighborhood?

20  A.   Yeah.  Uh-huh (affirmative response).

21  Q.   All right.  I interrupted you.  Now, what happened, how long

22  were you away at the Peace Corps?

23  A.   18 months.

24  Q.   And did you straighten out then?

25  A.   Not really.  I went and I got two trades.  I came back, and

1  I tried to, you know, be a productive citizen in the neighborhood

2  and I just got caught back up again.  You know, and as far as

3  selling drugs and using the drugs, the drugs escalated in my

4  life.  And I was arrested a couple times for crack cocaine and I

5  was sentenced to 3 years.

6  Q.   Excuse me.  Excuse me.  Did you go away and do 3 years'

7  time?

8  A.   Yes.

9  Q.   And how old were you when you were sentenced to 3 years for

10 your drug involvement?

11 A.   In my late 20s.

12 Q.   Was this after John was already arrested and in jail for

13 murder?

14 A.   Yeah.  It was after.

15 Q.   Now, before we get back in a moment or two to your

16 involvement with John after he was already in prison and on death

17 row, could you just tell us briefly what happened in your life to

18 you after you got out of 3 years in prison, after you got out of

19 jail?

20 A.   After I got out of jail, I decided I'm going to get my life

21 together.  And I found myself, I found myself getting caught

22 right back up in the same environment and the same activity all

23 over again.  And I had to realize, I said, wait a minute, I mean,

24 I just got out of jail.  I cannot go back doing the same thing.

25 I need help.  I had to come out of it now that I had a problem,

1  which I had a problem.  And I decide to check myself into a -- a

2  friend of mine that I seen one day and I couldn't believe what I

3  saw in this guy.  He just was a totally new, I mean,

4  transformation on this guy and I'm like, man, what happened to

5  you, man?  He said -- I told him, I said you didn't look this

6  good in prison and I was in prison with this guy.  He said, man,

7  I done got my life together.  I said, well, how did you do that?

8  Q.   I'm going to interrupt you because I understand what you're

9  saying, but tell us what you did after you spoke to this fellow.

10  What did you do to get straightened out?

11  A.   Well, he introduced me to this program.  That's what I was

12  getting to.  He introduced me to this program.  As a matter of

13  fact, he said, man, I got my life together in this program right

14  here, which was a holy ghost boot camp he called it.

15  Q.   Holy ghost boot camp?

16  A.   Yes.

17  Q.   Run by whom?

18  A.   It's run by a program called Jesus Miracle Power.  It's a

19  program that takes guys in that have drug problems and want to

20  get their lives together.  And so I said, what I got to do to get

21  in here?  He said, well, just come on in and you can talk with my

22  uncle because I didn't know that was his uncle running the place.

23  And I accepted to stay in this program.  They say it was a

24  one-year program.  And I said, well, I'll give it a try.  And

25  come to think of, I stayed in there almost five years, four and a

1   half years.

2   Q.   Well, during the four or five years you were in that

3   program, did you get outside, did you do any work?  What else did

4   you do?

5   A.   Oh, yeah, we always worked in the community, you know,

6   helped people with their houses, you know.  The ministry itself

7   had got a couple of houses that was donated to them so we was

8   fixing them up to house women and other guys because we was

9   running out of space.

10  Q.   And after you completed that program, after you were there

11  for four or five years, what kind of work did you get involved

12  with?

13  A.   Well, my thing was to just to engage into ministry.  And at

14  the time, by me being there at the ministry, I had got served

15  some papers, some subpoena papers for child support.  So I had to

16  go work.  So one of the pastor's friends owned a plumbing company

17  business.  And they called over and they asked if they had

18  anybody interested in learning a trade, but I was the only one

19  completed and at that time, I needed to go to work to take care

20  of my obligations that I neglected.

21  Q.   I'm going to interrupt you again, I'm sorry, but when did

22  you become Pastor James?  Is it Pastor James you're called?

23  A.   Yes, sir.

24  Q.   When did you get that title and how did you earn it and what

25  is your status with the church or with your church?

1   A.    Okay.  Right now, I got that, that title approximately about

2   five, six years after I finished that program.  Because I was

3   affiliated with the church called Victory Fellowship where I'm at

4   now.  I mean, I was always serving it.  When they always had

5   outreaches, I was always part of it.  And one specific day the

6   pastor had called me while I was working and wanted to have lunch

7   with me, the head pastor, and I was wondering why he wanted to

8   have lunch with me.  He asked me, he said, how would you like to

9   get paid for something that you love doing?  And I kind of

10  laughed.  I said, well, I am getting paid for what I love, what

11  I'm doing.  He said, well, we want to have you on board, on staff

12  with us.  And I said, well, I would love that.  So I had talked

13  to the guy who I was doing the plumbing with and he was in

14  agreement with that, you know, he told me he couldn't stop me,

15  you know.  So I became one of the pastors at Victory Fellowship.

16  Q.    Are you an ordained minister today?

17  A.    Not today.

18  Q.    How did you acquire your status other than being hired, as

19  you've told us and you're paid by the church?  Did you have to

20  perform anything or qualify to be what you are, to be Pastor

21  James?

22  A.    Not qualified, but I mean, I am a licensed minister with the

23  church.

24  Q.    And who licensed you?

25  A.    The church, the head pastor.

1  Q.   And are you on your way in some sort of program or study to

2  become an ordained minister?

3  A.   Yes, I'm still in college now, bible college.

4  Q.   Bible college?

5  A.   Yes.

6  Q.   And do you know when you will be eligible to become an

7  ordained minister?

8  A.   I think by the end of this year.

9  Q.   Now, back to Mr. Thompson.  Did there come a time after you

10  were released from prison and went through what you've already

11  told us about that you got -- made contact with John Thompson

12  again?

13  A.   Yeah.  As a matter of fact, it was when I was in that

14  program, you know.  We used to have our church service in

15  neighborhoods.  And one of our church service every Sunday

16  morning would be in the Melpomene project where the high-rise for

17  the old folks.  We would always have a service there every Sunday

18  morning.  And during the time I was in this program, I always

19  thought about John.  I said man, I wonder how John is doing.

20  Because, you see, I had got my life together.

21  Q.   Well, did you know he was in prison in Angola?

22  A.   Oh, yeah, I knew it.

23  Q.   Okay.

24  A.   And I always thought about him and wondered how he was

25  doing.  So some specific reason one Sunday morning, I saw his mom

1  just walk across the courtway and I asked the pastor, I said, can

2  I go holler at this lady over there, that's my friend mom.  So I

3  ran over and hollered and she was glad to see me because she

4  didn't know I had got my life together.  She saw me and she was

5  proud of me.  I said, Ms. Josephine, I said is there any kind of

6  way that I can go and get put on John's visiting list.  She said,

7  yeah, I'll get you the information.  So she got me the

8  information and I sent it all in and a couple of weeks later,

9  they sent me a respond letter.  They denied me.

10  Q.   Do you know why you were denied?

11  A.   From what I understood, I was still considered a convicted

12  felon.  And as far as I understand the law of Louisiana, if you

13  ever been incarcerated --

14  Q.   I'm going to interrupt you.  I think we understand what

15  you're saying.  I'm sorry.  But did you get past that and did you

16  finally get permission to go visit John?

17  A.   Yeah, that was the strangest thing.  About two, three weeks

18  later, I had got some papers from Angola accepting me to come in.

19  Q.   Now, Pastor Wise, can you tell us, please -- Pastor James,

20  can you tell us, please, what year or about when it was that you

21  first got permission to go see John?

22  A.   I want to think it was around '96 or '95 or something like

23  that.  Maybe '97.

24  Q.   Well, but he was still in Angola?

25  A.   Yes, sir.

1   Q.   And how often did you visit him?

2   A.   Every time they had a contact visit, which was sometime

3   twice a month, three times a month.

4   Q.   Did you go up there alone or did you bring his mother or

5   children or both or what?

6   A.   I would always go with his mother and if his kids wanted to

7   go, I would bring them.

8   Q.   And about how many, approximately how many times did you see

9   John after that first visit, how many times did you see him when

10  he was still in Angola?

11  A.   I want to say about maybe 10, 12 times.

12  Q.   And did you get to talk to him?

13  A.   Pretty much all the time.

14  Q.   Can you please explain to His Honor and the jury what you

15  observed about John, what conversations.  I don't mean everything

16  he asked you or you told him, but what was, what did you see?

17  What did you hear from John about how he was doing and what was

18  on his mind?

19  A.   Well, the first visit, it was more of a shock than anything,

20  because I hadn't seen him in about 11, 12 years.  He hadn't seen

21  me.  And I told his mom when we go, don't tell him I'm coming.  I

22  wanted it to be a surprise to him.  So when I got there and saw

23  him, you know and I sit down and start talking to him.  I didn't

24  listen to what he had to say.  In other words, I was doing the

25  talking because, you know, I wanted to let him know what happened

1  in my life.  You know.  And it was like he said, whoa, man, hold

2  up, hold up, hold up, I don't even know you anymore.  And I said

3  well, that's a good thing, because I'm a changed person.  And he

4  just start telling me some of the things that, you know, what was

5  going on in his life and everything.  And I could see some of the

6  hurt there.  And I mean he didn't say he was hurt.  He didn't say

7  he was, you know, dealing with things, but I can sense them.

8  Q.   Now, in addition to the 10 or 12 visits, did you have other

9  communications with John when he was still in Angola?  Did he

10  call you?

11 A.   Yes, he called me periodically.

12 Q.   How often would he call you?

13 A.   Once, twice a week.

14 Q.   And what was the nature of the conversations?

15 A.   A lot of times he would just call me, just checking on

16 seeing how I'm doing and, you know, if there is things that he

17 need, he would ask me could I pick these things up or he needed

18 this or he needed some money in his account or whatever.  But a

19 lot of times when I was not there, my wife would talk with him,

20 pray with him and it was times that he called me and tell me,

21 hey, man, they put a date on me.  You know, they set a date.  And

22 those are the kind of things that disturbed me as well as I know

23 it disturbed him, you know.

24 Q.   During those visits to Angola, other than the original time

25 you saw him and you've already told us about that, did he discuss

1   with you or ask you questions about religion, about God, about

2   different kinds of religions?  And, again, I'm not asking you to

3   give us every detail, but what was the, what were the nature,

4   what was the nature of the conversations and what he asked you or

5   what he said to you about religion while he was still in Angola?

6   A.    There is one thing that really stood out, you know, and, you

7   know, I had got -- I pretty much had got some of the

8   understanding of what he had asked me.  He had a problem with one

9   of the scriptures in the Bible that he didn't understand and it

10  was about the Trinity, the Father, Son and The Holy Spirit.  And

11  I explained it to him the best to my ability and we connected

12  there.  And he was, what his point was, he say, well, how can he

13  be three people?  And I say, well, the Father, Son and The Holy

14  Spirit is one, you know, and as we shared, we took time out to

15  share that and talk with that.  And I mean, it really gave him a

16  great insight, you know, and we just connected from that point

17  on.

18  Q.    I would like to now move ahead to the time when John was

19  moved from Angola to -- I have trouble with this -- I could say

20  parish and I could say prison, but the Orleans Parish, I have

21  trouble with, the Orleans prison, do you know that he was in

22  there for another four years before he was ultimately freed?

23  A.    Right.

24  Q.    Now, during those years when he was here in New Orleans at

25  the parish prison, did you see him?  Did you talk to him?  What

485

1  was your involvement with him then?

2  A.   Well, I visited periodically there, too, and he called a

3  lot.

4  Q.   And what were generally the nature of the conversations?   I

5  mean, was he telling you things?  Was he asking you questions?

6  What was going on?

7  A.   No.   Basically, I mean, he wasn't satisfied.   He was just

8  telling me, he said, man, I would rather be back in Angola

9  because of the conditions here.   You know, he said, man, I

10  haven't been eating.   And I noticed he had lost a lot of weight

11  being there.   You know.   And just basically stuff, you know, how

12  is everything going, you know.   Can you bring my mom next week or

13  stuff like that.   Bring my kids.

14  Q.   The last thing I want to ask you some questions about, sir,

15  is the period of time, the last three and a half years since John

16  got his freedom.   And that was May 9th of 2003, I believe.

17  A.   Uh-huh (affirmative response).

18  Q.   Until today.   The jury has heard his testimony.   You weren't

19  here yesterday and maybe have some sense as to what he has done,

20  what kind of work he has done.   And my question to you is:   How

21  much involvement, contact have you had with John since he's

22  become a free man?  How often do you see him?  How often do you

23  talk to him?   And then I'm going to ask you a few more questions

24  about what role you have been playing in his life.

25  A.   I don't get a chance to see him as much as I would like to

1  because, you know, a lot of stuff that I'm involved in and I'm

2  doing and John is doing some things that I'm real proud of him

3  what he's doing, trying to reach out to other people.  And, you

4  know, but we get together occasionally, you know.  We may have

5  dinner at my house with him and his wife and we go to their house

6  or we'll go out and eat, but we'll communicate, you know, pretty

7  often over the phone.

8  Q.   About how often do you communicate with him over the phone?

9  A.   I would say maybe once, twice a week or so.  Just to check

10  on one another, see how things are going.  If he's involved in

11  something, he would always call me.  Man, what do you think about

12  this?  I want to get a house, man, and help some of these guys

13  when they get off of death row or something like that.  Things of

14  that nature.  You know.  It's always trying to help somebody.

15  Q.   Well, has he come to you over the last three and a half

16  years to get some answers about religion or to get some guidance

17  or help from you in terms of advice?

18  A.   Well, he does ask advice on some things, you know.  And, as

19  a matter of fact, he comes to some of our services sometimes.

20  Q.   The services at your church?

21  A.   Yes.

22       MR. LITVIN:  Thank you very much, sir.  I have no

23  further questions.

24       THE COURT:  All right.  Mr. Carver.

25                      CROSS-EXAMINATION

1  BY MR. CARVER:

2  Q.   Is it Mr., Reverend, or Pastor Wise?

3  A.   Pastor Wise.

4  Q.   I want to make sure I call you by your correct title.

5       Pastor Wise, you said you've now got to see and be with

6  John Thompson after his release from prison; correct?

7  A.   Yes.

8  Q.   And you admit that since his release from prison, John has

9  been pretty fortunate; correct?

10 A.   What do you mean fortunate?

11 Q.   Well, it's my understanding 44 days after getting out of

12 prison, he got married and has a new wife?

13 A.   Okay.  Yeah.

14 Q.   Does that make him fortunate?  Does it make him blessed?

15 A.   Okay.  Yes.  Uh-huh (affirmative response).

16 Q.   I understand John, after getting released from prison, got a

17 brand-new house from Habitat for Humanity; is that correct?

18 A.   Yes.

19 Q.   That makes him fortunate?

20 A.   Yes, sir.

21 Q.   Makes him blessed?

22 A.   Yes, sir.

23 Q.   I understand after getting released from prison, John had a

24 new job?

25 A.   Yes, sir.

1  Q.   In fact, he's had several job opportunities; correct?

2  A.   Yes.

3  Q.   Does that make him fortunate?

4  A.   Blessed.

5  Q.   Makes him blessed.  So you would say John has been doing

6  pretty good since his release from prison?

7  A.   Yes.

8  Q.   Since his release from prison, has John done anything to --

9  or does he avoid his experience of prison?

10  A.   I don't quite understand the question.

11  Q.   Well, does he like talking about it or not talking about it?

12  A.   I wouldn't know that question there.

13  Q.   Well, weren't you with him --

14  A.   As far as with me.  I don't know about anybody else.

15  Q.   Weren't you with him when he spoke to a bunch of juveniles

16  at a detention center about his experience in prison?

17  A.   That's one occasion.

18  Q.   And he obviously enjoyed that experience; correct?

19  A.   Uh-huh (affirmative response).

20  Q.   In fact, now he even has a foundation set up where he tries

21  to help people who are on death row?

22  A.   Okay.

23  Q.   Would you say John Thompson today is taking pretty good care

24  of himself?

25  A.   I would think so.

1   Q.   Do you know of John, if he used drugs today?

2   A.   No, sir.

3   Q.   Do you know of him to drink alcohol today?

4   A.   No, sir.

5   Q.   Do you find John Thompson to be a pretty friendly guy today?

6   A.   Yes, sir.

7   Q.   Would you say he's well adjusted?

8   A.   I would think he's adjusting.

9   Q.   Would you say he's doing pretty good emotionally?

10  A.   Maybe.

11  Q.   When you used to go visit John Thompson in prison, you would

12  also bring along with you his mother and children; correct?

13  A.   Sometimes.   Sometimes it would just be his mother.

14  Q.   And I understand his spiritual advisor, Nancy Wohl, at times

15  would also bring his mother or children to visit him?

16  A.   Uh-huh (affirmative response).

17  Q.   But y'all did that separately.   Y'all wouldn't operate

18  together, meaning you didn't go with Nancy Wall?

19  A.   No, I didn't go with Nancy.   I met her there a couple of

20  times.

21  Q.   So there may have been times he was seeing his mother and

22  children twice a month while in prison?

23  A.   Yes, sir.

24  Q.   Prior to 1984, when John Thompson was arrested for armed

25  robbery, prior to that incarceration, did you ever visit

1  John Thompson when he was in prison for three months for the

2  concealed weapons charge?

3  A.    Here in Orleans?

4  Q.    Yes.

5  A.    No.

6  Q.    You were with John Thompson when he spoke to the juveniles

7  at the detention center; correct?

8  A.    Yes.

9  Q.    All right.  And he talked about his personal experience?

10  A.    Yes.

11  Q.    Was the purpose of that talk to the juveniles to make sure

12  that those juveniles stay on a straight and narrow path and don't

13  end up in prison?

14  A.    I think it was just to let these youngsters know that, you

15  know, you can easily get caught up into things out there on those

16  streets when you're hanging out with the wrong set of environment

17  and the wrong type of people.

18  Q.    All right.  So did John Thompson tell these juveniles don't

19  do drugs like I did because you could end up in prison?

20  A.    I don't remember.

21  Q.    Did John say don't commit burglaries like I did because you

22  could end up in prison?

23  A.    I don't remember him saying it, you know, like you're saying

24  it.

25  Q.    Did John say don't sell stolen property like I did because

1   you could end up in prison?

2   A.   I don't think he said it to the point of like I did it.   I

3   think he would just try to let these kids know, you know, about

4   the trouble that they would get into if they would be involved

5   with the wrong group of people.

6   Q.   And he based that on his personal experience?

7   A.   Uh-huh (affirmative response).

8            MR. CARVER:   That's all the questions I have,

9   Your Honor.   I thank you for your time.

10           THE COURT:   Any redirect?

11           MR. LITVIN:   Just one or two, Your Honor.

12                     REDIRECT EXAMINATION

13  BY MR. LITVIN:

14  Q.   I just want to ask you one or two questions about the

15  subject that was just asked, that is, the time you were with him

16  when he spoke to the youngsters in the detention center.   Why

17  were you with him?   Did you ask him to do that or did he just --

18  A.   No, he volunteered.   You know, I told him these are some of

19  the things that I'm involved in.   This is what I do.   I said, but

20  man, if you feel encouraged to come share with these guys, I

21  could see to you getting in.   And I talked with the chaplain of

22  Jefferson Parish and she said she would love for him to come

23  speak to them.

24  Q.   So you were involved to some extent in getting him there to

25  speak to the children?

1   A.    Right.

2   Q.    And you were with him?

3   A.    Yes.

4   Q.    And how did you feel about what he had to say?  Tell us what

5   you felt.  Did he do a good job?

6   A.    He did a great job.  Because out of the four or five years

7   I've been going in the juvenile detention, I mean, the attention

8   spans of these kids wasn't there, but it captivated them, you

9   know, to the point of, you know, when it was all over, it didn't

10  have a dry eye in the place.

11          These guys, I really truly believe each one of those

12  young men were touched and inspired by him sharing what happened

13  in his life, as well as some of the deputies that was there that

14  were sitting in the room.

15  Q.    When you say the three to four or five years you have been

16  going there, do you mean the time you had been going there as a

17  minister or pastor?

18  A.    Yeah, ministering.

19  Q.    So you had been trying to help these children for a number

20  of years?

21  A.    Oh, yeah.

22          MR. LITVIN:  That's all I have.  Thank you, sir.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  All right.  You may step down.  Thank you.

25          THE WITNESS:  Thank you.

1          MR. BANKS:  The plaintiff calls Eric Dubelier,

2   Your Honor.

3          THE COURT:  All right.

4          THE DEPUTY CLERK:  Raise your right hand.

5                      **ERIC DUBELIER**

6    was called as a witness and, after being first duly sworn by the

7   Clerk, was examined and testified on his oath as follows:

8          THE WITNESS:  Good morning, Your Honor.  My name is

9   Eric Dubelier.  My first name is spelled E-R-I-C, last name

10   D-U-B-E-L-I-E-R.

11                     CROSS-EXAMINATION

12   BY MR. COONEY:

13   Q.   Good morning, Mr. Dubelier.

14   A.   Good morning, sir.

15          MR. COONEY:  Your Honor, may I approach and hand

16   Mr. Dubelier a binder?

17          THE COURT:  Yes.

18                       EXAMINATION

19   BY MR. COONEY:

20   Q.   Mr. Dubelier, I'm going to hand you a binder of some of the

21   documents that we're going to refer to in your examination.

22   A.   Thank you, sir.

23   Q.   Now, Mr. Dubelier, am I correct that you were an assistant

24   district attorney in the Orleans Parish District Attorney's

25   Office in 1984 and 1985?

1  A.   Yes, sir, I was.

2  Q.    And you were the chief of screening at that time; is that

3  right?

4  A.   I think I became the chief of screening in 1984.  I think.

5  Q.   And as the chief of screening, would you agree with me that

6  you occupied essentially the third-highest office, highest

7  position in the office?

8  A.   Well, there was the District Attorney, there was the first

9  assistant district attorney, and then there were the division

10  chiefs.  I was one of multiple division chiefs.

11  Q.   And there were a small number of division chiefs; is that

12  right?

13  A.   My recollection is trial, screening, appeals, nonsupport.  I

14  think maybe there were two chiefs of trials.  So there were

15  probably five, five of us.

16  Q.   Mr. Dubelier, you graduated from law school in 1981; is that

17  right?

18  A.   Yes, sir, I did.

19  Q.   And so when you were made the chief of screening, you were

20  less than four years out of law school; am I right?

21  A.   I think that's right, yes, sir.

22  Q.   And you went straight from law school to the District

23  Attorney's Office?

24  A.   Yes, sir, I did.

25  Q.   And am I correct, Mr. Dubelier, you were one of the

1   prosecutors who tried John Thompson for the first-degree murder

2   of Ray Liuzza?

3   A.    Yes, sir, I did.

4   Q.    And you were the lead prosecutor on that case; am I right?

5   A.    Yes, sir, I was.

6   Q.    And Mr. Williams was your co-counsel in that case?

7   A.    Yes, he was.

8   Q.    And for some period of time, you were also the lead

9   prosecutor on the armed robbery prosecution against

10  John Thompson; am I right about that?

11  A.    Sir, I know you've asked me about this before.  I do not

12  remember the answer to that question.

13  Q.    You don't remember that?

14  A.    No.

15  Q.    Mr. Dubelier, I would ask you to take a look, if you would,

16  please, at Exhibit --

17  A.    Is it 33?

18  Q.    -- 42.

19  A.    42.  Okay.

20  Q.    Do you recognize that as -- I'm sorry, that's not the

21  exhibit I'm looking for.  Bear with me for one second.

22  A.    If you're looking for the Screening Action Form, I think

23  it's 33.

24  Q.    Well, that's one of the documents I'm looking for.  Let's

25  look at that one for a second.  Let's look at 33.

1  A.    Yes, sir.

2  Q.    Does that refresh your recollection as to whether or not you

3  were the special prosecutor in the armed robbery case?

4  A.    Yes, again, sir, you asked was I the lead prosecutor on the

5  case and I'm not sure what you mean by that, but at one point in

6  time it appears from this document that I was one of the

7  prosecutors assigned to the armed robbery case.

8  Q.    And you also recall that you signed a response to a

9  discovery request in the armed robbery case?

10 A.    I don't recall signing it, but I have subsequently seen it

11 and it has my signature on it, yes, sir.

12 Q.    Would you agree with me, Mr. Dubelier, that the Liuzza

13 prosecution or the prosecution involving the Liuzza murder was a

14 high-profile case?

15 A.    Yes, sir, I would.

16 Q.    And the victim was the son of a prominent hotel executive in

17 New Orleans?

18 A.    I think that's right.

19 Q.    And because it was a high-profile case, you would have

20 likely kept Mr. Connick informed of the status of the matter; am

21 I right?

22 A.    I'm sure that there were communications between myself and

23 Mr. Connick about the case.

24 Q.    And because you were working with Mr. Williams on the case,

25 am I correct that from time to time you would talk to him and go

1   over the strategy and the strategic decisions with regard to that

2   prosecution?

3   A.   I can only say that I'm sure we did.  I don't remember any

4   specific conversation with Williams about that.

5   Q.   When you were working on the armed robbery case, were you

6   working with Mr. Williams, were you working with Mr. Deegan?  Do

7   you recall who you were working with?

8   A.   No, sir, I don't.  And again, I don't recall working on the

9   armed robbery case.  I know I signed a document in connection

10  with the case.  I know I see this Screening Action Form, but I

11  also know I didn't try the case.

12  Q.   Would you agree with me that you were working on the Liuzza

13  murder even before an indictment came down against Mr. Thompson

14  and Mr. Freeman?

15  A.   I guess we -- well, we would have had to be working on it to

16  have indicted it, so I guess the answer to that is yes.  The

17  reason I pause, sir, is I don't remember the chronology of when

18  we got information from the Police Department and what we got, so

19  that's the reason I pause.

20  Q.   Would you agree with me that you were working with the

21  police on the investigation of the murder case even before

22  arrests were made of John Thompson and Kevin Freeman?

23  A.   You would have to refresh my recollection as to whether or

24  not we had to do anything for the police.  For instance, if they

25  needed search warrants, they may have come to us.  If they, you

1    know, they needed certain things done, they may have come to us.

2    Maybe not.  I don't remember.  I'm sorry.

3    Q.    Mr. Dubelier, do you remember that you were working with the

4    police even before John Thompson was identified as a suspect?

5    A.    Well, again, you would have to refresh my recollection with

6    the record as to whether or not the police needed us to do

7    anything.  We were the prosecutors, they were the investigators

8    and I don't remember whether they came to us and needed anything

9    from us.

10   Q.    Would it be typical in a complex case with you as the chief

11   of screening to be working with the police officers on an

12   investigation in a high-profile case?

13   A.    Not necessarily.

14   Q.    Is that something you ever did?

15   A.    Sir, I was a prosecutor for 17 years.  Five of them here,

16   12 years as a federal prosecutor and the practices changed in the

17   different offices I worked in.  My recollection with the police

18   here in New Orleans is they investigated the cases, we prosecuted

19   the cases.  It was different in the federal system where we

20   worked hand-in-hand with the investigators.  So I don't remember

21   it being typical that I would work with the police in a homicide

22   investigation.

23   Q.    Mr. Dubelier, did you have a close relationship with the

24   police officers here in Orleans Parish when you were the chief of

25   screening?

1  A.   I had a close relationship with some police officers and

2  there were other police officers who hated my guts and probably

3  would have killed me if they could have.

4  Q.   Did you have a close relationship with Donald Curole, for

5  example?

6  A.   I knew Donald Curole as a homicide investigator and I

7  remember having a relationship with him that was a positive one.

8  He was not one of the people who would be interested in killing

9  me.

10  Q.   I would like you to look, if you would, and I would ask

11  Mr. Vincent, if you would, to put up Exhibit 21, please.  Take a

12  look at Exhibit 21, please, Mr. Dubelier.

13  A.   Is that in the binder here?

14  Q.   It is, sir.

15  A.   Because there is no way I can see that.  Okay.

16  Q.   Would you agree with me that this is a copy of a Criminal

17  Investigation Bureau daily report?

18  A.   It says it is, so I guess it is.

19  Q.   And this would have been for the Liuzza murder?

20  A.   That's what it says, sir.

21  Q.   And that's dated January 10, 1985, if you look at the upper

22  left corner?

23  A.   Yes, sir, it is.

24  Q.   And I would like you to turn to the second page of this

25  document, if you would.

1  A.   I'm on it.

2  Q.   Would you agree with me that the substance of this document,

3  what it deals with is there was a potential witness by the name

4  of Mary Wells who claimed to have information with regard to the

5  Liuzza murder?

6  A.   Can you tell me where that is or do you want me to read the

7  whole page?  I'm happy to take the time to read the whole page.

8  Q.   Okay.  If that's what you need.

9  A.   Do you want to tell me where on the page you're referring

10  to?

11  Q.   Well, if you take a look at essentially the entire document,

12  Mr. Dubelier.  For example --

13  A.   I'm happy to do that.

14  Q.   Let's take a look at the next-to-last paragraph, starting

15  with "again."

16  A.   Next-to-last paragraph of which page, sir?

17  Q.   Of Page 2.

18  A.   Okay.

19  Q.   Does that next-to-last paragraph say, again, "After

20  consultation with Assistant District Attorney Eric Dubelier,

21  Detectives Curole and Demma decided not to formally charge a man

22  by the name of Charles Ricks with the murder of Ray Liuzza

23  because all the facts uncovered in this investigation indicate

24  that he was the innocent victim of a mistaken identification on

25  the part of a Mary Wells"?

1   A.    Yes, sir, I see that.

2   Q.    What kind of a relationship did you have with Mr. Demma?

3   A.    I remember a positive relationship with Mr. Demma.  He's a

4   very professional investigator.

5   Q.    And if you to go the first page of this document,

6   Mr. Dubelier, would you agree with me, if you look at the first

7   paragraph, this is, again, relating to information supplied by

8   Mary Wells?

9   A.    Yes, sir.

10  Q.    And the conclusion that you reached at that time was that

11  Mary Wells' information about the Liuzza murder was incorrect and

12  that this Mr. Ricks was not an appropriate suspect.  Am I right?

13  A.    On Page 1 it indicates, and let me say, sir, I just want to

14  preface this with saying I don't remember any of this, but just

15  from looking at the document it says they consulted with me and

16  prepared an arrest warrant for Charles Ricks and a search

17  warrant.  And then later it says they consulted with me again and

18  we decided to not go forward and charge Charles Ricks.

19  Q.    And that was because you concluded that Ricks was the

20  innocent victim of a mistaken identification on the part of a

21  Miss Wells?

22  A.    That's what the investigators wrote in this report.

23  Q.    Do you have any reason to quarrel with that conclusion?

24  A.    No, I don't.  I have no recollection of it at all, but I

25  have no reason to quarrel with it.

1   Q.   And would this also refresh your recollection that you were

2   working on the investigation of the Mr. Liuzza murder before

3   John Thompson and Kevin Freeman were arrested?

4   A.   Sir, it doesn't refresh my recollection; however, I don't

5   deny it.  This is 22 years ago.  I don't remember it, but I have

6   no reason to argue about the language of this report.

7   Q.   Would you agree with me that the prosecution of the armed

8   robbery case was part of the murder case prosecution strategy?

9   A.   Yes.

10  Q.   And I would ask Mr. Vincent, please, to display Exhibit 37.

11  And, Mr. Dubelier, if you would take a look at Exhibit 37 in your

12  book.

13  A.   Yes, sir.

14  Q.   Do you recognize that as a motion for continuance that you

15  filed in the John Thompson murder case?

16  A.   Yes.  And again, I have no recollection of filing it, but

17  it's my signature on it and it's Bates-stamped as filed so I have

18  no reason to dispute what it is.

19  Q.   Am I correct that one of the reasons why you filed this

20  motion in the court was that if you could try Mr. Thompson for

21  armed robbery first and get a conviction, it would be harder for

22  Mr. Thompson to testify and defend himself in the murder case?

23  A.   I think there were probably two components to it.  Yes to

24  that and also, it would probably impact the sentencing phase of

25  the trial, is my recollection of what our thinking was.

1   Q.   So that from your perspective, the two purposes were to make

2   it harder for Mr. Thompson to testify in his defense and,

3   secondly, because that could be used by you in the penalty phase

4   of the murder case?

5   A.   Well, again, I wouldn't characterize it in that way and I

6   would also say this was not unique to the Thompson case, and that

7   is, it was standard practice in the office if we had a capital

8   murder case and there were other charges also pending, we would

9   try those other charges first.

10  Q.   But the two objectives that you were trying to achieve,

11  number one, make it harder for Mr. Thompson to testify in his own

12  defense and, number two, to have an additional argument you could

13  make in favor of the death penalty; correct?

14  A.   The objectives were to make the case as strong as we

15  possibly could from the perspective of the State so the answer

16  would be yes.

17  Q.   Mr. Dubelier, I'm going to ask Mr. Vincent to put on the

18  screen the Screening Action Form which is Exhibit 33.  We talked

19  about that a minute ago.

20  A.   Yes, sir, I have it.

21  Q.   And I take it you have seen this document before?

22  A.   I think I saw this document in 1999.  I think I saw it again

23  in 2005.  And I saw it again the other day.

24  Q.   And do you recognize the document as a Screening Action

25  Form?

1  A.   Yes, sir, I do.

2  Q.   And you were the chief of screening at the time so you saw

3  these documents regularly, correct, these kinds of documents?

4  A.   I saw these kinds of documents regularly, in fact, every

5  day.

6  Q.   And this was a form that was prepared by Mr. Whittaker; is

7  that right?

8  A.   I don't know whether everything written on here is

9  Whittaker's handwriting or initials, but his name appears on it

10  so it appears he was the person who screened the case.

11  Q.   And he was the chief of armed robbery screening at the time;

12  is that right?

13  A.   Sir, you've asked me that before, and what I'm confused

14  about is there is another name on this form, Joe Tosterud, and

15  Joe Tosterud was an armed robbery screener, so I don't know

16  whether Mr. Whittaker was the armed robbery screener at the time

17  this form was screened.

18  Q.   If Mr. Whittaker testified that he was the armed robbery

19  screener at the time, would you have any reason to quarrel with

20  that?

21  A.   No, I wouldn't.

22  Q.   As the chief of screening, would it be the usual practice

23  for you to receive Screening Action Forms that were prepared by

24  the screeners that worked for you?

25  A.   The usual practice was whether or not the case was accepted

1  or refused, I was given a stack every day of probably 50 or 60 of
2  these things, and if it was accepted, I signed the charging
3  document.  If it was refused, I approved the refusal.  And then
4  if I disagreed with the action on the form, I would put a note on
5  it and send it back to the screener.
6  Q.   So in the usual course of things, am I correct you in your
7  capacity as the chief of screening would have received this
8  document; am I right about that?
9  A.   Usually.  I don't know whether I received this particular
10 document.
11 Q.   But that would have been the usual course of things;
12 correct?
13 A.   Correct.
14 Q.   And if Mr. Whittaker testified that he did send it to you,
15 you don't have any reason to quarrel with that; am I right?
16 A.   Mr. Whittaker testified 22 years later that he remembered
17 sending this document to me 22 years ago, I might quarrel with
18 that.
19 Q.   Sitting here today, you don't have any information that you
20 didn't receive that; correct?
21 A.   What I've asked before and no one has been able to produce
22 to me is the Bill of Information in the case.  If I signed the
23 Bill of Information, I saw the Screening Action Form.  If I
24 didn't sign the Bill of Information, in all likelihood, I didn't
25 see the Screening Action Form, that somebody acting in my place

1  because maybe I was out that day or busy or doing something else,

2  reviewed it so I have yet to see the Bill of Information.  I

3  cannot answer the question.

4  Q.   But in the ordinary course of things, you would receive this

5  document; correct?

6  A.   In the ordinary course of things, I received Screening

7  Action Forms.  If I was sick, if I was out of the office, if I

8  was too busy, there were other lawyers who would fill in and

9  review these forms for me.  I do not know and I've said it before

10  and I'll say it again, whether or not I ever got this particular

11  form.  I just don't know.

12  Q.   And, Mr. Dubelier, would you agree with me that if this

13  document was in this stack as you described of Screening Action

14  Forms that would be placed on your desk or provided to you by

15  your screeners, you would have had a particular interest in this

16  Screening Action Form because this related to a high-profile

17  murder case that you were handling in the office; am I right?

18  A.   Maybe, maybe not.

19  Q.   Now, if you had gotten this Screening Action Form in 1985,

20  Mr. Dubelier, it would have advised you that there was some blood

21  evidence in the case; correct?

22  A.   If I had gotten it, yes.  The form indicates that, let's

23  see, may wish to do blood test.  That's what I would have been

24  advised of.

25  Q.   And so, Mr. Vincent, can you bring up that section of the

1  document, please.  It says gun the same make and model as Liuzza

2  weapon.  That would have been significant to you; correct?

3  A.    If there was a gun in this case.  I don't know if there was

4  a gun recovered in the case.

5  Q.    Does this document not indicate to you that there was some

6  kind of gun that was involved in that particular case?

7  A.    That's different.  It says there was a gun involved.  For

8  instance, if a witness described a weapon in this case and

9  Whittaker was taking that description and matching it to a

10  description of a weapon in the Liuzza case, I would not view that

11  as something significant.

12  Q.    Mr. Dubelier, it says there gun the same make and model as

13  the Liuzza weapon, would that have been significant to you back

14  in 1985?

15  A.    Again, sir, if what he was saying was we had the gun in the

16  armed robbery and it was the same gun as in the murder, it would

17  have been tremendously significant.  I don't know that that's

18  what he's saying because I can't remember.

19  Q.    Even if it wasn't the same gun, if it was the same make and

20  model, Mr. Dubelier, wouldn't that be significant to you?

21  A.    Well, I guess the first question I would have, if I had

22  gotten this form, gone and asked Bruce Whittaker is how do we

23  know the gun was the same make and model.  How would we possibly

24  know that if we didn't have the gun.

25  Q.    Mr. Dubelier, it says there gun the same make and model as

1  the Liuzza weapon.  Does that raise any question in your mind as

2  to whether or not the District Attorney's Office or the police

3  had the gun?

4  A.   Yes.  Did we have the gun in the armed robbery?

5  Q.   That raises a question in your mind as to whether the State

6  of Louisiana had in its possession the gun?

7  A.   Yes.  Didn't we have it, sir?

8  Q.   The second paragraph or second sentence there, Mr. Dubelier,

9  says, "Victim made photo ID.  Will be down 3/11/85 if physical

10 desired.  May wish to do blood tests."  Do you see that?

11 A.   Yes.

12 Q.   And did that indicate to you, would that indicate to you

13 that there was some blood evidence issue in the case?

14 A.   Yes.

15 Q.   Good.  So if you had gotten this document back in 1985 in

16 the ordinary course of things, that would have indicated to you

17 that there may be some blood evidence in the case?

18 A.   That's what I just said.

19 Q.   Good.  And would you agree with me that in the armed robbery

20 case, blood evidence either would have helped your case, if the

21 blood type was consistent with Mr. Thompson's blood type or it

22 could show that Mr. Thompson was not the perpetrator if the blood

23 types didn't match?

24 A.   I don't know from that form whose blood we had.

25 Q.   Do you have any recollection of talking to Mr. Whittaker

1  about this issue?

2  A.   No.

3  Q.   You don't.  Do you have a recollection of ever talking to

4  Mr. Whittaker about the blood issue?

5  A.   I don't know.  I may have.  I may not have.  I don't know.

6  Q.   You can't recall?

7  A.   There is no way I can recall.  It's 22 or 23 years ago.

8  Q.   Mr. Dubelier, I think at some point you've said that at some

9  point before the armed robbery trial you handed it off to

10 Mr. Williams; is that right?

11 A.   If those were the words I used.  I know Mr. Williams tried

12 the case.  I know that.

13 Q.   Did you hand the case off to Mr. Williams at some point

14 prior to the trial?

15 A.   Yes.

16 Q.   Okay.  What's your best recollection as to when you handed

17 it off to Mr. Williams?

18 A.   I have no recollection of that.

19 Q.   Mr. Vincent, can you put up Page 222, Lines 15 to 20.  Based

20 on your recollection here today --

21       THE COURT:  Wait, start again.

22                     EXAMINATION

23 BY MR. COONEY:

24 Q.   Based on your recollection sitting here today, what's your

25 best estimate as to how long in advance of the actual start of

1  the Thompson trial it was that you handed it off for the

2  carjacking case?

3  A.   I think well in advance.

4  Q.   Well in advance?

5  A.   Well, I think you ought to show the rest of what I said.

6  Q.   What is your testimony to the jury, Mr. Dubelier?

7  A.   My testimony at the time of the deposition and at the time

8  today in front of the jury was that I said well in advance, you

9  said to me, well, Williams said it was right before and I said,

10  well, I won't dispute Williams' recollection if that's what his

11  recollection is, but I don't remember.  I think it would have

12  been unusual to pass off a case at the last minute.  I believe

13  that's what the dialogue was.

14  Q.   That's your testimony to this jury today?

15  A.   What is?

16  Q.   What you just said.

17  A.   What my testimony is today is that I believe the practice

18  would have been that the case would have been turned over to

19  Williams well in advance.  I have no recollection today whether I

20  turned it over to him a day in advance, a month in advance, six

21  months in advance.  I cannot remember.

22        MR. COONEY:  May I approach the witness, Your Honor?

23        THE COURT:  Yes.

24                        EXAMINATION

25  BY MR. COONEY:

1  Q.  Mr. Dubelier, I'm going to ask you to look at this, this

2  testimony starting on Page 222 and going over to 223.  And I'm

3  going to going to read this and I'm going to ask you whether I

4  read this correctly.

5        THE COURT:  Can the witness have a copy, also?  What

6  page and line?

7        MR. COONEY:  Page 222, Your Honor, starting at Line 15.

8        THE COURT:  Does the witness have it?

9        THE WITNESS:  Yes, sir, I have it.  Thank you.

10                         EXAMINATION

11  BY MR. COONEY:

12  Q.  "Based on your recollection sitting here today, what's your

13  best estimate as to how long in advance of the actual start of

14  the Thompson trial it was that you handed it off for the

15  carjacking case?

16        "ANSWER:  I think well in advance.

17        "And what would that mean?

18        "I don't know the answer to that.  I would, I just would

19  be surprised, I would be surprised if we made a last minute

20  change.  Now, if the recollection of Jim Williams is different,

21  no, he would have that recollection.  I don't remember a last

22  minute change of lawyers.

23        "QUESTION.  If Mr. Williams -- QUESTION:  If Mr.

24  Williams testified it was just a day or two before the trial,

25  would that be consistent with your recollection?

1          "ANSWER:  That would surprise me.  That would really

2    surprise me.  I'm not saying Williams is wrong, I'm saying that

3    surprises me because I'm trying to think what could have occurred

4    a day or two prior to trial that would have changed whether or

5    not I was going to try the case.  And it -- I don't have my

6    calendars from 20 years ago, you know, I guess maybe if I had a

7    calendar entry that showed I had to do something on a particular

8    day, but, that surprises me, Mr. Cooney.  That's all I can tell

9    you about that."

10   A.    That was my testimony then.  That's my testimony today.

11   Q.    If Mr. Williams testified that you made a strategic decision

12   not to use the blood evidence in the armed robbery case, would

13   that be a correct testimony, Mr. Dubelier?

14   A.    That I made or he made a strategic addition?

15   Q.    That you made, sir.

16   A.    That would be not correct.

17   Q.    I'd like you to take a look at Exhibit 42, if you would,

18   please, and I would ask Mr. Vincent to please put that up on the

19   screen.  Mr. Dubelier, do you recognize this as an application

20   for a Bill of Particulars in the Thompson murder case?  For the

21   Thompson robbery case.  I apologize.

22   A.    I don't know because it's not signed.  So I have no idea.

23   Q.    Do you have any reason sitting here today to dispute that

24   this is an application for Bill of Particulars in the Thompson

25   armed robbery case?

1  A.   I have no reason to agree and no reason to disagree.   I

2  don't know.   It's not signed.   If you tell me it came from the

3  Court record, I will agree with you.

4  Q.   I will tell you that there is a stipulation as to the

5  authenticity of this document in this case.

6  A.   That's fine.   I won't take issue with that then.

7  Q.   And I take it you sitting here today, you don't have any

8  recollection of having received this document?

9  A.   No, sir.

10  Q.   Is this the kind of document that you would receive in the

11  ordinary course as a prosecutor in the Orleans Parish District

12  Attorney's Office?

13  A.   This looks like a standard application for Bill of

14  Particulars that was filed by the Orleans Indigent Defenders

15  Program to the best of my recollection.   It's a standard form

16  they file in all cases.

17  Q.   And when you in your capacity as an assistant district

18  attorney in the Orleans Parish District Attorney's Office

19  received a document like this which asks for certain pieces of

20  evidence, is that what this does?   It asks for certain pieces of

21  information or evidence?

22  A.   Mr. Cooney, I apologize.   The print on this is small and I'm

23  having trouble reading it.   I just can't see it.   And I don't

24  have reading glasses.   Just give me a second, please.

25          Yes.

1  Q.   And it asks for example, for any weapons, which the

2  prosecution intends to offer.  That's Paragraph 3.

3  A.   Whatever it says it says, sir.

4  Q.   And in Paragraph 5, list and describe any and all items of

5  physical or tangible property obtained from any person including

6  but not restricted to the codefendant or codefendants, et cetera?

7  A.   Yes, sir.

8  Q.   Now, as a typical matter, Mr. Dubelier, when you were

9  responding to applications like this for a Bill of Particulars,

10  would you check the file before responding?

11  A.   Yes.

12  Q.   Okay.  And so one of the things, am I correct, that you

13  would have done before responding, if you received this document,

14  is you would have looked to the file and identified the various

15  items that were in that file?

16  A.   If I received it, yes, that's what I would have done.

17  Q.   That would have been the typical thing to do?

18  A.   Yes, sir.

19  Q.   And I take it the file would include the Screening Action

20  Form typically; am I right about that?

21  A.   Yes.

22  Q.   And it would also include a Crime Scene Technician Report;

23  am I right about that?

24  A.   Maybe.

25  Q.   That would be the typical thing; right?

1  A.    No.

2  Q.    It wouldn't be the typical thing.  What would be typically

3  in the file that you would review before you responded to the

4  application for the Bill of Particulars?

5  A.    For a nonmurder case, for a robbery case like this, I'm

6  assuming there was just a police incident report and a Screening

7  Action Form, and that could have been it.

8  Q.    So that in the typical case, at least the Screening Action

9  Form and in this case the Screening Action Form makes reference

10  to the blood evidence, am I correct?

11  A.    Yes, sir.

12  Q.    That's something that you would have looked at typically

13  before you responded to this application Bill of Particulars; am

14  I right?

15  A.    Yes.

16  Q.    I'm going to direct your attention on the screen, if I can,

17  to Exhibit 43, and for some reason I don't think it's in your

18  binder, Mr. Dubelier.

19  A.    That's okay.  If you can just make it bigger, I would rather

20  look at it up here.  I can't see the documents.

21  Q.    Do you see that, Mr. Dubelier, as an answer to a Motion For

22  Discovery and Inspection in the Thompson armed robbery case?

23  A.    Yes, sir, I do.

24  Q.    And is that your signature in the lower right-hand corner?

25  A.    Yes.  It doesn't look like that anymore, but my recollection

1   is that's what it locked like back then.

2   Q.   And, Mr. Vincent, can you go over to the right margin, if

3   you would, because I want to show the date.  I think it may be

4   hard for you to see, but can you blow that up, Mr. Vincent?  And

5   that says filed April 3, 1985?

6   A.   If you say so.

7   Q.   I'm going to hand you a copy of this.  It's kind of tough to

8   see from a distance.

9   A.   Oh, yeah, that's April 3rd.  That's it.  That's it.

10  Q.   April 3, 1985?

11  A.   Yes, sir.

12  Q.   And would you agree with me that that was eight days before

13  the armed robbery trial of John Thompson?

14  A.   If you say that's what the record reflects, of course.

15  Q.   And I will represent to you, Mr. Dubelier, there is a

16  stipulation between the parties that the armed robbery trial

17  started April 11th.

18  A.   That's fine, thank you.

19  Q.   And would you agree with me that at least as of April 3rd,

20  eight days before this document, you were still one of the

21  prosecutors that was handling the armed robbery case of

22  John Thompson?

23  A.   It appears so, yes.

24  Q.   Now, so this is April 3rd.  I would ask you to turn to

25  Exhibit 17 in your binder, if you would, and ask Mr. Vincent if

1  he could display that.

2  A.    Yes, sir.

3  Q.    And do you recognize that document, Mr. Dubelier, as the

4  New Orleans Police Department evidence property card?

5  A.    This is a New Orleans Police Department evidence property

6  card.  That's what it says.

7  Q.    Have you ever seen a document like that before?

8  A.    Like this, I'm sure I have.  Probably thousands of them.

9  Q.    And what this document does is it identifies for Central

10 Evidence and Property the various items of physical evidence that

11 are in Central Evidence and Property; am I right?

12 A.    Exactly.

13 Q.    Okay.  And if you go to the next page of this document, is

14 that a chain-of-custody page?

15 A.    That's what it says.

16 Q.    And what that does is if evidence is checked out, if you

17 will, of Central Evidence and Property, that has to get logged in

18 there; am I right?

19 A.    Yes.  My recollection is that's what the procedure was, yes,

20 sir.

21 Q.    And if it gets checked in, that has to get logged in there

22 as well?

23 A.    Yes.

24 Q.    There is a section that says outgoing, and that's the left

25 side of the document, and there is an incoming on the right side

1  of the document?

2  A.   Yes, it says released by, received by.

3  Q.   Okay.  Now, if you take a look at the first line item, do

4  you agree with me that some evidence was checked out of Central

5  Evidence and Property on April 4, 1985?  And I would ask

6  Mr. Vincent to please highlight that if you could.

7  A.   I'm sorry, I can't read that.  I see -- and again, I

8  apologize, I just can't read it.

9  Q.   Can you take a look at the --

10  A.   This is worse.  I'm sorry, sir.

11  Q.   Mr. Vincent, can you try to blow that up bigger?  Does that

12  show April 4, 1985, Mr. Dubelier?

13  A.   Yes, sir, it appears to, yes, sir.

14  Q.   So at least this document would seem to indicate that

15  something was checked out of Central Evidence and Property on

16  April 4, 1985?

17  A.   Yes.

18  Q.   And would you agree with me that April 4th is one day after

19  you signed the response to the Motion For Bill of Particulars in

20  the armed robbery case?

21  A.   It's a day after it was filed, yes, sir.

22  Q.   And would you also agree with me that if you look at -- and,

23  Mr. Vincent, if you could highlight what's in the parentheses up

24  there in that first item, E-6 and 7.  Would you agree with me

25  that E-6 and 7 refers to the blood specimens that were found,

1  that were located in Central Evidence and Property?  And I'll
2  direct your attention to the first page.
3  A.    Yes.
4  Q.    Okay.  So what this document shows is that on April 4, 1985,
5  the tennis shoe with blood on it and the piece of the victim's
6  right pants leg with blood on it was checked out of Central
7  Evidence and Property on April 4th; is that right?
8  A.    It looks like from reading this it was checked out April 4th
9  and returned on April 10th.  If I'm reading this correctly.
10 Q.    Now, does this sequence of events, Mr. Dubelier, refresh
11 your recollection as to whether or not you ordered the testing of
12 the blood in the armed robbery case?
13 A.    No, sir, it does not.
14 Q.    It does not.  I just want to make sure I'm clear on the
15 sequence.  You get the Motion For Bill of Particulars at some
16 point; correct?
17 A.    Correct.
18 Q.    On April 3rd, you file the answer to the bill of -- Motion
19 For Bill of Particulars; correct?
20 A.    Correct.
21 Q.    One of the things that's asked for in this Motion For Bill
22 of Particulars is any tangible or scientific evidence that had
23 been collected at the scene?
24 A.    Correct.
25 Q.    And you would have checked the file that would include the

1  Screening Action Form that says may wish to do blood test before

2  responding to the Motion For Bill of Particulars?

3  A.    Correct.

4  Q.    And the blood evidence was checked out of Central Evidence

5  and Property the day after you filed your response to the Motion

6  For Bill of Particulars?

7  A.    That's what this record reflects, yes, sir.

8  Q.    Do you dispute or deny that you ordered the testing of the

9  blood evidence in the John Thompson case?

10  A.    Do I dispute or deny?  I don't know.

11  Q.    Do you deny it?

12  A.    I don't know.

13  Q.    You don't know one way or the other?

14  A.    No, I don't know.

15  Q.    So sitting here today, you can't tell the jury whether you

16  did order that testing or whether you didn't order that testing?

17  A.    No, I think my answer to that, if it were one way or the

18  other, would be highly suspect given the fact that this happened

19  22 years ago.  I'm sorry, I cannot remember.  I don't know

20  whether I did.  I don't know whether I didn't.

21  Q.    So you can't say one way or the other?

22  A.    I don't know.

23  Q.    And, Mr. Vincent, could you put up Exhibit 45, please.

24  A.    Is this in the binder, sir?

25  Q.    It is.  Mr. Dubelier, would you agree that this is a copy of

1  a crime laboratory report dated April 9, 1985?

2  A.   Yes, sir, I would.

3  Q.   And am I also correct that you can't say today whether or

4  not you saw that report in 1985?

5  A.   That's correct.

6  Q.   Now --

7  A.   You know, let me go back a second.  If this report was not

8  turned over, I didn't see it.

9  Q.   How can you make a statement like that, Mr. Dubelier?

10  A.   Because I would have turned it over if I had it.

11  Q.   So that the only basis that you have for saying that you

12  didn't see it was because if you would have seen it, you would

13  have turned it over?

14  A.   That's correct.

15  Q.   You're as sure of that as the day is long?

16  A.   Yes, I am.

17  Q.    Mr. Vincent, can you please play Pages 27, Lines 21 to Page

18  29, Line 6 of Mr. Dubelier's deposition?

19            (WHEREUPON, the video is played at this time as

20  follows:)

21            "QUESTION:  Mr. Dubelier, we're placing before you

22  what's been marked as Dubelier Exhibit Number 1, which is a copy

23  of an April 9, 1985 report of the crime laboratory addressed to

24  the District Attorney's Office, Attention ADA Bruce Whittaker.

25  Do you recognize this document?

1          "ANSWER:  Is this the report that Mr. Glas showed to me

2     in 1999?

3          "QUESTION:  At the hearing, that's correct.

4          "ANSWER:  I recognize it from Mr. Glas having shown it

5     to me then in 1999, based on you telling me that this is the same

6     one.  I don't remember seeing all the pages of this.  I thought

7     he showed me -- I don't remember.  Maybe he did show me all four

8     pages.  I don't remember.

9          "QUESTION:  Prior to 1999, had you ever seen this

10    document before?

11         "ANSWER:  I have no recollection of ever having seen

12    this document prior to 1999.

13         "QUESTION:  Are you saying that you didn't see it

14    before or you can't recall one way or the other whether you had

15    seen it before?

16         "ANSWER:  There's no way I would be able to recall

17    whether or not I had seen this Document 20 years ago."

18              (WHEREUPON, the video testimony is concluded.)

19                           EXAMINATION

20    BY MR. COONEY:

21    Q.   And, Mr. Dubelier, that was your testimony at the

22    deposition; am I right?

23    A.   But, again, I gave more testimony, sir.  It goes on.  I kept

24    talking about this same issue.  And what I'm telling you today,

25    my testimony today is, I do not remember whether or not I ever

1  saw that document.  But I prosecuted thousands of case when I was

2  a DA and turned over thousands of these type of reports.  If I

3  had the report, I would have turned it over.  That's the best I

4  can do.

5  Q.   And you're saying that because if you didn't turn it over,

6  that would be a violation of the defendant's rights; is that

7  right?

8  A.   The crime lab report, we were obligated to turn over a crime

9  lab report.  That's the way it was.  That was standard operating

10  procedure in the office.  There are, again, records, I am sure,

11  in the office of hundreds, if maybe not more cases where I turned

12  over these type of reports.  So my practice would have been to

13  turn over the report.

14  Q.   But sitting here today, you can't say whether or not you did

15  that with regard to that report; am I right?

16  A.   No, I cannot, because I don't know whether I ever saw the

17  report.

18  Q.   Now, Mr. Dubelier, Mr. Thompson was convicted of attempted

19  armed robbery; am I right?

20  A.   Yes, he was.

21  Q.   And he didn't testify in the 1985 murder trial; am I right

22  about that, also?

23  A.   That's correct.

24  Q.   So --

25  A.   Now, could I ask you, again, I don't mean to be difficult, I

1  know he didn't testify in the trial in chief.  I don't remember

2  whether he testified in the penalty hearing.  If you say he

3  didn't, he didn't.

4  Q.    So that you accomplished the first objective with regard to

5  the armed robbery case; right?

6  A.    His lawyer determined not to put him on, and I believe he

7  did not put him on because he had an armed robbery conviction.

8  There may have been other factors as well.

9  Q.    And do you recall that Mr. Williams examined Marie LaGarde

10 during the penalty phase of the murder case?

11 A.    You've asked me that before.  I don't have a recollection of

12 it, but if the record of the trial reflects that's what occurred,

13 I'm not going to take issue with it.

14 Q.    And would you agree with me that you used the armed robbery

15 conviction to argue that John Thompson should die?

16 A.    If the record reflects that's what I did, that's what I did.

17 Q.    Let's do that.  Let's pull out -- let's show the jury what

18 you argued at the penalty phase.  And, Mr. Vincent, if you would

19 be good enough to bring up Page 453, starting at Line 13.  Can

20 you bring that up in a little bit larger size?  Mr. Dubelier, for

21 your convenience, if you look at Exhibit 137 of your --

22 A.    Yes, sir, I have it.

23          MR. COONEY:  Can you make that any bigger, James?

24          THE COURT:  Which exhibit are you on?

25          MR. COONEY:  This is Exhibit 137, Your Honor.

1              THE COURT:  I heard you say 453.

2              MR. COONEY:  Page 453 of Exhibit 137.

3              THE COURT:  That says Page 454.  Are you on the right

4    page?

5              MR. COONEY:  451.  I apologize, Your Honor.  May I

6    approach, Your Honor?

7              THE COURT:  Yes.

8                            EXAMINATION

9    BY MR. COONEY:

10   Q.   Would you agree with me, Mr. Dubelier, that you made the

11   following argument to the jury:  "Consider the testimony of

12   Mary LaGarde.  It's important because if anything goes to the

13   character of that man, it's the testimony of Mary LaGarde.  Based

14   on her testimony but for a split second, would there be three

15   more murder victims?  Would this be his second murder trial?  I

16   think so, because Mr. Thompson has a little signature he

17   uses, .357 Magnum.  That's his signature.  This one almost killed

18   three kids.  This one killed one man.  That's how he signs when

19   he leaves somewhere.  That's John Thompson.  Now, I'll tell you

20   folks, you're going to consider the circumstances and his

21   personality.  This is his personality.  You don't have to hear

22   from any highfalutin sociologist to figure out all about

23   John Thompson.  Look at these.  Look at these.  He likes them and

24   he kills with them.  Think about these when you go back to

25   determine what you want to do with him.  What does he consider

1  the value of life?  I think it's important when you go back to

2  consider what the penalty should be, how does he value life?"

3          Is that the argument that you made to the jury?

4  A.   That among a lot of other things, yes.

5  Q.   And would you agree with me that you made big use here of

6  the fact that the gun was the same make and model as used in the

7  Liuzza case?

8  A.   I stated that, yes.

9  Q.   You wanted to have the jury vote to kill John Thompson

10 based in part on that; correct?

11 A.   No, sir.  My obligation was to prosecute the case.  The

12 policy of the office in first-degree murder cases was if it was a

13 first-degree murder case, we pursued the death penalty.  It was

14 not discretionary.  That was the policy.  Did I personally want

15 the jury to find John Thompson guilty?  That wasn't my role.  My

16 role was to represent the people of the State of Louisiana,

17 present the evidence, and have them reach a determination.  This

18 was not personal.  It wasn't then and it isn't now.

19 Q.   You were trying to convince the jury to vote in favor of

20 killing John Thompson based on that argument; correct?

21 A.   In my role as an assistant United States attorney, yes, I

22 was advocating that on behalf of the people of the State of

23 Louisiana and that was my responsibility.

24 Q.   Let's look a little bit further on what you argued, a little

25 further down starting on Page 53, 453, Line 13.

1    A.    Could you hang on a second?

2    Q.    Are you there, Page 453, Line 13?

3    A.    I want to make sure you stopped and you're skipping where I

4    had the actual evidence of the murder case.

5    Q.    I'm focusing on, Mr. Dubelier, the evidence that you used

6    from the armed robbery conviction.

7    A.    That's fine.  Where are you?

8    Q.    Page 453, Line 13.  Did you further argue, "You know, folks,

9    the evidence is in pertaining to his prior conviction of

10   attempted armed robbery and the sentence is in the record.  He is

11   currently serving a sentence of 49 and a half years without the

12   benefit of parole, without the benefit of probation, without the

13   benefit of suspension of sentence.  What does that mean to

14   someone who is 22 years old?  That's life.  That's life.  He

15   can't get out.  And now he stands trial for murder.  And what are

16   you going to do?  You're going to say, okay, we'll give you one

17   more life.  We'll put another life sentence on top of the one you

18   already have.  Do you know what that means?  That means he wins.

19   He wins.  He walks out of this courtroom and he laughs, and he

20   says, 'Ha, ha, they put me through all that.  They put me through

21   three days of trial.  They found me guilty of killing that man.

22   I killed the man, and they didn't do anything to me.  I already

23   had the 49 and a half years.  I'm going to jail for the rest of

24   my life.  Ha, the joke is on them.  They didn't do anything to

25   me.  They can't hurt me, even though I killed that man.'  That's

1  a dangerous message to send, folks, to anyone, especially someone

2  like that, to let him get away with something like this."

3          Is that the argument you gave to the jury back in 1985?

4  A.    Yes, sir, it is.

5  Q.    You didn't actually believe that John Thompson would have

6  thought it was funny to receive a life sentence, did you?

7  A.    I have no idea what he would have thought.

8  Q.    Now, in big cases, Mr. Dubelier, like the Liuzza case, you

9  did your homework?

10  A.    Of course.

11  Q.    You prepared for the trial?

12  A.    Yes.

13  Q.    Important for you to know the facts?

14  A.    Yes.

15  Q.    Had to know what the witnesses would say on the stand;

16  right?

17  A.    Yes, as best we could.

18  Q.    Wanted to know what the physical evidence would be?

19  A.    Yes.

20  Q.    Wanted to review witness statements?

21  A.    Yes.

22  Q.    Wanted to read the police reports?

23  A.    Yes.

24  Q.    And in the Liuzza murder case, we already looked at a

25  document.  You were even talking to the police about the

1  circumstances of the Liuzza murder even before Mr. Thompson's

2  arrest; am I right?

3  A.   Yes.

4  Q.   And before you put a witness on the stand, you would prepare

5  that witness, right, typically?

6  A.   As best we could.

7  Q.   And that means you would meet with the witness that you were

8  calling to testify in your case and you would want to go over in

9  advance what that witness was going to say; am I right?

10 A.   All I can tell you is to the best of my recollection there

11 were many cases that I prosecuted, probably this one as well,

12 where the first time I met the witness was in the hallway right

13 before they testified and it was just by virtue of the volume of

14 work we had.

15 Q.   But in a high-profile case in particular, you would want to

16 make sure that you had met in advance and prepared the witnesses;

17 am I right?

18 A.   I may have done that, I may not have.  Again, I don't know.

19 Q.   In the ideal world, that's something you do; am I right?

20 A.   The DA's office in 1985 was not the ideal world.

21 Q.   If you had the opportunity to do it, you would meet with the

22 witnesses in advance; am I right?

23 A.   Yes.

24 Q.   Because your preparation for trial would be better if you

25 did that.

1  A.    Yes.

2  Q.    And you wanted to make sure that you could minimize any

3  surprise at trial.  That's one of the things you wanted to do.

4  A.    Correct.

5  Q.    Okay.  Would you agree with me that as a general matter, the

6  police try to get a complete description of the perpetrator from

7  eyewitnesses at the time of the crime?

8  A.    Theoretically, that's correct.  In my practice, I've not

9  found that to be literally correct.

10 Q.    But that at least as a goal, what the police want to try to

11 do when they come to a crime scene is get a description of a

12 perpetrator if they can?

13 A.    That's what they are trained to do.

14 Q.    And what they want to try to do is get the most complete

15 description they possibly can at the scene; am I right?

16 A.    That's what they are trained to do.

17 Q.    And part of that's because their recollection of what they

18 just saw is freshest right then and there than it might be, say,

19 six months later?

20 A.    Yes.

21 Q.    I would like to have you refer, if you would, Mr. Dubelier,

22 to Exhibit 30.  Mr. Vincent, if you could pull up Exhibit 30.  Do

23 you recognize this, Mr. Dubelier, as a supplemental police report

24 for the Thompson or the Liuzza murder?

25 A.    I recognize this as a report I think that you showed me in

1  2005, and it appears from the face of it that it is -- is it

2  marked supplemental at top?

3  Q.   It says incident report supplemental report.

4  A.   Yes, I don't know what it is because incident and

5  supplemental, something should be checked there, I would imagine,

6  so I don't know what it is.

7  Q.   Would you agree with me -- if you look at the length of the

8  document, would you agree with me that based on the length of

9  this document that it's a supplemental report?

10  A.   I don't know that I'd call it a supplemental report.   What

11  I'd call it is the Homicide Division's report, their final report

12  on this investigation.   That's what I would call it.

13  Q.   And I ask you to turn to Page 12 of the report, if you

14  would, and, Mr. Vincent, if you could pull up Page 12.   It says

15  Page 12 of 35.   And would you agree with me that the final

16  paragraph on Page 12 talks about a description provided by a

17  witness by the name of Paul Schliffka?

18  A.   Yes, sir, it does.

19  Q.   And, Mr. Vincent, would you be good enough to highlight the

20  section of that paragraph that talks about the witness'

21  description?

22       Would you agree with me that at least what's in this

23  police report about the description given by Paul Schliffka was

24  that the perpetrator was a Negro male, early 20s, 6 feet tall,

25  slim build, dark complexion, close-cut hair, wearing a black

1  nylon jacket and dark pants, possibly blue jeans?

2  A.   Yes, sir.

3  Q.   The hair is described as close-cut?

4  A.   Yes.

5  Q.   Do you see anything in that paragraph relating to

6  Mr. Schliffka's description of the perpetrator that uses the word

7  "Afro"?

8  A.   No.

9  Q.   And I take it you don't have any recollection that you

10  produced that document in the Thompson case, do you?

11  A.   No.  You asked me about this before, and what I've said

12  before and I'll say again the is final homicide report.  We may

13  or may not have had this report at the time the case was tried.

14  If there was a date on this report, it would answer that

15  question.  I don't know the answer to the question.  I can tell

16  you in practice, though, that it was not unusual for us to try a

17  homicide case and not have the final homicide report.

18  Q.   Mr. Dubelier, I don't think that was responsive to my

19  question.  My question was you don't a recollection of having

20  produced this to the defense in the Thompson case, do you?

21  A.   I don't have a recollection of ever having it to produce, so

22  no, I don't have a recollection of producing it to the defense.

23  Q.   I would ask you to look at the last page of this document,

24  if you would, Mr. Dubelier.

25  A.   Yes, sir.

1  Q.   On the last page of the document -- and would you agree with

2  me that what the document does is it goes through a long

3  narrative concerning the investigation of the Mr. Liuzza murder

4  case?

5  A.   Without reading it page by page, I will take your word for

6  it that that's what it does.

7  Q.   On the last page, what it says is "On Thursday, January 17,

8  1985, John Thompson and Kevin Freeman were indicted by an

9  Orleans Parish Grand Jury for the first-degree murder of Ray T.

10  Liuzza.  Charges against the pair are still pending in Criminal

11  District Court, the Parish of Orleans.  With the arrest of

12  John Thompson and Kevin Freeman, this case is now considered

13  solved and cleared.  Any additional information developed

14  relating to this investigation will be submitted in an additional

15  supplemental report.  Office of the Honorable District Attorney

16  to be consulted in this matter.  Bulletin sent."

17        Does this give you any information that this report was

18  prepared around the time that the police had referred this matter

19  to the District Attorney's Office?

20  A.   No.

21  Q.   That doesn't do that for you?

22  A.   No.

23  Q.   I would like to draw your attention to Exhibit 5, please.

24  A.   Yes, sir.

25  Q.   Do you recognize that as a New Orleans Police Department

1   daily report?

2   A.   Is that -- does it say that somewhere because I don't know

3   what that is.

4   Q.   Is it a Criminal Investigation Bureau daily report?

5   A.   It's a Criminal Investigations Bureau report.  You're using

6   the phrase "daily," I don't know what that means.

7   Q.   Do you have an understanding that as the --

8   A.   Oh, I see on Page 2 it says daily.

9   Q.   And was the phrase "daily" familiar to you as an assistant

10  district attorney in Orleans Parish?

11  A.   No.

12  Q.   It wasn't familiar to you?

13  A.   No.

14  Q.   Now, would you agree that the date of this document is

15  December 8, 1984?

16  A.   Correct.  Yes.

17  Q.   And the -- there is also a discussion here about an

18  interview of Mr. Schliffka?

19  A.   Correct.  There is.

20  Q.   And if we look at the last paragraph on the first page,

21  Mr. Vincent, if you could highlight that.  What we have in this

22  document is "Upon looking towards Josephine Street, Mr. Schliffka

23  observed a black male, early 20s, 6 feet tall, slim build, dark

24  complexion, short hair, wearing a black nylon jacket and dark

25  colored pants running across Baronne Street on Josephine Street

1  towards Dryades."  Do you see that?

2  A.   Yes.

3  Q.   Do you see any discussion in this paragraph concerning

4  Mr. Schliffka's description of the perpetrator that uses the word

5  "Afro"?

6  A.   No.

7  Q.   And I take it you don't have any recollection of having

8  produced this document to the defense; am I right?

9  A.   I don't know if I ever saw it, no.  I have no recollection.

10  Q.   Okay.  Let's go to Exhibit 2, if we can.  Do you recognize

11  Exhibit 2 as a Criminal Investigation Bureau report?

12  A.   That's what it says it is, yes.

13  Q.   And again, this is for the Liuzza murder; am I right?

14  A.   Yes.

15  Q.   I would like you to turn, if you would, to Page 2.

16  A.   Yes, sir.

17  Q.   If you would look at the bottom paragraph on Page 2, am I

18  correct that what's discussed here is an interview with

19  Mr. Schliffka?

20  A.   Correct.

21  Q.   And the people that were conducting the interview were

22  Officers Angelo and Carter?

23  A.   That's what this says, yes, sir.

24  Q.   And this was prepared on December 6th; am I right?

25  A.   I don't know.  It says the offense date is December 6th.  I

1  don't know when the report was prepared.

2  Q.   If you look at the bottom right-hand corner of the first

3  page.

4  A.   Yes.

5  Q.   And so December 6th was the day of the murder?

6  A.   Was it?

7  Q.   If there is a stipulation that December 6, '84 is the day of

8  the murder, you don't have any reason to quarrel with that?

9  A.   No, sir, I absolutely do not.

10  Q.   So this report would have been prepared the day of the

11  murder?  Based on what you see in this document?

12  A.   I guess so.  I mean, you would have to ask the police

13  officers.  I don't know for certain.  I'm sorry.

14  Q.   So going back to Page 2, what we have is Officers Angelo and

15  Carter interviewing Mr. Schliffka; am I right?

16  A.   Yes, that's what he makes reference to.  I don't know -- it

17  doesn't appear that they, that Angelo and Carter wrote this.  It

18  appears that the detectives talked to Angelo and Carter and then

19  wrote down what Angelo and Carter told them Schliffka had said.

20  That's what it appears to me to be.

21  Q.   So it says Schliffka told Officers Angelo and Carter that

22  "At approximately 12:40 a.m. he was getting into his vehicle

23  which was parked in front of his residence at 2026 Baronne Street

24  when he heard what sounded like several gunshots being fired

25  around the corner on Josephine Street.  Upon looking up,

1  Mr. Schliffka observed an unknown Negro male, previously

2  described, running on Josephine across Baronne Street in the

3  direction of Dryades.  As the wanted subject ran across Baronne

4  Street, he still clenched a dark colored revolver in his right

5  hand.  Mr. Schliffka ran to the corner of Baronne and Josephine

6  and watched the wanted subject as he fled up Josephine to Dryades

7  Street and then unknown."  You see that?

8  A.   Yes, sir.

9  Q.   And when it makes reference to previously described, am I

10  correct that on Page 1 of this document, there is the description

11  of who Mr. -- of what Mr. Schliffka saw?

12  A.   Yes, sir, there is.

13  Q.   And let's look at the wanted subject box.  And this is,

14  again, based on what Schliffka told Angelo and Carter?

15  A.   Yes, sir.

16  Q.   Unknown Negro male, 6 feet tall, black jacket, blue jeans,

17  close-cut hair, armed with a blue steel revolver, possibly with a

18  4-inch barrel.

19  A.   Yes, that's correct.

20  Q.   That's what it says?

21  A.   Yes.

22  Q.   No reference to an Afro in this document, either?

23  A.   No, sir.

24  Q.   And you don't have any recollection of having produced this

25  to the defense; am I right?

1   A.   I have no recollection of ever having had this nor producing
2   it to the defense.
3   Q.   But you can't say today whether you did or didn't have it;
4   am I right?  Twenty years ago, just like everything else, can you
5   remember that you had this document, Mr. Dubelier?
6   A.   No.  What I'm trying to say is that my -- to the best of my
7   recollection, generally, not in this case, but when we tried
8   homicide cases, we would have the incident report from the
9   police, we would have crime lab reports.  I don't remember as a
10  standard practice getting this kind of stuff.  This is the kind
11  of thing that would have been in the Police Department homicide
12  file that we would not necessarily have gotten.  That's the best
13  I can tell you.  Did I get it in this case?  I don't know the
14  answer to that.  I'm sorry, I can't do any better than that.
15  Q.   And certainly nobody would have stopped you from getting
16  that from the police files; right?
17  A.   The police did not give us access to their file.
18  Q.   Is it your testimony that --
19  A.   That's not their practice.
20  Q.   -- the police would exclude you from looking at those
21  documents?
22  A.   I can never recall once ever in my five and a half years
23  here going to the Homicide Bureau and going through the homicide
24  file.  They would send us material and we would rely on the
25  material they sent us.  All I can tell you is that was the

1    practice.

2    Q.    Did you ever try to review the information in the possession

3    of the police?

4    A.    Ever in any case?

5    Q.    Yes.

6    A.    I don't know.

7    Q.    Now, I thought you earlier said that the police reports

8    would be useful to you?  You would want to know what witnesses

9    told the police; right?

10   A.    Yes, sir, but there were, we would get things like the

11   incident report from the arresting officers, we might get a

12   witness statement, a copy of a witness statement with a Q & A in

13   it.  But my -- to the best of my recollection, and again, it's a

14   long time ago, the final homicide reports, this is in a day and

15   age before computers.  The homicide detectives were typing with

16   two fingers on typewriters and so this stuff took a long time to

17   get to us and there were many cases where we didn't get it until

18   after the case was already prosecuted.  Whether we got it in this

19   case or not, I do not know the answer to that.  I'm not going to

20   testify that we got it.  I'm not going to testify we didn't get

21   it.  I don't know.  I'm sorry.

22   Q.    Mr. Dubelier, there is a stipulation in this case, among all

23   the parties, "Defendants Dubelier and Williams were involved in

24   reviewing the police reports and evidence, preparing the murder

25   case against Mr. Thompson for trial, handling pretrial discovery

1   and pretrial motions, interviewing witnesses and presenting the

2   case on behalf of the State of Louisiana against Mr. Thompson at

3   trial."  Do you have any reason to quarrel with that?

4   A.   No, I don't, because that does not specifically say what

5   reports I had and I reviewed and I don't know the answer to it,

6   I'm sorry.  I can't help you.

7   Q.   And I want to make sure I'm clear on something.  Are you

8   saying that the police resisted your efforts or made it difficult

9   for you to review any of the material in their possession?

10  A.   What I'm saying is that my recollection, my best

11  recollection of the policy was, we did not have access to the

12  Homicide Division file.  They would send us the materials they

13  were going to send us and that's the way the system worked.

14  That's my best recollection 22 or 23 years later.

15  Q.   I would like to show you Exhibit 34, please.

16          THE COURT:  Wait a minute.  Wait a minute.  I want to

17  clarify something.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Mr. Dubelier, are you saying that in 1985,

20  the District Attorney's Office did not get the police reports on

21  a homicide investigation?  I'm trying to understand what you're

22  saying.

23          THE WITNESS:  What I'm saying, Your Honor, is the report

24  I'm being shown here looks to me to be the final report of the

25  Homicide Division.  It's a long report.  It's about 30 pages

1  long.  There were no --

2       THE COURT:  Is there a date on that report?

3       MR. COONEY:  There are three reports.  There's a report

4  that's dated December 6th, there's a report that's the date of

5  the murder, there is a report that's dated December 8th and there

6  is an undated report which at least sounds like it was prepared

7  on or around January 17th.  There are three documents that we're

8  talking about prepared at different dates, one of which was the

9  night of the murder.

10      THE WITNESS:  Your Honor, what I want to clear up is

11 that on this undated report, this appears to be the final report

12 of the Homicide Division.  It contains the entire investigation

13 and all the information they gathered up.  To the best of my

14 recollection, it was not uncommon that we would not have this

15 final report.  Often at the time we tried the case.  And the

16 reason was that there were no word processors.  The detectives

17 were typing this stuff on typewriters and it could take them

18 months and months to get us this final report.

19      THE COURT:  But you're not -- I'm just trying to

20 understand.  I'm sure the jury would like to know.  You certainly

21 had access to whatever information the police had?  You could go

22 talk to them, you could talk to the detectives; right?

23      THE WITNESS:  Absolutely.  It was the obligation of the

24 police, their affirmative obligation to give us the evidence

25 relating to the case.  I'm not suggesting in any way nor do I

 1   want to suggest that they purposefully would have withheld

 2   something from us.

 3              THE COURT:  I'm sorry.  Go ahead.

 4              THE WITNESS:  I'm sorry I wasn't clear on that, Your

 5   Honor.

 6                          EXAMINATION

 7   BY MR. COONEY:

 8   Q.   Mr. Dubelier, you could have looked at what was in the

 9   police's file when you were preparing for this case; am I right?

10   A.   Yes.  And the best answer I can give you to that now is I

11   don't recall ever doing that in five and a half years, looking in

12   the Homicide Division file, going to the Police Department and

13   looking in their Homicide Division file.  Could I have?  I never

14   did.  That's all I can tell you.  I don't recall that being the

15   practice.  It wasn't my individual practice.  It was simply not

16   the practice of the office.

17   Q.   So let me make sure I'm clear on this.  If there was

18   favorable information that was in the police's file that they

19   didn't give to you, you couldn't give that to the defense; am I

20   right?

21   A.   That's correct.  Because if I didn't have it, I couldn't

22   give it to them.

23   Q.   And all you were doing was just relying on whatever the

24   police gave to you; is that right?

25   A.   The practice was to rely on the police to give us the

1    information relating to the case and then we would turn that

2    information over, yes.  That was the practice.  That was the

3    practice in the DA's Office and it's been the practice in every

4    prosecutor's office I've ever worked in.  That's the practice.

5    I've never gone through an FBI file, either.

6    Q.   You don't believe it's your obligation as the prosecutor to

7    go through the police file to make sure that there is not *Brady*

8    information in the police file?

9    A.   Sir, all I can tell you is the practice was not that way in

10   the DA's Office and the practice was not that way in any other

11   prosecutor's office I ever went in.  There was an affirmative

12   obligation on the law enforcement officers.  They understood what

13   the obligation was.  And it was their affirmative obligation to

14   communicate that information to us.

15   Q.   And, Mr. Dubelier, am I correct that the person who has the

16   responsibility of producing the *Brady* information to the defense

17   is the prosecutor?

18   A.   That's correct.

19   Q.   That's your responsibility?

20   A.   It's the responsibility of the State, yes.

21   Q.   It's your responsibility as the prosecutor; am I right?

22   A.   Yes, it is, absolutely.

23   Q.   The defense certainly can't get the information from the

24   police, can they?

25   A.   Well, the defense can file a motion and then litigate it in

1  court, and maybe get the information or maybe not get the

2  information.

3  Q.   The defense can't pick up the phone and call the police and

4  say, give me your file; correct?

5  A.   I think that would be highly unlikely, yes.

6  Q.   You could do that; right?

7  A.   Again, yes.  The simple answer is yes.  I don't recall ever

8  having done that, but yes, the simple answer is yes.

9  Q.   All right.  Let's take a look at Exhibit 34, please.

10 A.   Yes, sir.  I have it.

11 Q.   Have you seen this document before?

12 A.   I think you showed this to me in 19 -- in 2005.

13 Q.   And would you agree with me that this is a motion for the

14 production of exculpatory evidence?

15 A.   That's what it's titled, yes, sir.

16 Q.   And it was filed in the murder case?

17 A.   Yes.  And, again, I think I noted the last time I saw it

18 there's handwriting on here and I don't know what that is.  It

19 says "see photograph" or something.  So I don't know when and who

20 wrote that on there.

21 Q.   Do you have any reason to doubt that is a motion for the

22 production of exculpatory evidence that was served on the

23 prosecutors by John Thompson's lawyers in the murder case?

24 A.   No.  I have no reason to doubt that.

25 Q.   Now, in Roman numeral one --

1  A.   And, again, let me say, this is not date stamped, so -- but

2  I can't tell you it was filed, but I have no reason to think that

3  it wasn't.  It doesn't have a date stamp on it.

4  Q.   And you don't have any reason to doubt that you received

5  that when you were representing the State; right?

6  A.   No.  No.  No.

7  Q.   In Roman I, Mr. Thompson's lawyers asked for, quote, "the

8  names of any eyewitnesses and copies of statements made by them.

9  This request is based on newspaper articles obtained by the

10 defense which indicate that eyewitnesses gave a physical

11 description of the killer which is inconsistent with John's

12 appearance."  Do you see that?

13 A.   Yes, sir, I do.

14 Q.   So what Mr. Thompson's lawyers were looking for were

15 physical descriptions of the killer that were in the possession

16 of the State; right?

17 A.   Yes, sir.

18 Q.   Now, I would like you to look at Exhibit 35, please.

19 A.   Well, they were looking at for physical descriptions that

20 were inconsistent with the defendant's appearance, yes, sir.

21       Okay.  35, I'm on it.

22 Q.   Well, it's not just limited to that, Mr. Dubelier.  It says

23 the names of any eyewitnesses and copies of statements made by

24 them and then it goes on to say simply that it's based on

25 newspaper articles obtained by the defense which indicate that

1  eyewitnesses gave a physical description of the killer which is

2  inconsistent with John's appearance; am I right?

3  A.    Right.   Right.

4  Q.    So he wanted the names of any eyewitnesses and copies of

5  statements by them?

6  A.    Well, the names of any eyewitnesses and copies and

7  statements by them would not be exculpatory evidence, per se.   So

8  no, that's not right.   That's not the way you read this.   This is

9  a motion for production of exculpatory evidence which means we're

10 obligated to produce the names of witnesses and any physical

11 descriptions that are exculpatory.

12 Q.    So you don't read this as asking for the names of any

13 eyewitnesses and copies of statements made by them?

14 A.    No, I don't.   Because it's a motion for production of

15 exculpatory evidence.   There was no obligation under the law in

16 the State of Louisiana at the time to produce names of witnesses.

17 Q.    I think the jury can read this for themselves.

18 A.    I think they can, too.

19        MR. CARVER:   Your Honor, I ask that the exhibit be

20 displayed so the jury can see the first part of that exhibit, the

21 first paragraph.

22        THE COURT:   You'll have a chance when you have the

23 witness on cross-examination.

24                        EXAMINATION

25 BY MR. COONEY:

1  Q.   I would like you to look at Exhibit 35, please,

2  Mr. Dubelier.

3  A.   Yes, sir.

4  Q.   And is this a copy of the State's answer to the motion for

5  production of exculpatory evidence?

6  A.   Sir, when you asked me about this before, it's unsigned.

7  There is no date stamp that it was filed.  I don't know whether

8  this was the answer that was actually filed in court.  I don't

9  know the answer to that.

10  Q.   I will represent to you that there's a stipulation as to the

11  authenticity of the document.  Do you have any reason to quarrel

12  with that?

13  A.   No.

14  Q.   Okay.  Now, with regard to Roman numeral one, what this

15  answer says is statement of Mary Wells is attached.  Not entitled

16  as to other witnesses?

17  A.   That's correct.

18  Q.   Do you see that?

19  A.   Yes.

20  Q.   Now, Mary Wells, we talked about her earlier in your

21  testimony; am I right?

22  A.   In my own testimony today?

23  Q.   Earlier today, Mary Wells, I showed you a police report from

24  before the Liuzza murder, the Thompson arrest.  Take a look at

25  Exhibit 21.

1   A.   Oh, Mary Wells, oh, was the thing on the other guy who --

2   yeah, okay.

3   Q.   And she was a discredited witness at that point; am I right?

4   A.   I guess.

5   Q.   You had concluded -- let's go back to Exhibit 21, if you

6   will.

7   A.   I'll go with whatever you say on this because I have not

8   looked at the record.  If Mary Wells said -- gave a description

9   or a name that was inconsistent with what was charged in our

10  case, then we produced Mary Wells' statement so the defense would

11  have that.

12  Q.   Mr. Vincent, can you go back to Exhibit 21, please.  And

13  let's go to the second page in the next-to-last paragraph.  And

14  this is from January 10th, I believe you testified --

15  A.   Yes.

16  Q.   -- after consultation with the assistant district attorney

17  Eric Dubelier, Detectives Curole and Demma decided not to

18  formally charge Charles Ricks with the murder of Ray Liuzza

19  because all of the facts uncovered in this investigation

20  indicated that he was the innocent victim of a mistaken

21  identification on the part of Mary Wells.  That was the

22  conclusion you reached in January of 1985?

23  A.   Yes, sir.

24  Q.   And so the answer that was given by the State of Louisiana

25  to Mr. Thompson's discovery request was to give the name of

1  Mary Wells, the person who provided the mistaken identification,

2  but not to provide the name of Mr. Schliffka; am I right about

3  that?

4  A.   No, you're wrong.

5  Q.   That's not what it says?

6  A.   It's what it says.  We gave the statement of Mary Wells.  We

7  didn't just give the name.  We gave her statement to the defense.

8  Q.   And that statement, sir, you had concluded was a mistaken

9  identification; am I right?

10  A.   The -- what I had concluded was the statement was

11  exculpatory and so we had to turn it over pursuant to *Brady*.

12  It's a motion for discovery of exculpatory information and my

13  answer or our answer was, here is the statement of Mary Wells,

14  implicit in us turning over, at least, we reached a determination

15  that it was exculpatory.

16  Q.   And you had also reached the determination that she had made

17  a mistaken identification; am I correct?  That's my question,

18  sir.

19  A.   Yes, from that, from reading that, yes, I reached that

20  conclusion.

21  Q.   And you didn't provide Mr. Couhig who was representing

22  Mr. Thompson at the time the name of Mr. Schliffka?

23  A.   Well, we did.  We filed an Amended Answer to Motion For

24  Production of Exculpatory Evidence and we did provide

25  Mr. Schliffka's name.

Q.    The exact document, the first document that I showed you,
your first answer, you didn't identify Mr. Schliffka at all, did
you?

A.    No.

Q.    Now, let's go to the next document.  Let's look at
Exhibit 36.  Am I will correct that that's the amended answer
that you're referring to?

A.    Yes, sir.

Q.    And in Paragraph Roman I, you state, "Mr. Paul Schliffka
described a man leaving the vicinity of the crime scene as being
approximately 6 feet tall.  Additionally, Mr. Schliffka failed to
make an identification from a photo lineup conducted on
January 17, 1985."  Do you see that?

A.    Correct.  Yes.

Q.    There is no reference in there to hair length, is there?

A.    No, there isn't.

Q.    Based on the actual description of the perpetrator from
Mr. Schliffka that's contained in the police reports, do you
think that the description that you provided to Mr. Thompson
there was a full and complete description from Mr. Schliffka?

A.    My answer to that question, and I think I've answered this
before and I'll answer it again, I believe, from the entire
record you've shown me that we're missing a report here.  I
believe there was an incident report of Carter and the other
officer that contained a description of Schliffka that we

1  probably used to answer this discovery answer.  The reason I say

2  that is, my best recollection of the practice was, the officers

3  who were first on the scene prepared an incident report.  No one

4  has been able to give me that incident report, so I don't know

5  whether it doesn't exist or it's not in the record, but I believe

6  that that answer was probably based on an incident report

7  prepared by the officers who were first on the scene.  I don't

8  know what that incident report says.  I'm sorry.

9  Q.   Mr. Dubelier, are you saying that there's another document

10  that we have never seen in this case?

11  A.   Look, all I'm telling you is -- here is what I'm telling

12  you, the normal practice was that the police would go out, the

13  uniformed officers, the men and women who wore the blue outfits,

14  the uniforms, would go out on the scene, they were first on the

15  scene.  They would prepare an incident report.  It was their

16  obligation to do that.  They came out and they would prepare an

17  incident report.  We would always have that because -- they were

18  typically very short and concise and they were prepared quickly

19  and we would get those within a couple of days of an offense.

20  I've not seen that in this record anywhere, and so I don't know

21  what the problem is, but I do know that from the trial testimony,

22  Carter got off the stand and refreshed his recollection with a

23  report.  I don't know whether that was the homicide report, the

24  incident report or one of these other reports you've shown me.  I

25  just don't know the answer.  I can't remember.  I'm sorry.  I

1  wish I could, but I can't.

2  Q.   Would you please take a look at Exhibit 2.

3  A.   Yes.

4  Q.   Does not that not contain information about what Schliffka

5  told Angelo and Carter?

6  A.   Yes, but this is not an incident report.  It's different.

7  Q.   Is there any reason why the incident report would include

8  different information than what's in the detective's report?

9  A.   I have no idea.

10  Q.   Typically, they would try to get the same information;

11  right?

12  A.   They would try.  They didn't always succeed, but they would

13  try.

14  Q.   It's important?

15  A.   It is important but --

16  Q.   You would want to make sure that the perpetrator's

17  description looks the same in all of the reports; right?

18  A.   Right.  That's right, but these are human beings and it

19  didn't always work out this way.

20  Q.   This was a high-profile case?

21  A.   That's right.

22  Q.   They wanted to make sure that they got the information

23  right?

24  A.   That's right.

25  Q.   And so we don't know what that incident report is because

1  we've never seen it.  We do have the December 6th report and it

2  says, close-cut hair; right?

3  A.   Yes.

4  Q.   That's not information that you provided to the defense; am

5  I right?

6  A.   Well, I'm not sure I didn't provide it.  And here's why.

7  Mr. Schliffka testified at trial.  My recollection from looking

8  at the trial transcript is Mr. Couhig stated in his opening

9  statement that Mr. Schliffka was going to testify and testify

10 that the perpetrator was 6 feet tall and had close-cropped hair.

11 So where did he get it from?  If he didn't get it from us, where

12 did he get it from?

13 Q.   Maybe he got it from the newspaper articles that he referred

14 to in the discovery request?

15 A.   Maybe he did.  Maybe he did.  The point of it then would be,

16 sir, he had it.  Regardless of whether or not he got it from me,

17 he had it prior to the trial.

18 Q.   Would you agree with me as a lawyer, as a defense lawyer,

19 that there is a difference between asking a witness a question

20 without the benefit of a document for impeachment on the one hand

21 and asking the witness a question where you have the benefit of a

22 document for impeachment on the other hand?

23 A.   Sir, I don't know what Mr. Couhig had or didn't have.  I

24 simply do not know the answer to that.

25 Q.   I'm asking you a different question.

A.   Yes, theoretically the way you presented that question,
there would be a difference.

Q.   It's a lot better to have that document in hand because if
the witness says something other than what you're expecting, you
can say, "Now, Mr. Witness, wait a minute, hold on, weren't you
interviewed by the police on December 6th and didn't you say at
that time, close-cut hair?  You didn't say the word 'Afro'; did
you?"  You could do that if you had the document?

A.   Let me tell you what my problem is with the way you're
asking this question.  You're accusing me 23 years later of
having not turned over a document.  You deposed me two years ago
and you accused me of not turning over a crime scene photograph
of Mr. -- of Mr. Thompson.  You accused me of that.  And when I
specifically asked you in the deposition does the record reflect
we turned over this photograph, you told me I represent to you
that we did not.  The State did not turn it over.  And you know
what.  I understand now from the record of this case we did turn
it over and you lied to me in this deposition.  So the way you're
asking this question, I don't have a recollection of whether or
not I had this report.  I don't have a recollection of what we
told them.  All I know is the record of this case indicates
Schliffka testified at the trial and testified consistent with
the information that's in this report.  That's what I know now.

Q.   Your testimony is that Schliffka's testimony at trial was
consistent with this report?

1  A.    My testimony --

2  Q.    Wait a minute.  Answer my question, please.

3  A.    Yes.

4  Q.    That's your testimony in front of this jury?

5  A.    My testimony in front of this jury is that when I

6  specifically asked you in a deposition two years ago did we turn

7  over this crime scene photo with Thompson's hair sticking up.

8          THE COURT:  Wait a minute, Mr. Dubelier.

9          THE WITNESS:  I'm sorry.  I'm sorry.

10         THE COURT:  You're getting very argumentative.  Just try

11 to answer his question.

12         Restate your question one more time.

13         THE WITNESS:  Your Honor, I apologize.

14                        EXAMINATION

15 BY MR. COONEY:

16 Q.    Would you agree with me that as a defense lawyer, it is very

17 different to impeach a witness with a document in hand than if

18 you don't have the document?

19 A.    Yes.

20 Q.    Much more useful to have the document, isn't it?

21 A.    Yes.

22 Q.    Now, you talked about some of the testimony from the armed

23 robbery trial.  I want to talk about that for a second.  I'm

24 going to ask you to go to Exhibit 137, if you would, please.

25 A.    This is the murder trial.  You indicated you wanted to ask

1  me about the armed robbery trial.

2  Q.   Yes, the murder trial.  Would you agree with me that,

3  Mr. Dubelier, that you conducted the direct examination of

4  Officer Carter at the murder trial?

5  A.   Yes, sir, I did.

6  Q.   Okay.  And he was one of the police officers that went and

7  interviewed Mr. Schliffka; am I right?

8  A.   Yes, sir.

9  Q.   And Exhibit 2 at least sets forth what the -- what

10  description was provided to Carter and Angelo by Schliffka?

11  A.   I'm sorry.  What, Exhibit 2?

12  Q.   Exhibit 2.

13  A.   Yes.

14  Q.   Now, did you ask Mr. Carter the following questions and did

15  Mr. Carter give you the following answers.  And I direct you to

16  Pages 65 of the transcript.

17       THE COURT:  Are you going to be a while longer with this

18  witness?

19       MR. COONEY:  Little bit, Your Honor.

20       THE COURT:  All right.  It's 10:30.  Let's take our

21  morning recess of about 15 minutes.  Ladies and gentlemen, please

22  leave your books folded, closed in your chairs or under your

23  chairs.  Don't discuss the case when you're out of the court and

24  we'll see you back in 15 minutes.

25       THE DEPUTY CLERK:  All rise.

 1                (WHEREUPON, the jury panel leaves the courtroom.)

 2           THE COURT:  Mr. Cooney, approximately how much longer do

 3      you think you'll be with this witness?

 4           MR. COONEY:  I'd say 15, 20 minutes, Your Honor.

 5           THE COURT:  Are you going to take Mr. Dubelier?

 6           MR. CARVER:  Yes, Your Honor.  I was curious how you

 7      wanted to handle that.  Actually, he is going to be our witness

 8      in chief, too.  So obviously I'm going to have an open -- I'll

 9      have an open cross, actually my cross will be his direct.

10           THE COURT:  You don't get to cross, you get to direct

11      the witness.  It's not a true cross-examination.  That's fine.

12      Because I know Mr. Dubelier has a flight out, right, this

13      afternoon?

14           THE WITNESS:  Yes.  Your Honor, and if I could say I

15      want to apologize again for arguing with counsel.

16           THE COURT:  That's okay.  But we want to make sure we

17      get you out of here so you're not -- your flight is not delayed.

18           THE WITNESS:  I appreciate that.

19           THE COURT:  I was hoping we could finish you before

20      lunch.  Maybe we can do that.  I think we can do that if there

21      are only another 15 minutes or so.  I don't know.  How long are

22      you going to be?

23           MR. CARVER:  I'm going to go quickly through some of

24      these documents.

25           THE COURT:  An hour or less?

1          MR. CARVER:  It will be less.

2          THE COURT:  We should be able to finish him before

3 lunch.  We'll come back in about 10 minutes now.  Okay.

4          (WHEREUPON, at this point in the proceedings there was a

5 brief recess.)

6          (WHEREUPON, the jury panel enters the courtroom.)

7          THE COURT:  Please be seated.  Mr. Cooney, you may

8 please continue.

9          MR. COONEY:  Thank you, Your Honor.

10                   EXAMINATION

11 BY MR. COONEY:

12 Q.   We need to make something clear here, Mr. Dubelier.  Let's

13 go back to Exhibit 2, if you can for a second, and, Mr. Vincent,

14 can you pull that up.  Exhibit 2 is dated December 6, '84.

15 Pardon me.  Exhibit 2, Mr. Dubelier, would you look at Exhibit 2?

16 A.   Yes.  Yes.

17 Q.   And the date of that Criminal Investigation Bureau Report is

18 December 6, '84?

19 A.   Yes.

20 Q.   That's the day of the murder?

21 A.   Yes.

22 Q.   And on Page 2 of that document, it contains information

23 about the description that Mr. Schliffka gave to Officers Angelo

24 and Carter; am I right?

25 A.   Yes, sir, I've testified to that.

1   Q.   Okay.  And on the first page of the document, the

2   description is 6 feet tall, black jacket, blue jeans, close-cut

3   hair, armed with a blue steel revolver, possibly with a 4-inch

4   barrel; am I right?

5   A.   Yes.

6   Q.   That's a description from the night of the murder?

7   A.   Correct.

8   Q.   Okay.  Now, do you recall that you conducted the direct

9   examination of Officer Carter during the murder trial?

10  A.   I don't recall it, but I know from looking at the record

11  that I did.

12  Q.   And I would ask you, if you would, if you will please turn

13  to page, I think it's 76 of the murder transcript that is in

14  front of you.

15  A.   Yes, sir.

16  Q.   And actually, if you'll look -- I'm sorry, it's not the

17  correct page.  Bear with me for a second.  If you'll look at

18  page.  You can put it up for me, James.  Look at Page 76.  Did

19  you conduct the examination of Officer Carter?

20  A.   Yes, I did.

21  Q.   And do you recall asking Officer Carter the following

22  questions and Carter giving the following answers:

23          "Do you recall interviewing any witnesses on the scene?

24          "Yes, sir, I did.

25          "Do you recall the names of the witnesses?

1        "I believe there was one, Mr. Schliffka -- I don't know

2   how to pronounce his name.

3        "Were any witnesses able to give you any description of

4   the alleged perpetrator?

5        "Yes, sir, he did.

6        "Did anyone else?

7        "No, sir, not that I recall.

8        "QUESTION:  Do you recall the description given to you?

9        "ANSWER:  And this was Detective Carter's answer or

10  Officer Carter's answer.  "Yes, sir, I do.  It was a black male.

11  He was described as being about 6 feet tall.  He was wearing a

12  black leather jacket and dark pants.  He was also dark

13  complected."

14       Question by you, "Was any further description given to

15  you of the perpetrator by Mr. Schliffka?

16       "ANSWER:  No, sir."

17       Did I read that correctly?

18  A.    Yes.

19  Q.    And Mr. Carter didn't mention the hair length, did he?

20  A.    No, he did not.

21  Q.    And if you turn to Page 77, am I correct that at that point

22  Mr. Couhig who represented Mr. Thompson at the time conducted the

23  cross-examination of Detective Carter or Officer Carter; am I

24  right?

25  A.    Yes.

1  Q.   And did Mr. Couhig ask the following questions and Officer

2  Carter give the following answers?

3        "Officer, did Mr. Schliffka tell you that there was one

4  perpetrator or two?

5        "He stated that he had seen only one -- only seen one

6  perpetrator.

7        "QUESTION:  Did you ask him about the hair?

8        "ANSWER:   Excuse me?

9        "QUESTION:  Did you ask him about the perpetrator's

10  hair?

11        "ANSWER:  Yes, sir.  We tried to ask him as much as we

12  could about the description.

13        "QUESTION:  Tell the jury what he said about the man's

14  hair.

15        "ANSWER:  I can't recall at this time.

16        "QUESTION:  Do you have a police report?  Did you fill

17  out a police report?

18        "ANSWER:  Yes, sir, my partner did.

19        "QUESTION:  You recall that you were called at 12:43.

20  Did you review that police report before testifying today?

21        "ANSWER:  Yes, sir, I did.

22        "QUESTION:  Does your police report contain the

23  description that Mr. Schliffka gave you?

24        "ANSWER:  I don't recall that he did.

25        "QUESTION:  Do you have the police report with you

1   today?

2           "ANSWER:  No, sir.

3           "QUESTION:  Did you send out, call your dispatcher and

4   give any sort of description of the perpetrator?

5           "ANSWER:  Yes, sir, we did.

6           "QUESTION:  Would that have contained a condition of the

7   hair if you had gotten it?

8           "ANSWER:  I'm sure it would.

9           "Is it your testimony that you can't recall that today?

10          "ANSWER:  That is true."

11          Is that what Officer Carter testified to in response to

12  examination by Mr. Couhig?

13  A.    Correct.

14  Q.    Now, continuing with the transcript, if you look at Page 78,

15  and, Mr. Vincent, if you could put this up, I would appreciate

16  it.  Am I correct that after Officer Carter denied remembering

17  anything about the hair, Mr. Thompson's lawyer, Mr. Couhig asked

18  the Court to have Officer Carter refresh his recollection about

19  the hair length by looking at the police report.

20  A.    Would you ask me a question?

21  Q.    Is that what happened?

22  A.    According to this transcript, yes.

23  Q.    And you don't have any reason to quarrel that's what

24  happened in the courtroom; right?

25  A.    No, no, not at all.

1  Q.   And at this point what happened is Officer Carter actually

2  got off the witness stand and walked over to the prosecutor's

3  table; am I right?

4  A.   I'm assuming from the record, yes, the witness stepped down

5  from the witness stand and went to prosecutor's table, yes.

6  Q.   That's what it says.  So Mr. Couhig asked the question about

7  the hair length.  Carter said he couldn't remember, he gets down

8  and he walks over to the table where you and Mr. Williams are

9  standing; is that right?

10 A.   Sitting down.

11 Q.   Sitting.  Okay.  And the three of you looked at the report;

12 is that right?

13 A.   Well, this says he looked at the report.

14 Q.   Do you have any -- would you have looked at the report with

15 him, Mr. Dubelier?

16 A.   No, I probably would have handed him the report and let him

17 look at it.

18 Q.   And then he went back to the witness stand?

19 A.   Right.

20 Q.   And am I correct that John's lawyer, Mr. Couhig, asked the

21 following questions and Carter gave the following answer:

22       "QUESTION:  Describe the hair.

23       "ANSWER:  Okay.  It was black and short.  Afro style."

24 A.   Right.

25 Q.   "QUESTION:  How tall was he?

1          "Approximately 6 feet.

2          "QUESTION:  Thank you, sir.  No further questions."

3    A.    Correct.

4    Q.    And I think we've established that there's no reference to

5    Afro style in Exhibits 2, Exhibits 5 or Exhibit 30; am I right?

6    A.    Right.  And that's the basis for what I said here earlier,

7    sir.  We have to be missing the incident report here that Carter

8    himself filled out.  There had to have been a report he filled

9    out because that's what he got off the stand to look at.  He

10   talked about his own report.  None of the reports you've shown me

11   are his report.

12   Q.    He didn't testify it was his own report.  He said it was his

13   partner's report; correct?

14   A.    Well, you haven't shown me a report filled out by his

15   partner, either.

16   Q.    Well, we don't have it, either, Mr. Dubelier.

17   A.    I'm sorry, I don't have it.  Okay.  I wish I had it.  But

18   from the sequence you read here to me, and my experience in the

19   office, there must have been an incident report that Carter and

20   his partner prepared at the time.  And I'm assuming based on this

21   testimony, this police officer is not out of his mind.  He's not

22   going to get off the witness stand, walk over, read a report, get

23   back up on the witness stand and testify inconsistent with the

24   report he's just read.

25   Q.    Unless he was trying to mislead the jury; right?

1    A.    Well --

2    Q.    Unless he was trying to mislead the jury.  That's one

3    possible explanation?

4    A.    I have no reason to believe this officer or anybody else was

5    trying to mislead the jury on this issue.  We turned over

6    Mr. Schliffka's name.  We specifically advised the defense lawyer

7    that Mr. Schliffka failed to identify the defendant in a photo

8    lineup which is about as exculpatory as you can possibly have.

9    One eyewitness and he failed to identify the defendant.  So we

10   turned over a picture of the defendant from an arrest several

11   days before where his hair was sticking straight up, which is

12   inconsistent with the description that Mr. Schliffka gave.  So I

13   don't know what else we could have done.

14   Q.    So it's your testimony that this police report that nobody

15   has seen here says something different from the three other

16   reports that we have seen?  That's your testimony?

17   A.    What I'm saying is you have not shown me a report prepared

18   by this officer or his partner.  I'm not being critical of you

19   for that.  If you don't have it, you don't have it.  And I don't

20   have it, either, and I don't know where it is, but there must

21   have been another report.

22   Q.    And you've seen three reports that don't include the word

23   "Afro style"; am I right?

24   A.    Yes.  Yes.

25   Q.    Now, Mr. Williams examined Mr. Schliffka at trial; is that

1 right?

2 A.    If the record reflects he did, he did.  I don't know.  I

3 don't remember.

4 Q.    I'm going to ask you to go to Page 89 in the transcript, if

5 you would.

6 A.    Yes, Mr. Williams did.

7 Q.    And would you agree with me that on redirect -- and I would

8 ask you to go to Pages 103 to 104 of the transcript -- there was

9 the following question and answer between Mr. Williams and

10 Mr. Schliffka:

11        "QUESTION:"

12 A.    Can I catch up, please.

13 Q.    Pages 103 to 104.

14 A.    I know, but I would like to have just a moment to see what

15 he said leading up to that so I can take these questions in

16 context.  Okay.

17 Q.    So on Pages 103 and 104, did Mr. Williams ask the following

18 questions and get the following answers from Mr. Schliffka:

19        "All right, Mr. Schliffka, you're still under oath.

20 Now, could you describe, let me ask you this question first.  You

21 have previously testified that the person that you saw had an

22 Afro type haircut; is that correct?

23        "ANSWER:  Yes.

24        "QUESTION:  All right.  Did the person who went by you

25 have his head shorn like and slicked back?

1           "ANSWER:  No.

2           "QUESTION:  It was sort of like blown up?  Would you

3   describe it a little bit more for the ladies and gentlemen of the

4   jury?

5           "ANSWER:  It wasn't a large picked out Afro.  It was

6   closer to the head and it was straight back.

7           "QUESTION:  Okay.  When you say not a large Afro, you'd

8   say about like this?

9           "No, closer to the head.

10          "QUESTION:  All right.  Describe using your hands the

11  shape of the man's hair that you saw on your own head.

12          "Okay.  It was like this and back.

13          "Thank you, sir.  I have no other questions."

14          Would you agree with me that none of that is in the

15  three police reports that we've seen in this case?

16  A.   Sir, you have to take the context of that testimony and the

17  testimony he gave in response to Mr. Couhig's questions several

18  pages before, which is why I asked to have the opportunity to

19  read that.  He said he had short hair.  And it was Afro style, so

20  I don't view short hair and Afro style as being inconsistent with

21  each other.  I guess I didn't view it that way at the time and I

22  don't view it that way today.  I don't understand the difference.

23  Q.   The information that is elicited by Mr. Williams here, he

24  asked it was sort of like blown up, he says, the question is

25  about an Afro style type haircut and this information about it

1  was like this and back.

2  A.   Well --

3  Q.   Wait a minute.  Wait a minute.  Let me ask the question,

4  please.

5  A.   No, you wait a minute.  You just --

6        THE COURT:  No, no, no, wait.  Mr. Dubelier, you have to

7  let him ask the question and then answer the question.

8        THE WITNESS:  I will.

9                         EXAMINATION

10 BY MR. COONEY:

11 Q.   None be of that information is in the three police reports

12 we have seen; am I right?

13 A.   We are right.  You just held your hands up.  One of the

14 problems with this record is I don't know what Mr. Schliffka or

15 Mr. Williams did with their hands.  I don't know whether they

16 went like this or they went like this (indicating).  You put your

17 hands out here.  There is nothing in the record that I see that

18 would reflect the gesture you just made is consistent with what

19 happened in court.

20 Q.   Do you think that Mr. Schliffka's testimony six months after

21 the event that we just read is consistent with the police reports

22 that we have seen in this case?

23 A.   I don't view Mr. Schliffka's testimony inconsistent with

24 what he told the police.

25 Q.   But my question, I want to make sure we're clear on this, do

1   you believe that the testimony that I just read from

2   Mr. Williams, the interrogation by Mr. Williams of Mr. Schliffka,

3   it is your testimony that that was consistent or inconsistent

4   with the description of the perpetrator that's contained in the

5   three documents that we have seen, sir?

6   A.   When you take the entirety of Mr. Schliffka's testimony,

7   both on direct, cross and redirect, I do not view it as being

8   inconsistent with the information that is in the police report.

9   Q.   Do you think that the defense lawyers -- if you were the

10  defense lawyer in this case, and you were representing

11  Mr. Thompson, would you have wanted to have those police reports

12  that simply said close-cut hair or short hair?

13  A.   In the context in this case involving this witness, that

14  wouldn't have made any difference.

15  Q.   That wouldn't have made any difference to you as a defense

16  lawyer?

17  A.   No, because you're dealing with a witness who testified

18  under oath, I looked at a lineup of John Thompson and I couldn't

19  pick him out.  So you're dealing with a witness who says I saw

20  for a moment somebody running 50 feet away at night in the dark

21  under a stressful situation, I looked at a lineup and I couldn't

22  pick out the defendant.  I can't think of anything more

23  exculpatory.  We put that witness on.  I can't think of anything

24  more exculpatory to Mr. Thompson.  I don't know what else I would

25  have done if I had anything else.

1    Q.   Mr. Dubelier, your testimony to the jury is, you wouldn't

2    have wanted to have that document as the defense lawyer for

3    Mr. Thompson to show that the only thing that was in those

4    documents was short hair or close-cut hair?  No reference to an

5    Afro, no reference to blown up.  No reference to back, none of

6    that?  You wouldn't have wanted to have that?

7    A.   What I'm saying is it wouldn't have made any difference.

8    Q.   Mr. Dubelier, was everything that you did in prosecution of

9    the John Thompson case consistent with the policy of the

10   Orleans Parish District Attorney's Office?

11   A.   Yes, it was.

12          MR. COONEY:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Mr. Carver.

14          MR. AARON:  Can we approach just for a second?

15          (WHEREUPON, there was a bench conference held outside of

16   the presence of the court reporter.)

17          THE COURT:  Okay.  Maybe I should explain briefly to the

18   jury.  Mr. Dubelier is actually a party to the case.  He's a

19   named defendant, even though he's sued in his official capacity

20   so he's really a defense witness in the case.  The plaintiffs

21   called him under what's called cross-examination, which they have

22   a right to do as part of their case.  Ordinarily, what you're

23   going to hear now would be presented in the defense portion of

24   the trial, but in order to try to accommodate the witness, who is

25   now residing out of town, the parties have agreed and I've

1   allowed the defendant to -- the defense to put on essentially

2   part of their case at this time.  So what you're going to hear

3   now is actually part of the defense case.

4           Go ahead, Mr. Carver.

5           MR. CARVER:  Thank you, Your Honor.  Your Honor, I have

6   some exhibits that I would be referring to and I would like to

7   hand those to the witness.

8           THE COURT:  Sure.

9           MR. CARVER:  Thank you.  Your Honor, before I start,

10  what I would like to do is have an opportunity to read one

11  stipulation that the parties have agreed to.

12          THE COURT:  All right.

13          MR. CARVER:  Uncontested material fact Number H.

14  Mr. Dubelier and Mr. Williams moved to reverse the order of the

15  trials so that the armed robbery trial would be held

16  approximately three weeks before the murder trial, an action that

17  is not improper, illegal, or unethical by Louisiana law.

18                      DIRECT EXAMINATION

19  BY MR. CARVER:

20  Q.   Mr. Dubelier, would you go ahead and state your current

21  occupation for us?

22  A.   I'm a lawyer.

23  Q.   And where do you practice?

24  A.   The office of my law firm is in -- I'm in the Washington,

25  D.C. office of my law firm, but I practice nationwide.

1  Q.   What does your practice primarily consist of?

2  A.   Representing clients, primarily corporate clients in matters

3  involving the Government as a party, whether they are criminal

4  matters or regulatory, federal regulatory matters.

5  Q.   And let's take it back a little ways.  Could you briefly

6  describe for us your education.

7  A.   Yes, sir.  I came to New Orleans in 1977.  I'm sorry, 1973,

8  when I was 17 years old to begin as an undergraduate at Tulane

9  University.  I attended Tulane from 1973 to 1977, and graduated

10 with honors in history.  I began Tulane Law School in 1977.

11 After approximately one year in the law school, when I was not --

12 I just wasn't that happy with law school, I got into a joint

13 degree program and so I wound up in 1981 graduating with a law

14 degree as well a Master's degree in business administration from

15 the graduate school of business administration at Tulane and the

16 law school at Tulane.

17 Q.   And take us briefly through your work experience.  Upon

18 graduating from law school at Tulane 1981, what's the first job

19 you had?

20 A.   My first job was in the District Attorney's Office here in

21 New Orleans and I believe I started whenever the bar results came

22 out that fall, so it probably would have been October, September

23 or October of 1981.

24 Q.   And we want to talk probably more briefly in detail about

25 your specific work experience at the Orleans Parish DA's office,

1 but you left the DA's office in what year?

2 A.   I want to say it was March of 198 -- it was either March or

3 April of 1987.  You know, it might have been later.  It might

4 have been the summer.  Maybe July of '87.

5 Q.   What was the reason for your departure from the DA's office?

6 A.   It was a combination of reasons.  There were personal

7 reasons as well as professional reasons.

8 Q.   Where did you -- let me ask you this:  Do any of those

9 reasons have to do with the John Thompson case?

10 A.   No.  Absolutely not.  The primary reason was my folks had

11 recently retired and moved to a small home in Florida and my

12 father passed away very suddenly and it was very difficult on my

13 mother so I moved to Florida.

14 Q.   Is that where your mother was staying?

15 A.   Yes.

16 Q.   What job did you take in Florida?

17 A.   I became an assistant United States attorney in the Southern

18 District of Florida in Miami.

19 Q.   I'm sorry.  Are you okay, Mr. Dubelier?

20 A.   Yeah, I'm okay.  Just give me a second.  Okay.

21 Q.   Obviously, you're emotional right now.  Why the emotion?

22 A.   I spent 17 years as a prosecutor, you know, it was a public

23 service.  I did it for a reason.  I never had the opportunity to

24 do military service.  I was the first person in my family to even

25 go to college.  And, you know, I'm proud of the service I did.

1   What I'm worried about is, you know, people have made allegations

2   against me in this lawsuit that are not true.  I have got three

3   small children.  And, you know, 20 years from now when I'm dead,

4   I don't want my kids and their kids and their kids to read things

5   about me that are not true, and this is very emotional for me and

6   I'm sorry.

7   Q.   Is that why you flew down from Washington, D.C. to be with

8   us today?

9   A.   Yes, it is.

10  Q.   At any time during this the testimony if you feel like you

11  need a break, just to blow a nose or wipe a tear, just raise your

12  hand and let me know.

13  A.   Just go ahead.  I'm sorry.  Okay.

14  Q.   I'm sorry.  You said you moved to Florida and you began

15  working as a --

16  A.   I became an assist United States attorney in the Southern

17  District of Florida.  I worked in the Miami office for almost

18  three years.  I worked on what was then the first President Bush

19  at the time was the Vice-President, and there was an organized

20  crime and racketeering drug task force in Miami to deal with drug

21  trafficking matters and I worked there for three years.

22  Q.   Just briefly describe -- I don't need any detail -- when you

23  say you worked, you were an assistant U.S. attorney, what does

24  that mean?

25  A.   When I was here, I worked for the State of Louisiana as a

1  state prosecutor.  When I went to Florida, I worked as a federal

2  prosecutor at a federal level.  So there was a presidentially

3  appointed United States attorney in the Southern District of

4  Florida and I worked on that person's staff.

5  Q.   Would you -- how did you view move to the U.S. Attorney's

6  Office?  You considered that a step up or a step backwards?

7  A.   I think it was not an uncommon progression for people who

8  were doing public service in this type of a way.  It was not

9  unusual for people from the DA's office to go to work in a U.S.

10  Attorney's Office.  The politics here in New Orleans were a

11  little bit different in that there were -- you know, my

12  recollection is there were always bitter feelings between the DA

13  and the U.S. Attorney here, and so it was not, it was not an

14  option careerwise often to move from the DA's office to the U.S.

15  Attorney's Office here.  I also didn't grow up here.  I didn't

16  know people in the legal community here.  I didn't have any

17  family here and so when I went to look for a federal prosecutor's

18  job, I looked elsewhere and found a job in Miami and that worked

19  out because that's where my mother was living at the time.

20  Q.   And it's from the U.S. Attorney's Office then you left and

21  went into private practice in D.C.?

22  A.   No, sir.  In 1990, I left the U.S. Attorney's Office in

23  Miami and I moved to the U.S. Attorney's Office in the District

24  of Columbia and I worked there as a line assistant U.S. Attorney

25  than as a supervisory assistant U.S. Attorney until September of

1  1998.

2  Q.   Let's go backwards again.  At the time you worked at the

3  DA's office from 1981 through 1987, who was the District Attorney

4  during that time period?

5  A.   Mr. Connick.

6  Q.   During that time period you worked at the DA's office, were

7  there certain policies that you had to follow and obey?

8  A.   Yes, sir.

9  Q.   Who established those policies?

10  A.   Mr. Connick.

11  Q.   What was Mr. Connick's policy with respect to the disclosure

12  of what we call *Brady* material to the defendant?

13  A.   Mr. Connick's policy was to comply with the law.

14  Q.   What would happen if you failed to comply with that policy?

15  A.   You would be subject to discipline.

16  Q.   By who?

17  A.   By Mr. Connick.  We all served at his pleasure.  He hired

18  us, he could fire us.

19  Q.   In addition to being fired by Mr. Connick for failure to

20  follow his policies, were there any other deterrents which would

21  preclude your -- or prevent you from disobeying his policy?

22  A.   Yes, sir, there were bar rules, ethics rules.  I don't

23  remember particularly what they were in Louisiana, but there were

24  common ethics rules from whatever bar you're a member of.  I'm a

25  member of the Louisiana Bar, the D.C. Bar, the New York Bar and

1    there were obligations when you're serving in a public capacity

2    as a prosecutor to meet certain ethical requirements.

3    Q.    Those are mandatory requirements?

4    A.    Yes, sir, they are.

5    Q.    And what would happen if you failed to follow the mandatory

6    ethical requirements set by the Bar Association?

7    A.    You would be subject to discipline by bar counsel up to and

8    including disbarment.

9    Q.    Meaning you couldn't practice law anymore?

10   A.    Correct.

11   Q.    When you worked at the DA's office, what was your practice

12   with respect to Mr. Connick's policy?

13   A.    To comply with the policy and to comply with the law.

14   Q.    Did you have any authority to change that policy?

15   A.    No, sir, I did not.

16   Q.    And you mentioned for us that you went to law school.  And

17   obviously, law school we learned from previous testimony is a

18   three-year endeavor; correct?

19   A.    It was four for me because I did the joint degree program.

20   Q.    Were there any subjects in law school that you took that

21   were applicable to your job as a prosecutor?

22   A.    Criminal law, criminal procedure, constitutional law.  There

23   may have been also a constitutional criminal procedure course on

24   top of that.

25   Q.    Upon graduating from law school, it's my understanding there

1  is a bar examination; correct?

2  A.   Yes, sir.

3  Q.   What's the purpose of a bar exam?

4  A.   To determine whether you've got the proper knowledge level

5  based on your education to practice law.

6  Q.   Were there any subjects on that bar exam that are related,

7  that were related to your duties as a prosecutor?

8  A.   I remember it was a three-day exam in the Superdome and

9  there were nine exams and I don't remember whether -- I don't

10  know whether there was a specific constitutional law exam or a

11  criminal law exam.  I just can't remember.

12  Q.   You obviously passed the bar exam?

13  A.   Yes, sir, I did.

14  Q.   When did you first learn that there was this legal

15  requirement to disclose what we call *Brady* or exculpatory

16  evidence to a defendant?

17  A.   I'm certain I learned that in law school.  I also after my

18  first year of law school did an internship, an unpaid internship

19  in the District Attorney's Office in Manhattan in New York, and

20  I'm sure -- I worked on several matters there and I'm sure that's

21  something that I would have learned there as well.

22  Q.   By 1985, how would you quantify your experience as a

23  prosecutor?

24  A.   I probably tried and the record of the DA's office would

25  reflect this with more precision, but I probably tried maybe a

1  hundred or so cases, somewhere in that ballpark.  I mean, it

2  could have been more, it could have been less, but a significant

3  number of cases.

4  Q.    Were any of those murder cases?

5  A.    Yes, they were.

6  Q.    Any of those armed robbery cases?

7  A.    Yes, they were.

8  Q.    While you had worked at the DA's office, what type of

9  guidance or instruction did you receive with respect to the

10  disclosure of *Brady* evidence?

11  A.    The way it was structured is that as younger lawyers, you

12  were never given primary responsibility to do the things you

13  needed to do without being supervised in some way.  So we started

14  out, I started out in the Juvenile Division and there were

15  supervisors down there monitoring what we were doing.  We were

16  also dealing primarily there, there were no juries, so we were

17  just dealing with judges in terms of the trials we were having.

18  And then when we were transferred to the Trial Division, it would

19  also be a senior lawyer and a junior lawyer and everything was

20  done in tandem.  There had to be two lawyers involved.  And

21  primarily the training was on-the-job training.  We had dockets

22  of cases every day that had to be tried and the senior person in

23  the court assigned to the court was responsible for training the

24  younger lawyer so that that person could ultimately become a

25  senior level lawyer.

1           Let me also say that, you know, when I talk about

2  senior and junior, it's in very relative terms.  And that is, I

3  think the typical career in the office was three years, so if you

4  had three years in, you were a senior level person.

5  Q.   Other than the on-the-job training that you described, what

6  other training did you do with respect to disclosure of *Brady*

7  material?

8  A.   You know, I can't remember specifically.  We were

9  responsible for staying up to date on case law.  I know important

10 cases relating to criminal procedure issues in Louisiana and both

11 out of the U.S. Supreme Court or the federal courts were

12 circulated periodically, so, you know, it was our primary

13 responsibility to stay up to date and as best the office could, I

14 think it was basically our appellate lawyers took responsibility

15 for doing this, circulating important information that it was

16 necessary for everybody to know as the law was evolving because

17 as you probably know, there was a significant evolution of *Brady*

18 and the cases that followed it during this time period.

19 Q.   With respect to the armed robbery of John Thompson back in

20 1984-85 time frame, were you aware that blood evidence existed?

21 A.   You know, as I've answered before, sir, I don't know that I

22 was aware and I don't know that I wasn't aware.  All I know is I

23 didn't try the case, and I cannot remember.

24 Q.   Do you know if Jim Williams was aware of the existence of

25 blood evidence?

1   A.    Somebody -- something caused Whittaker to write on the

2   Screening Action Form blood test.  So institutionally, the office

3   knew that there was something involving blood involving that

4   armed robbery case.  Did I specifically know or look at the

5   Screening Action Form?  I don't know.  But the office knew that

6   there was something having to do with blood in that case.

7   Q.    Did -- my question was the prosecutor Jim Williams?

8   A.    I would have no idea.  I've spoken to Jim Williams one time

9   in the past 18 years and I ran into him in 1999 when we all

10  testified about this, and I said hello to him in the hallway and

11  that was it.  You know, I want to make it clear, Williams and I

12  were not friends.  We were colleagues, but we were not friends.

13  Q.    Did you ask Mr. Williams to handle a Motion to Suppress

14  hearing in the John Thompson case?

15  A.    I know from the records that you've shown me that he did, in

16  fact, handle the hearing.  I don't know whether I asked him to or

17  he did it on his own initiative.  If he says I asked him to, I

18  would go with his best recollection of that.

19  Q.    Let me show you what's previously -- already been admitted

20  into evidence which is Exhibit 40, which is the first page of the

21  packet I provided to you.

22  A.    Yes, sir, I have it.

23  Q.    And you would agree that's the transcript of Motion to

24  Suppress hearing in the John Thompson trial on March 11, 1985?

25  A.    Yes, sir, I see that it is.

1   Q.   And who was present at that hearing?

2   A.   Looks like Jim Williams, Numa Bertel who at the time was the

3   head lawyer of the New Orleans Indigent Defender Program and

4   James Welch who I, just in the back of my mind, I seem to

5   remember the name.  I can't conjure up a vision of him.  I assume

6   he's another OIDP lawyer.

7   Q.   There is a transcript from that Motion to Suppress hearing.

8   Can you read what it says there or do you need me to read it to

9   you?

10   A.   Yes, sir, it says:  "By Mr. Williams:  Your Honor, also it's

11   the State's intention to file a motion to take a blood sample

12   from the defendant and we will file that motion, have a

13   criminalist here on the 27th."  What that would mean is, by

14   having a criminalist here, he intended to have someone from the

15   Police Department come over on the 27th to draw blood from

16   Mr. Thompson.

17   Q.   What conversations, if any, did you have with Mr. Williams

18   with respect to this statement he made in open court?

19   A.   I have no recollection of ever talking to Mr. Williams about

20   it.  It doesn't mean I did, it doesn't mean I didn't.  I just

21   can't remember.

22   Q.   Now, you've told us that Mr. Bertel was present at that

23   motion by transcript which acknowledges that; correct?

24   A.   Yes, sir.

25   Q.   Do you recall, what, if any, conversations following this

1  hearing did you have with Numa Bertel about the blood evidence?

2  A.   No, sir, I don't.

3  Q.   You're saying there weren't any or you don't recall that?

4  A.   There is no way I'd be able to tell you whether or not I

5  ever talked to Numa about this.  Numa, I probably had dozens and

6  dozens of cases with Numa over the years I was here.  I saw him

7  every single day.  He was in court every single day.  So this

8  would have been one of -- again, it could even be into the

9  hundreds of cases where I had something going on with Numa.

10 Q.   There was a -- also, with respect to the armed robbery of

11 John Thompson, we have Exhibit 41.  Just very briefly, can you

12 just tell us what that document is.

13 A.   This is a document, I think, shown to me by counsel for the

14 plaintiff.

15 Q.   It's Number 4 in your packet.

16 A.   Number 41.  It appears to be a standard Motion For Discovery

17 and Inspection filed by Mr. Welch.

18 Q.   And the type of things that he's asking for are what type of

19 things?

20 A.   You know, there was -- I don't want to confuse this with the

21 time I spent as a federal prosecutor, but I think there was a

22 Louisiana rule on discovery and this was a standard pleading that

23 would be filed by the OIDP and they would just follow the rule,

24 so whatever we were obligated -- I mean, they knew to ask for

25 what we had to give.  They didn't ask for what we didn't need to

1  give and this kind of motion was filed in every single case.  I

2  think we called it a -- I think it was a standing discovery order

3  or something like that.

4  Q.   Now, when the DA's office receives these type of motions, do

5  y'all respond to them?

6  A.   Yes.

7  Q.   Exhibit 43, which is Number 7.

8  A.   Yes.

9  Q.   Is that your -- is that a DA's response?

10 A.   Yes, sir.

11 Q.   It says there three and four -- correct me if I am wrong --

12 those are the questions where Mr. Bertel, John Thompson's

13 attorney, you know, asked what evidence do you have?

14 A.   Right.

15 Q.   What was the DA's response?

16 A.   Inspection to be permitted.  And I will tell you that

17 probably in my five and a half years in the office, I filed

18 hundreds of these things.  This was a form that we followed, it

19 was the standard form that we used and on physical evidence, we

20 indicated to the other side that they were permitted to inspect

21 the evidence.

22 Q.   Well, let me ask you:  The term inspection to be permitted,

23 what does that mean to the defendant's attorney when he receives

24 this?

25 A.   The evidence is not in the possession of the District

1   Attorney's Office.  It's in the possession of the Police

2   Department in the property and evidence room, and so a lawyer

3   could just not walk in there and say, I want to look at evidence

4   in a case.  So typically what would happen is that they would

5   either take our answer to the motion, we would give them a

6   separate letter, or I actually remember there were occasions

7   where the Police Department would just call and say, lawyer so

8   and so is here on such and such a case, is it okay to show them

9   the evidence.  And they would just look -- the Police Department

10  was just looking from us for confirmation that this was the

11  lawyer representing the person in the case.  So it was proper for

12  them to see the evidence.  So this was a routine that they would

13  then take these materials, go down to the property room, and look

14  at the physical evidence.

15  Q.   Let me make sure I understand again.  Who actually had the

16  evidence?

17  A.   The Police Department.

18  Q.   After you provided this document to John Thompson's attorney

19  advising him you can inspect the evidence, what response did you

20  receive from John Thompson's attorney?

21  A.   I have no idea.  I don't know whether I subsequently talked

22  to him about it.  I don't know whether he ever went and looked at

23  the evidence.  He was free, based on this response to go down to

24  the property and evidence room at the Police Department and look

25  at all of the physical evidence that was down there.

1  Q.    Let's take a look at that.  That's Exhibit 17, which is

2  Number 8.  This document here, what is this document?

3  A.    This is an evidence property card maintained in the

4  New Orleans Police Department which lists the evidence in a

5  particular matter.  And it appears to be the one for the Thompson

6  armed robbery case.

7  Q.    And does it list there the evidence that was in possession

8  of the police?

9  A.    Yes, it does.

10  Q.    Can you go ahead and identify the parts I have highlighted?

11  A.    Piece of victim right pants leg with blood.  One tennis

12  shoe, left, make FootJoy with blood on shoe.

13  Q.    When you advised Mr. Thompson's attorney inspection to be

14  permitted, is this the evidence that he would have been permitted

15  to inspect?

16  A.    He probably would have seen the card and then seen the

17  evidence.

18  Q.    Exhibit 64, which is not in your packet.  I think it's one

19  of the other ones I have stapled there separately.

20  A.    Yes, sir.

21  Q.    This is a transcript of a June 1999 hearing; correct?

22  A.    Yes, sir, it is.

23  Q.    And you were present at that hearing; correct?

24  A.    I was not -- I testified at the hearing.  I was not present

25  when other people testified.

1  Q.   What is your understanding of the substance of that hearing
2  that occurred in 1999?
3  A.   This had something to do with the armed robbery case.   It
4  surrounded the armed robbery case and statements that allegedly
5  had been made by a then-deceased former assistant DA to
6  Mr. Whittaker and Mr. Riehlmann.
7  Q.   If I suggest to you this was the motion that Mr. Connick --
8  a joint motion filed to see if Mr. Thompson should get a new
9  armed robbery trial, do you dispute that?
10 A.   No, I don't.  I never saw any motions or pleadings in
11 connection with it, but if that's what it was, that's what it
12 was.
13 Q.   Turn to page -- there is some testimony there by Numa
14 Bertel; correct?
15 A.   Yes.
16 Q.   All right.  You understood that to be John Thompson's
17 attorney in the armed robbery trial; correct?
18 A.   Yes.
19 Q.   Now, if you turn to Page 100 of that transcript.
20 A.   Yes.
21 Q.   And I've highlighted a portion of John Thompson's attorney's
22 testimony in 1999.
23 A.   Yes.
24 Q.   Tell me if I'm reading this correctly:  "Tell me, where did
25 you go to look at to inspect the evidence?

1          "To the Clerk's Office.

2          "Clerk's Office?

3          "Yes."

4    A.    You know, I'm going to, sir, Mr. Carver, I'm going to take

5    this -- Numa Bertel is an honest, reputable and good lawyer and

6    I'm going to take it in the context of the testimony he gave on

7    Page 99 and 200 and 100 where he talks about going to the

8    evidence room.  It would seem from that that the Clerk's Office,

9    he means the Clerk's Office in the courthouse.  The evidence

10   would not be in the Clerk's Office in the courthouse.  It would

11   be in the evidence room at the Police Department.  The only time

12   it would be in the Clerk's Office in the courthouse, I think, is

13   that after the case had been prosecuted, maybe it was kept in the

14   courthouse, but beforehand, it would be in at the Police

15   Department.  So I mean, I give Mr. Bertel the benefit of the

16   doubt that he was confused here and what he really meant to say

17   is that he went to the Police Department property and evidence

18   room.  What I take issue with with his testimony is that of the

19   thousands of cases he handled over all these years he can

20   remember what he did in this one.  But I would give him the

21   benefit of the doubt on that.  I think he probably meant he went

22   to the Police Department.

23   Q.    You would agree, if he went -- if he went to the Clerk's

24   Office --

25   A.    There wouldn't be anything to see because there wouldn't be

1  anything there.  But Mr. Bertel was the senior lawyer in that

2  office.  He probably went thousands of times to the Police

3  Department to look at evidence.  So he clearly knew where he

4  needed to go to look at the evidence.

5  Q.    In the armed robbery trial of John Thompson, were you trying

6  to hide the existence of blood evidence?

7  A.    No, sir, I was not.

8  Q.    Prior to the armed robbery trial of John Thompson, do you

9  know whether or not that blood had been tested?

10  A.    No.

11  Q.    Prior to the armed robbery trial, did you ever see the lab

12  report showing the testing of the blood evidence?

13  A.    To the best of my knowledge, I did not.  And as I explained

14  in previous testimony, there were a lot of things going on at and

15  around that time in the office, and this was not a single case I

16  was handling.  There were a lot of things going on.  So I have no

17  recollection of ever having seen that report.  I can't say I did

18  see it.  I can't say I didn't see it.  And if I could tell you

19  one way or another, I would suspect you'd be highly suspicious of

20  that testimony.  22 years later, I just cannot remember.

21  Q.    Let's turn our attention to the murder trial.

22  A.    Yes, sir.

23  Q.    It's Exhibit 35, and I apologize, I don't know if it's in

24  your pack, so you can follow along with me on the screen.  Can

25  you tell me what that is?

1  A.   That is the same document that counsel for plaintiff showed

2  me, Answer to Motion For Production of Exculpatory Evidence.

3  Q.   So this is a document whereby John Thompson's attorneys are

4  asking you what evidence do you have that shows John Thompson

5  didn't commit -- may not have committed the crime?

6  A.   Right.

7  Q.   What response did you give there in Number 1?

8  A.   That Mary Wells was a witness and we actually -- looks like

9  attached a witness statement of Mary Wells and that they were not

10  entitled as to other witnesses.

11  Q.   Were you trying to hide the existence of Mary Wells from

12  John Thompson's attorneys?

13  A.   No, sir.

14  Q.   Tell me if I am wrong, Mary Wells' statement or description

15  she gave was inconsistent with what John Thompson looked like;

16  correct?

17  A.   Mr. Carver, I have to be honest with you, until you

18  mentioned Mary Wells to me, I think, last night or this morning,

19  I don't even remember the whole thing about Mary Wells.  I don't

20  remember who she was or what she had to do with this.  All I know

21  is from looking at these documents is we turned over her

22  statement.

23  Q.   Exhibit 5, again, I don't know if it's part of your stack,

24  is a police report which indicates a description that was given

25  by Paul Schliffka; correct?

1  A.   Yes, sir.

2  Q.   And tell me if I'm reading this correctly.   "Mr. Schliffka

3  observed a black male, early 20s, 6 foot tall, slim build, dark

4  complexion, short hair."   I read that correctly, didn't I?

5  A.   Yes, sir.

6  Q.   And we may come back to this in a moment.   The -- based upon

7  that -- well, Exhibit 34 is the -- a request by John Thompson's

8  attorneys for information about eyewitnesses; correct?

9  A.   Yes, sir, it is.

10  Q.   What specifically, with respect to eyewitnesses, is this

11  document requesting?

12  A.   The names of any eyewitnesses and copies of any statements

13  made by them that would be exculpatory.   I do read this

14  differently from the way counsel was trying to characterize it.

15  It's a motion for exculpatory evidence.

16  Q.   What does the last sentence of that first paragraph say?

17  A.   This report is based on newspaper articles --

18  Q.   No, I'm sorry, the first paragraph starts off the defendant?

19  A.   "The defendant specifically requests the following

20  nonexclusive list of items which, on information and belief, are

21  believed to be exculpatory in nature."

22  Q.   What types of eyewitnesses is this document requesting?

23  A.   This is requesting information that is exculpatory, that is,

24  material information that would weigh on the guilt or innocence

25  of the defendant.

1   Q.   And as part of your ordinary practice, you responded to this
2   request; correct?
3   A.   Yes, sir, I did.
4   Q.   That's Exhibit 36.
5   A.   Yes, sir, it is.
6   Q.   And who did you identify as a witness who may have
7   exculpatory information which may show John Thompson didn't
8   commit the murder?
9   A.   Paul Schliffka.
10  Q.   Were you trying to hide the existence of Paul Schliffka from
11  John Thompson's attorneys?
12  A.   No, sir, I was not.
13  Q.   You were present at the murder trial; correct?
14  A.   Yes, sir, I was.
15  Q.   My understanding, just like in this trial, there were
16  opening statements made; correct?
17  A.   Yes, that's right.
18  Q.   What's the purpose of an opening statement by a defendant at
19  a criminal trial?
20  A.   To state the purpose for the prosecutor and the defense is
21  and it's all you're permitted to do is state what you believe the
22  evidence is going to show.  It's not an argument.  It's a
23  statement.
24  Q.   Exhibit 137, which is Page 33 of the murder trial
25  transcript, and I'll suggest that's the opening statement from

1  John Thompson's attorney, I think, that made to the jury prior to
2  the start of the murder trial.  Can you read that out loud for
3  us?
4  A.   "Mr. Schliffka will testify that he was there, that he was
5  there, that he saw one man, not two, one.  That that one man had
6  short cropped hair, that he was about 6 feet tall, that the hair
7  was not bushy.  You will see Kevin Freeman.  You will hear
8  testimony that when John went to jail on January the 17th, and
9  you will also hear testimony that prior to this incident, he had
10  a large bush of hair.  Kojak doesn't, and you will see that.
11  Mr. Schliffka saw one man run away."
12  Q.   Now, I'm turning back to the police report that I
13  highlighted there.  Is that consistent with your understanding of
14  what you just read in opening statement?
15  A.   Yes, sir.
16  Q.   Did you provide that information to John Thompson's
17  attorneys, the description of Paul Schliffka?
18  A.   I don't know.
19  Q.   Do you know how he got that information?
20  A.   If it wasn't publicly available information, that is, if
21  somebody has a newspaper article that that much detail was in,
22  but if there was not, I assume that we gave it to him.
23  Q.   Would you further assume that John Thompson's attorneys had
24  that information?
25  A.   I think they clearly had it based on the opening statement.

1   Q.   Exhibit 137, which is the transcripts of the murder trial,

2   that's a portion of the testimony of Paul Schliffka.  Can you

3   read what I have highlighted?

4   A.   "He looked about 6 foot and had short hair."

5   Q.   And is that consistent with the police report?

6   A.   "Mr. Schliffka observed a black male, early 20s, 6 foot

7   tall, slim build, dark complexion, short hair."

8   Q.   Is that consistent?

9   A.   Yes, sir.

10   Q.   In addition to Paul Schliffka, there was some other evidence

11   that came to light in the murder trial and one of them was the

12   issue of a reward.  Do you recall that?

13   A.   Yes, sir.

14   Q.   Exhibit 137, Page 34, and I will represent to you that's the

15   opening statement of John Thompson's attorneys.  It's Number 15

16   on your packet?

17   A.   Yes, sir.

18   Q.   Would you read what I have highlighted?

19   A.   "The conversation with Richard Perkins, you will have to

20   judge Mr. Perkins' motivation.  You will have to judge what

21   $15,000 in reward money meant to a person."

22   Q.   What does that suggest to you?

23   A.   It indicates that again in the opening statement

24   Mr. Couhig's anticipation was going to be that he was going to

25   present evidence that Mr. Perkins was motivated by a reward of

1    $15,000 to say what he was saying.

2    Q.    Did you try -- did you try to hide the fact that there was a

3    reward given in this case?

4    A.    No, sir.

5    Q.    In fact, it was common knowledge; correct?

6    A.    I don't remember whether it was common knowledge.  I don't

7    remember whether we knew the details of it, but clearly,

8    Mr. Thompson's lawyers knew the details of the reward.

9    Q.    The existence of a reward, could that be considered -- is

10   that to be considered exculpatory evidence?

11   A.    Yes, it could be considered impeachment evidence.

12   Q.    There has also been suggestions of some other reports that

13   were not disclosed to John Thompson's attorneys.  Exhibit 5,

14   which we looked at a few times, but let's look at the last page,

15   Page 18.  Page 18 of your exhibit.  Page 3 of the report.

16   A.    Yes.

17   Q.    You don't have to read that out loud because the jury has

18   seen this once before, just take a moment to read that paragraph

19   to yourself and let me know when you are ready for my question.

20   A.    (Witness reviews document.)  Yes.

21   Q.    What does Sheri Hartman -- excuse me.  How does

22   Sheri Hartman describe the perpetrator in that paragraph?

23   A.    She doesn't.  She doesn't because she didn't see him.

24   Q.    Is that paragraph exculpatory?

25   A.    No.

1   Q.   What did you understand your obligation to be with respect
2   to that report?
3   A.   We would not have an obligation to turn over that
4   information because it's not exculpatory.
5   Q.   What exculpatory information did you have regarding
6   Sheri Hartman?
7   A.   None.  And, please, sir, keep in mind that in dealing with
8   witnesses in these violent crime cases, this gave out a person's
9   address, date of birth, and there were witness safety issues here
10  so even on top of that had the information even been exculpatory,
11  there probably would have had to have been some other method by
12  which we would have communicated that possibly through the Court
13  to defense counsel.
14  Q.   Let's talk about that.  What is the policy of Harry Connick
15  with respect to giving out witness names and addresses and such?
16  A.   We would not do that because of the safety issues with the
17  witnesses.  However, if a witness had exculpatory information, it
18  was our obligation to make sure that defense counsel would have
19  an opportunity to have access to that witness.
20  Q.   You say safety information, what do you mean by safety
21  information?  Safety concerns?
22  A.   Safety concerns for the witness.  You know, when you're
23  dealing with these homicide cases, armed robbery cases, other
24  kinds of armed robbery, murder cases, people who are witnesses to
25  these things get scared.  Witnesses can be killed.  I've had

1   cases where witnesses were threatened.   I've been threatened.

2   You have to maintain the safety of the potential witnesses you're

3   dealing with.   It's part of our obligation.

4   Q.   So you have personal knowledge that a witness' life had been

5   in danger or jeopardized because an accused or defendant had that

6   information?

7   A.   I can't tell you a specific case, but I know that happened

8   in numerous times throughout my career, as well as me being

9   threatened as well.

10  Q.   Exhibit 4, which is Page 19 of your packet, you can read

11  that to yourself.   The jury has seen this previously.

12  A.   I'm sorry, I'm not seeing that one.

13  Q.   It's Number 19 of your packet.   And I will suggest when you

14  read that, this is additional information John Thompson's

15  attorney said we didn't turn over or the State didn't turn over.

16  A.   Yes, sir, I see it.

17  Q.   How does Stephen McAlister describe the perpetrator?

18  A.   He doesn't.   He didn't see him.

19  Q.   How does Rosemary Cash describe the perpetrator?

20  A.   She doesn't.   She didn't see him.

21  Q.   Does Stephen McAlister -- what does Stephen McAlister say

22  about hearing a car drive off?

23  A.   He doesn't say anything.

24  Q.   What does Rosemary Cash say about an automobile?

25  A.   Nothing.

1  Q.   What did you understand your *Brady* obligation to be with

2  respect to disclosing that information?

3  A.   This information is not exculpatory.  There would not have

4  been any obligation to disclose it nor would we have disclosed

5  it.

6  Q.   Exhibit 23, which if you will turn to the last page of the

7  exhibit, it's Page 24 of the packet, and again, I'll suggest to

8  you this is additional information which has been alleged that we

9  did not, the State did not disclose to John Thompson.

10 A.   Yes, sir.

11 Q.   Okay.  Who is the -- who is the woman that saw Kevin Freeman

12 drive away?

13 A.   It doesn't say.

14 Q.   How would you disclose that -- well, how would you disclose

15 the identity of an unidentified woman to John Thompson's

16 attorneys?

17 A.   There would be no way to do that.

18 Q.   Also in that report, that very last sentence, it says,

19 Freeman also told Perkins that a woman saw him, and I want you to

20 focus on, drive away from the scene?

21 A.   Saw him driving away from the scene, yes.

22 Q.   You prosecuted the murder case; correct?

23 A.   Yes, I did.

24 Q.   Do you recall what the significance was, if any, of Freeman

25 driving away from the murder scene?

1  A.    No, I don't.

2  Q.    Just so the jury -- what was the significance of

3  Kevin Freeman with respect to the murder?

4  A.    Kevin Freeman was the co-perpetrator.  He was with

5  Mr. Thompson, according to the evidence we had in 1985.

6  Q.    It has been suggested, Mr. Dubelier, that you did not follow

7  the law with respect to *Brady*.  How do you respond?

8  A.    My response is that that's not true.

9  Q.    It's been suggested that you didn't understand *Brady*.  How

10 do you respond?

11 A.    I understood *Brady*.  I understood our obligations pursuant

12 to *Brady* and I made every effort to comply with what those

13 obligations are.  In 17 years of being a prosecutor, did I ever

14 make a mistake, maybe I did, but I never did anything knowingly,

15 intentionally or negligently that was either unethical or

16 improper.

17 Q.    What did you ever do with respect to the John Thompson armed

18 robbery trial, murder trial which was not in compliance with

19 Harry Connick's policy to follow the law?

20 A.    Nothing.

21         MR. CARVER:  Your Honor, I have no further questions.

22         THE COURT:  Any redirect?

23         MR. COONEY:  Yes, Your Honor.

24                         RECROSS-EXAMINATION

25 BY MR. COONEY:

1   Q.   Mr. Dubelier, referring to Exhibit 40, which is the first

2   document in the packet that Mr. Carver gave you.

3   A.   Yes, sir, I have it.

4   Q.   He directed your attention to a comment that was made by

5   Mr. Williams at the end of the hearing.  "It's also the State's

6   intention to file a motion to take a blood sample from the

7   defendant and we will file that motion and have a criminalist

8   here on the 27th"?

9   A.   Yes, sir.

10  Q.   Is it your testimony that that statement satisfied any

11  obligation on the part of the State of Louisiana to produce the

12  blood report?

13  A.   The report wouldn't have existed at this time.

14  Q.   Does this statement relieve the State of Louisiana, the

15  prosecutors, from producing the blood report?

16  A.   The subsequent report?

17  Q.   Right.

18  A.   No.

19  Q.   Okay.  Thank you.  Okay.  I would like you to look at

20  Exhibit 43, which is another document that you were asked about,

21  and that is your response to the Motion For Discovery and

22  Inspection in the armed robbery case?

23  A.   Yes, sir.

24  Q.   And one of the things Mr. Carver asked you to focus on was

25  Paragraphs 3 and 4 of your response.

1  A.   Yes, sir.

2  Q.   And in Paragraph 3 and 4, that's where you said inspection

3  to be permitted?

4  A.   Yes, I did.

5  Q.   And I believe you also testified that when the defendant's

6  lawyer got a copy of this response, that was basically the key

7  that enabled the lawyer to go to Central Evidence and Property

8  and say, here it is, the District Attorney's Office has said I

9  can come in here and take a look at the evidence; is that right?

10  A.   I think what I said is to the best of my recollection, it

11  was either this form alone or a combination of the form and a

12  phone call by us or the lawyer would just go down there and the

13  police would call and say it was okay.  It was some combination

14  of those things.

15  Q.   But the defense lawyer needed something from you before they

16  could just go into Central Evidence and Property and start

17  looking at the evidence?

18  A.   Absolutely, yes, sir.

19  Q.   And this was served on April 3rd, at least it was filed on

20  April 3, 1985; am I right?

21  A.   That appears to be the case, yes.

22  Q.   And if you look at Exhibit 17, that was a document that we

23  talked about before, that's the property card?

24  A.   Yes.

25  Q.   And we looked at the chain of custody, and it looks like at,

1  if you look at the second page, at 10:05 a.m., on April 4th, the
2  blood evidence was checked out?
3  A.   The evidence was checked out.   The card was there, but the
4  evidence was checked out.
5  Q.   And you don't know, you don't know that, in fact, the card
6  was there; am I correct?
7  A.   I don't know that this evidence and property card was there.
8  It would have to be.   It would have to be in the record.
9  Q.   You know for a fact that that particular property card was,
10 in fact, available for Mr. Bertel to take a look at?
11 A.   That would have been the normal process.
12 Q.   That would have been the normal process.   But if he went
13 over there after --
14 A.   And if I could tell you my recollection is, as best I can
15 tell you, the evidence was typically kept in like paper brown
16 grocery bags, and then this card or something like this card
17 would be stapled on the outside of the bag.   Because that's how
18 we get it when we get it in court.
19 Q.   So if Mr. Bertel got your response, which was filed on
20 April 3rd, and went over the next day, anytime after 10 o'clock
21 in the morning, he wouldn't find the blood evidence, would he?
22 A.   He would have found the card.
23 Q.   But he wouldn't have found the blood evidence, would he?
24 A.   No, because the blood evidence would have been checked out,
25 and I'm assuming what the Police Department would have said in

1  response to his inquiry of where's the blood evidence, it's at

2  the lab.

3  Q.   And that's an assumption on your part; correct?

4  A.   Yes, it is.

5  Q.   I would like you to look at Exhibit 34, which is a Motion

6  For Production of Exculpatory Evidence.

7  A.   Yes, sir.

8  Q.   And we've focused on a couple of other paragraphs, but I

9  would like you to look at Paragraph 4.  And, Mr. Vincent, if you

10  could put that up.  In Paragraph 4, this is a very specific

11  request by Mr. Couhig and what he asks for here is any and all

12  police reports made by the homicide investigators which must

13  necessarily be replete with accounts of identifications

14  inconsistent with the defendant's appearance.  That's the first

15  sentence; right?

16  A.   Yeah.

17  Q.   So he's not just asking you to produce the stuff that's in

18  your file.  He says, I want any and all police reports made by

19  the homicide investigators.  That's what he asked you?

20  A.   Yes.

21  Q.   I would like you to look at Exhibit 2.  Would you agree with

22  me that Exhibit 2, which we've talked about before, is a report

23  by homicide investigators?

24  A.   Yes, it is.

25  Q.   And that's one of those reports that has the, that says

1  close-cut hair?

2  A.   Yes, it does.

3  Q.   And Exhibit 5, let's look at that one.

4  A.   Right.

5  Q.   And Exhibit 2 was the one on the night of the murder,

6  December 6th.  Am I right?

7  A.   Yes.

8  Q.   And Exhibit 5 is December 8th, and that's also a homicide

9  investigator report?

10  A.   Right.

11  Q.   And that's got the description, short hair?  You see that?

12  A.   Yes.

13  Q.   And Exhibit 30, is that a homicide investigator report?

14  A.   Yes.

15  Q.   And that description, if you recall, on Page 12, was

16  close-cut hair?

17  A.   Yes.

18  Q.   So Mr. Couhig, what he did, John's lawyer in the murder

19  case, asked for homicide investigator reports that are

20  inconsistent with the appearance of Mr. Thompson?

21  A.   Right.

22  Q.   Right?

23  A.   Right.

24  Q.   Okay.  Let's look at the first response that Mr. Carver took

25  you through, which is Exhibit -- actually, I want to have you

1  take a look at Exhibit 35, which is one of the exhibits that I

2  asked you to look at.

3  A.   Yes, sir, I've got it.

4  Q.   Would you agree with me that the request by Mr. Couhig,

5  John Thompson's lawyers for any and all police reports made by

6  homicide investigators which must necessarily be replete with

7  accounts of identifications inconsistent with the defendant's

8  appearance, would you agree with me that that was Roman numeral

9  IV in the request?

10  A.   Right.

11  Q.   And in Roman numeral IV of the State's response, the answer

12  was none?

13  A.   Right.

14  Q.   It doesn't say we're not going to produce them to you.  It

15  doesn't say we just go looked at our own file.  The answer of the

16  State of Louisiana was there were no police reports made by

17  homicide investigators which are replete with accounts of

18  identifications inconsistent with the defendant's appearance.  Is

19  that the response of the State of Louisiana?

20  A.   Yes, it was.

21  Q.   Do you think that's an accurate response?

22  A.   Yes.

23  Q.   That's your testimony?

24  A.   Yes.

25  Q.   You think that testimony with regard to the hair length,

1  that information with regard to the hair length that was in those

2  homicide investigator reports is not inconsistent with

3  defendant's appearance?

4  A.   That answer was based on what was known to us at the time.

5  Q.   Mr. Dubelier, it didn't ask you for what was known to you at

6  the time.  It specifically asks you for police reports made by

7  the homicide investigators.

8  A.   That's right.

9  Q.   Did you ask the homicide investigators whether they had such

10  information?

11  A.   I don't know whether or not I did.  What I did do was

12  provide the name of Mr. Schliffka.  I provided information about

13  Mr. Schliffka.  Mr. Thompson's lawyers knew that Mr. Schliffka

14  had stated that Mr. Thompson had close-cropped hair.  They knew

15  that because they said it in the opening statement, and we

16  provided them with a copy of a Bureau of Identification picture

17  that had been taken several days before the murder in connection

18  with an unrelated arrest that had Mr. Thompson with big hair

19  sticking up which was inconsistent with what the description was

20  of Mr. Schliffka.  We gave them everything we had relating to

21  this issue.  It would have been --

22  Q.   Mr. Dubelier, your testimony is you had the B of I picture

23  at that point.  You knew that he had that bushy hair; right?

24  That's what you just said to the jury.

25  A.   Well, here's -- here is what I know.  I know that when I

1  testified two years ago --

2  Q.   That's not my question, Mr. Dubelier.  My question to you,

3  Mr. Dubelier --

4         THE COURT:  Wait a minute.  Wait a minute.  Wait a

5  minute.

6         THE WITNESS:  I'm not arguing.

7         THE COURT:  Ask the question again.  Mr. Dubelier, just

8  answer the question.  Let's not argue with each other.

9         MR. COONEY:  Thank you, Your Honor.

10                        EXAMINATION

11  BY MR. COONEY:

12  Q.   Am I correct that you just told the jury that when you made

13  this response, you had the B of I picture of Mr. Thompson with

14  the bushy hair?

15  A.   No.  No, I'm saying I didn't say that.

16  Q.   When did you have the B of I picture of Mr. Thompson with

17  the bushy hair?

18  A.   Last night I reviewed a court decision in connection with

19  this matter from Judge Livaudais.

20  Q.   You are not --

21         MR. COONEY:  Your Honor, he is not answering the

22  question.

23         THE COURT:  Mr. Dubelier, just answer the question.  We

24  don't want you to talk about court decisions.

25         THE WITNESS:  I'm trying to think how I can answer the

1   question, then, Your Honor, because I only know it from -- I

2   don't have a personal recollection of it.  I only know of it from

3   looking at a document.  Can I say a document without saying what

4   the document was?

5              MR. COONEY:  Let me ask a slightly different question.

6                              EXAMINATION

7   BY MR. COONEY:

8   Q.   Did you not just tell the jury that at some time in the

9   John Thompson prosecution, whether it was before you wrote this

10  response or some other time, that you had a picture of John

11  Thompson with the big, bushy hair?

12  A.   I understand that the record of the case indicates that we

13  tried to offer the picture into evidence and the defense attorney

14  objected.  That's my best understanding of this issue.

15  Q.   So your testimony is you had the picture?

16             THE COURT:  Mr. Dubelier, you can answer that "yes" or

17  "no."  Did you have the picture?

18             THE WITNESS:  My understanding --

19             THE COURT:  No, no.  Answer that "yes" or "no."

20             THE WITNESS:  I cannot -- I don't remember whether I had

21  the picture.

22             THE COURT:  From reading the record, you can't tell --

23             THE WITNESS:  From reading the record, I believe we had

24  the picture, yes, from reading the record.

25             THE COURT:  Okay.  Next question.

1                              EXAMINATION

2    BY MR. COONEY:

3    Q.    This request, Mr. Couhig's request specifically asked you to

4    provide any police reports made by the homicide investigators;

5    correct?

6    A.    That contained descriptions that were inconsistent with the

7    description or with the appearance of Mr. Thompson.   The

8    appearance when, I have no idea.   The appearance of Mr. Thompson.

9    Q.    Do you think the fair -- fair interpretation of that

10   question was on the night of the murder?

11   A.    Yes.

12   Q.    Okay.  And would you agree with me that the State of

13   Louisiana's response wasn't, we're just telling you what we've

14   got in our possession.  We don't have it.  What you told

15   Mr. Couhig because the question was any and all police reports,

16   not just the ones in your possession, your response was none.

17   A.    That's right.

18   Q.    And then I would like you to look at Exhibit 36, please.   Is

19   that an amended answer to the Motion for Production of

20   Exculpatory Evidence?

21   A.    I'm sorry, what exhibit?

22   Q.    Exhibit 36 from the binder, please.

23   A.    Yes.

24   Q.    Okay.  And is that your signature that appears at the

25   bottom?

1   A.    Yes, sir, it is.

2   Q.    And in Roman numeral IV and V, am I correct that you don't

3   provide any information there about homicide investigation

4   reports, do you?

5   A.    No, we do not.

6   Q.    Okay.  Just talks about Kevin -- Kevin Freeman?

7   A.    Yes.

8   Q.    With regard to Mr. Couhig's opening statement in the murder

9   trial, am I correct, you don't know where Mr. Couhig got whatever

10  information he had about the hair length of the perpetrator?

11  A.    That's right.  I don't know whether he got it from us or

12  not.

13  Q.    He could have gotten it from the newspaper, could have

14  gotten it from some other location.  You don't know where he got

15  it?

16  A.    Could have gotten it from Mr. Schliffka.

17  Q.    And would you agree with me that an opening statement is not

18  evidence?

19  A.    It is not.  It's the intention of what the evidence is going

20  to be.

21  Q.    A police report, on the other hand, that could be evidence;

22  am I right?

23  A.    Well, no, not technically.  It's the testimony that's the

24  evidence.

25  Q.    Would you agree with me that a police report could be a

1  piece of evidence in a piece of litigation?

2  A.   Yes.

3  Q.   Now, with respect to this reward issue, the existence of a

4  reward in the Liuzza case, that was well known; right?

5  A.   If you tell me it was, it was.  I don't remember, but if you

6  tell me the record is clear and it was in the newspaper, I will

7  not dispute you on that.

8  Q.   Would you agree with me that there's a difference between

9  knowing about the existence of the reward, a reward on the one

10  hand, and whether a witness made some kind of effort to collect

11  on a reward on the other?

12  A.   Yes, there is a difference.

13  Q.   You also talked about witness safety issues and talked about

14  some of the dangers associated with giving out witness names.

15  I'm correct you gave out Mr. Schliffka's name in this case;

16  correct?  You gave the defense Mr. Schliffka's name?

17  A.   Correct.

18  Q.   There was no danger issue about giving out the hair length

19  that Mr. Schliffka reported; correct?

20  A.   No.

21  Q.   Mr. Vincent, would you be good enough to put up Exhibit 23,

22  please.

23          Now, Exhibit 23, is that one of the documents that

24  Mr. Carver was asking you about?

25  A.   Is that in your binder or in his collection?

1  Q.   It's in his collection.  It's the last document in his

2  collection, Mr. Dubelier.

3  A.   Got it.

4  Q.   Okay.  And I would like to direct your attention, if I

5  could, to the last page of the document, Page 4.

6  A.   Yes, I have it.

7  Q.   And in this particular paragraph, this is information about

8  what Kevin Freeman supposedly told Richard "Funk" Perkins; is

9  that right?

10  A.   The way I read this is, this is Curole and Demma talking to

11  Perkins about what Freeman told him.  If I'm reading it

12  correctly.

13  Q.   I think that's right.  I think that's right.  Okay.  Now,

14  looking at this document, one of the things that at least Perkins

15  says that Freeman said was, quote, "They purposely cruised the

16  St. Charles Avenue area looking for white men to rob because they

17  believed the people in that area were rich and carried a lot of

18  cash."  Do you see that?

19  A.   Yes.

20  Q.   Is it your recollection, Mr. Dubelier, that that information

21  is inconsistent with the testimony of Mr. Freeman from the 1985

22  murder trial of John Thompson?

23  A.   I don't know.

24  Q.   And so if the record reflected that Mr. Freeman testified

25  that he was riding with John Thompson and didn't think anything

1  was amiss, they ran out of gas, they were walking along and the

2  next thing he knew, Mr. Thompson was going to go, quote, unquote,

3  "hit Mr. Liuzza," would you agree with me that that sentence is

4  inconsistent with that testimony?

5  A.   Yes.

6  Q.   And would you also agree with me that this document says,

7  when he, Freeman, realized that Thompson intended to shoot

8  Liuzza, he left him and ran to the vehicle.  As he reached the

9  vehicle, he heard several gunshots, at which time he entered his

10 vehicle and drove away?  Do you see that?

11 A.   Right.  Right.

12 Q.   Do you recall whether Kevin Freeman testified in the 1985

13 murder trial of John Thompson that he and Thompson were driving,

14 that the car ran out of gas, that he parked the car, that he was

15 walking with Thompson, when he saw something happen, he ran away,

16 went home, took his bath, and came back the next day with $2

17 worth of gas to get his car?

18 A.   Are you saying that's what he testified to in the murder

19 trial?

20 Q.   Do you recall that?

21 A.   No.

22 Q.   If he said that --

23 A.   I'm not going to dispute it.  If he said it, he said it.

24 Q.   If he said that, would that be inconsistent with what's in

25 this document?

1   A.   It would be inconsistent with what Perkins said Freeman

2   said.  What Demma says Perkins said Freeman said.

3   Q.   This would be inconsistent?

4   A.   Yes.

5            MR. COONEY:  I have nothing further.

6            THE COURT:  You can step down Mr. Dubelier.  Thank you.

7            THE WITNESS:  Thank you, Your Honor.

8            (WHEREUPON, the witness is excused.)

9            THE COURT:  Who is your next witness?

10           MR. LITVIN:  Mr. Trenticosta.  He'll be maybe 20 minutes

11   or so.

12           THE COURT:  Is he here now?

13           MR. CARVER:  He is.

14           THE COURT:  That will work just about perfectly.  We'll

15   recess for lunch just about 12:30.  Is everybody on the jury

16   okay?

17           THE DEPUTY CLERK:  Please raise your right hand.

18                 **NICHOLAS J. TRENTICOSTA**

19   was called as a witness and, after being first duly sworn by the

20   Clerk, was examined and testified on his oath as follows:

21           THE WITNESS:  My name is Nicholas Trenticosta.

22                 DIRECT EXAMINATION

23   BY MR. LITVIN:

24   Q.   Mr. Trenticosta, would you tell us, please, what your

25   occupation or profession is?

1  A.    I'm a lawyer.

2  Q.    You practice here in New Orleans?

3  A.    Yes, I do.

4  Q.    I'm going to ask you to tell us, please, briefly, we don't

5  have to know where you went to junior high school, but give us

6  your educational background, please.

7  A.    University of New Orleans, and Southern University of

8  New Orleans.  I got two degrees from each school.  Seven years

9  after that, I went to law school in Baton Rouge at LSU.  And I

10 was admitted to practice law in 1987.

11 Q.    Again, briefly, what did you do before you decided to go to

12 law school and why did you decide to go to law school?

13 A.    I was a social worker.  I had a social work degree from SUNO

14 and I worked in mainly the St. Thomas housing project for an

15 organization called Hope House.  And in the middle '70s or

16 throughout the '70s, I had the opportunity to, at the end of the

17 '70s, early '80s, to learn a little bit about the death penalty.

18 There was an office in the neighborhood called Louisiana

19 Coalition on Jails and Prisons.  Sort of a prisoner rights

20 organization.  And they wanted a committee to be formed to

21 protest the death penalty and it was coming into play at that

22 time.

23        Around about '83, I had an opportunity to visit a fellow

24 on death row, named Antonio James, and at that meeting, I decided

25 I needed to become a lawyer and represent people who were

1  sentenced to death.  I drove from the penitentiary to LSU Law

2  School, picked up an application, and enrolled after I was

3  admitted.

4  Q.   Now, would you tell us what you've done since you -- well,

5  excuse me.  You were admitted to the bar?

6  A.   Yes.

7  Q.   You practice in New Orleans or --

8  A.   When I, when I graduated from law school, the following day,

9  I drove to Tallahassee, Florida, where I had been hired by the

10 only state office which had lawyers exclusively devoted to

11 representing people on death row.  So my first year of being a

12 lawyer, I worked in Florida at that project.  And after a year,

13 the Congress had decided -- this was in '88 -- that they wanted

14 the federal public defenders offices to set up offices in various

15 states to provide counsel for persons on death row.  And I then

16 said, well, Louisiana was one of the states that was coming

17 on-line, and I came back to Louisiana and started working, opened

18 the doors of an office called the Loyola Death Penalty Resource

19 Center.

20 Q.   Could you just bring us up to date with your experience and

21 activity as a lawyer?

22 A.   Sure.  From winter of '88, like December, when we opened up

23 our office, our charge was to represent everyone on death row in

24 Louisiana or to find lawyers to come in and represent those

25 fellows on a pro bono basis.

1  Q.    Pro bono means without being compensated?

2  A.    Right.  Right.  And at that time, in 1988, there was only

3  one state in the United States that provided lawyers for guys who

4  were on death row to work on post-conviction cases.  So that

5  meant there was a large group of large law firms throughout the

6  country who would volunteer their time, energy and money to

7  represent a guy on death row.  When we opened our office, the

8  lawyers from your firm, Gordon & Michael, they had already signed

9  up to represent John Thompson.  I then joined them in the case as

10  local counsel.  And so we worked the project until -- Loyola

11  University kept us until about 1999.  The funding, the federal

12  funding stopped in the 20 resource centers around the country --

13  Q.    Excuse me for interrupting.  Federal funding stopped.  That

14  means you weren't getting paid now?

15  A.    In '96 the federal funding stopped and we were getting paid

16  by court appointments.  It was difficult because sometimes

17  judges, judges who decide how much they are going to pay you for

18  your work sometimes would not pay very much money, so we were

19  always struggling for money.  Loyola University did not provide

20  funding for us.  They provided other services, but not dollars.

21  And after they saw the office going into the red a little bit too

22  much, we disbanded the resource center.

23        At that time, '99, we had been working with the

24  legislators in Louisiana to get passed a bill that would require

25  the State of Louisiana to provide lawyers for fellows on death

1  row who didn't have counsel.  And that did pass, and there is now

2  a state-funded public defender office that represents persons on

3  death row.

4  Q.   Before we -- I'm sorry, am I interrupting?

5  A.   I represent people on death row and that's what I continue

6  to do.  I have done what for the last 20 years and I'm trying to

7  work myself out of a job.

8  Q.   Before I start asking you some questions about Mr. Thompson,

9  what is your office now?  When I say what is your office, I don't

10  mean the color of bricks, I mean, you're still representing

11  people on death row and are you part of an organization or who

12  pays your bill?

13  A.   I have a not-for-profit corporation called The Center For

14  Equal Justice.  It is myself, and we had another lawyer or I had

15  another lawyer, and my wife, Susan Herrera who works there is

16  also a lawyer.  I also have a firm with my wife that we do other

17  death penalty cases around the country, mainly for the Government

18  of El Salvador, so I have a not-for-profit law office and a

19  partnership with my wife.

20  Q.   Now, sir, when did you first get to meet or know on work

21  with John Thompson?

22  A.   It would have been in 1989.  I don't have a specific memory,

23  but I know I signed on to the case then and I would have visited

24  him.

25  Q.   Now, the jury already knows from the evidence in this case

1  that Mr. Thompson, in '89, was already at Angola State Prison on

2  death row, and he was there until the spring, I think, May of --

3  or June of 1999.  Would you tell us now, sir, what contacts you

4  had either in terms of visits with or other contacts with

5  Mr. Thompson from the time you first got involved on John's

6  behalf until he left and came back to prison here, to the parish

7  prison?

8  A.   Well, I visited him at the penitentiary.  It's hard to say

9  how much.  Maybe once, as -- as the times called for.  In other

10 words, if we were preparing for a hearing, preparing pleadings,

11 then I would visit with him more so we could work on those

12 issues, but from '89 until he left Angola, I visited with him

13 quite a bit.  And we also had a lot of phone contact.  The

14 fellows on the row were allowed to call their lawyers each day.

15 I didn't speak with him every day, but he called to the office

16 and I talked with him on the phone.

17 Q.   Now, I'm going to ask you some questions a little later

18 about your observations and your knowledge of Angola.  But I

19 would like to jump forward now and ask you some questions about

20 May of 2003, when John Thompson was retried for the murder with

21 which he had been -- of which he had accused and was acquitted

22 and the next day was freed.  Do you remember that, when that was

23 in May of 2003?

24 A.   Very well.  Very well.  John and I, the evening he got out,

25 we went to a function, it was a benefit for the, I think, the

 1   Innocence Project or something at a nightclub.  And John and I

 2   went, and I remember it was very, very, very difficult for him.

 3   We lasted about two minutes.  They wanted him on the stage to

 4   speak and say some things, and it was impossible at that time.

 5   It was -- as we were leaving the place, I told John, when are you

 6   coming to work?  I've got an office for you.  When are you going

 7   to show up?  And he said, well, I need about a week.  You know,

 8   he needed about a week to relax and I'll be there, boss, don't

 9   worry.

10   Q.   When had you and John decided that if he ever got off death

11   row, he was going to come work for you?  When was that decided?

12   A.   I think it was, it might have been a couple days before he

13   was actually acquitted, but I certainly remember the conversation

14   that evening.  I also had a conversation with Michael about it.

15   Q.   Well, before I ask you -- well, let me just ask you, what

16   did you -- why did you hire John Thompson to work for you?

17   A.   Because John needed, in my opinion, a structure.  He needed

18   a place to go every day.  He needed someone who could support

19   him.  I know this because I know I've been around prisoners and

20   I've been around prisoners who have been released.  I've had

21   exonerated prisoners like John released and I know that for many,

22   many people it is extremely difficult to reintegrate into

23   society.  And I'm talking about exonerated folks, people who were

24   innocent of crimes, as well as persons who may have been guilty.

25   Everything has changed since they went in.  Prison life and

1  adjustment is very, very different and I knew that John probably

2  could use a lot of day-to-day support, as well as a little bit of

3  money at the end of every week, and I also knew because I knew

4  John well, that it would be very important for him to work on my

5  cases, people he had left behind.

6  Q.   Your cases, excuse me, sir, your cases were people that were

7  still on death row back in Angola?

8  A.   That's right.

9  Q.   Did you know that John hadn't even graduated from high

10 school?

11 A.   Uh-huh (affirmative response).

12 Q.   As well as the fact that he was away from society for

13 18 years or so?

14 A.   Yes, I knew that.

15 Q.   What made you think that John could perform any valuable

16 function for you, for your office, or for these prisoners who you

17 represented?

18 A.   Well, I didn't.  I didn't know if he could.  I mean, being a

19 paralegal or an investigator in a law office requires skills that

20 I knew John did not have, so I didn't know if he could perform

21 well, but that wasn't the reason.  In other words, I wasn't

22 hiring John to come in and do a bang-up job in a case.

23 Everything he had to do in a case he was going to have to learn.

24 But I did it because I knew he needed it.  You know, he needed

25 that kind of place.  And at the time he came in, we had my three

1  lawyers, myself, Paula and my wife Susan Herrera and interns from
2  England.  Young lawyers from England would come work for us for a
3  year or something like that.  And our office is in the
4  St. Charles Avenue Baptist Church in the so-called basement.  And
5  we spent a lot of time in the first six months not working, each
6  of us, just talking with John.  A lot of it was him debriefing.
7  Talking about his experiences.  And knowing a little bit about
8  mental health issues, I knew that that was extremely important
9  for John and for a person like John to be able to relax and talk
10 at will and be -- and not be concerned about what's going to be
11 said and how people might think about it.  You know.  Eventually,
12 he started doing some successful tasks for us.
13 Q.   Well, that's what I want to get to now.  We'll come back
14 with some of the problems you were just starting to refer to, but
15 he worked for you for, what, approximately two years?
16 A.   That's right.
17 Q.   And during those two years, was he working full time or
18 40 hours a week or whatever number of hours?
19 A.   40 hours a week.  We opened, I usually got to the office at
20 9 o'clock.  John was already there.  And oftentimes we left
21 together at 5, 6 o'clock.  And if we worked late, we worked late.
22 Q.   Now, would you tell us a little more specifically what kind
23 of work John -- you gave John to do and how he handled it.  And
24 when I say how he handled it, I would like you to tell us what he
25 did well and what he didn't do well.  What he improved at and

1    what problems, if any, he had.  In other words, I'm asking you to
2    give this jury and His Honor an assessment as to what kind of an
3    employee he was working for you in your practice as we've heard.
4    How did he do?  How would you rate him?  Good and bad.
5    A.    On some skills, I would rate him D minus.  On some skills A
6    plus.  And if I could, you know, go to the copy machine and copy
7    a thousand pages of transcripts and make sure you don't miss any
8    pages, and the machine gets jammed, as you well know, machines,
9    copy machines, and John would stand there, he would open it up
10   and it has some directions, but this is not something he had ever
11   encountered before.  It would take him half the day to figure out
12   how to get the machine working again.  Once he figured it out, he
13   figured it out and then it would work.
14         One case I had during that period was very active.  We
15   were having hearings in court, a fellow on death row in Louisiana
16   who he knew, and we had to prepare for that hearing.  Which meant
17   I had to get all of the files organized, the exhibits organized,
18   copied, labeled, you know, a lot of intense paralegal work.  John
19   did very good at that.  Organizing files and making sure that
20   labels are put on and so when I go in the courtroom, I can turn
21   around and pick out something out of a box.  And so that, that
22   experience was very good.  He was very good at that.
23         If I tell John would you go read Supreme Court Rule 10
24   and tell me how many copies of the writ I need to file and how
25   many days I have to file it?  I didn't get an answer.  It was,

1    you know, a difficult task for him to go read legal rules and
2    figure out what the answer was.  So eventually, I saw that there
3    were strengths and weaknesses.  One of the strengths was John
4    interviewing witnesses.  You know, we investigate a lot of cases,
5    and I went out with him sometimes interviewing witnesses who had
6    appeared in a case either by speaking with the police or
7    testifying at trial.  He was extremely good at that.  He was a
8    very welcoming person.  People want to talk to him.  He's polite
9    and did very well as an investigator.  And my wife started
10   spending a lot more time with him trying to train him to be an
11   investigator.  And she's a lawyer, but she doesn't practice law.
12   Most of what she does is investigation, mitigation investigation
13   for death penalty cases.  And she would sit John down for hours
14   at a time and explain how you have to be prepared for an
15   interview with a witness, you have to know what the witness has
16   said before.  What are your goals for the interview.  How do you
17   approach the interview.  And he was getting very good at it.  And
18   then John said, I want to go to visit the guys at Angola.  And as
19   a rule, that if at Angola if you were a prisoner and you're
20   released, you have a period of time, I think it's two years
21   before you can become a visitor.  So I called the prison and I
22   said, John is my paralegal, and paralegals can go in under the
23   lawyer's authority.  And the prison said, well, all the
24   paralegals you have, Nick, are law students, we understand that,
25   does Mr. Thompson have a paralegal degree?  And I said, no.  He's

1  never been to school for paralegal degree.  So I got off the

2  phone, and I explained to John that he was not going to be able

3  to go visit.  And he said, "Well, I guess I have to go to

4  paralegal school.  How do I do that?"  And I said first, you need

5  a GED.  And we --

6  Q.    Excuse me.  I think most of us know that that's a high

7  school equivalency.

8  A.    Yes, high school equivalency.  And I thought it was going to

9  be very beneficial to John just in learning, just to getting back

10 into a classroom, reading and writing.  John's writing skills are

11 not very good.  If I get a report from him on some task he did or

12 an interview he did, his writing skills are very poor.  And I

13 attribute it, you know, the school system is not a very good

14 school system here and people don't learn how to write and the

15 GED program would help him along with that.  So he enrolled in a

16 GED program.

17 Q.    I want to go on to a different topic dealing with the two

18 years that he worked with you, but anything else about, you know,

19 the kind of jobs you gave him and what he excelled at and what he

20 didn't do so well at?  Have you pretty much covered it?

21 A.    I'm trying to think.  You know, investigation, files, it was

22 great having him around to talk to the fellows on the row because

23 they call my office and it was very helpful for them, my clients.

24 Q.    Mr. Trenticosta, during those same two years that John

25 actually worked for you, did you and your wife get involved with

1    his personal life, his personal problems?  I mean, you mentioned
2    a problem with the copying machine, but to what extent did John
3    ask for your help or need your help or get your help or that of
4    your wife in terms of dealing with the problems in life that he
5    was now facing being a free man after 18 years?
6    A.    We were and are, but you're speaking in the past, we were
7    very good friends.  And it wasn't a boss/worker relationship, and
8    it wasn't that way with my wife.  My wife was close with John,
9    close with Lavern, his wife.
10   Q.    Excuse me for interrupting, but did he discuss with you
11   getting married a short time after coming out of prison?
12   A.    Oh, sure.  Oh, sure.  I mean, I, look, John was an open book
13   to me.  And my first reaction is, do you know what you're getting
14   into?  Well, I've been married a couple of times.  I have a clue,
15   and he said, sure I do.  I love this woman.  She loves me and
16   it's going to be helpful.  It's going to be good for me.  She's
17   going to be good for me.

18           And we, I say we, my wife and I, we have counseled
19   them, both John and his wife, in those years when they were
20   having struggles.  And as many young couples, young married
21   couples have struggles, they were having struggles and, of
22   course, some of it had to do with the fact that they were now
23   older, they weren't young married couples.  But they had their
24   difficulties.  And I spent time with both of them trying to
25   figure out a way to get over the humps.  Every marriage is going

1   to be rocky.  And when it gets rocky, and I remember saying this

2   to John, when it gets rocky, that's when you got to go to work.

3   That's not when you leave.  That's when you really have to

4   struggle with it and overcome whatever the difficulty is.  So we

5   were very close with him in that way.

6   Q.   So would you tell us, please, first of all, after he stopped

7   working for you in '95, that was before Katrina?

8   A.   Yes, it was.

9   Q.   Have you continued to -- have you and your wife continued to

10  maintain a friendship with John and Lavern?

11  A.   Yes.

12  Q.   Do you know what he's done?

13  A.   Oh, yeah.

14  Q.   Or what he's tried to do since?

15  A.   Oh, sure.

16  Q.   Has he discussed those things with you before he gets

17  involved?

18  A.   Oh, yes.

19  Q.   Has he discussed his problems with you?

20  A.   You know, you don't, I don't see him as often anymore, so if

21  he's having some rocky times in his marriage right now, I don't

22  know about it.  I don't see him on a day-to-day basis, but, sure,

23  we're very, very close in terms of staying together.  When he was

24  in the office, and it was clear to me, and I think John at one

25  point, that he was wasn't going to stay working with us.  You

1  know, he was going to move on to other things that seemed

2  exciting to him.  And he's always talked about opening up his own

3  business.  So at one point he was exploring a laundromat business

4  and at one point he was exploring a sports bar business.  So

5  those were going along.  And when, you know, he had an

6  opportunity, I think, to start a business, I was extremely happy

7  for him.  Because that's what he wanted to do.

8  Q.   The jury has heard from John and they know that a year ago,

9  February 1st of 2006 he and Lavern took over a lease and opened a

10 coffee shop at a hotel and that lasted for about a year and he's

11 told the jury what went well and what happened after FEMA stopped

12 paying for the tenants.  But during that year, did you go to the

13 coffee shop?  Were you involved in giving him advice?  Helping

14 him or encouraging him and discouraging him?

15 A.   Encouraging him.  I don't think I did any help for him.  It

16 was his shop and his business and he didn't turn to me for any

17 advice, actually, it was going okay.  But in that period of time,

18 John began meeting with other persons who wanted to set up a

19 program to help exonerated prisoners when they are released from

20 prison and I counseled him a lot and other folks he's working

21 with on how to get funding, what the structure should be, what

22 realistically can you do as a group to help fellows who need some

23 resources when they come out of prison.  And eventually he formed

24 a board, a corporation.  I'm on advisory board, so we're moving

25 along.

1  Q.   I'm going to come back to that in a minute.  But I jumped

2  over one or two jobs.  That, did John discuss with you after he

3  left your employment his going to work at the church where Lavern

4  works?

5  A.   Oh, yeah, sure, sure.

6  Q.   And you are aware that he was promoted to manager?

7  A.   Oh, yeah.  Yeah.

8  Q.   And you knew that when he was hit by Katrina and had to

9  leave New Orleans and his home was damaged, the month or so or

10  two they were away, they got jobs at a library in Northern

11  Louisiana?

12  A.   I kept up.

13  Q.   Now, I want to ask you a few questions and I have just two

14  areas.

15         May I continue, Your Honor, or could we -- I have about

16  five more minutes or so.

17         THE COURT:  You're about 30 minutes now.  You told me it

18  was going to be 15.  So we have to break for lunch sometime soon.

19  I was hoping to finish this witness, but the other side has to

20  cross-examine him so --

21         MR. LITVIN:  I'll finish up afterwards.  Thank you,

22  Your Honor, I'm sorry if I --

23         THE COURT:  How much longer are you going to be?

24         MR. LITVIN:  About five or ten minutes.

25         THE COURT:  We're going to recess for lunch now.  It's

1    12:35.  Please close your notebooks, ladies and gentlemen, leave

2    them in your chairs or under your chairs.  And remember not to

3    discuss the case when you're out of the courtroom.  Please come

4    back by 1:45.  Okay?

5              THE DEPUTY CLERK:  All rise.

6              (WHEREUPON, the jury panel leaves the courtroom.)

7              THE COURT:  Mr. Litvin, I'm not trying to be critical of

8    you, but your questions tend to be longer than his answer

9    sometimes, so if you could make your questions more concise or

10   precise, it might speed things along.  The questions are on and

11   on and on before you finally pose a question to him.

12             MR. LITVIN:  Thank you, sir.

13             THE COURT:  Just a suggestion.

14                  I know the plaintiffs at some point referred to an

15   Exhibit 92, which is not in the unobjected-to books.

16             MR. BANKS:  I think, 92, 137.  There have been a few

17   others I have note of.

18             THE COURT:  You guys need to have that list.  At some

19   point you-all need to formally offer those before you rest.

20             (WHEREUPON, at 12:35 p.m., the Court took a luncheon

21   recess.)

22                       *    *    *

23

24

25

1                          P-R-O-C-E-E-D-I-N-G-S

2                      WEDNESDAY, FEBRUARY 7, 2007

3                      A F T E R N O O N   S E S S I O N

4                          (COURT CALLED TO ORDER)

5

6            (WHEREUPON, the proceedings resumed at 1:45 p.m. after

7     the luncheon recess.)

8            THE DEPUTY CLERK:  Everyone rise.

9            THE COURT:  Good afternoon.

10           (WHEREUPON, the jury panel enters the courtroom.)

11           THE COURT:  All right.  Please be seated, ladies and

12    gentlemen.

13           All right.  Mr. Litvin, you may resume with your direct

14    examination.

15           MR. LITVIN:  Thank you, Your Honor.

16                              EXAMINATION

17    BY MR. LITVIN:

18    Q.   Would you tell us, please, what your involvement is with the

19    new organization that John Thompson is involved with,

20    resurrection against -- after exoneration, and I think someone

21    has already testified you're a member of the Board.

22           THE COURT:  He's testified.  He just said that right

23    before lunch.

24           MR. LITVIN:  Thank you, sir.

25                              EXAMINATION

1   BY MR. LITVIN:

2   Q.   What are your obligations or involvement as a member of the

3   Board?

4   A.   I'm on the Advisory Board.  And the Advisory Board is

5   consulting with the fellows who are putting this thing together

6   on issues of fund-raising, legal issues on incorporation and

7   those sort of things.

8   Q.   Now, you told us earlier that you had been to Angola prison,

9   you may have told us how many times you've been there?

10  Frequently?

11  A.   Hundreds.

12  Q.   Hundreds of times?

13  A.   Yes.

14  Q.   During the time that John Thompson was there, sir, from 1987

15  until he was transferred back to New Orleans in the spring of

16  '99, do you know how many people were executed there?

17  A.   From the time he went there?  Approximately seven.  I have a

18  list, but it's around seven people, maybe eight.

19  Q.   And were they electrocuted or lethal injection?

20  A.   Most were lethal injection.  Electrocutions stopped in 1991.

21  Q.   On your many visits to Angola, did you ever get into the

22  cell block and to where the death row inmates are kept?

23  A.   Yes.  When I first started working, representing guys on

24  death row, the area of death row was in one area of the prison.

25  It moved two different times, so there were three different

1  areas.  I was on the tiers on each one.  I was in the cells on

2  each one.

3  Q.   Would you please describe for us what the, first of all,

4  what the cells were like?

5  A.   The cells, 6-foot by 9-foot, or 7-foot by 9 and a half feet,

6  depending upon which area.  So one could, if you have -- if

7  you're almost fix foot tall, you can touch both walls.  There's a

8  fixed toilet/sink in one area.  There's a bunk, you know, bolted

9  to the floor.  And there's a desk which is just a flat surface

10  with a bolted bench next to it.  It takes up quite a lot of area

11  in the cell itself.

12        MR. LITVIN:  Your Honor, I would like permission to show

13  to the jury on the screen Plaintiff's Exhibit 138, which is a

14  photograph of one of these cells.

15        MR. GOINS:  Your Honor, could we take a look at the

16  photograph first?

17        THE COURT:  Sure.  Okay.  Without objection?  Go ahead.

18  138, is it?

19        MR. LITVIN:  Yes, Your Honor.

20                          EXAMINATION

21  BY MR. LITVIN:

22  Q.   I'm not asking you to repeat what you've just told us, but

23  would you use this photograph, if you can to, first of all, is

24  that a window at the back of the cell or is it --

25  A.   That's a so-called mirror.

1  Q.    Now, on the right is the obviously the cot or bed?

2  A.    Yes.

3  Q.    Toilet in the back?

4  A.    Yes.

5  Q.    What's on the other wall?  I don't know if it's clear here,

6  but --

7  A.    Well, I don't see the tabletop or the chair.  This -- this

8  photograph is a -- not an actual cell.  This is at the museum at

9  Angola.  And it is the same size as the cells, and the front of

10 it and the walls are the same, but it's missing that table.

11 Q.    Okay.  And can we see on this photograph the slot, the

12 opening a little bit left of center where the food is passed in

13 and out?

14 A.    Yeah, that's where the food goes in.

15 Q.    Now, would you tell us what the conditions are on that cell

16 block at Angola, what you've witnessed, what you know about

17 firsthand.

18 A.    The cells, generally about 15 to a tier are on one side, and

19 the tier, the hall passes in front of the cell.  At the end of

20 the tier is a shower.  And the inmates are locked in those cells

21 23 hours a day.  One hour each day, they are allowed to come out

22 onto the tier when no other inmates are out.  There is no

23 physical contact between inmates.  Three days a week on that

24 hour, they can go outside in the exercise yard, weather

25 permitting.

1  Q.    In the exercise yard, are they able to have physical contact

2  with any other inmates?

3  A.    No.  Each yard is separate.  There are adjoining yards, so

4  one man can be in one yard, the other in the next yard, and they

5  can actually devise a football, usually made out of clothing and

6  tape and play pitch and catch over the barbed wire fence, but

7  they are not in the same yard.

8  Q.    Back in the cell block, Mr. Trenticosta, again, based on

9  your visits, what are the conditions like in the summer and what

10 are they like in the winter?

11 A.    Well, there's no air conditioning.  The summer heat is as

12 stifling as anyplace could be, because there's no ventilation.

13 And the tiers would have a fan at the end of the tier blowing hot

14 air, but it usually only got three or four cells.  So if you were

15 up in the front, you might have a little ventilation happening,

16 but not so much.  And, you know, the temperatures hover around a

17 hundred.  It's very, very hot in the summer.

18         The winter, they don't really cut the heat on to be a

19 comfortable condition.

20 Q.    Is there any heat in the winter?

21 A.    There is, I think they have some heat, but I've been there

22 and I've had my coat on and I haven't taken my coat off.  I mean,

23 it gets very high.  And some of the times in these years that

24 I've visited, the attorney visits were taking place in an

25 air-conditioned room and I had a lot of clients that would call

1  me in the summer for six months in the summer, please come visit
2  me, because they wanted to be, get a little relief from the heat.
3  Q.   And is there any problem with odors or other conditions that
4  I haven't asked you about in the cell block?
5  A.   Well, yeah, you have individuals who are, who don't always
6  want to take showers, who don't take showers.  A lot of the
7  fellows on death row are mentally ill.  A lot of them have brain
8  dysfunction handicaps.  Those fellows sometimes are confused.
9  They are not taking baths for weeks at a time, and if you happen
10 to be on the tier near somebody like that, it's constant reeking
11 of odors.  It's terrible.
12        MR. LITVIN:  Thank you, Mr. Trenticosta.  I have nothing
13 further, Your Honor.
14        THE COURT:  Okay.  Mr. Goins.
15        MR. GOINS:  Yes, Your Honor, a few questions.
16                    CROSS-EXAMINATION
17 BY MR. GOINS:
18 Q.   Mr. Trenticosta, would it be fair to say that within six
19 months after John was exonerated and released from prison, that
20 he was doing well and very healthy mentally?
21 A.   Not, not the person I knew.
22 Q.   Okay.  Do you ever remember talking to a reporter for the
23 Gambit Weekly and telling that reporter exactly what I just said?
24 A.   That he was, I don't remember talking to the reporter.
25        MR. GOINS:  Okay.  May I approach, Your Honor, and show

1   him the newspaper article and see if it refreshes his

2   recollection?

3         THE COURT:  Sure.

4         THE WITNESS:  (Reviews the document.)  Yes, I see it.

5                     EXAMINATION

6   BY MR. GOINS:

7   Q.   Does that refresh your recollection?

8   A.   Yes, it does.

9   Q.   Okay.  So did you indeed talk to a newspaper reporter for

10   Gambit --

11   A.   Yes.

12   Q.   -- six months --

13   A.   Yes.

14   Q.   And you said that he was doing well and he was healthy

15   mentally?

16   A.   I said or at least it's quoted as what I said.  He's doing

17   well, he's very healthy mentally.

18   Q.   Now, does that refresh your recollection because if it

19   doesn't, we can -- can simply be introduced as --

20   A.   Yes, it does.

21   Q.   Okay.  Thank you.  I only have a couple more questions.

22         Until Monday of this week, were you an attorney of

23   record in this case?

24   A.   Yes, I was.

25   Q.   And did you, as attorney of record, have a financial

1   interest in the case?

2   A.   Yes, I do.

3   Q.   Do you to this day have a financial interest?

4   A.   Yes.

5   Q.   And what is the nature of that financial interest?

6   A.   The firm Morgan, Lewis & Bockius are primary lead counsel.

7   I took on a role as local counsel, and of course, I have

8   knowledge of the case because of my previous involvement with the

9   post-conviction case.  And I believe my percentage of -- if there

10  is an award.  I say I believe it because I haven't looked at the

11  document.  I think it's 4 percent of what Morgan Lewis will

12  recover.

13  Q.   Is that your interest or is that your nonprofits interest?

14  A.   Well, no, it's, I guess it's mine.

15  Q.   So you personally would benefit if Mr. Thompson were to

16  prevail in this case?

17  A.   Well, generally the way -- yes, I guess I would.  And the

18  way I benefit is if someone gives me money for a case, through a

19  court order, for example, I deposit that money in the nonprofit

20  account and then that account pays a salary to me.  So I figure I

21  would do the same here.  That's what I do with my money.

22  Q.   But presently, you are the one that will personally benefit

23  if Mr. Thompson prevails?

24  A.   That's correct.

25          MR. GOINS:  I have no further questions.  Can I approach

1  and get the article?

2          THE COURT:  Yes.

3                          REDIRECT-EXAMINATION

4  BY MR. LITVIN:

5  Q.    Mr. Trenticosta, does the fact that you have a potential fee

6  interest in this case, has that affected the accuracy or the

7  truth of what you've just testified to today?

8  A.    Not to my knowledge.  I think I've testified truthfully.

9  Q.    Now, with regard to the newspaper article that Mr. Goins

10 mentioned and specifically the statement that he read that you

11 said Mr. Thompson was doing well mentally or whatever the exact

12 words were, was he doing well mentally when he worked for you?

13 A.    Well, I think the article was written six months after he

14 started working, and in my opinion, it's a relative term.  He was

15 doing well mentally from my opinion based upon what he had just

16 gone through.  He was doing well.  As I mentioned in the article,

17 a lot of fellows who are exonerated and come home don't do well.

18 They find themselves in trouble, they find themselves in

19 desperate situations.  John was doing relatively well.

20 Q.    Did he have problems mentally?

21 A.    You know, I'm not -- I'm not -- I'm not the shrink.  I think

22 he had problems because it was difficult for him to be in groups

23 of people.  It was difficult for him to be out in public.  He

24 was, he was fearful a lot of times.  We would go places to eat,

25 and he would say, can we leave now.  And I just had a sense, it's

1   too small of a place, there's too many people in here, let's take

2   our sandwich and go to the park.  So I think that he had some

3   difficulties, for sure.

4           MR. LITVIN:  Thank you very much.  Nothing further,

5   Your Honor.

6           THE COURT:  Thank you, Mr. Trenticosta.

7           THE WITNESS:  Thank you, Judge.

8           THE COURT:  All right, next witness.  Mr. Grassian.

9           THE DEPUTY CLERK:  Please raise your right hand.

10                      **STUART GRASSIAN, M.D.**

11   was called as a witness and, after being first duly sworn by the

12   Clerk, was examined and testified on his oath as follows:

13           MR. LITVIN:  Excuse me, Your Honor.

14           THE WITNESS:  My name is Dr. Stuart Grassian,

15   S-T-U-A-R-T, G-R-A-S-S-I-A-N.

16                      VOIR DIRE EXAMINATION

17   BY MR. LITVIN:

18   Q.   Good afternoon, Dr. Grassian.

19   A.   Good afternoon.

20   Q.   Are you a physician licensed to practice medicine?

21   A.   Yes, I am.

22   Q.   And will you explain to us --

23           MR. LITVIN:  Your Honor, at this time I would like to

24   ask that the doctor's curriculum vitae, his qualifications, a

25   resumé, which is Exhibit 84, if you would just put the first page

1  up, please.

2                          EXAMINATION

3  BY MR. LITVIN:

4  Q.   Doctor, I assume you're familiar with your resumé?

5  A.   Yes.

6  Q.   I'm not going to ask you to go through every page, but I'm

7  going to ask you first to tell us what training you had starting

8  perhaps with your college and medical school, and then I'm going

9  to ask you some additional questions.

10  A.   I attended Harvard College from 1963 to '67 and have a

11  Bachelor's degree from Harvard.  My M.D. degree is from New York

12  University Medical Center in 1973.  And I continued on there

13  doing an internship in medicine from '73 to '74.  From '74 to '77

14  I completed a residency in psychiatry at an adult psychiatry at

15  the Beth Israel Hospital, Harvard Medical School in Boston and

16  was Board certified in psychiatry in 1979.

17  Q.   And have you remained a Board-certified psychiatrist ever

18  since?

19  A.   Yes.  I also attained subspecialty certification in forensic

20  psychiatry in 1996.

21  Q.   Perhaps you could go to the next page, 1324.  Now, Doctor,

22  this screen shows the other certifications you have?

23  A.   Right.

24  Q.   Doctor, before I ask you about some of your additional

25  specialties and qualifications, have you, since 1974, when you

642

completed your internship, and since '77 when you completed your

residency, have you been a practicing psychiatrist ever since?

A.   Yes, I have.

Q.   Do you still see patients on a regular basis?

A.   I have a pretty much full-time clinical practice, yes.

Q.   Now, did there come a time when you got involved with a

particular area of psychiatry other than general psychiatry?

A.   Well, yes.  I believe you're referring to my interest in

forensic psychiatry, and particularly in the area of the

psychiatric effects of stringent conditions of confinement in

prisoners.

Q.   Well, yes.  Would you tell us first when and under what

circumstances you got involved in that area?

A.   I first became involved in that area, I believe it was about

1979 or so.  A friend of mine from college had become head of the

Massachusetts Correctional Legal Services and had filed a class

action lawsuit regarding conditions.

Q.   Excuse me for interrupting.  I don't want a lot of details

about some other case, but just the general circumstances.

A.   Well, this friend had started a class action lawsuit

regarding conditions in solitary confinement at a Massachusetts

maximum security prison and asked me to be involved to interview

and evaluate prisoners, which I did, somewhat skeptically at

first because I didn't really necessarily think I was going to

find anything.  But I was pretty horrified and kind of shocked by

1  what I saw.  And as a result of it, did a fair amount of research
2  on the issue, and ended up publishing a couple of studies, one of
3  which has become, well, fairly famous in this area.  It was
4  published in the American Journal of Psychiatry on the
5  psychopathologic effects of solitary confinement.  Since that
6  time, I've been retained in quite a number of class action
7  lawsuits and individual lawsuits.  I've actually been involved in
8  some unusual situations involving people on death row who have
9  waived their appeals and sort of volunteered to be executed.
10  I've been involved in issues involving acute terrorists who had
11  stopped cooperating with the Government after they had been
12  exposed to periods of solitary confinement and how to help get
13  them back on track to the extent that was possible.  It was
14  really kind of a fascinating range of things that are involved in
15  this, in this area.
16  Q.   And the last, what, 30 years approximately or 20-something
17  years that you've been involved in this field, would you give us
18  some sense as to the amount of speaking, lecturing, writing, and
19  involvement on a national media level?  What have you really done
20  in this field and including what have you done recently?
21  A.   Well, I published initially two articles.  I've recently
22  just actually, I guess, in the last weeks or month or so,
23  published a major review article in Washington University, a
24  journal of law and policy regarding this issue.  I've been
25  involved in quite a number of class action lawsuits, some of

1    which have reached the federal appellate level.  And I have

2    lectured, oh, I don't know, quite a variety of places, including

3    Harvard.  I've been on, you know, on media as well, 60 Minutes

4    twice.  Actually, I'm going to be on 60 Minutes in the next week

5    or two again.

6    Q.    Excuse me for interrupting.  You're going to be on

7    60 Minutes next week or two on what subject?

8    A.    This is all about mental illness in prison, solitary

9    confinement, the effects of solitary confinement in prison, the

10   maximum security institutions.  There was an article actually

11   just last week in Time magazine on that same issue in which I

12   contributed.  I mean, it's become quite a, quite a significant

13   issue as the population in our prisons grows and the use of these

14   types of conditions of confinement increases, we're kind of

15   having to relearn the lessons that were known in America almost

16   200 years ago about the effects of these types of conditions of

17   confinement and how really brutal they are.

18   Q.    Dr. Grassian, to your knowledge -- well, I'm sorry, I'll

19   withdraw that question.

20          Have you been involved as a consultant or as a witness

21   or as a lecturer for any prison systems or governmental

22   institutions or federal government or people working -- what has

23   been your involvement on behalf of government and prison systems?

24   A.    Well, I'm involved, well, I have been involved as a

25   consultant and an expert to the Florida Department of Corrections

1   regarding their prison system.  And helped negotiate a settlement

2   between the Department of Corrections and the plaintiffs

3   regarding issues in mental health and solitary confinement.

4           I am still involved in a case involving a private

5   corporation known as the Asmore Corporation, which was providing

6   detention facilities for people who were illegal or undocumented

7   aliens in New Jersey.  So I'm still involved in that case.

8           And there are others where you really can't classify

9   who I'm involved with.  In one case I was involved with a person

10  who was waiving his appeals for the death penalty and basically

11  was working for the public defender but against the wishes of the

12  inmate in that particular -- well, actually, there's been a

13  couple of cases like that.  So it varies.

14  Q.   Have you ever been to the Angola State Prison?

15  A.   I have, I believe just on one occasion.  I was trying to

16  remember if there were two, but I think it might have only been

17  one.

18  Q.   Not in connection with this case?

19  A.   No.  Not at all.

20  Q.   And have you been qualified as an expert in various state

21  and federal courts in the United States?

22  A.   Yes.  I've been qualified as an expert in this area in many

23  federal and state jurisdictions.

24  Q.   Do you know of any other psychiatrists in the United States

25  who has written, lectured, been qualified as an expert in this

 1   field at your level?  When I say at your level, I don't mean as
 2   smart as you are.  What I mean is who has done as much work or
 3   has as much prominence as you do in this field?
 4   A.   Well, I think there are other people who have done a lot of
 5   good work in it.  I think most -- the people who I know or people
 6   who have done the work generally do acknowledge that my study was
 7   a kind of landmark and that I'm probably the leading expert in
 8   this area in the country.
 9        MR. LITVIN:  Your Honor, I offer Dr. Stuart Grassian in
10   the field of psychiatry and mental and emotional illness
11   generally, and in the specific area of the consequences of
12   long-term confinement, solitary confinement and incarceration on
13   death row.
14        THE COURT:  Mr. Aaron.
15        MR. AARON:  I just have a few questions.
16                     TRAVERSE EXAMINATION
17   BY MR. AARON:
18   Q.   Doctor, I notice in your curriculum vitae that you've
19   testified in at least 33 lawsuits?
20   A.   I think it probably would be more than that.
21   Q.   More than that?  I just counted the ones here.  So it's more
22   than that?
23   A.   This would be -- the list is probably of the last five
24   years, I would suppose.
25   Q.   It stops at 2005 and I counted 33 up to that.

1  A.   Oh, you don't have ones that are more recent than this?

2  Q.   No, I'm sorry.

3  A.   I'm sorry.  The CV was probably handed to the folks in 2005.

4  But I probably testify a handful of times a year on average.

5  Q.   Do you primarily testify for the plaintiff, defendant or a

6  mixture of both?

7  A.   Well, generally as an overall proposition, I couldn't say it

8  was more for one or the other.  Sometimes I testify down the

9  middle like for the Commonwealth of Massachusetts or the Board of

10  Registration of Medicine or, you know, governmental entities that

11  presumably aren't on one side of an issue or another.

12  Q.   But when you're not testifying for governmental entities,

13  are you primarily testifying for the plaintiff?

14  A.   No.  No.  I would say it's probably, roughly even.  I don't

15  really know.  Roughly.

16  Q.   You're Board certified in psychiatry and you're licensed in

17  Massachusetts?

18  A.   That's correct.

19  Q.   Are you licensed in Louisiana?

20  A.   No, I'm not.

21  Q.   Okay.  In your relationship with the plaintiff, Doctor --

22  I'm sorry, Mr. Thompson --

23  A.   Yes.

24  Q.   -- were you a treating physician?

25  A.   No.

1  Q.   You were simply hired in connection with this litigation?

2  A.   Correct.

3  Q.   Approximately how many visits with him did you have before

4  you formulated your opinion?

5  A.   I met with him over two days for quite a number of hours.  I

6  don't know how many, but quite a bit of time.

7  Q.   But that was one instance that you met with him?

8  A.   I said two days.

9  Q.   But one instance?

10  A.   I'm not sure.

11  Q.   One set of two days.  It wasn't --

12  A.   One day after another.

13  Q.   Two days and that was it.  You didn't meet with him --

14  A.   Correct.

15  Q.   Right.  Okay.  In terms of -- when is the last time you met

16  with Mr. Thompson in a clinical way?

17  A.   Do you mean in terms of doing a forensic evaluation?

18  Q.   Right.

19  A.   It would have been stated in this expected testimony.  It

20  was in 2005.  June or May or something.

21  Q.   I didn't mean to cut you off.  But since that time, you have

22  not met with Mr. Thompson?

23  A.   Not formally, no.  I just sat next to him today, but that's

24  the first time I'd seen him since 2005.

25           MR. AARON:  I have no further questions, Your Honor.

1           THE COURT:  All right.  I'm going to allow him to

2     testify as an expert in the field tendered.  Okay.

3           MR. LITVIN:  Thank you, Your Honor.

4                       DIRECT EXAMINATION

5     BY MR. LITVIN:

6     Q.   Dr. Grassian, before I ask you specific questions about what

7     you did in connection with Mr. Thompson and the workup you did

8     and your opinions, would you first tell us, based on your

9     experience in this field of long-term confinement, solitary

10    confinement, death row confinement, what the problems are, what

11    you have -- what research you've done and what opinions you've

12    expressed.  I'm not asking you to go on for an hour, but just

13    give the jury and His Honor a sense of what the psychiatric,

14    mental illness and emotional problems are attendant to long-term

15    confinement.

16    A.   Okay.  I'll try to do it real briefly.  Basically, when a

17    person is placed in a situation where there is a lack of any kind

18    of meaningful and formative stimulation, an atmosphere that's

19    kind of utterly monotonous, tedious, unvarying, without any

20    opportunity really for occupation, to do something, after a

21    while, I think that any of us can actually kind of sense this

22    because we've had similar types of things in a very minor way.

23    What happens after a while is you can't maintain your level of

24    attention.  Your alertness starts to go.  People start descending

25    into a kind of stupor, a fog, you know, they can't really think.

1  Their mind kind of goes.  It's not rest.  It's a very
2  uncomfortable feeling.
3        And people in solitary confinement live with this kind
4  of experience for days.  Day after day after day.  And it's a
5  very toxic kind of experience to mental functioning.
6        Some people, most -- the people -- some people become
7  exceedingly ill as a result of this.  And actually develop an
8  overt delirium where they become confused, hallucinating,
9  agitated, overtly psychotic.  Just like a delirium you could get
10 in an intensive care unit or from some kind of metabolic
11 toxicity.  And I've seen that many, many times.  That's one of
12 the things that I've written about and I think has become
13 important in the literature in this, in this field.  These overt
14 delirious psychoses, these overt psychotic delirium.
15       But even those who don't descend into an overt
16 psychotic delirium are going to suffer terribly.  They -- people
17 experience this kind of mental fog where they can't relax, they
18 can't read, they can't do anything.  And after a while, the very
19 absence of stimulation causes you to dread stimulation.  You
20 know, if you're in that kind of state, any noise becomes like
21 jarring.  I've had situations like, one time, for example, I was
22 sitting in a fluorescent lit room talking to an inmate who had
23 been in solitary and I mean, I couldn't, he couldn't talk to me
24 because of the buzzing of the fluorescent light which I couldn't
25 even notice.  You know, I had to really listen to it to notice

1   that it was there.  Total preoccupation.

2           I had another fellow who was, I don't know, he was like

3   maybe 40 years old, had a little bit of a prostate problem.

4   24 hours a day, 7 days a week, the only thing he could think

5   about was that his bladder didn't feel empty.  It was driving him

6   mad.

7           You know, you could imagine people with the dripping of

8   water, of the water faucet in the cell above you and that's all

9   you start paying attention to and after a while you can't stand

10  it.  People develop these agitated, impulsive, chaotic kind of

11  things and start mutilating themselves, start having all kinds of

12  odd perceptual experiences, hallucinations, very bad things

13  happen.  But in the best situation, you have people who are

14  chronically in this state of inability to pay attention and when

15  they do pay attention, they can't stop paying attention to that

16  thing.  They can't shift attention.  So the attention that they

17  pay ends up being obsessional.  You pay attention to something

18  that's almost always unpleasant and you can't stop thinking about

19  it.  Like the water dripping or the fluorescent light or whatever

20  else.  And it's just people live with this kind of torture day

21  after day after day unrelieved.

22          And as I said, I mean, the people who survive are

23  generally people who have tremendous internal resources,

24  intelligence and think and a lot of people survive by becoming

25  jailhouse lawyers.  Using their own, you know, they're generating

1   stimulation internally.  Which I think really is actually very

2   important to John's survival on death row.

3           Now, I'm talking about solitary confinement.  Death row

4   is, you know, as just really another layer of hell.  Imagine,

5   you've got nothing to think about and these guys who are next to

6   you, they are all going to -- the State is trying to kill you.

7   It's trying to kill them.  And imagine, imagine a person who's

8   got some horrible cancer, and they are getting -- they're

9   tortured day after day, torturous treatment and then every once

10  in a while it's like that test, that MRI, that CAT scan that

11  here's that ruling from the Court, and you're either going to

12  live or die.  You know, that CAT scan is going to show more

13  tumors or it's not.  You're going to live or you're going to die.

14  And you're waiting and there is nothing you can do.  You can't

15  stop thinking about it.  There's nothing to distract you from it.

16  And if you try to get distracted from it by the 15 other guys on

17  the tier, well, guess what, every one of them, you can't afford

18  to get close to them because if you get close to them, they too

19  may die and that happened and that did happen to John.

20          I remember him talking about one of the guys he allowed

21  himself to get close to and the torture every time this fellow

22  would get sent away to the death house and then he would come

23  back a few days later, he wouldn't be dead and he would get sent

24  away again and eventually he got sent away and he never came

25  back.  And then sometimes you would end up finding stuff in your

1  cell that wasn't there before.  It was whatever was left of the

2  guy who died.  He gave you his stuff.  And, you know, the other

3  inmates in death rote row, they are just going fast.  They

4  wouldn't eat.  Pray, send letters to the family.  But utterly

5  helpless.

6  Q.   Doctor, let me now focus your attention on what you did to

7  prepare for your testimony in this case and now I'm going to ask

8  you some specific questions about Mr. Thompson rather than the

9  general overview you gave.

10  A.   Sure.

11  Q.   First of all, when you were first asked to evaluate

12  Mr. Thompson, would you give us some idea of what you did to

13  prepare your, to come to your opinions and prepare for testifying

14  today?  And I'm going to ask you later about each specific person

15  you spoke to, but I just want the jury to understand what you did

16  as part of your investigation that let you make a diagnosis and

17  come to conclusions in this case.

18  A.   In this particular case, most of what I did involved

19  interviews and most of them being in person here in New Orleans.

20  As I said, I spent a number of hours with John, and then the

21  other people I interviewed, I can't say how much times, I don't

22  really recall, but we talked maybe a couple of hours, anywhere

23  from two to three hours each.  His wife Lavern, Nick Trenticosta,

24  Nancy Wall, who I believe has already testified here.  Let's see.

25  Wait.  James, James Wise, Pastor Wise.  And I know I must be

1  forgetting somebody.

2  Q.   Sir, do you have a copy of your report?

3  A.   Oh, I have a copy of it, yeah.

4  Q.   Let me just interrupt to say if it's necessary for you to

5  refer to your report during the course of my questioning or other

6  questioning --

7  A.   Right.

8  Q.   -- please feel free.

9  A.   Well, actually I got them all.  The only other person I

10  spoke with, I spoke with over the phone was John, Jr., John's

11  son.  He was living -- he wasn't in New Orleans.  I think he was

12  in Oklahoma or some other state.  So I spoke to him over the

13  phone.  And those were the sum total of the interviews.  I also

14  reviewed a couple of documents, an ABC Primetime Live entitled

15  *Judgment At Midnight*.  That was, I believe that was about Antonio

16  James, his death, his execution.

17          A collection of letters, quite a large collection of

18  letters that John wrote to Nancy Wall, and a series of

19  photographs, including postmortem photographs of one of the

20  inmates who had been electrocuted while John was at Angola.

21  Q.   Sir, would you please tell us first what -- did you make an

22  assessment and a diagnosis of John's problems at the time you saw

23  him?

24  A.   Yes.  Well, not at the time I saw him but altogether, yeah.

25  After I saw him and interviewed the other people, yeah.

1  Q.   Did your assessment of Mr. Thompson's condition when you saw

2  him when you did this evaluation and your diagnosis, were they

3  made to a reasonable degree of medical certainty?

4  A.   Yes.

5  Q.   And before, again, we get to the details of what you did,

6  will you tell us, please, what your diagnosis was of

7  Mr. Thompson?

8  A.   Sure.  He certainly would be best characterized as suffering

9  from a chronic posttraumatic stress disorder.

10 Q.   I'll come back and ask you to define that later, but did you

11 also come to an opinion within a reasonable degree of medical

12 certainty as to the cause of this condition and the other

13 problems that you, that you determined he had suffered with?

14 A.   Yes.

15 Q.   And in your opinion, what was the cause of those problems?

16 A.   His prolonged 18-year incarceration in solitary and in death

17 row, the fear of death.  That whole experience in the Department

18 of Corrections of Louisiana.

19 Q.   And, sir, did you also, to a reasonable degree of medical

20 certainty, did you form an opinion as to what the future holds

21 for Mr. Thompson with regard to the emotional problems and the

22 diagnosis you made, what does the future hold?  What is the

23 prognosis?

24 A.   To the extent that John was suffering at the time that I met

25 him, the prognosis is clearly that there was not much likelihood

1   of it significantly changing over time.

2   Q.   Now, sir, would you please tell us what work you did, who

3   you interviewed, and what information helped you come to these

4   conclusions.

5   A.   If you could clarify.  I think I indicated who I

6   interviewed.

7   Q.   Yes.

8   A.   But you're asking me beyond that?

9   Q.   Yes.  I'm sorry.  If you would, if you want -- if it's

10  helpful to refer to your report, please do, but I would like you

11  to tell us what information you obtained during these interviews

12  of the people you have identified that helped you arrive at the

13  diagnosis and the conclusion and the other opinions you've just

14  given to us.

15  A.   I think in asking that question probably the most realistic

16  way for me to answer it is to provide a history, which would be

17  part of the evaluation process that a psychiatrist would go

18  through.

19  Q.   You're talking about a history from John Thompson?

20  A.   Well, John's history, right.

21  Q.   Well, would you give us that, please?

22  A.   Sure, I mean, I can do it briefly.  I mean, I think there

23  has probably been testimony.  John grew up in the New Orleans

24  area, a fairly impoverished background.  A mom who really was too

25  young and too immature to really take care of him, but blessed

1   with a very loving, very strict, really just caring grandma,

2   and -- paternal grandmother and he was basically raised by her

3   during his formative years.

4        And it sounds like she was really a wonderful person.

5   There were times when his mom would take him off and those times

6   were not good.  His mom really wasn't able to do more than as

7   John described it, play mother and that meant at times when she

8   would be frustrated or her boyfriend would be frustrated, he

9   would get whippings, that part wasn't good, but for the most part

10  he lived with his grandma.  He was actually a reasonably good

11  kid.  Went to church every week with -- probably I think his

12  friend James, Pastor Wise, talked about that.  They would go to

13  church and did pretty well at school, you know, it wasn't bad.

14  And very athletic, into sports and pretty well-behaved kid until,

15  unfortunately, you know, when they got to be early teens, they

16  started getting into the hood, the larger neighborhood, which

17  wasn't so good.  And, you know, some bad things happened in terms

18  of drugs and stuff, which I think has been testified.

19       But, you know, one of the things that comes across in

20  John's early history is that there was a lot of real good

21  development, real good nurturing in his life.  When he was 16, he

22  got involved with his girlfriend Denise.  They had a -- this was

23  his second baby since his girlfriend Helen.  He had his second

24  son by the time he was 16 and Helen and he, they had broken up,

25  but they had maintained a cordial relationship.  He continued to

1    parent Dedrick, the firstborn, together and he and Denise

2    maintained a pretty solid relationship for a very long time.  He

3    was 16.  It was 1978.  And he and Denise remained together until

4    he was in prison in 1985.  And they loved their little baby,

5    John, Jr.  It was -- he was happy.  And John is -- John is a

6    very, very kind, nurturing human being.  He loved taking care of

7    Denise.  He loved being good to her.  Getting her things, buying

8    her things because she was poor as well.  He loved taking care of

9    John, Jr.  You know, I think a lot of people really talk about

10   what a generous and sweet guy John is.  And I've certainly seen

11   it in my discussions with him.

12           I mean, he was getting involved in petty crime, drug

13   dealing and stuff, but, you know, at the same time he was also

14   involved in legitimate jobs.  You know, he would do both.  I

15   mean, it was a way to make a living and to provide Denise with

16   clothes and stuff.  Make her happy.  And that's basically what

17   his life was like up until the time of 1985, when he was in

18   prison.  He maintained a very close relationship with his

19   grandma, and even when he was with Denise still took care of him,

20   you know, went over and helped his grandma out, very

21   affectionate, loving relationship.

22           Also, by the way, with Pastor Wise's grandmother

23   because they lived close together and the two grandmothers, you

24   know, sort of saw them both as their children and so, you know,

25   if either one misbehaved, they would answer to both grandmothers,

1  you know, and I mean, I think that wonderful, the wonderful

2  nurturing that he got lives on in John today and that's really,

3  you know, I think it's quite remarkable.

4  Q.   Would you continue with the history from John after he was

5  incarcerated and charged with two crimes, and was convicted and

6  put on death row?

7  A.   I mean, as one could certainly imagine and as John really

8  was able to describe, it was absolutely terrifying.  He knew that

9  people were lying about him.  That these witnesses against him

10  were not telling the truth.  And there was absolutely nothing he

11  could do.  I mean, at first he couldn't believe that they would

12  convict him.  First the carjacking conviction and then, I mean,

13  he was absolutely like a deer in the headlights.  Just absolutely

14  horrified, terrified.  And then after the conviction on the

15  murder charge, he was sent to the Orleans Parish Prison where he

16  remained for two years, and apparently -- I've seen places like

17  this.  I've heard about places like this.  Apparently, it was a

18  very lawless institution where the corrections officers could

19  only, could do no more than really maintain the order of not

20  getting hurt themselves and not letting people escape.  But once

21  these guys -- most of them have very, very long sentences -- once

22  they were in that dayroom, it was dog-eat-dog, it was very

23  dangerous.  John witnessed men raping men.  He witnessed a lot of

24  violence and it was like every day was a matter of survival in

25  that place.  It's pretty hellish.  And, of course, you know, he

1   never really experienced anything like that.  He wasn't prepared

2   for that.

3            And then, after the mandatory appeals were done in

4   1987, I believe that was September '87, he was sent to Angola to

5   the death row.  And he's really able to give a very vivid

6   description of what that was like, being brought to the cell,

7   utterly alone.  Remember, in Orleans prison, there's like four

8   guys to a cell, a big dayroom, it's insane, it's violent.  Then

9   in Angola suddenly it's nothing.  You're in this tiny, little

10  cell all by yourself and there is stuff in this cell.  And he

11  says this isn't my stuff.  Whose stuff is this?  Well, it's stuff

12  from the man who has just been executed.  And imagine, you know,

13  what it was like, your heart stops.  I mean, you suddenly

14  realize, they are here to kill me.  They are here to kill all of

15  us.  That's why I'm here.  They want to kill me.  They are going

16  to kill me.  Absolutely terrifying ordeal.

17           And, you know, it's very hard for John to talk about

18  this stuff.  You know, it really took awhile to kind of open him

19  up and help him to just say it.

20           But death row, you know, it is a hellish place.  I

21  mean, you're utterly isolated.  You could talk because the bar

22  doors, it's not a solid door, it's bar door, so you could talk to

23  other guys and maintain contact and even develop relationships,

24  even though you can't touch them, you know, even see them

25  basically, unless they are walking down the tier.  But, you know,

1  there is this awful feeling, that, you know, you can't afford to

2  feel close to anyone because it's too horrifying, you know, it's

3  15 guys or 16 guys, everyone going through the same thing.

4  Waiting for that next, that next death sentence, that next, the

5  execution date.  And people going and coming back, people going

6  and never coming back and then their stuff appearing in your cell

7  or appearing in someone's cell and no one wants to eat and

8  everyone is quiet, and everyone is fasting, praying.

9          John kept himself alive, kept himself sane by being

10  involved legally and he also kept himself sane by literally by

11  caring about other people.  During the entire time of his

12  incarceration, he maintained absolute concern for his two boys

13  throughout.  You know, just constant preoccupation with how these

14  kids were doing, buying his son, John, Jr. gifts when John, Jr.

15  would do well in school.  Talking about how important it was to

16  do well at school and not to go through the path he had gone

17  through, gone down.  Feeling the utter frustration that there was

18  nothing he could really do to help mold his kids, to help his

19  kids go down the right path.  He spent a lot of time praying, a

20  lot of time being fearful.  There was one time when he saw these

21  pictures of this man whose body was all holes burnt into it and

22  just pieces of flesh charred and burnt away in electrocution and,

23  you know, those kind of images, once they are in your mind, you

24  have nothing else to distract yourself, you can't get rid of

25  those images, they are there forever and still are for John.

1  Later on he saw this movie, *The Green Mile*, and it just brought

2  it all back.  He can't get away from it.

3         So that's, really, in a very quick form, what it was

4  like, it was absolutely utter torture day by day to live like

5  that.  There's nothing to do.  There's nothing to distract

6  yourself and it's utter passivity, utter helplessness in the face

7  of all of it.  And the smells, I mean, Nick was talking a little

8  bit about the smells, from the guys who didn't shower.  Nick did

9  mention the guys who were really mentally deranged.  A lot of

10  people on death row are mentally deranged.  I mean, I can tell

11  you that.  They throw feces out in the tier.  Sometimes they

12  cover the walls of their cells with feces and sometimes the

13  prison officials, the corrections officers don't bother cleaning

14  it up for a long time.  And you're sitting there, it's a hundred

15  degrees and it's a hundred percent humidity and you're smelling

16  it and there's no ventilation.  It's like a hellish situation.

17  Q.  Did John discuss with you what life was like after he was

18  transferred from Angola back to the Orleans Parish Prison where

19  he was still a prisoner for about four years before he was

20  finally freed?

21  A.  Yes, he did.  If I could, I did want to just mention, one

22  thing I really did forget to mention was in 1999 when he came

23  really close to dying and I assume that that testimony has been

24  given about that.  But, you know, his family visited and he tried

25  so hard to be strong for them, to tell his boys not to be bitter,

 1  not to let this ruin their lives.  Trying to be strong, even for
 2  Nancy Wall.  You know, that if she couldn't, if it was too much
 3  for her, she didn't have to come, accompany him to the death
 4  chamber.  And never letting them know, I mean, he was in an utter
 5  panic.  He was just utterly panicked.  At one point was so
 6  terrified he had to call the corrections officers.  They thought
 7  he was having a heart attack.  It wasn't.  Panic.  So weak, so
 8  shaken and weak.  But didn't want anyone to know.  Didn't want
 9  anyone in his family to know.  And then as, sure, I mean,
10  eventually he did move on to the Orleans Parish Prison and I
11  guess it was pretty similar to what it had been like before
12  because it's really an awful place.  Four guys in a room.  A lot
13  of violence, horrible food.  You know, just a kind of hellhole,
14  but that was after, for the most part, after he knew he wasn't
15  going to be killed.  But that's not really true because he could
16  be killed in Orleans Parish Prison too, I suppose.
17  Q.   Did you also take a history from John Thompson as to what he
18  did after he was released from prison in May of 2003 until you
19  saw him a couple of years later?
20  A.   Yes.  First of all, it has to be said, if you look at how
21  John has adjusted, you know, the fact that he was able to
22  maintain a marriage, after 44 days he got out, he got married,
23  he's still married.  His relationship with Nick, his ability to
24  try to get these jobs and start businesses, he is an absolutely
25  remarkable human being.  I mean, you know, I will just say

1    personally I think the world of John Thompson.  I think he's just
2    really remarkable.  The strength, the courage that he has and the
3    absolute dedication to caring about others.  Even now, you know,
4    with his work with people on death row and exonerated people and
5    people out of prison.  His grandma was apparently a very, very
6    nurturing, very loving person and it's really carried over into
7    John and I think that's really helped keep him going.
8            But the one thing about John is he'll never ever let
9    anyone know how much he suffers.  You know, he covers
10   beautifully.  I mean, he's just tremendously strong, but he
11   suffers by himself.  And sometimes people see it and it's really
12   hard.  Like John, Jr. was talking about how ashamed his dad is,
13   you know, his dad had asked John, Jr. for help how to use a cell
14   phone.  You could just feel the shame.  You know, Nick was
15   talking about how he had such a hard time with a copier and I
16   didn't hear about that, but I know what the problem was because I
17   know John.  He can't ask for help.  He feels so ashamed about not
18   knowing.  You know, there were times like one time the lock of
19   his door broke or something and Nick had said to him, why don't
20   you just go to Home Depot and get what you need, and John just
21   was utterly distraught, said, Nick, I don't know how to do
22   anything.  It's like the world had changed.  I mean, he had lost
23   his life.  He had lost from the age of 22 to 40 and he had no
24   life.  You know, he didn't know what a cell phone was.  He didn't
25   understand this technology.  He didn't understand prices of

1    things.  He always thought he was being taken advantage of.  And
2    the shame, that feeling that, you know, you've got this, you're a
3    pariah.  You're something grotesque.  You don't deserve to be out
4    here and people know it and they can feel it and you're
5    different.  So a tremendous sense of inadequacy, a tremendous
6    sense of shame.  That's why he can't get the GED degree that he
7    should get and, you know, he can't learn how to fix the copier,
8    because he can't ask.  You know, as I said, when his, when he
9    asked his son about the cell phone, he just -- I mean, his son
10   felt so bad for him.

11          Or there is another time where, you know, they were
12   driving around doing nothing wrong and the police car, the police
13   pulled him over because they had an expired inspection sticker.
14   John didn't even probably realize.  He hadn't been out needing an
15   inspection sticker for 18 years.  He didn't know.  And, you know,
16   for the kids, the boys, it's nothing.  All right, you know.  The
17   guy gave him a warning.  Didn't even give him a ticket.  It was
18   clear that it was an accident.  They didn't really know.  But
19   John, Jr. said, you know, it was so hard looking at his father.
20   His father was shaking, terrified of seeing that, when that
21   police officer stopped him.  You know, they see it.  I mean, they
22   see it a lot, how he's so frightened around police.  I mean, he
23   just avoids or runs away.  He gets so shaky.  And that's why I
24   thought it would be better for him to leave.  You know, because
25   he's a very proud man, and I don't think he lets, he doesn't want

1  anyone to see those things, but people generally do see the fear,

2  the terrible feelings of inadequacy.  The constant jumpiness,

3  can't sit still all the time.  He's always jumping.  If something

4  goes off like a car backfires or, you know, July 4th and he's

5  just jumpy.  He's constantly startled, constantly vigilant, you

6  know, constantly afraid.  Can't sleep well.  You know, Lavern

7  talked about that.  He can't sleep well.  He's getting up.  Just

8  always restless.

9  Q.   You said at the beginning of that last answer, you said

10 something that John is in a lot of pain.  How do you know he's in

11 a lot of pain?

12 A.   Well, you know, partly, I mean, you hear a descriptions like

13 what John, Jr. said and John, Jr. saw the pain.  And would I

14 bring that up with John, Sr.?  No.  I wouldn't remind him of it

15 because it would embarrass him, but John, Sr. did tell me about

16 some of these things.  You know, I mean, obviously that's my job

17 is to get people to talk about things.  I mean, he did tell me

18 about the interest of images, of the electrocution, the charred

19 body.  I mean, obviously, I don't know, I mean, it's my job.  I

20 kind of know how to ask the questions and stuff, but he doesn't

21 tell people this stuff.  I mean, this stuff about feeling so

22 inadequate, for example, I mean, I kind of know it.  I mean, I

23 know it's a common feeling in my people who have been in prison

24 for a long time, so I guess I ask the questions and it allows him

25 to talk about the specific incidents.  There was a time when, you

know, he was mowing Nick Trenticosta's lawn, and ended up taking

him half the day and Nick Trenticosta doesn't have that big of a

lawn.  And at the end, he was so humiliated and defeated that it

took so long.  He didn't know that you could lower the blade to

cut it shorter the first time around.  And he just didn't know

how to use the machine.  Nick could have told him in one minute.

He wouldn't ask.  Just like I'm sure that's what happened with

the copier.  He wouldn't ask.  He's too embarrassed, too

embarrassed that he didn't know, that I don't know anything.

That whole business with the GED, you know, and Nick Trenticosta

saying he doesn't have good verbal skills.  John is a real bright

guy.  A very verbal guy.  Of course, he didn't graduate from high

school.  There are a lot of syntax and rules he doesn't know and

he can learn that stuff, but when he doesn't know something, he

becomes paralyzed by shame, feelings of terrible inadequacies.

Feelings of being different, being a pariah, being an outcast,

being something disgusting is just always with him.

Q.    Well, I'm not going to ask you to tell us what Nancy Wall

told you and James Wise and Nick Trenticosta, and the other

people most of whom the jury has already heard from, but is there

anything that was of additional significance from your interviews

with the other five or six people you spoke to?

        MR. AARON:  Your Honor, I would object.  Hearsay.  He

may generally describe the discussions, but he can't say what

they said.

1        THE COURT:  Well, he's an expert witness.  An expert

2   witness can rely on hearsay and evidence that's not even

3   admissible independently.  As long as it's something that the

4   expert typically would rely on in his profession, so phrase it

5   that way and we can get through it.

6        THE WITNESS:  I'm not sure that it's that much.  There

7   is something I should have mentioned, which was how John has been

8   able to maintain his faith and I think that's also been very

9   sustaining for him.  Again, you know, if you look at people

10  generally, I actually mentioned this to you before, Mr. Litvin,

11  if you look at people generally, some people, it doesn't take

12  much for them to fall apart or to stop functioning, you know.

13       MR. AARON:  Objection, Your Honor, nonresponsive.

14       MR. LITVIN:  Well, Your Honor, I think he's explaining

15  his evaluation.

16       THE COURT:  Okay.  Well, it isn't responsive, though.

17  Why don't you ask your next question.  I sustain the objection.

18                          EXAMINATION

19  BY MR. LITVIN:

20  Q.   Would you explain to us or give us an analogy, if you can,

21  as to the problems that we're discussing with John at this time,

22  at this stage of his life?

23  A.   I'm sorry.  What I was going to try to explain was that the

24  feeling of gross inadequacy, of constant fear, which are very

25  typical of people with posttraumatic stress disorder, one analogy

1  is the analogy of people who have been raped, which is another

2  reason that people develop posttraumatic stress disorder and you

3  find that different people have different ways of coping, of

4  reacting to the trauma.  Some people, their functioning really

5  falls apart.  And some people it falls apart much more easily

6  than for other people.  Other people won't let their functioning

7  fall apart.  John is one of those.

8         And, you know, he's terrified of the police.  He's

9  terrified of death row, but what does he do?  He goes back and

10  tries to help people on death row.  He tries to help people who

11  were on death row and were exonerated.  You know, his response to

12  trauma is to try to help others.  And to face, keep facing it.

13  It doesn't get better, but he keeps facing it.  That, to me,

14  that's a form of heroism that he keeps doing it and trying to

15  make it better for others.

16         You know, if you look at posttraumatic stress disorder,

17  it's interesting there are two phenomena that are very

18  characteristic.  One is avoidance of things that remind you of

19  the trauma, and the other is constant intrusive images of the

20  things that remind you of the trauma.  And within all of that,

21  there is a subgroup of people who keep reencountering the trauma

22  and reencountering it, desperate to try to make it better and

23  that's what John does.  He really tries to make it better for

24  others who come after him.

25  Q.  Would that indicate a certain strength he has?

1  A.   Again, I really do think John has a tremendous strength of

2  character.  That's why the terrible pain he lives with every day

3  is not --

4  Q.   Dr. Grassian, what I would like to explain is if he's so

5  remarkable or so strong or has accomplished so much as you've

6  indicated, isn't that the opposite of having pain or suffering or

7  being inadequate?

8  A.   No.  You're confusing two parameters, two different

9  dimensions of human experience.  And if you look at psychiatry

10 generally, we talk about two really different dimensions of human

11 experience.  One is symptomatic, suffering, depression, anxiety,

12 whatever.  Symptomatic problems.  And the other is functioning.

13 There are people who are not terribly symptomatic but don't

14 function very well at all.  And then there are people who are

15 highly, highly symptomatic, suffer, suffer terribly but function

16 well despite -- you know, remarkably well.  And that really has

17 to do with a strength of character that the person has.  What the

18 person is bringing to their suffering.  There are people who

19 bring such strengths to their suffering that despite the terrible

20 psychiatric suffering, the psychiatric symptomatology, they

21 function pretty well and that's true of John.  Actually, if you

22 look at these axes of -- in psychiatric diagnosis, it's a little

23 mumbo jumbo, but one of them is called the global assessment of

24 functioning.  And it's a mishmash because what it's a mixture of

25 is two different dimensions.  One is how symptomatic is the

1  person, how much do they suffer psychiatrically.  And the other

2  is how well do they function?  Or how impaired is their

3  functioning?  It's really two separate dimensions.  Two very,

4  very separate dimensions.  And as I said, you do find people who,

5  despite enormous suffering, enormous psychiatric symptomatology

6  function darn well and there are other people who with very

7  little in the way of psychiatry symptomatology, psychiatric

8  suffering, don't function too well at all.  John is a person who

9  functions remarkably well given the amount that he suffers and

10  has suffered.

11  Q.   Well, Dr. Grassian, I'm going to ask you to assume because

12  you last interviewed Mr. Thompson about two years ago, I'm going

13  to ask you to assume that since you last saw him when he was

14  still working for Nick Trenticosta?

15  A.   Right.

16  Q.   I'm going to ask you to assume that, and the jury has heard

17  this testimony, that he stopped working for Nick in the summer of

18  1955, shortly after you saw him -- not 1955.

19  A.   2005.

20  Q.   I have to do better than parish prison.  He stopped working

21  for Nick in the summer of 2005?

22  A.   Right.

23  Q.   And at that point he immediately went to work at the same

24  church where his wife Lavern is working doing maintenance or

25  janitorial work, and that when Hurricane Katrina hit New Orleans

1   and his house was inundated, he and Lavern went north to a

2   northern area of Louisiana for a while, and when he was there, he

3   and Lavern found jobs in a library.  It was only for several

4   weeks or so and that when he came back to New Orleans, he

5   continued, he and Lavern continued to work at the church, and

6   that about a year ago, he and Lavern opened or took over lease at

7   a hotel, and they had a coffee shop, they made sandwiches and got

8   into selling T-shirts and things and they did well at first and

9   for reasons the jury has heard then that went sort of down, that

10  went south.  And that that lease ended last week on February 1st

11  and that he is now involved in organizing -- an organization

12  called Resurrection After Exoneration and you have heard some of

13  this testimony from Nick this morning.

14  A.   Right.

15  Q.   And that he's trying to put this together and that's the

16  kind of work at least at the moment he plans to do if he gets the

17  funding.

18  A.   Right.

19  Q.   Now, assuming that all those facts I've just laid on you,

20  I've asked you to assume, are reasonably accurate, Doctor, does

21  that cause you to change any of the opinions that you've given to

22  the Court and for the jury today?

23  A.    No.  It just really corroborates that John's very, very

24  strong, very -- a wonderful guy.  And he'll keep -- he'll keep

25  fighting.  He'll keep struggling and I pray for him that things

1  go well.

2  Q.    Doctor, a little while ago I started off by asking you what

3  your diagnosis was and you've told us, I believe, it was

4  product --

5  A.    Posttraumatic.

6  Q.    Posttraumatic stress disorder?

7  A.    Right.

8  Q.    And I said I'll ask you to define that later.  Would you now

9  explain to us, please, and you've spoken about this already to

10  some extent, but will you explain to the jury what posttraumatic

11  stress disorder is and what it means when you say it's chronic?

12  A.    Sure.  Well, a trauma is an event in a person's life which

13  is so horrifying or terrifying that really to some extent it

14  really overwhelms the person's capacity to insulate themselves

15  from raw horror or raw terror.  And a person experiences that raw

16  horror or raw terror, it's overwhelming and what happens as a

17  result is there is some biochemical change in the brain that

18  occurs, some change in the hypothalamic pituitary axis, cortisol

19  response, people become hyperaroused all the time, fearful,

20  jumpy, startling, can't sleep well, irritable.  It's one of the

21  syndromes.  Part of the syndrome.  It's one of the dimensions of

22  it.  They start having intrusive recollections.  Images of what,

23  of some aspect of it.  It's usually a very specific aspect.  Very

24  perceptually specific like, you know, it could be like a

25  photograph of a person who's been electrocuted.  It could be

1   anything.  It's not necessarily predictable what the particular

2   perception is, but once it's there, it's just incredibly powerful

3   and brings back all of these horrifying, terrifying affects

4   associated with it.

5        The other thing that happens to people is they become

6   numb.  Their efforts to ward off these awful experiences, awful

7   anxieties, awful intrusive images, they tend to develop a kind of

8   emotional numbing, a sense of a foreshortened future.  Like

9   people who have been traumatized will start to feel that they are

10  going to die young.  John -- I didn't mention that, but John has

11  that fear, fears he's going to be killed.  He fears he's going to

12  be killed actually a lot, you know, which at this point is really

13  irrational, but it's part of the syndrome.

14       There is also this horrible loss of self-esteem.

15  That's very common in posttraumatic stress disorder, that sense

16  of utter helplessness, utter powerlessness leads to a loss of

17  self-confidence, a loss of -- feelings of inadequacy and shame

18  and guilt.  I mean, even like I gave you the analogy of rape

19  victims, rape victims end up feeling ashamed and feeling guilty,

20  feeling inadequate, feeling like they are pariahs.  They didn't

21  do anything.  They are not the ones who should feel that way,

22  it's the perpetrator.  But that's a very typical, very

23  characteristic symptom of posttraumatic stress disorder.

24       Chronic trauma, obviously being on death row for year

25  after year is chronic -- I mean, coming close to death, all that,

1  chronic recurrent trauma tends to be very resistant to change and

2  there is evidence of research, medical literature evidence that

3  if a person is beyond a trauma for six months and continues to be

4  quite symptomatic, that after that the chance of substantial

5  improvement is very, very limited.  But I mean, in reality,

6  someone who is so chronically and recurrently traumatized is not

7  likely to do well.

8          That's why, for example, this whole business about

9  keeping people in Iraq for so long, soldiers in Iraq is really

10 scary because it reaches a point where you can tolerate combat,

11 you can tolerate it, but then you reach the end and you have

12 nothing left and then it's got you.  And that's why I think the

13 incidence of PTS, posttraumatic stress disorder among people

14 returning from Iraq is said to be like 30, 40 percent, which is

15 just horrible.

16 Q.   Dr. Grassian, we have heard in this courtroom over the last

17 few days in a speech, in an opening speech from one of the

18 attorneys for the defendants and in some testimony when

19 Mr. Thompson was cross-examined, we've heard that John as

20 youngster, as a child was on occasion whipped by his mother's

21 husband or boyfriend, that he was whipped by an uncle on at least

22 one occasion, that he was whipped sometimes by his mother, not

23 his grandmother but by his mother.

24 A.   Right.

25 Q.   And then on at least one occasion, he had significant welts

676

1    on his body so that his grandmother made, took some position that

2    John was staying with her?

3    A.    Right.

4    Q.    And we've also heard, of course, and you've referred to this

5    that John grew up in a rough neighborhood and was involved in

6    some things that weren't good, and had some arrests.

7         My question, sir, is does any of that change your

8    opinion as to what your diagnosis is, what the cause of his

9    problems are, or whether or not they are going to go on in the

10   future?

11   A.    Not at all.  I mean, you know, those whippings and all that,

12   we know that basically he lived in a good home environment, and

13   before he was arrested, he was living with Denise, he was happy

14   with her, he loved her, thought she was really pretty.  Loved

15   doting on her.  Loved his son.  I mean, he was a pretty -- he had

16   a lot of happiness, a lot of richness in his life.  He wasn't

17   fearful.  I mean, he was okay.  I mean, sure, he was engaging in

18   this petty criminal behavior, but hopefully, he would have worked

19   his way out of it.  I mean, his friend Pastor Wise did and Pastor

20   Wise didn't have to go to death row to accomplish that.  You

21   know, you get a little older, a little wiser.  I mean, I remember

22   seeing a picture of him before he was arrested with his little

23   son, John, he was glowing.  You know, just smiling from ear to

24   ear, just so happy.  And that's what he was like.

25   Q.    This is going to sound very repetitive, but least it's my

1    last question:  Dr. Grassian, are all of the opinions, the
2    medical opinions, your diagnosis, your assessment of John, your
3    opinion as to the cause or reasons for his problems and your
4    opinion as to what he has to look forward to in the future with
5    regard to these problems, have they all been given to us to a
6    reasonable degree of medical certainty?
7    A.   Yes.
8            MR. LITVIN:  Thank you.  Nothing further, Your Honor.
9            THE COURT:  Mr. Aaron.
10                      CROSS-EXAMINATION
11   BY MR. AARON:
12   Q.   Doctor, let's talk medicine.  Would you define for the jury
13   what the term "stressor" means.
14   A.   Sure.  Basically, a stressor is something that impinges upon
15   a person and can stress the organism.  Obviously, if you're
16   referring to a psychiatric stressor, emotional stressor, it could
17   be other kinds of stressors as well.
18   Q.   Could someone experiencing an event and losing all of their
19   property like Hurricane Katrina be a stressor?
20   A.   Of course.
21   Q.   Could someone getting shot with a shotgun in a drive-by
22   shooting, could that be a stressor?
23   A.   I would think that inevitably would be a stressor.
24   Q.   Okay.  Now, let's talk just a little bit about background.
25   You got a history from John Thompson; correct?

1   A.    Yes.

2   Q.    The little bit I know about medicine suggests to me that a

3   history is only as good as its accuracy; correct?

4   A.    I'm sorry.

5   Q.    You take down what the person tell you.  Right?

6   A.    Yeah.

7   Q.    If the person leaves things out --

8   A.    Right.

9   Q.    -- then your history would not be accurate; correct?

10  A.    Well, I mean that's a confusing question.  In forensic

11  analysis, you don't simply take everything the person says as the

12  gospel, and repeat it to a jury as though it was the gospel.

13  That's not what you do.  So that's not the, that's not the

14  methodology.

15  Q.    I guess my point was this, Doctor.  You took a history from

16  John Thompson and if you look at your report it's on, I think,

17  Page 6, and it's goes on to the next page.  You give a history of

18  his life before incarceration.  You do not include in that

19  history the fact that John Thompson was a victim of a drive-by

20  shooting.  But you say now that that would be a stressor?

21  A.    Of course.

22  Q.    But you don't include it in your history?

23  A.    That's true.

24  Q.    Did you not include it because you didn't think it was

25  important or did you not include it because Mr. Thompson didn't

1  tell you about it?

2  A.   No, he told me about it.

3  Q.   And you still decided not to put it in?

4  A.   I didn't think it was, I didn't think it was important to

5  the narrative as I was producing it.

6  Q.   Now, are you aware of the fact that when John Thompson first

7  went to prison after the convictions for armed robbery and

8  murder, he was at parish prison?

9  A.   I think I indicated that he was there for two years.

10  Q.   Okay.  Are you aware of the fact that he was put on, I think

11  he said, Tier B-1, which was a tier of people who had nothing to

12  lose?

13  A.   Right.

14  Q.   Okay.  Are you aware or did he tell you that while on this

15  violent tier with all of these violent, scary people, he was

16  elected by the other prisoners as the tier rep?  Did he tell you

17  that?

18  A.   I don't recall that.  I'm not surprised.

19  Q.   Now, let me ask you this:  Doctor, if it was so fearful an

20  experience for John Thompson and he was scared of these people,

21  how do you think he got himself elected tier rep?

22  A.   I believe I've just been testifying about the tremendous

23  strength of character that John has, and how that's perfectly

24  consistent with exactly how John would have coped with the terror

25  he was feeling.  That was John Thompson to a T.

1   Q.    So John overcame the terror?

2   A.    I don't know if he overcame it.  He coped with it.  He's a

3   man of tremendous strength of character.

4   Q.    You mentioned early in your testimony, you used the term

5   overt delirium.  Has John ever experienced that?

6   A.    No, I was saying that the toxicity is such that many people

7   do.  John is a person who has managed pain, suffering and stress

8   remarkably well.  Remarkably well.

9   Q.    Has John ever had any psychotic psychosis?  I'm sorry,

10  psychosis?

11  A.    Psychosis even.  I don't believe so.

12  Q.    Okay.  Has John, you mentioned that John can't stay still,

13  he's constantly jumpy and I watched John for a very long time on

14  the stand, and he seemed very poised and he wasn't jumping around

15  and he wasn't fidgety, so was that another control mechanism of

16  John's?

17  A.    No, I can't say he -- would you like me to explain that?

18  Q.    I figured you could, Doctor, go ahead.

19  A.    That's actually funny because you're asking the question

20  that -- I actually consulted on a Hollywood film.

21  Q.    I was going to ask you about that, too.

22  A.    But the very same issue came up.  The fact is when a person

23  is concentrating on something, the fear, the jumpiness is not

24  going to be as present because they are focused.  It's when they

25  are trying to relax that they have the problem.  So for John to

1    sit here and focus on what's going on, that's not the time you're

2    going to see him have trouble.  You're going to see John have

3    trouble when there is nothing to do.  Do you notice that John

4    keeps himself real busy.  I mean, look at the wonderful things

5    John's done.  But he's always keeping himself busy because he

6    can't relax.  I mean, not just because he can't relax but, in

7    fact, it's very hard for John to relax.

8    Q.    Okay.  So it's fair to say John does not have a problem

9    concentrating.  He can concentrate; right?

10   A.    Yes.  I think so.  I'm sorry, that's just a general

11   statement.  I think the answer is generally, yes.  I think

12   generally John can concentrate.

13   Q.    I thought we would agree on that.  All right.  Let's talk a

14   little bit about inability to sleep.  Mr. Thompson took the

15   stand.  He didn't complain about not being able to sleep.  His

16   spiritual advisor took the stand and she never once mentioned

17   John having problems sleeping and his pastor, Pastor Wise took

18   the stand and he never -- did John ever tell you about not being

19   able to sleep because it's not in your report?

20   A.    No, actually, I think it was Lavern who told me about that.

21   Q.    But it's not in here?

22   A.    In my report?

23   Q.    Right.

24   A.    No.  There are a couple of things that aren't in my report

25   that I would have loved to have put in.  Like that thing about

1  John, Jr. talking about being stopped by the police officer.

2  Q.   Sometimes when people are diagnosed as having posttraumatic

3  stress disorder, they do negative things.  Would such a negative

4  thing be like turning to alcohol or drugs?

5  A.   That happens, yes.

6  Q.   I didn't see it in your report, but do you have any -- any

7  feelings or knowledge that John Thompson has turned to alcohol or

8  drugs?

9  A.   To my knowledge, John has actually turned to religion and

10 tied to the church, he prays every day.

11 Q.   That's positive, isn't it?

12 A.   I think it's wonderful.

13 Q.   Now, what about anger, isn't that something, a negative

14 reaction that some people have?

15 A.   Yes.

16 Q.   Have you noticed that in John Thompson?

17 A.   Well, there is some, yeah.  I mean, he manages it, but it's

18 created trouble in his relationship with Lavern, but again, I

19 think that John has tremendous strength of character.  They went

20 through some couples therapy, just a few sessions.  They really

21 took what they learned and applied it and the marriage got

22 better.  Yeah, I mean, irritability and difficulty with

23 frustration is very hard, is very hard for John.

24 Q.   In terms of posttraumatic stress disorder, in most

25 instances, can it be, you know, treated by a psychiatrist or a

1  psychologist?

2  A.    I'm not sure what you mean.  I mean, are you asking would it

3  be useful for John to get treatment or would it be expected?  It

4  would be a major change in his symptomatology as a result of such

5  treatment.

6  Q.    Could such treatment be positive?

7  A.    I think it could be helpful, but you have to sort of specify

8  what aspect of the posttraumatic stress disorder you were really

9  trying to treat.  I think the part that could be helped is the

10  feelings of inadequacy.  The fearfulness, the jumpiness, those

11  are -- I don't know that those are going to change much.  I mean,

12  but the feelings of inadequacy, I think, might be amenable to

13  psychotherapy.  But remember John Thompson isn't the kind of

14  person who is likely to, who is likely to be able to embrace the

15  idea of psychotherapy.

16  Q.    Okay.  Can posttraumatic stress disorder be treated with

17  medications?

18  A.    Well, I mean, the answer to that is that sometimes

19  medication can be somewhat helpful.  It hasn't proven to be

20  remarkably helpful for posttraumatic stress disorder.  If John

21  came to me for treatment, would I start him on medication?  I'm

22  not sure.  I'm kind of dubious about whether it's likely to help.

23  Q.    Could someone benefit, who has posttraumatic stress

24  disorder, by talking to another person for support?

25  A.    Well, that's what I was saying.  I think that at least in

1  terms of some of those feelings, especially the feelings of

2  inadequacy, I think that some psychotherapy would be beneficial.

3  I think it's unrealistic to think that John would avail himself

4  of that.  I mean, he's such a private and proud person, but, you

5  know, I mean, his talking to other people about getting out of

6  prison, my guess is it might serve a psychotherapeutic value to

7  John.  You know, it's sort of like grappling with his own demons

8  when he's grappling with theirs?

9  Q.   What about practicing relaxation methods?

10 A.   No, I don't know.  I think that one of the best forms of

11 relaxation training or relaxation exercise is prayer and John

12 does that every day, so I think he does that and that's good.  I

13 think that's great.

14 Q.   Well, let me ask you this.  You mentioned earlier in your

15 testimony the idea of his distracting activities, something that

16 takes one's mind off of whatever the problem is.  Could you tell

17 the jury about positive distracting activities that John could

18 participate in to deal with the posttraumatic distress disorder

19 that you have diagnosed?

20 A.   I'm a little lost by what you're saying.  But --

21 Q.   Do you know what I mean?

22 A.   I did indicate to you, I mean --

23 Q.   Do you know what I mean by positive distracting activities?

24 A.   I don't think I used that particular term.  I mean -- I have

25 to ask what you mean.

1  Q.   Let me give you an example.  Recreational or work

2  activities.

3  A.   Right.  Right.

4  Q.   That's what I meant.

5  A.   Well, sure, I mean, I think I've been testifying about how

6  John copes by keeping himself busy in very positive, very

7  productive ways.  And, you know, that's terrific.  That's

8  wonderful.  He does that.

9  Q.   You mentioned that John has a problem being around people

10 and because of the long years of isolation?

11 A.   Right.

12 Q.   Are you aware that John has done at least two speaking

13 engagements that this jury has heard about, Nancy Wall mentioned

14 John going over to an expensive Catholic girls high school in

15 New Orleans and speaking to them.  Are you aware of that?

16 A.   Yes.  And that's like consistent with what I said.  I mean,

17 it's a different interaction.  I could explain it if you would

18 like.

19 Q.   I got you.  And you're also aware that Mr. Thompson went

20 with Pastor Wise over to a detention facility?

21 A.   Yes, I heard about that.

22 Q.   Now, you mentioned that he is fearful of being around law

23 enforcement types?

24 A.   Yes.

25 Q.   Were you here for Pastor Wise's testimony?

1  A.    Yes.

2  Q.    Okay.  Do you remember hearing him say that even the guards

3  were crying?

4  A.    Oh, yes, absolutely.

5  Q.    Did John ever call -- has John ever called you since your

6  last interaction, professional interaction with him?

7  A.    No, I don't think so.

8  Q.    Did you ever refer Mr. Thompson to any medical care provider

9  since you diagnosed him with a condition?

10 A.    Well, I don't recall how I ended our conversation, but I

11 would imagine I would have spoken with him about the possibility

12 that it would be helpful to talk to someone on a continuing

13 basis.  But I wouldn't push it and I would have doubted that John

14 would have taken me up on that suggestion.  But I mean, that

15 would have been, you know, that would be my custom if I felt that

16 someone could profit from medication or psychotherapy.  I would

17 mention it at the end and not push real strenuously towards it.

18 Q.    You mentioned that in prison there were no distractions and

19 that was a problem?

20 A.    Well, no positive distractions; right.

21 Q.    Are you aware that even on death row, Mr. Thompson played

22 chess and Scrabble with other prisoners?

23 A.    Yes.

24 Q.    Would you consider that a positive distraction?

25 A.    You're actually right.  If I said no, as opposed to hardly

1  any, then I stand corrected.

2  Q.   Are you aware of the fact that Mr. Thompson participated

3  while at Angola in a number of religion services?

4  A.   Yes.

5  Q.   And that would be a positive distraction?

6  A.   Yes.  Those religion services you were referring to, they

7  were quite limited in number, but, yes, absolutely.  When he

8  could, he did.

9  Q.   Are you aware that he had access to television, books, radio

10  and then in his words, to tune things out, he put his headphones

11  on?

12  A.   Right.

13  Q.   Have you ever personally been on the tier of death row at

14  Angola?

15  A.   Not at Angola, no.

16  Q.   So the smells that you talked about, you've not actually

17  smelled any of those, have you?

18  A.   I think basically it smells the same at most every

19  institution.

20  Q.   You have not actually gone to Angola?

21  A.   I have been to Angola.  I've never been to the death row,

22  no.

23  Q.   Now, are you familiar with the term "complex PTSD"?

24  A.   No.  No, I haven't heard that.

25  Q.   I'm looking at an article written by Julia M. Whalen, Ph.D.

1  and Laurie Stone Ph.D. who suggest that when posttraumatic stress

2  disorder is at a chronic stage, it's more properly referred to as

3  complex posttraumatic stress disorder.  You've never heard that?

4  A.    No, never.

5  Q.    Now, chronic posttraumatic stress disorder, as I understand

6  it, comes from some long-term event; correct?  Or an event of

7  long, if it lasts a long time.  It's not like something sudden

8  which would create acute posttraumatic stress disorder?

9  A.    No, that's not correct.

10 Q.    Okay.  So if I were to say that someone is a prisoner of

11 war, for let's say 10 years, they would be more likely to have

12 chronic posttraumatic stress disorder as opposed to acute?

13 A.    No.  You're confused about the meaning of the term.

14 Q.    Okay.  Well, educate me, Doctor.

15 A.    Sure.  First of all, most traumas that we see in clinical

16 practice are actually acute traumas.  They are incidents that

17 occur once and have a very finite duration.  A rape, a car

18 accident, an assault or whatever.  That doesn't say that there

19 aren't ones that are long-lasting like prisoner of war, battle,

20 which is another very, very important cause of PTSD.  But, these

21 acute events, these acute traumas can result in chronic

22 posttraumatic stress disorder.

23 Q.    Let's talk about --

24 A.    And what that means is that the posttraumatic stress

25 disorder continues for six months basically without significant

1  improvement after the trauma ends.

2  Q.   All right.  So let's talk about John Thompson.

3  A.   Okay.

4  Q.   Is it your professional opinion that he initially started

5  out with acute posttraumatic stress disorder and then that

6  graduated to chronic or are you saying he automatically started

7  with chronic?

8  A.   You're confused.  Let me try to explain.  First of all, you

9  have to understand that these diagnoses are, in psychiatry, we

10 deal with a multidimensional world with infinite variability.

11 Now, if you think about it, if a person is in a prisoner of war

12 camp, tortured and then tortured again the second day and they

13 are going to be tortured the third day, how can they be diagnosed

14 with having posttraumatic stress disorder.  By definition the

15 trauma is continuing.  So I mean, that little box that we create

16 in our universe called posttraumatic stress disorder doesn't

17 really fit that situation.  It's a continuing traumatic stress

18 disorder.

19 Q.   Let me stop you right there, Doctor.  So let's talk about

20 John Thompson.  The incarceration, in your professional opinion,

21 was that a continuing, I guess my problem is this:  You diagnosed

22 him as having posttraumatic stress disorder, but under your own

23 definition it seems as though his situation was ongoing so that

24 it would not be what you diagnosed it as?

25 A.   That's not true.  Because we were very careful in my direct

1  examination.  Mr. Litvin asked me how did I diagnose him at the

2  time that I first saw him in 2005.  And I said I diagnosed him in

3  2005 as having chronic posttraumatic stress disorder.  Now, the

4  trauma had ended.  So according to this, the boxes that *DSM*, you

5  know, sort of puts -- these arbitrary boxes it puts in the world,

6  it's an exactly correct diagnosis.

7  Q.   Are you familiar with an individual by the name of Nelson

8  Mandela?

9  A.   Oh, of course.

10  Q.   Are you aware that Nelson Mandela was in solitary

11  confinement as a political prisoner for over 20 years?

12  A.   I am aware of that.

13  Q.   Are you aware that after getting out he became president of

14  a country?

15  A.   I think I am aware of that.

16  Q.   Okay.  So is it fair to say that persons who might have been

17  in a situation that after they are let out might have been

18  diagnosed with posttraumatic stress disorder can go on and do

19  good things?

20  A.   Well, I think that John Thompson has gone on and done good

21  things.  I don't know if Nelson Mandela had suffered

22  posttraumatic distress disorder.  I mean, a remarkable human

23  being.  Obviously he suffered a lot, did well, did brilliantly,

24  but I have no idea about his psychological status.

25  Q.   But you would admit that he was incarcerated in solitary

1   confinement for at least 20 years?

2   A.   I'll certainly admit that that's our understanding.  I mean,

3   I have no direct communication or information about it, but

4   that's what I understand.

5   Q.   You indicated that John Thompson has tremendous resources,

6   that's a direct quote, and so he's able to overcome obstacles;

7   correct?

8   A.   Right.

9   Q.   Okay.  Which means then that he can establish social

10  relationships?

11  A.   He has.  He's gotten married and stayed married for years.

12  He's got a relationship with Nick.

13  Q.   Okay.  He can be loved and love?

14  A.   He is loved.  And he does love.

15  Q.   He can hold down a job?

16  A.   He's done so.

17  Q.   You mentioned lack of self-esteem.  It seems to me that a

18  person who wants to go into business or start a foundation to

19  help other people has self-esteem.

20  A.   Well, it may seem that way to you, but there are people who

21  struggle.  They struggle with their own internal demons and

22  despite struggling with their internal demons keep fighting, and

23  that's what's so heroic about a guy like John who struggles with

24  a lot of internal demons and he keeps fighting and he won't stop,

25  he won't give up.

692

1  Q.   How do you make a separation in terms of his stress?  How do

2  you make a demarcation between his life before he went into

3  prison and his life after he came out of prison?

4  A.   I'm not sure I understand what you mean, his life before he

5  went into prison.

6  Q.   I guess what I'm saying is earlier in your testimony you

7  admitted that getting shot in the leg with a shotgun in a

8  drive-by was traumatic.  Right?

9  A.   No.  It was physically traumatic, but I don't know if it was

10  psychologically traumatic.

11  Q.   You don't think it was?  It would be?

12  A.   I wouldn't know.  First of all, when a person gets shot, if

13  they are rendered unconscious, one thing you can be sure of is

14  they don't suffer psychological trauma because they're

15  unconscious.  I have a patient who was in a terrible car

16  accident, and with her sister.  Her sister was knocked

17  unconscious and had neck injuries, ended up with surgeries, and

18  my patient physically was better off.  Didn't end up with any

19  massive physical injuries.  She's the one that ended up with

20  posttraumatic stress disorder.  Her sister never experienced what

21  happened because she was unconscious.

22  Q.   You are aware of what John Thompson was like before he went

23  to jail for 18 years in 1985?

24  A.   To the extent that I testified, I mean --

25  Q.   Do you think that while the John Thompson you see now is

1  clearly not the John Thompson, wild, crazy with the big hair back

2  then, would you attribute that solely to growing up or what?

3  A.   I don't appreciate the characterization and I don't agree

4  with it.  He was just not wild and crazy and big hair.  He was a

5  loving man.  He was a loving father.  And a loving boyfriend to

6  his girlfriend.  A loving grandson to his grandmother and the

7  wild and crazy and Afro, big deal.  And the fact, yes, he grew up

8  in a lousy environment where there was a lot of crime and petty

9  crime is a way of keeping afloat and he engaged in that.  But

10 don't say he was just wild and crazy and a gad guy.  He had a lot

11 of decent stuff in him as a young kid.  A lot more than most

12 young kinds have.

13 Q.   My point was this was that in his earlier years he engaged

14 in a lot of negative behavior which he does not seem to engage in

15 now.

16 A.   He engaged in some negative behavior.  He engaged in a hell

17 of a lot of positive behavior, too.

18 Q.   Back then?

19 A.   Absolutely.  How many kids do you know who at the age of 17

20 have a child and go out and support that child and be a father to

21 that child and a father to the other, the first child, and

22 maintain a loving relationship with their girlfriend for seven

23 years, and still have a loving relationship with their

24 grandmother.  I mean, there aren't that many people in my, you

25 know, nice suburban town of Newton who could do that.

1   John Thompson did it and I think that's pretty darned good for a

2   guy who grew up like that and was 17 years old when he was a

3   father of two.

4   Q.   Are you aware of the fact that with respect to the first

5   child, Mr. Thompson's grandmother or mother took care of that

6   one, it wasn't only until the second child that he had to then

7   take on the responsibility and, quote, be a man?

8   A.   Yep.

9   Q.   That's not what you said.  You said he took responsibility

10  from day one with the first child.

11  A.   I don't think I said that.  But if I did, I'm sorry.  When

12  John, Jr. was born, at the age of 17, he became a father of two.

13  And I think he did pretty darned well.  I tell you, I doubt that

14  I could have done that well.

15  Q.   You seem to trivialize the type of criminal activity that

16  Mr. Thompson was engaged in.  In your opinion, selling marijuana

17  and PCP is something minor and insignificant?

18  A.   I don't know if it's minor and insignificant.  I mean, but

19  within the environment, the community, the culture, the economic

20  situation in which he grew up, the economic opportunities he had,

21  I sure ain't going to condemn him for it.

22  Q.   I'm not trying to condemn.  I'm just trying to find out from

23  you.  What we're trying to find out, Doctor, is he's seeking

24  damages in this case and we're trying to figure out, you know,

25  how bad off is he and from the stand and from the discussions by

1    friends of his, he does not seem to be bad off.  The only one who

2    seems to put a condition on him is you and so I'm trying to find

3    out what is so bad?

4    A.   I would disagree with your characterization.  I think other

5    people who have testified and other people with whom I have spoke

6    have discussed these symptoms with me.  Even Nick earlier --

7    Q.   Mr. Trenticosta from the witness stand, upon being impeached

8    with the Gambit article, admitted that in his opinion he was

9    health mentally?

10   A.   No, I mean --

11          MR. LITVIN:  Objection, Your Honor.

12          THE COURT:  Wait.  What's the objection?

13          MR. LITVIN:  The objection is he was cross-examined with

14   an article and he gave his testimony, but to characterize it the

15   way Mr. Aaron has, I think is improper.

16          THE COURT:  Rephrase your question, Mr. Aaron.

17                         EXAMINATION

18   BY MR. AARON:

19   Q.   Ultimately, Mr. Trenticosta admitted on questioning by my

20   partner, Mr. Goins, that in his opinion John Thompson was healthy

21   mentally?

22   A.   I think Mr. Trenticosta's opinion that John was healthy

23   mentally has to be seen in context as Mr. Trenticosta stated.  I

24   mean, given what he had just gone through, that guy was

25   functioning very, very well.  But Nick Trenticosta told me about

1  these incidents where John would be so humiliated, so embarrassed
2  about his inability to function, his lack of knowledge of things.
3  So I mean, whatever Nick said to that guy, and however the guy
4  interpreted it because I've been, you know, quoted in a lot of
5  periodical, a lot of news articles and I'm telling you, a lot of
6  that stuff is paraphrased.  It ain't what I said.  It's what
7  somebody said I said.  So who knows and who knows what the
8  context is.  But Nick certainly was fully aware of how much John
9  suffered with feelings of inadequacy and fear.  Nick could talk
10 about it.  You didn't ask him.  Maybe Mr. Litvin didn't ask him,
11 but he could talk about it, so he talked about it with me.  So
12 what I said to you isn't separate or different from what Nick
13 said could have said to you if you had asked.
14 Q.   Excuse me.  Can people diagnosed with posttraumatic stress
15 disorder have successful lives, careers?
16 A.   I pray that John will continue to progress and do well with
17 his life.
18 Q.   You have not dealt with him in a professional sense in the
19 last two years, but from what you've heard in the courtroom, does
20 it seem as though he has been coping well?
21 A.   I think he is.  I really hope this nonprofit thing works out
22 for him.
23 Q.   Answer my question, please.  Do you believe he's been coping
24 well?
25 A.   I think so.  I mean, you know, you worry.  Right now John's

1  trying to organize something that could be wonderful, but what's
2  going to happen if he can't get the funding.  You know, at what
3  point would he finally just run out of steam?  I don't know.  I
4  don't know if he's going to run out of steam.  I don't know if
5  he's going to have good luck and things are going to prosper for
6  him.  I don't know what the future holds, but I know he's got
7  these vulnerabilities because he is still saddled with fears.
8  You mentioned social things.  Yeah, he can go back talk to a
9  group, but the first time he did it with Pastor Wise, he was
10 crying.  He was crying.  And Pastor Wise knew enough to never
11 talk about it again.  About how he felt because he got into it
12 and he started crying.  And it's one thing to talk to people when
13 you're offering them something, when you're giving to them, it's
14 another thing just to feel comfortable in a crowd.  He doesn't.
15 He doesn't.  He doesn't.  He used to, but now the weekends he's
16 home with Lavern.  He doesn't go out socially like he used to.
17 He doesn't feel gregarious like he used to.  He can do it in a
18 setting where he's actually doing something professionally,
19 giving something, but he doesn't feel comfortable in simple
20 social situations.
21 Q.   Let me get a question in, Doctor.
22 A.   Please.
23 Q.   All right.  You mentioned that you have a fear that he won't
24 be able to cope with failure like the foundation doesn't get off
25 the ground; right?

1  A.   No, I didn't say that.  I said I worry.  I don't know.

2  Q.   You don't know.  Well, you are aware of the fact that he had

3  a sandwich shop which didn't do well and he seemed to be able to

4  testify about it and seemed like he handled that, you know, that

5  bad luck pretty well?

6  A.   It seems that way.  Again, you're asking me what does the

7  future hold for him in terms of success, failure.  How much

8  failure could he tolerate without breaking?  I don't know the

9  answer to that.  All I can tell you is the vulnerabilities.  I

10 can tell you the suffering, but I can't tell you whether his

11 functioning is going to fall apart.  I haven't testified here

12 today that his functioning is going to fall apart.  I've

13 testified that he's suffering.  I testified that he's symptomatic

14 and that he has a tremendous strength of character to try to keep

15 moving on despite the suffering.

16 Q.   So is it fair to say, Doctor, that you don't know in terms

17 of the future, in terms of John Thompson?

18 A.   In terms of functioning, no.  In terms of symptomatology,

19 yes.

20 Q.   But in terms of symptomatology, he may well be able to learn

21 and utilize positive coping devices so that he deals with

22 whatever life throws at him?

23 A.   Again, you're confusing symptomatology with functioning.

24 His symptomatology is not likely to change.  His functioning has

25 really been remarkably good and I pray for him that it will

1  continue to be, but I can't predict it.  I can predict that his

2  symptomatology is not likely to change.

3  Q.   In terms of your practice, Doctor, has most of it been with

4  persons who have been either incarcerated or persons who have

5  been imprisoned or anything like that?  Is that primarily --

6  A.   Most of my clinical work?

7  Q.   Yes.

8  A.   No.

9  Q.   Have you ever dealt with families of victims?

10  A.   Families of victims, oh, quite a bit, yeah.

11  Q.   I noticed in formulating your report, you didn't have very

12  much discussion with John Thompson's family members.  And so that

13  sort of bothered me and I wondered if maybe your practice didn't

14  include that?

15  A.   What do you mean?  I spoke to Lavern.  I spoke to John, Jr.

16  Well, his grandma is deceased.  I spoke to James.  I was going to

17  speak to Dedrick but somehow it didn't, I don't know, some

18  logistics problem, I don't recall.

19  Q.   Did you speak to his other son?

20  A.   Dedrick.  No, I didn't.  I said, I was going to speak to

21  Dedrick and I don't recall why that didn't happen.  There was

22  some logistics problem.

23  Q.   Do you know whether or not he's incarcerated?

24  A.   Was he incarcerated at the time?  I don't recall.

25  Q.   You are aware that he's been incarcerated?

1  A.   I know he had some drug problems.  I don't recall

2  specifically and I don't recall why I wasn't able to speak with

3  Dedrick at the time I did the report.

4  Q.   Let's see, Doctor, I think I'm almost done.  Oh, when

5  Mr. Thompson talked to the jury about the last time he had got an

6  indication that the death sentence date was set for May 20, 1999,

7  he said that he really lost it, to use his words, and I think he

8  was probably seen by some medical people?

9  A.   Right.

10  Q.   And he says, they gave me one pill and that was it.  I was

11  better.

12  A.   Right.

13  Q.   You're laughing, but why are you laughing?

14  A.   It's just John.  Somebody said to him, you know, you must be

15  stressed, and his response, stressed about what?  He's facing

16  death in two weeks.  He just wouldn't allow himself.  As I say

17  he's got tremendous strength of character.  And, yeah, I mean, he

18  had a panic attack.  I don't know what they gave him.  I'm sure

19  it was some tranquilizer, and he calmed down.  He did have a lot

20  of anxiety.  I don't think he ever had a full-blown panic attack

21  again.  Again, I just think he's a remarkable guy.

22  Q.   Doctor, you mentioned that in his early years of school

23  John Thompson did well.  Are you aware of the fact that he was

24  kept back in the second grade?

25  A.   Right.  Right, I am aware of that.  I can't recall the

1  details, but I did know about it.  I'm trying to remember the

2  circumstances.  You know, he actually -- John had actually gone

3  to like eight different elementary schools.

4  Q.    Do you think that's traumatic?

5  A.    No.  Not traumatic.  But it's not necessarily pleasant,

6  either.

7  Q.    That's not traumatic, going to eight elementary schools?

8  A.    John got along real well with people.  He's always had

9  friends.  I mean, it's not great.  It's bad for you, but

10  traumatic, come on, it's not like being raped, it's not like

11  being threatened with death.  Come on.

12  Q.    Let's get on the subject of being raped.  In your interview

13  with John Thompson, did he ever tell you he was raped?

14  A.    Oh, absolutely not.

15  Q.    He was not raped?

16  A.    As far as I know.

17  Q.    Okay.  All right.  Did he ever tell you that in prison he

18  was beaten by either prisoners or guards?

19  A.    I don't think so.  I don't recall it.

20  Q.    Did he ever tell you he was denied food, water?

21  A.    Not that I can -- no, I don't believe so.  I mean, he may

22  have been, but I don't recall it.

23  Q.    You are aware of the fact that when John Thompson's mother

24  married at about age 21, the person she married was abusive to

25  John Thompson?

1  A.    That's the guy that whipped him?  Yeah.

2  Q.    Are you aware that he was whipped with sticks, belts,

3  extension cords?

4  A.    Yeah, well, I knew sticks from the man, and his mother beat

5  him with extension cord.  I don't know anything about a belt.

6  Q.    Well, I got his deposition and he says all three.  Would you

7  consider that traumatic?

8  A.    I don't know.  I mean, John was whipped.  You know, he

9  wasn't the only kid who was whipped and it's not a great thing.

10  I mean, he wasn't a traumatized kid.

11  Q.    He wasn't traumatized?

12  A.    No.  He wasn't a kid suffering from traumatic stress

13  disorder.

14  Q.    So in your professional opinion to a reasonable degree of

15  medical certainty, the only traumatic event in his life was being

16  incarcerated for the 18 years?  That's it?

17  A.    Well, I don't know.  I mean, what's the point of that?  I

18  mean, listen --

19  Q.    We're trying to figure out his damages.  We're trying to

20  figure out how do we allocate this?

21  A.    The chronic posttraumatic stress disorder was related to the

22  imprisonment and coming close to death.  I mean, you can trace it

23  if by no other means to his, the images he has, the memories that

24  induce the terrifying, these terrifying, intrusive images.  They

25  are of the death row, they are of people dying.  They are of the

1    fear of being killed.  Of the charred body.  I mean, it's all
2    about death row.
3    Q.    So let me ask you this then, in your professional opinion to
4    a reasonable degree of medical certainty, him going to a
5    psychiatrist or a psychologist either, A., he won't do it or B.,
6    it wouldn't do any good anyway; is that your opinion?
7    A.    Well, I think -- I think if he could talk to someone about
8    his experience, I think it might be helpful.  And maybe he'll
9    have an opportunity to do that if he can bring this foundation,
10   this nonprofit forward.  Not so much as a patient, but as a
11   director or leader of an organization trying to help people,
12   where these kinds of issues are going to come up recurrently and
13   it may give him a chance to work on them himself.
14   Q.    Prior to -- prior to rendering your opinion, did you have
15   occasion to review any prior medical records of John Thompson
16   either at Angola, at Parish Prison or from a private physician?
17   A.    No, I haven't.
18   Q.    Okay.  So basically your diagnosis, prognosis, et cetera, is
19   based upon the two days that you spent with John Thompson, your
20   interviews with the people that you listed, and the history that
21   he recited to you; is that correct?
22   A.    Plus my experience, my education, experience.  After all,
23   one of the things you're looking for is consistency and internal
24   consistency with what the person says, their relationship between
25   affect and their emotional experience and what they say, how it

fits in with what other people say.  I mean, you know, you take

things like John, Jr. feeling, you know, just feeling that

intense grief that his father feels about all that he's lost in

life and sort of desperate wish to try to make up for it.  The

terrible shame, the shakiness, the fear, I mean, it's very

powerful.  You know, people can try to pull the wool over your

eyes and usually when they do, it comes across very sterile and

not filled with a lot of details.  But when people describe

things with enormous detail and tremendous emotional power, and

they're not Marlon Brando, when a person talks that way, you know

you've got it.

Q.   And if a person were to selectively leave certain

information out in relating a history to you, what would that

tell you, Doctor?

A.   I'm not sure that's a very good question.  What are you

referring to specifically?

Q.   My point is this, if someone selectively decides not to tell

you something about their past when you're trying to develop an

opinion, would that tell you something about the person?

A.   I don't know.  I mean, it depends on the situation.  Again,

I think that it presumably would say something, I don't know, but

you would have to be more specific in describing the situation.

Q.   Obviously psychiatry is not an exact science.  Thank you,

Doctor.

          THE COURT:  Is that a question?

1              MR. AARON:  No, Your Honor.

2              THE COURT:  A comment?

3              MR. AARON:  I was just putting a point at the end of a

4     sentence.

5              THE COURT:  Well, it's not proper.  You need to ask a

6     question.  Not make a comment.  Strike that last statement.

7              MR. AARON:  No further questions.

8              THE COURT:  Okay.  No further questions?

9              MR. LITVIN:  No further questions.

10             THE COURT:  Okay.  Thank you.  You can step down.

11             All right, we're going to take our afternoon recess of

12    about 15 minutes, ladies and gentlemen.  Please close your

13    notebooks, leave them in your chairs and don't discuss the case

14    when you're out of the courtroom.  We'll be back in 15 minutes.

15             THE DEPUTY CLERK:  All rise.

16             (WHEREUPON, The jury panel leaves the courtroom.)

17             THE COURT:  Do the plaintiffs have any further

18    witnesses?  You haven't offered some of these documents.

19             MR. COONEY:  That's what Mr. Banks is doing right now.

20             MR. BANKS:  Do you want me to do that now, Your Honor?

21             THE COURT:  If you're ready.

22             MR. BANKS:  You want them just identified by number or

23    description?

24             THE COURT:  Number with a brief description.

25             MR. BANKS:  There are five exhibits, Your Honor, that we

1  would offer into evidence --

2      THE COURT:  Everyone else can sit down if you like.  I'm

3  just standing to stretch.

4      MR. BANKS:  -- that weren't part of the original 91 that

5  were unobjected to.  92 is the photograph of John Thompson with

6  his son.  96 is the reward notice, the public reward notice.  97

7  is a Crime Stoppers reward notice that was posted publicly.  137

8  consists of some additional excerpts from the murder trial, 1985

9  murder trial.  And 138 is the photograph of the jail cell that

10  was shown to Mr. Trenticosta.

11      THE COURT:  Okay.  My understanding those are being

12  offered by the plaintiff?

13      MR. BANKS:  Yes, Your Honor.

14      MR. CARVER:  Your Honor --

15      THE COURT:  Any objections to any of those?

16      MR. CARVER:  Yes, Your Honor.  Obviously, the -- I

17  recall the photograph being used.  I recall the -- what's the

18  last exhibit you just read?

19      MR. BANKS:  The murder trial transcript.  Excerpts 137,

20  Mr. Cooney used those.

21      MR. CARVER:  I honestly don't recall any use of any

22  evidence of the Crime Stoppers.  God knows, I don't ever recall

23  seeing --

24      MR. AARON:  That didn't come in.

25      MR. BANKS:  I can tell you where that came in,

1    Your Honor.  That came in from the excerpts that we read from the

2    1995 hearing that referred to those exhibits and these are the

3    renumbered versions.  Yes, Your Honor.  And witnesses have

4    testified that the reward was publicly posted.

5         THE COURT:  Well, is there any objection to that, the

6    authenticity of it or anything?

7         MR. AARON:  I'll let it go, Your Honor.

8         THE COURT:  So all those are admitted without objection.

9         MR. CARVER:  Your Honor, and defendants would like to

10   offer and introduce into evidence the following exhibits which

11   were not part of the original 91:  Exhibit 99, which is the Code

12   of Professional Responsibility which was in existence during that

13   relevant time period, and Exhibit 100, which is the relevant

14   portions of the Code of Criminal Procedure Article 716 through

15   723, which were for that relevant time period.

16        MR. BANKS:  Your Honor, we would object to those.  We

17   don't believe that it's appropriate that law should be going back

18   to the jury in the jury room any more than a copy of the *Brady*

19   decision or the *Kyles* decision or the *Giglio* decision or any of

20   the others.  The jury should get facts and evidence, but not the

21   law except as Your Honor instructs as argued.

22        MR. CARVER:  Your Honor --

23        THE COURT:  Well, that's true.  Also my concern about

24   those things is they could mislead the jury because those things

25   do not state the law.  You know that and I know that.  We all

1  know that.  Those things cannot override whatever the law is as
2  to *Brady*.  Whatever those things say are basically irrelevant in
3  terms of whether there was a *Brady* violation or not.  So I don't
4  understand what the relevance is, could possibly be.  The danger
5  is, any minimum relevancy, which I can't see any, to me is
6  outweighed by the danger of confusing the jury and misleading the
7  jury, so I would say I would not let it go in under 403.  I'll
8  hear you before I make a final ruling on that.

9         MR. AARON:  If you remember, I got into an exchange with
10  the legal expert and I asked him, because our witnesses kept
11  saying that they were following Louisiana laws and I asked him
12  could you follow that state law and the federal law without --
13  are the two inconsistent?  He said no.  And I asked him
14  point-blank in his opinion, did you think they were
15  unconstitutional with respect to, you know, contrasting with
16  *Brady*?  He said no.

17         THE COURT:  Well, what he said was, he later explained
18  it that that was part of *Brady*.  It doesn't totally state *Brady*
19  because it doesn't talk about impeachment materials.  So I think,
20  I just think that would be confusing to the jury, misleading to
21  the jury, would serve no useful purpose for having it in evidence
22  so I'm going to sustain the objections.

23         Okay.  Do you have any motions to make?  Did the
24  plaintiffs rest with those exhibits?

25         MR. BANKS:  Yes, Your Honor, the plaintiff rests.

1          THE COURT:  And by the way, we'll do this again on the
2   record so we don't have to bring the jury in just to have you
3   rest and take them out again, I'll let you rest now, I'll let
4   Mr. Aaron make his motions.  Then we'll do it formally on the
5   record.  I'll ask you if you have any more evidence, you'll rest,
6   you have already had a chance to make your motions, we'll just go
7   on with the trial.  Okay?

8          Okay.  The plaintiffs rest; right?

9          MR. BANKS:  Yes, Your Honor, that's correct.

10         THE COURT:  Mr. Aaron.

11         MR. AARON:  Your Honor, as you're aware, there are three
12  defendants in this case.  I'm sorry, there are four defendants in
13  this case.  There are -- defendants James Williams is sued in
14  their official capacity.

15         THE COURT:  Everybody is sued in their official
16  capacity.

17         MR. AARON:  Well, let me get to my point.  We asked for
18  judgment as a matter of law as to whether or not James Williams
19  was a policymaker and therefore the whole cause of action.  All
20  the evidence that came out said he was not a policymaker.  They
21  didn't controvert that.  Same thing with Mr. Dubelier.  So we
22  would ask for a judgment as a matter of law as to those two
23  causes of action and whatever is against those two defendants.

24         We would ask for the same thing against Mr. Connick.
25  They never did show that actions were taken pursuant to a policy

1   of him not to obey the law.  His policy was obey the law and
2   everyone said that that was his policy.  And so if his policy was
3   to obey the law, anybody who did something contrary would be
4   violating Mr. Connick's policy.
5           THE COURT:  I don't believe it's that simple.  I think
6   if his policy itself misstates the law, then that can be a cause
7   of action right there.
8           I agree with you with regard to policy-making, though.
9   I haven't heard any evidence on which a reasonable jury could
10  conclude that Mr. Williams or Mr. Dubelier were official
11  policymakers.  Do you want to respond to that?
12          MR. BANKS:  May we respond at this time?
13          THE COURT:  Very briefly.  Because I haven't heard
14  one piece of evidence on that.
15          MR. BANKS:  Your Honor, I think what the Court laid out
16  in its summary judgment opinion on the law was correct in
17  discussing when an individual can become a policymaker.  What
18  we've heard here is that Mr. Connick had a very simplistic policy
19  of follow the law.  But, and Your Honor described this in greater
20  detail in your opinion, he did not elaborate on that policy nor
21  did he provide training as to that policy.  Namely, he provided
22  no standards by which one could determine what is a piece of
23  *Brady* material or not.  Therefore, by abdicating that
24  responsibility, by not providing any standards, by not providing
25  a manual, by not providing a guide book and by not providing

1   training, he enabled and delegated that policy-making to the high

2   level district attorneys themselves who were practicing and

3   that's what Your Honor noted in the summary judgment opinion.

4   The only question, I believe, is whether we have established that

5   and I think the witnesses have testified that.

6           THE COURT:  I'll think about it during the recess, but

7   I'm inclined to say those claims don't go -- that claim doesn't

8   go to the jury.

9           MR. AARON:  Yes.  A couple more.  If I could get to

10  them.

11          MR. BANKS:  Yes, I'm sorry.

12          MR. AARON:  Your Honor, this is a civil rights action.

13  They have brought a conspiracy claim under Section 1985.

14          THE COURT:  Yeah, I'm going to deal with that right now,

15  too.  I don't need any argument on that.  There is no basis for a

16  conspiracy claim here under 1985 for a couple of reasons.  First

17  of all, you can't conspire with yourself.  You know, the

18  allegations are that multiple employees in the DA's Office

19  conspired with each other and that's not a conspiracy claim.  And

20  in addition, a 1985-based conspiracy claim must allege or show a

21  class-based conspiracy, like based on race, gender or religion or

22  something like that.  There is no evidence of that in this case.

23          And there are a number of cases saying this, but one old

24  case, not old case, but one case out of the Fifth Circuit is

25  *Benningfield versus The City of Houston* which is at 157 Fed.3d

1   369, 1998 Fifth Circuit case, so I'm going to dismiss the

2   plaintiff's conspiracy claims based under 1985.

3          MR. AARON:  Although the word never came up, I believe

4   in the original complaint, there was a punitive damage claim.

5          THE COURT:  That's obviously gone, because the

6   individual claims are gone.

7          MR. BANKS:  Correct, Your Honor.

8          THE COURT:  I assume the plaintiffs concede that you

9   can't -- you can't have a punitive damage claim against the DA's

10  Office.

11         MR. BANKS:  That's right.  That's correct.

12         THE COURT:  That would only have been if there were

13  individual claims left.  So punitive damages are out.  Conspiracy

14  claim is out.

15         MR. AARON:  Dubelier, Williams?

16         THE COURT:  What?

17         MR. AARON:  Dubelier, Williams?

18         THE COURT:  In terms of whether they are policymakers,

19  I'm going to think about that a little further, but I'm inclined

20  to say there's not sufficient evidence for that to go to the jury

21  and if that's the case, what would be left would be the failure

22  to train claims -- well, the two questions, it seems to me, that

23  would go to the jury would be whether there was an injury or a

24  violation of Mr. Thompson's constitutional rights because of the

25  policy of the DA's Office with regard to *Brady* and/or, secondly,

1 whether there was a failure to train with deliberate

2 indifference.

3          MR. AARON:  We would also make a judgment as a matter of

4 law as to those two things, but I think the second one on

5 deliberate indifference was even broader was failure to train,

6 monitor, supervise and I think all of the evidence showed that it

7 might not have been formal training, but it was on-the-job

8 training.

9          THE COURT:  I think there is sufficient evidence that a

10 fact finder could go either way on that.  I think the jury is

11 going to have to decide whether they believe the training and

12 supervision and so forth was adequate or not.  So that's going to

13 go to the jury.

14          MR. BANKS:  Your Honor, may I have just 60 seconds on

15 the final policymaker issue?

16          THE COURT:  Sure.

17          MR. BANKS:  What the Court said in its opinion on the

18 summary judgment motion in denying it on the final policymaker

19 was as follows:  That there was evidence that the policy amounts

20 to little more than obey the law as you understand it.  Under

21 this scenario, the policy is itself an actual delegation of

22 policy-making authority to those implementing it.  The assistant

23 DAs were authorized to create the office's policy on the nature

24 of *Brady* duties.  That's exactly what we heard here in this case.

25 What the witnesses have said is that Mr. Connick had no policy

1  whatsoever beyond obey the law at most.  What we've heard as a

2  result of that is that senior people like Dubelier and Williams

3  who as Mr. Solino described on video were not even required to

4  pretry cases, not even subject to the protocol that was set up

5  within the office for pretrying cases and trying to minimize

6  *Brady* violations were on their own --

7          THE COURT:  I understand your argument.  I'll give it

8  some further thought.  Okay?

9          MR. BANKS:  Thank you, Your Honor.

10         THE COURT:  All right.  We'll be back in about

11 10 minutes here.

12         (WHEREUPON, at this point in the proceedings there was a

13 brief recess.)

14         THE DEPUTY CLERK:  All rise.

15         THE COURT:  All right.  What I've decided to do on that

16 issue of who would fire the policymakers.  I'm going to think

17 about that a little further.  I don't have to make a final ruling

18 now.  I'll decide that, obviously, before the case goes to the

19 jury.  Okay?

20         We'll bring the jury in.  I'll ask the plaintiffs if

21 they have any further evidence, they'll say they rest.  You don't

22 have to renew your motions, you've already made them for the

23 record, okay?  Let's bring the jury in.

24         (WHEREUPON, the jury panel enters the courtroom.)

25         THE COURT:  Please be seated, everyone.

1          Okay.  Do the plaintiffs have any further witnesses or

2   evidence?

3          MR. BANKS:  We do not, Your Honor, the plaintiff rests

4   at this time.

5          THE COURT:  All right.  Very well.  Ladies and

6   gentlemen, we've concluded the plaintiff's portion of the trial.

7   Now we're going move into the defendants' case.  And, Mr. Aaron,

8   you can call your first witness.

9          MR. AARON:  Michael Riehlmann.

10         THE DEPUTY CLERK:  Please raise your right hand.

11                         **MICHAEL RIEHLMANN**

12   was called as a witness and, after being first duly sworn by the

13   Clerk, was examined and testified on his oath as follows:

14         THE WITNESS:  Michael Riehlmann, last name is

15   R-I-E-H-L-M-A-N-N.

16                         DIRECT EXAMINATION

17   BY MR. AARON:

18   Q.   Mr. Riehlmann, I have no prepared questions so this should

19   go pretty quick.

20   A.   Okay.

21   Q.   What's your occupation?

22   A.   I'm an attorney.

23   Q.   How long have you been an attorney?

24   A.   25 years.

25   Q.   Have you ever been an Assistant District Attorney?

1  A.    Yes.

2  Q.    When were you an Assistant District Attorney?

3  A.    From October of '85 to October of '88.

4  Q.    And was that in the Orleans Parish District Attorney's

5  Office?

6  A.    Correct.

7  Q.    Did you ever have occasion to make the acquaintance of an

8  attorney by the name of Gerry Deegan?

9  A.    I did.

10  Q.    Did you make that acquaintance while you were an employee of

11  the District Attorney's Office or outside of that arrangement?

12  A.    We met the first week we both began law school.

13  Q.    And were you both in the District Attorney's Office at the

14  same time?

15  A.    He was there before me, but there was a period of time where

16  we were there together, correct.

17  Q.    Is it fair to say that you and Gerry Deegan were close

18  friends?

19  A.    Very.

20  Q.    Mr. Deegan, as I understand it, is currently deceased?

21  A.    That's correct.

22  Q.    And to the best of your recollection, when did he die?

23  A.    July 22, 1994.

24  Q.    '94?

25  A.    Yes.

1  Q.   Prior to Mr. Deegan dying, did he ever reveal anything to

2  you with respect to the suppression of evidence while he was an

3  Assistant District Attorney for the Parish of Orleans?

4  A.   He did.

5  Q.   And would you tell the jury what he related to you?

6  A.   Well, as best as I can recall as being 13 years, we had a

7  conversation in April of 1994.  I believe it to be April.  That

8  was when he discovered that he, that cancer that he had been

9  treated for previously had recurred and that the prognosis was

10 terminal.  His doctors had given him just a few months to live

11 and he told me -- one night we were in the barroom that is a

12 block down from the Criminal District Courthouse, he told me, as

13 best that I can recall, that he had failed to inform the defense

14 of exculpatory information in a case.  I can't recall with any

15 real specificity what else we said about it.

16 Q.   Did he say that anyone else was involved with the

17 suppression or did he just simply say, "I did it"?

18 A.   He may have said that someone else was involved, but I don't

19 recall.

20 Q.   But you do recall him saying that he did it?

21 A.   Yes.

22 Q.   Were you ever contacted by John Thompson's attorneys with

23 respect to the information that you got from Gerry Deegan?

24 A.   Yes.

25 Q.   Could you explain to the jury the circumstances and what

1  transpired?

2  A.   What happened was, my former law partner, Bruce Whittaker

3  and I, we shared an office, not -- we had a big what had

4  previously been a library in the law office.  We shared it.  We

5  had two desks in there where we would work, we would naturally

6  converse.  In addition to being law partners, long-time friends

7  and he came back from Criminal District Court.  He worked as a

8  public defender, he came back one morning and explained to me

9  about a conversation that he had with Mr. Thompson's attorneys

10  and what he said I don't recall in particular, but the details

11  that he did provide me with reminded me of the conversation that

12  I had with Mr. Deegan some five years before.  The conversation

13  that I had with Mr. Whittaker was sometime in 1999.  And so as we

14  discussed it more, I recalled the conversation I had had with

15  Mr. Deegan.  I told him, Gerry told me that he had failed to turn

16  over stuff that might have been exculpatory, and he said, "Well,

17  we need, you need to contact Mr. Cooney and Mr. Banks and tell

18  them what you know."  And that's what I did.

19  Q.   Okay.  Let me refer you to, and I'll put it up on the

20  screen, Trial Exhibit Number 58.  Have you ever seen that

21  document before?

22  A.   I recognize my signature, but my eyesight is not good enough

23  for me to read the question.

24  Q.   It purports to be an affidavit done State of Louisiana,

25  Parish of Orleans, it says, "Before me notary came and appeared

1   on the 27th day of April 1999 where I could be duly sworn and

2   attested to the following:  That I'm a practicing attorney and

3   have been since October 1983, that I worked as an Assistant

4   District Attorney from October 1985 until October 1988.

5   Gerry Deegan was a close, personal friend of mine and he was also

6   an Assistant District Attorney between 1984 and 1987.  He and Jim

7   Williams were trial attorneys in the armed robbery trial of

8   John Thompson," and then it goes on.  Then there is a signature

9   below that purports to be a signature of one Michael G.

10  Riehlmann?

11  A.    That's my signature.

12  Q.    That's your signature.  Do you recall executing this

13  affidavit?

14  A.    I do.

15  Q.    To the lower left of the document, it says, "Sworn to and

16  subscribed before me the aforesaid" and it says notary public, do

17  you recognize that signature?

18  A.    It's Bruce's signature.

19  Q.    By Bruce, you mean with Bruce Whittaker?

20  A.    I do.

21  Q.    There was a Bruce Whittaker who previously served in the

22  District Attorney's Office, is that the same person?

23  A.    That's correct.

24  Q.    And you and he were law partners?

25  A.    That's correct.

1   Q.    Okay.   Now, as a result of signing this affidavit, did you

2   run into a spot of bad luck professionally?

3   A.    Mr. Connick referred a complaint to the bar association as a

4   result of my involvement with this.

5   Q.    So Mr. Connick filed a complaint with the bar association?

6   A.    That's correct.

7   Q.    And was this complaint reviewed, to the best of your

8   knowledge, by the Office of Disciplinary Counsel?

9   A.    It was.

10   Q.    And were formal charges ever filed against you?

11   A.    Yes.

12   Q.    And what were the charges that were filed against you?

13   A.    Failure to report another attorney's misconduct.   There were

14   other charges, but I believe that that, that's the gist of it.

15   Q.    And was -- were those charges presented to a hearing

16   committee of the disciplinary board?

17   A.    Yes.

18   Q.    And what was the finding of that hearing committee?

19   A.    I don't recall what the finding of the hearing committee

20   was.

21   Q.    Did the matter get appealed from the hearing committee to

22   the disciplinary board?

23   A.    Yes.

24   Q.    Do you recall the finding of the disciplinary board?

25   A.    I really don't.

1   Q.   Did the matter go to the Louisiana Supreme Court?

2   A.   Yes.

3   Q.   Do you recall what the Louisiana Supreme Court did?

4   A.   Yes.  They --

5   Q.   What did they do?

6   A.   They sustained Mr. Plattsmier's charges finding that I did

7   indeed fail to timely report another attorney's misconduct.

8   Q.   Now, in the affidavit, you say that at some time prior to

9   1994, and after 1985, that's a big, pretty big range, you can't

10   pin it down any more than that?

11   A.   I honestly can't read, as highlighted there, so I don't

12   know.  Could you read the whole thing?

13   Q.   Well, this is what your affidavit says.

14   A.   Okay.

15   Q.   That at some time prior to 1994 and after 1985, the late

16   Gerry Deegan said to me that he had intentionally suppressed

17   blood evidence in the armed robbery trial of John Thompson that

18   in some way exculpated the defendant.

19   A.   No, I can't pin it down more.  It was in April of '94.

20   That's what I believed to the best of my ability, yeah.

21   Q.   Do you think it was shortly before Mr. Deegan died?

22   A.   Well, I know it was in -- it was in the same conversation

23   that he told me he was going to be dying soon, and I know that

24   that conversation occurred in April of '94.  I remember that

25   specifically.

1   Q.   Are you aware that in 1999, Mr. Connick was presented by

2   Mr. Thompson's attorneys with certain evidence that a blood lab

3   report had been suppressed and also provided him with a copy of

4   this affidavit?  Are you aware of that?

5   A.   I know that they were provided with a copy of the affidavit.

6   I know that there was a crime lab report.  Do I know that it was

7   suppressed, no.  I would be -- I would surmise that it was, but I

8   don't know that it was.

9   Q.   Do you recall in or by June of 1999 attending a hearing

10  presided over by Judge Patrick Quinlan, judge of Criminal

11  District Court for the Parish of Orleans?

12  A.   I do.

13  Q.   Do you know what the nature of that proceeding was about?

14  A.   It was a joint -- I believe a joint motion for a new trial.

15  Q.   And who were the parties making that motion?

16  A.   The District Attorney's Office and Mr. Thompson.

17  Q.   And by District Attorney's Office, you mean Harry Connick?

18  A.   That's correct.

19  Q.   Okay.  Now, did you testify at that proceeding?

20  A.   I did.

21  Q.   And do you recall what you were inquired of?  What did they

22  ask you about at that hearing?

23  A.   About what we're talking about today.  About Mr. Deegan's

24  conversation with me.

25  Q.   Now, do you recall there ever being a Grand Jury proceeding

1  or -- the use of a Grand Jury as an investigative tool where

2  issues related to this may have come up?

3  A.   I'm recalling it now for the first time in years.  I had

4  forgotten about that entirely.  But, yeah, I do recall that.

5  Q.   Did you ever have to appear before the Grand Jury?  And I

6  won't ask you what you said, but did you have to have -- to

7  appear before the Grand Jury?

8            THE WITNESS:  If I'm permitted to say that, Judge?

9            THE COURT:  Yes.

10            THE WITNESS:  Okay.  I do recall that I appeared before

11  the Grand Jury, yes.

12                    EXAMINATION

13  BY MR. AARON:

14  Q.   And you do recall that the Grand Jury action was commenced

15  by Harry Connick?

16  A.   Him being the DA at the time, I would imagine that he would

17  be the only person that could have commenced it, yes.

18  Q.   Now, in terms of filing bar complaints against you, do you

19  know if Mr. Connick filed bar complaints about anyone else

20  relative to this?

21            MR. BANKS:  Objection, Your Honor, I would ask to see

22  the Court sidebar on this.

23            THE COURT:  Okay.

24            (WHEREUPON, there was a bench conference.)

25            MR. BANKS:  Your Honor, the defendants filed Motion in

1  Limine.

2          THE COURT:  Wait, wait, wait.  This is exactly the

3  subject that you wanted me to rule on the Motion in Limine that

4  they not raise and now you're raising it.

5          MR. AARON:  If I can say, we met with your law clerk --

6          THE COURT:  Keep your voice down.

7          MR. AARON:  We met with your law clerk this morning on

8  jury charges.  They came with a new jury charge, a Sixth Circuit

9  case that says if you did not --

10         THE COURT:  Well, I don't know about jury charges

11  because I haven't decided what the jury charge is going to be.

12         MR. AARON:  Here is my problem, my fear is, this is the

13  problem, this is what their case says.

14         THE COURT:  Do you want to go into it?  Do you want to

15  open the door to all the Grand Jury stuff?

16         MR. AARON:  Well, I don't care.

17         THE COURT:  Do you want to go there?

18         MR. BANKS:  It's his decision.

19         MR. AARON:  They don't mind me doing it, but here's the

20  problem, let me just tell you why I'm doing it.  It's the jury

21  charge.  The jury charge --

22         THE COURT:  Don't worry about the jury charge.  We're

23  talking about evidence now.  We're not talking about the jury

24  charge here.  You don't know what the jury charge is going to be

25  because I don't know what it's going to be.

1        MR. AARON:  Well, that's my problem, I don't know.

2        THE COURT:  Okay.

3        MR. AARON:  And they interjected a jury charge.

4        THE COURT:  Okay.  You've already opened the door to

5   Grand Jury so my only question is do you guys object?  If so, I

6   sustain it.  If you don't object, he's opened the door and you

7   can go ahead.

8        MR. BANKS:  I don't object to the Grand Jury as to the

9   ethics charges.  Those ethics charges.  The Grand Jury,

10  Your Honor, denied the motion but said we would see how it played

11  out.  The ethics charges, Your Honor, I believe, granted the

12  motion -- unless we opened the door and we haven't finished our

13  case or styled our case and the Court's ruling --

14       THE COURT:  I don't even know what the ethics charges --

15       MR. BANKS:  The ethics charges filed by Whittaker and

16  Williams, that never went anywhere.  We don't know what happened

17  to them, we don't know what evidence Connick presented, but they

18  didn't want that coming in because no probable cause was found.

19  And now after our case is done, after they got the ruling they

20  wanted on Motion in Limine, they want to use it.

21       THE COURT:  Okay.  Okay.  Very simple.  Do you object to

22  his last question or do you withdraw your objection?  It's up to

23  you.

24       MR. BANKS:  I'm not withdrawing the objection as to the

25  ethics charges.

 1          THE COURT:  No, no, he's asking about -- wait, let me

 2    see.  Wait.  Wait.  Maybe I misunderstood the question.

 3          MR. AARON:  I didn't ask him.

 4          THE COURT:  Wait, I've got it right here.

 5          Here is the question that's pending:  "In terms of

 6    filing bar complaints against you, do you know if Mr. Connick

 7    filed bar complaints by anyone else relative to this?"

 8          I see.  Okay.  I misunderstood.  I thought he was still

 9    talking about Grand Jury.  You object?

10          MR. BANKS:  Yes.

11          THE COURT:  I sustain it.  Okay.

12          (WHEREUPON, the bench conference concluded.)

13                          EXAMINATION

14    BY MR. AARON:

15    Q.   Other than Mr. Deegan, did anyone else confess to you about

16    suppressing evidence with respect to John Thompson?

17    A.   No, sir.

18          MR. AARON:  I have no further questions, Your Honor.

19          THE COURT:  All right.  Mr. Banks.

20          MR. BANKS:  Thank you, Your Honor.

21                       CROSS-EXAMINATION

22    BY MR. BANKS:

23    Q.   Hello, Mr. Riehlmann.

24    A.   Hello.

25    Q.   I believe in your affidavit you say you were an Assistant

1  District Attorney from 1985, October '85 until October of 1988;

2  is that right?

3  A.   Yes, sir.

4  Q.   In Mr. Connick's office the entire time?

5  A.   Yes, sir.

6  Q.   Did you have experience in criminal law or procedure before

7  that other than law school?

8  A.   No.

9  Q.   When did you graduate law school, sir?

10  A.   May of 1983.

11       MR. AARON:  Objection, Your Honor, it goes beyond the

12  scope of direct exam.

13       THE COURT:  When did he graduate from law school, you

14  object to that?

15       MR. AARON:  No, he asked him what training he got on

16  *Brady*.  I didn't ask him that on direct.

17       THE COURT:  The question was when did you graduate from

18  law school and the answer was May of 1983 and you objected.  That

19  was the question.

20       MR. AARON:  Maybe I heard something.  I think it's

21  getting late in the day, Judge.  I thought I heard him asking

22  something about *Brady*.

23       THE COURT:  Maybe you're anticipating something.

24                         EXAMINATION

25  BY MR. BANKS:

1  Q.   Was Mr. Deegan a peer of yours?

2  A.   He was -- he and I were law school classmates, and then

3  worked together at -- for a period of time at the District

4  Attorney's Office, yes.

5  Q.   You started about the same time at the office as Mr. Deegan

6  or he was there before you?

7  A.   No, he was there before me.

8  Q.   Maybe Mr. Aaron was anticipating my question.  Can you tell

9  us, sir, what training you had at the DA's Office --

10       MR. AARON:  Objection, Your Honor, outside the scope of

11  direct.

12       MR. BANKS:  Your Honor, I believe this is a subject that

13  this witness as an Assistant District Attorney can talk about

14  rather than us calling him.

15       THE COURT:  Yeah, you have a right to call him back in

16  rebuttal, if necessary.  Both sides have listed Mr. Riehlmann as

17  a possible witness, so I'm going to overrule the objection.

18                         EXAMINATION

19  BY MR. BANKS:

20  Q.   Mr. Riehlmann, tell us what training you had with regard to

21  a prosecutor's obligation under *Brady* during the entirety of your

22  time at Mr. Connick's District Attorney's Office.

23  A.   Well, training, I mean, I guess that could encompass a

24  number of things, but mainly at Mr. Connick's office you were

25  trained on the job.

1  Q.    Meaning, I'm sorry, I didn't mean to cut you off, sir.

2  A.    You were trained on the job.  You were put in a courtroom

3  with a more experienced attorney, and then as you were able to

4  handle yourself, you were given more responsibility.  Initially,

5  you weren't given much responsibility at all.

6         To answer your question specifically as it relates to

7  *Brady*, I don't recall that I was ever trained or instructed by

8  anybody about my *Brady* obligations, no.

9  Q.    There were some gray areas under *Brady*, right, as to what

10 was -- what you were required to produce and what you weren't

11 required to produce?

12 A.    I never thought so, no.

13 Q.    Did you have any reason to believe that your friend,

14 Mr. Deegan, had any more training than you did on *Brady*?

15 A.    I couldn't speak to that because he was there for a year or

16 so before I was.

17 Q.    Now, when you met with Mr. Deegan and he told you in the

18 time shortly before his death that he had suppressed evidence,

19 did he say anything about whether or not Mr. Dubelier was

20 involved in that?

21 A.    No.  He might have, but I don't recall that he did.

22 Q.    So at least at this point, you can't say whether

23 Mr. Dubelier was involved or wasn't involved?

24 A.    No, I cannot.

25 Q.    And the same with Mr. Williams, can you say based on what

1  Mr. Deegan told you whether Mr. Williams was involved or was not

2  involved?

3  A.    No, I cannot.

4  Q.    I think you said this whole thing surfaced, your affidavit

5  and the statement you gave us as a result of Mr. Whittaker

6  sharing with you that Mr. Cooney and I had talked to him; is that

7  right?

8  A.    That's correct.  That's correct.

9  Q.    And then you volunteered to Mr. Whittaker something that you

10 remembered from your prior discussion with Mr. Deegan?

11 A.    That's correct.

12 Q.    And you said you were Mr. Whittaker's partner and good

13 friend?

14 A.    Correct.

15 Q.    Now, at this point, had Mr. Whittaker told you that the

16 blood report that we had shown him was addressed to him; namely,

17 on the top of the blood report it said to Assistant District

18 Attorney Bruce Whittaker?

19 A.    I don't remember if he told me that or not.

20 Q.    You learned that at some point, though?

21 A.    Yes.  I guess I surmised that that is why you and Mr. Cooney

22 went to speak to him because it was his name on --

23 Q.    So at the stage that Mr. Whittaker told you about it, did

24 you think maybe he was in some potential trouble for failing to

25 turn it over?

1  A.    No, I never thought that.

2  Q.    Had you heard anything else at that point about what

3  Assistant District Attorneys had seen or not seen the blood

4  report?

5  A.    No.

6  Q.    The only thing you knew at that point was that the blood

7  report was addressed to your partner and friend?

8  A.    I believe I knew that.

9  Q.    And when you prepared this affidavit, this indicated that at

10 least that Mr. Deegan was to be assigned some fault or

11 responsibility in connection with the failure to produce blood

12 evidence or the blood report or something?

13 A.    Yes.

14 Q.    Mr. Deegan didn't tell you specifically about a blood report

15 as opposed to blood evidence, did he?

16 A.    I don't remember exactly what he said.  All I know is that

17 whatever it was that Bruce told me in our conversation triggered

18 the memory I had of the other conversation with Mr. Deegan.

19 Q.    I will represent to you that Mr. Whittaker has testified in

20 this court that he took the blood report that he got and he put

21 it on Mr. Williams' desk.  Do you know whether that's true or

22 not?

23 A.    I've heard him testify to that.

24 Q.    But you don't have any independent knowledge?

25 A.    No, I don't.

1   Q.   You don't know whether it ever made its way to Mr. Deegan?

2   A.   No.  I wasn't even in the office then.

3   Q.   You don't have any reason to believe, for example, that

4   Mr. Deegan would have taken it off of Mr. Williams' desk?

5   A.   I would have no reason to believe that.

6   Q.   In assigning some responsibility to Mr. Deegan who was

7   deceased, did this take some of the pressure off of your friend

8   and partner, Mr. Whittaker?

9   A.   I never considered him to be at fault or to have any

10  pressure on him.  I don't know that I could answer that question.

11  How I can answer that question.

12  Q.   When Mr. Whittaker approached you and you told him about

13  this, did he suggest that you come forward to Mr. Cooney and me

14  to give us this information?

15  A.   He did, but it was my recollection it was more out of a

16  sense that you could have this information and it ought to come

17  to light and not -- but, yes, to answer your question.

18  Q.   He also had information in 1985 and he didn't do anything to

19  bring it to light then, did he?

20  A.   I don't know what he did then.

21  Q.   What's your practice now, sir?

22  A.   I would say it's 95 percent criminal defense.

23  Q.   You represent criminal defendants routinely?

24  A.   I'm a public defender in Jefferson Parish and I've worked

25  here in federal court on, as an attorney for indigent defendants.

1  Q.   Do you find as someone who has practiced in this field on

2  the prosecution side and on the defense side that sometimes when

3  people are caught red-handed doing something wrong, they are a

4  little bit more likely to speak up than they would be otherwise?

5  A.   I don't know that I could answer that question honestly.

6  Q.   Would you say sometimes when people are caught red-handed

7  with something, they are more likely to want to put the blame on

8  someone else?

9       MR. AARON:   Objection, Your Honor, this is a

10 hypothetical.

11      THE COURT:   I sustain the objection.

12                          EXAMINATION

13 BY MR. BANKS:

14 Q.   You knew there was a motion filed for a new trial by

15 Mr. Connick in 1999, didn't you?

16 A.   You mean that resulted in the hearing before this --

17 Q.   Yes, the hearing at which you testified and at which your

18 affidavit was presented?

19 A.   Yes, sir.

20 Q.   Right?

21 A.   Yes, sir.

22 Q.   That was the first time the DA had done anything in the

23 14 years since Mr. Thompson was charged with carjacking and

24 convicted, to bring this blood evidence to a public hearing, as

25 far as you knew; right?

1   A.   As far as I know, yes.

2   Q.   Now, by that time, Mr. Connick had been confronted with the

3   blood report, the crime scene technician report, the Screening

4   Action Form that Mr. Whittaker did, a card or a test showing

5   Mr. Thompson's blood type and a blood card from Mr. LaGarde, the

6   driver from the carjacking; correct?

7   A.   I really don't know all of that, Mr. Banks, honestly.

8   Q.   Well, by the time we came to you, there was pretty

9   compelling evidence showing that Mr. Thompson wasn't the

10   perpetrator; right?

11   A.   Well, as I recall, when you came to my office for us to do

12   that affidavit, we -- I believe you had a copy of the NOPD crime

13   lab report showing the blood type of the -- taken from the crime

14   scene.  I believe, I don't recall that you had anything showing

15   what Mr. Thompson's blood type was, but I believe you told me

16   what it was and that it was clearly inconsistent with -- the two

17   were different blood types.  But as far as the other documents

18   that you made reference to, I don't know that I've seen those.  I

19   just don't know if I've ever seen those other documents.

20   Q.   Did you feel that in 1999 when Mr. Connick filed this motion

21   for a new trial, he was doing the right thing?

22   A.   Absolutely.

23   Q.   But by that point, the office had already been caught

24   withholding a blood report from 14 years ago; right?

25   A.   I suppose you would have to draw that conclusion, yes.

1    Q.    Doing the right thing after you have been caught is a little

2    bit different from doing the right thing before you got caught,

3    isn't it?

4    A.    I suppose, yes, sir.

5         MR. BANKS:  Thanks.  No further questions,

6    Mr. Riehlmann.

7         THE COURT:  Any redirect, Mr. Aaron?

8         MR. AARON:  Yes, Your Honor.

9                    REDIRECT EXAMINATION

10   BY MR. AARON:

11   Q.    When Mr. Deegan made his confession to you about suppressing

12   evidence, did he state to you that he did it because he wasn't

13   trained by Harry Connick?

14   A.    No.  Again, I don't recall the exact words he used, but I

15   never got that impression.

16   Q.    You never got that impression; right?

17   A.    No, sir.

18   Q.    Okay.  It has been just suggested that Mr. Connick did

19   nothing for 15 years.  Do you have any knowledge that Mr. Connick

20   learned about the suppression of blood evidence prior to your

21   affidavit in 1999?

22   A.    No, I don't.

23         MR. AARON:  I have no further questions.

24         THE COURT:  All right.  You can step down.  Thank you,

25   Mr. Riehlmann.

1              All right.  You can call your next witness.

2              MR. AARON:  Mr. McElroy.

3              THE DEPUTY CLERK:  Mr. McElroy, please raise your right

4    hand.

5                          **TIMOTHY McELROY**

6     was called as a witness and, after being first duly sworn by the

7     Clerk, was examined and testified on his oath as follows:

8              THE WITNESS:  My name is Tim McElroy or Timothy, Tim

9    McElroy, M-C-E-L-R-O-Y.

10                         DIRECT EXAMINATION

11   BY MR. GOINS:

12   Q.   Mr. McElroy, how are you presently employed?

13   A.   I am the chief of trials for the Jefferson Parish District

14   Attorney's Office as a prosecutor.

15   Q.   Have you always held that position?

16   A.   No.

17   Q.   And what position did you hold prior to being the chief of

18   trials?

19   A.   I was a chief of the Screening Division in District Attorney

20   Paul Connick's office in Jefferson Parish.

21   Q.   When did you first go to work for Mr. Connick, for Paul

22   Connick in Jefferson Parish?

23   A.   I began the day following Mr. Harry Connick's at the last --

24   the last day of Mr. Connick's term, I started the very next day

25   at District Attorney Paul Connick's office.

1   Q.   And the Mr. Connick you're referring to is

2   Mr. Harry Connick?

3   A.   I am.

4   Q.   Which position did you have on the last day of the term of

5   Mr. Harry Connick?

6   A.   I was District Attorney Harry Connick's first assistant.

7   Q.   When did you first go to work for Mr. Harry Connick?

8   A.   I began work as a law clerk in District Attorney

9   Harry Connick's office in or about the summer of 1983.

10  Q.   And then when you graduated from law school, did you go to

11  work for the District Attorney's Office?

12  A.   Actually, when I graduated from LSU Law School in 1977, my

13  first job as a lawyer was to return home to Houma.  My home is

14  Houma, where I grew up in Terrebonne Parish, and I began work for

15  District Attorney Norvel Rhodes in 1977.

16  Q.   When you first went to work for the Houma District

17  Attorney's Office, were you given any training?

18  A.   In the Houma District Attorney's Office?  Yeah.  My training

19  was to be with Jim Alcock.

20  Q.   Did you have any formal training?

21  A.   I -- really, the word "formal" training for me is, you'll

22  have to -- ask me what you mean.

23  Q.   In a classroom?

24  A.   Classroom instructions?

25  Q.   Where the only thing you're doing is being trained on a

1    subject matter that has relevance to the work that you perform?

2    A.   I did not in District Attorney Norvel Rhodes' office, I did

3    not ever have a classroom presentation other than annually the

4    Louisiana District Attorneys Association and most District

5    Attorneys' Offices, if not all of them, are members of the

6    Louisiana District Attorneys Association host -- I think at that

7    time it might have been an annual educational seminar.  So in

8    terms of formal classroom podium presentations, I did go to the

9    Louisiana District Attorneys seminars in 1977, '78, '79.

10   Q.   This is before you went to work for District Attorney

11   Harry Connick?

12   A.   Oh, yes.  I went to work for District Attorney Harry Connick

13   in the summer of 1983.

14   Q.   What types of subjects were addressed in the Louisiana

15   District Attorneys training?

16   A.   Oh, every variety of subject.

17   Q.   Then let's shorten this.  Was the subject of *Brady*

18   disclosures ever addressed in the Louisiana District Attorneys

19   training?

20   A.   I have to tell you, I cannot recall specifically what the

21   topics of instruction were in 1977 and '78 and '79.  Nor for that

22   matter, when I returned to the work as a prosecutor in 1984 and

23   then through now, today, I cannot tell you at any one of those

24   seminars and I go almost annually if at every session there was a

25   *Brady*, but *Brady* in a prosecutor's world is something you study

1  all the time.

2  Q.   Have you ever been a presenter at those seminars?

3  A.   Yes.  I've taught at those seminars.

4  Q.   Now, you said that you joined the Orleans Parish District

5  Attorney's Office, Harry Connick's office in 1983 as a law clerk;

6  is that right?

7  A.   I did.

8  Q.   Did you ultimately become an Assistant District Attorney?

9  A.   Oh, yes, I was sworn on my birthday in 1984.

10 Q.   And what position -- what was your job description and job

11 duties when you first assumed the position as the Assistant

12 District Attorney with Harry Connick's office?

13 A.   In District Attorney Harry Connick's office, the typical

14 program was to employ the newer assistants in what we refer to as

15 "support units," that is, where you are prosecuting cases before

16 a judge alone and not a jury so that you can learn how to marshal

17 evidence, we call it "marshalling evidence," which is to say, you

18 learn how to -- what evidence do I need to identify, how do I

19 introduce it, when do you object, how to direct exam, how to

20 cross-exam.  Trial techniques.  After you become aligned in those

21 areas, you're then assigned to the, what we would call the

22 "Felony Division," the "Trial Division" where you then begin

23 working with a partner in a section of court in which like

24 Judge Barbier's court here where there will be a jury seated, you

25 will be at the table with another prosecutor, lead prosecutor and

1  co-counsel.

2          So the question was, where did I begin?  I began in the

3  Appeals Division.  Because I had previous prosecutor experience

4  and they needed me in the Appeals Division.  I then moved to the

5  Magistrate Division.  I then went directly into trials fairly

6  quickly.

7  Q.   Let's slow down.  When did you go into trials?

8  A.   I went into trials -- if I was sworn in January of 1984, I

9  believe I went into trials as early as February or March of 1984.

10 Q.   So you didn't stay in the other two divisions very long?

11 A.   No, I had been a prosecutor in the other office as I

12 mentioned.

13 Q.   And when you went into the trials, the Felony Trials

14 Division --

15 A.   Yes, sir.

16 Q.   -- were you a junior?

17 A.   Yes, sir.

18 Q.   Or a senior?

19 A.   I was a junior.

20 Q.   And what were the responsibilities of a junior?

21 A.   The junior is the grunt.  The junior is the go-to person.

22 The junior is the you've-got-to-learn-what-to-do person.  Call

23 this witness, line up that police officer, go check the evidence,

24 see whether or not the police officers are available.  In other

25 words, the junior basically learns how to put a case together

1   under the direction of a senior assistant.  In fact, it's an

2   internship.  The junior can also, if the senior believes, the

3   junior can also assume leadership in some trials.  Such as

4   relatively simple prosecutions, a police officer in a narcotics

5   case where there is a professional witness, a police officer,

6   these kinds of simple cases.  As the cases become more complex,

7   the cases are -- the senior prosecutor in the court would be

8   responsible for those.

9   Q.   And so you were supervised by the senior?

10  A.   As a junior, I was supervised by the senior.

11  Q.   And is it fair to say that you received your training from

12  the senior?

13  A.   Every day.  Every day.

14  Q.   Did you --

15  A.   Every waking, every hour.

16  Q.   Did you ultimately become a senior?

17  A.   Yes.

18  Q.   And when did you become a senior?

19  A.   I really cannot tell you when I became a senior.  Again, I

20  moved relatively quickly through Mr. Connick's office because I

21  had had experience as a prosecutor in another office and I had

22  prosecuted major cases in 1977 and '78 and '79.  So once I had

23  done a run as a junior assistant and learned about the Orleans

24  process in selecting jurors and preparing witnesses and pretrying

25  cases, I became a senior relatively quickly.

1  Q.   Were you a senior in the April, May to June time frame in

2  1985?

3  A.   In '85?  Definitely.  Definitely.

4  Q.   And then what position did you attain after being a senior?

5  A.   In about 1987, I was selected to become the deputy chief of

6  trials.

7  Q.   Did you skip over any positions when you became the deputy

8  chief of trials?

9  A.   No.  I was making progression into management.  I had

10  become, I had been a junior assistant, I had become a senior

11  assistant, and at that point, by having been appointed to be

12  deputy chief of trials under Bridget Bane, I was beginning a

13  management track.  So I would say in 1987, I was tapped for

14  management and I have been in management for virtually 20 years

15  as a prosecutor.

16  Q.   Which position did you attain after the deputy chief of

17  trials?

18  A.   In 1988, the following year, I was made chief of trials.

19  Q.   Did you at any point in time have any supervision or

20  responsibilities for the screeners that worked in the office?

21  A.   Yes.  In 1990, I became the chief of screening.  I moved

22  from trial chief to screening chief, which is a completely

23  different division in the office.

24  Q.   What is the responsibility and function of the screeners?

25  A.   The screeners, under the Harry Connick organization, were

1  supposed to be your most experienced attorneys in the office.

2  Their responsibility was to take a police report, review what the

3  police officers accused the citizen of doing, determine whether

4  or not the evidence was lawfully seized, whether or not the

5  offense occurred in the jurisdiction, in this case in Orleans

6  where I worked, whether or not all of the evidence was complete,

7  and most importantly, whether or not the evidence was provable

8  beyond a reasonable doubt, which is in a criminal case what the

9  burden of the prosecutor is to prove their case beyond a

10  reasonable doubt.  Screeners make those decisions on every

11  arrest.

12  Q.   Did the screeners play any role in the analysis of *Brady*

13  issues?

14  A.   Every District Attorney, every District Attorney has a role

15  in the analysis of *Brady* determination.  Every Assistant District

16  Attorney.

17  Q.   After heading the Screening Division, what did you do next?

18  A.   Well, I did that for about a dozen years.  And then after

19  Camille Buras was elected to the criminal court bench, I

20  succeeded Camille Buras who was elected to the bench and I became

21  the first assistant to District Attorney Harry Connick.

22  Q.   Were there many Assistant District Attorneys who were

23  elected to the bench under Harry Connick's administration?

24  A.   There are like 12 sitting judges and I know of least five

25  who had served in Harry Connick's office and some of them as

1  first assistant.  And, yes.  And several other judges on that

2  bench, I served with as Assistant District Attorneys who are

3  criminal court judges.

4  Q.   How long were you the first assistant?

5  A.   Camille was elected in 1998.  I took -- therefore, when she

6  assumed the bench, I took her job as first assistant in October

7  of 1998.

8  Q.   And then when did you leave that position?

9  A.   The day District Attorney Harry Connick left office, I left

10 office.

11 Q.   That was in 2003; is that correct?

12 A.   That was January 13, I think, 2003.

13 Q.   So you were in the District Attorney's Office for 20 years,

14 1983 through 2003; is that correct?

15 A.   Actually, I think it's 19 because I'm starting to work my

16 retirement out.  So I was there about 19 years in District

17 Attorney Harry Connick's office.  I've been in Paul Connick's

18 office four years.

19 Q.   And you worked your way from the bottom of the ladder to the

20 top of the ladder at the District Attorney's Office; is that

21 correct?

22 A.   Yes.  Yes.

23 Q.   To the best of your knowledge, what was the scheme or

24 process that was in place in the District Attorney's Office for

25 addressing the issue of *Brady* evidence, uncovering and disclosing

1  *Brady* evidence?

2  A.    That's a very broad question.  In what respect are you

3  asking me, in the screening process, where a screener looks at

4  the -- there is many, many processes.  Every time a District

5  Attorney who has a separate oath, reviews a file, whether you --

6  the first District Attorney to do that is a screening attorney.

7  They'll review a file to determine whether or not there is

8  exculpatory evidence, which there is a lot of law in this, but it

9  means anything in a prosecutor's file which is favorable to the

10 man who has been arrested, the woman who has been arrested, the

11 accused.  The screeners do that first.

12       If the screener finds *Brady* material, the screener is

13 required to report that by calling someone or refusing the

14 charge.  Or the screener can note that on a Screening Action

15 Form, a form designed to follow the file, and forward an accepted

16 case on to a trial attorney.

17       If a screening attorney makes a decision that the

18 evidence is there and he believes a case can successfully be

19 prosecuted beyond a reasonable doubt, the screener accepts the

20 case, the Clerk's Office allots the case and it goes to a trial

21 attorney.  That's the second review for exculpatory material.

22       In Harry Connick's organization, there are three team

23 members in every court, an investigator, who is typically a

24 New Orleans police officer retired, reviewed the file.  Then the

25 junior assistant, which I have described reviewed the file.  Then

1  the senior assistant.  So there are three more individuals

2  reviewing.  Now, they are not just looking for exculpatory

3  material.  They are learning the file.  Part of learning the file

4  is reviewing whether or not there is information in the file that

5  can be favorable to the accused.

6  Q.   Let me stop you there.  If either, let's start with the

7  junior.  If the junior had a question with regard to *Brady*

8  evidence, looking at information, and could not determine for

9  himself whether or not the evidence that he was looking at needed

10  to be disclosed to the defendant, what could the junior do to

11  resolve that issue?

12  A.   What must the junior do?  And junior Assistant District

13  Attorneys really should not make a decision.  A junior assistant

14  is there in design to take that question to the senior attorney

15  who is the instructor, and the lead attorney.  So a junior

16  assistant must identify it and present the question to a senior

17  assistant.  And the senior assistant will make that

18  determination.

19  Q.   Now, the initial screen begins with the screener?

20  A.   Yes.

21  Q.   And is the screener more experienced than the senior?

22  A.   It was not always so.  We tried to make that so.  What

23  Connick's office, the way Connick prepared the office chart was

24  to have very experienced people.

25           MR. COONEY:  Your Honor, can I interpose an objection?

1  Mr. McElroy was in this office twenty years.  I don't think we

2  have any time frame, we're talking about different times here.  I

3  think it's very confusing if we don't have a time frame on this.

4        THE COURT:  Yeah, I sustain that.  I think you need to

5  pinpoint when you're talking about.

6                          EXAMINATION

7  BY MR. GOINS:

8  Q.   Mr. McElroy, did the procedure that you first experienced

9  when you went to Mr. Connick's office with regard to screening,

10 did that procedure stay the same?

11 A.   What I have described for you is at '84 and '85.  Those are

12 my personal experiences.  It's not what I read.  I was there.

13 The screeners in --

14 Q.   Excuse me.

15 A.   Go ahead.

16 Q.   Did the process change over time?

17 A.   No.

18 Q.   Was there any element added?  Was there any element of

19 formal training --

20 A.   Oh, there were several.

21 Q.   -- added at any point?

22 A.   There were several elements added over the years.  But I'm

23 telling you what was in '84 and what maintained.  Many things

24 were added, yes.

25 Q.   So is it fair to say that the description you're giving now

1   is the minimal process that existed when you first went to work

2   for Harry Connick?

3   A.   '84?

4   Q.   1984.

5   A.   That's correct.  And maintained throughout.

6   Q.   And as time went by, additional elements were added?

7   A.   Right.  But nothing was subtracted.

8   Q.   So it became more sophisticated as the time went by?

9   A.   And you asked me the question of whether or not experienced

10  persons were in screening.  My answer is, if at all possible we

11  took the experience, once you finish as a senior assistant as

12  I've described for you, and you didn't make the management track

13  like I was lucky to do, you would typically go into the screening

14  function.  Because then you could -- you weren't in court every

15  day getting beat up.  You were reading police reports and talking

16  to police officers and civilian witnesses and asking them

17  questions.  So after you were a senior attorney and you

18  prosecuted so many cases every day you were in court, what

19  Mr. Connick's organization required is that you then went to a

20  screening function and you reviewed cases.  So that was, that was

21  ideal.  It wasn't always true.  We didn't always have all the

22  screeners being senior assistants.  But that's what our ideal

23  was.

24  Q.   So the first take was the screeners and then the next take

25  is the juniors.  If the senior --

1  A.    I'm sorry.  The next take is the police officer assigned to

2  that court.  And then the junior.

3  Q.    Now, the junior would go to the senior.  If the senior had a

4  problem, where would the senior address his issues?  Or her

5  issues?

6  A.    The senior assistant in each court had to pretry every case.

7  The senior assistant in every court had to pretry.  Whether you

8  had a problem with the case or not.  You had a responsibility to

9  pretry.  That is, to talk out the problems and the issues with

10  your trial chief or with your deputy trial chief.  So senior

11  assistants went to deputy chiefs or trial chiefs.

12  Q.    Was the junior present?

13  A.    Yes.

14  Q.    With the senior when the --

15  A.    I assure you.

16  Q.    -- when the two of them went to the pretrial?

17  A.    I assure you no senior would go into a pretrial without a

18  junior because all the work that the chief gave the senior would

19  be delegated by the senior to the junior.

20  Q.    Was there anyone else present in the prescreening other than

21  the chief?

22  A.    I'm sorry.  Could you repeat that.

23  Q.    In the pretrial --

24  A.    Yes.

25  Q.    -- and I probably misspoke, in the pretrial other than the

1  chief, the junior, and the senior, were there any other

2  individuals that would participate in the pretrial?

3  A.   No, it was a junior assistant, the senior assistant and the

4  deputy chief on some occasions, and the trial chief.  If the

5  assistants wanted a reduction on a case, the reductions would go

6  directly to the trial chief, because only the trial chief could

7  reduce cases.  So if a deputy chief could pretry with the senior

8  and the junior, but the trial chief had to pretry reduction

9  requests or dismissal requests.

10 Q.   What role, if any, did the pretrial play in the unearthing

11 of *Brady* material?

12 A.   A closer examination of what exactly -- this is what

13 pretrials were.  What's the theory of your case?  How do you

14 intend to prove it?  Who are your witnesses?  Have you talked to

15 them?  Have you gotten discovery from them?  Did you ask for

16 discovery from them?  Do you have information that is favorable

17 to the accused?  Have you been through any statements from the

18 defendant that you have to advise the defense attorney about?

19 Statements, evidence, statements from the defendant, evidence

20 taken from the defendant are matters that have to come before the

21 judge alone.  You want to make sure those matters are handled and

22 the judge has ruled on that before you call a jury.

23 Q.   Were there any other processes or checks and balances in

24 existence in District Attorney Harry Connick's office in the

25 1984-1985 time frame other than the ones that you've just told

1  the jury about?

2  A.   I told you about the LDAA function, the seminar.  There were

3  trial meetings.  This is a very important training, since, again,

4  I'm not sure exactly what the formal training question is.  This

5  would be -- this would be all the trial attorneys meeting on a

6  regular basis -- weekly basis with the trial chief.  Reviewing

7  for the whole, there were ten sections of court in 1984.  They

8  added two more criminal courts since then.  But there were ten

9  criminal courts, so you would have at or about 20 attorneys.

10 They would be all gathering around and that's when you would

11 share what happened this week.  What cases went to trial.  You

12 would, it was very collegiate.  This is where you exchanged

13 information.

14        There were also, and this is a very important piece of

15 this, examination for *Brady* because that's where you continue to

16 ask me, the chief of the Appeals Division in District Attorney

17 Harry Connick's office was responsible for reviewing all most

18 recent decisions, you would think so.  Whenever the appellate

19 courts issued opinions, the chief of appeals would have to digest

20 those opinions and would send out the opinions to the chief

21 staff, chief staff.  The chief of all the different divisions.

22 Sometimes those opinions didn't require any further discussion

23 from the chief of appeals.  Sometimes it took the chief of

24 appeals to come in and tell us what they meant, describe for us

25 and educate.  Sometimes the chief of appeals would teach, Bill

1   Campbell, just recently died, was the chief of appeals when I was
2   in the Trial Division.  And Mike McMahon, who is the U.S.
3   Attorney here would come and lecture us from a chief of appeals
4   position.  On those occasions where it was necessary.  Otherwise,
5   chief staff would disseminate those opinions to people who worked
6   under them.
7   Q.   Now, would those opinions to the best of your recollection,
8   include analyses of cases that involved *Brady* material?
9   A.   Of course.  Of course.  *Brady*'s only an aspect, a very
10  important aspect of a prosecutor's responsibility.  Another part
11  of it is was were there statements from the defendant that were
12  properly taken?  Was it properly advised?  Was there evidence
13  taken from the defendant?  In a legal way, was it legally seized.
14  So there were many areas in which, in prosecution, and in
15  criminal law you have to remain abreast.
16  Q.   So you provided us with a number of processes, checks and
17  balances designed to analyze *Brady* material.  Were there any
18  others than the ones that you've just provided us with?
19  A.   We're still talking in that time frame in which I am an
20  Assistant District Attorney, 1984, '85, '86, '87.  '88 I am trial
21  chief.  '89 I am screening chief.  Yes.  We added more.  As the
22  decisions from the U.S. Supreme Court began focusing on
23  exculpatory information, we added more instruction on
24  exculpatory.
25  Q.   Did you ever add any formal training?  In the classroom

1    training by an instructor standing up, providing instruction with

2    regard to *Brady*?

3    A.    Yes.

4    Q.    And when was that added?

5    A.    Well, the best of my recollection, somewhere, we began our

6    CLEs in our office sometime in the '90s.  Before we began our

7    instruction in the office, continuing legal education, I'm sorry,

8    in our office, before the State imposed a requirement on members

9    of the bar to have CLE, 15, I think we have 15 units you're

10   required to take, so we began instructing in our office.  Bridget

11   Bane might be able to tell you better, but I, I remember the

12   class instruction became more frequent.  And I cannot tell you a

13   specific year when it became more frequent.

14   Q.    Was there ever a policy enunciated by the District Attorney

15   himself, Harry Connick, with regard to *Brady* material?

16   A.    Again, I want to speak to policy, because as lawyers we've

17   talked about this.  There were memoranda on a regular basis

18   regarding different issues.  *Brady* is certainly one of them.

19   Q.    This is in the '84, '85 time frame?

20   A.    Yes.  At some point around 1987, my best recollection

21   because I was working with Bridget Bane as her deputy chief, we

22   compiled all the memoranda from all -- the trial chapter alone is

23   like 30 pages, 25, 30 pages dealing with various trial issues.

24   And the *Brady* policy that we had prior to when we put it in a

25   booklet form in 1987 was made a part of that booklet in 1987,

1  which we called our office policy manual.  We published it in

2  1987.  I remember that because I was a deputy chief and I helped

3  Bridget put all the memoranda from all the different locations

4  together.

5  Q.   And what was now, that -- the policy that was instituted in

6  1987, was that the first time that a policy was enunciated by

7  District Attorney Harry Connick to the best of your recollection?

8  A.   It is my recollection.  It was not the first time.

9  Q.   And when was the first time that you learned of a policy

10 that had been enunciated by the district attorney?

11 A.   When you walk in the door.  When you walk in the door.  1983

12 I began as a law clerk.  '84 I'm in appeals for a short while in

13 magistrate.  You're instructed on *Brady* from the very beginning

14 when you take your oath as a prosecutor.

15 Q.   Other than -- and what exactly was that policy to the best

16 of your recollection?

17 A.   Well, the one that is codified said that *Brady* is a -- *Brady*

18 is a Supreme Court decision from the '60s which refers to an

19 entire body of work.  There is a line of cases that continued to

20 define what the Courts mean when they say reveal to the accused

21 exculpatory.  What does that mean?  Exculpatory, evidence that is

22 favorable to the accused.  So when we talk about *Brady*, we're

23 talking about a continuing progression of cases.  You're exposed

24 to that progression of cases the minute you start working in a

25 District Attorney's Office.

1  Q.   And, again, can you tell us what the policy was?

2  A.   That anything favorable to the accused was disclosed.  That

3  if the information was -- frankly over time it began to develop

4  into different tests -- if the information is impeachment

5  information, that is where a witness could take the witness stand

6  and be asked questions that would be damaging to the State's

7  case, impeachment, that information then became *Brady* material.

8  And that, I remember from the very beginning, it was codified in

9  the policy manual as Article 5.2 something, I remember.  And we

10  defined it there specifically saying if -- you should review your

11  files for exculpatory information.  If you are not certain, you

12  should seek guidance.  If you're not certain from the guidance

13  you've got, then you need to ensure that those matters are

14  completely talked about.  Whether or not our policy at the time,

15  as it's written, required you to go to a judge, I don't quite

16  remember because I don't remember it verbatim.

17  Q.   Was there ever a policy that the District Attorney had in

18  the '84 through '85 time frame of withholding *Brady* material?

19  A.   A policy of withholding?

20  Q.   That's correct?

21  A.   No.  Never.

22  Q.   Were there any other policymakers, to the best of your

23  knowledge, and now we're talking about throughout the entirety of

24  your time frame because you began at the bottom and worked your

25  way all the way up to the top and you became first assistant, so

1  were there ever any other policymakers in the District Attorney's

2  Office other than Harry Connick?

3  A.    Never.  I've worked in three District Attorney's Offices.

4  There is one policymaker in the District Attorney's Office.

5  There are first assistants of chief prosecutors whose job it is

6  to report to the District Attorney that there is this problem,

7  the District Attorney, particularly this District Attorney will

8  say, and what are you doing to address it.  Well, this is what

9  we're going to do.  We're going to write this, we're going to

10 come to you, we're going to show you what it is we intend to

11 teach.  So he relies on -- this man relies on his first assistant

12 to tell him what the problem is, create a policy, bring it to

13 him, he looks at it, talks to you, blesses it and then it's

14 incorporated into office practice.  There is a policy and then

15 there is a practice.  The practice is to implement the policy.

16 Sometimes the practice failed to implement the policy.

17 Q.    During the time frame when you were a first assistant, I

18 mean, a second and then a first, were you ever at any point in

19 time instructed by any supervisor to disregard *Brady*?

20 A.    By a second?  I'm sorry.

21 Q.    By any supervisor, whenever you were either a first or a

22 second.

23 A.    Oh, you mean a junior or a senior?

24 Q.    Junior or senior.

25 A.    First is reserved for the first assistant.  Sorry about

1  that.

2  Q.   I misspoke.   I apologize.

3  A.   The junior or senior assistant -- what was the question?

4  Q.   Was there ever a point in time when a supervisor instructed

5  a junior or a senior to disregard -- instructed you to disregard

6  *Brady*?

7  A.   It never happened.   It never happened to me.   I never heard

8  it.   I never heard it.   And I would have.

9  Q.   What was Harry Connick's attitude towards training when you

10 first went to work for the District Attorney's Office, to the

11 best of your knowledge?

12 A.   I know Harry very well.   He's not just my former employee --

13 employer, he's my friend.   It is one of my blessings to know this

14 man.   Harry was very energetic, very innovative and training was

15 a very important part of what he did.   In fact, training was a

16 very substantial part of Harry's office.

17      MR. GOINS:   Your Honor, I'm at a point where I'm going

18 to shift gears into the *Thompson* case and to what took place in

19 the 1990s and it's 5:25 or so.   This will take a little while.

20 Do you want to -- would Your Honor wish that we stop at this

21 point in time?

22      THE COURT:   How much more do you have to go?

23      MR. GOINS:   I probably have at least another 30 to

24 45 minutes, Your Honor.   At least 30 minutes.

25      THE COURT:   All right.   We'll recess for the evening

1  right now.  Ladies and gentlemen, please close and leave your

2  notebooks in your chairs or under your chairs.  Remember my

3  admonition about not discussing the case when you're at home this

4  evening.  And please be back here so we can try to start at 8:30

5  in the morning.  Have a good evening.

6          THE DEPUTY CLERK:  All rise.

7          (WHEREUPON, the jury panel leaves the courtroom.)

8          THE COURT:  Let's talk about what witnesses the

9  defendants are going to call tomorrow after Mr. McElroy

10  concludes.

11          MR. GOINS:  The District Attorney Harry Connick will be

12  next.

13          THE COURT:  Okay.  Then who?

14          MR. GOINS:  Val Solino.  And then Bridget Bane.

15          MR. AARON:  Bridget Bane.  We may call Eddie Jordan.

16  I'll find out tonight, Your Honor.

17          MR. GOINS:  He would be the last one.

18          MR. AARON:  I doubt if I'm going to call him.

19          THE COURT:  If you do, that's going to be it?

20          MR. GOINS:  Yes, Your Honor.

21          THE COURT:  All right.  We'll see everybody back at 8:30

22  in the morning.

23          MR. BANKS:  Your Honor, if the evidence finishes either

24  shortly before or shortly after the lunch break, will you expect

25  that we would close tomorrow?

1     THE COURT:  It just depends on the timing.  I have to

2  play it.  You know, I don't want to tell you no and catch you by

3  surprise.  It just depends.  I try to calculate, you know, what

4  time we would get the case in the hands of the jury.  I don't

5  want to be sending them out at 5:00, 5:30 in the evening.  So

6  we'll just see.

7     MR. BANKS:  Fair enough.  Thank you, Your Honor.

8     (WHEREUPON, at 5:30 p.m. on Wednesday, February 7, 2007,

9  the proceedings were concluded.)

10                          *    *    *

11                   REPORTER'S CERTIFICATE

12

13    I, Cathy Pepper, Certified Realtime Reporter, Registered

14  Professional Reporter, Certified Court Reporter, Official Court

15  Reporter, United States District Court, Eastern District of

16  Louisiana, do hereby certify that the foregoing is a true and

17  correct transcript, to the best of my ability and understanding,

18  from the record of the proceedings in the above-entitled and

19  numbered matter.

20

21

22                    _____

23                    Cathy Pepper, CCR, RPR, CRR

24                    Official Court Reporter

25                    United States District Court