1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3
    ****************************************************************
4

5   JOHN THOMPSON

6                                CIVIL ACTION NO. 03-2045 "J"
    V.                           NEW ORLEANS, LOUISIANA
7                                THURSDAY, FEBRUARY 8, 2007, 8:30 A.M.

8   HARRY F. CONNICK, et al.

9
    ****************************************************************
10

11                            **VOLUME IV**
                    TRANSCRIPT OF TRIAL PROCEEDINGS
12          HEARD BEFORE THE HONORABLE CARL J. BARBIER
                    UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15

16  FOR THE PLAINTIFF:        MORGAN, LEWIS & BOCKIUS, LLP
                              BY:  J. GORDON COONEY, JR., ESQUIRE
17                                 MICHAEL L. BANKS, ESQUIRE
                                   S. GERALD LITVIN, ESQUIRE
18                            1701 MARKET STREET
                              PHILADELPHIA, PENNSYLVANIA, 19103
19

20

21  FOR THE DEFENDANT:        GOINS AARON, PLC
                              BY:  RICHARD GOINS, ESQUIRE
22                                 WILLIAM D. AARON, ESQUIRE
                                   MARK C. CARVER, ESQUIRE
23                            1010 COMMON STREET, SUITE 2600
                              NEW ORLEANS, LOUISIANA  70112
24

25  ALSO PRESENT:             HARRY CONNICK, ESQUIRE

1   OFFICIAL COURT REPORTER:        CATHY PEPPER, CCR, RPR, CRR
                                   500 POYDRAS STREET, ROOM B406
2                                  NEW ORLEANS, LOUISIANA 70130
                                   (504) 589-7779
3

4   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    Examinations                                    Page

4

5    **TIMOTHY McELROY** (Resumed)............................  766

6    EXAMINATION BY MR. GOINS (Resumed)....................  766

7    CROSS-EXAMINATION BY MR. COONEY.......................  786

8    **HARRY CONNICK**.........................................  818

9    DIRECT EXAMINATION BY MR. AARON.......................  818

10   CROSS-EXAMINATION BY MR. COONEY.......................  851

11   **BRIDGET BANE**..........................................  885

12   DIRECT EXAMINATION BY MR. AARON.......................  885

13   CROSS-EXAMINATION BY MR. BANKS........................  898

14   **VAL SOLINO** ...........................................  904

15   DIRECT EXAMINATION BY MR. BANKS.......................  904

16   CROSS-EXAMINATION BY MR. GOINS........................  929

17   REDIRECT EXAMINATION BY MR. BANKS.....................  930

18   **JOHN JERRY GLAS**.......................................  931

19   DIRECT EXAMINATION  BY MR. BANKS......................  931

20   CROSS-EXAMINATION BY MR. GOINS........................  984

21   REDIRECT EXAMINATION BY MR. BANKS.....................  991

22

23

24

25

1                          **P-R-O-C-E-E-D-I-N-G-S**

2                       THURSDAY, FEBRUARY 8, 2007

3                        M O R N I N G   S E S S I O N

4                         (COURT CALLED TO ORDER)

5

6              THE DEPUTY CLERK:  Everyone rise.

7              THE COURT:  Good morning.  Have a seat.  We have one

8    juror who is still missing.  Maybe she'll show up in the next few

9    minutes.  I'm not sure.  She's the same juror who was late on

10   Tuesday morning and held us up for a few minutes.  I don't know

11   if you-all even knew that but we started a little late Tuesday

12   morning because we were waiting for one juror to show up.

13             It seems like no matter how much I emphasize to these

14   folks the fact of being here early, being here on time, we always

15   get some straggler, and I don't know what to do with these folks,

16   you know.  I try to entice them to get here early by giving them

17   breakfast.  That doesn't work for everybody, I guess.  I know

18   this lady is coming from across the lake, Mandeville.  And that

19   could be a problem in itself.  But it just tells me that you need

20   to leave earlier.

21             MR. BANKS:  We would get here earlier for breakfast.

22             THE COURT:  There you go.  So let's see.  I'll wait

23   just a few more minutes.  If she doesn't show up, we'll just go

24   on without her.  We have enough jurors.  And like I said, the

25   fact that this is the second time she was late kind of tells me

1  something, you know.

2          Clay is working on a revision of the jury instructions

3  that we should have for you shortly this morning and he'll give

4  you that.  It's in response to some of the feedback that he's had

5  from both sides.

6          She's here?  All right.  I'm not going to talk to her

7  privately.  But anyway you-all will get that shortly.  And you

8  will also have a verdict form, a draft of a verdict form.  It's

9  very short, very simple.  I think it's like three questions.  And

10  sorry, Mr. Aaron, but I didn't incorporate your 47-question --

11          MR. AARON:  Judge, next time if I'm on the plaintiff's

12  side, I'll ask for three questions.

13          THE COURT:  But you did get one line.

14          MR. AARON:  I got a line.

15          THE COURT:  One line for damages.  Since both of you

16  asked for one line for damages, I decided to give you one line

17  for damages.  That's what you get.  So I guess both of you are

18  happy with that.

19          All right.  So your witnesses this morning, of course

20  you have Mr. McElroy, we're going to finish him, and then you

21  told me Mr. Connick would be next.

22          MR. GOINS:  That's correct, Your Honor.

23          THE COURT:  And then Mr. Solino.

24          MR. GOINS:  That's correct.

25          THE COURT:  And then Bridget Bane and then maybe

1  Mr. Jordan.  Have you decided that?

2          MR. AARON:  Your Honor, I had a conversation with

3  Mr. Jordan this morning.  He will not be appearing.

4          THE COURT:  Okay.  Have you got some estimate as to how

5  long it might take us to complete all of their testimony in just

6  your best estimate?

7          MR. GOINS:  Three hours.

8          THE COURT:  Three hours for all of it?

9          MR. GOINS:  Hopefully.

10          MR. AARON:  That's a guess, Judge.

11          MR. BANKS:  Is that estimate direct examination and

12  cross or just your questions?

13          MR. GOINS:  Well, I'm not trying to be a wise guy.

14  That's a reasonable cross, but a Philadelphia cross might take

15  more than that, Your Honor.

16          MR. AARON:  I think we can do everybody in three hours.

17  Mr. Connick will be longer than most.

18          MR. GOINS:  We'll try to keep it short, Your Honor.

19          THE COURT:  All right.  We'll see.  Okay.  Let's bring

20  in the jury.

21          THE DEPUTY CLERK:  All rise.

22          (WHEREUPON, the jury panel enters the courtroom.)

23          THE COURT:  All right.  Good morning, ladies and

24  gentlemen.  Please be seated.  I hope everyone had a pleasant

25  evening.  Ms. Nunez, are you having a little trouble getting here

1  in the morning?

2          JUROR:  Yes.

3          THE COURT:  You come from Mandeville?

4          JUROR:  Yes.

5          THE COURT:  You have traffic problems?

6          JUROR:  Traffic.

7          THE COURT:  I would like to ask you, I know it's

8  inconvenient, but I don't know whether we'd be -- how long it

9  would take, but just try to leave a little bit earlier because,

10  like I said, when one person is late, it holds up everybody.  We

11  can't start without you.  I appreciate it, though.  I know coming

12  from across the lake can be difficult sometimes.  Across the --

13  you come from, what, Mandeville across the Causeway?

14          JUROR:  Across the Causeway.

15          THE COURT:  All right.  Thank you, ma'am.

16          Okay.  We're going to resume where we left off.  We're

17  still on Mr. McElroy's direct examination.

18                          EXAMINATION

19  BY MR. GOINS:

20  Q.   Mr. McElroy, did there ever come a time when you learned

21  that there was an issue involving blood testing that had occurred

22  in the armed robbery trial of Mr. Thompson?

23  A.   Yes.

24  Q.   And when was it that you learned of that problem?

25  A.   In April of 1999.

1  Q.   What was it that you learned?

2  A.   I received as first assistant, I received a phone call from,

3  I believe it's two of the gentlemen, Mr. Michael Banks, Mr. J.

4  Gordon Cooney, that's the first time I had ever heard from these

5  gentlemen.  I received a phone call saying that they had

6  information that was critical, as I'm paraphrasing this as I

7  received it, information that was critical and it was of grave,

8  grave urgency, and they may have told me at that time there was

9  blood testing and typing that had been done and it affected the

10 rights of their client, John Thompson.  They also shared with me,

11 since I was not at that time familiar with Mr. Thompson, that

12 Mr. Thompson had been scheduled for execution, and that, of

13 course, ratchets up the concern to me.

14 Q.   Were you provided with any documents as a result of the

15 communications that you had from Messrs. Cooney and Banks?

16 A.   Yes.

17 Q.   Why?

18 A.   The gentlemen asked me if I could be available and I said

19 absolutely.  So the very next morning, I met with, I believe it

20 was both these gentlemen at the counsel table.  Prior to my

21 actually having met with them, I advised Mr. Connick, as I would

22 and should do, who said yes, immediately get them in.  Let's talk

23 about it.  At that time in our meeting, which I believe, if my

24 memory serves me correctly, was the day following the phone call.

25 It was immediate.  They provided me with several documents.

1  Q.   What documents were you given?

2  A.   The ones I recall specifically because it was the first time

3  I had ever seen a blood typing report, and it was in connection

4  with an armed robbery that the State alleged Mr. Thompson

5  committed.

6         There also was presented at that meeting, if my memory

7  serves me correctly, I think it was at that meeting, an affidavit

8  from Mike Riehlmann, who had been a former Assistant District

9  Attorney and a very experienced former Assistant District

10  Attorney at some time in the '80s, I remember Mike well, a

11  colleague of mine -- Mike Riehlmann executed a notarized

12  document, notarized by Bruce Whittaker.  The two of them were law

13  partners at that time.  This is April of 1999.  There may have

14  been a couple other documents, but those two strike me

15  immediately.

16  Q.   Did the document relate to the blood type of Mr. Thompson?

17  A.   Definitely.

18  Q.   And at that point in time, was there some question with

19  regard to the accuracy of the testing itself?

20  A.   Well, my impression was that the document -- as lawyers, a

21  document will typically speak for itself.  The document was a

22  crime laboratory report, and in that crime laboratory report it

23  indicated that blood, which had been spilled during the occasion

24  of the armed robbery, which had occurred in December of 1984, and

25  the report was dated April of 1985, in that report it said that

1   the blood had been typed B type, B, boy.  I did not know

2   Mr. Thompson's blood type.  And now that you asked me, I recall

3   that Mr. Cooney or Mr. Banks provided also a record of

4   Mr. Thompson's blood type.  I believe it was from Charity

5   Hospital.  Again, I'm not familiar with John Thompson at that

6   time nor these gentlemen from Philadelphia.  But it did indicate

7   a blood type of Mr. Thompson that was, critically was type O.

8   Q.   Was there anything done to determine the accuracy and

9   authenticity of the blood test itself?

10  A.   Well, my immediate concern, we had several very compelling

11  concerns at that moment.  My immediate concern was Mr. Connick

12  had said, given this information, I must now go into court

13  immediately, move Judge Quinlan to stay the execution.

14  Q.   And did he immediately move Judge Quinlan to stay the

15  execution?

16  A.   Yes.

17  Q.   Was it his decision?

18  A.   It was his decision and the gentlemen from Philadelphia

19  asked whether or not they could join us and, of course, they are

20  his counsel.  So we immediately moved, that was our first

21  priority, to resolve whatever questions were lingering at that

22  time, but in the meantime, Mr. Thompson's execution date had to

23  be stopped, halted, whatever vehicle required.  So we went to

24  Judge Quinlan, all of us, representing both Mr. Thompson and the

25  State of Louisiana, and immediately asked the Court to halt the

1    execution.  Judge Quinlan did so, of course.  That was our

2    primary concern.  My other concern was how do I confirm what

3    these gentlemen are telling me, because it's important from the

4    State of Louisiana's standpoint, I'm representing the State of

5    Louisiana, that we determine that there's more than an allegation

6    of defense counsel, in this case Mr. Cooney and Mr. Banks.  I

7    wanted to have Mr. Thompson's blood tested to confirm his blood

8    type.

9            I also immediately, this is now thinking in the year

10   1999, I'm thinking that if there's any evidence of blood, that I

11   immediately wanted that typed for DNA, because we're now, from

12   1985 when the prosecution occurred or 1984 when the blood was let

13   in December of '84 and typed in '85, I wanted, of course, to type

14   that blood in the year 1999 for DNA.

15   Q.   Were you able to do that?

16   A.   I could not.  I could not.  The garment that was the subject

17   of the blood typing had been destroyed, was missing, because we

18   made that inquiry with the Clerk of Court, and that the

19   opportunity, it was missing.

20   Q.   Okay.  And you've taken steps to halt the execution of

21   Mr. Thompson.  What, if anything, did Harry Connick do to address

22   the cloud that had arisen regarding the armed robbery conviction?

23   A.   Well, there were two vehicles.  One was what prosecution,

24   prosecution used a Grand Jury as an investigatory tool.  In

25   Louisiana, Grand Jury --

1           THE COURT:  Excuse me, Mr. McElroy.  Counsel, approach
2  the bench.

3           (WHEREUPON, there ws a bench conference.)

4           THE COURT:  This is very interesting, but you guys
5  filed a motion to exclude them bringing out anything about a
6  Grand Jury investigation or bar complaints which sounds like now
7  you're going to bring all that out yourself.

8           MR. AARON:  We had a discussion this morning.  We're
9  not going to bring the bar complaints, but we had a discussion
10 that we will bring the Grand Jury and they will be allowed to
11 bring Glas to.

12          THE COURT:  Okay.

13          MR. GOINS:  It wasn't my idea, Judge.

14          THE COURT:  That's all right.

15          MR. AARON:  I just want you to know how far it was
16 going to go.  We are not going to go into --

17          THE COURT:  Well, if y'all have worked that out, okay.
18 Fine.

19          MR. GOINS:  It wasn't my idea.

20          (WHEREUPON, the bench conference was concluded.)

21                              EXAMINATION

22 BY MR. GOINS:

23 Q.   I think I asked you what steps did Mr. Connick take to

24 investigate the cloud that had arisen regarding the armed robbery

25 conviction and you were talking about the Grand Jury?

1  A.    Yes.  Prosecution has available to it a Grand Jury.  Grand

2  jurors are impaneled for 6-month terms in the State of Louisiana,

3  during which term they hear what the prosecutors have in terms of

4  an investigation.  The --

5  Q.    Was there any other vehicle that was taken?

6  A.    Yes.  The Grand Jury was impaneled and heard one or two

7  sessions in May.  In June, the following month, there was a very

8  public hearing in front of Judge Pat Quinlan.

9  Q.    And how did that hearing come about?

10  A.    The hearing came about because once Mr. Thompson was

11  convicted of the armed robbery, there has to be a legal mechanism

12  to remove the conviction.  We at that time were convinced that

13  the conviction needed to be removed.  We had determined that

14  Mr. Thompson had been unfairly convicted, had been wrongfully

15  convicted.  Therefore, we, as the state, needed to process before

16  the Court a method of removing the conviction.  So we moved for a

17  new trial based on newly discovered evidence, and the vehicle

18  that we used, the motion for new trial was prepared by the chief

19  of our appeals and my right hand in the investigation, and

20  Harry's chief of appeals, Val Solino.

21  Q.    Is it fair to say that the new trial was intended to address

22  the issue of Mr. Thompson's conviction -- Mr. Thompson's armed

23  robbery conviction?

24  A.    That's exactly the purpose of it.

25  Q.    Is it fair to say that the Grand Jury investigation was

1  intended to address the issue as to whether or not there was any

2  wrongdoing with regard to the testing itself?

3  A.    Criminal wrongdoing.

4  Q.    Now, who was it that had the laboring oar for the Grand Jury

5  investigation?

6  A.    The laboring oar?

7  Q.    The laboring oars.   That's the one.

8  A.    As first assistant to Harry Connick, I assumed control of

9  the investigation.   That's one of the primary responsibilities

10 for a first assistant in Mr. Connick's administration.   So it was

11 I who had to marshal the evidence, had to determine what evidence

12 was available, who were going to be the targets, who were the

13 suspects, whether or not those suspects could be produced,

14 whether or not they had constitutional rights attached to them,

15 whether or not -- these kinds of things when you're determining

16 whether or not an investigation to a crime, there is many facets

17 and that would have been under my direct leadership, reporting

18 directly to the district attorney.

19 Q.    And with regard to the motion for a new trial, was that

20 filed jointly as well?

21 A.    By jointly, do you mean were Mr. Banks and Mr. Cooney --

22 Q.    That's correct.

23 A.    No question about it, no question about it.   These gentlemen

24 had as much an interest in hearing from everyone as Mr. Connick

25 did.

1   Q.    So Mr. Connick and the plaintiff's counsel were working in

2   consultation cooperation?

3   A.    At that time.

4   Q.    At that time?

5   A.    We were cooperative counsel.

6   Q.    Now, what --

7   A.    Or I thought so.

8   Q.    Was there a hearing on the retrial motion?

9   A.    Oh, yes.  When we filed a motion for a new trial, was there

10  a hearing?

11  Q.    Yes.

12  A.    Yes.  That would have been the June, late June, I want to

13  say June 29th, because as I, as I map this, I think the gentlemen

14  at plaintiff's table called me April 29th, and exactly two months

15  later, we were airing everything publicly in Judge Pat Quinlan's

16  courtroom.

17  Q.    To the best of your recollection, was that hearing a

18  complete airing of what had transpired with regard to the blood

19  testing?

20  A.    Absolutely.  An exhaustive production of every evidence,

21  every piece of evidence, and everyone who was responsible,

22  everybody who played a part in the 1984, 1985 prosecution.

23  Q.    What was the result of that hearing?  What was the ruling on

24  that hearing?

25  A.    Judge Quinlan made several observations, but what he did

1   was, he said both of you have asked me to grant a new trial.

2   Certainly based on the evidence I hear today, I am granting a new

3   trial and vacating the conviction.

4   Q.   Was Mr. Thompson ever retried on the armed robbery charge?

5   A.   No.

6   Q.   Why was he not retried?

7   A.   The evidence, owing in part, if not wholly, to the document

8   that these gentlemen presented in '99, the evidence was that the

9   perpetrator of the armed robbery got into a scuffle with two or

10   three persons in a car and during that scuffle, the perpetrator

11   that is, the robber, bled, bled, and bled on the pants leg of one

12   of the robbery victims.  In a car.  This is all happening in a

13   car.

14           That blood type was type B, and Mr. Thompson, not just

15   from the documents presented by counsel, was type O, but I also

16   had Mr. Thompson independently blood tested as a result of

17   counsel's bringing to our attention, I had him independently

18   blood typed in court to confirm and I did confirm that, in fact,

19   Mr. Thompson's blood type is O.  Therefore, I find it a legal

20   impossibility that Mr. Thompson was the perpetrator, owing to

21   that blood type, if that blood type was correct, that

22   Mr. Thompson could not have been the perpetrator of the armed

23   robbery.

24   Q.   Is it fair to say that Mr. Connick took the laboring oar in

25   halting the execution?

1  A.    Yes.

2  Q.    And in asking for a new trial?

3  A.    Yes.

4  Q.    And in ultimately --

5  A.    He was the leader.  You say laboring oar.  He was the leader

6  in this.

7  Q.    And then ultimately determining not to retry --

8  A.    Yes.

9  Q.    -- Mr. Thompson?

10  A.    Oh, yes.  Yes.

11  Q.    Getting back to the Grand Jury investigation, were there any

12  Assistant District Attorneys that assisted you as the point

13  person in that process?

14  A.    Yes.  An investigation of this type requires not just me, I

15  mean, I'm running the office.  I'm doing several other things

16  that are critical as the chief officer.  So I need to rely on the

17  people who are in my chief staff.  As first assistant,

18  Mr. Connick's organizational chart has several chiefs in the

19  different divisions, juvenile, appeals, trials, screening.  We've

20  talked about those.  I called on the chief of our appeals

21  division, Val Solino, to be basically my go-to person.  Prepare

22  something.  We're dealing with an investigation discovered in '99

23  of a prosecution that was, what, 15, 14 years earlier.  From 1985

24  to 1999.  It was 15 years earlier, so I needed Mr. Solino to do a

25  lot of research and I needed him to -- he's a good lawyer and I

1   needed him to be the person who perhaps brought in the different

2   individuals for questioning.

3   Q.   Was there anyone else that assisted you?

4   A.   Mr. Solino was assisted by another Assistant District

5   Attorney very junior.  I've described to you our junior/senior

6   system.  Mr. Solino called upon an Assistant District Attorney at

7   the time known as John Jerry Glas, who is named John Jerry Glas,

8   one S.  There is a Robert Glass, who is a criminal defense

9   attorney with two S's.  This is a John Jerry Glas has been a

10  prosecutor in Mr. Connick's office for about two years.  And he

11  spells his name with one S.  John Jerry Glas was assisting Val.

12  I also called on several individuals.  Mr. Connick's Chief

13  Investigator at the time is a extraordinarily competent police

14  officer, a captain with the New Orleans Police Department named

15  Danny Lawless.  He was very critical in this inquiry.  We also

16  had the services of Mr. Bill Wessell, who was to

17  Mr. Harry Connick what you and Mr. Aaron are to Mr. Eddie Jordan,

18  civil counsel.  Who it was Mr. Connick's first assistant and dear

19  friend, we had his counsel and there were several other chief

20  staff, Mr. Richard Olivier on occasion I called on.  I may have

21  even called on Mr. Connick's chief of trials at that time who was

22  Mike Bollman.  That was the leadership.

23  Q.   So would it be fair to say that the role of John Jerry Glas

24  was a supportive role, that of a batboy to a baseball team?

25  A.   John Jerry Glas had an extremely auxiliary position.  He

1   was, he was involved in our discussions, but only some of them.

2   He was not at the top level.  He was not always brought in on the

3   information we had.  And John J. Glas has completely

4   mischaracterized his own role.  I know his role.  He was not a

5   point man, as he called it.

6   Q.   What ultimately happened with that investigation?

7   A.   We -- we collapsed the Grand Jury.  We did not ask the

8   Grand Jury to return any indictments.

9   Q.   Why is it that you collapsed the Grand Jury?  And first of

10  all, who was it that made the decision to collapse the

11  Grand Jury?

12  A.   Well, the decision of that type has to be made ultimately,

13  as all decisions do of this type, by Mr. Connick.  But it would

14  have been on my recommendation or the recommendation of several

15  people.  Certainly against the recommendation of John Jerry Glas,

16  which is why he, why his name appears today, I guess.

17  Q.   And what was the reason for, to the best of your

18  understanding, did you participate in the ultimate discussions

19  that led to the collapse --

20  A.   Oh, yeah.

21  Q.   -- collapsing of the Grand Jury?  What was the reasoning,

22  why was it that the Grand Jury was ultimately collapsed?

23  A.   Sure.  I understand that.  I, at that time had, I had about

24  15, 16, 18 years of experience.  I knew we would be looking at

25  several targets and we did look at several targets.

1   Mike Riehlmann, who received a confession, he called it "a

2   confession" from a former Assistant District Attorney who

3   prosecuted the case -- whose name is Gerry Deegan.  We had

4   interviewed Mike Riehlmann.

5        We had interviewed Whittaker, who I also had as a

6   target, understand, because he was the screener of the armed

7   robbery and he was one of the persons who indicated, as a

8   screener, on the form that he filed, remember yesterday I

9   described the Screening Action Form that Mr. Eric Dubelier was

10  the lead prosecutor in a murder case involving Mr. Thompson and

11  also that the individuals trying the case may want to take blood

12  evidence.  So I knew that Mr. Whittaker knew there was blood

13  evidence, so in my mind and in 1999, our investigation certainly

14  focused on Mr. Mike Riehlmann, Mr. Bruce Whittaker as a target

15  for obstruction of justice.

16       In my mind I also had -- the trial lawyers,

17  Gerry Deegan had died.  He died of cancer in about 1994.  But the

18  other attorney on that case was Jim Williams.  And Jim Williams

19  was also a target.  I came to learn that while Mr. Eric Dubelier,

20  who was the chief of screening at the time when the case was

21  screened and three or four months later was the prosecutor, was

22  supposed to have been the lead counsel in the armed robbery;

23  however, Mr. Dubelier did not prosecute the armed robbery, but I

24  had to consider him as a possible target because of the

25  information we were receiving.  So we had, I had in my mind these

1  targets.

2       My job was to get information from these various

3  persons and quite frankly, to have them believe that I was

4  investigating each of them so that I could secure from them

5  information to determine whether or not we had a prosecution for

6  obstruction of justice or malfeasance on the part of former

7  Assistant District Attorneys, all of which was based on a

8  statement made in a bar by Gerry Deegan to his very dear friend

9  Mike Riehlmann at a time when Mike Riehlmann believed

10  Gerry Deegan was dying.  So I now had to find out whether or not

11  there was a conspiracy, whether or not there were more persons

12  involved than Gerry Deegan in his statement.

13       So I had the opportunity of interviewing virtually all

14  of these individuals, perhaps with the exception of Mr. Williams,

15  which I cannot today remember whether or not I interviewed

16  Mr. Williams directly prior to the Grand Jury.  When I called

17  Jim Williams, after I heard from the gentlemen at the plaintiff

18  bar, I literally accused him of hiding evidence.  Based on the

19  statements made by Gerry Deegan to Mike Riehlmann that I, I,

20  Gerry Deegan suppressed blood evidence, I knew his co-counsel or

21  learned that his co-counsel in that case was Jim Williams.  Did

22  Gerry Deegan's confession extend to Jim Williams?  So when I

23  called Jim Williams, I said, we have been provided documents from

24  that robbery case, and during the course of that, you're the

25  prosecutor, and we find that certain information was not filed in

1   court.  And I learned later, Mr. Williams says, "Well, McElroy
2   called me, he practically accused me of hiding evidence."  I
3   didn't practically accuse him.  I accused him of hiding evidence.
4   Q.    What was the ultimate determination and why is it that you
5   decided not to go forth?
6   A.    Again, from a screening perspective, and now I think I hope
7   you understand screening, is the assimilation of all evidence and
8   who the witnesses will be, from a screening perspective and I had
9   been Mr. Connick's screening chief for 12 years, nobody knows
10  that job, I think, even today, forgive me if this sounds a bit
11  over the top, but I know screening, and I've been a screening DA
12  and chief in two District Attorneys' offices.  Based on the
13  evidence that I secured at the time and that was made very public
14  in June of 1999 in front of Judge Quinlan, Mr. Connick's office
15  could not prove that Jim Williams came into possession of the
16  blood type report.  The only person who could do that would
17  either be Gerry Deegan -- gone, dead -- or Bruce Whittaker, the
18  screener who said, "May wish a blood test."  Bruce Whittaker told
19  us, "I don't know when I got the report, but I'm sure when I got
20  it, I put it on Jim's desk."  And I specifically, "You mean you
21  put it on Jim Williams' desk, you mean you remember putting that
22  report on Jim Williams' desk?"  "Tim, that's what I would do."
23  That is not the credible evidence that a prosecutor goes to the
24  court to prosecute a citizen on a criminal case.  I would not --
25  Mr. Connick and I as his first assistant would not permit such a

1  case to be filed.  As prosecutors it must feel in your oath that

2  you have the kind of evidence that a jury can convict on.  And

3  after assessing the evidence, I made a very reasoned approach

4  that there was not the evidence necessary to convict anyone still

5  living.

6  Q.   Would it be fair to say that the decision to not prosecute

7  was based on the same reason why the decision was made to not

8  prosecute Mr. Thompson again, insufficiency of evidence to prove

9  the charge?

10 A.   Same standard.  Same standard.  Screening is screening no

11 matter you're talking about Mr. Thompson, Mr. McElroy,

12 Mr. Connick, Mr. Deegan, Mr. Goins, Judge Barbier, it is the same

13 standard.  Do I have the evidence to present to a jury to prove

14 beyond a reasonable doubt.  Same standard whether it's a priest,

15 or whether or not it's a drug dealer on trial.

16 Q.   Now, yesterday we talked about Mr. Connick being the

17 policymaker.  Was there any way that any Assistant District

18 Attorney could ever enunciate policy for Harry Connick's District

19 Attorney's Office?

20 A.    No, I know you have to ask.  There is no way anybody inside

21 of a District Attorney's Office believes that anybody except the

22 elected DA makes policy.

23 Q.   Was there any way for an Assistant District Attorney to

24 promulgate, to send forth, to infuse his policy in anything or

25 anyone in the District Attorney's Office based on your many years

1  of experience in that office?

2  A.   Listen, the answer is no.  Here is my answer.  No, no, no.

3  As a managing prosecutor, as a person who teaches prosecution and

4  has for years, I know that there is policy, and then I know that

5  there is practice, and anybody in a business, I don't think this

6  is unique to our work.  The policy is set by the administration.

7  If somebody practices differently, hey, you know, Harry had 700

8  lawyers in 30 years.  Seven hundred lawyers.  In my 20 years with

9  Harry, I hired and disciplined and trained 500 lawyers.  They may

10 have practiced differently and for that I'm sorry if they

11 practiced contrary to policy.

12 Q.   Did Mr. Connick do anything to inform the presently employed

13 Assistant District Attorneys with regard to the problems that had

14 arisen with Mr. Thompson's armed robbery conviction?

15 A.   Every now and again, in the 619 South White is located right

16 at the corner of Tulane and Broad.  In our work, criminal justice

17 work, Tulane and Broad is a vernacular for the criminal

18 courthouse in Orleans.  South White Street is that street that

19 runs parallel right next to.  In the District Attorney's Office,

20 there is a huge room known as a Grand Jury room, because that's

21 where it was designed for the Grand Jury to meet.  And where we

22 had office meetings, where we had our trial meetings weekly,

23 whenever there were staff meetings to be had.

24      Well, Harry Connick would call an assembly is what I

25 would call it.  I specifically recall Harry Connick on this

1   occasion, the discovery by these gentlemen of that document, and

2   our investigation, before we were going to have a hearing in

3   Judge Quinlan's court, June of '99, calling everyone together and

4   I can remember Harry Connick, he had that sort of a tight jaw and

5   he would pace a little bit and he walked in and he gave this

6   rousing, you have got to read these files.  You have got to know

7   what's in these files.  You have got to be aware.  In other

8   words, this is Harry Connick saying, you know, you're lawyers,

9   you're responsible for knowing the law.  If you're not sure, you

10  have to ask.  If you're not sure, go to class.  If you're not

11  sure, read the decision.  That specifically was done the very

12  day, in fact, that John Glas was coming up to confront

13  Mr. Connick and resign.  Because Mr. Connick and I were on our

14  way to the assembly when John Jerry Glas confronted Mr. Connick.

15  Q.   Was this the first time that you saw Mr. Connick address an

16  assembly of Assistant District Attorneys with regard to *Brady*

17  issues?

18  A.   No.  No.  He had addressed, he had addressed assemblies

19  before at various times because there were several decisions that

20  were rendered and some of which had, as I mentioned to you

21  yesterday, the progression of cases to final, in law the Supreme

22  Court makes decisions and they change prior decisions, expand on

23  prior decisions.

24          THE COURT:  Mr. McElroy, wait.  If we're going to get

25  through this in the time you told me, Mr. McElroy, you're going

1   to have to try to limit your answer to the question.  The

2   question was:  Was that the first time Mr. Connick addressed the

3   group.  And I think you said no.  You have another question?

4           MR. GOINS:  I think he's answered a few others,

5   Your Honor.

6           THE COURT:  I think so.

7           MR. GOINS:  Thank you, Your Honor.

8                           EXAMINATION

9   BY MR. GOINS:

10  Q.   Did he ever have occasion to have one-on-one sessions with

11  Assistant District Attorneys --

12  A.   Yes.

13  Q.   -- who did not comply with the *Brady* requirements?

14  A.   Yes.

15  Q.   And did it happen on more than one occasion?

16  A.   Yes.

17  Q.   And what would he do in those sessions?

18  A.   Counsel.  Direct.  What are you thinking?  Where do you get

19  your authority?  Who are you listening to?  Counseling.

20  Q.   Yesterday you testified that you're presently employed by

21  Jefferson Parish, the District Attorney's Office there.  Does

22  Jefferson Parish have any formal training?

23  A.   Yes.

24  Q.   And what is that formal training that they have?

25  A.   Very much like what Mr. Harry Connick's office.  There are

1  meetings, continuing legal education, pretrials.

2  Q.   And you view that as formal training?

3  A.   That is formal training.  Now I have to expand on this,

4  Your Honor.

5          THE COURT:  Go ahead.

6          THE WITNESS:  Formal training, I'm a little perplexed

7  because we keep using that term, but there is no more formal

8  training than one-on-one.  I mean, I don't know if that's formal

9  or informal, but we view our teaching as one-on-one as better

10  than classes.  We do one-on-one.  Our instruction is one-on-one.

11  And I consider that training, formal or otherwise.

12          MR. GOINS:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Mr. Cooney.

14          MR. COONEY:  Your Honor, may I approach?

15          THE COURT:  Sure.

16                    CROSS-EXAMINATION

17  BY MR. COONEY:

18  Q.   Good morning, Mr. McElroy.  I'm just handing you some

19  documents that may be used during your examination.  Thank you.

20  A.   Good morning, Mr. J. Gordon Cooney.

21  Q.   My friends call me Gordon, but thank you.

22  A.   Good morning, Mr. Cooney.

23  Q.   Mr. McElroy, you've testified for a bit this morning about

24  the Grand Jury investigation; is that right?  And I believe you

25  testified that you led that Grand Jury investigation, am I right

1  about that?

2  A.    That's correct.

3  Q.    Would you describe the efforts that you made with regard to

4  that Grand Jury investigation as thorough?

5  A.    Yes.

6  Q.    This was a serious matter?

7  A.    I think the most serious matter I have handled in my

8  20-something years.

9  Q.    And you identified some so-called targets, I think; is that

10 right?

11 A.    That's correct.

12 Q.    And I think you mentioned that Mr. Dubelier was a possible

13 target; is that right?

14 A.    He became one.

15 Q.    And Mr. Williams was a possible target?

16 A.    That's correct.

17 Q.    And Mr. Whittaker was a possible target?

18 A.    Right.

19 Q.    And Mr. Riehlmann was a possible target, am I right?

20 A.    That's correct.

21 Q.    And I think you said that you handled the interactions with

22 those gentlemen as part of this investigation, am I right about

23 that?

24 A.    That's correct.

25 Q.    And would you say that you conducted a thorough

1  investigation of them?

2  A.   Yes.

3  Q.   How long would you say your discussions with Mr. Dubelier

4  lasted?

5  A.   I don't remember meeting Mr. Dubelier.

6  Q.   You spoke to him over the phone?

7  A.   I don't remember talking to Mr. Dubelier.

8  Q.   Did you conduct a thorough investigation of Mr. Dubelier,

9  sir?

10 A.   I don't remember talking to Mr. Dubelier.

11 Q.   Well, if you -- you don't remember talking to him at all?

12 A.   No.

13 Q.   So how could you do a thorough investigation of what

14 Mr. Dubelier did without talking to him?

15 A.   Because I learned -- this is the whole truth -- because I

16 learned about Mr. Dubelier's participation in the armed robbery

17 was, in fact, filing one document, which was a legal pleading, a

18 discovery, as we call them.  And from what I learned, and from

19 what I knew from discussions by other lawyers with Mr. Dubelier,

20 that that did not put him in the prime suspect seat.

21 Q.   Now, were you aware he was the special prosecutor when the

22 case was filed in the armed robbery case?

23 A.   Now, what time frame?  Because we have several time frames.

24 Q.   When the armed robbery case was initiated in 1985, are you

25 aware that he was the special prosecutor in the armed robbery

1   case?

2   A.   My answer is, in 1999, when I began reviewing the 1985 armed

3   robbery, one, my review included the Screening Action Form by

4   Mr. Bruce Whittaker.  On that Screening Action Form,

5   Mr. Whittaker had written, Eric Dubelier, special prosecutor.

6   And whether or not that meant Dubelier was special prosecutor on

7   the armed robbery or on the murder, I do not know.

8   Q.   And with regard to the pleading that you said he signed, am

9   I correct that he signed a discovery response in the armed

10  robbery case that was dated only eight days before the armed

11  robbery trial?  Does that sound right based on your recollection?

12  A.   I hesitate to do days.  I recall from having seen these

13  documents so often that Mr. Dubelier filed the answers in the

14  armed robbery case either the 2nd or the 3rd of April.  I also

15  recall that the case was scheduled for prosecution on April 10th,

16  but the judge moved it back a day because the defense attorney

17  requested a day.  So whatever time that is.

18  Q.   Mr. McElroy, if Mr. Dubelier testified in his deposition

19  that as part of your thorough investigation of this matter, you

20  spoke to him for about five minutes on this matter, would you

21  have any reason to doubt that as being correct?

22  A.   Not at all.

23  Q.   Now, the investigation that you were doing, did it concern

24  just the armed robbery case or did it also concern the murder

25  case?

1  A.    The armed robbery case.

2  Q.    You weren't looking into whether there were any issues that

3  had happened in the murder case, did you?

4  A.    I was not.

5  Q.    That's true, even though -- am I correct that you had an

6  understanding that the armed robbery case was part of the

7  strategy in the murder case?

8  A.    Let me answer the question.  I did not review the murder

9  case.  It was our position then, and I have not changed my

10 position, that the newly discovered evidence was in the armed

11 robbery case, the blood typing report.  Therefore, my

12 investigation was directly connected to Gerry Deegan's confession

13 to Riehlmann that he hid evidence which he later produced.  So my

14 investigation was specifically directed at the armed robbery

15 conviction.

16 Q.    And did you understand at the time that you were doing the

17 investigation that the prosecutors in 1985 had used the armed

18 robbery as part of the strategy in the murder case?

19 A.    I learned in 1999, again, this is I'm learning this

20 information from the various individuals that the armed robbery

21 was clearly going to be used in the homicide case in the

22 prosecution.

23 Q.    And did you know that Mr. Williams tried both the armed

24 robbery case and the murder case?

25 A.    I came to learn that.

1  Q.   That Mr. Dubelier was the prosecutor, was the lead trial

2  counsel in the murder case and was involved at least at some

3  point in the armed robbery case?

4  A.   Are you asking me did I come to know that?

5  Q.   Did you know that in 1999, yes?

6  A.   Yes.

7  Q.   Okay.  And despite those facts, you didn't think it was

8  necessary to take a look into the question of whether there was

9  evidence that had also been hidden in the murder case?

10 A.   No.  And I'll give you my answer on that, please,

11 Mr. Cooney.  The information I had was that in the robbery case,

12 there had been a blood typing.  I'm sure on the basis of what

13 information you had in your access to me that had you believed

14 there was suppressed evidence in the homicide, you would have

15 made that clear to me when we met in April of 1999.

16 Q.   That's not something you looked into, is it, Mr. McElroy?

17 A.   I'll tell you what I did.

18 Q.   Excuse me, Mr. McElroy, would you answer my question,

19 please.

20 A.   What was the question?  You said, is that something you

21 looked into.

22 Q.   Is that something you didn't look into in 1999; right?

23 A.   Then I will answer you question, yes, I did.  Our belief was

24 that the armed robbery case required review.  There had been

25 nothing that suggested the murder case required review.  However,

1   that was a legal question before the courts as to whether or not

2   Mr. Thompson's homicide case would be reversed or not.

3   Therefore, I assigned special prosecutor Glen Woods, who was one

4   of Mr. Connick's most experienced attorneys, to begin reviewing

5   the murder case.  I also at that time assigned Danny Lawless, the

6   Chief Investigator.  I also came to learn that Mr. Val Solino,

7   the very man that was my point on the Grand Jury had been working

8   the John Thompson habeas corpus petitions post-conviction for

9   10 years, and no one had ever recommended or suggested to me in

10  1999 that there was something untoward in the murder case.

11  Q.   Based on the investigation that you've just testified to

12  that took place regarding the murder case, talking about

13  Mr. Woods and others who were involved in doing that.

14  A.   Yes.

15  Q.   Was it your conclusion based on that review that nothing had

16  been done that was inconsistent with the policy of the

17  Orleans Parish District Attorney's Office?

18  A.   I did not conduct a review of the homicide.  I -- I

19  commissioned two or three other assistants to review the murder

20  case is when I learned that the murder case had been under review

21  in the federal system for several years.  So no, I had not been

22  aware of any wrongdoing in the murder case.

23  Q.   You weren't aware of anything that was a departure from the

24  policy of the office; is that right?

25  A.   That's correct.

1  Q.   Mr. McElroy, what is circumstantial evidence?

2  A.   Circumstantial evidence is that evidence which tends to

3  convict.  Assuming that the State can exclude every reasonable

4  hypothesis of innocence.

5  Q.   What's the difference between circumstantial evidence on the

6  one hand and direct evidence on the other hand, Mr. McElroy?

7  A.   Direct evidence is evidence that directly accuses and

8  convicts.  Circumstantial evidence requires a level of pointing

9  an arrow in a certain direction and hoping that the jury will

10  connect that, the totality of which presents a case beyond a

11  reasonable doubt.  In criminal cases.

12  Q.   Am I correct that the Orleans Parish District Attorney's

13  Office prosecutes cases, some cases are based exclusively on

14  circumstantial evidence?

15  A.   Yes.

16  Q.   Mr. McElroy, am I correct that you started in Mr. Connick's

17  office, Mr. Harry Connick's office in 1984?

18  A.   That's correct.  Actually, no.  You're incorrect.  I began

19  in 1983 as a law clerk as I said yesterday.

20  Q.   But you started as an Assistant District Attorney, I stand

21  corrected, in 1984?

22  A.   That's correct.

23  Q.   And so when the John Thompson prosecutions took place in

24  1985, you were a relatively new prosecutor in that office?

25  A.   In that office, that's right.  Forgive me.  I had literally

1  been prosecuting in that office for a year and four months, five
2  months.
3  Q.   Right.  You didn't have any personal involvement, if I'm
4  correct, in those two trials in 1985?
5  A.   I did not.
6  Q.   Would you agree with me that the Thompson cases were
7  high-profile cases in the office?
8  A.   I would agree that it was one of many high-profile cases in
9  the Orleans District Attorney's Office.
10 Q.   Do you remember having your deposition taken in this case,
11 Mr. McElroy?
12 A.   Yes.
13 Q.   And at that time --
14 A.   In May of 2005, yes.
15 Q.   And do you recall that you were put under oath at the
16 beginning of that deposition?
17 A.   I remember.  And I remember you saying you would let me
18 answer my questions completely.
19 Q.   Mr. Vincent, would you play Page 17 of Mr. McElroy's
20 deposition, please?
21          (WHEREUPON, the deposition is played as follows:)
22          "QUESTION:  Were you aware of those prosecutions at the
23 time?
24          "ANSWER:  By aware, I -- I may have been aware, as any
25 lawyer in the office was aware, but there were and still are very

1    many high-profile cases in Orleans, and it figured as a

2    high-profile case because of the death of Mr. Liuzza."

3              (WHEREUPON, the deposition was concluded.)

4              THE WITNESS:  That should read "there are and were."

5    There are and were many.  If you'll read it in context,

6    Mr. Cooney, you'll see that I'm saying it was one of those

7    high-profile cases.

8                          EXAMINATION

9    BY MR. COONEY:

10   Q.   I think the jury can -- I think the transcript speaks for

11   itself.

12   A.   I'm correcting it.  I'm telling you now.  There are -- could

13   I ask that that be played again, Your Honor?

14   Q.   Let's play it again.

15             THE COURT:  Sure.  Do you have the written transcript,

16   too, that the witness has?

17             MR. COONEY:  Yes, it's right in front of him,

18   Your Honor.

19             THE COURT:  What page is that?

20             MR. COONEY:  Page 17, Lines 2 through 10.

21             THE COURT:  Let Mr. McElroy -- give him a chance to

22   look at the transcript.  What page and line?

23             MR. COONEY:  Page 17, Lines 2 through 10, Your Honor.

24             THE COURT:  Give him a chance to read that.

25             THE WITNESS:  That's incorrect.  It should read, "There

1    were and there still are very many high-profile, high-profile

2    cases in New Orleans, and I figured it as a high-profile case

3    because of the death of Mr. Liuzza."

4                             EXAMINATION

5    BY MR. COONEY:

6    Q.    But, Mr. McElroy, what you're saying is the court reporter

7    took this down wrong; is that right?  Can we --

8    A.    Yes.

9    Q.    Can we play the testimony again so we can hear what you

10   said?

11   A.    Sure.

12              (WHEREUPON, the deposition is played as follows:)

13              "QUESTION:  Were you aware of those prosecutions at the

14   time?

15              "ANSWER:  By aware, I -- I may have been aware, as any

16   lawyer in the office was aware, but there were and still are very

17   many high-profile cases in Orleans, and it figured as a

18   high-profile case because of the death of Mr. Liuzza."

19              (WHEREUPON, the deposition was concluded.)

20                             EXAMINATION

21   BY MR. COONEY:

22   Q.    Now, Mr. McElroy, am I correct that you didn't have a

23   management role at the Orleans Parish District Attorney's Office

24   until about 1986 or 1987, when you became the deputy chief of

25   trials?

1  A.    That's correct.

2  Q.    And you didn't become the first assistant until 1998; is

3  that right?

4  A.    That's right.

5  Q.    And that was well after Mr. Thompson's murder trial?

6  A.    That's correct.

7  Q.    Now, you spent 19 or 20 years at the Orleans Parish District

8  Attorney's Office, am I right about that?

9  A.    That's correct.

10  Q.    And you left when Mr. Connick left office in early 2003?

11  A.    That's correct.

12  Q.    And at that time you went over to work for Mr. Paul Connick,

13  who is the District Attorney of Jefferson Parish?

14  A.    That's correct.

15  Q.    And am I right that Mr. Paul Connick is Harry Connick's

16  nephew?

17  A.    That's correct.

18  Q.    You were Harry Connick's right-hand man for many years

19  before the two of you left the office here in New Orleans, am I

20  right?

21  A.    I was one of his senior counselors, one of his senior

22  advisors, yes, sir.

23  Q.    And am I right that he is a dear and personal friend of

24  yours?

25  A.    Very dear and personal friend.

1  Q.   And yesterday, I think you said it was a blessing to know

2  him?

3  A.   Every day, what I said is, I considered a blessing to have

4  his friendship.  It is.

5  Q.   And would I be right that you would do just about anything

6  to help him out?

7  A.   No.  You would be wrong, and I know that question from

8  having asked it many times before.  My first loyalty is to my

9  oath now as a witness, my oath as an attorney and my oath as a

10  prosecutor.  And if -- well, I don't want to answer your next

11  question, but I will tell you, I've had many fights with my dear

12  friend, and we have disagreed, but I consider him all the more my

13  dear friend after the fight.

14  Q.   Now, yesterday I think you testified that in the 1984, 1985

15  time frame, someone in the office would send out memoranda on

16  legal issues to the various assistants and some of those

17  memoranda might include *Brady*?

18  A.   Yes, I did.  I said it was typically the point for that

19  would have been the chief of appeals.  Because the decisions from

20  the high court are obviously coming through our appeals division

21  and being processed after throughout.

22  Q.   And I believe you also testified that the 1987 policy manual

23  was compiled by assembling all of those memoranda that had been

24  issued on the various legal issues over the years?

25  A.   That's correct.

1  Q.    Okay.  Can we ask you to take a look, please, at Exhibit 51,

2  which is in your binder and Mr. Vincent, would you be good enough

3  to put that up for the jury, please.

4         Mr. McElroy, is that a copy of the 1987 Orleans Parish

5  District Attorney's Office policy manual?

6  A.    Well, it's a -- it appears to be, yes.

7  Q.    And am I correct that that's the earliest written policy

8  manual of which you're aware?

9  A.    Yeah.  I even have my name on it and it says on the title

10 page Policy Manual Book Number 7, dated February 1, 1987.

11 Q.    And that is the earliest manual of which you're aware,

12 correct, 1987?

13 A.    That's correct.

14 Q.    That's two years after the Thompson prosecution?

15 A.    That's correct.

16 Q.    Let's take a look at Section 5.25 if we can and see what

17 that says.

18 A.    Okay.

19 Q.    Mr. Vincent, if you could pull that up, I would appreciate

20 it.

21        Am I right, Mr. McElroy, this is the section of the

22 policy manual that deals with *Brady* material?

23 A.    It's titled *Brady* material.

24 Q.    Are you aware of any other section of the policy manual that

25 refers to *Brady* material?

1  A.   Not specifically as *Brady* material.  However, in answer, in

2  the whole truth, there are many sections that deal with pretrials

3  and consultation, which, of course, as I explained have to do

4  with an explanation of *Brady* material.

5  Q.   This is the section of the manual that talks about *Brady*?

6  A.   That's right.  It's labeled pretrial *Brady* material.

7  Q.   And it's one paragraph long; am I right?

8  A.   That's correct.

9  Q.   Four sentences?

10 A.   Well, I don't know how many sentences.

11 Q.   We can count them.  In the first sentence, it says, "In most

12 cases in response to the request of defense attorneys, the judge

13 orders the State to produce so-called *Brady* material.  That is

14 information in the possession of the State which is exculpatory

15 regarding the defendant."

16       I want to examine that sentence for a second.

17 A.   Sure.

18 Q.   Is it your understanding, Mr. McElroy, that the *Brady*

19 obligation that a prosecutor has is limited to situations where

20 there is a request of defense attorneys?

21 A.   That is no longer true.

22 Q.   And is it your testimony that that was true in 1987?

23 A.   The specific year that the courts may have ruled that it is

24 no longer a requirement for a request, I don't know the year.

25 But it is no longer true.  There is no need for a defense to

1  prompt for exculpatory material.

2  Q.   Because the prosecutor has an obligation to turn over

3  favorable evidence regardless of whether the defendant asks for

4  it?

5  A.   Unquestionably.  Unquestionably.

6  Q.   And am I correct that the prosecutor's obligation to turn

7  over *Brady* material is not dependent upon a judge ordering the

8  State to produce so-called *Brady* material?

9  A.   That's correct.

10  Q.   And am I also right that the *Brady* obligation goes beyond

11  mere exculpatory evidence?

12  A.   Yes, it includes impeachment evidence.  That is, of course,

13  a line of cases that define this.  I think the impeachment may

14  have been post 1987, but I don't have my notes.  I don't know

15  that.

16  Q.   Would you recall that the *Giglio* case addressed that,

17  Mr. McElroy?

18       MR. GOINS:  Your Honor, at this point in time I would

19  like to object to --

20       THE COURT:  Overruled.

21       THE WITNESS:  I would have to see the *Giglio* case.

22                            EXAMINATION

23  BY MR. COONEY:

24  Q.   And you don't remember *Giglio*?

25  A.   Well, I remember it by name, but I would have to see it.

1  Q.    You don't remember what it held?

2  A.    Not specifically at this moment.  If I'm going to be

3  questioned on it, if you want to show it to me, I would be

4  delighted to read it and tell you what I think it holds.

5  Q.    Do you recall it was a case in the Supreme Court of the

6  United States at least?

7  A.    Yes, sure.  In fact, the federal attorneys refer to *Giglio*

8  all the time.  We call it *Brady*.  The federal authorities call it

9  *Giglio* impeachment evidence.

10 Q.    Would you agree with me that, and let's go --

11 A.    And what year was *Giglio* decided?

12 Q.    1972, sir.

13 A.    Okay.

14 Q.    Let's look at the third paragraph of the document.  The

15 third sentence of the document.  The third sentence says,

16 "Failure to produce *Brady* materials has resulted in mistrials and

17 reversals, as well as extended court battles over jeopardy

18 issues."  Do you see that sentence?

19 A.    Yes.

20 Q.    Is there anything in this paragraph that talks about the

21 impact on the constitutional rights of a criminal defendant if

22 *Brady* material is not produced?

23 A.    The whole paragraph speaks to the impact of the

24 constitutional rights of a defendant.

25 Q.    Correct me if I'm wrong, Mr. McElroy, what I'm looking at

1  here is mistrials, reversals, extended court battles over

2  jeopardy issues.  Am I not right that what that's focusing on is

3  transactional burden imposed on the District Attorney's Office?

4  A.   Transactional burden imposed on the District Attorney's

5  Office?

6  Q.   The difficulty associated with having to retry a case,

7  extending court battles, is there anything in here that talks

8  about, that talks about the impact on the criminal defendant?

9  A.   Mr. Cooney, the entire paragraph addresses the rights of the

10  accused.  When we speak in terms of mistrials and reversals, it

11  addresses very specifically the question of John Thompson.  Very

12  specifically.

13  Q.   And would you agree with me that there's no sentence in

14  there that says, and if you withhold *Brady* material, it will

15  affect the constitutional rights of the defendant?

16  A.   Would I agree that that language that you've just used is

17  not in there?

18  Q.   Yes.

19  A.   I agree.

20  Q.   And the final sentence in this paragraph says, "In all cases

21  a review of *Brady* issues, including apparently self-serving

22  statements made by the defendant, must be included in a pretrial

23  conference and each assistant must be familiar with the law

24  regarding exculpatory information possessed by the State."  Is

25  that what it says?

1   A.    That's exactly what it says.

2   Q.    And so the burden here is put on the individual assistant to

3   make sure that he or she is familiar with the law, am I right?

4   A.    It's -- yes.  And I want to be answer this, please.  In my

5   opinion, that's the only sentence that needs to be in 5.25.  In

6   my opinion, in all cases, a review of *Brady* issues, even if the

7   accused makes a statement that appears to be self-serving, has to

8   be included in our pretrial conferences, and every assistant, not

9   just because that assistant is a prosecutor, but because that

10  assistant is a lawyer, must be familiar with the law regarding

11  disclosure of exculpatory information.

12  Q.    Would you agree with me that, aside from this reference to

13  self-serving statements made by the defendant, this section

14  doesn't give an assistant any guidance as to what is or is not

15  *Brady* material?

16  A.    I disagree.

17  Q.    During your testimony yesterday, one of the things you were

18  asked by Mr. Goins was whether prior to this written standard

19  there was a standard that Mr. Connick had used throughout the

20  office and what that was.  And I believe you testified that the

21  standard that Mr. Connick had articulated was evidence favorable

22  to the accused must be produced.  Is that what you said

23  yesterday?

24  A.    That's correct.  Well, I frankly don't remember my quote,

25  and I know better now, Mr. Cooney, than to trust you on my quote,

1  so I don't know what you're quoting or when.

2  Q.   What was Mr. Connick's standard, sir, in -- prior to the

3  production of this written document?

4  A.   Pretry your cases, know what the cases say from the Supreme

5  Court, get consultation, and there are a myriad of things

6  involved in *Brady* issues, a myriad of things.  And we've only

7  touched on a couple.

8  Q.   If other witnesses have testified in this case that the

9  policy was simply, quote, follow the law, is that a more accurate

10 recitation of Mr. Connick's pre-1987 policy?

11 A.   I would say that if those attorneys believed that was the

12 policy, they were in trouble.

13 Q.   Okay.

14 A.   It starts with following the law.

15 Q.   Now, let's talk about the pretrial conferences that you

16 mentioned yesterday and some other issues.  Am I correct that

17 with regard to *Brady*, Mr. Connick had a lot of activities that he

18 was responsible for as the District Attorney's Office besides

19 sitting down and reading opinions that were coming down from

20 courts?

21 A.   Sure.  Sure.

22 Q.   And would you agree with me that he was really dependent

23 upon others in the office to make sure that somebody was familiar

24 with the *Brady* standard?

25 A.   Sure.  Primarily the first assistant and the chiefs of the

1  various divisions for instruction.

2  Q.   And you talked about the process by which the junior

3  assistant and the senior assistant would pretry a case?

4  A.   That's correct.

5  Q.   Would you agree with me that special prosecutors were not

6  required to pretry cases?

7  A.   Generally speaking, special prosecutors, and you had to have

8  permission to be one, were more experienced and likely not going

9  to pretry cases.

10  Q.   And Mr. Dubelier was a special prosecutor in the murder case

11  of John Thompson?

12  A.   I have come to learn that he was while he was chief of

13  screening.

14  Q.   And Mr. Williams was a special prosecutor in the armed

15  robbery case, am I right about that?

16  A.   Yes.

17  Q.   Would you agree with me that a system of *Brady* compliance in

18  an office that's based on supervision by other attorneys in a

19  pretrial setting is dependent upon whether the supervisors are

20  adequately trained?

21  A.   Yes.

22  Q.   Would you agree with me that it's often a difficult decision

23  for a prosecutor to determine whether or not a particular piece

24  of evidence is exculpatory?

25  A.   Not often.  It is sometimes.  It is sometimes very apparent.

1    It is sometimes not.

2    Q.    Now, you are currently the chief of screening in Jefferson

3    Parish?

4    A.    No, I'm not.  I'm currently the chief of trials.

5    Q.    Chief of trials.  But at one point you were chief of

6    screening; is that right?

7    A.    That's correct.

8    Q.    Would you agree with me that a chief of screening has to try

9    to develop a good relationship with the police?

10   A.    I believe a relationship with the police is one of the most

11   important aspects of a chief of screening.  Communication, that

12   is communication.

13   Q.    Would you agree that in a complex case, the chief of

14   screening usually would have regular contact with the detectives?

15   A.    Yes.

16   Q.    Maybe daily contact?

17   A.    Let me say, we had this discussion in my deposition when you

18   were asking questions.  It isn't necessary -- there may be many

19   conferences by a police officer working a case with the chief of

20   screening.  I don't know that those conference -- in my

21   experience, and I can speak from mine only, I would not know the

22   whole case.  Perhaps an officer came to me and said, I'm having a

23   problem.  I might need an immunized witness.  I can only do that

24   through Grand Jury.  It doesn't mean I would know the whole case.

25   They would bring to me what roadblock they have in a case, and as

1  a chief of screening, I would try to help them figure that out.

2  Q.   But it's important to have regular contact with the

3  detectives, as you just testified?

4  A.   Well, chiefs of screening typically have regular contact

5  with their counterparts in the department, not necessarily

6  detectives, but perhaps the chief of detective.

7  Q.   Mr. Vincent, can you play Page 80 of Mr. McElroy's

8  deposition, please.  Let me refer you, Mr. McElroy, to your

9  deposition and I'm referring you to Page 80, and I'm starting at

10  Line 12, and I'm going to ask you whether I asked you the

11  following questions and you gave the following answers.

12       "In a complex type of case, how regular would it be

13  typical for the chief of screening to have contact with the

14  detectives, for example?

15       "ANSWER:  Extremely regular.

16       "QUESTION:  Maybe daily?

17       "ANSWER:  Daily.  I know I do.  I did during my

18  10 years at Orleans and I -- I do every day here in Jefferson."

19       Was that your testimony, Mr. McElroy?

20  A.   Yes, it was.

21  Q.   And is it your understanding that Mr. Dubelier had a good

22  relationship with the police?

23  A.   You know, I'm reluctant to speak about Mr. Dubelier's

24  relationship.  I didn't have a lot of contact with Mr. Dubelier

25  in the office, '84, '85.  I knew him to be the chief of

1   screening, really, but I never knew of him not to have a good

2   relationship with police officers.

3   Q.   Was your understanding clearer back when your deposition was

4   taken?

5   A.   Well, I don't know.  I'm sure you're going to tell me.

6   Q.   Why don't we play this segment of Mr. McElroy's deposition,

7   please, Page 81, Line 16 through 82, Line 1.

8   A.   I'm sorry, what number?

9   Q.   "QUESTION:  Did you have a sense of what kind of

10   relationship Mr. Dubelier had with police in that regard when he

11   was chief of screening?

12           "ANSWER:  Yeah, he was close to the police officers.

13   That was my sense.  I was not in his division, but I had a sense

14   that Mr. Dubelier was close.  He and Mr. Letten, the U.S.

15   Attorney here, both exhibited a strong relationship with police,

16   identity with police."

17           Was that your testimony when your deposition was taken?

18   A.   Sure.  And I agree with myself.

19   Q.   Was it your understanding that Mr. Williams had a good

20   relationship with the police?

21   A.   With Homicide I think Mr. Williams had a good relationship.

22   Q.   Now, at some point in April 1999, I believe you testified in

23   response to Mr. Goins' questions this morning, that you learned

24   about some blood evidence in the John Thompson armed robbery

25   case?

1 A. Testified that I was made aware of it by you and Mr. Banks.

2 Q. Actually, wasn't it Mr. Whittaker who brought this to your

3 attention?

4 A. You asked me that before during our deposition.  My

5 recollection is still that it was you and Mr. Banks.

6 Q. Do you recall that Mr. Solino was involved in some of the

7 early discussions about the discovery of the blood evidence?

8 Involved with you and Mr. Banks and myself and Mr. Whittaker?

9 A. Sure.  Sure.

10 Q. I would like you to ask you to take a look at, I think it's

11 Exhibit 61, which is in your binder.  Mr. Vincent, if you would

12 be good enough to put that on the screen, I would appreciate it.

13   Is Exhibit 61, Mr. McElroy, a file memorandum from

14 Mr. Solino to the file dated May 3, 1999?

15 A. Yes.  Are you asking me if the memorandum from Mr. Solino is

16 Exhibit 61?

17 Q. Is Exhibit 61 a memorandum from Mr. Solino to the file dated

18 May 3, 1999?

19 A. Yes, it is.

20 Q. And I take it you have seen that before?

21 A. Yes.

22 Q. Did you see it at around the time it was prepared?

23 A. I can't remember that, whether or not I saw this in 1999.  I

24 do remember your showing it to me during my deposition in May of

25 2005.

Q.    Okay.  I would like you to turn to -- the memorandum itself
isn't numbered, but there are some numbers in the lower right
corner of the document.  And I would like you to turn to Page
EX000590.

A.    590.

Q.    Would you agree with me that at least what this memorandum
describes on this page is the various pieces of evidence that
Mr. Banks and I presented to you and Mr. Solino in connection
with the discovery of the blood evidence in the armed robbery
case?

A.    There are eight, there is a listing of eight documents, and
Solino's memorandum says that you and Mr. Cooney presented to he
and I those eight documents.  And I quite frankly have no reason
to believe that is not so.

Q.    And so just so we can quickly go through what's in there.

A.    Okay.

Q.    And Mr. Vincent has it up on the screen, the first is a copy
of the crime tech report from the robbery; is that right?

A.    That's what it lists, yes.

Q.    And the second is a copy of the now infamous crime lab
report reflecting the blood type on the victim's pant leg?

A.    That's correct.

Q.    The third is a letter from Stewart J. LaGarde, Jr.
reflecting his blood type as noted on a Virginia blood donor
card?

1  A.   Yes, that's what it says.

2  Q.   And you remember, he was the driver of the car whose pant

3  leg was cut out, do you remember that?

4  A.   I remember, he's the one who struggled with the perpetrator.

5  Q.   Correct.  The fourth is a letter from the Medical Center of

6  Louisiana with an attached document purporting to reflect

7  John Thompson's blood type?

8  A.   I do remember that.

9  Q.   And I believe you testified that when you did your own

10 analysis of John Thompson's blood type, that showed that, in

11 fact, he did have type O blood as opposed to the type B blood on

12 the crime lab report?

13 A.   The type B blood you said?

14 Q.   Right.

15 A.   That's correct.

16 Q.   The fifth item is a handwritten note to Jim Williams

17 regarding -- referencing a blood sample for Calvin Ross -- Rose.

18 The sixth, a transcript of the penalty phase of John Thompson's

19 first-degree murder trial; is that right?

20 A.   That's what it says.

21 Q.   And do you recall that what we presented to you in that

22 regard was the testimony of Marie LaGarde during the penalty

23 phase and the argument to the jury, the closing argument to the

24 jury that the prosecutors made using the carjacking conviction?

25 A.   Quite frankly, I see that, but I don't recall having that

1  transcript.

2  Q.   The seventh item was an affidavit from --

3  A.   May I stop you for a moment.  I do recall having heard

4  Ms. LaGarde's testimony several times from others, but I don't

5  remember getting the transcript from you or Mr. Banks.

6  Q.   The seventh item was an affidavit from Mr. Riehlmann?

7  A.   Yes, I remember that well.

8  Q.   And the eighth item was an affidavit from Mr. Bertel?

9  A.   And I remember that, but I couldn't tell you what it says.

10 I remember there was one, but I don't remember what it says.

11 Q.   Would you agree with me that the evidence that Mr. Banks and

12 I had brought to you at that point tended to show that

13 John Thompson was not the perpetrator of the armed robbery and

14 raised some pretty serious questions about the integrity of the

15 prosecution against John Thompson for armed robbery?

16 A.   Yes.

17 Q.   And would you agree with me that the District Attorney

18 essentially had had no choice but to agree to our request for a

19 stay of execution under those circumstances?

20 A.   You remember it as your request.  I remember us taking the

21 lead.

22 Q.   So you don't believe that when we came to you with all of

23 this information, we didn't say, "Mr. McElroy, we have all this

24 information, Mr. Thompson is supposed to be executed in two

25 weeks"?

1  A.    Yeah.

2  Q.    "We're going to file a motion tomorrow, but we would much

3  rather do it with you because there is no reason for us to have a

4  fight over this"?

5  A.    That could be it.  That's right.

6  Q.    That's what happened; right?

7  A.    Well, that sounds right.  That sounds right.  I know you're

8  saying that.  I remember Harry Connick saying, I'm doing it,

9  whether they do it or not.

10  Q.    I would like for you to look at Page EX00588, which is a

11  couple of pages earlier.

12  A.    In the same exhibit?

13  Q.    Yes, sir.

14  A.    And what again is the page number?

15  Q.    588 in the lower right-hand corner.

16  A.    Yes, sir.

17  Q.    Okay.  And am I correct, if you could just take a moment and

18  familiarize yourself with that page.

19  A.    (Witness reviews the document.)

20  Q.    Just let me know when you have had an adequate period of

21  time to read it.

22  A.    (Witness reviews the document.)  I have.

23  Q.    Okay.  Thank you, Mr. McElroy.  Looking at the paragraph

24  that starts "On the morning of April 29th," am I correct that

25  what this paragraph is talking about is the meeting in your

1    office with Mr. Solino and Mr. Whittaker?

2    A.    That's correct.

3    Q.    About the discovery of this blood evidence?

4    A.    That's correct.

5    Q.    And I would like to direct your attention to the bottom

6    third of the page, and there's a sentence that says, that starts

7    with "Whittaker also stated," and let me read this to you and

8    make sure I read it correctly, and then I want to ask you some

9    questions about it.

10            "Whittaker also stated that Riehlmann had had a lengthy

11   conversation with Stewart J. LaGarde, one of the victims in the

12   robbery case on April 28, 1999.  According to Whittaker,

13   Riehlmann informed him that Jay LaGarde stated that during the

14   trial, he had asked Jim Williams, a former Assistant District

15   Attorney who prosecuted the Thompson robbery with Deegan, if

16   anything had developed from the blood evidence.  According to

17   Whittaker, Riehlmann stated that LaGarde told him that Williams

18   told LaGarde that, quote, 'the blood evidence was inconclusive.'"

19   Is that what that says?

20   A.    That's what it says.

21   Q.    Now, do you recall ever having a conversation with Jay

22   LaGarde?

23   A.    Yes.

24   Q.    And am I correct that Jay LaGarde told you that he wasn't

25   sure it was Williams, but it was either Whittaker or Williams

1  that said that to him?

2  A.   As I recall it was either Whittaker -- no, it was either

3  Williams or Deegan, but I don't recall that Mr. LaGarde said

4  he -- what I do recall is Mr. LaGarde could not specifically

5  identify who of the two of them did.

6  Q.   Let's go to Page 143, Line 9 of the deposition, if we can.

7  Rather than putting it up, Mr. McElroy, let me read, refer you to

8  143, Line 9, of your deposition and we'll read it.  Starting at

9  Line 9 on Page 143:

10        "QUESTION:  According to Whittaker, Riehlmann stated

11  that LaGarde told him that Williams told LaGarde that the blood

12  evidence was inconclusive.

13        "ANSWER:  I see that statement.

14        "QUESTION:  Okay.  Do you remember hearing from any

15  source that Mr. LaGarde had said he was told by Williams that the

16  blood evidence was inconclusive?

17        "ANSWER:  I don't recall ever hearing that.  I recall,

18  if my memory serves me correctly that during the course of our

19  investigation of trying to piece this particular case together, I

20  don't know from where I learned it, but I do remember reading and

21  it might have been the hearing I referred to earlier, the

22  transcript of the hearing, that Mr. LaGarde, in conversations

23  with someone he could not recall, he knew it was an Assistant

24  District Attorney, but he did not know whether or not it was

25  Mr. Whittaker or Mr. Williams that he had a discussion about

1    blood evidence.  That's what I recall.

2              "Your recollection is that this came from Mr. LaGarde?

3              "ANSWER:  Yes.

4              "Did you ever talk directly with Mr. LaGarde?

5              "ANSWER:  I did."

6              Was that your testimony?

7    A.   That's right.

8              MR. COONEY:  I have no further questions, Mr. McElroy.

9    Thank you.

10             THE COURT:  Redirect.

11             MR. GOINS:  No redirect.

12             THE COURT:  Okay.  You can step down, Mr. McElroy.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Who is your next witness?

15             MR. AARON:  Mr. Connick.  Could we take a break,

16   Your Honor?

17             THE COURT:  Yes.  Let's take our morning recess right

18   now for about 15 minutes before we start with the next witness.

19             All right.  Please leave your notebooks in your chairs

20   or under your chairs.

21             THE DEPUTY CLERK:  All rise.

22             (WHEREUPON, the jury panel leaves the courtroom.)

23             THE COURT:  Clay should have the latest revised version

24   of the jury instructions for you-all in a minute or two.  It's

25   not necessarily a final version.  It's the latest version.  And

1  we're still thinking and looking at a few things.

2          MR. AARON:  Do I have time to run to the men's room?

3          THE COURT:  Yes.  We're taking 15 minutes.

4          (WHEREUPON, at this point in the proceedings there was

5  a brief recess.)

6          THE DEPUTY CLERK:  All rise.

7          (WHEREUPON, the jury panel enters the courtroom.)

8          THE COURT:  All right.  Please be seated.

9          MR. AARON:  At this point, Your Honor, the defense

10  calls Harry Connick.

11          THE DEPUTY CLERK:  Please raise your right hand.

12                      **HARRY CONNICK**

13   was called as a witness and, after being first duly sworn by the

14   Clerk, was examined and testified on his oath as follows:

15                      DIRECT EXAMINATION

16  BY MR. AARON:

17  Q.   How are you doing, Mr. Connick?

18  A.   Fine, thank you, Mr. Aaron.

19  Q.   I notice you have two hearing aids.  Can you hear me?

20  A.   Yes, I hear you fine.

21          Before you start, may I apologize to the Court for my

22  outburst the other day and to the Members of the Jury and also to

23  the officers of the Court.  I think I forgot my own rule in the

24  case.

25          THE COURT:  That's fine.  Would you please start by

1    giving us your full name and spell it for the court reporter.

2          THE WITNESS:  My full name is Harry Connick,

3    C-O-N-N-I-C-K.

4                          EXAMINATION

5    BY MR. AARON:

6    Q.    Mr. Connick, when were you born?

7    A.    On March 27th of 1926.

8    Q.    So that would make you as of today 80 years old?

9    A.    I'll be 81 this March.

10   Q.    And do you reside in Orleans Parish?

11   A.    Yes, I do.

12   Q.    And how long have you resided in Orleans Parish?

13   A.    Since I was two years old.

14   Q.    Did you come from a large family or small family?

15   A.    Well, eight children and I was the second of the eight.  Six

16   boys and two girls.

17   Q.    And I don't want to bring up bad memories, but you have been

18   married, one of your wives died; is that correct?

19   A.    Yes, the mother of my children died when she was relatively

20   young.

21   Q.    And you've remarried and you currently have another wife?

22   A.    Yes, I have, very happily married, yes.

23   Q.    You had two children?

24   A.    Yes.

25   Q.    And what are their names?

1  A.   Suzanna.  She is now a doctor.  And Harry, Jr.

2  Q.   It's Harry Connick, Jr., the entertainer?

3  A.   Yes.

4  Q.   Let's talk first about your educational background.  Where

5  did you go to college?

6  A.   I went to Loyola, and I studied business administration in

7  New Orleans.

8  Q.   Did you graduate with a degree in business administration?

9  A.   Yes, I did.

10  Q.   And after graduating from college, did you go to law school?

11  A.   I went to law school, but in between that, I spent some time

12  in North Africa working, but when I came back from North Africa,

13  I went to back to Loyola to get my graduate degree and graduated

14  from that and then went to Tulane Law School and graduated in

15  1961 with a degree in law.

16  Q.   Now, the in between period that you alluded to, you were in

17  the military?

18  A.   Yes.  I was in World War II.  And I was 18 at the time and I

19  had just gotten out of high school.  And I went into the Navy,

20  and I spent two years in the Navy.

21  Q.   While in the Navy, did you stay just in the United States or

22  did you go abroad?

23  A.   I was on a ship, on an attack transport, the USS LANDER.

24  Q.   And while you were in the Navy, did you receive any

25  citations?

1  A.   Yes, I did.  A number of them, and two were for being in the

2  Pacific during the time of the invasion of Iwo Jima and Okinawa.

3  Q.   And you received battle stars in Okinawa and Iwo Jima?

4  A.    Yes, I did.

5  Q.   You are a member of the Louisiana bar?

6  A.   Yes.

7  Q.   And do you remember when you were first admitted to practice

8  in Louisiana?

9  A.   1961.

10 Q.   And you've continued as a practicing attorney since 1961?

11 A.   Oh, yes.

12 Q.   Now, let's talk a little bit about your employment prior to

13 becoming District Attorney.  What was your first job out of law

14 school?

15 A.   When I got out of law school, I went over to Tulane and

16 Broad and I wanted to be a criminal defense lawyer.  And I

17 volunteered to do cases, free cases for people who were in parish

18 prison and who couldn't afford a lawyer.  I did that.  Then I

19 joined the Legal Aid Bureau at that time which was doing the same

20 work, but I was getting paid for it.

21          And I did that.  And after that, after, oh, three and a

22 half plus years of that, I got a call from the U.S. Attorney over

23 here, Mr. Lacour, and he offered me a job and it was several

24 hundred dollars a month more, and we needed it, so I took the job

25 over here as a prosecutor, and I did that from 1969, from 1965

1  until 1969.

2  Q.   Let me cut you off before you continue.

3  A.   All right.

4  Q.   During those employments, did you ever have to deal with

5  *Brady* issues?

6  A.   Oh, yes.  We -- *Brady* is the basic principles for lawyers,

7  especially those who practice criminal law.  It's the ABCs of

8  what we do.  We taught it in law school in criminal law, in

9  criminal procedure and in constitutional law.  And it's also

10  heavily emphasized in the canon of professional ethics, so yes,

11  we all were exposed to that.

12  Q.   You can continue with your employment.  You stopped with

13  Assistant U.S. Attorney.

14  A.   And incidentally, too, as a legal aid attorney, I filed many

15  motions to suppress evidence and many motions under *Brady* asking

16  for *Brady* material, and when I was an Assistant U.S. Attorney, I

17  would have to respond to motions filed on behalf of the defendant

18  by their lawyers.  So it was something that if you were engaged

19  in the practice of criminal law, you were exposed to on an

20  ongoing regular basis.

21  Q.   So I understand it's before you even became District

22  Attorney, you had been a defense attorney and a prosecutor with

23  the U.S. Attorney's Office?

24  A.   Yes.

25  Q.   Okay.  Continue.

1   A.   Well, I left the job to run against Mr. Garrison in 1969.   I

2   was unsuccessful.   So I went into practice with my wife.   And

3   then in 1973, I sought election again against Mr. Garrison again,

4   and I was elected, and I was sworn in on April 1st of 1974 to the

5   job.

6   Q.   Let's talk a little bit about that period when you were in

7   practice with your wife.   What was the nature of your practice?

8   A.   It was criminal law again.   That's what I loved and that's

9   what I practiced mostly.   I did some civil work, and, you know,

10   had to, I was introduced to a lot of civil practice, but my main

11   interest has always been criminal justice system.

12   Q.   When you became District Attorney for the Parish of Orleans,

13   was there anything that you did with respect to organization or

14   reorganization of the office?

15   A.   I completely restructured the office.   One of the first

16   things I did, we kept most of the assistants who Mr. Garrison had

17   on his staff, but I imposed some dramatically different changes

18   in the office.   And I wasn't familiar with the people that

19   Mr. Garrison had in his office, but I structured the office to

20   provide greater efficiency in the office, and better -- better

21   access to more information about the criminal justice system, and

22   installed a number of checks and balances.

23           I began by creating a different standard in the

24   Screening Division.   Normally, prosecutors accept a great

25   percentage of the cases that the police bring to them.   As a

 1  legal aid attorney and as a criminal defense attorney, I learned
 2  early on that a lot of people get arrested and spend time in jail
 3  and they really shouldn't even be there.  And so I designed a
 4  program that made a different screening setup that don't take a
 5  case unless a crime has, in fact, been committed.  And if the
 6  person that's arrested, in fact, committed that crime.  And if
 7  you have enough evidence, legal evidence to go forward and get a
 8  prosecution.  And the consequence of that, the acceptance rate in
 9  the office went from, I guess, between 80 and 90 percent to down
10  to 50 percent, which the police didn't like very much, but
11  playing a political issue in campaigns, they wanted me to charge
12  more people, but I wasn't going to run that kind of office with a
13  lot of plea bargaining.  I brought over, I requested eight former
14  Assistant United States Attorneys, who I had worked with.  One of
15  them was Bob Livingston, Mike Ellis, Dan Markey, Pat Hand, a
16  bunch of them that I knew from over here, if they would come work
17  for me.  They were in private practice at the time.  So these
18  were all people I knew and I knew that they would buy into what I
19  was teaching and what my philosophy was and so they agreed to
20  leave their practices and come work for me.  And their job
21  specifically was to help me set this office up to train these
22  people.
23          Also, they had maybe a handful of investigators in
24  Mr. Garrison's office.  To me, one of the essential ingredients
25  of an effective prosecution is to have a police officer as the

1   investigator in each section of court.  And Superintendent

2   Clarence Giarrusso was very cooperative in letting me have, we

3   went up, I think, to 23, 24, 25 investigators.  One investigator

4   was assigned to each section of court.  And I would tell my

5   assistants that this is the keel of our ship.  This is the person

6   who you go to if you need some advice about a rap sheet or about

7   motions, and they were experienced guys, had been on the force

8   for 20, 25 years, some of them.  And they helped, the junior

9   assistant was under the supervision of a senior assistant.  And

10  so with that structure in place, we proceeded to try a lot of

11  cases.  My policies stimulated a lot of cases.  We didn't support

12  a lot of plea bargaining unless we had to do it.  And

13  consequently the number of trials accelerated substantially in

14  the office, way over anybody else in the State of Louisiana.  And

15  some of my lawyers tried 40, 50, 60 cases a year.

16  Q.   Let me cut you off just a little bit.

17  A.   Okay.

18  Q.   Can we focus in on what, if anything, you did with respect

19  to the assignment of attorneys to sections of court that was not

20  done by your predecessor, Mr. Garrison?

21  A.   Well, a lot of the people in Mr. Garrison's office were

22  assigned to special units, to armed robbery, and they were good,

23  armed robbery unit.  In fact, one became one of my first

24  assistants.  And homicides, and one of those fellows became the

25  head of my criminal bureau when I started.  And so they had those

1   units and they had one lawyer in each section of court.  And I

2   really wanted two lawyers, and so that's what we did, two.  I

3   broke up those units and redeployed those individuals.

4   Q.   Why did you think there should be two lawyers in each

5   section?

6   A.   I wanted to get -- one of the assistants, the young

7   assistants that I met when I went out there, I was talking to him

8   one day about the cases that he tried, and I said, I said, "Did

9   you ever try a murder case?"  "No."  "Did you ever try an armed

10  robbery case?"  "No."  "Did you ever try a rape case?"  "No."

11  But he said all of those guys in those different units, the rape,

12  homicide, et cetera, they tried those cases.  I said, well, I

13  want my young people to be exposed as much as possible.  And so

14  one of the things we did to expose them, to teach them to this

15  was to break up those units and send those more experienced

16  lawyers down to the sections of court, and they with the former

17  Assistant U.S. Attorneys formed an excellent teaching tool.

18          In fact, one of my former lawyers is in the back and

19  told me that he was one of the teaching officers and I didn't

20  remember him as doing that.  He said, yeah, every Saturday

21  morning we were down there teaching and they were.  But I had

22  forgotten about that.

23  Q.   On the subject of training and teaching, beyond assigning a

24  junior and a senior assistant to each section, is there anything

25  else that you did?  Could you tell the jury about it?

1   A.   My memory is -- you would have to refresh it in some way for

2   me.

3            MR. AARON:  Your Honor, because of his age, could I

4   lead a little bit?

5            THE COURT:  Go ahead.

6                            EXAMINATION

7   BY MR. AARON:

8   Q.   Specifically, let's talk about pretrying cases.  Did you do

9   anything in terms of pretrying cases?

10  A.   Absolutely.  That was essential.  You couldn't go to trial

11  without having spoken to a senior assistant about the case, and

12  it was the senior assistant's responsibility, which imposed a big

13  burden on them, and they had a broader shoulder of knowledge than

14  the other young people did.  And they were subjected to that on a

15  regular ongoing basis, in addition to these trial meetings.

16           The seniors, if they wanted to go to trial, they were

17  supposed to go to the head of the Trial Division and do the same

18  thing.  The Trial Division had weekly regular meetings with those

19  assistants about what happened this week, what's going to happen

20  next week and would bring out new decisions to them.

21           We would get the new decisions on a regular basis.

22  Whenever I would see a young lawyer, I would say -- we had what

23  they called advance sheets from the Louisiana Supreme Court.

24  These were little books that gave only a small section of

25  decisions that the Supreme Court or the appellate court would

1  write.  And I would always remind them and I would tell them,
2  remember in my days, the only time I had to read those things is
3  when I went to the bathroom.  I said take your advance sheet with
4  you to the bathroom.  And constantly getting them to read and to
5  understand what was new in the law.
6  Q.   Now, whose responsibility was it to disseminate these new
7  decisions of cases, do you recall?
8  A.   Bill Russell was my first assistant and we would sit down.
9  We had a lot of -- every time we had a thought, we would put it
10  into a written form.  I was insisting on having a policy manual
11  in the office.
12       In those days, most offices didn't have a policy
13  manual.  Running a -- compiling a policy manual was a full-time
14  job.  I mean, you had to put a lot of different data together,
15  about anywhere from seven or eight to nine, ten or eleven
16  divisions.  And it was a lot of work.  But we didn't have the
17  time to devote to putting one together, but our policy manual was
18  in existence, in essence, in one form or the other, from the
19  first day we went into office.  And Mr. Wessell and I would
20  dictate -- something would come up that needed to put in the
21  manual, we'd write a policy manual, write a policy decision on it
22  by memorandum and circulated it widely throughout the office.
23       When new decisions came down, the appellate, chief of
24  the Appellate Division would digest that opinion and would send
25  that around.  And so there was a lot of circulation of new

1  decisions from Louisiana Supreme Court, the Fifth Circuit over

2  here, and the Supreme Court of the United States.

3  Q.    Early on in the plaintiff's case, they showed a little video

4  of your deposition, and in there you said you stopped practicing

5  law.  Could you explain what you meant by that to the jury?

6  A.    I think they wanted to find out if I was up on the law.  And

7  I'll readily tell anybody that I'm not a legal scholar.  I mean,

8  I love to go to the library and I love to do research.  And I did

9  it one time, claim a knowledge about searches and seizure, I

10  wrote papers on it and gave lectures on it.  But when I became a

11  full-time DA, gave up my practice and if you wanted to work for

12  me, you had to give up your practice.  We wanted your attention,

13  your professional attention exclusively on your responsibilities

14  of the office.  And so we -- so I stopped.

15          I recall, I looked at my deposition again, and they had

16  said something about I gave up reading decisions, and I did give

17  up going to the library, but I had -- I tried a number of cases.

18  I tried a bunch of cases over the years, and that necessitated

19  going to the library, but as a routine, we had an appellate

20  chief, I had a first assistant, and if I wanted to find out what

21  the law was, I would call Val or somebody or Louise Korns who was

22  there at that time, I said would you give me a reading on this

23  *Brady* case or whatever it may be.  And I would get a memorandum

24  in a very succinct form, but I didn't study the case like I had

25  to if I were going to use it in court.  But they were correct, I

1  guess, in assuming that I didn't study the law like I did, I had
2  to when I was a private practitioner.
3  Q.   It's my understanding during the 29 years that you were
4  District Attorney for the Parish of Orleans, the Louisiana
5  Legislature enacted a number of laws on the subject of criminal
6  law and criminal procedure.  Could you tell the jury to what
7  extent, if any, you may have participated in the development of
8  those laws?
9  A.   Yes.  New Orleans, because of its unique position in the
10  city -- in the State, had a substantial number of cases, more
11  than other jurisdictions.  Consequently, we would get a lot of
12  fact situations in our court that were received before other
13  jurisdictions because they didn't have a lot of cases like we
14  did.  And from that would oftentimes come suggestions for new,
15  enacting new laws.  And we did that.
16       For instance, the fellow with the firearm statute, that
17  increased significantly the penalty of someone who had been
18  convicted of a crime, a felony to possess a firearm.  We
19  originated that.  We went to Baton Rouge, and all of -- in 28 of
20  my 29 years I would go to Baton Rouge every legislative session.
21  I was a member of the Louisiana District Attorneys Association.
22  I was a member of the National District Attorneys Association.  I
23  was a member of the Board of the Louisiana DA's Association, and
24  I was a lecturer for them, but we would go to each session, and
25  as a member of the Board, we would introduce our legislation to

1    the Board of Directors for the Louisiana DA's Association first

2    so as not to conflict with other people offering new legislation

3    in the State.

4             And we had over 200 pieces of legislation enacted.  And

5    many of them had to do with criminal law and procedure.  A felon

6    with a firearm.  One of the complaints that one of my female

7    assistants brought to me was, and she was very active in the

8    prosecution of sex crimes, was that when a woman who is a rape,

9    victim takes the stand, the defense could question her on pre,

10   previous sexual encounters.  And she said that's very unfair.  I

11   said, I would agree, and so that was another, I had a bill

12   written up and I took that up there.  And those are the kind of

13   bills we would lobby and many of them became the law of the

14   State.

15   Q.   On any given year, approximately how many Assistant District

16   Attorneys would be working for you?

17   A.   I would say 70.  Sometimes 75.

18   Q.   Over the many years that you served as District Attorney, do

19   you have any idea how many different Assistant District Attorneys

20   worked for you?

21   A.   Well over 700.

22   Q.   Over 700.  Is it fair to say that many of your former

23   assistants became federal judges, United States Attorneys,

24   Assistant U.S. Attorneys, state court judges?

25   A.   Yeah.  Three of my former assistants are sitting on this

1   bench over here now, and one of my former assistants is a U.S.

2   Attorney in this district.  Another is a U.S. Attorney in

3   Houston.  Six judges on the Criminal District Court bench now are

4   former assistants of mine.  They are also on the Court of

5   Appeals, Jim McKay and Cannizzaro, Judge Cannizzaro.  And they've

6   become, they are very much in demand in Mr. Letten's office.  I

7   think he must have anywhere from 12 to 16 or 17 at any one time

8   of my former assistants because he had worked in my office.

9   Q.   I didn't mean to cut you off.  Is it fair to say that many

10  other prosecutors' offices, state and federal, used your office

11  as a training ground?

12  A.   All over the State.

13  Q.   And did that cause you to have a problem with people staying

14  with you?

15  A.   Huge turnover.

16  Q.   Now, did you pay really big salaries to your Assistant

17  District Attorneys?

18  A.   No.  We fought for years to get increases in salaries.  We

19  started off back when I started it was 17 thousand a year.  And

20  over the years we were able, when I left I think it was 30

21  thousand a year from the State.  And the City would supplement

22  that.  So we were able to pay anywhere from 30 to 35 thousand for

23  someone beginning, and then if they stayed with us for a long

24  time, the first assistant got, I think, 85 percent of what my

25  salary was, and then it went down.  My salary was a hundred

1   thousand a year and then it went down from that.  But not

2   compared to other offices, it wasn't on the high end of the pay

3   scale.

4   Q.   Did many people leave because of salary?

5   A.   Yeah.  But fortunately, we had some who stayed, people like

6   Tim McElroy and Judge Buras and Judge Bigelow, Judge Dennis

7   Waldron.  A lot of them stayed with us for long periods, Judge

8   Alarcon, a lot of times because they liked what they do and they

9   wanted to learn.  And a lot -- some of the fellows that I see in

10  the hallways around here had stayed with me for five, beyond the

11  three-year commitment period because they learned and they wanted

12  to learn and this was what they wanted to do.

13  Q.   You ceased being District Attorney in 2003.  Why was that?

14  A.   Well, I was 76 at the time, and frankly, I was, you know,

15  you kind of have a zest to be something in life and a lot of

16  energy and it's a hard job, and, you know, I was begging for

17  money for your lawyers and then trying to push legislation and

18  it's just a tough job.  And I was ready to spend a little time

19  with my wife and my children.

20  Q.   Are you retired now?

21  A.   Yes.

22  Q.   Now, let's -- I'm going to have a few topics and as I move

23  through, I'll give you a little headline what topic I'm going to

24  move through.  Let's talk about, first of all, discovery law in

25  1985.  There's been some discussion previously by the plaintiffs,

1   one of their experts, about open file versus closed file.  Could

2   you, what was your policy?  And why?

3   A.   We had a policy of, first of all, teaching the law to the --

4   to the lawyers.  And our policy primarily came from the law of

5   the State of Louisiana, particularly the discovery law.  The

6   cases that was decided in Louisiana on criminal law and

7   procedure, the United States Supreme Court cases, and then the

8   Canon of Professional Responsibility.  That was the framework of

9   the policy of my office.

10        Some of the decisions said that we were obligated,

11  which were very clear, we were obligated to turn over to the

12  defendant certain items.  Under the State statutes and under the,

13  the laws of discovery particularly, they sort of reiterated a lot

14  of that, both the State law -- the State law in many instances

15  echoed the federal law, because if we would get a decision from

16  the federal court, the legislators would incorporate that in the

17  State law and then, of course, the canon of ethics.  And those

18  were -- that was the framework of what my policy was.

19        One of the Supreme Court decisions said, you know, you

20  don't have -- the prosecutor doesn't have to turn over his whole

21  file.  And I had experience with open-file discovery, and you can

22  use it with some people and not with others.  So Jim Letten told

23  me, well, I used, I was very liberal in giving it out.  Other

24  attorneys, young attorneys particularly, you had to make it very

25  clear to them what their responsibility was.  And not give, they

1  had enough decisions to make without giving them a lot of leeway.

2  But they knew that whatever that law was, they were responsible.

3  They had learned it as a matter of fact.  To take a bar

4  examination, they had to understand all of what I'm telling you

5  because they were quizzed on it.  And so they knew what their

6  responsibilities were.  My policy was, as was stated in the

7  article that Mr. Cooney, I think, referred to with Mr. McElroy,

8  that they were obliged to turn over that information.

9  Q.    But your policy was not open file?

10  A.    No.  And every -- some DAs have open file.  It may be fine

11  for them.  But as a lawyer who grew up in the Criminal District

12  Court watching defense lawyers operate and watching prosecutors

13  operate, I thought it better not to have an open-file discovery.

14  Q.    Did you ever --

15  A.    And there's a lot of reasons for that, incidentally.  It

16  wasn't just a kwim, a whim, rather.

17  Q.    You wanted to state some reasons?

18  A.    Well, we were concerned about safety of witnesses and

19  victims and such as that.  And we felt that it was our

20  responsibility to protect those people.

21  Q.    With respect to your policies, did you ever instruct any

22  Assistant District Attorney, any of the over 700 that worked for

23  you, to violate *Brady* and not turn over -- let me finish -- not

24  turn over evidence that the defense was entitled to receive?

25  A.    Absolutely not.

1  Q.   Now, over the course of the years, obviously, a few things

2  slipped through the cracks, and on occasion, someone might have

3  been found not to have turned over exculpatory evidence.  What

4  would you do if you found out and if the person was still working

5  for you?

6  A.   Well, I would talk to the person and find out what happened.

7  If they were still in my employ, I had control over that

8  situation.

9       I know that Mr. Cooney, I think, during my deposition

10 asked me if I ever reprimanded anyone.  I reprimanded lawyers a

11 lot of times, but I had to have some reason to.  To me a

12 reprimand is a, is a serious matter.  I mean, you're accusing

13 someone of not doing what they were supposed to do.  And before I

14 reprimand anyone, I would like to get my facts.  And I would find

15 out if these people, if they were still in my employ, what

16 happened in the case and they would explain it to me.  And I may

17 not have made the same decision that they would have made or that

18 they actually made, but it was, it was one that was, it wasn't

19 perhaps, it was a neglect to do something they should have done

20 sometime, but you have a young lawyer and he goes into a section

21 of court, they mentioned Judge Calvin Johnson wrote a letter.

22 Q.   I was going to get to that.

23 A.   Well, the letter was very vague as to what specifically he

24 had in mind.  He didn't name anyone.  He didn't name any specific

25 transgression, but I took it upon myself to find out, well, who

1    was in that section of court?  What would prompt Judge Calvin

2    Johnson to write this letter.  Well, this young man named Jim

3    Dugan and he hadn't been with me very long, and he was very

4    conscientious and he was transferred to Judge Johnson's court and

5    after being there only a short time, and Judge Calvin Johnson

6    incidentally had one of the biggest backlogs, that was his way of

7    handling his business, one of the biggest backlogs in criminal

8    court.  At that time I think he had 300 plus cases on his docket

9    that were backlogged as compared to some other lawyers that may

10   have had 40 or 50.  Well, it's a lot more difficult to go into a

11   section when you're young and you're new at it and review

12   300 cases as it is opposed to go into a section that has maybe 40

13   or 50.  And he was faced with a situation of turning something

14   over.  He said, Mr. Connick, to be honest with you, I haven't had

15   a chance to look at all of those files.  I said, okay.  I said,

16   try to look at your, try to, I did teach him, tell him, look at

17   your docket for that week, for the next day and the day after

18   that, and pull those cases and find out what you have to do in

19   those.  Because managing a docket was new to them.  And, you

20   know, they just -- you had to give them some understanding.

21   Q.    Now, the letter that you're talking about, and I'm sure

22   they'll correct me if I get the date wrong was in 1998, wasn't

23   it?

24   A.    Yes.

25   Q.    Prior to 1998 -- well, no, let's say prior to 1985, let's

1   focus in on the Thompson case, did you ever receive a letter from

2   a judge complaining about not turning over exculpatory evidence?

3   A.   No.   No.   At the time something else I was shown on my

4   deposition was a list of cases, there were about 15 of them, and

5   I was asked if I knew about them.   And some of them I had no idea

6   what they were about.   But subsequent to that, I've looked at

7   those cases.   Only four of those cases were cases that came out

8   of my office from 1974 until 1984.   Four of them had to do with

9   written decisions regarding failure on the part of people in my

10  office to turn those, to turn over favorable information.

11          And I looked at the decisions and I think in virtually

12  every one of -- literally every one of those decisions, the

13  lawyer in those, in those four cases were employed by me at the

14  time, by me, they had made a decision not to turn something over,

15  the judge had ruled it that they were correct, he looked -- they

16  had motions to suppress, motions to discover.   The judge had

17  looked at those, heard the arguments on it and agreed with us.

18  But anyway, the court of -- our appeals at that time went

19  directly from the criminal court to the Supreme Court.   No cases

20  before the Court of Appeals in Louisiana at that time.

21  Q.   You mean criminal cases?

22  A.   Criminal cases, that is.   And so the Supreme Court of

23  Louisiana sent over in '74, '76, '80 and '82 or something like

24  that, those four cases and at that time frame we had thousands of

25  decisions that were appealed to the Louisiana Supreme Court,

1  thousands.  And so four decisions out of those and Mr. Williams
2  wasn't involved in any of them and neither was anybody else we're
3  talking about in this case.  And it was an unusual thing for my
4  office to receive a reversal at that time.  And everybody reacted
5  to it and they were, what are you talking about?  Who was
6  reversed?  Why?  And that was immediately disseminated through
7  the office and everybody was aware of it and this is what you
8  avoid.  This is what you avoid.
9  Q.   Did you attend the meetings where these decisions were
10 disseminated?
11 A.   Absolutely.  In fact, Mr. Whalen this morning was telling me
12 we had Saturday meetings on these subjects, you know.  Frankly, I
13 had forgotten about that.  But, yeah, they were discussed.
14 Q.   And if there was a problem, did you personally tell your
15 assistants don't do this again?
16 A.   Absolutely.  I used to visit, I was accused of
17 micromanagement.  I used to visit those divisions.  I'd go walk
18 in and not talk to the chief, but I would talk to the young
19 lawyers and find out what they were doing and how they were
20 doing.
21 Q.   During the course of your tenure as District Attorney, did
22 you personally handle any cases?
23 A.   Oh, yes, a number of them.  One of the earliest cases I
24 tried was a case against one of the real kingpins of dope pushers
25 in the city, Joseph Sylvester in a murder-for-hire case.  I

1   prosecuted that.  I prosecuted another number of men who --

2   homosexual men who posed as scoutmasters and --

3   Q.    You mean Boy Scoutmasters?

4   A.    Pardon.

5   Q.    Boy Scout troops?

6   A.    Boy Scout troops, yeah.  And they would entice these young

7   men, very young men, into the troop and then abuse them sexually

8   and that was -- took a long time to try a bunch of those cases.

9   The murder of, and probable rape of a little two-year-old baby in

10  one of the projects by a man who had just been released from

11  Angola.  And there was nobody left.  The child had been cut up

12  and the remains put into a plastic garbage bag and dumped into

13  the river.  And I prosecuted those and a number of other cases

14  through the years.

15  Q.    Approximately how many cases would get referred to your

16  office on an average annual basis by the Police Department?

17  A.    Going back to '74, it could have been anywhere from 10 to

18  15,000 a year.  And at the end it was as high as 30 some-odd

19  thousand.  It was pretty heavy through the years.

20  Q.    So in a year that had 30,000 cases, your screeners would

21  have to screen 30,000 cases?

22  A.    Yes, or less than that depending on the year you're talking

23  about.  I would say 15,000.  Many, many cases.

24  Q.    Back in 1985, and this is an approximation, I know I'm

25  asking you to go back a long time to remember, but approximately

1  how many cases per year would the prosecutors in your office

2  handle?

3  A.   I would say on the average of 15,000, I would say

4  approximately.

5  Q.   Altogether.  How about individual?

6  A.   I would say anywhere from 12, 16, 17,000 cases a year.  Am I

7  answering your question?

8  Q.   No, I'm talking about, let's talk about the juniors and

9  senior assistants in the sections, approximately how many cases

10  per year would each, let's say, juniors and senior attorney

11  handle together?

12  A.   Well, divide, let's say, half of the amount that came in,

13  and then you divide it further by say, ten, that number of, the

14  number of sections they had at the time.  And so I would say,

15  again, that would come down to, you know, over a thousand, I

16  would say, easily.

17  Q.   Now, with that many cases coming through, is it fair to say

18  that a few could slip through the cracks?

19  A.   Well, I don't like the term of slip through the cracks.  I

20  would say perhaps it was because that, I think, necessitates an

21  opinion about not paying attention to what you were doing.  I

22  would think --

23  Q.   My poor choice of words.

24  A.   I think that we made, my lawyers made some decisions as we

25  all do, that are not in keeping with the opinion of other people,

1  the people, say, judges or defense lawyers.  And that's
2  understandable in what we did.  And so then they made mistakes.
3  And but they -- hopefully, most of them were corrected, which
4  weren't very many, compared to the volume of work that we had.
5  Q.   Now, you heard Mr. McElroy's testimony with respect to what
6  was done in connection to the motion for new trial, the motion to
7  set aside the stay for Mr. Thompson.  You also heard about use of
8  the Grand Jury as an investigative tool.  Is there anything that
9  you might want to add to that for the benefit of the jury?
10  A.   Well, I would like to -- his slant on the thing is somewhat
11  different from mine.
12  Q.   That's why I give you the opportunity.
13  A.   Let me say how I recall it.  I was in my office one day and
14  Mr. McElroy came in and he said there are two lawyers from
15  Philadelphia who have a very important matter to discuss with us.
16  I went in and introduced myself and we spoke.  And I met
17  Mr. Cooney and I met Mr. Banks and they proceeded to tell me that
18  they had come across through their investigation information that
19  there was a lab report in the armed robbery case of Mr. Thompson
20  that had not been turned over to the defense.  And, you know,
21  that was totally unacceptable and they explained to me what it
22  was and gave us more details about it and it was extremely
23  serious.  And we talked about it and I think they were wondering
24  what I was going to do.
25            And I knew what I was going to do immediately.  I was

1   going to give them, when they told me that Mr. Thompson was on

2   death row, I said, "Well, I'm going to go to court and I'm going

3   to have that death penalty set aside because of the newly

4   discovered evidence."  And so we made that clear that we're going

5   to do that as the first step.  And they said, may we join you in

6   the motion.  I said absolutely.  So we filed a motion in court.

7   I think it was the next day or very quickly.  And we set that

8   wheel in motion.

9        The other thing I did was to ask Mr. McElroy to give me

10  a more accurate rundown on who was responsible for what.  And I

11  learned that Mr. Deegan, who was deceased, had told

12  Mr. Riehlmann, who was also a former assistant prosecutor under

13  me, that he had -- he had suppressed the evidence.  He had -- he

14  had gotten rid of the evidence or words to that effect.

15       And Mr. McElroy worked on that.  And I found out later

16  that he was going to bring Val Solino into it with him, which he

17  did.

18       And I also wanted to find out after Tim told me that I

19  can't find anything except on Gerry Deegan.  I cannot put any

20  evidence in anybody's hands that would in any way inculpate them,

21  that would in any way include them in this suppression of

22  evidence.  I said, let me try, I'm going to go to the Grand Jury.

23  And so I called the -- had Tim call the Grand Jury, Tim McElroy

24  and the Grand Jury met.  And then after one or two meetings, I

25  forget exactly which, I was told by Tim -- in the presence of

1    Mr. McElroy, and I think, one of our young assistants, Mr. John
2    Jerry Glas was there and Mr. Solino, Val Solino, and maybe
3    Mr. Russell.  I don't know.  When I had things of that nature, I
4    would like for Billy Russell who was extremely experienced and
5    who had been a first assistant to be involved in the decision.

6            I had learned that we weren't getting anywhere in the
7    Grand Jury.  We had a situation, I think, that Mr. McElroy
8    explained.  We had some lawyers who were, who didn't have to go
9    to the Grand Jury if they didn't want to.  If they were involved
10   in it, they could say I'm not going to go, I take the Fifth
11   Amendment because they had a right to do that.

12           Anyway, I decided, and what I had learned about from
13   somebody, I thought it was Val Solino, and I understood since
14   that that it wasn't true, but I still say it was Mr. Solino, told
15   me that that case involving those assistants had -- the statute
16   of limitations had run on it.
17   Q.   Explain to the jury what you mean by statute of limitations?
18   A.   In Louisiana, if you don't bring a case to trial, if you
19   don't charge a certain individual before a certain period of
20   time, then the law says you can't do it after that.  And the
21   legislature has set a period of time four years on some charges
22   and six years on another kind of charge, and maybe never on a
23   murder case, let's say.

24           And the case had prescribed, I was told.  And I was
25   satisfied.  And rather push it, and rather have, I don't know who

1  had appeared, but Tim told me, Mr. McElroy told me that we just

2  weren't getting anywhere.  So I said let's stop it.  I started it

3  and I can stop it.  I felt it was not the first time I had done

4  it because of prescription.  It's just not something that I can

5  in good conscience do, even though prescription is an affirmative

6  defense, it's something that the defendant has to raise if you

7  charge him, but why charge him knowing he will probably raise

8  this as a defense issue.  It's a useless thing to do.  So I said,

9  we'll work at it another way.  And we had to do this anyway.  We

10 had to go to court and have a lot of motion in Judge Quinlan's

11 court asking for a new trial.  It was the only mechanism that I

12 felt was open to me to do that.

13         In that motion, in that process, was a hearing, and in

14 that hearing everybody plus many more people who didn't testify

15 before the Grand Jury would come in before the public, before the

16 media and testify about what happened, each one of them.

17 Mr. Riehlmann, Mr. Whittaker, Mr. Dubelier, Mr. Williams, police,

18 everybody that was connected with it testified at that hearing.

19 And it was very open and the judge after it was over with,

20 criticized my office and although he ruled on some of the motions

21 admitting the evidence, we also found out at that hearing that it

22 was a defense lawyer who didn't do a lot to further his cause,

23 the cause of his client.

24 Q.   Are you referring to Numa Bertel?

25 A.   Mr. Bertel because he testified at that hearing that as a

1  defense lawyer he didn't have to do anything, which was never my
2  understanding of what the responsibility of a defense lawyer was.
3        Anyway, we achieved what we wanted to do and that was
4  to give Mr. Thompson a new trial.  And he deserved one, he was
5  treated unfairly and I felt very badly about it, and so I took
6  all possible courses that I could take that were available to me
7  to do that.  And it worked out that he did, that he did get the
8  new trial, but he was never tried on it.
9  Q.   After the conclusion of this hearing, did you call a meeting
10 of everybody in the staff, the lawyers, Assistant District
11 Attorneys?  Did you call a meeting?
12 A.   You know, somebody said that, and I forgot, but let me tell
13 you what I did beyond that open hearing.  I wrote a letter, and
14 it pained me to do this, but it's something that had to be done,
15 I wrote to the Louisiana State Bar Association about
16 Mr. Dubelier.
17 Q.   Let me cut you off right there.  And let's go into another
18 topic.  Let's go into another topic.  Let's talk about have you
19 had any discussions with staff with respect to how terrible a
20 thing it was and not to do it again, whatever?
21 A.   I probably would have, but I specifically, when Mr. McElroy
22 testified to that, I don't recall that.  I kind of did that when,
23 when I had to do it.  It was something that I wanted to get all
24 of my trial lawyers together, all of my investigators together
25 and say this is what happened.  You know, why did it happen?

1    You've got to, you've got to never let it happen again.

2              And, you know, they, most of the time it sunk in.

3    Q.   Let me ask you a question.  When Mr. Banks and Mr. Cooney

4    came down from Philadelphia to meet with you, the purpose was to

5    discuss setting aside the attempted armed carjacking conviction;

6    correct?

7    A.   Right.

8    Q.   Did they ever discuss with you setting aside the conviction

9    in the murder trial when they met with you in 1999?

10   A.   Well, they did discuss at some point in time the role that

11   the armed robbery played in the homicide case.  In their mind, to

12   their mind they the thought it was unusual for my office to try

13   the armed robbery case before the murder case.  It's very usual.

14   I mean, I don't know a prosecutor who doesn't do that, and there

15   is nothing unlawful about it or illegal or improper.  But they

16   did discuss the murder case and they said, they said that the

17   reason Mr. Thompson didn't take the stand is he couldn't take the

18   stand in the homicide case was -- I didn't agree with them on

19   that, but that it was because of the armed robbery conviction.

20   Q.   But we saw on the screen that when they met with you, they

21   gave you a list of pieces of evidence that was withheld, correct?

22   A.   Yes.  That's what they said.

23   Q.   Everything that was on the list referred to the armed

24   carjacking conviction?

25   A.   Right.

1   Q.   It did not refer to the murder conviction?

2   A.   No.

3   Q.   Okay.  That was my point.  Now, during the course of your

4   29 years as District Attorney, were you ever asked by

5   organizations to speak on legal topics?

6   A.   Frequently.

7   Q.   And what sort of organizations invited you to speak and what

8   sort of topics did you speak on?

9   A.   Aside from many local organizations, political groups and

10  church groups and such as that, civic groups, the Louisiana DA's

11  Association, the National DA's Association, the National College

12  of District Attorneys and other -- other law enforcement.  When I

13  was assistant over here, I was responsible for -- the subject of

14  search and seizure in those days was extremely important.  It was

15  new.  We had every law enforcement officer, non-federal law

16  enforcement officer at least in Louisiana attend a conference

17  that I had conceived and put together.  I talked at that.  Wrote

18  a paper on that.  And throughout my years I spoke in Washington,

19  DC to a group of federal enforcement people.

20  Q.   I'm holding in my hand, I guess it must have been a brochure

21  from a program conducted by the National District Attorneys

22  Association called symposium on prosecution prevention, treatment

23  of drug abuse.  Do you recall speaking at that in 2002?

24  A.   Yes.

25  Q.   Now, over the course of your 29 years as District Attorney,

1  have you ever been recognized or given awards by any

2  organizations?

3  A.    Yes.

4  Q.    Could you explain it to the jury?

5  A.    Well, one of the ones that I was very proud of was one from

6  the Attorney General of the United States when I was an assistant

7  working over here.  For outstanding performance.  I had become

8  chief of the Criminal Division over here.  And anyway, I got that

9  award.

10          And then John Walters is the drug czar, the man in

11  charge of the National Drug Policy Bureau, gave me an award for

12  my efforts on behalf of my office to do something about young

13  people using drugs.  We had some programs that dealt with that.

14  And a lot of others, you know.

15  Q.    When a person became an Assistant District Attorney in your

16  office, they had already been sworn in by the clerk of the

17  Louisiana Supreme Court as a lawyer, did you make them take

18  another oath?

19  A.    No.  Well, they had, by law, I think they had to take an

20  oath before a judge, and they took, when they became the

21  Assistant District Attorney, all of that responsibility to

22  respect the law and obey the law and implement the law was

23  followed at that time, yeah, they had to do that.

24  Q.    And in specific that oath that they had to take said that

25  they would defend the constitutional laws of the United States?

1  A.    Absolutely.

2  Q.    As well as the constitutional laws of the State of

3  Louisiana?

4  A.    Absolutely.

5  Q.    Now, if someone in your office were to fail to turn over

6  *Brady* evidence, evidence that under the Constitution a defendant

7  was entitled to receive, would that person be following your

8  policy or breaking your policy?

9  A.    He would be breaking my policy, not violating the policy.

10  Not following the law.

11          MR. AARON:  Excuse me one second.

12          Mr. Connick, I have no further questions.  I tender you

13  to plaintiff's counsel.

14          THE WITNESS:  Before we do that, can I ask for a break,

15  Your Honor?

16          THE COURT:  All right.  Let's take about a five-minute

17  recess.

18          THE DEPUTY CLERK:  All rise.

19          (WHEREUPON, the jury panel leaves the courtroom and at

20  this point in the proceedings there was a brief recess.)

21          THE DEPUTY CLERK:  All rise.

22          (WHEREUPON, the jury panel enters the courtroom.)

23          THE COURT:  Please be seated, everyone.

24          MR. COONEY:  Your Honor, may I approach?

25          THE COURT:  Mr. Cooney.  Yes.

1                            CROSS-EXAMINATION

2    BY MR. COONEY:

3    Q.   Mr. Connick, I'm just going to hand to you a binder of a few

4    documents and the transcript of your deposition.

5    A.   Yes, sir.

6    Q.   I'm going to try to be relatively brief, Mr. Connick.

7              Would you agree, Mr. Connick, that as the District

8    Attorney, you were aware that from time to time the State would

9    come into possession of *Brady* evidence in criminal cases?

10   A.   Of course.

11   Q.   And would you also agree with me that you also knew that if

12   the favorable evidence came into possession of the State and if

13   it wasn't produced to the defense, the result of that would be a

14   violation of the accused's constitutional rights?

15   A.   Yes.

16   Q.   Now, I think you testified during your direct examination by

17   Mr. Aaron that you did not have an open-file discovery policy in

18   1985; is that right?

19   A.   Not as a matter of policy.  We just said the defense is

20   entitled to what the law provides and what *Brady* provides, what

21   the Louisiana discovery law provides and what the professional

22   responsibility for prosecutors provides.

23   Q.   But open-file discovery as you understand it is when the

24   prosecutor basically literally opens his file and says to the

25   defense lawyer, take a look, here it is.

A.    I've defended and prosecuted a lot of cases, Mr. Cooney, and
I know exactly what that means, and some of my lawyers,
Mr. Letten, for one, when I spoke to him, he said, you know, I
had generally an open-file policy.  Other former assistants have
done that, but I did not have an open-file policy.
Q.    For the office, you made the policy decision?
A.    And the Supreme Court has ruled, I'm learning as I read some
of these cases, that the prosecutor doesn't have to give over
everything that's in his file.
Q.    It's a policy decision on your part whether or not you're
going to adopt open-file discovery; right?
A.    Yes.
Q.    And at least as far as the policy office is concerned, you
decided you were not going to have open-file discovery as the
policy of the office?
A.    Yes.
Q.    Would you agree with me, if you don't have open-file
discovery, that means it's going to be up to the individual
prosecutors handling particular cases to do a thorough review of
the file and make sure they get things right under *Brady*?
A.    The individual prosecutor, plus there is in my office is a
senior assistant, or the trial chief, or someone above him, and
if, if you look at the checks and balances in the system, the
judge has to be involved in that, too, because it becomes an
issue when an attorney for the defendant files a motion for

1   discovery.

2   Q.   And the judge only gets involved if somehow it gets brought

3   to the judge's attention; is that right?

4   A.   Well, the defense lawyer usually brings it to the attention

5   of the judge, and the judge will, the ones that I have been

6   before, will, and this is what, again, the law says, will, it's a

7   motion, and it's to be heard before a judge.  The question, the

8   request is made for information, and if it's denied, if there is

9   a basis for it, then the judge will, and the prosecutor will

10   decline to turn it over.  The judge has to decide that.  Even by

11   in camera inspections, if necessary.

12   Q.   But typically the judge is not going to take the

13   prosecutor's entire file and look through it and decide what's

14   *Brady* and what's not?

15   A.   No.  That's a decision that lawyers make.  Do it every day.

16   Q.   Would you also agree in order to be able to make the right

17   decision under *Brady*, the lawyers that are working on a

18   particular case, not only have to do a thorough review of the

19   file, they also have to understand the law?

20   A.   Yes.

21   Q.   Would you agree with me that in 1985, many of the

22   assistants, the Assistant District Attorneys in your office were

23   coming fresh out of law school?

24   A.   Yes.

25   Q.   And in 1985, you had section chiefs that were less than four

1   years out of law school, like Mr. Dubelier, for example?

2   A.   Yes.

3   Q.   Are you familiar with the American Bar Association?

4   A.   Of course.

5   Q.   And could you just tell the jury what the ABA is,

6   Mr. Connick?

7   A.   The American Bar Association is a group of lawyers who, it's

8   an organization of attorneys, and they specialize and train

9   lawyers in different aspects of the law, in civil law and

10  criminal law, constitutional law, commercial law, all kinds of

11  things, and they have a publication on a regular basis, and they

12  have a standard of conduct that it's not, it's just their opinion

13  of what it ought to be.  It's not the law.  You don't have to

14  follow it if you don't want to.

15  Q.   Would you agree with me that the American Bar Association or

16  the ABA is the national organization of all lawyers in the U.S.?

17  A.   It's a very liberal national organization when it comes to

18  criminal justice.

19  Q.   Were you aware that in the 1970s, the American Bar

20  Association issued something called the American Bar Association

21  standards for criminal justice?

22  A.   Yes.

23  Q.   And were you aware that it included specific standards for

24  the prosecution function?

25  A.   Yes.

1  Q.   Did you know that the then Chief Justice Warren Burger of

2  the Supreme Court, called the standards, quote, the singlemost

3  comprehensive and probably the most monumental undertaking in the

4  field of criminal justice ever attempted by the American legal

5  profession in our national history?

6  A.   No.

7  Q.   Are you aware that a second edition of the ABA standard,

8  first edition, '74, are you aware that the second edition was

9  released in 1980?

10 A.   I don't recall the dates on that.

11 Q.   Generally, is that consistent with your recollection as

12 to --

13 A.   I would say so.

14 Q.   And are you aware that the ABA standards included a

15 provision called ABA Standard 11-2.1 which concerned the pretrial

16 disclosure by the prosecutor?

17 A.   I may have by number at that time, but by concept, I think I

18 recall that.

19 Q.   Mr. Lawless, were you here for Mr. Lawless' testimony the

20 other day when he talked about that during the plaintiff's case?

21 A.   No, I wasn't able to be here.

22 Q.   If I could, Mr. Connick, would you take a look at Exhibit 78

23 which is in your binder and I'm going to ask Mr. Vincent if he

24 would be kind enough to put that up on the screen.  And I'm going

25 to refer you to Page 27, first, if I can.  And would you agree

1  with me that --

2  A.   One moment, please.

3  Q.   -- what appears on the beginning of 27 and carrying over to

4  28 would be a --

5           THE COURT:  Which exhibit?

6           MR. COONEY:  I'm sorry, Your Honor, it's Exhibit 178.

7           THE COURT:  Why don't you see if you can assist

8  Mr. Connick in finding the right exhibit.

9           THE WITNESS:  I have 78.  I thought you said 78.

10          MR. COONEY:  78, I think that may be right.  That's it.

11 Thank you, Mr. Connick.

12                          EXAMINATION

13 BY MR. COONEY:

14 Q.   And would you agree with me that what appears there is the

15 ABA's Discovery Standard 11-2.1, Prosecutorial Disclosure?

16 A.   I see it.

17 Q.   And, Mr. Connick, the question is simply whether you

18 recognize that as the ABA Discovery Standard 11-2.1,

19 Prosecutorial Disclosure?

20          MR. AARON:  I don't think he heard you.

21          THE WITNESS:  I'm sorry.  What was the question?

22                          EXAMINATION

23 BY MR. COONEY:

24 Q.   The question, Mr. Connick, is do you see that that is the

25 ABA Discovery Standard 11-2.1?

1  A.   Yes, I see that.

2  Q.   Okay.  Thank you.  And just looking at the first part of

3  that, Mr. Connick, there is a Section A, and then on the next

4  page, there are items, little Roman (i) through little Roman

5  (vi)?

6  A.   Yes.

7  Q.   And what the ABA has done there is to identify some

8  bright-line categories of information that have to be produced

9  under that standard?

10  A.   Yes.

11  Q.   Like names and addresses of witnesses together with their

12  relevant witness or recorded statements is the first category?

13  A.   Right.

14  Q.   And then in Section D, am I correct that one of the things

15  the ABA suggests here is that the prosecuting attorney's

16  obligations under the standard extends to material and

17  information in the possession or control of members of the

18  prosecutor's staff, and of any others who have participated in

19  the investigation or evaluation of the case and who either

20  regularly report to or with reference to the particular case have

21  reported to the prosecutor's office.  Do you see that reference

22  there?

23  A.   Yes.

24  Q.   Okay.  And is that referring at least in the ABA standard to

25  the concept that if there is information in the possession of the

1  police and the police are working with the prosecutor on a

2  particular matter, the obligation to disclose includes that as

3  well?

4  A.   This is what they say.  But, may I address that?

5  Q.   Well, I think, Mr. Connick, I think your counsel can ask the

6  questions in redirect.

7  A.   This is in response to what you have, but okay.

8  Q.   Thank you.  Are you aware just looking at this document as

9  well, Mr. Connick, that Standard 3-2.5, it's a little bit further

10 in that document, also --

11 A.   What page is that on?  What page is that on?

12 Q.   It's on the next page, I think, Mr. Connick.

13 A.   I see it.  Office handbook?

14 Q.   Yes, 3-2.5.

15 A.   But before we, the jury has seen these things that you

16 mentioned, but one of them is under Louisiana law, inadmissible.

17        THE COURT:  Wait a minute, Mr. Connick, wait a minute.

18 Let's try to just answer Mr. Cooney's questions, if you would.

19        THE WITNESS:  Okay.

20        THE COURT:  Answer his questions and then you can

21 answer Mr. Aaron's questions again.  Go ahead, Mr. Cooney.

22                         EXAMINATION

23 BY MR. COONEY:

24 Q.   Mr. Connick, I'm directing your attention to Standard 3-2.5

25 of the ABA standards.  And in that, this deals with a

1   prosecutor's handbook policy guidelines and procedures, is that

2   what that section deals with?

3   A.   On Page 29 at the bottom, you have office handbook.  Is that

4   what it is?

5   Q.   Just above that, Mr. Connick.  Standard 3-2.5, prosecutor's

6   handbook?

7   A.   Right.  I see it.

8   Q.   And what it says in Section A is that it says, each

9   prosecutor's office should develop a statement of, 1, general

10  policies to guide the exercise of prosecutorial discretion, and,

11  2, procedures of the office.  The objectives of these policies

12  are as to discretion and procedures should be to achieve a fair,

13  efficient and effective enforcement of the criminal law.  Is that

14  what that says?

15  A.   Yes.

16  Q.   And in the part down below that says office handbook, am I

17  correct that the ABA standard also suggests that the articulation

18  of policies and procedures should be preserved and a handbook or

19  manual that reflects current rules, statutes and judicial

20  decisions.  It should also contain detailed descriptions of the

21  criteria governing the principal duties of the office.  Highly

22  useful manuals have been established in many prosecutor's

23  offices.  They serve to maintain consistent practices and

24  continuity despite changing personnel, and tend to assure that

25  the policies adopted at the highest levels of the office are

1  observed by the staff.  Is that what that says, Mr. Connick?

2  A.    And that's what we had.

3  Q.    Now, the ABA standards are not mandatory.  They are not the

4  force of law; correct?

5  A.    That's correct.  And some of them are suggesting illegal

6  activity in Louisiana, particularly about the Grand Jury.  They

7  suggest that, and I read this, you read it, that the -- those

8  portions, and in small (iii), those portions of Grand Jury

9  minutes concerning testimony of the accused and relevant

10 testimony of witnesses, Louisiana law doesn't prohibit making

11 public the activity before a Grand Jury.  And then the second

12 one, they say, (i), the letter (i), one (i), names and addresses

13 of witnesses together with their relevant written or recorded

14 testimony, the names and addresses of witnesses have led, in my

15 city, to the death of witnesses, and to the intimidation of

16 witnesses.  And I'm not about to expose somebody who comes

17 forward in a criminal case with possible death.  That's why we

18 have a great deal of difficulty in having witnesses come forward

19 today who are being killed.  I wouldn't make that available to

20 defense lawyers.  I prosecuted a person for killing witnesses.

21 Q.    Mr. Connick, with respect to the provision with respect to a

22 handbook, am I correct that the first handbook in the office was

23 1987?

24 A.    No, not -- technically, you may be correct, but we started

25 to gather information from day one, before I took office, I

1  wanted a policy manual.  I'm a manager, I had a business when I
2  was in law school, I ran it with my now deceased wife.  And I
3  think I know something about management.  And I think policies
4  have to be in writing.  We did that from day one.  We didn't have
5  the time or the money to dedicate to this work like this.  What
6  they are suggesting to is extremely difficult for lawyers,
7  prosecutors to do.  Try going to the council and tell them you
8  want a manual and you want a certain amount of money, 25 or 35 or
9  $50,000 to print up a hundred and something manuals and to do the
10 research on it.  You have to consider what we did under realistic
11 circumstances.  This is -- ABA is a -- this is talking about what
12 would be nice to have.  And I agree, what can be implemented
13 should be implemented, but some of them are impossible to
14 implement.
15 Q.   And are you aware, Mr. Connick, that there's a stipulation
16 in this case that defendants have not provided or identify any
17 written policy promulgated by the District Attorney's Office
18 concerning *Brady* that predates a February 1987 policy manual
19 other than the Code of Professional Responsibility which
20 concerned *Brady* and which had been in existence since 1970?
21 A.   I'm well aware of that, Mr. Cooney.  They didn't run the
22 office, I did, and while we were waiting for that policy manual
23 to be put into a three-ring binder like this, we -- we did
24 promulgate, we did prepare and promulgate, send among our
25 assistants policy changes as they happened.  And they were, they

1    were what became the contents of the policy manual.  So they

2    existed.  We didn't just divine a policy manual overnight on

3    February the 1st of 1987.  Something had to take place before

4    that.  And that was a lot of work.

5    Q.    And Mr. McElroy described the fact that the policy manual

6    was a compilation of the prior memoranda; is that right?

7    A.    Among other things, yes.

8    Q.    Let's take a look at that manual, if we can, Mr. Connick.  I

9    believe it's Exhibit 51 and if I could, once you find it,

10   Mr. Connick, can we just go to Section 5.25, please.

11   A.    Is this the manual?

12   Q.    It is.  It's Exhibit 51 in this thick binder, Mr. Connick.

13   A.    What page is it on?

14   Q.    It's behind the tab marked 51, sir.

15   A.    51.

16   Q.    Thank you.  Thanks for bearing with me on this.

17   A.    All right, I have it.

18   Q.    And I think if you go to Section 5.25, which is on Page --

19   it's marked down on the bottom, Mr. Connick, EX000427, Section

20   5.25.

21   A.    I have it.

22   Q.    In looking at that section, is that the section from the

23   policy manual that dealt with *Brady*?

24   A.    Yes, sir.

25   Q.    And in looking at that section, one of the things that

1  struck me is there is a sentence in here that says, failure to

2  produce *Brady* material has resulted in mistrials and reversals,

3  as well as extended court battles over jeopardy issues.  Do you

4  see that?

5  A.   Yes.  I've read it before.

6  Q.   Do you see any sentence in there, Mr. Connick, that talks

7  about how failure to produce *Brady* material has a significant

8  impact on the rights of the criminal defendant?

9  A.   If a lawyer, either a prosecutor or a defense lawyer doesn't

10 know that from the first day he studies law, then something is

11 wrong with him.  Everybody knows that.  It's an extremely serious

12 violation to deny anyone of any constitutional right and I don't

13 think I have to put it in writing that it's against the law to do

14 that.

15 Q.   But, sir, what it focuses on is not the rights of the

16 accused.  It focuses on the impact from mistrials, reversals and

17 extended court battles, that's what it focuses on; right?

18 A.   If that's your opinion of it, you can certainly have that

19 opinion, but I don't agree with you at all on that.

20 Q.   Now, prior to 1985, I think Mr. Aaron asked you some

21 questions about some prior *Brady* violations that occurred in your

22 office?

23 A.   Yes.

24 Q.   And am I correct that one of those cases was *State v.*

25 *James Carney*?  Do you remember that case?

1   A.   Do you have that list of cases in front of you?

2   Q.   I actually have some cases in that binder there,

3   Mr. Connick.  If you don't mind, if you look at behind tab, the

4   first tab in the -- behind Tab A in that binder, there are some

5   cases.

6   A.   I know *Carney* is one of them.

7   Q.   And am I correct that *Carney* was a murder case?

8   A.   Yes, I think it was.  Yes.

9   Q.   And it involved your office; am I right?

10   A.   Yes.  There were four cases before 1985, all cases were

11   decided by the Louisiana Supreme Court.  All had to do with the

12   suppression of *Brady* evidence.  All of them were the defendant

13   had filed a motion requesting the State turn over exculpatory

14   evidence.  It was heard before a judge.  The judge ruled in our

15   favor on it.  It went to the Supreme Court, and the Supreme Court

16   reversed it.  It was a 4/3 decision and the dissent said that we

17   were as right as the other four said we were wrong, but I recall

18   those four cases.

19   Q.   Do you recall there were at least four cases from the

20   Louisiana Supreme Court before Mr. Thompson's case where there

21   were *Brady* violations found by the Louisiana Supreme Court?

22   A.   Yes, four cases out of 10 years of cases which would be

23   thousands of decisions.

24   Q.   And, Mr. Connick, am I also correct that there will be

25   individual cases decided at the trial court level where the trial

1   court would say, I disagreed with the view of the prosecutor,

2   turn over the material?

3   A.   Right.

4   Q.   And those wouldn't be caught in any published opinion.   That

5   wouldn't be something that we could go back to now and say, well,

6   in this case, in this case, in this case --

7   A.   No.

8   Q.   -- that the trial judge disagreed with the decisions by your

9   prosecutors?

10  A.   I think there were four cases, and those cases, that

11  information was volunteered by my office to someone along the

12  road, which was also given over to you or you got from something.

13  That was something we had calculated voluntarily, and shared with

14  anybody who wanted it.   We felt it was a public record, but there

15  were four cases that were decided at the district court level

16  that we were, we had failed to turn over evidence.   There was no

17  written opinion on it, though, so I can't tell you.

18  Q.   Four cases at the Supreme Court level?

19  A.   No.

20  Q.   Right.   We were talking about four cases at the Supreme

21  Court level?

22  A.   There were four cases before 19 -- four cases before

23  Mr. Thompson's case that were decided by the Louisiana Supreme

24  Court.

25  Q.   Correct.

1  A.   You're talking about cases where there were no decisions,

2  and there were, I think, four of those decided by the district

3  court, and there are no opinions at all on that.

4  Q.   And, Mr. Connick, there are often cases where a defense

5  lawyer and a prosecutor would go before a judge and have an

6  argument about whether something should be produced or not.

7  There's no decision.  Those cases aren't captured in that list,

8  are they?

9  A.   Say it again, Mr. Cooney.

10 Q.   Every day lawyers are going in front of judges and arguing

11 over motions on a variety of issues, would you agree with me

12 about that?

13 A.   Yes, sir.

14 Q.   And a lot of those decisions, the decisions by judges, in

15 those kinds of situations, are not reduced to writing in a formal

16 opinion, am I correct about that?

17 A.   Yes, sir.

18 Q.   And that would also be the case with regard to decisions

19 regarding *Brady* questions, am I right about that?

20 A.   I would presume so.

21 Q.   Now, with regard to the blood evidence in this case, please,

22 Mr. Connick, I think you testified that in 1999, you did learn

23 about the crime laboratory report and the other documents that

24 were brought to Mr. McElroy's attention?

25 A.   No, I didn't know about anything but the report from the

1  crime lab on the blood evidence from you and Michael Banks.

2  Q.   So you didn't know about the other documents that we gave to

3  Mr. McElroy?

4  A.   Not at that point.

5  Q.   At some point did you become aware of those things?

6  A.   I really became aware of them when you took my deposition.

7  At that time.

8  Q.   Okay.  Now, there was some testimony this morning about the

9  Grand Jury --

10  A.   Yes, sir.

11  Q.   -- in the case.  And am I correct that just so we're clear

12  about this, this was a Grand Jury investigation that you had

13  initiated into the conduct of lawyers that formerly were in your

14  office concerning the handling of the John Thompson armed robbery

15  case?

16  A.   Yes.

17  Q.   Had you ever heard of a District Attorney using a Grand Jury

18  to investigate his own office's conduct before that?

19  A.   No -- yeah, I did it.  I did it a number of times, not only

20  with my assistants, but we got complaints about people who came

21  to the office and they claimed all sorts of things.  Now, we

22  could have, we could have turned it over to someone else and made

23  it public, or we could have done a preliminary investigation

24  ourselves to find out whether what we were told had any substance

25  to it or not.  If it had any substance, and we were involved in

1  it, we would recuse ourselves.  And this was the same situation

2  here.  We -- I did not know what was told to me and you didn't

3  tell me and neither did Michael, your associate tell me,

4  Mr. Banks, about -- I knew nothing except the blood evidence

5  information.  But who else was involved in it, I had to find out

6  who was involved, and I determined that we should take a

7  preliminary look.  I asked Mr. McElroy to investigate.  He said,

8  I can't find out anything.  Only except against Mr. Deegan.  So I

9  said, well, let's try the Grand Jury and just probe a little bit

10  and try to find out and may evidently change the situation and it

11  didn't.  And I didn't continue that.  It was fruitless.  It would

12  be unfair, in my opinion, when I found out, one, we had nothing

13  to go on, and two, it had prescribed.  And so I decided to

14  abandon the Grand Jury.

15  Q.   My question was, had you ever heard of another District

16  Attorney using a Grand Jury to investigate his or her own office?

17  A.   I don't know.  I've never heard of it, but I've done it.

18  Q.   Did you think that using a Grand Jury to investigate your

19  own office raised any potential conflict of interest issues?

20  A.   That's why I qualified my answer to you, that we would probe

21  and if we determined that there was some substance to it, we

22  would immediately withdraw and turn over whatever information we

23  had to the Attorney General of the State of Louisiana, which is

24  what Louisiana law prescribed.

25  Q.   Now, the actual proceedings before a Grand Jury, the

1    testimony before the Grand Jury itself, that's confidential by

2    statute, am I right?

3    A.    Yes, it is.

4    Q.    So with regard to a Grand Jury investigation, you as the

5    District Attorney could know what the witnesses would say before

6    the Grand Jury, but persons outside the District Attorney's

7    Office couldn't know what was said; is that right?

8    A.    Well, you had to keep in mind, I don't know whether you've

9    ever conducted a Grand Jury investigation, but we have many, and

10   oftentimes you will find out before you go in to the Grand Jury

11   what it is that you're looking for.  And if -- if -- you go in,

12   it's the same thing, well, you know that you don't have anything.

13   In other words, you wouldn't have to disclose anything from the

14   Grand Jury to turn the case over to someone else to investigate.

15   All you would have to do would be to take preliminary what you

16   had -- preliminarily what you had and do it.  If you give it, you

17   know, give it to someone else to investigate.  The Attorney

18   General.

19   Q.    I'm sorry, I didn't mean to interrupt.

20   A.    That's all right.  That's all right.

21   Q.    In terms of what's said to the Grand Jury by the witnesses,

22   that's not something that somebody outside law enforcement, the

23   DA's office or on the Attorney General's Office can know about;

24   correct?

25   A.    That's correct.  Regardless what have the ABA says.

1  Q.   So that, for example, you and the other prosecutors could

2  learn about the facts using testimony before the Grand Jury, but

3  Mr. Banks and I couldn't find out about what the testimony was

4  before the grand jurors; is that right?

5  A.   No.   I disagree with you entirely.   We had an open hearing,

6  a public hearing before a district court judge and before -- you

7  were there, and everything that you wanted to know as far as I

8  was concerned, we presented.   We had -- we had witnesses appear,

9  we had Mr. Dubelier appear, we had Mr. Williams, we had

10 Mr. Riehlmann, and policemen.   We had everyone connected with

11 that case intimately or remotely publicly say what their

12 involvement was.   No, what you're implying is a cover-up, is an

13 insult to me, and I resent that, resent it.   And because if you

14 take that in an isolated instance, one could possibly perceive

15 that as a cover-up, but when I take the very issue that you're

16 concerned about and put it entirely before the public, how can

17 you stand there and say that we're covering something up?   And

18 besides that, I made a complaint to the Bar Association asking

19 them to look into Mr. Riehlmann and --

20          THE COURT:   Wait a minute, Mr. Connick.   Just disregard

21 that last comment by Mr. Connick.   That has no relevance here at

22 all to this case.

23                              EXAMINATION

24 BY MR. COONEY:

25 Q.   And, Mr. Connick, what you were just talking about was the

1    hearing on the motion in the criminal case, not the Grand Jury

2    proceedings; is that right?

3    A.    Yes.

4    Q.    Would you agree with me that one of the Assistant District

5    Attorneys working on the Grand Jury proceeding was John

6    Jerry Glas?

7    A.    I don't know what he was doing, but I found out later that,

8    that it was his claim that he was in charge of the investigation.

9    Q.    He was working on the case?

10   A.    He -- he was, but I found out later, but it was my

11   impression it was only as a research, to help them out.  He

12   wasn't in any way responsible for any decisions or for doing

13   anything.

14   Q.    Are you aware that after some of the witnesses who testified

15   before the Grand Jury and whatever they said, Mr. Glas prepared

16   draft indictments of certain of the prosecutors in your office?

17   A.    At my -- I did that.  I said I want some indictments

18   prepared.  I told that to Mr. McElroy.  That was standard

19   procedure that I would use in Grand Jury proceedings.

20   Q.    And am I correct that I think I understood your testimony

21   today that you decided to discontinue the Grand Jury proceedings?

22   A.    Yes, I did.  I thought it was the fair and right thing to

23   do.

24   Q.    And am I correct that the Grand Jury proceedings were

25   terminated before the Grand Jury heard from all the witnesses?

1  A.    They were.  And that's not uncommon for me to stop something

2  that is unfair or unjust, just as we did in the case of

3  Mr. Thompson.  It was unfair and unjust to let his case go on.

4  And the minute you told me about it, we stopped it.  We proceeded

5  to take steps to stop it.  And I did the same thing with the

6  Grand Jury.  It was fruitless, unfair.

7  Q.    During the time the Grand Jury was involved, Mr. Connick, am

8  I correct that you had at least one or two meetings with the

9  various assistants in your office who were working on the

10 Grand Jury proceeding?

11 A.    I don't have a vivid recollection of it, but I think what

12 you say would probably be correct, yes.

13 Q.    At any time when you were discussing the crime laboratory

14 report in the armed robbery case, did you suggest to Mr. Glas or

15 to anyone else that that report might not qualify as *Brady*

16 material if the prosecutors didn't know Mr. Thompson's blood

17 type?

18 A.    Absolutely not.  Absolutely not.  Under the law it qualifies

19 as *Brady* material.  Under Louisiana law we must turn that over.

20 Under *Brady* we must turn that over.  I did that one time as a

21 prosecutor and I got indicted by the U.S. Attorney over here for

22 doing it.

23 Q.    May I ask you if you would, please, to turn to Exhibit 118,

24 Mr. Connick.  It's the last exhibit in the binder.

25 A.    Yes.

1  Q.   And, Mr. Vincent, if you would be good enough to put that

2  up.  Would you agree with me that this is a memorandum from

3  Mr. Glas to you?

4  A.   Yes.

5  Q.   And its date is May 10, 1999?

6  A.   Yeah, I see the date on it.

7  Q.   Okay.  And would you agree with me that this was two days

8  before you terminated the Grand Jury investigation?

9  A.   I would have to guess on the date, but if you're familiar

10 with that chronology, I would agree with you.

11 Q.   Thank you.  I want to go through the facts that are set

12 forth here and ask you a couple of questions.  So this is a memo

13 from Mr. Glas to you and it purports to set forth certain facts.

14 Fact Number 1 is that the murder of Ray Liuzza was a high-profile

15 case?

16 A.   I wouldn't call that a fact of the case.  I would call it an

17 observation and you may be correct on it, but --

18 Q.   Would you disagree with that observation?

19 A.   Well, no.  But I don't know what -- anyway, I would agree

20 that that's what he said.

21 Q.   And Fact Number 2 is that Mr. Williams' boss, Eric Dubelier,

22 was allowed to be a special prosecutor and the lead prosecutor in

23 the Liuzza murder?  Would you agree with that?

24 A.   I don't know how that came about.  I have no idea that he

25 was allowed to be that.  I don't know how it happened.  I wasn't

1  familiar with that.

2  Q.   But in terms of your understanding of the case, you

3  understood that that was correct?

4  A.   I understand that he was a prosecutor in the armed robbery

5  case, yes.

6  Q.   And Fact Number 3 was that Williams was not the senior DA in

7  Section B.  Do you have any reason to disagree with that fact?

8  A.   No.

9  Q.   Fact Number 4, Williams was allowed to be a special

10  prosecutor in the armed robbery trial.  Do you see that?

11  A.   I see that.

12  Q.   Do you have any reason to believe that that fact was

13  incorrect?

14  A.   Well, that's what Number 2 says, I thought, but I would -- I

15  wouldn't dispute that.

16  Q.   Fact Number 5 is junior ADA Deegan had never even been made

17  a section leader.  In fact, before April 1, 1985, he had always

18  been the second junior in Section D.  Do you have any reason to

19  believe that that wasn't correct?

20  A.   No.  I don't know what the materiality of all of these are,

21  but I don't know anything about Mr. Deegan's assignments.

22  Q.   Fact Number 6 is that the armed robbery conviction was

23  considered essential to getting the death penalty in the Liuzza

24  murder trial?

25  A.   I don't share that view with anybody.  I know that that's

1  what you say our motive was and perhaps it was, nothing unusual,

2  but you have said that it kept Mr. John Thompson from taking the

3  witness stand.  There are many, many reasons why someone may not

4  want to take the witness stand in a trial.

5  Q.   But at least what Mr. Glas in your office wrote in May of

6  1999 was, the armed robbery conviction was considered essential

7  to getting the death penalty in the Liuzza murder trial?

8  A.   That's what he said.  But I don't know whether I shared that

9  view.  I think you've heard my disagreement with that before.

10 Q.   Number 7.  He says, Dubelier wanted the armed robbery tried

11 before the Liuzza murder trial.  And I think you've testified

12 earlier today that that was something that you would do as a

13 matter of course?

14 A.   I would agree with that.

15 Q.   Fact Number 8, Williams knew about the bloody pants and

16 shoe.  Do you have any information that's inconsistent with that?

17 A.   I don't know what Mr. Williams knew at that time.

18 Q.   Fact Number 9, Williams, in open court, requests that

19 Thompson's blood be taken and tested.  We've heard about that

20 this week; correct?

21 A.   I heard of that, but I didn't know that until somebody else

22 brought it to my attention many years later.

23 Q.   Fact Number 10, on April 2, 1985, Dubelier answers the

24 defendant's motion for Bill of Particulars and the Motion For

25 Discovery and Inspection.  Nothing is said of any testing.  Do

1  you have any information that's inconsistent with that fact?

2  A.   I see that he said it, but I don't know anything about that.

3  I had nothing to do with either case, Mr. Cooney, and I just

4  don't know any facts about it.

5  Q.   I'm not suggesting that you knew that in 1985.  I'm really

6  focusing on the 1999 time period here, Mr. Connick.

7         Fact Number 11, what Mr. Glas tells you is that on

8  April 3, 1985, Dubelier's answers are filed in court.  And do you

9  have any information that's contrary to that statement?

10 A.   I don't know whether that's correct or incorrect.

11 Q.   But you have no information that it would be incorrect; am I

12 right?

13 A.   Nor that it's correct.

14 Q.   And on Fact Number 12, on April 4, 1985, Palm (phonetic)

15 picks up bloody pants and shoe for testing.  Do you any

16 information that that's not correct?

17 A.   Nor that it's correct.

18 Q.   13, the testing of the bloody pants and shoe was expedited

19 by something -- someone.  Do you have any information that that

20 was incorrect?

21 A.   No, no firsthand knowledge whatsoever about that.

22 Q.   14, on April 9, 1985, the examination is finished.  The

23 report is handwritten, typed, addressed to Whittaker and placed

24 in the DA pickup.  Do you have any information that that's

25 incorrect?

1  A.    No.

2  Q.    15, Whittaker received the report.  Do you have any

3  information that that's incorrect?

4  A.    At that time, no.  I heard Mr. Whittaker testify at that

5  open hearing that he did receive a report.

6  Q.    16, Whittaker placed the report on Williams' desk.  Do you

7  have any information that that's not correct?

8  A.    Yeah, I heard him say that.  In 1999, in June of '99.

9  Q.    17, junior ADA Deegan saw the report.  Do you have any

10  information that that's incorrect?

11  A.    I found that out through you folks, and that he, that he

12  squashed it or quashed it or whatever word he said.

13  Q.    19, Williams does not question Jay LaGarde about bloody

14  pants and shoe.

15  A.    I don't know that.  I don't know whether that's correct or

16  not.

17  Q.    Did you hear the testimony this week about Williams'

18  questioning of Jay LaGarde?

19  A.    When Mr. Williams was on the stand?

20  Q.    Yeah.

21  A.    I think I did, yes.

22  Q.    20, junior ADA Deegan only asks crime tech Cusimano about

23  the gun and his pictures, not about the bloody pants and shoe.

24  A.    I have no idea about that.

25  Q.    And during the testimony this week, the testimony of

1    Mr. Williams, did you recall Mr. Banks asking Mr. Williams

2    questions about that?

3    A.   I don't know anything about those statements.

4    Q.   21, Williams introduces five of the seven pieces of evidence

5    from the NOPD crime lab.  He does not introduce the bloody pants

6    and shoe.  Do you have any information that's inconsistent with

7    that?

8    A.   No, sir.  I have nothing.

9    Q.   22, Numa Bertel is never told by Whittaker about the bloody

10   pants or shoe or given the crime lab report.  Do you have any

11   information that's inconsistent with that?

12   A.   No.  I don't know that.

13   Q.   23, Williams writes jury trial report stating that there was

14   no corroboration for the identification.  Do you have any

15   information that that's incorrect?

16   A.   No, sir.

17   Q.   24, Williams closes the DA file signing the inside front

18   cover.  Do you have any information that that's incorrect?

19   A.   No, nor that it's correct.

20   Q.   25, the crime lab report is not in the DA file.  Do you have

21   any information that that's incorrect?

22   A.   No, sir.

23   Q.   26, the crime lab report is not in the microfilmed copies of

24   the DA file.  Do you have any information that that's incorrect?

25   A.   No.

Q.    27, Deegan confessed to Riehlmann that he had intentionally
suppressed blood evidence in the armed robbery trial of
John Thompson that in some way exculpated the defendant.  Do you
have any information that that's not correct?

A.    No, sir, I know nothing about it.

Q.    And finally 28, Williams tells Whittaker that he remembers
Deegan starting to say something about blood evidence, but he
told him, whoa, indicating that he didn't want to know.  Do you
have any information that that's incorrect?

A.    No.

Q.    Bear with me for one second.

A.    May I respond to what you're telling me?  I wouldn't take a
memorandum from Mr. Glas.  He's the low man on the totem pole and
he writes something to me, which is presumptuous as the devil on
his part and inform -- Mr. McElroy was in charge of that.
Mr. Glas, I wouldn't -- I don't know whether this is correct or
not.  I wouldn't want to rely on anything Mr. Glas would tell me.
I think he was a fine young man.  He had some ideas that were
different from mine that were not in keeping with the standards I
wanted for my office, and he was either going to be fired or he
was going to resign.  We gave him that chance.  But to my, if you
ask me a question about Mr. Glas, to be honest with you, I wish
him no ill, I've never said anything about him publicly unless I
was -- my integrity was put into a position against his, so I
wish him no ill, but I don't want him writing me memorandums.

1  Q.   I'm sorry, Mr. Connick, I didn't mean to interrupt.   Am I

2  correct that you had this memorandum from Mr. Glas before you

3  decided to terminate the Grand Jury proceedings?

4  A.   I don't think I -- maybe I did, but I don't remember that.

5  And if Mr. Glas gave it to me, I think I've made it clear to you

6  that I don't want to see it.   I would go to Mr. McElroy for

7  facts.   A lot of these things, I don't even know whether they are

8  facts or not.   I don't even know whether he does, as a matter of

9  fact.   A lot of the things that he talked about in here,

10  Mr. Deegan did or could have done.   Not anybody else and he's

11  dead, and was dead at that time.   I could do nothing about that.

12        MR. COONEY:   Excuse me, Mr. Connick.   I have nothing

13  further, Your Honor.   Thank you.

14        THE COURT:   All right.   Any redirect?

15        MR. AARON:   We need no redirect.

16        THE COURT:   My question was do you have any redirect?

17        MR. AARON:   No, Your Honor.

18        THE COURT:   Mr. Aaron, approach the bench.   Counsel,

19  approach the bench.

20        Mr. Connick, you may step down.

21        (WHEREUPON, there was a bench conference.)

22        THE COURT:   Mr. Aaron, you're a good lawyer, but I'm

23  tired of these snide remarks.   You made it yesterday during a

24  witness.   We don't need commentary.   We don't need speeches.   We

25  don't need remarks.   I asked you if you had any redirect.   That

1   was an improper remark.  You made improper remarks and comments

2   yesterday when you were cross-examining their defense witness.

3   Just stop it, okay?  Stop it.

4            (WHEREUPON, the bench conference concluded.)

5            THE COURT:  Okay.  Who is your next witness?

6            MR. AARON:  Bridget Bane.

7            THE COURT:  How long is that testimony going to take?

8            MR. AARON:  It shouldn't be too long.  Twenty minutes,

9   a half an hour.

10           THE COURT:  You-all are going to have

11  cross-examination?

12           MR. BANKS:  We don't know, Your Honor, we don't know

13  what she's going to say.  I suspect recross at least.

14           THE COURT:  All right.  We're going to recess for lunch

15  now.  It's 12:15.  I don't want to wait until 1 o'clock for

16  lunch, so we'll recess for lunch now and please close your

17  notebooks, leave it under your chair or on your chair.  And

18  remember not to discuss the case when you're out for lunch and

19  we'll see you back, let's see, it's 12:15, we're going to take a

20  little bit longer than normal lunch hour today because I've got

21  some other matters I have to attend to, so let's say we come back

22  at, let's say 1:45.  Okay?  1:45.

23           THE DEPUTY CLERK:  All rise.

24           (WHEREUPON, the jury panel leaves the courtroom.)

25           THE COURT:  I'm going to warn all of you again, I don't

1  want any commentary during the questioning of the witnesses.  No

2  remarks by counsel.  You ask a question, the witness answers, you

3  ask another question.  If I say do you have any more questions,

4  you say "yes" or "no," and no snide remarks, no side remarks, no

5  commentary by the lawyers.  Okay?  I'm tired of that.  Okay.

6  We'll come back at 1:45.

7           (WHEREUPON, at 12:20 p.m., the Court took a luncheon

8  recess.)

9                          *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **P-R-O-C-E-E-D-I-N-G-S**

2                     THURSDAY, FEBRUARY 8, 2007

3                   A F T E R N O O N   S E S S I O N

4                     (COURT CALLED TO ORDER)

5

6              (WHEREUPON, the proceedings resumed at 1:45 p.m. after

7   the luncheon recess.)

8              THE DEPUTY CLERK:  All rise.

9              THE COURT:  Let's see where we are now.  You have who

10  left?

11             MR. AARON:  Bridget Bane.

12             THE COURT:  Just one witness, Bridget Bane.

13             MR. COONEY:  We're going to call Mr. Solino very

14  briefly and Mr. Glas and we would anticipate that would be it.

15             THE COURT:  Okay.  Do you have any feel for what time

16  we might finish the evidence?

17             MR. BANKS:  My best guess is about 4, 4:30.  I'd say

18  about 4 o'clock, maybe a little later.

19             THE COURT:  All right.  Here would be my plan then:  I

20  don't want to be sending the jury out at 6:30 or something.  We

21  have no way to feed them here.  The logistics are too difficult

22  and since we had planned to try this case this week anyway, we

23  can just bring them back early tomorrow morning to do closings

24  and charges and send them out.

25             What we can do is when we conclude all the evidence,

1   you guys come back, we can meet and talk about jury charges.

2   Okay?  I think we have them close to being finalized, but there

3   are a few things we still need to work out.

4           Okay.  Anything else before we bring the jury in?

5           MR. BANKS:  No, sir.

6           THE COURT:  Okay.  Let's bring the jury in.

7           By the way, you may see about ten young law students

8   walk in at some point today.  I think they are going to come in.

9   They are across the hall.  It's my trial advocacy class that

10  somebody else is handling for me in Judge Porteous's courtroom

11  across the hall and they've asked if they could come in for a few

12  minutes at some point, so I'm not sure when they are going to

13  come in, but if you see about ten or twelve people walking in,

14  that's who they are.

15          (WHEREUPON, the jury panel enters the courtroom.)

16          THE COURT:  Please be seated.  Good afternoon, ladies

17  and gentlemen.  Let me tell you where we are in the trial so you

18  have a sense of the schedule to complete the trial.  I've talked

19  to the lawyers in the case.  We're not going to hold them exactly

20  to this, but they estimate that we will finish all of the

21  evidence or testimony in the case probably by 4:30 or so today.

22  I have to spend some time meeting with the lawyers to finalize

23  the legal instructions and if we continued on, it would be very

24  late this evening by the time the lawyers would get to make their

25  closing arguments and I would read to you my legal instructions,

1   and I don't want to be sending you out at 6:00, 6:30 in the

2   evening.

3        So what the plan would be is that after all of the

4   evidence is completed this evening, we're going to recess.  I'll

5   send you home to come back at 8:30 tomorrow morning.  When you

6   come back in the morning, we'll be ready to do the closing

7   arguments and legal instructions and then you can begin your

8   deliberations, okay?

9        All right.  Mr. Aaron.

10       MR. AARON:  Bridget Bane.

11       THE DEPUTY CLERK:  Please raise your right hand.

12                          **BRIDGET BANE**

13    was called as a witness and, after being first duly sworn by the

14    Clerk, was examined and testified on her oath as follows:

15       THE WITNESS:  Bridget Bane, Bridget Bane,

16   B-R-I-D-G-E-T, Bane, B-A-N-E.

17                      DIRECT EXAMINATION

18   BY MR. AARON:

19   Q.   Mrs. Bane, where do you currently reside?

20   A.   I currently reside in Pacifica, California.  It's close to

21   San Francisco, a little to the south.

22   Q.   You flew in just for this trial?

23   A.   I flew in all night, as a matter of fact, just for this,

24   yes.

25   Q.   Were you ever employed by the Orleans Parish District

1  Attorney's Office?

2  A.   I was.

3  Q.   And could you tell the jury when you were employed?

4  A.   I was employed first at the District Attorney's Office in

5  1975.  Mr. Connick was elected in 1974, and I graduated from

6  Tulane University Law School just about that time.  And I was

7  employed by him right out of law school.  And I stayed on -- I

8  was employed by Mr. Connick on two separate periods of time.  The

9  first one began in 1975 and ended in 1989.  The second began in

10 1995 and ended in 1997.

11 Q.   During your first stint with the DA's Office, can you tell

12 the jury what positions you held and for approximately how long

13 you held those positions.

14 A.   When I was first employed at the District Attorney's Office,

15 I was assigned as a trial attorney in a section of court for

16 approximately eight months.  And during that time, I had, I

17 participated in and saw to verdict 23 felony jury trials.  After

18 that I was transferred to the Screening Division.  I became a

19 screening attorney where I stayed for a year and maybe three

20 months.  At that time, I was appointed to be the chief of trials,

21 and I stayed in that position for three years.  Subsequent to

22 that, I became the chief of screening for three years.  And

23 subsequent to that, I was the chief of Juvenile Division for a

24 year.  And then I was back in the Trial Division as the chief for

25 three years, 1985, '86, 1984, '85, '86.  And in '87, I was

887

1  appointed as the Chief Assistant District Attorney, and stayed

2  there till I left at the end of '88.

3  Q.    And why don't you tell the jury about the second time you

4  worked there, starting in 1995, I believe you said?

5  A.    The second time, well, the first time I left to accept a job

6  at the District Attorney's Office in San Francisco at the end of

7  1989 primary because I was going to California to assume the care

8  of my disabled sister.  The second time I began in 1995, and I

9  came back and was appointed special prosecutor.  Some of my

10 personal business brought me here.  I stayed with Mr. Connick for

11 two years, 1995, 1996.  And in 1997 I left because Mayor Marc

12 Morial invited me to become a member of his cabinet as the

13 commissioner of criminal justice, and I stayed in that position

14 until the year 2000, when I returned to San Francisco.

15 Q.    As you know, this case focuses in on the period 1984-1985.

16 I understand from what you've said, '84, '85, '86, you were the

17 chief of trials?

18 A.    That's correct.

19 Q.    What were your duties as chief of trials in 1984-85?

20 A.    As chief of trials, it was my job on a day-to-day basis to

21 monitor and to provide training and checks and balances and

22 evaluations for every section of court, every felony section.

23 And in some cases for magistrate cases although those were

24 usually under a separate supervisor.  But if they were related to

25 the felony cases in our Trial Division, we also, we also looked

1   at that.  But I was responsible for the training of the trial

2   assistants at that time.

3   Q.   Would you explain to the jury what you did with respect to

4   training?

5   A.   Yes.  With respect to training, Mr. Connick had developed a

6   system of tremendous checks and balances, all the way from when

7   the case came into the system until the case went out of the

8   system.  And I got the case, the Trial Division got the case from

9   the Screening Division.  By the time we got the case, 50 percent

10   of the cases had already been refused by the Screening Division

11   because there wasn't sufficient evidence.  And one of

12   Mr. Connick's primary policies, and something that he changed

13   from his predecessor was that people should not languish in jail

14   while they are waiting for a case to make its way through the

15   system, only to find out that at the end it doesn't have enough

16   evidence.  And the predecessor, and many, many other DAs in the

17   country, I know, because I have visited and spoken with many,

18   their system was to accept every case that came in the door, and

19   wait until it got into the trial sections, and some trial

20   attorney would say, oh, wait a minute, we don't have the

21   evidence.  So that was not our system.  So the Trial Division got

22   approximately 50 percent of the cases that the police brought to

23   the office.

24           What I did, because we had a young staff, I relied on

25   the junior/senior rolls in the trial sections, but I knew that I

1 could not rely solely on that, so we developed a system of

2 pretrials.  Every case, before it went to a jury, and before it

3 went to a judge trial, if it were a felony case, had to be

4 pretried with me.  That was not, that was not an easy task.  It

5 wasn't a pretty task for the trial attorneys.  Sometimes they

6 were still sitting outside my office at 8:30 and 9 o'clock at

7 night waiting for their pretrials, but they pretried their cases

8 and their cases had to be signed off by me or by the deputy

9 chief.

10          So when the pretrials occurred, there was a checklist

11 of, I would say, 70 items.  I looked at one the other day, a

12 blank one.  That covered just about every aspect of trial.  What

13 the evidence was going to be, what the lab reports were, who the

14 witnesses were, what the problems were that they could identify.

15 Everything was covered.  And then it was signed off on.

16          And we had, we had a maxim, and the maxim was you are

17 not going to get in trouble if you lose a case, but you will get

18 in trouble if you're not prepared for a case.

19          And the trial attorneys all knew that if they went to

20 trial by hook or by crook and I did not know that they were going

21 to trial or the deputy chief didn't know, they were doing it at

22 their own risk if they had not pretried it.  And there were

23 occasions when people wouldn't.  They felt that in the press of

24 time and the excitement of the moment, they were ready.

25          Another training that we used was Saturday morning

1  sessions.  We would probably have been charged with abuse if, if

2  there were an agency that looked over young DAs because they

3  worked at night, they worked all day, they worked on Saturdays.

4  They worked on Sundays.  Sometimes with judges, they worked until

5  11 o'clock, 12 o'clock at night.

6          So we would have Saturday sessions.  And Saturday

7  sessions were designed to give special trainings when they were

8  needed.  The Louisiana Highway Patrol came in to show us what a

9  machine really looked like so that when we had a DUI, we knew

10  what a calibrated machine really was, rather than just read about

11  it in a report.

12          We had specialized training on rape cases.  We would

13  have medical people in to train us on rape cases.  And in -- on

14  many Saturdays, what we did was come in and have all of the

15  murder cases, homicide cases and all of the rape cases that were

16  pending trial and that were likely to go to trial in the next

17  month, we would bring them in and we would have everyone there

18  and we would go over them.  We would identify problems, we would

19  talk about them.  We would try to solve them.  We would talk

20  about the best pairs to try cases.  Screeners would come, people

21  like Jim Williams, and would help out, would train, and would

22  volunteer to assist on some of the cases that the trial, the

23  Trial Division people had.

24          So we had, we had developed all of that.  We also had

25  developed a post-trial conference for cases that were tried and

1  lost.  So that it didn't just count as a loss against the person,
2  but that that person who was usually extraordinarily depressed,
3  and especially if they had a grieving victim of some kind, but it
4  gave them a way to learn from what had happened.  And we tried to
5  do it in a positive way.  So we had a lot of other training
6  mechanisms.
7          I came in believing in education.  I had, prior to law
8  school, taught at the Xavier University, Loyola University,
9  Tulane University, and LSU at various times.
10  Q.  Contention has been made that the supervisors at the
11  District Attorney's Office did not understand *Brady*.  What's your
12  understanding of what the requirements of *Brady* are?  Do you
13  know?
14  A.  The requirements of *Brady*, as I have always understood them,
15  is to turn over evidence that is favorable to the defense and
16  might show that his innocence or might mitigate his crime or
17  might reduce his sentence.
18  Q.  Now, when did you first learn about *Brady*?  Was it at the
19  DA's Office, was it at law school?  When was it?
20  A.  I learned about it in law school.
21  Q.  Do you remember what specific courses in law school you
22  might have learned about *Brady*?
23  A.  Criminal law, constitutional law, constitutional criminal
24  law, criminal law and procedure.
25  Q.  Now, you talked about various types of training, training

1  junior/senior training, pretrying before you as chief of trials,

2  you mentioned Saturday training sessions.  Would *Brady* come up

3  during any of those sessions?

4  A.   Yes.  Yes.

5  Q.   Would you explain to the jury how it might come up and what

6  might be discussed?

7  A.   There were times when I had trial attorneys approach me and

8  come into my office and say, I've got this, I don't know whether

9  I need to turn it over or not.  And that was understandable

10  because even though they knew about *Brady* and I knew about *Brady*,

11  and that it was a 1963 case and it regarded fairness and due

12  process of law, and that they had to abide by it, they sometimes

13  needed a little help or more than a little help in trying to

14  figure out if they should turn it over.

15        Everyone in the office was available for that kind of

16  discussion.  And it was, it was just as good for them, sometimes

17  they went to Mr. Connick, and he would tell them.  I can remember

18  one specific case where he told someone to turn over evidence.  I

19  have told people to turn over evidence.  I have sometimes said,

20  no, you don't have to turn that over.  That is not exculpatory or

21  it is not *Brady* for any other reason so don't turn it over.

22  Q.   Now, were you ever involved in any hiring of Assistant DAs?

23  A.   Yes.  I helped devise a panel interview system.  At first,

24  things came so fast and furious and we had so many cases that it

25  was difficult to have what you would look at as, like, an

1  established training where we had to do -- you know, I tried to

2  get an orientation started for new DAs, but they came one this

3  week, and three next month.  And it was rather difficult, and

4  then we needed them right away to try the cases.  But I tried to,

5  we tried to develop systems for everything.  And we tried to, we

6  did develop a very good system for hiring.  Instead of saying,

7  okay, now you're going to go and interview with the chief of

8  screening and next week you're going to interview with the trial

9  chief, which is sometimes how it happened in the beginning, we

10  devised a panel and we got several of the chiefs together at one

11  time to interview people.  And I -- and after a while, we also,

12  we realized that we didn't need to just ask questions and find

13  out if they were going to be, look like they were going to be

14  comfortable in the courtroom.  But we also had to find out if

15  they could write, even though they had been to law school.  So we

16  devised a writing sample aspect of the interview process.  That

17  writing sample never changed after it was instituted.  It was

18  always that they were asked to, the candidate was asked to write

19  an essay on the exclusionary rule and another essay on *Brady*

20  material.

21  Q.   So before you even hired them, they had to write an essay on

22  those topics?

23  A.   That's correct.

24  Q.   And when was that process in place?

25  A.   You know, I traced it all the way back to Camille Buras in

1  1986.  And I think that I had put it in place in 1984 or 1985.  I

2  cannot, I know it was there from '86 all the way to the end of

3  Mr. Connick's tenure.  Every single candidate wrote that.

4  Q.   Let's talk a little bit about supervision in the office.  As

5  I understand it, you had the District Attorney, directly under

6  the District Attorney, you had first assistant and then below

7  that level, you had a number of division chiefs, might be chief

8  of screening, chief of trials, chief of juvenile, chief of

9  appeals, et cetera?

10  A.   That's correct.

11  Q.   Now, below that level, let's say chief of screening, there

12  would be homicide screener, robbery screener, various types of

13  screeners; correct?

14  A.   That's correct.

15  Q.   And under trial section, that's where the bulk of the

16  attorneys were; correct?

17  A.   Yes.

18  Q.   So you would have junior assistants and senior assistants

19  and they all, in that section, they all reported to you?

20  A.   Right.  And in some sections where cases were tried, every

21  single day and sometimes twice a day we would put three people.

22  So once in a while we had a senior or pro seniors.  We didn't

23  always have the perfect hierarchy because with the experience

24  sometimes we had two people who had only had a year's experience

25  in the same section.

1   Q.   Is it fair to say that everyone below the level of the

2   District Attorney had an immediate supervisor?

3   A.   Yes.  Absolutely.

4   Q.   Is it fair to say that everybody knew who their supervisor

5   was?

6   A.   Correct.

7   Q.   Now, are you familiar with a written policy, manual or

8   handbook of the District Attorney's Office that was devised on or

9   about February 1, 1987?

10  A.   I am.

11  Q.   Did you have any involvement with that, and if you did,

12  would you explain it to the jury?

13  A.   I did.  I tried to collect all of the various sections that

14  described what the various sections of the District Attorney's

15  Office did.  We had a section on screening.  We had a section on

16  trials.  We had a section on pretrials.  And we assigned it out

17  to various people and then I was given the task of getting it

18  back in, and trying to maybe edit it, put it together and get it

19  to the chief assistant.

20  Q.   Now, although the manual is dated February 1, 1987, is it

21  fair to say that certain of the policies were developed prior to

22  that time?

23  A.   Absolutely.  They were developed, some of them were

24  developed very early on in Mr. Connick's tenure.

25  Q.   Now, when you came back to the District Attorney's Office in

1    1995, you were a special prosecutor.  What did you do in that

2    regard?

3    A.    In that regard, I handled outreach into the community for

4    Mr. Connick at that time, some victim/witness duties, and also

5    trying to gain funding and to lobby various aspects of the

6    community and instruct various aspects in the community on drug

7    testing in schools.

8    Q.    Were you personally involved at all with respect to the

9    Thompson case?

10   A.    Not at all.

11   Q.    During your entire tenure with the District Attorney's

12   Office, were you ever accused of withholding evidence?

13   A.    Never.

14   Q.    During the time that you were with the District Attorney's

15   Office, the two times, did you ever know of a policy by

16   Harry Connick to disobey *Brady*?

17   A.    A policy, would you -- am I hearing you right?

18   Q.    It was too many words.  Let me rephrase it.

19          During the two times you were with the District

20   Attorney's Office, did you ever know Harry Connick to have a

21   policy which says, don't follow *Brady*?

22   A.    No.  That is the farthest thing from my knowledge and

23   understanding of Harry Connick that I could conceive of.

24   Q.    And what did you understand Harry Connick's policy to be

25   with respect to *Brady*?

A.    Harry Connick's policy was to turn over material required
under the law and under the *Brady* case, and overall and in
general, his policy was to try cases fairly and not to prosecute
if you didn't have the evidence and not to go forward if
something happened to the evidence, but to dismiss or reduce.
That's why he had a 50 percent refusal rate, which angered a lot
of the police, but which, you know, we tried to help them
understand the reason that we did it.

Q.    I just have a few questions left.  With respect to the
making of policies for the District Attorney's Office, including
policies with respect to *Brady*, who made such policies for the
District Attorney's Office or Orleans Parish?

A.    Mr. Connick.

Q.    Do you know of anybody else, Mr. Dubelier, Mr. Williams or
anybody else in the office who made policy?

A.    No one else made policy.  We would follow Mr. Connick's
direction or if we thought that there was an area that needed
some policy improvement or some policy that did not even exist,
we would go to Mr. Connick, discuss it with him, and then draft
it and submit it to the chief assistant and then it got to
Mr. Connick.

        MR. AARON:  I have no further questions at this time,
Your Honor.

        THE COURT:  All right.  Mr. Banks.

        MR. BANKS:  Yes.  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BANKS:

Q.   Good afternoon, Ms. Bane, I don't think we've met before.

A.   I don't think so.

Q.   I'm Michael Banks.

A.   Mr. Banks, nice to meet you.

Q.   I believe you said, Ms. Bane, that sometimes Assistant District Attorneys, even young Assistant District Attorneys went directly to Mr. Connick with questions?

A.   There were some occasions when usually when Mr. Connick was walking around the building, as he was want to do, and sometimes in the courtroom, in the courts themselves as he was want to do and they would usually try to bombard him with questions and concerns.

     As far as Mr. Connick directly supervising anybody in the Trial Division, that just didn't happen.  And if they wanted a meeting, it had to go through us.

Q.   Understood.  But he was accessible if an Assistant District Attorney found him and talked to him, right?

A.   He had an open-door policy.

Q.   In your experience, did you find that he was willing to engage the Assistant District Attorneys and talk to them if they had something to say to him that was important?

A.   Yes, I did.

Q.   When an ADA, an Assistant District Attorney approached

1  Mr. Connick directly with something, you wouldn't consider that
2  presumptuous or out of line?
3  A.   I wouldn't consider it --
4  Q.   Presumptuous or out of line, would you?
5  A.   I don't know if I would or not.  If they approached
6  Mr. Connick on certain subjects or in a certain way, I might
7  consider it presumptuous.  There were chains of command.
8  Q.   If it was a matter, though, in which Mr. Connick had
9  expressed an interest in, had been involved and a young Assistant
10 District Attorney was also working on that, it wouldn't be out of
11 line for that Assistant District Attorney to share his thoughts
12 with Mr. Connick, would it?
13 A.   You know, I can't comment unless you want to give me a real
14 hypothet that has some facts in it, but I can tell you that
15 normally Mr. Connick would send for an assistant if he wished to
16 have that kind of dialogue.  And most of the time, if not all the
17 time, would also ask that person's supervisor to be present.
18 Q.   Did you know John Jerry Glas, who was an Assistant District
19 Attorney in the office?
20 A.   I did not.
21 Q.   So you wouldn't know whether he was presumptuous or out of
22 line in speaking directly to Mr. Connick, would you?
23 A.   I would not.
24 Q.   I think you said when you arrived at the office, you went
25 through a series of positions.  Were they promotions?

1   A.   I think that they were promotions.  I think that they were

2   stepping stones that were pretty well designed.  Some of them you

3   might, if you really wanted to get analytical, you might call the

4   first steps, like laterals, getting your broad experience.

5   Q.   None of them were steps down or demotions?

6   A.   Not that I knew of.

7   Q.   Tell me if I track the progression right, you had some

8   junior positions and then along the way you at one point became

9   chief of trials; correct?

10  A.   Correct.

11  Q.   And then you went to chief of screening after being chief of

12  trials?

13  A.   Yes, I did.

14  Q.   Was that a step up or a lateral move?

15  A.   The chiefs are generally on the same footing.  Because they

16  have their own divisions and they don't sort of cross-pollinate.

17  Except when we devise something cooperative like the Saturday

18  meetings I was talking about.  So it was, I would say it was

19  lateral, Mr. Banks.

20  Q.   Chief of screening, like chief of trials, was a very

21  important position in the office, wasn't it?

22  A.   Yes, absolutely.

23  Q.   Mr. Dubelier was the chief of screening when you were there;

24  correct?

25  A.   For part of the time.

1   Q.   When you were chief of trials?

2   A.   Yes.  But I think that someone else was also there.  We had

3   several chiefs of screening, who I think was Mr. Larson,

4   Mr. Dubelier, Mr. Harper.  During that general time, so I --

5   Q.   But am I right, though, that Dubelier was a chief of

6   screening, and at some point after he ceased to be a chief of

7   screening, you moved into that position?

8   A.   No, prior to him.

9   Q.   Oh, prior to that him.  Okay.  I see.

10       I think you described and tell me if I am wrong, this

11  process of pretrying cases as a check and balance; is that right?

12  A.   It was checks and balances.  It was training.

13  Q.   What does that mean, checks and balances?

14  A.   That means, to me that means really it's kind of an awkward

15  way of saying accountability.  It was to provide accountability

16  in a system that in -- is -- in other jurisdictions might be a

17  little bit prone to, to not having all the accountability factors

18  in place.

19  Q.   And accountability included accountability for the

20  obligation of the District Attorney's Office to produce *Brady*

21  material; right?

22  A.   Correct.

23  Q.   Do you know whether either of the prosecutions against

24  Mr. Thompson, the carjacking case, or the homicide case was

25  pretried?

1   A.    I am not familiar with that case or how it was tried.

2   Q.    If Mr. Solino had testified earlier in this case through

3   deposition excerpts that those cases were not pretried because

4   the people handling them were not required to pretry cases, would

5   you have any basis for knowing whether that was true or not?

6   A.    I have no basis for knowing.

7   Q.    But would you agree with me that if the cases weren't

8   pretried, one of these pieces of this check-and-balance system

9   that you had put in place just wasn't followed if that's correct?

10  A.    Are you talking about people in the Screening Division?

11  Q.    I'm talking about whoever tried the Thompson carjacking case

12  and the Thompson murder cases, if those weren't pretried, would

13  you agree with me that one of the checks and balances that you

14  had designed was not applied to those trials?

15  A.    If they were in my division, that is absolutely true.  I

16  designed that primarily for the Trial Division.  When attorneys

17  got to screening, they were always more experienced.  They had

18  been through the trial sections almost universally, and had a

19  great deal of experience trying cases.  When I was the chief of

20  screening, we pretried cases.

21  Q.    I think you said the trial attorneys sometimes asked you or

22  others senior in the office questions about *Brady*?

23  A.    Yes.

24  Q.    About what they had to produce?

25  A.    Correct.

Q.    They would sometimes come to you and say, I'm not trying to

quote, something like Ms. Bane, or I suspect they called you by

your first name, I've got this piece of evidence here, I'm not

sure whether I have to produce it or not; right?

A.    That's usually what it was, yeah.

Q.    And you talked them through it; right?

A.    That's correct, Mr. Banks.

Q.    Sometimes you expected that a young Assistant District

Attorney or any Assistant District Attorney may not know the

answer to that question without talking to someone like you;

right?

A.    Well, that's how it happened.  That sometimes they didn't

quite know.

Q.    But merely because a District Attorney or Assistant District

Attorney, I'm not talking with Mr. Connick, merely because an

Assistant District Attorney graduates law school and learns about

the *Brady* case and criminal procedure of the Constitution, that

doesn't necessarily make that person qualified to answer every

*Brady* question that comes along, does it?

A.    No, it does not.

          MR. BANKS:  I don't think I have anything further,

Ms. Bane.  Thank you very much.

          THE COURT:  Any redirect?

          MR. AARON:  No, sir.

          THE COURT:  Okay, Ms. Bane.  Thank you.

1          THE WITNESS:  Thank you, Judge.

2          THE COURT:  Do the defendants have any other witnesses?

3          MR. AARON:  We have no further witnesses.  The defense

4     rests, Your Honor.

5          THE COURT:  All right.  Does the plaintiff have any

6     rebuttal evidence?

7          MR. BANKS:  Yes, Your Honor.  As a rebuttal witness we

8     would like to call Val Solino.  I believe he's out there.

9          THE COURT:  Okay.

10          THE DEPUTY CLERK:  Please raise your right hand.

11                          **VAL SOLINO**

12     was called as a witness and, after being first duly sworn by the

13     Clerk, was examined and testified on his oath as follows:

14          THE WITNESS:  Val Solino.  V-A-L, S-O-L-I-N-O.

15          MR. BANKS:  Your Honor, may I place a copy of

16     Mr. Solino's transcript, deposition transcript in front of him?

17          THE COURT:  Sure.

18          MR. BANKS:  Thank you, sir.

19                        DIRECT EXAMINATION

20     BY MR. BANKS:

21     Q.   Mr. Solino, this jury heard some excerpts from your

22     deposition testimony that we read to them earlier in the case,

23     but they haven't met you or heard who you are.  Would you tell us

24     where you are employed, sir?

25     A.   I'm employed by the Orleans Parish District Attorney's

1  Office.

2  Q.    How long have you been there?

3  A.    21 years.

4  Q.    What positions have you held in the office?

5  A.    All the positions?

6  Q.    Well, tell you what, if you could track us through at least

7  the major promotions or positions of responsibility that you had.

8  A.    I started as a junior trial attorney.  I went up to a

9  screening attorney, magistrate supervisor, appellate attorney,

10  chief of appeals, and I'm now the Executive Assistant District

11  Attorney.  And along the way, for the better part of two and a

12  half years, I was also a trial senior, trial, senior trial

13  attorney.

14  Q.    Did you ever have any involvement in the Thompson case --

15  A.    Yes, I did.

16  Q.    -- or cases?

17  A.    Not as a trial -- well, not originally as a trial attorney,

18  but, yes.

19  Q.    When did you first have involvement in any of the Thompson

20  cases?

21  A.    Sometime late 1989 or early 1990, when I was first assigned

22  to the Appellate Division at the DA's Office.

23  Q.    At that point was Mr. Thompson's case in what we call

24  "post-conviction stage"?

25  A.    That is correct.  Yes, it was.

1  Q.   And just so we can explain that to the jury, would you tell

2  me if this is right, that Mr. Thompson had appealed his

3  convictions and after those appeals were exhausted, there is

4  another set of proceedings whereby Mr. Thompson's lawyers were

5  able to file petitions attempting to bring new evidence to the

6  attention of the Court?  And if you wish to disagree with my

7  characterization, please do.

8  A.   Well, I wouldn't necessarily say it was an attempt to bring

9  new evidence.  It was an attempt to raise constitutional issues

10 that may not have been considered on appeal, but, yes, it was a

11 second layer of what the average person on the street might

12 consider an appellate process.

13 Q.   And you handled that post-conviction process from about 1989

14 or '90 through the time of Mr. Thompson's retrial?

15 A.   That's correct.

16 Q.   And then you actually were the lead prosecutor at the

17 retrial of Mr. Thompson's murder case in 2003?

18 A.   That is correct.

19 Q.   Do you recall testifying at a deposition in this case?

20 A.   Yes, I do.

21 Q.   That was, we got together in an office, I believe it was

22 Mr. Goins' office and we asked you some questions under oath?

23 Correct?

24 A.   Yes, I remember that.

25 Q.   And you were not just what we call a "fact witness."  You

1  were a designated representative of the District Attorney's

2  Office; is that right?

3  A.   I believe that is correct, yes.

4  Q.   Does that mean, Mr. Solino, as you understood it that we

5  asked the office of the District Attorney to designate a witness

6  who would be the official voice of the office, the person whose

7  testimony would bind the office on certain issues?

8  A.   If that's the legal significance of that, I'll take your

9  word for it.  Yes.

10         MR. BANKS:  I'm going to show you, Your Honor, I don't

11 think we've marked this before, it's just a copy of the 30(b)(6)

12 designations.  May I hand that to Mr. Solino?

13         THE COURT:  Sure.

14         MR. BANKS:  And I believe it would be 139, to mark it.

15                      EXAMINATION

16 BY MR. BANKS:

17 Q.   Mr. Solino am I correct that this notice lists the topics on

18 which you were the official spokesperson for the office?

19 A.   Yes, that's what it appears to be.

20 Q.   And if we look down the first page, it says the District

21 Attorney's Office shall designate one or more officials,

22 representatives or other individuals to testify with respect to

23 the following matters specific to the time period of December 5,

24 1984 through May 8, 2003.  And then it gave the first topic and

25 that's the only one I want to identify right now.  The topic is

1  the District Attorney's Office's policies, practices, procedures

2  and training concerning the identification, disclosure, and

3  production of exculpatory evidence and/or evidence favorable to

4  the accused, including, but not limited to, *Brady* material.

5  Right?

6  A.  You're asking me if that's what's printed on here?

7  Q.  Yes, sir.

8  A.  That's correct.

9  Q.  So just to cut through that, you were the one the office

10  designated to describe the office policy on *Brady*; right?

11  A.  That's correct.

12  Q.  All right.  You understand the *Brady* rule, don't you?

13  A.  I like to think I do, yes.

14  Q.  When did you first become familiar with the *Brady* rule?

15  A.  I can't put a time period on that.  I'm sure -- I'm sure I

16  absolutely heard about it in law school.  Whether or not I became

17  familiar with it before then, I don't know.  But at least as of

18  law school.

19  Q.  Certainly during the entirety of your time in Mr. Connick's

20  District Attorney's Office and even since Mr. Connick retired,

21  you have worked with the *Brady* rule?

22  A.  Well, I mean, I don't know what you mean when you say I have

23  worked with the *Brady* rule.  I'm familiar with what is generally

24  referred to as the *Brady* rule.  Yes.

25  Q.  Let's explore that a little bit, given that you were the

1  designated representative.  Is the *Brady* rule limited to

2  producing exculpatory evidence?

3  A.    No.

4  Q.    What is exculpatory evidence, Mr. Solino?

5  A.    Exactly what it sounds like.  Any evidence that would tend

6  to negate the guilt or prove the innocence of somebody who is

7  accused of a crime, and it also encompasses impeachment

8  information or other information that would tend to cast doubt on

9  other evidence that may exist that was to be brought forward

10 against a person accused.

11 Q.    That's what *Brady* requires; right?  But exculpatory evidence

12 is evidence that just proves the innocence of the defendant?

13 A.    That's right.  If you want to limit it to just exculpatory

14 evidence, yes.

15 Q.    So *Brady* --

16 A.    I thought you were asking a broader question.

17 Q.    *Brady* is broader than exculpatory evidence.  It includes

18 evidence that might be used to impeach a witness and by that, it

19 means evidence to show that the witness isn't telling the truth?

20 A.    As I understand it, that's correct.

21 Q.    That has been the law since 1972, when the *Giglio* case was

22 decided?

23 A.    I didn't come here prepared to call out dates, but it has

24 been the law as long as I've been involved in criminal practice.

25 Q.    You know that that's -- the *Giglio* case interprets *Brady* to

1 say that, though, don't you?

2 A.   I know that what is generally referred to as the *Giglio* rule

3 encompasses impeachment information that is beneficial to a

4 defendant's cause or someone who is accused of a crime.

5             MR. BANKS:  May I approach, Your Honor?

6                         EXAMINATION

7 BY MR. BANKS:

8 Q.   I'm just going to show you a copy of the *Giglio* case.  I

9 don't want you to get into it in any substance, I just want to

10 ask you the date of the decision.

11 A.   Do you want me to read it into the record?

12 Q.   Just the date.

13 A.   It's dated as decided February of 1972.

14 Q.   So that was about two years before even Mr. Connick took

15 office as the District Attorney in New Orleans?

16 A.   Yes.

17 Q.   *Brady* doesn't -- let me state this differently, sir.  The

18 *Brady* rule isn't limited to evidence that a judge requires you to

19 turn over, is it?

20 A.   Not in my understanding, it is not.  From whatever the

21 source, the ethical obligation is to disclose the information.

22 Q.   Regardless of whether the defense requests it and regardless

23 of whether the judge orders it to be turned over, your

24 understanding under *Brady* is, if it is favorable to the defense

25 the way you've described it, it must be turned over; right?

1  A.   That has always been my understanding, yes.

2  Q.   I would like to show you something.  It's a 1987 handbook.

3  It's Exhibit 51.  Would you put the first page of that up,

4  please.  Can you see this on the screen, Mr. Solino?  I think

5  it's probably up there in one of those books, if you need a

6  better copy.

7  A.   Well, I can see it, but I can't read it.

8         MR. BANKS:  All right.  Here we go.  Your Honor, if I

9  may approach and hand Mr. Solino just a copy so he can look at

10  it.

11         THE COURT:  That's fine.  I assume you can blow that

12  up, also, can't you?

13         MR. BANKS:  I think my colleague can do that.

14                        EXAMINATION

15  BY MR. BANKS:

16  Q.   We've heard a lot about this policy.  This is a 1987 policy,

17  Mr. Solino?

18  A.   Yes.

19  Q.   Do you recall in the course of this case, we served certain

20  discovery requests in the civil litigation asking the office of

21  the District Attorney to produce documents; right?

22  A.   That's my recollection, yes.

23  Q.   And the person they asked to produce the documents was the

24  same person they asked to testify as their official

25  representative.  That's you.  You looked for policies; right?

1  A.    I believe so, yes.

2  Q.    This was the oldest policy you found, this 1987 policy?

3  A.    That is correct.

4  Q.    And by 1987, you had been in the District Attorney's Office

5  for about two years?

6  A.    By 1987, I had been in the DA's Office for approximately a

7  year and three or four months, yes.

8  Q.    Now, I know you weren't here when Mr. McElroy testified and

9  when Ms. Bane testified, so I can't ask you to agree or disagree,

10 but I'm going to make a representation to you and ask if it's

11 consistent with your recollection.  They said that in putting

12 this policy manual together, there had been a whole bunch of

13 memos and other policies that someone gathered and put them all

14 together to create this manual.  Is that your understanding?

15 A.    I don't have a recollection of participating in putting this

16 together.  Only finding it, but my recollection would be that

17 that's generally how the policy manual was.  I believe it was

18 done that way, so it could be supplemented from time to time

19 without having to, you know, eliminate the whole book.  You just

20 replace the pages and the policies that needed to be undated.

21 Q.    My colleague here, Mr. Vincent, is going to put up on the

22 board Section 5.25, which I think we've heard and agree is the

23 section dealing with *Brady*.  And that is on page, well, let's put

24 it up and we'll get a page number.  It may be tagged in your

25 copy, but it's page at the bottom 427, if that makes it easier

1   for you, or you can look at it on the screen.  We've blown it up.

2   Okay?  Can we blow that back up?  It went away.

3            This is the section of the handbook dealing with *Brady*;

4   right?

5   A.   That's what it says, yes.

6   Q.   If someone pulled all the memos and the policies together,

7   this is what they got; right?

8   A.   I believe that that's the way this works, yes.

9   Q.   The first statement, the first sentence, rather, that's not

10  a full and complete description of what *Brady* requires, is it?

11  You can read it to yourself.  The jury has heard it a number of

12  times.

13  A.   Can I get that question again?

14  Q.   Sure.  This isn't a complete and accurate statement of

15  everything that *Brady* requires, is it, the first sentence?

16  A.   The first sentence?

17  Q.   Yes.

18  A.   No, I wouldn't say that that completely describes the *Brady*

19  responsibility, no.

20  Q.   In other words, this first sentence of 5.25 talks about

21  requests from defense attorneys resulting in orders by a judge

22  that material be produced, but you said before, *Brady* is much

23  broader than that; right?

24  A.   Yes.

25  Q.   And there's nothing in this first sentence or anywhere in

1   this paragraph about impeachment material, the 1972 *Giglio* rule?

2   A.   It doesn't reference *Giglio*.  It doesn't include any

3   reference to impeachment.

4   Q.   Let me ask you:  You understand that one of the issues in

5   this case involves a crime lab report that surfaced in 1999.  It

6   was originally a crime lab report from 1985, but we learned about

7   it in 1999.  You know that; right?

8   A.   Yes.

9   Q.   Let me ask you a question under this policy.  Suppose an

10  assistant district attorney was sitting there in 1985 holding

11  this 5.25, this policy, and he had in his hands a crime lab

12  report that showed that there was blood evidence from the scene

13  of the armed robbery and that that blood evidence was tested and

14  it was type B and he knew that it was the perpetrator's blood,

15  but he didn't know whether it was the criminal defendant's blood

16  type or not.  Would there be anything in this policy, the 1987

17  handbook, that would have told that Assistant District Attorney

18  you must produce that crime lab report?

19  A.   If I'm understanding you correctly, the hypothetical is that

20  the prosecutor does not know the person on trial's blood type?

21  Q.   Yes.  That's exactly what I asked.  Just based on this 5.25?

22  A.   Well, in that case, it doesn't seem to me it would be

23  exculpatory until he knew it was exculpatory, if he didn't know

24  the blood type.

25  Q.   So if you were sitting there as an Assistant District

1 Attorney in 1985 and you were looking at this handbook, which I
2 know didn't exist yet so it's a hypothetical, you were looking at
3 this handbook to figure out do I have to produce this crime lab
4 report under the circumstances I just described, you might think
5 I don't have to produce it; right?
6 A.   Well, if you are asking what I would have done in 1985, I
7 wouldn't have been resorting to this.
8 Q.   No, that wasn't my question.  My question is if one were
9 looking at the handbook for guidance?
10 A.   Well, this is -- this is not clear.  It says in most cases,
11 but if you want me to -- if you want me to say that your question
12 is accurate as to your conclusion, I guess it would be.  If this
13 is the only thing a person was going to go by.
14 Q.   Now, do you think by any chance that two years before this
15 first handbook that you found there was a broader written policy
16 statement in the office as to *Brady* requirements and obligations?
17 A.   I don't recall if there was or if there wasn't.
18 Q.   Do you recall when you testified in this case in your
19 deposition as the designated representative of the office, the
20 voice of the office, whether I asked you about the blood report
21 issue?
22 A.   When you asked me about it in what context?  It certainly
23 came up, I recall.
24 Q.   Well, whether I asked you about whether that report was a
25 *Brady* obligation, *Brady* -- let me rephrase that.  That was very

1   inartful.

2          Do you remember me asking you your views as the

3   official representative of the DA's Office whether you thought

4   that blood report was *Brady* material?

5   A.   I believe the issue came up.  I can't sit here and tell you

6   I have a specific recollection of you asking the question.

7   Q.   Let's try to refresh it.  The crime lab report we know was

8   prepared on April 9, 1985; right?

9   A.   I'll take your word for it, yeah.

10  Q.   That was two days before the carjacking trial, the armed

11  robbery trial?  Will you take my word for that, too?

12  A.   (Witness nods head affirmatively.)

13  Q.   Right, sir?

14  A.   Yes.

15  Q.   And that report showed that the blood from Jay LaGarde's

16  pant leg had been tested and a definitive and conclusive result

17  was obtained; right?

18  A.   Uh-huh (affirmative response).

19  Q.   Anyone who read that report on April 9, 10 or 11 would know

20  that that piece of bloody pant leg was type B blood; correct?

21  A.   Yes.

22  Q.   So that the perpetrator was either -- well, let me, again,

23  reword that.  That piece of evidence would have been potentially

24  very important in the case, wouldn't it?

25  A.   Correct.

1   Q.   In other words, in a case where all you had was an

2   eyewitness identification by three teenagers, that piece of

3   evidence could have been helpful to the prosecution if

4   Mr. Thompson had type B blood?

5   A.   Yeah.  That's correct.

6   Q.   But, on the other hand, if Mr. Thompson did not have type B

7   blood, it could be conclusive evidence of his innocence; right?

8   A.   That's correct.

9   Q.   Was it your view under *Brady* that in that circumstance on

10  April 9, 1985, that if the prosecutor holding that blood report

11  did not know Mr. Thompson's blood type, he could just sit on that

12  report and do nothing?

13  A.   You're asking a question in a very roundabout way.  Let me

14  answer it like this.  I would have expected a prosecutor to turn

15  that lab report over, period.  That's what I would have done and

16  that's what I would expected them to have done under the policy

17  in the office as I understood it at the time.

18  Q.   Let's go to your deposition testimony.  Page 221, Line 18,

19  unfortunately we don't have it on videotape, but we do have it on

20  the screen.

21  A.   What was the page number again?

22  Q.   221, Line 18.  And could we blow up from Line 18 to the

23  bottom.  I'll read my question and then we'll get your answer.

24  My question, Mr. Solino, is yeah, okay.  I wasn't very artful,

25  but here's my question:

1    "Just based on your understanding of the *Brady* rule, if
2  the prosecutors in the armed robbery case had had the crime lab
3  report, but did not know whether it matched Mr. Thompson's blood
4  type, would they have been obligated to turn it over to the
5  defense?"
6         And let's hit the next page for your response.
7         "ANSWER:  If your question is to use me as an example,
8  if I'm holding a crime lab report that says blood on a shoe is B,
9  and I have some reason to believe that the blood on the shoe came
10 from the perpetrator, and I don't know what the perpetrator's
11 blood type is, do I feel I have a legal requirement at that point
12 to disclose that lab report?  No."
13        That was your answer; right?
14 A.    That's correct.
15 Q.    Did you know that even Mr. Connick said he thought *Brady*
16 would have required this to be turned over in that circumstance?
17 A.    Well, what you have written up there, says, I say, at that
18 point.  Okay.
19 Q.    When would it have had to be turned over?
20 A.    Let me finish my answer, please.
21 Q.    Yes, sir.
22 A.    Because all along at the deposition and even today, the
23 suggestion was that you weren't trying to trick anybody or bait
24 anybody into an incorrect expression of their opinion.
25 Q.    No, sir.

A.   I understood that question at the time and understand it now
to be I'm holding a report in my hand right at this minute, what
do I do with it.  And my answer there, which is why I said at
that point is what I would have done.  Nothing.  What I would
have done one minute or one second later, was go out and try and
find out if there was a next step to be taken.  Is there a blood
test to be done or I would have made an effort to find out if it
was exculpatory or not, which probably would have included having
turned it over.  But the very second that I find out about it, I
mean, I'm going to do a few more, I'm going to attempt to do some
additional research before I will conclude it is *Brady*.  But I
have no doubt in my mind that this lab report should have been
turned over and I would have turned it over, had it been me.

Q.   I don't think you said that in your deposition, did you?

A.   Well, these folks can read it and draw their own
conclusions.

Q.   Yes.  Okay.  Let's go back to 1985.  The people who knew
about this lab report, whoever knew about this lab report, you
think, should have turned it over, notwithstanding whatever you
said in your deposition; right?

A.   Are you asking me should they have turned it over?

Q.   Yes.

A.   They should have made it known, yes.

Q.   Were you part of the group in the office that convened the
Grand Jury investigation in 1999 relating to the Thompson

1  carjacking conviction?

2  A.   I was involved in that process, yes.

3  Q.   Would you agree with me that the reason for convening a

4  Grand Jury, at least the reason should have been in part to get

5  to the truth?

6  A.   I would agree with that, yes.

7  Q.   Okay.  It wasn't to bury the truth, it was to get to the

8  truth?

9  A.   Well, as I recall, it was to find out what happened.

10 Q.   In a Grand Jury, witnesses can actually be subpoenaed to

11 come in and testify?

12 A.   That's correct.

13 Q.   And you would agree with me that when this issue surfaced in

14 1999, it was important to investigate the scope and extent of

15 wrongdoing in the office?

16 A.   There was an attempt and a decision made to find out exactly

17 what had happened with that lab report, correct.

18 Q.   The Grand Jury was a good way to do that, you thought?

19 A.   The Grand Jury was the way the DA decided to do it, and I

20 never thought beyond that.

21 Q.   Before the Grand Jury got started, do you know whether

22 Mr. Glas was involved, Jerry Glas, in doing any research into the

23 legal issues relating to this?

24 A.   Before the Grand Jury --

25 Q.   Yes.

1  A.    -- process began?

2  Q.    Yes.  Before the Grand Jury was convened and began to hear

3  testimony.

4  A.    What do you mean convened and began -- are you talking about

5  in the days leading up to preparing witnesses to go to the

6  Grand Jury or are you talking about -- what exactly are you

7  asking?

8  Q.    Forgive my imprecise terminology.  I was never a DA.  Is

9  there some point where the Grand Jury convenes or gets together

10 for the first time to hear evidence?

11 A.    That is correct, yes.

12 Q.    And if I represent to you that that was May 6th of 1999, you

13 wouldn't have any basis to disagree with that, would you?

14 A.    No.

15 Q.    Before May 6th of 1999, do you know whether Jerry Glas did

16 any research on the legal issues relating to this investigation?

17 A.    Again, I do find that your question is very inartfully

18 asked.  Are you asking me -- if you are asking me when the

19 decision was made to begin a Grand Jury process here, if I

20 contacted Jerry Glas, explained to him the situation, and in the

21 days leading up to the first Grand Jury session, did Jerry Glas

22 do some research on these issues?  I don't have a specific

23 recollection of that, but he may very well have, and if he did,

24 he probably did it at my instruction.

25 Q.    We had some testimony from a prior witness, Mr. Connick,

1   about statute of limitations and prescription.  Do you recall any

2   research being done on that or any discussion with Mr. Glas?

3   A.    I recall that was an issue, and I'm sure Jerry and I both

4   did research on it.  I don't have a specific recollection of it,

5   but I do recall it was an issue.

6   Q.    And maybe you can explain this to the jury a little bit

7   again, I may be guilty of using imprecise questioning, but

8   prescription and statute of limitations, was that a way of

9   looking into the question of whether these events had occurred so

10  long ago that it was too late in 1999 to bring criminal charges

11  against former prosecutors?

12  A.    Well, prescription is a Louisiana term that describes the

13  statute of limitations, which means if a statute of limitation is

14  applicable and it has vested, then you can't charge criminal

15  behavior.  And it would have been part of a routine screening

16  process in this type of case or somebody who would have been

17  charged with a $200 theft for the attorneys handling it, if the

18  case were aged, to consider whether or not prescription had

19  vested.  And that is, I'm sure that is an undertaking that we

20  reviewed in this particular case.

21  Q.    Did you reach a conclusion at that time that there was a

22  legitimate argument to be made that these charges were not

23  prescribed, meaning they were not untimely?

24  A.    My recollection, although I honestly will tell you I do not

25  recall all of the rationale sitting here all these many years

1    later, was that I had personally concluded that there was an

2    argument to be made that prescription had not vested in these

3    cases.  If there was, if there was criminal act, a criminal act

4    to be charged, I did not think it would have been prescribed by

5    the statute of limitation.

6    Q.    So you didn't tell Mr. Connick, no way can we bring

7    indictments here because these charges would be prescribed?

8    A.    I don't recall that type of a specific conversation.  It's

9    not the way I would have talked to the DA.  If it came up at all,

10   I'm sure I would have expressed my opinion, and that would have

11   been the end of it.

12   Q.    You and Mr. Glas prepared indictments for the Grand Jury

13   against Mr. Williams and Mr. Whittaker, didn't you?

14   A.    I don't have a recollection of being, of actually preparing

15   paperwork.  It very well may have been done.  It would have been

16   the type of thing that we would have been, that we would have

17   done as just to be prepared so that we wouldn't have been caught

18   at the last minute not having something that we thought we may

19   have needed, but I don't have a specific recollection of that.

20   Q.    But you don't recall to the contrary, either?

21   A.    That is correct.  And I'm telling you right now, it's

22   something that would have been in my nature to have done, just

23   as, just to get the work done out of the way.  Whether we

24   intended to use it or not.

25   Q.    You were present on May 6th, the first day when the

1  Grand Jury heard testimony, right?

2  A.   Again, I don't have a specific recollection, but I believe I

3  was there.  I would have been there, I should have been there.

4  My recollection is that I was there.

5  Q.   The Grand Jury was scheduled to come back a second day a

6  week later to hear more witnesses; right?

7  A.   I recall there was more than one session and the Grand Jury

8  meets once a week, yes.

9  Q.   There were additional witnesses subpoenaed for the second

10  session to come in and testify?

11  A.   There were witnesses scheduled to come in.  I do not have a

12  recollection as to whether or not we actually served subpoenas on

13  these people or if the individuals, based upon our contact, came

14  in without a subpoena.  I don't recall subpoenas.  There may have

15  been, but I don't recall.

16  Q.   There was a meeting in Mr. Connick's office the night before

17  the Grand Jury was to hear its second day of testimony; correct?

18  A.   That, I do not recall.

19  Q.   Do you recall a meeting in Mr. Connick's office at all?

20  A.   I recall a meeting with Mr. -- in Mr. Connick's office, but

21  I don't recall it to be before the second day, the second

22  Grand Jury session.

23  Q.   Do you think that's incorrect or you just don't recall one

24  way or the other?

25  A.   I believe it to be incorrect.  I think we had at least two

1   sessions before we met in Mr. Connick's office.  I could be

2   wrong, but that's my recollection.

3   Q.   You do recall there to be a meeting in Mr. Connick's office

4   with you, Mr. Connick, Mr. McElroy, Mr. Glas, who else?

5   A.   Yes.

6   Q.   Anyone else?

7   A.   I believe Bill Wessell was present.

8   Q.   He was not a District Attorney or Assistant District

9   Attorney, was he?

10  A.   He was not, he was not a warranted or commissioned Assistant

11  District Attorney at that time to my knowledge.

12  Q.   And at that meeting, Mr. Connick announced the decision he

13  was shutting down the Grand Jury.  He was not going to allow the

14  Grand Jury to hear any more evidence; right?

15  A.   There was a meeting where all those people were present as

16  you've described, and a decision was made by the DA to not -- to

17  not allow the Grand Jury to reach, to deliberate on the issue.

18  Q.   Do you recall Mr. Connick saying at that meeting, not only

19  was he not going to seek indictments and ask the Grand Jury to

20  deliberate, he wasn't even going to allow any more Grand Jury

21  testimony?

22  A.   I don't recall that, because my recollection is there was no

23  one left to testify.  That's my recollection.

24  Q.   Are you certain of that, sir?

25  A.   I can only be as certain as my recollection serves me, and

1  my recollection is that everyone we had identified as a pertinent

2  witness had testified.  If you can provide me with a name of

3  somebody who was left, maybe it will jar my memory, but my

4  recollection is we had a couple of sessions and everyone who had

5  pertinent information had made a presentation to the Grand Jury.

6  Q.   If Mr. Glas were to testify to the contrary, do you have any

7  reason to doubt his recollection?

8  A.   I'm not going to comment on what anybody says.  I'm telling

9  you what I recall.  If Mr. Glas calls out a name as someone who

10  was left to testify, and you want to repeat that name to me now

11  and it jars my memory, I will stand corrected.  But as of now, I

12  will tell you, I do not recall that there was further testimony

13  to be taken.

14  Q.   There's been some reference here to a public hearing in

15  1999, a public hearing in front of Judge Quinlan who had tried

16  the Thompson cases.  You recall that; right?

17  A.   Yes, I do.

18  Q.   Mr. Connick described that hearing to this jury.  Do you

19  recall how that hearing came about?

20  A.   If it's the same hearing that I'm recalling, I believe we

21  had filed a motion to set aside Mr. Thompson's conviction, and

22  presented it to the judge in the armed robbery case.  The judge

23  refused to just grant the motion and insisted on having a hearing

24  and to bring all of the witnesses in and have them testify on the

25  record.  As a result of that, there was, in fact, a hearing at

1   the conclusion of which the judge granted the motion, which we

2   had filed.

3   Q.   So it wasn't you or Mr. Connick asking for a public hearing

4   on this; right?

5   A.   I remember very vividly it was Judge Quinlan who insisted on

6   having this hearing.

7   Q.   So the motion you had filed, you asked for Judge Quinlan to

8   decide without a hearing, but he said, no, we're having a

9   hearing; right?

10  A.   I don't remember if the motion had language in there

11  Judge Quinlan decided without a hearing.  We presented the facts

12  as we understood them and represented to the judge that the right

13  thing to do, based upon the information that had been -- come to

14  our attention, was to set this conviction aside and we asked the

15  judge to do that.

16  Q.   The Grand Jury proceedings were secret, right?

17  A.   Well, they are all, by law they are secret in Louisiana.

18  Q.   But by choosing to do an investigation through a Grand Jury,

19  it kept Mr. Cooney or me or Judge Barbier or this jury from

20  hearing what went on in that course of that investigation; right?

21  A.   I would say that that is not suggesting a correct impression

22  to this jury because virtually everyone that testified at that

23  Grand Jury were people that Mr. Thompson's attorneys were well

24  aware of and in some cases had provided us access to so that we

25  didn't have to go through a long process of finding them, and I

1  will state right now for this record that I doubt there is not

2  one iota of doubt in my mind that Mr. Thompson's attorneys knew

3  everything that was presented to that Grand Jury from the

4  independent sources or from Jerry, myself, or perhaps Tim McElroy

5  who explained everything to Mr. Glas, to you, and to Mr. Cooney.

6  At that point, I don't think there was much -- that there was an

7  issue with transparency at all, but at that point, there

8  certainly was no curtains there.  Everything that we knew, you

9  guys knew, and you knew it virtually the same time that we did.

10  Q.   Did you tell us what witnesses actually testified to in the

11  Grand Jury hearings?

12  A.   I don't believe that that is something that, by law, that we

13  can disclose, if my memory serves me correctly, but --

14  Q.   Right.

15  A.   -- there was no secret about the people that were being

16  called because, as I recall, you guys were talking to them as

17  well.

18  Q.   But what those witnesses actually said in the Grand Jury

19  room under subpoena would not have been something that we would

20  have been entitled to find out, would it?

21  A.   That is correct.  And that is something by law that as a,

22  that anybody who is a participant in those Grand Jury proceedings

23  are prohibited by law from disclosing.

24  Q.   And the only public proceeding in 1999 on this was the

25  hearing ordered by Judge Quinlan; right?

1    A.    If I remember correctly, yes, that's right.

2            MR. BANKS:  Nothing further, Mr. Solino.  Thank you.

3            MR. GOINS:  I just have one question, Your Honor.

4            THE COURT:  Okay, Mr. Goins.

5                        CROSS-EXAMINATION

6    BY MR. GOINS:

7    Q.    Mr. Solino, you were asked whether or not you believe that

8    the -- that the possibility of prosecution for withholding the

9    blood evidence had prescribed, were you not?

10   A.    Yes.

11   Q.    The question I had for you is, did you have an opinion as to

12   whether or not the evidence that was in the possession of the

13   District Attorney's Office would have been sufficient to support

14   a conviction for withholding the report?

15   A.    That's a difficult question.  Prosecutors struggle with that

16   all the time, especially if you have any experience in the

17   Screening Division.  The evidence in this case of any wrongdoing

18   on anybody's part other than Gerry Deegan was extraordinarily

19   circumstantial.  My personal opinion, and I'm sure I expressed

20   this to Jerry Glas, and I maintain it to this day, that I did not

21   think there was a high probability that a conviction could be had

22   against anyone in this case with the exception of Gerry Deegan.

23   However, I believe that in saying that, I would also have -- I

24   would also have recognized, you know, the word that's used these

25   days is spin, but I would also have recognized that there was an

1  argument to be made, you know, you never know, lightning might

2  strike, but I felt that the evidence was circumstantial and it

3  was so tenuous that there was not a realistic chance of a

4  conviction against anyone other than Gerry Deegan in this case

5  for any crime relating to that blood, to that crime lab report.

6          MR. GOINS:  No further questions.

7          THE COURT:  Redirect?

8          MR. BANKS:  Yes, Your Honor.

9                  REDIRECT EXAMINATION

10  BY MR. BANKS:

11  Q.   As an experienced District Attorney, Mr. Solino, you've seen

12  witnesses -- excuse me, you've seen criminal defendants convicted

13  and sent to jail on circumstantial evidence, haven't you?

14  A.   I've seen it happen, yes.

15          MR. BANKS:  Nothing further, Your Honor.  Thank you.

16          THE COURT:  Okay.  Thank you, Mr. Solino.

17          Does the plaintiff have another witness?

18          MR. BANKS:  Yes, Your Honor, John Jerry Glas.

19          THE COURT:  Okay.  Let's take about a 10-minute recess.

20  And we'll take Mr. Glas.

21          THE DEPUTY CLERK:  All rise.

22          (WHEREUPON, the jury panel leaves the courtroom.)

23          THE COURT:  Clay is going to give you the last version

24  of the jury instructions, the last revised draft, and we'll have

25  time to talk about these after the evidence is concluded.

1      MR. BANKS:  Not final draft.

2      (WHEREUPON, at this point in the proceedings there was

3  a brief recess.)

4      THE DEPUTY:  All rise.

5      (WHEREUPON, the jury panel enters the courtroom.)

6      THE COURT:  Please be seated.  Mr. Banks, you may call

7  your next witness.

8      MR. BANKS:  Your Honor, the plaintiff calls John

9  Jerry Glas.

10      THE DEPUTY CLERK:  Please raise your right hand.

11                     **JOHN JERRY GLAS**

12   was called as a witness and, after being first duly sworn by the

13   Clerk, was examined and testified on his oath as follows:

14      THE WITNESS:  John Jerry Glas, Jerry with a J and Glas

15  with one S.

16                     DIRECT EXAMINATION

17  BY MR. BANKS:

18  Q.   Good afternoon, Mr. Glas.  Some prior witnesses have

19  referred to Jerry Glas.  I take it that's you?

20  A.   Yes, sir.

21  Q.   Tell us what you do for a living, sir.

22  A.   I'm a partner at the law firm of Deutsch, Kerrigan & Stiles.

23  Q.   What kind of practice do you have?

24  A.   I do insurance defense, product liability.

25  Q.   Litigation?

1  A.    Yes, sir.

2  Q.    What is your educational background, starting with college?

3  A.    I went to college at Holy Cross in Worcester, Massachusetts.

4  I'm from here.   I was allowed to go there because it's a Jesuit

5  school and I got a degree in philosophy.   Then I went to

6  University of Toronto, I got a master's in philosophy.   Came home

7  to New Orleans, I taught religion for a year at Jesuit High

8  School and then I went to LSU Law School.

9  Q.    When did you graduate law school?

10  A.    I graduated law school in 1996.

11  Q.    While you were in law school, did you have any ideas what

12  you wanted to do when you got out?

13  A.    I always wanted to be a prosecutor.

14  Q.    Why?

15  A.    Well, I always wanted to be a prosecutor.   I was from here.

16  When I went to law school, I did well in criminal law.   I got to

17  be the law clerk for Professor Cheney Joseph, who was the

18  criminal law professor.   I got to help him rewrite the criminal

19  jury instructions for Louisiana.   And then my last year in law

20  school, that last summer, I interned for the Judge Advocate

21  General and I got to work in the Criminal Law Division at the

22  Pentagon for the summer.

23  Q.    When did you graduate law school?

24  A.    I graduated in 1996, and then I went to clerk at the DA's

25  Office here in New Orleans.

1   Q.   Was Mr. Connick the DA at the time?

2   A.   Yes, sir.

3   Q.   So that was your first job as a lawyer?

4   A.   Yes, sir.

5   Q.   What positions did you hold at the District Attorney's

6   Office?

7   A.   Well, I started, I passed the bar in the fall of '96, and I

8   started clerking in Judge Waldron's section of court,

9   volunteering.  Then after a while, I got hired on.  You've got to

10  work your way up so you start in child support court and then

11  usually you go to juvenile.  I think I started in March of '97.

12  I did maybe three months in child support court, I skipped

13  juvenile.  They had me go straight to magistrate court.  I was

14  there for about two months, and then in September of '97, I was

15  put in Section A of felony trials.

16  Q.   Did you stay in that position through the rest of your

17  tenure?

18  A.   We bounced around a lot from section to section.  I served

19  in Section A, with Judge Elloie.  I served in, you know, Judge

20  Sharon Hunter's section of court, Judge Cannizzaro, Judge Julian

21  Parker and eventually I was promoted to a Senior Assistant

22  District Attorney, I was given my own section, Judge Parker's

23  section and I was there until I left to join Val Solino in

24  appeals and work also as a special prosecutor.

25  Q.   Were you well regarded as a prosecutor?  I'm not asking you

1  to be immodest.

2  A.   I was consistently promoted and I was allowed to try any

3  case I wanted.

4  Q.   I know, I think you weren't here when Mr. McElroy testified

5  about you before, but did you receive any commendations or praise

6  from Mr. McElroy himself when he was the first Assistant District

7  Attorney?

8  A.   I didn't have a lot of, I didn't have a lot of interaction

9  with Mr. McElroy.  The only time I would have any sort of

10  feedback from him, every time you did a trial, a jury trial, you

11  had to submit a report after the trial, and that would go up to

12  Mr. McElroy, and he would jot notes on the paper and send it back

13  down.  When they made me a Senior Assistant District Attorney,

14  they issued a little memo to the firm, to the office telling me

15  that I had been promoted, but that's about the only interaction I

16  had with him.

17  Q.   I'm going to show you a copy of that memo.  I ask that we

18  mark it as Exhibit 140.  What is that, Mr. Glas?

19  A.   This is the memo that they issued when they made me a Senior

20  Assistant District Attorney.  It goes through and it tells how

21  long I've been Assistant District Attorney, how many jury trials

22  I've done, how many judge trials I've done.

23  Q.   How many trials did it say you had done by that time?

24  A.   Well, this is by August of 1998, so this is one year after I

25  had gotten to felony trials, less than a year and by then I had

1  done 52 jury trials and 32 judge trials.

2  Q.   And there's a handwritten note on the bottom?

3  A.   Yes, sir.

4  Q.   Who wrote that?

5  A.   I believe that's Mr. McElroy.

6  Q.   What does it say on there?

7  A.   Congratulations, John Jerry, your dedication is appreciated.

8  Q.   I would like to show you another, I'm sorry, what's the date

9  of the memo again?

10 A.   August 25, 1998.

11 Q.   I would like to show you Exhibit 141.  Tell us what 141 is,

12 please, Mr. Glas.

13 A.   This is a list of the jurors on a, this was a death penalty

14 case that was going to go to trial.  During voir dire you fill

15 this out to see who you're going to select and at the end you

16 submit it along with everything else.  Mr. McElroy had a habit

17 when you won, he would put three stars like he did on the memo

18 you showed me before.  He would put three stars, circle your name

19 and then he'd write you a note at the bottom of the page.

20 Q.   What note did Mr. McElroy write to you at the bottom of the

21 page?

22 A.   For this case, he wrote, outstanding performance by a rising

23 star.

24 Q.   Did Mr. McElroy ever criticize your performance or

25 dedication or professionalism during the time you were an

1  Assistant District Attorney?

2  A.   No, sir.

3  Q.   I take it you were employed in the office in April of 1999?

4  A.   Yes, sir.

5  Q.   Before that time, before April of 1999, had you ever heard

6  of John Thompson or the prior prosecutions against Mr. Thompson?

7  A.   No, sir.

8  Q.   Did something happen that brought those to your attention?

9  A.   Yes, sir.

10  Q.   Tell us how you learned about the John Thompson armed

11  robbery case.

12  A.   On Wednesday, April 28th, the defense attorneys in the

13  John Thompson case, yourself included, provided the DA's Office

14  with a crime lab report that showed what the -- what the blood

15  type was of the person who had bled on a pair of shoes and on a

16  pair of pants, actually for one of them.  And this blood type did

17  not match the blood type of John Thompson, we were told.  That

18  was given to the office, Val and to Mr. McElroy on Wednesday.  On

19  Thursday, I got called up on Mr. McElroy's office with

20  Val Solino, and that was the first time that I got involved.

21  Q.   What was your role initially?

22  A.   Well, when they called me up to the office, they mainly

23  wanted to know what my opinion was and wanted to talk about what

24  we were going to do.  I'll tell you right off the bat that I was

25  pretty skeptical.  This was an 11th hour thing.

1   Q.    Skeptical of what?

2   A.    Well, Mr. Thompson was set to be, he was set to be executed

3   within weeks or within days, I can't remember which, but when I

4   saw the piece of paper with Walter Strata's crime lab report, it

5   was a mess.  I mean, this thing was from 1985.  It looked like it

6   had photocopied a thousand times.  And I'll tell you, I

7   thought -- I thought there was a distinct possibility that you or

8   one of the other defense attorneys had taken a pen and where

9   there was an O that would have matched John Thompson's blood

10  type, you put a line through and made it into a B.  And I told

11  them that.  I said we have to get a better copy than this.  We

12  have got to find out if this is just something they did to buy

13  him time.

14  Q.    Did you ever find out whether it was real and whether the B

15  was accurate?

16  A.    Yes, I did.

17  Q.    What did you find out?

18  A.    Well, the next day we went and we got a clean copy from the

19  crime lab report from Walter Strata.  I also got a copy of his

20  handwritten notes which were typed into the report, so I could

21  make sure that it was actually a B on both his handwritten notes

22  and on the original first typed report.

23  Q.    Did you understand at that point that there was going to be

24  an investigation?

25  A.    There was no question about it.

1    Q.    Did Mr. McElroy tell you what your role would be in that
2    investigation?
3    A.    Mr. McElroy and Mr. Solino had a problem because they had
4    already talked to Bruce Whittaker, I don't see it here, but the
5    crime lab report is always addressed to an Assistant District
6    Attorney, usually to the one who requested it.  And so it said
7    Bruce Whittaker's name on it and by the time I went up there on
8    Thursday, Mr. McElroy and Mr. Solino had already spoken to
9    Bruce Whittaker and he had already said things to them that were
10   going to be important.  And so I knew that they were going to be
11   witnesses, they knew that they were going to be witnesses.  And
12   at that point, they asked me to be the point man to be in charge
13   of running this down and finding out if this was real or not.
14   Q.    If a witness came in in this Court and said your role in the
15   case was minor, that you were just some young DA doing research
16   and other minor tasks, would that be accurate?
17   A.    That's not true.
18   Q.    Were you the point man?
19   A.    Yes.  I asked Mr. McElroy if Val could assist me because I
20   had never done a Grand Jury proceeding before.  Actually, at that
21   point we hadn't even talked about that.  I just wanted Val to
22   help me because he knew the case.  Val had handled the appeal in
23   for John Thompson in the murder case for years.  He knew the case
24   in and out.  I knew nothing about the murder trial, I knew
25   nothing about the armed robbery, so I said I would do it.  I'd

1   drop what I was doing and do it, but I wanted Val to help me.

2   Q.   So you asked Mr. Solino to work with you on this?

3   A.   Yes.  And we had done -- the same month, April that same

4   year, Val and I had just done a first-degree murder trial

5   together, *Douglas Whitten* trial, a four-count first-degree murder

6   trial and we convicted him on all four counts.  We worked well

7   together, he was my supervisor, we were both in appeals, and we

8   liked working together.

9   Q.   Do you recall Mr. Solino's reaction at that meeting when the

10  crime lab report was presented?

11  A.   I think he was skeptical, too.

12  Q.   Did he say anything about when would happen if an

13  investigation wasn't conducted, if you guys didn't look into

14  this?

15  A.   I don't know, I don't know if Val said it or if I said it,

16  but I will admit that one of my first thoughts was that if you

17  guys really had found this and if it was real, then you would

18  have held a press conference on the front stairs of Tulane and

19  Broad and you would have told every newspaper, you know, in the

20  country to show up.  And that's why I thought that this was just

21  a stall tactic.  I didn't think it was legit.

22  Q.   Do you remember in a day or two time frame after this

23  meeting, joining Mr. Connick, Mr. McElroy, Mr. Solino and a

24  newspaper reporter for a session to discuss this?

25  A.   Yes, sir.

1    Q.    How did what happen?

2    A.    Well, I spent the next day running down everything we needed

3    to do.  Went and got a copy of the crime lab report, the

4    handwritten reports, talked to Walter Strata.  The only thing I

5    was not allowed to do was talk to Bruce Whittaker or any of the

6    attorneys that were involved.

7    Q.    Why?

8    A.    Tim McElroy said that he would deal with Bruce Whittaker and

9    that I was not to contact the attorneys.  And so I ran down

10   documents on Friday.

11   Q.    So you were to interview other witnesses, chase down all

12   other leads, but you were not permitted to contact the former

13   Assistant District Attorneys, Whittaker, Williams, and Dubelier?

14   A.    That's true.  And so I spent Friday going through, I got the

15   NOPD police report because I wanted to see if it mentioned the

16   blood evidence.  And it did not.  So if a defense attorney had

17   gotten just the NOPD police report, they wouldn't know that there

18   was any blood evidence.

19         Then I went and I read through the trial transcript

20   itself.  I wanted to see, did this come up at trial, either the

21   bloody shoe or the bloody pant leg, and it did not.  When

22   Gerry Deegan called crime tech Cusimano to the stand, the crime

23   tech had done only four things.  He took pictures, he did

24   something else, oh, took pictures, grabbed the gun, grabbed the

25   shoe and grabbed the pants leg.

Q.   Dusted for fingerprints on the gun?

A.   Yes, right.  But those were the four objects, the four things that he had to do.  And Gerry Deegan's direct of him was, you know, "Did you seize the gun?"  "Yes."  "Did you take photos?"  "Yes."  That's it.  So I knew that the pants and the shoe weren't mentioned in the police report, they were not mentioned at trial, and then we wanted to know what happened to them.  There was a question of whether or not they had been destroyed.  There was a policy at the court property room, they would destroy evidence after a certain amount of time if the appeal was over and everything else and there was a question if it was still out there.  So we went to Central Evidence and Property on that Friday and we found the Central Evidence and Property card.  I'll just briefly say, there are two property --

Q.   Exhibit 17, but keep going, we'll put it up for the jury and you to take a look at.

A.   There are two property rooms.  There's the Court property room and then there is the police property room, so a lot of times when you have police officers collecting evidence out at the scene, they will log it into the police property room, it will be assigned a number.  In this case of John Thompson's armed robbery, there were seven, E-1 through E-7.  Then in the course of a trial, that evidence would be brought over usually by a police officer or by your investigator and then you enter it into evidence at the trial, court property room takes control of it,

1  they bring it down to the basement, which is where the evidence

2  was stored, as we all know now, and it would be put into the

3  court property room logbook.

4          So let's start at the beginning.  So we went to the

5  NOPD, what they call "CE&P," Central Evidence and Property, and

6  that's where we got the, went to the CE&P and we saw that

7  Gerry Deegan had personally signed out all seven objects.  And

8  then the next question was, where were they?  And for that, we

9  wanted to go see Mr. Lombard and Mr. Warren Spears in the court

10  property room to see if that had been put into the court property

11  room.  I knew it hadn't been shown to anybody at the trial.  I

12  knew it hadn't been entered into evidence.

13  Q.   Well, tell us about that at the trial.  If we look at the

14  bottom of this card, you see where it says E-1 -- no, same part,

15  E-1, one ban (phonetic) Wesson caliber blue steel revolver -- I'm

16  paraphrasing -- a bullet jacket, et cetera, 1 through 7, E-1

17  through E-7.  Am I correct that E-6 is the blood-stained piece of

18  right pant leg; right?

19  A.   Okay.

20  Q.   E-7 was the tennis shoe?

21  A.   E-7 is the tennis shoe, yes, sir.

22  Q.   And E-1 through 5 were other pieces of evidence, the gun,

23  the bullet jacket, the cartridge, et cetera?

24  A.   Yes, sir.

25  Q.   What was introduced at the trial?

1  A.   E-1 through 5.

2  Q.   Do you remember which of the prosecutors introduced the

3  evidence at the trial?  Was it Mr. Williams?

4  A.   I do not.  Well, I know Gerry Deegan did the crime tech

5  direct.  I do not know who put in E-1 through 5.

6  Q.   So one of the two prosecutors who was there actually moved

7  into evidence E-1 through 5?

8  A.   Yes, sir.  And at that time it would have been -- the piece

9  of evidence itself would have been marked with an exhibit

10 sticker, starting with S.

11 Q.   And Exhibits E-6 and E-7, the blood evidence never surfaced

12 at the trial?

13 A.   Yeah.  That's never showed up at trial and when we went to

14 the court property room, that's when we realized that it had not

15 been, it had not been entered into the court property room, so

16 Gerry Deegan checked it out at the police property room,

17 personally signs for it and it never goes into the court property

18 room.  E-1 through 7 get checked out, E-1 through 5 goes in.  And

19 that night we met with Mr. McElroy, Val Solino and Harry Connick

20 in Mr. McElroy's office to talk about what we had found.

21 Val Solino called this the smoking gun.

22 Q.   You mentioned a meeting with a newspaper reporter.  Was that

23 different from the one --

24 A.   That was the same meeting.  It was that night.  So it's

25 that, it's that Friday, that Friday night.  That Friday night

 1  they had Rhonda Bell come in, and this was after the decision had

 2  been made that -- we talked about this, what do you do?  What do

 3  you do when you find something like this?  And, you know, we

 4  could have sat on it or we could have, you know, given it over to

 5  you-all, given it to Rhonda Bell, gotten ahead of the curve and

 6  been completely forthright.  And Val Solino and I both were

 7  adamant that the way to go was for us to get out ahead of this

 8  and to find out exactly what had happened.  And so Rhonda Bell

 9  came over and I believe this was one of the documents that was

10  turned over to her.  I know she wrote an article.  I'm sure you

11  can find that.

12  Q.   Was there any discussion at that meeting about the

13  possibility of using a Grand Jury to investigate?

14  A.    That's when it was decided.  We're trying to decide what to

15  do.  We want to talk to the witnesses.  You can talk to witnesses

16  and that's fine, but you're not going to have them on the record.

17  You're don't have them subject to perjury.  It's not being

18  transcribed.  So we were trying to figure out how do we get to

19  the bottom of this and how far does it go?  We know Gerry Deegan,

20  but we knew -- I believe by then they already had the affidavit

21  from Mike Riehlmann and in Mike Riehlmann's affidavit, as you

22  know, he said that Gerry Deegan confessed that he had destroyed

23  blood evidence in a case.  And so we here we have him checking it

24  out, we have the two pieces of blood evidence disappearing in his

25  hands, and then we have the affidavit.  And the question was does

1  it end with Gerry Deegan or does it go on?  And I recommended or

2  Val recommended or we both recommended that we do a Grand Jury

3  probe.  This is exactly the kind of thing that we weren't going

4  to stand for, that we need to find out who was involved, what

5  they knew, when they knew it.  And one way to do it was to have a

6  Grand Jury probe and Mr. Connick liked that idea.

7  Q.   So he accepted your recommendation to use a Grand Jury to

8  investigate this?

9  A.   I don't know if it was my recommendation.  He said he had

10  one concern or one question.

11  Q.   Now, this jury has already heard, Mr. Glas, about Grand Jury

12  secrecy and I just want to know, because we're going to talk a

13  little bit about this investigation.  You do understand that what

14  goes on in the Grand Jury room is secret?

15  A.   Yes, sir.

16  Q.   In other words, I'm not allowed to ask you what a witness

17  testified to in that room?

18  A.   Yes, sir.  You knew that because I got a court order before

19  I even talked to you or to the Office of Disciplinary Counsel or

20  anybody else.

21  Q.   And if at any time you think my questions are designed to

22  avoid that, please tell me and I'll stay away, the judge will

23  protect you because we're not going to ask you to violate the

24  Grand Jury secrecy duty that you owe.  Okay?

25  A.   I won't, yes, sir.

Q.   All right.  Very well.  I want to focus instead on what
happened in your discussions with Mr. Solino and Mr. Connick and
Mr. McElroy and your interviews with witnesses and things outside
the Grand Jury room.  Is that all right?

A.   Yes, sir.

Q.   What was your role in the actual Grand Jury proceedings, the
hearings?  Don't tell us what people said, just what was your
role?

A.   Well, the first Grand Jury, it was a Friday night.  The
first Grand Jury -- Grand Juries meet on Thursdays, so we had
until Friday until Thursday to find out as much as we could
before we presented to the Grand Jury.  And on the day of the
Grand Jury, Tim McElroy did the director, asked questions of
Bruce Whittaker.  I handled all of the other witnesses.  I think
there were five or six other witnesses.  That was my involvement.

Q.   Was that consistent with your role of being the point man
that you questioned most of the witnesses?

A.   Yes, sir.  You know, and I say I, I'm sure it was me and Val
a lot of times, but, you know, I interviewed Mr. Lombard,
Mr. Spears, Mr. Strata, I can go to the list.  Mr. Bertel.  We
went through everybody, got all of the records and documents.
Our only involvement with Mr. McElroy and Mr. Connick was
reporting to them on that Friday night and then as we went.

     By Monday I had -- Monday you have to issue your
subpoenas to get people there on Thursday for the Grand Jury.  So

1  I had to decide who we were going to call by Monday and I

2  submitted that list by Monday, and then we were running other

3  things down.

4  Q.   The first day of Grand Jury hearings, the first testimony,

5  was that May 6 of 1999?

6  A.   It was that Thursday, yes, sir.

7  Q.   Before that meeting, do you recall having any discussions

8  with Mr. Connick about the issue of what we call "prescription"?

9  The jury has heard a little bit about that.

10  A.   Yes, sir.  That, yes, sir.

11  Q.   Tell us when that happened.

12  A.   That first came up with Mr. Connick that meeting on Friday

13  night, when the issue of using a Grand Jury to get to the bottom

14  of this came up.

15  Q.   I'm losing track of my dates.  Is that Friday night,

16  April 30th or --

17  A.   Friday, April 30th.

18  Q.   Friday night, April 30th?

19  A.   We get the report on Wednesday, I get called up on Thursday,

20  I spent Friday running down these things, finding the stuff, and

21  then we meet with them Friday night.  That's when the Grand Jury

22  comes up and that's when he says, what about prescription?

23  Q.   Had you researched that question, done legal research?

24  A.   Yes, sir.  I think Val and I both had at that point.

25  Q.   Had anyone researched that other than you and Mr. Solino?

1  A.   No, sir.

2  Q.   Tell us what you told Mr. Connick in response to his

3  question about prescription, whether these events were too old to

4  warrant potentially bringing criminal charges?

5  A.   Well, you know, when you go and look in the textbooks and

6  you're looking for cases, it's often, it's going to be hard

7  sometimes because you're not going to find cases exactly like it.

8  There was no case exactly like this.  Going through, trying to

9  find, it's easy if somebody, you know, commits a battery and so

10  you have a certain amount of time, a number of months or a number

11  of years to file a charge against them.  But when you're talking

12  about obstruction of justice or malfeasance in office, something

13  that a person did while they were in office or while they were a

14  DA that they hid, well, you don't, you don't know about it.  So

15  how can you charge them with having done anything because you

16  don't know about it yet.  So the question is when does the clock

17  start ticking?  Does it start ticking the day that -- if

18  Gerry Deegan or Jim Williams or anybody, if they buried this

19  report, does the clock start ticking that day or does it start

20  ticking the day we find out about it?

21  Q.   Does it start ticking, in your conclusion, did the clock

22  start to tick for prescription if a crime occurred and you didn't

23  even know about it?  No one knew about it?

24  A.   What I told Mr. Connick was that I didn't find anything

25  directly on point.  If you go to civil law, if a doctor drops a

1   sponge in someone's body and nobody finds out about it and three

2   years later they find it, the clock didn't start ticking when he

3   dropped it, it starts ticking when you find it.  It's a principle

4   called *contra non valentem*.  There are plenty cases on that, but

5   it just doesn't come up that often in a criminal context.  I

6   couldn't find any Louisiana cases on point.  But what I told him

7   was this, I remember it very vividly.  I said I cannot imagine a

8   Louisiana Supreme Court Justice saying, if you hide blood

9   evidence for more than six years, you're off the hook.  That

10  opinion was never going to be written.  And when I told

11  Mr. Connick that, he said, I agree, let's go for it.

12  Q.    So he agreed with you that the charges were not -- that the

13  matter was not too old to warrant charges?

14  A.    Correct.

15  Q.    How about Mr. Solino, did he agree?

16  A.    Yes, sir.

17  Q.    Did Mr. McElroy express any disagreement?

18  A.    Mr. McElroy was not in favor of the Grand Jury probe from

19  the beginning.  And I don't remember what he said about

20  prescription.  I remember what Val said, I remember what

21  Mr. Connick said, and that's what I know.

22  Q.    Did Mr. McElroy say why he wasn't in favor of the Grand Jury

23  or just he didn't like it?

24  A.    I don't know.  I just remember that he didn't like the idea.

25  Q.    Before the Grand Jury testimony began, did you talk to as

1  many witnesses as you could, other than the ones McElroy told you

2  not to talk to?

3  A.   Well, let me say that I talked to all of the witnesses that

4  I could find, anybody that was involved trying to run down and

5  find out exactly what had happened to the shoe and to the pants

6  leg, and that included a number of people.

7  Q.   In the course of your investigation, before the Grand Jury

8  proceedings began, before the hearings began, did you investigate

9  the discovery requests that had been made by Mr. Thompson's

10  lawyers in the armed robbery case and the response of the special

11  prosecutor, Mr. Dubelier to that?

12  A.   Yeah.

13  Q.   Do you remember what you found?

14  A.   Yes, sir.

15  Q.   Tell us about that, tell the jury about it, please.

16  A.   Well, when you're handling a criminal case, the defendant

17  has a right to find out what evidence you have.  The only way

18  they can do that is if they file a pleading, a discovery pleading

19  saying what do you have.

20  Q.   You mean other than *Brady* evidence, right?  I mean, *Brady*

21  evidence has to be produced regardless?

22  A.   Right.  There are two ways that you can have an obligation

23  as a DA to turn something over.  First of all, under *Brady* and

24  *Kyles*, you have a duty to turn over any evidence which is

25  material either to guilt or to the punishment and --

1   Q.    The jury has heard quite a bit about that.

2   A.    I'm sure.   Then also, if there is something else that they

3   specifically requested, you have to tell them truthfully whether

4   you have it, whether you object to turning it over or not, you

5   must answer the discovery truthfully.   And so we went and looked

6   to see did he ask about blood evidence.   Did he ask about

7   testing.   And there was a discovery response, the discovery

8   response was prepared by, I think it was Mr. Dubelier, and it was

9   stamped, I believe it was prepared on -- I'm going to say --

10  Q.    If I told you April the 2nd?

11  A.    If you could tell me what the date of the Monday was.   Tell

12  me what the date of that Monday was.

13  Q.    April 2nd was a Monday and April -- well, I'm sorry.   I

14  don't know back in 1985.   The jury has heard evidence that the

15  report was, the response was signed April 2nd and served and

16  filed April 3rd of 1985.

17  A.    I think, I think you would find that, I -- I could be wrong

18  about the dates, but they, Eric Dubelier signs the discovery on,

19  like, a Wednesday.   It's filed on a Thursday, and on Friday,

20  somebody from the crime lab is walking over there to check out

21  just E-6 and E-7.

22  Q.    The blood evidence?

23  A.    Yes, sir.

24  Q.    What did that mean to you?   What was the significance of

25  that, Mr. Glas?

1   A.   Well, he didn't, he didn't, in the answers, tell them that

2   they had blood evidence, and he didn't tell them that he was

3   going to request testing or that testing had been done or

4   anything else.  And so I immediately went and looked at the --

5   well, the Screening Action Form, which when you first get a case

6   in, the screener who gets the case together, there is a Screening

7   Action Form where he can put on notes suggesting to help the DA,

8   so Bruce Whittaker was the screener.  He writes, may want to get

9   something, to the effect of you may want to get the blood

10  evidence testing, which is always a good idea.

11  Q.   Let me just ask you a question.  If Mr. Dubelier had wanted

12  to be straightforward in this when he served his discovery

13  response, could he have written, have blood evidence, going to

14  send for testing tomorrow?

15  A.   Yes, sir, he could have.  So they -- so the person from the

16  crime lab goes out and picks it up on, picks it up on, like, I

17  think that Thursday or Friday.

18  Q.   The 4th?  We heard about 10 o'clock a.m. on the morning of

19  the 4th.

20  A.   Okay.  And then he sets it up to be tested on Monday.  Now,

21  it's my understanding, I interviewed Walter Strata about this

22  specific test.

23  Q.   Just remind us who Walter Strata is?

24  A.   Walter Strata was the crime lab person who actually did the

25  testing on the blood.  So you've got this trial which is set to

1  go on Wednesday.  That's right, on Wednesday.  And on Monday,

2  they are doing the blood testing.  It takes one day.  He's got

3  the results by Tuesday.  He handwrites his conclusions on

4  Tuesday.  He puts it in a box, where things are typed in the

5  order in which they are put there, in theory, he told me, and

6  it's actually typed that same day.

7  Q.   Is that faster than these things are usually done?

8  A.   He described this as a rush job.  Obviously, he's getting

9  the results of the blood testing the day before this murder trial

10  is set to begin.

11  Q.   Do you conclude that maybe --

12  A.   I'm sorry, armed robbery trial.

13  Q.   That's quite all right.  Did you conclude that maybe the

14  crime lab actually requested the evidence and set up the testing

15  at this time?

16  A.   It's never been my experience that the crime lab suddenly

17  three days before a trial without anyone calling them decided on

18  their own to go through all their cases and find one in which

19  they could do blood testing.  If someone had ordered this, it was

20  a rush job.

21  Q.   The armed robbery was December 28th, 1984, so the evidence

22  had been there over four months by then?

23  A.   Right.  Yes, sir.

24  Q.   So what happened next?

25  A.   So they do the blood testing on, I think it's that Tuesday.

1    Trial is set to begin on Wednesday, but they can't start the
2    trial on Wednesday, I think, because you had the *Norris Vessel*
3    murder trial which was a judge trial in the same section of
4    court.  Which I think Bravo was in Section B.  So it's in Section
5    B, they've already got a trial going and that's, I believe it's
6    Bruce Whittaker and Gerry Deegan who are trying the Norris Vessel
7    case.
8    Q.   That was a murder case?
9    A.   And that was a murder case.  It was a judge trial murder.
10   Q.   I understand.  They were trying another murder case, Deegan
11   and Whittaker, in the two days right before Thompson's armed
12   robbery trial started?
13   A.   Yes, sir.
14   Q.   Did that have any significance to you?
15   A.   First of all, in each section you've got a senior and you've
16   got a junior.  At least one junior.  Sometimes two juniors.
17   Gerry Deegan was a junior in Section B.  So the Norris Vessel
18   trial was coming up and so is the armed robbery trial.
19   Jim Williams is in charge of the armed robbery trial.  Bruce
20   Whittaker is in charge of the Norris Vessel murder trials.  Two
21   murder trials, they were going to piggyback them.  One is going
22   to end, the other one is going to start the same day which ends
23   up being, I think, Thursday.
24   Q.   So they weren't two murder trials, it was Thompson case
25   and --

1  A.   Murder and armed robbery.  I'm going to do that all day.  So

2  you've got, you've got a murder and an armed robbery trial being

3  piggybacked.  You've got the same junior working on both cases,

4  so you know this guy is running ragged.  I don't know what he was

5  doing on Monday.  I think he was in trial on Tuesday, but it

6  might have been that he was in trial Wednesday and Thursday.  But

7  in any event, he's in trial with Bruce Whittaker immediately

8  before this case was set to go.  So I believe, of course, that

9  Jim Williams who is the senior, he's in charge of this case, this

10  armed robbery case, that he's the one who is shepherding it,

11  getting ready for trial.

12  Q.   Before the hearings began, did you talk to Bruce Whittaker,

13  after all the crime lab report was --

14  A.   I was not -- I was not supposed to talk to any of the

15  attorneys, any of the former Assistant District Attorneys.

16  Q.   So you didn't talk to Mr. Whittaker at all?

17  A.   I was in the room when they had Bruce Whittaker come in.

18  Q.   Okay.  In the Grand Jury?

19  A.   Before that.

20  Q.   Oh, okay.

21  A.   I was there at the Grand Jury, too, but I can't talk about

22  that.

23  Q.   I was trying to distinguish because I promised you and the

24  judge that I would not get into what happened in the Grand Jury

25  room.  Were you in a room where Bruce Whittaker spoke to someone

1  at a time outside of the Grand Jury hearings?

2  A.   Yes, sir.

3  Q.   Tell us about that, what was discussed at that meeting?

4  A.   Well, that's still that Friday.  That's the day after that I

5  got called up to get the things started.  And on that Friday, one

6  of the things we got was the answer to discovery, saw where it

7  was stamped, saw what the answer was.  And we saw the date that

8  the crime lab guy had gone and gotten the bloody shoe and the

9  bloody pant leg.  So they had Bruce Whittaker come in and Tim

10  McElroy, Val Solino, Mr. Connick, and I believe Lieutenant Danny

11  Lawless, I believe he was there, too.

12  Q.   We've heard reference to Danny Lawless.  He was an

13  investigator in the District Attorney's Office?

14  A.   Yes, sir, he was a member of the New Orleans Police

15  Department, he was assigned as investigator, I think the head

16  investigator at the office.  And so they brought Bruce Whittaker

17  in and they started to ask him questions.

18  Q.   What did they ask and what did Mr. Whittaker say?

19  A.   I don't remember anything.  Everything I can tell you, you

20  know, that -- the most important thing was that he -- it's what

21  he admitted and what he denied.  You know, he admitted that he

22  got the report, which he kind of had to do because his name was

23  on it.  He admitted he got the report and he admitted that he

24  brought the report to Jim Williams, and he admitted that he put

25  it on Jim Williams' desk, but he denied knowing whether

1 Jim Williams actually got the report that showed that the

2 perpetrator's blood type was B.  And we asked him, you know,

3 wait, you know, are you telling me -- well, did you talk to

4 Jim Williams about the report?

5 Q.   Let me just ask you for a moment.  Mr. Whittaker

6 and Mr. Williams worked right near each other, right?  Maybe you

7 don't know where their offices were.  I'll withdraw that.

8        You knew that Mr. Whittaker testified in the Thompson

9 armed robbery case by that point, right?

10 A.   I don't want it to get confusing.

11 Q.   Okay.

12 A.   But one of the things that you can't over -- one of the

13 things that stuck out to me is that, you know, you're an

14 Assistant District Attorney in screening, here is what normally

15 happens:  You get a police report, here is a bad guy, this is

16 what he did, you either accept it and you're going to reject it.

17 I never worked in screening, but that's generally how it

18 happened.  In this case, it wasn't quite like that.  The armed

19 robbery, which I'm sure you've heard about, involved Mimi and Jay

20 LaGarde and their brother, and during the struggle when Jay

21 LaGarde crashes the car, the armed robber comes forward, he

22 wheels around, if I'm remembering correctly, grabs for the gun,

23 starts kicking bad guy in the face, bad guy bleeds on his shoe

24 and on his pants leg.  Okay?  They don't catch the bad guy that

25 night.  They don't catch him ever.  And then one day in the

1  newspaper, there's a picture of John Thompson who has been

2  arrested for the murder trial, and the LaGarde family, and I

3  don't know, I can't say you who saw the picture first or what

4  says, hey, could this guy who's been arrested --

5      MR. GOINS:  Your Honor, I'm going to object to hearsay.

6  He's now saying what the LaGardes said.  It's an out-of-court

7  utterance of some other person.

8      THE COURT:  I'm going to overrule the objection.  This

9  was part of your -- you did this as part of your investigation

10 into this?

11     THE WITNESS:  Yes, Your Honor.

12     THE COURT:  Okay.  Overrule the objection.

13     MR. BANKS:  Mr. Glas.

14     THE WITNESS:  And so it was my understanding that, you

15 know, they are at home and I don't remember if it was Stewart

16 LaGarde, the father, or it was Mimi LaGarde who saw it, but I do

17 remember that Jay LaGarde was away at school in college.  And so

18 they look at the picture, could this be it.  Mimi says, yeah,

19 that could be him.  I think they send it up to Jay LaGarde.  He

20 says, yeah, I think that could be him.  And Bruce Whittaker does

21 his own photo lineup.  Now, normally a police officer does your

22 photo lineup.  And I'm not saying it's right or wrong.  I'm just

23 saying it's unusual.  He puts together some pictures along with

24 the same picture, I think, that was in the paper, goes to the

25 LaGardes' house and says, tell me which of these guys did the

1   armed robbery.  And Mimi LaGarde identifies the same picture, I

2   think she saw in the paper, of John Thompson.  And he goes, good

3   enough, and they charge him with the armed robbery.  He'd already

4   been arrested for the murder.

5   Q.   What do you think of that identification and how that might

6   hold up in trial?

7   A.   It's a terrible identification.  You know, you struggle over

8   identifications where you've got a police officer who does a

9   lineup on the card and you're looking to see if the background

10  behind one of the faces is a little bit lighter than another one,

11  is it suggestive, does it look like it's an earlier, an older

12  picture.  You can get pretty crazy with this.  Here, you know,

13  this is someone who saw the guy having been arrested for murder

14  and is asked, could this be the guy.

15  Q.   Well, let me ask you this:  What's the significance of that

16  to your investigation and review of the blood evidence issues?

17  A.   Well, you know, there was a motion hearing.  And, you know,

18  they file a motion to throw out this identification because it's

19  unreliable.  And at that hearing as a District Attorney, it was

20  always our job to go in and to call the police officer, show that

21  everything was done by the book.  They do this identification,

22  they put Mimi LaGarde on the stand, as I recall.  She explains

23  what I just told you, and the judge, instead of saying, this

24  happens a lot of times, your motion to throw it out, motion to

25  suppress, it's denied.  Instead the judge says I'm going to take

1  this under advisement.  Which means I have to think about this.

2  And at that point, you know, at that point, if I'm a prosecutor,

3  I'm thinking my -- and it's an ID only case at that point, my ID

4  just went out the window, I've got nothing here.

5  Q.   So what would that indicate to you about the blood evidence

6  and the significance of the blood evidence?

7  A.   That's all you've got.

8  Q.   When Whittaker was speaking in this meeting and describing

9  having left the report on Williams' desk, was he asked in that

10  meeting, did you ever talk to Jim Williams?  Did you find out,

11  did you find out from Jim whether he saw the blood report?  Did

12  you find out whether the blood matched?  Did you find out what

13  they did with this blood report?

14  A.   He was.  And I had cases, not many, but I had some cases

15  against Bruce Whittaker when I was a DA.  I respect him, he's a

16  good lawyer.  But I will you that when he was in that room,

17  that's when he got uncomfortable.  He looked uncomfortable if I

18  had to describe the way he was acting and everything else.  But

19  he starts -- this is what he's actually telling us.  He's telling

20  us, he's a witness in the John Thompson armed robbery case.  He's

21  going to be called to the stand to explain the photo lineup I

22  just told you about.  He personally walks the perpetrator's blood

23  type over to Jim Williams' desk and puts it on, gets called, I

24  believe, by Jim Williams, but in either event, called at trial,

25  waits at trial, testifies at trial, and never says, hey, did the

1  blood evidence rush job that I personally delivered to your desk,

2  did it match up with John Thompson's blood type?  I find that

3  incredible and I wasn't the only person.  Lieutenant Danny

4  Lawless who was in the room because he's NOPD officer and a good

5  one, and when it was over, and I don't think I said a word when

6  Bruce Whittaker was in.  I'm pretty sure I didn't say a word when

7  he was in Tim McElroy's office.  When they were done, they all

8  turned to Lieutenant Lawless and said what do you think?  And he

9  said I think they're hiding something.  I think he's hiding

10 something.  Everybody agreed and so now this is Friday, I've got

11 from then until Thursday for the Grand Jury.  The question is,

12 what are we going to do, are we going to call him?  We agreed

13 that he would be called, and then, you know, at that point,

14 Mr. Connick kind of, you know, took the cuffs off and said, go.

15 Find out everything you can go find out about this before

16 Thursday.

17 Q.   And did you get back to Mr. Connick from time to time with

18 your conclusions and findings?

19 A.   Yes, sir.

20 Q.   You kept him in the loop?

21 A.   Yes, sir.

22 Q.   Did you tell Mr. Connick that you spoke to Mimi and Jay

23 LaGarde?

24 A.   Yes, sir.

25 Q.   What did you tell Mr. Connick about your discussions with

1  Mimi and Jay LaGarde?

2  A.    Well, Mimi and Jay LaGarde, they remembered that when they

3  showed up for the trial, obviously, you know, they remembered

4  them taking the shoe and they remembered the police cutting Jay

5  LaGarde's pants leg or seizing a whole pair of bloody pants, I

6  forget which one it was, but they remembered that, so when they

7  show up at the trial, they say, hey, did the blood match

8  John Thompson's?  And Jay LaGarde specifically remembered being

9  told by the person who did his direct examination that it was

10  inconclusive.

11  Q.    What does that mean?

12  A.    That they couldn't tell what blood type the pants leg or the

13  shoe was.

14  Q.    But the crime lab report said it was Exhibit B?

15  A.    Yes, sir.

16  Q.    So that answer given by the District Attorney who put

17  Mr. LaGarde on the stand would have been dishonest or inaccurate?

18  A.    It would have been accurate as to the shoe.  It would have

19  been inaccurate as to the pants leg.

20  Q.    Because no result could be obtained from the shoe, the

21  result was obtained from the pant leg; right?

22  A.    That's correct.  And you can't miss it.  It's on the report,

23  B.

24  Q.    Mr. Williams was the DA who put Mr. LaGarde on the stand in

25  the armed robbery case, wasn't he?

1  A.    Yes, sir.

2  Q.    Did you think this was just a rogue DA, Gerry Deegan, the

3  young assistant who on his own without knowledge of Whittaker or

4  Williams or Dubelier or anyone else committed a bad act?

5  A.    No, sir.

6  Q.    Why not?  Maybe that's a pretty broad question.

7  A.    You know, I did, in fact, y'all showed me my deposition.  I

8  did a memo.  When we -- all right.  A couple things.  You know,

9  we did meet with Mr. Connick from time to time, and one of the

10 times we met with him was the same morning of the first

11 Grand Jury meeting.  That morning we had Val said we had a

12 command performance at Mr. Connick's house, so for the first time

13 that I had been at the DA's office, I get to go to Mr. Connick's

14 house for breakfast that morning to meet and talk about what was

15 going to happen in front of the Grand Jury.

16 Q.    May 6th, 1999?

17 A.    Yes, sir, I believe that's correct.

18 Q.    Go ahead.

19 A.    So that was one of the times that we sat down with him.  I

20 showed up at the house.  There are a number of people there.

21 Q.    Did Mr. Connick ever tell you that it was presumptuous or

22 inappropriate on your part to speak to him directly or send him

23 memos or share your facts or conclusions with him?

24 A.    No, sir, no.  In fact, that morning, we're getting together

25 so that Val and I can tell him what we had found.

1  Q.   On the morning of May 6th at Mr. Connick's house, you said

2  you had breakfast?

3  A.   Yes, sir.  Well, we had orange juice and donuts.

4  Q.   Over orange juice and donuts, did you tell Mr. Connick that

5  it was your intention to ask every question that had to be asked

6  in front of that Grand Jury and to find out everything that you

7  could find out?

8  A.   Yes, I did.  Yes, sir.

9  Q.   Was that your intention?

10  A.   Yes, sir.

11  Q.   Now, without telling us what you asked and what witnesses

12  said, did you do that at the hearing on May 6th?

13  A.   Yes, sir.

14  Q.   Did you start as to those witnesses by asking everything you

15  could to find out the truth and as many facts as you could get?

16  A.   Yes, sir.  Mr. Connick and Mr. McElroy were there for

17  Bruce Whittaker.  Then they left, and I handled the next, I think

18  it's five or six witnesses in front of the Grand Jury, about

19  another six or seven hours that we were -- maybe not, five or

20  six hours that we were there.

21  Q.   Do you recall between -- well, let me just ask you, the

22  Grand Jury, this first day was on May 6th, and they were

23  scheduled to meet again on May 13th, a week later to hear more

24  witnesses?

25  A.   The Grand Jury meets every Thursday.  The question became

1   whether there would be more evidence presented at the next

2   Grand Jury session.

3   Q.   When the session finished on May 6th, did you expect to be

4   presenting more witnesses on May the 13th?

5   A.   Yes, sir.

6   Q.   Were there witnesses you had identified who had not yet

7   testified?

8   A.   Yes, sir.

9   Q.   Do you recall sending a memo to Mr. Connick between May 6th

10  and May 13th outlining the conclusions, the facts that you had

11  come to?

12  A.   I am sure I did.

13  Q.   Let's go to Exhibit 118.  Can you put that up on the screen?

14  And it's also, if it would easier for you, sir, if you look at

15  the book you have there, there is probably a black binder on your

16  left, but you can look on the screen, either way, that says

17  Connick on it.  Under McElroy.  Well, maybe not.  The very bottom

18  binder is the one that says Connick.  I think Tab 118 there is

19  the same.  Let's look at this Exhibit 118.  This is a memo that

20  you wrote to Harry Connick on May the 10th?

21  A.   Yes, sir.

22  Q.   He didn't get back to you after he got this and say this was

23  presumptuous or criticize you in any way for sending it?

24  A.   No, sir.

25  Q.   Let's go, Mr. Vincent, to the substance, maybe you could

1  take a portion of it and blow it up.  I'm not going to ask you

2  about every paragraph, but you were outlining for Mr. Connick the

3  facts that you had reached, the conclusions you had reached based

4  on the investigation you had done as of this date which was

5  between day one and day two of Grand Jury hearings; is that

6  right?

7  A.    Yes, sir.

8  Q.    Just go through a few of these.  Dubelier, Number 7,

9  Dubelier wanted the armed robbery tried before the Liuzza murder

10  trial.  You knew that from talking to witnesses?

11  A.    I knew that from talking to Val Solino.  And that made sense

12  to me because you want to get the armed robbery conviction before

13  you go to the penalty phase of the murder.

14  Q.    Number 8, Williams knew about the bloody pant and shoe.

15  There was no doubt in your mind that Mr. Williams knew about

16  there was blood evidence, was there?

17  A.    No doubt.

18  Q.    We talked about Number 9, Williams making a request in open

19  court that the blood be tested and you talked about Number 10;

20  right?  This is the answer to the discovery motion when Dubelier

21  said inspection to be permitted?  Right?

22  A.    Yes, sir.

23  Q.    Not we have blood evidence, we're sending it out for

24  testing, inspection to be permitted?

25  A.    That's correct, sir.

1  Q.   Will you go to the next section, please.  Just to go through

2  the sequence to make sure this refreshes your recollection.

3  April 3rd, Dubelier's answers were filed in court.  On April 4th,

4  the blood evidence was picked up to be tested.  Right?  That's

5  12?

6  A.   Yes, sir.

7  Q.   Number 13, the testing of the bloody pants/shoe was

8  expedited by someone.  Why were you telling Mr. Connick that

9  someone was rushing this?  What was the significance of that?

10 A.   Well, it had significance for, to me that significance is

11 for two reasons.  One is that this is not something that the

12 screener requested, you know, as soon as he got the case he

13 requested it and it goes off and it's going to come back and go

14 to whoever is handling the case in trials.  It wasn't something

15 that they had requested months before.  Somebody obviously after

16 that, that motion hearing realized that this was going to be a

17 tough ID case, and somebody was trying to get it done before the

18 trial began, and that's why, you know, somebody was walking over

19 to pick it up the Friday before trial.

20 Q.   Number 18, Williams called the shots at trial?

21 A.   Yes, sir, he was the senior and it was his case.

22 Q.   Go down to the bottom.  I had asked you before if you

23 remembered who at the armed robbery hearing actually introduced

24 into evidence those pieces of evidence that the DA wanted to

25 introduce, and you didn't remember on the stand, which is fine,

1  but let's just look at Paragraph 21.  Williams introduces five of

2  the seven pieces of evidence from the NOPD crime lab.  He does

3  not introduce the bloody pants and shoe.  Does this refresh your

4  recollection that it was Williams who put 5/7ths of the evidence

5  in, but nothing about the blood?

6  A.   I don't remember, but, yes, if I put that there, that's

7  correct.

8  Q.   You wouldn't have written it had you not seen it in the

9  file?

10  A.   Yes.

11  Q.   I wanted to blow that up.  Numa Bertel.  He was

12  Mr. Thompson's lawyer in the armed robbery case?

13  A.   Yes, sir.

14  Q.   And you advised Mr. Connick that Bertel was never told by

15  Whittaker about the bloody pants/shoe or given the crime lab

16  report, right?

17  A.   Yes, sir.

18  Q.   Now, 23 and 24, actually, 23, 24 and 25, the jury has seen

19  them, but I'll just summarize.  Williams writes a trial report

20  saying there is no corroboration for the identification.  Let's

21  start with that.  Was that Mr. Williams saying that these are

22  weak identifications, this could be a difficult conviction to

23  get?

24       MR. GOINS:  I object.  Your Honor, pure speculation as

25  to what --

1            MR. BANKS:  I'll withdraw that, Your Honor.

2                          EXAMINATION

3   BY MR. BANKS:

4   Q.   What did you mean by that when you wrote Number 23?

5   A.   No corroboration to me means no support for it.  You've got,

6   you've got an identification case only.  They say this is the

7   person who robbed him.  Nothing puts him at the scene or links

8   him to the crime.

9   Q.   So what bearing did that have on your investigation and what

10  you were saying to Mr. Connick?

11  A.   Well, it has to kind of be taken with the next one.  The

12  crime lab report is not in the DA file.  I went and saw John Rohr

13  (phonetic), who was our guy in charge of all of the files because

14  obviously, one of my questions was, was the report, which

15  obviously didn't go into the courtroom, is it in the file.  So I

16  had him make a copy of the entire thing, seal it, then let me see

17  the original.  I go through and look, and it's not there.  So the

18  last we have is Bruce Whittaker saying that he put it on

19  Jim Williams' desk.  It does not go to the defense, it doesn't go

20  in a trial, and it doesn't go into the DA file.

21  Q.   And Mr. Williams closed the file signing the inside front

22  cover.  What was the significance of that?

23  A.   He closed the file out.  He's supposed to go through and

24  make sure everything is in there before he closes the file out

25  and even on your jury trial report.  Now, your jury trial report,

970

1  you type up, you tell them what happened at trial, and you submit

2  this, I think you saw, this is not the jury trial report, this is

3  something else that Tim would give us the stars on if we won, but

4  the jury trial report, he puts no corroboration for the ID.  And

5  that's, that is what it is.

6  Q.   The last point, Williams tells Whittaker that he remembers

7  Deegan starting to say something about blood evidence, but he

8  told him, whoa, indicating that he did not want to know.

9  A.   That is what Whittaker said.

10  Q.   We can pull that down, thanks.

11        The next session after May 6th was scheduled for

12  May 13th.  You said a Thursday.

13  A.   I'm sorry, can you repeat that question?

14  Q.   The next Grand Jury session, the next time they would hear

15  evidence in this investigation was on May 13th?

16  A.   Yes, sir.

17  Q.   To your knowledge, did the Grand Jury hear testimony from

18  witnesses that day?

19  A.   They did not, sir.

20  Q.   Why not?  What happened?

21  A.   Well, you know, the morning that we went to Mr. Connick's

22  house, it was 180 degrees.  I mean, he completely changed.  We

23  were at his house.  We tell him there is a new person there.

24  There are some new people there or a person, I don't know.  But

25  anyway, there is a reason for us to go through all of the

1   evidence again.  We put it all out there.  I'm convinced, I think

2   Val is convinced that this is, that this was done, that both

3   Gerry Deegan, Jim Williams and possibly Bruce Whittaker had

4   gotten the report and had scuttled it because either they knew it

5   didn't match, didn't want to take the chance, in either event,

6   they scuttled the report.  At that point they completely disagree

7   with us.  Mr. Connick disagrees, I don't know.  I don't think so,

8   there is not enough evidence.  Absolutely not.  That was, we

9   still went forward that day with the Grand Jury, but I believe it

10  was the next day or a couple days after that, I don't know when

11  it was, there was another meeting and it was absolutely clear

12  that Mr. Connick did not think that there was enough evidence or

13  did not want to go forward, but it was completely different than

14  our first meeting when we showed him the smoking gun.  And at

15  that point that they started talking about the, you know,

16  Gerry Deegan, the rogue junior DA in Section B, while he's in

17  trial with Bruce Whittaker masterminds the hiding of this blood

18  evidence.

19  Q.    So you thought the rogue DA theory was ridiculous?

20  A.    I thought it was ridiculous.

21  Q.    May 12th, the night before the Grand Jury was to convene

22  again, do you recall a meeting in Mr. Connick's office?

23  A.    Yes, sir.

24  Q.    Who was there?

25  A.    The night before the second Grand Jury meeting was me, Val

1  Solino, it was Tim McElroy, Mr. Connick, the chief of screening,

2  I think at the time, Richard Olivier, and I think it's a

3  Mr. Wessell.

4  Q.    What happened at that meeting?

5  A.    Well, I went to the meeting with a list of the exhibits that

6  I wanted to show the Grand Jury, a list of witnesses that I

7  intended to call the next day, and also I went to them with two

8  typed indictments.

9  Q.    And let me just stop you for one second.  You already had

10  witnesses subpoenaed and scheduled to be there the next day?

11  A.    I don't know if they were subpoenaed or if they were just

12  scheduled.

13  Q.    Okay.  Go ahead.  So you had indictments typed up?

14  A.    Yes, sir.

15  Q.    Tell us about that.  Indictments against whom saying what?

16  A.    I typed up too indictments, one -- well, both of then

17  against Bruce Whittaker and Jim Williams.  Gerry Deegan was

18  deceased.  So Jim Williams and Bruce Whittaker for obstruction of

19  justice and malfeasance in office.

20  Q.    You didn't have anything typed up against Dubelier, had you

21  reached a conclusion yet one way or the other as to whether

22  Mr. Dubelier had done anything wrong?

23  A.    No, sir.  And, you know --

24  Q.    Were you prepared to say he hadn't done anything wrong?

25  A.    No.  I could not, I could not say that it ended with

1   Jim Williams, especially since Dubelier answered the discovery
2   and Dubelier was the lead on the murder trial.  Well, we're one
3   week into the investigation.  I mean, it's, you know, there are
4   still a lot of people we need to talk to and a lot of things we
5   need to look at.
6   Q.   Sometimes indictments or further proceedings lead to
7   additional information and additional targets or charges; right?
8   A.   And sometimes you charge people and they come forward and
9   they tell you everything.
10  Q.   So anyway, here we are, it's the night before day two?
11  A.   Yes, sir.
12  Q.   Was day two, were you expecting day two to be the final day
13  of testimony or did you know?
14  A.   I didn't know.  But, you know, I can't go into what happened
15  at the first Grand Jury meeting.  There were witnesses, I can
16  tell you, I can tell you that, you know, obviously anyone would
17  be concerned about the DA's Office investigating itself, its own
18  people while, you know, I mean, Mr. McElroy was Assistant
19  District Attorney at the same time as Mr. Williams and
20  Mr. Dubelier and Mr. Connick was in office at the same time.
21  They had, you know, concerns and I gave them my word, I will show
22  you everything I find, and I'll call every witness you want me to
23  call and I'll show you every piece of evidence that you ask for.
24  Q.   You gave your word to whom?
25  A.   To the Grand Jurors.

974

1  Q.   So let's go back to this meeting on May the 12th, the night

2  before what was supposed to be day two.  Tell us what happened at

3  that meeting.

4  A.   So we went up to the office to tell Mr. Connick where we

5  were.

6  Q.   Who is "we"?  You and Mr. Solino went up?

7  A.   Yes, sir.

8  Q.   And you told him you were going to present the Grand Jury

9  with indictments?

10  A.   That was our recommendation, yes, sir.

11  Q.   And what was Mr. Connick's response?

12  A.   No.  Not enough evidence.  This is all circumstantial

13  evidence.

14  Q.   Did you or Mr. Solino respond to that?

15  A.   Mr. Solino is a much better diplomat.  However you want to

16  say it, diplomacy or politician than I was.  And Val who is, has

17  a tremendous amount of respect for Mr. Connick and likes

18  Mr. Connick very much, I think he very, very delicately said, you

19  know, Mr. Connick, we convict people of murder all the time on

20  circumstantial evidence.  Why wouldn't we charge District

21  Attorneys, former District Attorneys, with obstruction of justice

22  and malfeasance in office based on circumstantial evidence.  All

23  you have to do is exclude every reasonable hypothesis of

24  innocence.  That's the test for circumstantial evidence and here

25  we believed that we could exclude every reasonable hypothesis of

1  innocence.  We had them signing and checking out the evidence
2  itself, we had a confession from one of the people involved, we
3  had, we had all of the evidence, and Mr. Connick was adamant.
4  Absolutely not.  There is not enough evidence.  And then everyone
5  in the room started to talk about that.
6  Q.   Well, what did people in the room say?
7  A.   Well --
8  Q.   Did you as the less diplomatic one of the pair say anything?
9  A.   I was -- I was adamant that there was enough evidence to
10  convict.  And I was concerned at the time, I was concerned about
11  a number of things, but I offered to try the case myself.  And we
12  had done a murder trial, I had done a first-degree murder trial
13  that month.  I had done one two months before.  And, you know, I
14  didn't, I was convinced that a jury would convict him of the
15  evidence and I thought that we should leave it up to the Grand
16  Jurors to decide whether to indict or not.  And as we went around
17  the room, different people said I believe that there is enough
18  for this charge or that charge and when it became clear in the
19  room that there was enough evidence to convict, then Mr. Connick
20  said something else.
21  Q.   Well, he changed his position?
22  A.   Well, he didn't change his position.
23  Q.   Tell us what he did.
24  A.   Well, I don't care if there is enough evidence, it's
25  prescribed.

1  Q.    Meaning the charges are based on something that happened too

2  long ago?

3  A.    That's what Mr. Connick said.  He said, it's prescribed,

4  it's been too long.  And that's when, I'm less diplomatic.  I

5  said wait, we've talked about this.  What Supreme Court Justice

6  is going to say if you hide it for six years, you're off the

7  hook.  If you only hide it for five years, you can charge him.

8  If you can keep it hidden for six years, we can't charge with you

9  the crime.

10 Q.    Let me understand this, Mr. Glas.  You had told Mr. Connick

11 before the Grand Jury even started that you had done research and

12 analysis and you concluded the charges would not be prescribed

13 and he, after hearing your explanation, said, I agree?

14 A.    He was satisfied with that, yes.  The first meeting when we

15 showed him the smoking gun, he was, you know, you're right, we

16 have a good-faith basis for doing the Grand Jury probe, let's do

17 it.  And now here we are, it's the moment of, you know, are we

18 given the indictment or we don't and he's saying it's prescribed.

19 And I'm looking at Val because Val and I are the only two people

20 I know in the room who looked at the issue of prescription and

21 we're both saying the same thing which is why are you saying

22 that, Mr. Connick.  We have not seen anything that says that.

23 Q.    So Mr. Solino, he's already testified about this in this

24 Court, but Mr. Solino agreed with you on May the 12th that the

25 charges would not be prescribed if there was a good argument to

1  make?

2  A.   That there was a good argument to make.  Prescription is an

3  affirmative defense, so if you charge somebody with -- I mean, if

4  you charge somebody with a crime, they have to raise the issue of

5  prescription and say, well, whether or not I'm guilty of that

6  crime, it's been too long, it's prescribed.  And then a judge

7  decides whether it is and then that judge's ruling can be

8  reviewed by the Fourth Circuit and by the Supreme Court.  So my

9  point to Mr. Connick was, even if you believe that, and I don't

10  know why you believe that, but even if you believe that, I really

11  don't think that's our decision to make.  I think that, let them

12  raise that argument, let a judge rule on it, let a judge tell us

13  it's been too long and let the Fourth Court of Appeal tell us the

14  judge is right and let the Supreme Court tell us that the Fourth

15  Circuit is right.

16  Q.   Did Mr. Connick explain to you what, if anything, caused him

17  to reverse 180 degrees from the week before when he had agreed

18  with you about prescription?

19  A.   No, sir.

20  Q.   So what happened after you and Mr. Solino pointed that out

21  to Mr. Connick?

22  A.   Well, he decided that he was, we were going to end the

23  Grand Jury.

24  Q.   Did you comment on that about ending the Grand Jury, either

25  seeking indictments or continuing testimony or anything else?

1  A.    Mr. Connick is the District Attorney.  It's within his

2  discretion to prosecute or not prosecute anybody.  It's within

3  his discretion and I don't question that.  My problem was that I

4  had given him my word, so what I said was, I will go in, I'll

5  call the witnesses, I'll show them the evidence, I will pack my

6  things up, I will walk out and then you can go in and you can

7  tell him anything that you want.  That's exactly what I told him.

8  Q.    About indictment or not?

9  A.    Yeah, you go in and tell him it's prescribed.  You go in and

10  tell them whatever you want, you're the District Attorney, it's

11  within your discretion to do that, but I gave him my word, I want

12  to show them everything, I want to show them the additional

13  exhibits, I want to hear from the additional witnesses.

14  Q.    You wanted to get the facts, right?

15  A.    I wanted to keep my word.  And I also, you know, the

16  Grand Jury can indict against the recommendation of a District

17  Attorney.  I thought we should leave it up to them, but if

18  Mr. Connick was going to say he was not going to allow them to

19  return a bill, either a no true bill or a true bill or whatever,

20  that's up to him.  I work for him, but I wanted to show them

21  everything before he went in and told them that.

22  Q.    So what did Mr. Connick say after you told him they should

23  at least get to hear the facts of the witnesses?

24  A.    You're not showing them another piece of paper.  And I said

25  why.  And he said, because that will make my job more difficult.

1  Q.    Make his job more difficult?

2  A.    And I said, then your job is more difficult.  And that was

3  the first time I've ever talked back to him.  That's the first

4  time that, not that I had a lot of dealings with Mr. Connick when

5  I was trying the cases, but I mean --

6  Q.    Did you feel that what he was doing was wrong?

7  A.    It's not for me to say.  It's not for me to say.  You

8  know --

9  Q.    That's fine.  So what did you do?

10 A.    Plus I'm 29 years old.  I'm 29 years old, this is all I've

11 ever wanted to do.  It's my career.  I'm good at it.  Maybe the

12 first thing I'm really good at in my entire life and I'm good at

13 it.  I'm good with the victims, I'm good with the witnesses, and

14 I was good as a trial lawyer.  And all I wanted to do was work at

15 the DA's Office.  I mean, you're living on nothing.  You're not

16 doing it for the money or for anything else.

17 Q.    But you liked it?

18 A.    You love the work.  And that's where I wanted to be.  And at

19 that moment, I got two choices, you know, I go down to my little

20 cube or I say something and for whatever reason I watched that

21 movie *Searching For Bobby Fischer*, you know, within a week of

22 that day, and, you know, the mother, the mother that was -- the

23 instructor doesn't want the kid to play chess at the park because

24 it hurts his teaching and he says it makes my job harder and the

25 mother said then your job is harder.  So Mr. Connick says, you're

1    not showing them another piece of paper because it will make my

2    job harder and I say then your job is harder.  And at that point

3    he says why are you being a pain in my butt?  I'm not sure he

4    said -- why are you being a pain in my butt and I said, you know,

5    think about what you are to doing.  You're asking me not to show

6    the Grand Jurors evidence in a case in which they are doing a

7    probe into whether DAs hid evidence.  You know, I'm trying to

8    protect you.  This was a chance for this office, which as long as

9    I was there, you know, I took pride in the cases that we handled.

10   And I turned over plenty of evidence that was not exculpatory,

11   that was going to make my life miserable just because it was the

12   right thing to do.  We tried the cases clean.  You either won or

13   you lost the case.  It's --

14   Q.   You were an ethical prosecutor?

15   A.   Well, I did what I thought was right.  And this was a chance

16   for us to say we have caught guys who did not do it right.  And

17   we do not tolerate this and we will get to the bottom of it and

18   we will indict our own.  And you remember that hearing, the first

19   hearing we had about this about whether the evidence had been

20   destroyed by the court property room.  I handled that hearing.  I

21   called Mr. Spears to the stand, and I asked him every question

22   you could ask and at the end of that hearing, I said, "I tender

23   the witness" and you said, "I have no questions."  And that's the

24   way we should have handled it.  We should have indicted these

25   guys, but they didn't and it was wrong.

1   Q.   Let's just go back.  After you told Mr. Connick the line

2   from the movie his job just got harder, what happened?

3   A.   Well, it was over.  I mean, we're walking out of the room,

4   and you can tell right now, what are we, eight years later, I

5   don't even do criminal law anymore.  And I still, I'm still

6   starting to talk loudly about it and to get worked up about it.

7   You can tell.  We were already starting to raise our voices.  Why

8   are you being a pain in my butt?  I'm trying to protect you, I

9   tell him.  And as we're walking out into this little foyer

10  outside of his office and there's a secretary there and there are

11  other people there and they hear us and we're talking loudly to

12  each other, and I said, we were walking into the largest room in

13  the DA's Office because Mr. Connick was about to give a lecture

14  to all the DAs on your duty to turn things over.  So I turned to

15  him and I said, just let me go in and show them everything.  No,

16  you're not showing them everything.  We do the whole thing.

17  Q.   You mean to the Grand Jury?

18  A.   What's that?

19  Q.   The Grand Jury, not the meeting?  You were trying to tell

20  him to let you go in to the Grand Jury?

21  A.   Let me go tomorrow morning to the Grand Jury, I'll put on

22  all of the stuff that we found and then you go in and tell them

23  what you want.  He says no, and I say then I want off the case.

24  He goes, fine, you're off the case.  So I turn around, I walk

25  into the room, I sit down, my face is probably red as, you know,

1  a cape and I'm sitting down there, and Mr. Connick walks in, 80

2  DAs in the room and proceeds to give an lecture on your duty to

3  turn things over.

4  Q.   What happened when the meeting ended?

5  A.   I went downstairs.  Now, you got to remember, my -- this is,

6  what, June of 1999, okay.

7  Q.   Yes, sir.

8  A.   Okay.  So 29 years old, I'm married, my wife just graduated

9  from law school, you know, not only do I have never typed a

10  resumé for anyplace else, but I don't have any leads or anything

11  else like that.  The only place I ever wanted to work.  I go

12  downstairs, I type my resignation letter and I packed everything

13  in my office and I put it in my car.

14  Q.   Why?

15  A.   Because I'm going to give him one more chance the next

16  morning to let me do it and then if they say no, then I'm going

17  to resign.  And I knew exactly what was going to happen.  So I

18  went home, talked to my parents, you know, here is the situation,

19  I am not going to go -- it's wrong.  So the next morning I went

20  in, went up to the Tim McElroy's office and I sat in there in the

21  same little foyer with Ms. Zulli (phonetic) and everybody else.

22  You know, everybody remembered the night before.  I went into

23  Mr. McElroy's office and I said, Tim, just let me show them what

24  we have, and then you-all can tell them whatever you want.  He

25  said no, that's not going to happen.  I handed him my resignation

1   letter, and at that point, I said, look, you know -- at that

2   point, in appeals I had, I was handling a lot of cases, a pretty

3   big docket and I was also special in several kind of high-profile

4   murders and several rapes.

5   Q.   Special prosecutor?

6   A.   Yeah.  I mean, I had one where the son killed his mother.

7   Q.   We don't need those details?

8   A.   So I had these cases and it's a lot of information, a lot of

9   work on these cases and I said I will go down to my office in the

10  next two weeks, I will sit down and I will type up memos and

11  everything else about them, I'll ease the transition to whoever

12  is going to replace me and I tell you I won't say a thing about

13  the case, I'll just sit down there.  I went down to my office.

14  Val was waiting.  He saw that my office had been cleared out, he

15  was, he knew what that meant.  And as I'm walking down the

16  stairs, Val is being paged and by the time I get downstairs a few

17  minutes later, Val comes down and says they want you out of the

18  building.  So here I've been for the last probably two years or

19  more, I've done close to a hundred trials, you know, it's my

20  life, it's everything, and I'm going to be escorted out of the

21  building.

22  Q.   So your career goal is over?

23  A.   That's it.  You're not going to do criminal law.  You're not

24  going to be a prosecutor anymore.  So tomorrow morning, I'll type

25  up a resumé and I'll apply to local law firms and that was it.

1  Fifteen minutes after I resigned, they entered the Grand Jury

2  probe.

3  Q.   So did you ever get to fulfill the promise you made to the

4  Grand Jurors to show them everything?

5  A.   I did not.

6         MR. BANKS:  Mr. Glas, thanks very much.  I have no

7  questions.  Counsel for the defendants may have a few for you.

8         THE COURT:  Mr. Goins?

9         MR. GOINS:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. GOINS:

12  Q.   Mr. Glas, does blood evidence degrade over time?

13  A.   I do not know.

14  Q.   You didn't find it out from Mr. Cusimano?

15  A.   Excuse me.

16  Q.   Did you try to find that out?  When you were conducting your

17  investigation, did you try to determine why the test on the

18  tennis shoes was inclusive and why the other test was reliable?

19  A.   I don't think I did.

20  Q.   You didn't try to do that?

21  A.   I don't think so.  I don't remember, but I don't --

22  Q.   Did you try to do any research to determine whether or not

23  it was reasonable to expect, given the fact that the test had not

24  been done for, what, four months, they got, they got the blood

25  evidence in December, but they didn't do the test until, what was

1    it, April?

2    A.   Until the day -- two days before trial.

3    Q.   In April?

4    A.   Yes, sir.

5    Q.   Did you try to determine whether scientifically, the blood

6    evidence had degraded to the point where none of those tests

7    would have been reliable?

8    A.   No, sir.

9    Q.   And why didn't you do that?

10   A.   My only concern was the report.  Was the report accurate,

11   and what happened to that report.  Walter Strata told me that the

12   report was accurate, his notes confirmed it and it was my job

13   find out what happened to that report.

14   Q.   But you wanted to tell the Grand Jury everything?

15   A.   Yes, sir.

16   Q.   Well, why didn't you want to tell them about the scientific

17   probabilities as to whether or not this test was totally

18   unreliable because the blood may have degraded?

19   A.   Whether the test was unreliable or not, if you have a report

20   that says this is the perpetrator's blood type, you have a duty

21   to turn this over to the defense.  This is it.  I mean, this is

22   not, well, you know, we've got some testimony that somebody says

23   that he was six foot two, not six foot one, I'm not going to turn

24   that over or I got 30 pictures and one of them is of a lamp, I

25   won't turn that over because it's not relevant.  It's not a close

1   call.  This is a piece of paper with the perpetrator's blood type
2   on it.  Whether or not this test is accurate, I think that's an
3   interesting question and I'm sure either side would raise it no
4   matter what the result in a trial, but you have a duty to turn
5   this over and the DAs took it and they threw it away.  And
6   that's, that was my concern.
7   Q.   And didn't Harry Connick agree with you that they had a duty
8   to turn it over?
9   A.   No, sir, he did not.
10  Q.   Well, why did he then ask for a new trial?  Why did he then
11  ask for a stay of the execution?
12  A.   First of all, when we said, you know, when we were in that
13  room the night before at the second Grand Jury meeting the night
14  that I said I want off the case, the night that we had the
15  argument, when I said that we have proof that this went, I
16  believe we can prove this was -- that Jim Williams knew about
17  this, Mr. Connick and Mr. McElroy started to argue with us as to
18  whether or not you have a duty to turn over, whether you have a
19  duty to turn over that report.  And Mr. Connick's point that he
20  tried to make or to persuade me about was that if you don't
21  intend to use that piece of paper and you don't actually know
22  what John Thompson's blood type is, then you don't have a duty to
23  turn it over.  And Mr. McElroy agreed.  And I did not.  Val
24  Solino did not and to my recollection, I don't remember anybody
25  else in the room necessarily agreeing with that.  I mean,

1  otherwise you're the DA, hey, I got a piece of paper that's got

2  the perpetrator's blood type on it, I'm not going to use that, so

3  I'm just -- and I don't know what his is, I'm just going to go

4  ahead and put it over there.

5  Q.   Did Mr. Connick file a motion for a new trial and set aside

6  the conviction of Mr. Thompson?

7  A.   Yes, sir.  After all this, yes, sir, he did.

8  Q.   Because, because you convinced him; is that right?

9  A.   No, sir, because he had a test that showed that

10  Mr. Thompson's blood type did not match the perpetrator's.

11  Q.   So he agreed with you that it should have been turned over?

12  A.   No, sir.  That night he did not agree with me that they had

13  a duty to turn it over.

14  Q.   Why did he file the motion?

15  A.   Because the motion has to do with guilt or innocence.  What

16  we're talking about has to do with *Brady* and *Kyles*.  I'm talking

17  about whether or not you turn it over.  You're talking about

18  whether or not you, you know, continue to prosecute somebody when

19  there is scientific evidence that he's not guilty.  Mr. Connick

20  disagreed that we had a duty to turn it over, but he agreed now

21  that we have it and now that we know, now we should dismiss the

22  charges and they did.  I mean, the Thursday that I got called up

23  there, once we had this piece of paper that they scuttled, once

24  we had it, and we knew, or we suspected, I doubt it, but we

25  suspected, at that point we stayed the execution.  I say "we," I

1  think Val went over and filed a motion to stay the execution
2  until we could get to the bottom of it.
3          I do not, look, I do not question in any respect
4  whether or not Mr. Connick did the right thing by dismissing the
5  charges.  He did.  You were talking about scientific evidence,
6  but we had evidence that he didn't commit the crime.  Mr. Connick
7  did the right thing by dismissing it.
8  Q.   He also did the right thing by not retrying it?
9  A.   Yes, sir.
10  Q.   Now, you were very proud of being an Assistant District
11  Attorney?
12  A.   Yes, sir.
13  Q.   And you were very proud because you had been well trained
14  and you understood *Brady* and you turned everything over that you
15  should turn over?
16  A.   That's not why I was proud of being an Assistant District
17  Attorney.
18  Q.   But you did do that, didn't you?
19  A.   Did I do that?
20  Q.   You had been well trained and you did turn the evidence over
21  that had to be turned over?
22  A.   Yes, sir, I did do that.
23  Q.   And to the best of your recollection, the other people in
24  the office did the exact same thing?
25  A.   I did not know of anybody throwing away exculpatory evidence

1  while I was at the DA's Office.

2  Q.   And it offended you that the rest of the world was casting

3  aspersions upon Harry Connick's office because you knew that what

4  they were saying was not the truth; isn't that true?

5  A.   Yes, sir, I think we're paying for the sins of the former

6  DAs.

7  Q.   And it was being done right when you were there?

8  A.   When I was there, I was doing it right.  I think other

9  people were.

10  Q.   And everybody else in the office was doing it right?

11  A.   I can't say that.  I don't know of anybody doing it wrong,

12  but, you know.

13  Q.   And you were well trained; is that correct?

14  A.   I don't know what you mean by trained.  I got on-the-job

15  training.

16  Q.   You were asked that question in your deposition; weren't

17  you?

18  A.   Yes, sir.

19  Q.   And what was the answer that you gave in your deposition

20  with regard to the training?

21  A.   Well, we received a lot of on-the-job training.  Certainly

22  when I was a law clerk, I was lucky enough to be with some

23  outstanding Assistant District Attorneys.  There were guys, I

24  won't go through all of their names, but I clerked in a section

25  that had a good DA.  I saw how he did it.  He did it right.  He

1  was a good DA.  Then when I was a junior, I got put with a good

2  Assistant District Attorney who he did it right and I learned a

3  lot from him.  But when it came to -- and we had -- we did have,

4  we have to do a certain number of CLE hours every year, so the

5  DA's Office so that we don't have to go pay for them, they would

6  put on CLE seminars from time to time so we could fulfill those

7  things.  But, you know, in your section, you kind of ran your

8  section.

9  Q.   And you wanted to prove to the world that what was being

10 said about the office was not accurate?

11 A.   I think that was part of it, yes, sir.

12 Q.   You were on a mission; is that correct?

13 A.   I don't know if I would call it a "mission".

14 Q.   It was important to you?

15 A.   Yes, sir.

16 Q.   And you really put your heart and soul into it?

17 A.   Yes, sir.

18 Q.   And it deflated you, it just crushed you when this process

19 came to an end?

20 A.   Yes, sir.  It did.

21 Q.   And it destroyed you that the career that you dreamed about

22 slipped from your grasp?

23 A.   It was upsetting that I had to leave the DA's Office, yes,

24 sir.  I did not want to go.  I wanted to stay there.

25          MR. GOINS:  I have no further questions.

1          THE COURT:  Any redirect?

2                REDIRECT EXAMINATION

3  BY MR. BANKS:

4  Q.   In your investigation, you didn't try to look at what

5  training was provided to Assistant District Attorneys in the

6  early and mid 1980s, did you?

7  A.   No, sir, there was no time.

8  Q.   Did you have any knowledge about what kind of training was

9  provided back then?

10 A.   No, sir.

11         MR. BANKS:  Nothing further, Your Honor, thank you.

12         THE WITNESS:  Thank you, Mr. Glas.

13         MR. BANKS:  With that, Your Honor, the plaintiff's

14 rebuttal case is concluded.

15         THE COURT:  Very well.  All right.  Ladies and

16 gentlemen, here is where we are.  We're at the end of all of the

17 evidence or testimony of the case.  What remains are the closing

18 arguments of the attorneys and my legal instructions to you.  We

19 haven't calculated the time exactly yet, but that will take a

20 little while to do.

21         So what we're going to do now is to go ahead and

22 recess.  We are right at about the time I told you yesterday,

23 which was a pretty good estimate by the attorneys, about 4:30.

24 We're going to recess for the evening and, again, I'm going ask

25 you to close your notebooks, put them on your chairs or under

1  your chairs.  They will be there in the morning.  I'm going to

2  remind you that it's important that you not discuss this case

3  when you go home this evening.  And also, again, I'm not

4  predicting whether there will or won't be any publicity, but

5  should there be any about this case, I'm going to instruct you

6  and ask you not to watch, listen, or read any media reports about

7  this case.

8          And please be here on time tomorrow morning so that we

9  can try to start promptly at 8:30 with the closing arguments of

10  the attorneys.  Okay?  Well, that's fine.  There are other things

11  I have to tell you.  I can tell you tomorrow.  Have a good

12  evening.

13          (WHEREUPON, the jury panel leaves the courtroom.)

14          THE COURT:  All right.  The jury is out of the

15  courtroom.  Does anyone have any other motions, any motions to

16  make before we take up jury instructions?

17          MR. AARON:  Yes, Your Honor.  The defense reurges

18  judgment as a matter of law as to each and every one of the

19  contentions of the plaintiffs.  I think what's remaining is the

20  action against Williams alleging that he was a policymaker and

21  his policies caused the harm to Mr. Thompson.  We have

22  Mr. Dubelier alleged to be a policymaker and causing a harm to

23  him.  I think the Court had previously taken those under

24  advisement.  We have Mr. Connick as a policymaker and allegedly

25  his policy causing a harm.  And then finally we have the

1    deliberate indifference claim against Mr. Connick.  So as to all

2    of those, we move for judgment as a matter of law.

3              THE COURT:  So on all of the claims, I guess?

4              MR. AARON:  Yes.

5              THE COURT:  Which is a shorthand way of saying the same

6    thing.

7              All right.  Mr. Banks or Mr. Cooney, do you want to say

8    anything briefly in response?

9              MR. BANKS:  Your Honor, do you want me to address all

10   three or are there particular issues that you would like me to

11   focus on?

12             THE COURT:  Well, I think just briefly on the

13   policymaking issue.

14             MR. BANKS:  Very well, Your Honor.  Mr. McElroy

15   testified and Mr. Connick agreed that Mr. Connick had stopped

16   reading the law.  Now, there is nothing wrong with that, but

17   Mr. Connick had stopped reading cases and the law and what

18   Mr. McElroy says was that Mr. Connick was dependent on others to

19   ensure that they were familiar with the *Brady* standards.  Now, a

20   policy that just says follow the law isn't a policy.  It doesn't

21   add anything to the law.  The law after all requires whatever the

22   law requires.  So what Mr. Connick had done was say, as

23   Mr. McElroy described, that the first assistants and the chiefs

24   would be responsible, not only for reading the law, but

25   determining what the law was and how it would be complied with.

1        Mr. Dubelier at a minimum was one of the chiefs.  He

2   was the chief of screening.  That meant that with Mr. Connick's

3   abdication of that responsibility, Mr. Dubelier was responsible

4   for establishing and enforcing any policy other than just the law

5   is what it is.

6        THE COURT:  All right.  The United States Supreme Court

7   in *Jett v. Dallas Independent School District*, 491 U.S. 701 at

8   Page 737, it's a 1989 U.S. Supreme Court case, made it clear that

9   the identification of those officials whose decisions represent

10  the official policy of the local governmental unit is itself a

11  legal question to be resolved at trial before the case is

12  submitted to the jury.  So it's a question for me to decide after

13  hearing all of the evidence, considering all the applicable, if

14  any, state law on the issue of who was the final policymaker.

15       I am to make this determination by reviewing the

16  relevant legal materials, including state and local positive law,

17  as well as custom or usage having the force of law.  Official

18  policymaking authority may be granted directly by a legislative

19  enactment or may be delegated by an official who possesses such

20  authority.

21       And in reviewing or considering this matter, I have

22  taken into account that there is a state law in Louisiana which,

23  of course, declares that the elected District Attorney to be the

24  official policymaker for his office, his or her office, but it

25  does also authorize the elected District Attorney to delegate his

 1    or her policymaking authority to someone else in his office.

 2           In the previous ruling that I made on the defendants'

 3    motion for summary judgment on this issue, I considered that law

 4    and, of course, being a motion for summary judgment, I did at

 5    that time assume all facts and draw all inferences in the

 6    plaintiff's favor, and I found that there was a possibility that

 7    certain of the Assistant District Attorneys in Mr. Connick's

 8    office might have been delegated final policymaking authority in

 9    one or more areas.  So based on that, I deny the defendants'

10    motion for summary judgment on that issue.

11           There are special difficulties which can arise when it

12    is contended that a municipal policymaker has delegated his

13    policymaking authority to another official.  The authority to

14    make municipal policy is necessarily the authority to make final

15    policy.  And I cite for that proposition *City of St. Louis v.*

16    *Praprotnik*, P-R-A-P-R-O-T-N-I-K, another U.S. Supreme Court case

17    at 485 U.S. 112 at Page 126, a 1988 U.S. Supreme Court case.

18           So the fact that a municipal employee exercises

19    discretion, even a great deal of independent discretion in making

20    decisions is not enough to establish final policymaking

21    authority.  When a subordinate's discretionary decisions are

22    constrained by policies not of that subordinate's making or when

23    a subordinate's decisions are subject to review by the authorized

24    final policymaker, then the subordinate has not been delegated

25    final policymaking authority.

1          Having now heard all of the evidence in this case, I

2    find that there is no evidence to support the plaintiff's theory

3    that either Mr. Dubelier or Mr. Williams were actually, in fact,

4    delegated final policymaking authority on the issue of *Brady*.

5    The evidence indicates that Mr. Connick, in fact, retained the

6    final authority to create the office's policy, whatever that

7    policy is, and whether the policy was proper or deficient is

8    another matter for the jury to consider, but Mr. Connick did

9    retain final policymaking authority for the policy, that is, and

10   to review all decisions of his assistants.  The evidence has

11   indicated only that the prosecutors' decisions were constrained

12   by Mr. Connick's final policymaking authority.

13          So for those reasons, maybe it doesn't amount to much,

14   there are no individual claims against Mr. Dubelier or

15   Mr. Williams that remain by the time this trial started.  They

16   are sued only in their official capacities, as is Mr. Connick.

17   Therefore, I've already instructed the jury at the beginning in

18   jury selection, as I recall, and I'm going to tell them again in

19   my final legal instructions to the jury that even though

20   Mr. Connick, Mr. Dubelier, and Mr. Williams are named as

21   defendants, they are named only in their official capacities and,

22   in effect, it's a suit against the Orleans Parish District

23   Attorney's Office.  We tell them that.  We can make it as

24   explicit as we can.

25          So there is no need to dismiss anybody.  They have

 1  already been dismissed insofar as any individual liability or

 2  personal liability.  They have none that's going to be clear to

 3  the jury.  It's a suit against the District Attorney's Office.

 4  But I do agree with the defendants' argument, I guess, that that

 5  issue should not go to the jury.  In other words, if I had found

 6  that there had been evidence to support Williams and/or Dubelier

 7  being final policymakers, then obviously if a jury concluded that

 8  they personally participated in whatever constitutional violation

 9  occurred, that would be enough of a liability right there without

10  any further finding.  I just don't think there is any evidence or

11  there is insufficient evidence to instruct the jury accordingly.

12  And otherwise, I think I already ruled on the other parts of your

13  motion.  I already granted parts of your earlier motion at the

14  conclusion of the plaintiff's case.  I've dismissed any claims

15  under Section 1985 for conspiracy and I dismissed any claims

16  for -- the plaintiffs admit they have no claims remaining for

17  punitive damages because they are only official capacity claims.

18          That being the case, what I see as remaining in this

19  case, and what I'm otherwise denying the defendants' motion, I'm

20  going to allow the jury to decide, because I do think there is

21  evidence that a reasonable fact finder could find, could base

22  this decision on, I'll allow the jury to determine whether or not

23  the policy itself was deficient and did not meet the

24  constitutional requirements of *Brady* and his progeny.  And that's

25  one way the office could be liable.  And the other way would be

1  if -- I'll allow the jury to decide whether there was deliberate

2  indifference with respect to training, supervision, and

3  monitoring of the Assistant District Attorneys.  So those two

4  issues only will go to the jury.

5          Okay, that being said --

6          MR. AARON:  Can I ask one thing, Judge?

7          THE COURT:  Yes.

8          MR. AARON:  In opening we both were talking about what

9  the evidence was going to show about them being policymakers.

10  With your ruling then I'm not even going to talk about Dubelier

11  and Williams and I guess the question is maybe you could have

12  some sort of instruction to the jury as to, you know, why I'm not

13  talking about that anymore.

14          MR. BANKS:  Well, it's in there.  There is an

15  instruction that --

16          MR. AARON:  No, because they don't get that until after

17  our opening.

18          THE COURT:  What do you want me to tell them?

19          MR. AARON:  I want them to say that you have decided on

20  whether or not, who the official policymaker was.

21          THE COURT:  I think we do that.

22          THE LAW CLERK:  We took it out.  We took out -- this is

23  the whole second theory of liability, but I can put --

24          MR. AARON:  I meant before, I meant before the closing

25  arguments because you see what I'm saying, I don't want them

1  expecting me --

2          THE COURT:  Well, I'm not going to give them

3  instructions before and then after.  It's perfectly legitimate

4  for you, once you know what's in my instructions, you can tell

5  them.  I don't want you to give them a legal lecture, a lecture

6  on the law, but you can tell them the judge will tell you that

7  blah, blah, blah.

8          MR. AARON:  Got you.

9          THE COURT:  But the law is that there are three ways in

10  which -- let me find that part of the instructions.  There are

11  three ways in which the entity, the office can be liable for

12  inadequate training or supervision.  One is if the policy itself

13  is inadequate or unconstitutional.  The second is if the -- is if

14  the -- I'm in the wrong part.  What page was that, Clay, where we

15  took that out?

16          THE LAW CLERK:  That's on Page 25.  I took out the 26.

17  I'm sorry, 26.

18          THE COURT:  Yeah, 26.

19          THE LAW CLERK:  No, no, no.

20          THE COURT:  23?  23, I believe; right?  The bottom of

21  23, is that it?

22          MR. BANKS:  Yes, that's it, Your Honor, you lay out the

23  three reasons at the bottom of 23 and --

24          MR. COONEY:  Now two reasons.

25          MR. BANKS:  Now two, yes.

1          THE COURT:  Ye2, we first said there were three ways
2     because the third way is if the official policymaker himself or
3     herself participates in the constitutional violation, even a
4     single act can make him or her or the entity liable.
5          MR. AARON:  Right.
6          THE COURT:  But since in this case, Mr. Connick is the
7     only final policymaker I have concluded and since there is no
8     argument by the plaintiffs, it's not even been alleged that
9     Mr. Connick personally was involved in this constitutional
10    violation, then I thought it was easier to just leave that out of
11    the equation rather than explain some law to the jury who has not
12    even an issue.  So that's why we just said one and two instead of
13    one, two, and three.
14         MR. AARON:  So actually, it is appropriate for me to
15    say the judge will give you the law and he will suggest to you, I
16    can say something like that in closing?  Is that all right?
17         THE COURT:  Well, something like what?  You said
18    something like that.
19         MR. AARON:  I would have your jury charges.
20         THE COURT:  You can say something like that.
21         MR. AARON:  No, at that point I will have your jury
22    charge.
23         THE COURT:  As long as you say what's in my jury
24    charge, you should be okay.
25         MR. AARON:  I'll do that.

1          THE COURT:  Okay.  Have y'all had a chance to look at
2     the latest revised draft?
3          MR. AARON:  I did it quickly.  I thought -- it was
4     finished, though; right?
5          THE LAW CLERK:  It's not finished as far as we haven't
6     heard from everybody.
7          THE COURT:  Let's hear from any objections, because
8     when Clay comes in tomorrow morning, while you guys are making
9     your closing arguments, he's going to be finalizing this thing,
10    and I want to see if I can get whatever remaining objections you
11    have.
12          We're on the record here.  For the record, we've given
13    counsel a couple of versions or drafts of proposed final
14    instructions and verdict forms.  The last one I think we gave to
15    you -- I know you haven't had a whole lot of time.  We gave it to
16    you around 3 o'clock and it's now about almost 5.
17          Mr. Cooney, do you have any comments, objections or
18    anything you would like to say in regard to those, to this last
19    draft?
20          MR. COONEY:  Yes.  Thank you, Your Honor, and we
21    appreciate the opportunity.  I think the one comment that we
22    have, and it may, there may be an interaction between the
23    instructions on the one hand and the verdict form on the other.
24    You'll recall when we started this Odyssey on Monday, one of the
25    things we talked about was how we were going to handle the other

1    items of evidence that the plaintiffs contended were *Brady*

2    material in the case and I believe what the Court suggested was

3    the way we were going to proceed was there weren't going to be

4    separate findings by the jury on additional pieces of *Brady*

5    material, but that the jury could consider those pieces of

6    evidence in connection with whether there is a pattern or a

7    policy.

8              THE COURT:  Well, that's why I let you put that into

9    evidence.  And the reason for my thought process on that has been

10   all along that, I mean, the factual and procedural scenario of

11   this whole case is very unique, obviously, for a lot of reasons,

12   but what we have, as I see it, is a clear and basically

13   undisputed *Brady* violation that occurred in the armed robbery

14   trial, which affected, infected, whatever you want to call it,

15   impacted the subsequent murder trial by depriving, as held by the

16   Fourth Circuit and I think affirmed by the Louisiana Supreme

17   Court that that affected or deprived Mr. Thompson of his

18   constitutional right to testify on his own behalf and, of course,

19   it also affected the penalty phase.

20             So as I recall, first, the Fourth Circuit had vacated

21   the death penalty, but affirmed the conviction and the Supreme

22   Court said, no, the conviction is out, too.  I think the trial

23   court and then the Fourth Circuit vacated the conviction and the

24   Supreme Court affirmed.  I think that's how it went.  Right.

25             MR. COONEY:  That's right, Your Honor.

1    THE COURT:  So in any event, the point is is that in my

2    mind, that's a given.  In other words, there is no reasonable

3    jury could find to the contrary but that there was a *Brady*

4    violation which not only exculpated Mr. -- materially affected,

5    obviously, the armed robbery trial, but it obviously materially

6    affected the murder trial as found by the state courts of

7    Louisiana, final decisions of those state courts.

8    So under *Kyles*, as I recall, it's clear that the

9    exercise here of what we have to ask the jury to do is not

10   consider a piece of evidence by piece of evidence, you know, was

11   this *Brady* material, was it turned over, was it suppressed, was

12   it, you know, at each piece of evidence.  It's a cumulative test.

13   The legal test is, was there a violation of his constitutional

14   rights by withholding of evidence and then, of course, all other

15   parameters that go with it, all the other criteria that go with

16   that.  But was there a violation considering all of the evidence

17   cumulatively?  Since the blood evidence alone proved the

18   violation, I'm not going to ask the jury, you know, was this

19   other stuff also *Brady*.  I'll let you put that in for the sole

20   purpose of showing the cumulative nature of and impact or

21   evidence, that is, as to whether or not it all goes to the

22   training and deliberate indifference arguments and issues and

23   that sort of thing.

24   MR. COONEY:  I understand.

25   THE COURT:  So I didn't want to preempt.  Maybe I

1    should let you say what you wanted to say because maybe I

2    wouldn't have had to say as much.  Are you asking me to say

3    something about that in the instructions or what are you asking?

4         MR. COONEY:  I am, Your Honor, because I think I

5    understand the logic.  My concern is that if you read the

6    instruction and you look at the jury charge, a reasonable juror

7    could read that and think that the only thing that they are to

8    consider is the blood evidence, and all this other stuff about

9    hair length and rewards and all that other stuff that you've

10   decided that that's not an issue, and so we think that since the

11   purpose of the admission of that evidence was in order for the

12   jury to determine whether that reflected on the adequacy of the

13   training or whether there was a pattern or a policy, we think it

14   would be appropriate for there to be a sentence to be added,

15   perhaps in the section of the charge dealing with the official

16   policy that in determining whether --

17        THE COURT:  Let's talk exactly what you want me to add.

18   What page?

19        MR. COONEY:  I think Page 24, Your Honor, would be an

20   appropriate place.

21        THE COURT:  That deals with official policy?

22        MR. COONEY:  Yes, Your Honor.

23        THE COURT:  What exactly would you like me to include?

24        MR. COONEY:  We would like to have language at the --

25   at the end of that, that particular portion of the charge to the

1   effect of, in determining whether or not there is a common and

2   well-settled policy and practice.

3            THE COURT:  Do you have that in writing?

4            MR. COONEY:  I can certainly submit it in writing,

5   Your Honor.

6            THE COURT:  Just go ahead and read it for now.

7            MR. COONEY:   In determining whether or not there is a

8   common and well-settled policy or practice, you may consider

9   evidence concerning the other information plaintiff alleges was

10  not produced to him in the underlying murder case.

11           THE COURT:  That's it?

12           MR. COONEY:  I think, Your Honor, similar language with

13  regard to the inadequate training section would be appropriate.

14  It's the same basic concept, Your Honor.

15           THE COURT:  Okay.  Give that in writing to Clay.  I'll

16  consider it.  Okay.  I'll think about it.  Of course, I'll let

17  Mr. Aaron respond to that in a minute when he gets up.  Okay,

18  anything else?  That's it?  What about the verdict form?

19           MR. COONEY:  I don't know that we've seen the latest

20  version of that, Your Honor.

21           MR. AARON:  I think there's only one version.

22           THE LAW CLERK:  I changed that December '99 thing.

23           MR. COONEY:  Subject to the December '99 comment,

24  Your Honor, we have no -- well, the only, I guess comment we have

25  is if Your Honor addresses the concern that we had that I just

1  raised with regard to the instruction, we don't have any concerns

2  with regard to the special verdict form, but amplifying my

3  earlier point, if you look at Question 1 and Question 2, they

4  focus on the *Brady* violation in the armed robbery case and the

5  resulting infringement of John Thompson's right to testify, I

6  think that absent the kind of language we're talking about in the

7  charge, the jury could misconstrue that the only thing that's at

8  issue in this case is the armed robbery charge and that the --

9  all the other evidence with regard to the reward and the other

10  documents, the hair length --

11        THE COURT:  Specifically, what do you suggest we change

12  or how do you suggest we change it?

13        MR. COONEY:  I think, Your Honor, if the change that we

14  propose in the instruction itself.

15        THE COURT:  That would take care of it?

16        MR. COONEY:  If we did it in both the official policy

17  section and in the training section, I think that that would

18  probably address our concern.

19        THE COURT:  Okay.  Okay.  Give that language in writing

20  to Clay and I'll consider it.  Anything else on either the

21  instructions or verdict form for -- on behalf of the plaintiffs?

22        MR. BANKS:  May I just have a moment to talk to

23  Mr. Cooney?

24        THE COURT:  While you're doing that, let me hear from

25  Mr. Carver.  Are you going to do it?

1        MR. CARVER:  Yes, Your Honor, Mark Carver for the

2    defendants.  I'll start with the jury instructions.

3        THE COURT:  Yes, please.

4        MR. CARVER:  Beginning on Page 21.

5        THE COURT:  21, okay.

6        MR. CARVER:  In the middle of the second paragraph it

7    states the good or bad faith of the prosecution does not matter.

8        THE COURT:  That's true.  That's true.  We're not

9    talking about punitive damages here, remember?  It doesn't matter

10   if it was intentional or not for a *Brady* violation.  That's the

11   law, isn't it?  Anybody disagree with that?  That's the state of

12   the law.

13       MR. CARVER:  That's deliberate indifference violation.

14   We've cited some law in the proposed jury charges that say, and

15   I'll -- let me get the exact quote.

16       THE COURT:  This is not talking about deliberate

17   indifference.  Later we described to them deliberate

18   indifference.  This is telling them what is a *Brady*, what is the

19   constitutional requirement to turn over *Brady* evidence.  I'm

20   pretty sure it's an accurate statement of the law.  The bad faith

21   of the prosecution does not matter.  I believe you can be

22   deliberately indifferent and not be in bad faith.  I don't think

23   it's necessarily the same thing.

24       MR. CARVER:  Then perhaps my argument I'm making now

25   should be made with respect to the deliberate indifference for

1    training.  I think in that respect --

2         THE COURT:  Okay.  Well, I didn't mean to interrupt

3    you.  Just let me hear your objections one at a time.  So that

4    one, that's in the middle of Page 21.

5         MR. CARVER:  Right.

6         THE COURT:  I'll look at that again, but I think that's

7    an accurate statement of the law.  Go ahead, next one.

8         MR. CARVER:  Following that sentence, it discusses that

9    we have a duty to, the state has a duty to --

10        THE COURT:  Where are you now?

11        MR. CARVER:  Same page, next sentence, Page 21.  It

12   begins, the sentence begins, the prosecutor's obligation.

13        THE COURT:  Okay.  I see it.

14        MR. CARVER:  My understanding is that the law that's

15   cited here comes out of the *Kyles* decision which was not

16   established until 1995.

17        THE COURT:  Well, that's not exactly accurate.  *Kyles*

18   did say that, you're right, but I'll find it for you.  Clay, I

19   don't know if I got that back from you or not.

20        THE LAW CLERK:  I have three cases and I'm not sure

21   what you're looking at.

22        THE COURT:  Yes.  Exactly.  There is case law from the

23   Fifth Circuit going back to the 1960s after *Brady v. Maryland* and

24   *Giglio* was decided in the '70s, '60s and '70s that say that the

25   prosecutor can't just say, it wasn't in my file, so I didn't have

1   a duty to turn it over.  When you know that you've got a police

2   department that's investigating, you're relying on their

3   investigation, you've got a duty.  You represent the state.  You

4   don't represent just the Orleans Parish District Attorney's

5   Office.  You've got an affirmative duty to find out what's in

6   that, and produce it.  I mean, that's the law.  I think *Kyles*

7   reaffirmed that from the U.S. Supreme Court, but I don't think

8   that was new law, certainly not in the Fifth Circuit.

9            THE LAW CLERK:  It was three cases.

10           THE COURT:  Remind me what year was *Brady* decided.

11           MR. COONEY:  '63, Your Honor.

12           THE COURT:  Early '60s.  1967 *Luna v. Beto*, B-E-T-O,

13   391 Fed.2d 329, doesn't matter that the police and not the

14   prosecutor withheld the evidence and the prosecutor said we

15   didn't know about it because it wasn't in our file.

16           *Smith v. State of Florida*, when Florida was still part

17   of our circuit, 410 Fed.2d 1349, along the same lines.

18           And I think there are other cases, but in other words,

19   that was a principle that goes back to the late '60s, so it

20   wasn't some brand-new law that the U.S. Supreme Court made up in

21   *Kyles*.

22           MR. CARVER:  Moving on, Your Honor, Page 25.  The

23   bottom there, it begins, second District Attorney's failure.

24           THE COURT:  Okay.

25           MR. CARVER:  I've read that, and it was kind of

1  confusing to me.  It's going to be confusing to a jury.  I think

2  it would be much simpler just to say was Harry Connick

3  deliberately indifferent to the need to train, monitor and

4  supervise.  I think that's the question, was Harry Connick

5  deliberately indifferent to that need.

6           THE COURT:  Well, I guess it's another way of saying

7  the same thing.  The District Attorney's Office, second, this is

8  what they have, well, you pose an informal question.  These are

9  not questions.  These are stated in the form of elements that

10 they have to prove, and the element is the way they can prove

11 this and it's by showing that the District Attorney's failure to

12 adequately train, monitor, or supervise amounted to deliberate

13 indifference to the fact that inaction would obviously result in

14 a constitutional violation.

15          MR. CARVER:  To say it my way --

16          THE COURT:  I wouldn't phrase it here as a question.

17 That sounds more like a verdict form question.

18          MR. CARVER:  I agree, but I think it can be phrased in

19 the term of a statement.  The District Attorney was deliberately

20 indifferent to the need to adequately train, monitor and

21 supervise.

22          THE COURT:  Well, that's a possibility.  Clay, you

23 wrote that down?  We'll think about that language.  Where did

24 this language come from exactly, the way that we have it phrased,

25 Clay?  I think they both state the law accurately, it's just a

1   matter of how we phrase it.

2           THE LAW CLERK:  I think you're leaving off that last

3   part.

4           MR. CARVER:  I didn't say the whole complete thing.

5           THE COURT:  If you've got some specific language you

6   want to tender on that, give it to Clay before you leave here

7   today, okay?

8           MR. CARVER:  Yes, Your Honor.

9           THE COURT:  And give it to him in writing, if you can,

10  even if it's handwritten.

11          What's the next one?

12          MR. CARVER:  Page 26 and there's no specific caution

13  here, but this goes to what I was alluding to earlier about bad

14  faith and deliberate indifference.  Certainly, plaintiffs have

15  put on or suggested evidence that the prosecutors acted

16  intentionally.  There is case law that supports that a prosecutor

17  who is otherwise reasonably trained or fails to follow policy or

18  intentionally breaks the law, that does not constitute deliberate

19  indifference by Harry Connick.  And there was a lot of evidence

20  to that and I think the jury needs to be aware what is the effect

21  if a person intentionally fails to follow policy, intentionally

22  breaks the law.

23          THE COURT:  Well, do you have language you want to

24  suggest and where would we include it?

25          MR. CARVER:  I have language I want to suggest and I

1  think we can do it right at the -- we can do it right after Page

2  27, right after the third one.

3          THE COURT:  After the third?

4          MR. CARVER:  This section where we are discussing the

5  definition of the --

6          THE COURT:  I understand after the paragraph that says

7  third, the wrong choice, blah, blah, blah?

8          MR. CARVER:  That would be fine.

9          THE COURT:  After that paragraph, is that what you want

10 to say?

11         MR. CARVER:  One moment, Your Honor.  Your Honor,

12 actually, I would prefer to put it before, back on Page 26, right

13 before you give the three requirements.

14         THE COURT:  Well, you have the language you want to

15 add?

16         MR. CARVER:  Yes, Your Honor, I have the language I'd

17 like to add.

18         THE COURT:  Do you have it in writing?

19         MR. CARVER:  I have it writing.

20         THE COURT:  Read it to me.  Isn't that already covered

21 where we tell them somewhere else, I'm pretty sure we tell them

22 that the fault must be in the training program itself, not in a

23 particular prosecutor?  And we say something else along the same

24 lines.

25         MR. BANKS:  Yes, it's on Page 26, Your Honor, the first

 1  full paragraph in the second sentence.

 2          THE COURT:  Yes.

 3          MR. CARVER:  Your Honor, what they have here is, "A

 4  District Attorney cannot reasonably be expected to guard against

 5  the deliberate criminal acts of its properly trained employees

 6  when he has no basis upon which to anticipate the misconduct."

 7          THE COURT:  Okay.  Give that language to Clay and I'll

 8  consider it.

 9          MR. BANKS:  We're troubled by that, Your Honor.

10          THE COURT:  Well, I'm not saying I'm going to include

11  it.  I said I would consider it.

12          MR. CARVER:  Also, as part of that definition in that

13  same location, Your Honor, we would like to include language that

14  says that deliberate indifference to training requires a pattern

15  of similar violations and proof of deliberate indifference

16  requires more than a single isolated act.

17          MR. BANKS:  That's not the law, Your Honor.

18          THE COURT:  No, I'm not giving that.  That was in your

19  motion for summary judgment that I denied.

20          MR. CARVER:  Page 28, Your Honor, the last sentence, it

21  says --

22          THE COURT:  What page?

23          MR. CARVER:  Page 28.

24          THE COURT:  Okay.

25          MR. CARVER:  It says Mr. Thompson must prove that the

1  wrongful acts of the continuous --

2          THE COURT:  Wait, where are you reading from?

3          MR. CARVER:  The very last sentence on Page 28.

4          THE COURT:  It's 29 on mine.

5          MR. CARVER:  Mine says Page 28.

6          THE COURT:  Where?  Last paragraph?

7          MR. CARVER:  The last sentence.  It begins, stated

8  another way, Mr. Thompson must prove that the wrongful acts of

9  the defendants --

10         THE COURT:  Did this language change from what I had,

11 Clay?

12         THE LAW CLERK:  Now it's 28.  He started a different

13 thing.

14         THE COURT:  Stated another way.  Is that what I'm

15 reading?

16         MR. CARVER:  Mine says Page 28 and the last sentence

17 begins stated another way.

18         THE COURT:  Oh, okay.  That's not the language where

19 you started before, though.  That's the problem.  Okay.  I'm

20 following you now.  The beginning of the last sentence on the

21 bottom of Page 28; right?

22         MR. CARVER:  Right.  The whole sentence, the whole

23 sentence reads, "Stated another way, Mr. Thompson must prove that

24 the wrongful acts of the defendants were the moving force behind

25 his injuries."  I think using the word "defendants" may not be

1    entirely correct, especially now since Dubelier and Williams are

2    not policymakers.  I think what the, what the moving force is

3    supposed to be is the policy or the deliberate indifference, not

4    the acts of the defendants, not the acts of Deegan or not the

5    acts -- it's the policy.

6            THE COURT:  Mr. Carver, the problem we're having here

7    in this discussion is you can't read every sentence in here in

8    isolation.  You have to read this in the context of the overall

9    instruction.  We've already told them at length what the

10   plaintiff has to prove, prove deliberate indifference or to prove

11   a defective policy, unconstitutional policy.  So I don't see a

12   problem with that.  Okay.  What else?

13           MR. CARVER:  Lastly, Your Honor, in the damage section,

14   there is no mention of an allocation of fault.

15           THE COURT:  Right.  And I'm not going to get there, and

16   I'll talk about that right now.  That's your last one?  I'll give

17   my reasons for that.

18           MR. CARVER:  Yes, Your Honor, that is the last one.

19   The -- I just have one comment on the special verdict form.

20           THE COURT:  Okay.

21           MR. CARVER:  On the special verdict form, there does

22   not appear to be any question where the jury is asked to

23   determine whether or not the policy or the deliberate

24   indifference caused an actual harm, an actual injury to

25   John Thompson, whether or not it actually caused him, you know,

1    to be on death row for 18 years.  I know --

2            THE COURT:  What's the last question?  It says,

3    compensate him for damages he has actually suffered or is

4    reasonably likely to suffer in the future as a result of the

5    District Attorney's policy or deliberate indifference.  Doesn't

6    that address that?  And then we tell them what that means in the

7    instruction.

8            MR. CARVER:  I would agree with you.

9            THE COURT:  Yes.  Okay.

10           MR. BANKS:  Your Honor, I'm sorry.

11           THE COURT:  Let me just comment on why I'm not giving

12   the apportionment of liability here.  When the defendants raised

13   that, frankly, I find their argument a little bizarre for reasons

14   I've explained.  The defendant has asked for an apportionment of

15   responsibility of fault among many parties, including several of

16   the individual attorneys in the District Attorney's Office and

17   plaintiff's attorney in the armed robbery case, plaintiff's

18   attorneys in the murder case, the NOPD and plaintiff himself.

19           Well, first of all, even if legally there was a

20   requirement to submit apportionment of fault issues to the jury,

21   I would not do so unless there was some evidence to support that

22   going to the jury.  There has been no evidence in this case that,

23   let me just take them one by one, that Mr. Thompson caused his

24   injury or damages personally.  Number 1.  There is absolutely no

25   evidence of that.  There is no evidence that I found, that I've

1   heard that the NOPD, the New Orleans Police Department did

2   anything wrong to cause his injury or damages.  There's no

3   evidence that the plaintiff's attorneys in his murder case, who,

4   I think were Mr. Fanning and Mr. Couhig, did anything wrong to

5   cause his injury or damages that he's claiming.

6          The only suggestion that the defendants have offered

7   and tried to suggest in some of the evidence in the case is that

8   Mr. Numa Bertel, who was representing him in the armed robbery

9   trial, as I understand, from the Orleans Indigent Defender

10  office, didn't do enough to investigate the case himself.  The

11  argument seems to be that we didn't have a responsibility to

12  disclose this, find this evidence and turn it over, but

13  Mr. Bertel did.  Poor Mr. Bertel, representing this guy through

14  the indigent defender office, had a higher degree of

15  responsibility than the Orleans District Attorney's Office had.

16  That seems to be your argument to me which I said is rather

17  bizarre.

18          Here's the legal analysis, Title 42, United States

19  Code, Section 1988 dictates the procedure for determining what

20  law to apply to an admission of a civil rights case such as this.

21  And I'm not going to read that whole statute, but essentially

22  it's a three-step process.  You first look to see whether there

23  is applicable federal law on the issues, substantive law on the

24  issues.  There's no applicable federal substantive law on

25  apportionment of liability here.  There is no federal statutory

1   law or anything that applies here.

2        So if there is none, if federal law is deficient, the

3   next step is to look to state law.  And you look to state law and

4   you look to see what the state law is on this issue, if any, and

5   whether the state law is consistent with the goals and purposes

6   of the federal civil rights statutes or not.  And you look at

7   *Dobson v. Camden*, 705 Fed.2d 759 Fifth Circuit 1983 for that

8   principle.  State law at the times these prosecutions occurred in

9   1985, which is their pertinent time because what we're talking

10  about, if any state law applied here, there would be Louisiana

11  Civil Code Article 2324(b), which concerns the liability of joint

12  tort-feasors.

13        The current article, of course, essentially says you

14  have to apportion fault and except in instances that aren't

15  applicable here, there is no solidary or joint and several

16  liability.  However, that was not the law in 1985.  From 1980,

17  after the comparative fault scheme came into play and was adopted

18  by the Louisiana Legislature, from that time until July 2nd of

19  1987, the Louisiana law basically said that you can apportion

20  liability pursuant to the comparative fault statute but there is

21  still full joint and several solidary liability.  That law was

22  next changed in 1987, which is after this all occurred.  So it

23  wouldn't apply.  Louisiana Supreme Court has said in *Aucoin*,

24  A-U-C-O-I-N, *v. State* at 712 So.2nd 62 at Pages 67, 68, 1998,

25  Louisiana Supreme Court decision, found that the amendments to

1    Article 2324 are substantive and are not to be applied

2    retroactively.  So we would have to look at what the state of the

3    law was in Louisiana.  As of 1985, we had full joint and several

4    liability at that time.

5           So here is the situation:  We have a nonparty, Mr. Numa

6    Bertel, who has not been sued by anybody, he's not been

7    represented by anybody, he's not been present at trial, and it

8    doesn't matter because if the DA, if we apportion fault and the

9    District Attorney's Office was found, guess what, 1 percent at

10   fault, they would pay 100 percent of the judgment under the state

11   of the law in Louisiana as of 1985.  So that's one good reason

12   why it would be a futile exercise to start having a jury -- and

13   this is already going to be a difficult case, I think, for this

14   jury from a legal perspective.  It's not like a car accident, who

15   ran the red light, for obvious reasons, so I don't want to

16   unnecessarily complicate what this jury is going to do here, and

17   so for that reason, I'm not going to get it.

18          I also have some serious doubts that if I -- well,

19   there is no reason to apply apportionment of liability for the

20   reasons I've just stated.  And if you try to apply current state

21   law or any variation thereof, we had about three or four

22   iterations of solidary liability since 1979 in this state, I

23   think it could be said that it would undermine or be inconsistent

24   with the purpose of the federal Civil Rights Act that we are

25   dealing with here.

1          So in this case, the responsibility of any

2     nongovernmental act as to interest to the plaintiff to me is

3     better subsumed in the causation requirement.  So as we're

4     telling them and you're going to tell them and I'm going to tell

5     them and the verdict form is going to tell them that the only way

6     the plaintiff can recover is for any injuries or damages caused

7     by constitutional violation by the District Attorney's Office if

8     they so find one.  And he can only recover for damages or

9     injuries caused by that constitutional violation.  So again, I

10    don't see any need to do that.  So for those reasons, I'm not

11    going to include that.

12          All right.  We're going to consider the other matters

13    that you-all have raised.  Anybody --

14          MR. BANKS:  Just the special verdict form very briefly.

15    We have a concern, and it applies to both Paragraphs 1 and 2.

16    Does the Court have the form?

17          THE COURT:  I do.

18          MR. BANKS:  By wording it this way about the *Brady*

19    violation in the armed robbery case resulting in infringement of

20    rights to testify, the jury may conclude, the only sheet they'll

21    have back there that that's the only issue.  I know they'll hear

22    an instruction, we hope, but this is what they'll take back.

23          THE COURT:  They'll have the instructions, too.

24          MR. BANKS:  Right.  Okay.  But the concern we have,

25    Your Honor, is that the jury could conclude that there were *Brady*

1   violations in the murder case that resulted from inadequate or

2   deficient policies that are beyond and unrelated to or at least

3   separate from the carjacking issue.  So what we, we would propose

4   the following language, if the Court would hear us.

5           THE COURT:  Okay.

6           MR. BANKS:  And I'll read this and then I can give it

7   to Clay, if requested.

8           THE COURT:  Go ahead.

9           MR. BANKS:  Was the *Brady* violation in the armed

10  robbery case or any infringement of John Thompson's rights in the

11  murder trial substantially caused by an official policy of the

12  District Attorney?  That embraces within it we think what

13  Your Honor had contemplated, but also allows the jury to consider

14  and evaluate anything else beyond that if they believe

15  appropriate.

16          THE COURT:  Well, I'll have to see it in writing.

17          MR. BANKS:  I did.

18          THE COURT:  There is a lot of ways you could word this

19  or phrase it and we're trying to, again, simplify it for purposes

20  of the jury.  We're going to be giving them 35 pages or so of

21  legal instruction which is going to be difficult as it is for

22  them to comprehend.  And then I try to simplify the verdict form

23  to make it make sense.

24          MR. BANKS:  We tried to keep this very simple.

25  Your Honor, if Clay can read my terrible handwriting, I'm going

1    to give that to him.

2              THE COURT:  Okay.

3              MR. BANKS:  That's the only other comment.  I

4    apologize.  That's the only other comment we have.

5              THE COURT:  Mr. Carver, do you want to say anything?

6              MR. CARVER:  No further comments, but we will provide

7    Clay with the proposed language we wanted to add.

8              THE COURT:  All right.  And, obviously, I'll either

9    take your suggestions and change or modify the last version you

10   have or not.  And we'll give it to you as early as we can.  What

11   we'll try to do is tell you in the morning what I've changed or

12   what we haven't so you'll know that before you make your

13   arguments, even if you don't have a hard copy of the final

14   version.  Okay?

15             MR. BANKS:  Thank you, Your Honor.

16             THE COURT:  Now, let's talk about closing arguments.

17   Who is going to do closing arguments?

18             MR. BANKS:  I will for the plaintiff, Your Honor.

19             MR. AARON:  I will for the defendant, Your Honor.

20             THE COURT:  Mr. Banks, are you doing closing and

21   rebuttal?

22             MR. BANKS:  That's my expectation, sir.

23             THE COURT:  Okay.  How much time would you request for

24   both, all combined?

25             MR. BANKS:  Let me confer with -- I would like to have

1    45 minutes for my initial closing and up to 15 for rebuttal.

2    I'll try to keep it shorter, but I would like to at least have

3    that latitude, Your Honor.

4            THE COURT:  That's a lot of talking.

5            MR. BANKS:  I'm hoping to keep it shorter.

6            THE COURT:  You know these folks watch all these TV

7    shows now where lawyers make 60 seconds --

8            MR. BANKS:  Witnesses crumble on the second question

9    and --

10           THE COURT:  You really can put them to sleep.  Let me

11   hear from Mr. Aaron.

12           MR. AARON:  Judge, I think --

13           THE COURT:  That would be an hour each, that would

14   two hours.

15           MR. AARON:  My experience practicing and teaching and

16   people's attention spans are about an hour.  That being said, I

17   would suggest 30 minutes each side, they do 25 minutes on their

18   main argument and 5 minutes for rebuttal.

19           MR. BANKS:  I know I need more than that.

20           MR. AARON:  And we do 30 minutes.

21           THE COURT:  How about if we compromise here.  The

22   wisdom of Solomon, do 45 minutes, you can do 30 and 15 or --

23           MR. BANKS:  However I carve the 45.

24           THE COURT:  Well, within limits.  I don't want you to

25   save the bulk of it for rebuttal.

1          MR. BANKS:  I would not.

2          THE COURT:  My general rule is you have to use at least

3     two-thirds of your time up front.

4          MR. BANKS:  I most definitely will.  45 total?

5          THE COURT:  30 and 15 or if you want to say less than

6     15, you can do 35 and 10, or 40 and 5 if you want.  Let Eileen

7     know.  You can let her know in the morning how you want to divide

8     that time, Mr. Banks, and if you want reminders, she'll tell you

9     like if you want, if you got 5 minutes left, you got 2 minutes

10    left, 1 minute left and then when your time is up, she'll turn to

11    me.  I don't, I won't cut you off in midstream if it looks like

12    you're ending, but if it looks like you're still winding up, I

13    don't mean winding down, I mean winding up, I'll gently tell you

14    your time is about up, you need to wrap it up.

15         MR. BANKS:  Do I need to let Eileen know in advance

16    what I'm reserving for rebuttal or can I use the residue once I

17    hit --

18         THE COURT:  Well, you can do that, but if you use it

19    all, then you have none left.

20         MR. BANKS:  That, I recognize.

21         THE COURT:  Okay.  You've got 45 minutes divided within

22    the parameters I told you, any way you want.  Let Eileen know

23    what you want and you've got equal time, of course.  If you want

24    reminders, let her know.

25         MR. AARON:  I don't think I'm going to need the whole

 1   time.

 2          MR. BANKS:  See you tomorrow, Your Honor.

 3          THE COURT:  We'll see everybody at 8:30 in the morning.

 4   Have a good evening.  Well, actually, you-all probably should get

 5   here a little early because hopefully we'll at least be able to

 6   tell you what changes we've decided to incorporate or not at that

 7   point even if we don't have the hard copy.

 8          Give me the numbers again.

 9          MR. BANKS:  118.

10          THE COURT:  Which is what?

11          MR. BANKS:  118 was the memorandum from Jerry Glas to

12   Mr. Connick.

13          139 was the deposition notice for Mr. Solino

14   designating him as a representative.

15          140 and 141 were the two things that Jerry Glas

16   brought, his commendations from Mr. McElroy.

17          THE COURT:  Oh, his commendations.

18          MR. BANKS:  And those are the four.

19          THE COURT:  All right.  Without objection, those are

20   admitted.

21          MR. CARVER:  Just a point of clarification, I was

22   handed the list of what has been admitted and 137, which is the

23   murder trial transcript, is that the entire transcript or just

24   the portions that were referred to?

25          MR. BANKS:  The portions that were referred to.

1        THE COURT:  Yes, we're not putting in an entire.  We

2  already said pretrial, I think, we're only putting in relevant

3  parts.  We're not putting in --

4        MR. BANKS:  That's exactly right.

5        THE COURT:  -- voluminous trial transcript.  You send

6  that stuff back to the jury, they don't know what to do with

7  that.  They'll start reading it.

8        MR. CARVER:  Do you need the specific page numbers from

9  me?

10        THE DEPUTY CLERK:  Yeah.  Yes.

11        MR. BANKS:  Do you want us to provide those?

12        MR. COONEY:  I thought there was a copy of one --

13  wasn't there a section, if I'm correct?

14        THE COURT:  Didn't you-all have that in the unobjected

15  to book, like the portions of it?

16        MR. COONEY:  Yes, Your Honor, Exhibit 50 was the

17  transcript of the murder trial that included the portions that

18  everybody agreed was appropriate.  I don't know if there are

19  additional pages that were referred to.  I don't recall.

20        MR. BANKS:  There were a few from 137.

21        THE DEPUTY:  Y'all did refer to 137.

22        MR. COONEY:  There was some argument.

23        THE COURT:  Are we talking about Exhibit 137 or Page

24  137?

25        MR. BANKS:  No, I'm sorry, Exhibit 137.

1         THE COURT:  Is that not officially in evidence yet,

2  137?

3         MR. BANKS:  No, 137 was moved into evidence, I think.

4         THE COURT:  It is in evidence, Eileen?

5         THE DEPUTY:  Yes, sir.

6         MR. BANKS:  It's a portion of the transcript, but a

7  healthy portion, frankly.

8         THE COURT:  How many pages is it?  That whole book is

9  137?

10         MR. COONEY:  But there were only a couple of pages that

11  were referenced during the testimony.

12         THE COURT:  Only the pages that are used.

13         MR. BANKS:  We can pull those pages.

14         THE COURT:  Well, why don't you kind of agree on what

15  was used and what should go in and, hopefully, y'all can agree on

16  that and make sure you remind us before we bring the jury in in

17  the morning and we'll in put that on the record.  Okay?

18         MR. BANKS:  Very well.

19         THE COURT:  All right.  Have a good evening.

20         MR. BANKS:  You too, Your Honor.

21        (WHEREUPON, at 5:32 p.m. on Thursday, February 8, 2007,

22  the proceedings were concluded.)

23               *   *   *

24

25

REPORTER'S CERTIFICATE

   I, Cathy Pepper, Certified Realtime Reporter, Registered
Professional Reporter, Certified Court Reporter, Official Court
Reporter, United States District Court, Eastern District of
Louisiana, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and understanding,
from the record of the proceedings in the above-entitled and
numbered matter.


                              _____

                              Cathy Pepper, CCR, RPR, CRR
                              Official Court Reporter
                              United States District Court