```
1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2

3    ****************************************************************

4

5    JOHN THOMPSON

6                               CIVIL ACTION NO. 03-2045 "J"
     V.                         NEW ORLEANS, LOUISIANA
7                               FRIDAY, FEBRUARY 9, 2007, 8:30 A.M.

8    HARRY F. CONNICK, et al.

9    ****************************************************************

10                              VOLUME V
11              TRANSCRIPT OF TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE CARL J. BARBIER
12                 UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14

15   FOR THE PLAINTIFF:      MORGAN, LEWIS & BOCKIUS, LLP
                             BY:  J. GORDON COONEY, JR., ESQUIRE
16                                MICHAEL L. BANKS, ESQUIRE
                                  S. GERALD LITVIN, ESQUIRE
17                           1701 MARKET STREET
                             PHILADELPHIA, PENNSYLVANIA, 19103
18

19

20   FOR THE DEFENDANT:      GOINS AARON, PLC
                             BY:  RICHARD GOINS, ESQUIRE
21                                WILLIAM D. AARON, ESQUIRE
                                  MARK C. CARVER, ESQUIRE
22                           1010 COMMON STREET, SUITE 2600
                             NEW ORLEANS, LOUISIANA  70112
23

24

25   ALSO PRESENT:           HARRY CONNICK
```

```
 1   OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RPR, CRR
                                  500 POYDRAS STREET, ROOM B406
 2                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7779
 3

 4   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           **I N D E X**

2

3                                                              <u>Page</u>

4

5    CLOSING ARGUMENTS BY MR. BANKS......................... 1035

6    CLOSING ARGUMENTS BY MR. AARON......................... 1054

7    CLOSING ARGUMENTS BY MR. BANKS......................... 1074

8    WRITTEN LEGAL INSTRUCTIONS ............................ 1082

9    QUESTION #1 FROM THE JURY PANEL....................... 1110

10   VERDICT............................................... 1116

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     **P-R-O-C-E-E-D-I-N-G-S**

2                 FRIDAY, FEBRUARY 9, 2007

3               M O R N I N G   S E S S I O N

4                 (COURT CALLED TO ORDER)

5

6           THE DEPUTY CLERK:  All rise.

7           THE COURT:  Good morning, everyone.  Please be seated.

8    Before we bring the jury in, Clay gave you-all, this morning, I

9    believe, the final version of the jury instructions that I intend

10   to read to the jury after closing arguments.  And he pointed out

11   to you, I think, the changes that we did or did not incorporate,

12   based on our on-the-record conversation late yesterday afternoon.

13   And I want to give each side one more opportunity, if you care

14   to, to voice any remaining -- you don't have to repeat what you

15   said yesterday, but any additional objections to the instruction

16   or verdict form.  I'll give you a chance to voice right now.

17        Mr. Cooney.

18           MR. COONEY:  Yes, Your Honor, thank you.  We filed the

19   plaintiff's supplemental request regarding the jury charge this

20   morning, and one of the issues that we requested, Your Honor, was

21   that in the section of the charge dealing with liability through

22   inadequate training or supervision, that the last paragraph of

23   that section deals with the difficult choice issue.

24        Plaintiff would request that there be further instruction

25   that, "A choice may be difficult because it requires more than

1    the application of common sense or because, although the proper

2    course is clear, the employee had powerful incentives to make the

3    wrong choice."

4        And we would site the *Walker versus City of New York* case

5    there.  We think it's important, Your Honor, for the jury to

6    understand that a difficult choice can arise not just because the

7    facts or the law is unclear but also because there may be some

8    powerful incentive to, at work with the actor that could be

9    addressed through training.

10        THE COURT:  I'm going to deny that.  We decided not to

11    incorporate that.  There is no end to what you could include.

12    You could write a Law Review article as a jury instruction on

13    these issues if you wanted to, but at some point you have to end.

14    You have to give the basic law, basic principles to the jury and

15    then you guys can argue the rest of it based on that.  So I think

16    the charge as constructed fairly states the law and what the jury

17    has to find or consider.  And anyway, I'm not going to

18    incorporate that language.

19        We did incorporate, I think, you had a minor change, just in

20    changing district attorneys.  I think you wanted to change it to

21    District Attorney's Office instead of just the district attorney

22    on page 15, so we did change that.  And we incorporated some of

23    the other suggestions, I think, from yesterday evening, but I'm

24    not going to add that language.

25        MR. COONEY:  Thank you, Your Honor.

1    THE COURT:   Thank you.

2    Mr. Carver.

3    MR. CARVER:   Your Honor, just very briefly, without

4    rehashing what we went through yesterday, we'd just like to renew

5    our concerns and objections.

6    THE COURT:   Don't renew or rehash anything.   That's what

7    I said.   It's all on the record from yesterday.   Just anything in

8    additional.

9    MR. CARVER:   Nothing additional than what I said

10   yesterday.

11   THE COURT:   All right.   Thank you.

12   The jury is still not here.   We have one missing juror

13   but it's the not the same missing juror who was missing the first

14   two days.   Juror Number 7 apparently called here 15, 20 minutes

15   ago and talked to my assistant and said that his vehicle had a

16   flat tire over in Slidell where he lives across the lake, and he

17   was waiting for someone to come and fix the flat tire, and he

18   hoped that he could be here in 45 minutes.

19   Unfortunately, I'm not, we're not going to be able to wait

20   that long.   It's not even certain that he's going to be here in

21   45 minutes.   So we have seven jurors remaining.   We're going to

22   go with the seven jurors that we have.

23   Bring in the jury, please.

24   And when Mr. Trahan, I think it is, when he arrives, he's

25   going to have to remain outside or in the jury room or somewhere.

1   Not in the jury room, because I don't want him mixing with the

2   other jurors during deliberation.  He can wait somewhere

3   separately and then I'll speak to him after I send the jury out,

4   okay?

5           THE MARSHAL:  Yes, sir.  All rise.

6           (WHEREUPON, the jury panel enters the courtroom.)

7           THE COURT:  For the record, it's already almost

8   20 minutes after our starting time.  All right.  Please be

9   seated, ladies and gentlemen.

10      All right, ladies and gentlemen, as I told you yesterday

11  evening, we're into the final phase of the trial, and the next

12  part will be closing arguments by counsel.

13      And following that, I'll read my legal instructions and

14  we'll send you out to deliberate.

15      Mr. Banks.

16          MR. BANKS:  Thank you, Your Honor.  Before my clock

17  starts, I'm just going to turn the podium here, if I may.

18          THE COURT:  Sure.

19                      CLOSING ARGUMENTS

20  BY MR. BANKS:

21          Good morning.  Thank you for your patience and

22  extraordinary attentiveness throughout this trial.  I would like

23  to start by asking you a question.  It's really a simple one and

24  it goes to the heart of this case:  Why didn't they produce the

25  evidence?  Why were they fighting so hard to keep a jury from

1  hearing the evidence?  The evidence is the facts, and the facts
2  are the truth.  They tried to explain it.  They said, Well, you
3  know, there are these dangers of witnesses being killed.

4      That's a legitimate fear, but not here.  There was no fear
5  or danger of a witness being killed if the blood evidence was
6  produced.  That wasn't a problem.  There was no danger or fear of
7  a witness being killed if they told you what the perpetrator's
8  hair length was, what the murder's hair length was.  There was no
9  danger or fear of a witness being killed if the reward
10  information came out.

11      For some reason, for some reason, they didn't want the facts
12  to come out.  They didn't want the jury to decide it on the
13  truth.

14      Now, look, I'm not suggesting that the prosecutors believed
15  John Thompson was innocent or they believed he was guilty; we
16  don't know.  We don't know what they were really thinking.  But
17  what we do know is that they didn't share the truth.  And I'm not
18  talking just about Mr. Williams and Mr. Dubelier and
19  Mr. Whittaker.  I'm not talking about their issues with the
20  truth.  It goes higher.  It goes all the way up to the top.

21      We heard the last witness in this case yesterday, he was
22  very powerful, Mr. Glas.  And you know what he told you, that in
23  1999, four years after John Thompson was sentenced to death --
24  excuse me, fourteen years after John Thompson was sentenced to
25  death and after a hellish experience on death row, they were

1   still burying the truth.  They still didn't want the facts to

2   come out.  They shut down the Grand Jury, the one investigative

3   tool that Mr. Connick and Mr. McElroy convened.  And they shut it

4   down.

5       The thing that Mr. Glas said was designed to get the truth.

6   Mr. Glas promised those grand jurors that he would get the truth.

7   It was the last thing I asked him.  Did you get to keep your

8   promise?  No, he said.  And that order came all the way from the

9   top.  All the way.

10      Now, they say, Well, Mr. Thompson should be grateful because

11  in 1999, after all, the DA went in and went in to see the judge,

12  Pat Quinlan, not Judge Barbier, the criminal court judge and

13  asked to set aside the conviction, the armed robbery conviction,

14  and Mr. Thompson should be grateful for that.

15      Well, let's just talk about that.  Is that the search for

16  the truth?  No.  The truth was already out.  We had found the

17  truth.  By the time we went to Mr. Connick, we knew the crime lab

18  report, we knew Mr. Thompson's blood type.  We knew Mr. LaGarde's

19  blood type.  We showed definitively that the crime lab report was

20  delivered to the DA two days before the armed robbery trial.  We

21  showed that the blood evidence was known to Williams and others

22  from the time they took this case three months before the trial.

23      So going to the judge at that point, when there was explicit

24  proof of wrongdoing, explicit proof of innocence, that didn't do

25  much for John.  That's not some heroic quest.  They said they did

1    the right thing; they didn't do the right thing.  Do you know

2    why?  Actually, I can't tell you why.  I can tell you what they

3    did.  For four more years, John Thompson sat in jail.  For four

4    years, the DA's office from the very top continued to fight the

5    notion that John Thompson should get a new trial, even after a

6    *Brady* violation that Judge Barbier will tell you was clear as a

7    bell, even after all the evidence surfaced showing that not only

8    was there a *Brady* violation but it interfered with John's right

9    to testify in his own defense, even though the very same

10   prosecutors who tried him for murder were the ones who hid the

11   blood evidence.  He sat there for four more years in Orleans

12   Parish Prison hoping and waiting that some court somewhere would

13   grant him a new trial.

14       That, ladies and gentlemen of the jury, is not a quest for

15   the truth.  It wasn't about the truth.

16       During those four years, John's sons turned from boys into

17   men.  And he got older.  Four more years of his life lost.

18   Because to them, it was like a game.  It was like a football

19   game.  They had already won the trophy.  We won the trophy.  We

20   got the conviction.  We don't have to give it back.

21       It's not even like a football game.  It's like an episode of

22   *Jeopardy*.  It's like a game show.  Here's what they said:  We

23   gave you the answer, now you tell us the question.  The answer,

24   they said they dropped a little hint to Numa Bertel at the

25   suppression hearing in 1999.  They stood up and Mr. Williams

1  said, We may wish to do a blood test.  So they dropped a hint and

2  just like *Jeopardy*, it was up to Mr. Bertel to ask the question,

3  Oh, do you have blood evidence?  That's not *Brady*.  That's not

4  the truth.  That's not what the truth is about.

5      Let me ask you a second question:  Do you have any doubt in

6  your mind, any, any, that if this was Jerry Glas trying that case

7  in 1999, that he would have turned over the blood evidence?  You

8  know the truth there, don't you?

9      Jerry Glas, if he had this blood report, if he had this

10  piece of paper, you know what he would have done, he would have

11  walked over to Numa Bertel and said, There is blood evidence.  I

12  don't know whether it makes your client more guilty or whether it

13  exonerates him, but you have a right to know because it's fair,

14  it's equitable, it's moral, it's right.

15      But unfortunately, not everybody is Jerry Glas.  He's an

16  extraordinary human being.  And I'm not saying everybody can be

17  like Jerry Glas.  I can't, but do you know why you have training

18  and do you know why you have policies on things like *Brady*?

19  Because not everybody can be Jerry Glas.  That's a very high

20  standard.  Not everybody can measure up to that.  And for many

21  people, you need to show them.  You need to tell them.  You need

22  to reinforce what's the law.  And more than what's the law,

23  what's the truth?

24      We heard it actually from a very interesting source here:

25  Eddie Jordan.  Some of you may have heard about Eddie Jordan,

1    read about him.  You may like him, not like him based on what

2    you've heard.  It's not relevant here.  I want to talk about what

3    Eddie Jordan said.  The current district attorney, Mr. Connick's

4    successor, who would be in a position to know, testified, this is

5    what he said:  He had, quote, real concerns about whether the

6    office had done all that it could to ensure that evidence that

7    defendants were entitled to was turned over.

8         And then he talked about the national study.  He said, and

9    this is a quote, "He found this office had one of the worst

10   records in terms of *Brady*."

11        So what did the defense do?  They hustled him right out of

12   the courtroom.  Remember, he was here for opening.  He was here

13   for the morning of the first day and part of the afternoon.  And

14   once his testimony went up on that screen, they did what they

15   always do with evidence they don't like, it disappeared.

16   Mr. Jordan never returned.  Mr. Connick came back, Mr. Dubelier

17   came back, Mr. Williams testified, but Eddie Jordan, gone.

18        Now, they did bring in Bridget Bane.  They flew her in from

19   California to tell you about the training.  It's fairly obvious

20   Ms. Bane was a high-level person in the office.  She was very

21   close to Harry Connick, as was Mr. McElroy.  And there is nothing

22   wrong with that.  Strong leaders, forceful leaders like

23   Harry Connick.  They do inspire loyalty in some people, and

24   that's not a bad thing.

25        Ms. Bane and Mr. McElroy were very, very loyal to

1  Mr. Connick, and I commend them for that.  But what Ms. Bane
2  talked about was something different from what we heard
3  throughout the trial.  She talked about these training programs,
4  night and day, Saturdays, I wondered how people had time to try
5  the cases.

6      You know what was interesting?  A couple of things.  The
7  witnesses in this case, the people who tried Thompson and who
8  dealt with the blood evidence, they didn't recall any of that
9  training.  Williams, Solino, Dubelier, Riehlmann, Whittaker, all
10  of them said, No training.  No Saturday sessions, no seminars, no
11  programs, nothing like that.

12      Whatever training Ms. Bane may have offered, these guys
13  weren't invited.  Maybe it was because they were senior enough,
14  they had never been trained, that someone thought they didn't
15  need it.  Well, we guess that's wrong, too, right?  I mean, we
16  know they needed it.

17      I found something that Ms. Bane said fascinating.  She said
18  during the time of Mr. Connick's tenure, the time we're talking
19  about here, there were 700 assistant district attorneys who went
20  through that office -- 700.

21      I would bet that most of those 700 are still in New Orleans
22  or still in the Louisiana area.  Did you hear from one of them,
23  one out of 700 people tell you about training?  Tell you about
24  policies other than Williams and Dubelier and Solino and
25  Whittaker?  Did you hear one?  Why did they have to fly a loyal

1   lieutenant all the way in from California?  Why not bring in a

2   parade of people, people we heard who are now judges and federal

3   prosecutors?  You know why.  You know why.

4        They say, Well, don't forget, we also had on-the-job

5   training.  We took young assistant district attorneys or juniors

6   or seconds or whatever we called them, and we matched them up

7   with senior prosecutors and they got trained.  That's what

8   Williams and Whittaker and Dubelier and Solino and all those guys

9   said.  We went into the courtroom and went through trials like

10  this and we got trained by the senior people we were working

11  with.

12       Now, let's understand that.  Let's take the examples we

13  heard about.  Mr. Deegan.  He was a young guy.  He was getting

14  trained.  Deegan had two trials that we heard about:  The Vessel

15  murder trial, which went right up to the armed robbery case and

16  the Thompson armed robbery case.

17       So who was training Jerry Deegan?  Bruce Whittaker.  The guy

18  who sat on the blood report, the guy who sat on the evidence was

19  the one they say, Oh, he did the on-the-job training.

20       And how about Williams?  He looked up the line, too.  He

21  said the second in command was trained by the first in command.

22  So he was trained by Mr. Dubelier?  That's the on-the-job

23  training they are talking about?  I mean, please, that's not very

24  reassuring, is it?

25       Joe Lawless made this crystal clear.  Mr. Lawless, our

1    expert witness, our first, literally wrote the book,

2    *Prosecutorial Misconduct* by Joseph F. Lawless.  He tracked

3    through and summarized the inconsistencies between these

4    defendants, between these former prosecuters and showed how they

5    told totally different stories about *Brady*.  How they didn't even

6    seem to understand at this late date, in this courtroom how to

7    get it straight among themselves.  He told you there were no

8    standards, no definitions, no meaningful policies, no meaningful

9    training for the people involved in the Thompson case.  No

10   guidance.  And most of all, most of all, no message.

11       Because do you know what training is?  Training isn't just

12   saying, These are the rules.  It's not me saying to Mr. Cooney,

13   Here is the rule, here's what's *Brady*, here is what's not.  Here

14   is what you go through.  Training is the message.  It's me

15   saying, Mr. Cooney, *Brady* is important.  It's the goal of this

16   office, the rights of the criminal defendant are vital and we're

17   not going to violate them.

18       That's what training is.  Not just telling you how to do it,

19   telling you why to do it.  That's why you have training in the

20   first place.  And there was none of that.  None.  None that any

21   of these prosecutors could recall.  They couldn't find one

22   example.  It's no wonder they couldn't get it right.  It's no

23   wonder they got confused when they took the stand.

24       Let's review for a minute.  The cast of characters we had

25   here who were involved.  Mr. Connick said this in his video

1   deposition, the first part on the screen, he said definitely,

2   definitely, the crime lab report was *Brady* material and had to be

3   turned over.  Here is the quote.  "Whatever the results of the

4   blood test were, they should have turned that over."

5       And the second quote, "With my poor evaluation of *Brady*, I

6   think I know enough to know that if they have some blood

7   evidence, it has to be turned over."

8       Not just the report, he said.  The actual evidence had to be

9   turned over.  McElroy said the same thing.  He always did,

10  frankly, but that's what they said in this case.  Do you remember

11  what they said behind closed doors?  Mr. Glas told us that

12  yesterday when Mr. Aaron questioned him.

13      When they were behind closed doors that fateful night in

14  Mr. Connick's office, the night before Mr. Connick shut down the

15  Grand Jury, Mr. Connick said and Mr. McElroy agreed that the

16  crime lab report wasn't even *Brady* material.  They didn't have to

17  turn it over because they didn't know Thompson's blood type.

18  They didn't know if it exonerated him.  Totally different story

19  behind closed doors.

20      And, ladies and gentlemen, please understand this.  *Brady*

21  violations don't happen in courtrooms in front of you and

22  Judge Barbier.  They happen behind closed doors.  To understand

23  what the real policy is, not the piece of paper, the real policy,

24  to understand whether *Brady* violations occur, you have to look

25  behind the closed doors.  And Jerry Glas took us there.

1    Well, how about the others?  Mr. Solino testified in open
2    court, and this is fascinating, too, Mr. Solino was the official
3    representative of the office.  He was the guy that was brought in
4    to say, This is what *Brady* is.  And he said, this is a quote:
5    "Even if you have the crime lab report and it shows that the
6    blood was tested," he says, "if I'm holding a crime lab report
7    that says blood on a shoe is B and I have some reason to believe
8    that the blood on the shoe came from the perpetrator but I don't
9    know what the perpetrator's blood type is, do I feel I have a
10   legal requirement at that point to disclose the crime lab report?
11   No."
12   That's what he said.  That is what the official statement of
13   the office was, the guy who was asked to come in and say, what's
14   your policy.  So he agreed with what Mr. Connick and McElroy said
15   behind closed doors, but disagreed with what they said in this
16   Court.
17   Dubelier, he got religion.  He said, Of course you have to
18   turn it over.
19   Williams, he said, Absolutely you have to turn it over in
20   this Court.
21   This is really wild.  The two guys who actually hid the
22   blood evidence and the crime lab report and engaged in the
23   wrongdoing, Dubelier, they are in here saying, You have to turn
24   it over.  Whereas, Mr. Solino and Mr. Connick and Mr. McElroy,
25   behind closed doors, the ones who started the Grand Jury

1    proceeding, they say you don't.

2        Well, there is really one voice in the law and let me just

3    make this clear.  Judge Barbier is the voice of the law.  His

4    Honor is going to tell you what the law is.  He's going to

5    instruct you when we're done.  This is what he's going to say.

6    This is a quote from his instruction.  "In this case, I have

7    determined that the nonproduced blood evidence and the resulting

8    infringement of Mr. Thompson's right to testify in the murder

9    case violated his constitutional rights as a matter of law."

10        I wish someone who made that statement was in charge of

11   training.  I wish someone who was in charge of that statement had

12   written the policy in 1985.  And, yes, that brings us to the

13   policy.

14        Mr. Lawless said you have to have a policy.  You have to

15   have a handbook.  They didn't even have one in 1985.  They admit

16   that in this case.  Mr. Connick explained, Well, in the 12 years

17   between his election in 1987, they wanted to get a handbook

18   together but it took a lot of resources.

19        So finally, Mr. McElroy explained they got all their

20   policies, let's turn to Exhibit 51, they rolled them up into one,

21   all these memos that they had been handing out.  And this is what

22   we got.  We got one paragraph that doesn't even say, Follow the

23   law.  One paragraph that Mr. Solino admitted wouldn't give any

24   guidance at all, none, to a district attorney holding a crime lab

25   report, standing there saying, I have a report that shows a blood

1   test, I don't know what Mr. Thompson's type is.  How would this

2   help you determine whether to turn that over?

3        This wasn't a policy.  This was a joke.  And Solino told you

4   it was wrong.  It talks about at the request of the defense

5   attorneys, the judge ordering *Brady* material to be turned over.

6   Judge Barbier will tell you that wasn't the standard.

7        The one policy they had was wrong.  And it does talk about

8   some policies.  It says if you don't produce this, failure to

9   produce will result in mistrials and reversals.  How sad.  If you

10  don't produce this, we'll have to do it again.

11       That's not what *Brady* is about.  It's about the criminal

12  defendants and their rights.  It's actually about one other

13  thing.  The community should be just as outraged as John Thompson

14  was at what happened.  Because, remember, I think it was

15  Mr. Williams who admitted this:  If you prosecute the wrong guy

16  and you send him to jail, even if you execute him, put him in a

17  chair and electrocute him, the real bad guy is still out there.

18       That's the worst part of it perhaps.  It's not just that

19  Mr. Thompson is locked up, it's not just that.  Whoever robbed

20  those LaGarde kids, whoever killed Ray Liuzza, they weren't put

21  away.  They weren't prosecuted.  And that's a tragedy.

22       Ms. Bane tried to overcome that.  She said, Well, we have a

23  different kind of policy.  We pretried cases.  I'm sorry, I'm

24  looking at the clock; the judge puts a limit on us.  We pretry

25  cases.  We require that people who are trying the cases to meet

1    with the chief of trials, and they go over the case and the file

2    and see if there is *Brady* material.  That is a great idea.  I

3    have to admit it.  She described it as a check and balance.  And

4    she's right.  It's an important check and balance.  If the policy

5    makes them follow it.

6         But as Mr. Solino explained, Dubelier and Williams were

7    special prosecutors.  They didn't even have to pretry the cases.

8    There was a whole class of people, these senior DAs who were

9    excused from this check and balance.  Whatever policy was wrapped

10   up in pretrying cases, it didn't help Mr. Thompson.  It didn't

11   even apply to him.

12        You know, the DA can't just put his head in the sand.  The

13   DA and the assistant district attorneys, they can't just sit

14   there as Mr. Dubelier did and say, We'll wait for *Brady* to fly up

15   and smack us in the face.  They have to go find it.

16        Dubelier, do you remember Dubelier testifying about this?

17   He said, Well, I looked at whatever the police sent me.  I didn't

18   ask for more.  Often I didn't get police dailies, sometimes I

19   didn't get police reports, although Williams said he had them

20   here.  He said, I didn't go look for them.  In 17 years as a

21   prosecutor I never did that.

22        Again, I'm going to turn to Judge Barbier, the voice of the

23   law, he will tell you the prosecutor's obligation to disclose

24   information is based on what all state officers knew at the time,

25   not just on the information that the prosecutor has in his or her

1   possession.  This is keen now.  Implied within this obligation is

2   a duty of the individual prosecutors to learn of any favorable

3   evidence known to others acting on the government's behalf in the

4   case, including the police.

5      What Judge Barbier will tell you is the law, Mr. Dubelier

6   will tell you was not the policy.  The policy, if there was one,

7   didn't match the law.

8      Now, I think Mr. Aaron will be the one closing.  I don't

9   know if he'll say the same thing he said in his opening.  In his

10   opening, he stood up and said, It was a rogue, young DA.  Jerry

11   Deegan.

12      We know better than that now.  We know Williams, Whittaker,

13   Dubelier and others were involved.  He said, It was a rogue DA

14   and Numa Bertel.  He tried to blame John Thompson's lawyer in the

15   armed robbery case.  That's amazing.

16      In this trial they're still doing it.  They are still trying

17   to blame the wrong people and justify the hiding of evidence.  We

18   heard so much about what Williams and Dubelier did.  We heard

19   about Dubelier, how he responded to a discovery request in the

20   armed robbery case and didn't disclose the blood evidence.  He

21   said, Inspection to be permitted, and then when poor Numa Bertel

22   walked over to the evidence room, the blood had already been

23   checked out, as Dubelier knew it would be.

24      In the murder case he did the same thing.  First response to

25   discovery:  Tell us witnesses who could see the perpetrator and

1   might see something different from what we know Mr. Thompson to

2   be.  He wrote, None.  And he identified a witness, Mary Wells,

3   the crazy person they had discredited.  He deliberately sent the

4   defense on a wild goose chase.  He identified Mary Wells but not

5   Paul Schliffka.

6       What does that tell you about the practice of keeping

7   witnesses from getting killed?  He identified a witness who the

8   prosecutor said had nothing whatsoever to do with the entire

9   case, but not Paul Schliffka.

10      And then, in his amended response, he identified Schliffka.

11  He said Schliffka saw the perpetrator.  He said he's six feet

12  tall and nothing about the hair.  He was misleading the defense

13  as he did with Officer Carter on the stand.  Mr. Carter, describe

14  the perpetrator.  Carter explained, Black male, six feet tall.

15  Nothing about hair.  Dubelier sat there.  They had to show the

16  witness the police report, the one that Dubelier admits he didn't

17  even give to the defense.  They showed him that.  Right?  And

18  what did Carter say?  Afro.  He made up a word that was

19  inconsistent with every police report the DAs had.

20      And what did Dubelier do?  He sat there.  Do I really need

21  to go through what Williams did?  I mean, that's off the charts

22  in the carjacking case.  Every single piece of paper, blood

23  evidence, may wish to do blood test, crime scene technician

24  report, evidence card, evidence delivered to the courtroom.

25      Williams admits when he was asked, Did you stay away from

1    the blood evidence at the trial, in your opening and questioning

2    Jay LaGarde?  We obviously did.

3        And Jay LaGarde told Jerry Glas the truth.  Williams went up

4    to him and said, Do we have, whatever happened to the blood

5    evidence?  Williams said it was inconclusive.  It was a lie.  It

6    was an absolute lie.

7        I left something out here.  I haven't talked about

8    Mr. Thompson.  He is the reason we're here, after all.  He's the

9    *Brady* victim here.  I told you how the community was victimized

10   by this, but the victim that we're in this courtroom to talk

11   about is Mr. Thompson.  And what can you do as jurors?  What

12   justice can you give?  You can't give perfect justice.  You can't

13   give him 18 years back.  You can't put him back in his

14   grandmother's house.  You can't give him the last 10 years of his

15   grandmother's life while he was in jail.  You can't give him the

16   kids' birthday parties he missed.  The ice cream on a hot day

17   with his sons.  The hugs with his sons.  You can't give him the

18   years with his mother.  You can't give him the time he went from

19   being a young man who was doing some things that weren't perfect,

20   selling marijuana, stolen property, into a grown man.  You can't

21   give him those years from 22 to 40.  You can't take away the

22   horrors that he endured in a six-foot-nine cell.  This was John's

23   life.  From here to here.  From here to here.  Twenty-three hours

24   a day.  A hundred degrees.  A hundred percent humidity.  Walls on

25   three sides and bars.  No window.  No fan.  Odors.  Stench.

1   Screaming inmates around him.  And all the time the fear, the

2   real fear as he watched other people being taken away, strapped

3   in chairs and electricity being shot through their bodies and

4   taken to tables where they pumped poison through their veins, he

5   got closer and closer to that day, as every one of his appeals,

6   every one of his appeals passed.

7       I watched Mr. Dubelier as Mr. Dubelier became very emotional

8   on the stand and he talked about his sons.  He was agonizing

9   because he thought maybe his sons would read one day that he

10  committed a *Brady* violation.

11      What about the agony of John Thompson?  What about that?

12  John Thompson's sons woke up every morning and went to bed every

13  night wondering if their dad was a murderer.  John said they

14  visited him in jail and said, Daddy, when are you coming home?

15  That's when they were young.  When they got older, they realized,

16  they understood, they must have wondered, Is my dad a murderer?

17  Did he kill a man in cold blood?  Did he carjack three kids?

18  Would he have killed them?

19      Whatever they wondered about that, they knew he was getting

20  closer to death, that he was going to be put on a table and

21  killed.  And don't you think that weighed on John's mind?  John's

22  not one to complain.  He doesn't whine.

23      As Dr. Grassian told you, he copes, he functions.  He gets

24  credit for that.  He is a marvelous human being.  But he endured

25  agony for 18 years, and he's got 30 or 40 more years of pain that

1    nobody one can take away.

2        So we can't take away the pain.  We can't take away what he

3    endured or what he will endure, but there is something you can

4    do.  There is only one thing we can do in this Court.  You can

5    compensate him.  Fairly.  Not more than he deserves, but not

6    less.  How much?  It's for you.

7        Is a thousand dollars a day worth what he suffered in

8    prison?  I'm asking?  I don't know.  Would any sane or rational

9    person endure what he endured in that hellhole for a thousand

10   dollars a day, 6,686 days?  I don't think so.  I don't think a

11   rational person, a sane person would do that for a million

12   dollars a year.  It's not a million dollars a year wouldn't

13   compensate him for what he suffered in jail, waiting to be

14   executed, waiting.  But it's for you to decide, ladies and

15   gentlemen.

16       I just ask you to compensate him fairly.  Maybe you'll think

17   the numbers I mentioned are too high.  Then don't award it.

18   Maybe you'll think they are too low.  You decide because you know

19   something about justice and you know something about the truth.

20   That's why you're here.

21       There were jurors that didn't hear the facts.  You've heard

22   the facts.  You've heard the whole truth.  All I'm asking you to

23   do is do justice to the best we can for what this man suffered.

24       I want to hear what Mr. Aaron has to say.  He gets a chance

25   to speak.  And then I may stand up again and comment about that.

1  And I look forward to it.

2      Thank you.

3          THE COURT:  All right.  Thank you, Mr. Banks.

4  Mr. Aaron.

5                      CLOSING ARGUMENTS

6  BY MR. AARON:

7      Ladies and gentlemen, in my opening statement, I told you

8  that you were going hear two versions of a story that was like

9  night and day, and when I give you my closing, it will be exactly

10  the same thing.

11      In my opening statement, I told you, ladies and gentlemen,

12  that there were two important considerations in this case that

13  Mr. Banks made no mention of.  Did Harry Connick have an

14  unconstitutional policy?  Was Harry Connick deliberately

15  indifferent to the training, monitoring and supervision of his

16  staff?

17      Mr. Banks spoke for a half an hour, ladies and gentlemen,

18  and didn't talk about the two important things, the two important

19  things that when the Judge gives you his instructions, you'll

20  see.  That's what this is really about.

21      There's an old saying in marketing that what you do is you

22  don't sell the steak, you sell the sizzle.  So when you watch a

23  commercial on TV, you can hear the steak sizzling and you can

24  imagine what it's going to taste like.  And they do that to

25  really get you in.  But they are not selling the steak.  What you

1    got, ladies and gentlemen, was the sizzle.  Let me talk about the

2    steak.

3         Mr. Banks started off talking about Mr. Glas, and he praised

4    Mr. Glas as being a wonderful young man, and he is.  But even

5    Mr. Glas told you, ladies and gentlemen, that he had never, let

6    me repeat that, never handled a Grand Jury before in his entire

7    career.

8         He also told you, ladies and gentlemen, that he really was a

9    minor player with respect to the Grand Jury.  He told you he was

10   not allowed to talk the lawyers or any other main witnesses in

11   the case.

12        Now, Mr. Glas did something that young people sometimes do:

13   They are angry with what the boss wants to do, they have their

14   opinion, and they make the fatal mistake of shouting at the boss.

15   And that's what he did.  And then after he shouted at the boss,

16   he said, I'm going to threaten to quit if you don't change your

17   mind.  Well, the boss didn't change his mind, so Mr. Glas quit.

18        Now, it has been suggested that all of the Louisiana lawyers

19   involved in case are two things:  One, they are dumb, and two,

20   they are corrupt.  I suggest to you, ladies and gentlemen, you

21   had an opportunity to see all the lawyers involved take the

22   stand.  They are very intelligent people.  They went to college,

23   they went to law school, and, ladies and gentlemen, every person

24   who testified, even John Jerry Glas said, I was trained.

25        Now, Mr. Thompson's lawyers want you to believe that the

1   standard is formal training.  That's not the standard, ladies and

2   gentlemen.  The evidence showed that everybody who went through

3   Harry Connick's office, all 700 lawyers had on-the-job training.

4        Now, let's look at it.  Most people are trained on the job.

5   People get a job, somebody more senior explains to them what the

6   job is about, and each day they learn a little bit more about the

7   job.  That's what happened in the case of the District Attorney's

8   Office.

9        Now, training, how did it go on?  Junior came on staff, was

10  paired off with a senior attorney.  In addition, they had another

11  level of supervision and training.  There was a chief of trials.

12  All the people had to what?  Pretry cases.  They mentioned that.

13  But they try and act as if that wasn't a form of training, ladies

14  and gentlemen.  Obviously it was.  Every witness who took the

15  stand told you that it was.  And it's obvious, common sense tells

16  us, if you get a job, they pair you with a more senior person.

17  You can be a mechanic, junior mechanic, and they pair you with a

18  senior mechanic.  And you're not allowed to do different things

19  until you are ready.  Take John Jerry Glas, he had been there two

20  years.  He wasn't ready to do a Grand Jury.

21        Now, in his testimony, John Jerry Glas admitted two things:

22  The first thing he admitted was that it was within the discretion

23  of Mr. Connick as district attorney to commence a Grand Jury or

24  to stop a Grand Jury.  He was also asked on the witness stand to

25  comment about Mr. Connick's actions.  And he said, I cannot

1   comment on that.

2        Now, one thing I think everybody realizes:  You get two

3   lawyers in a room, you get two versions of an opinion.  You get

4   three lawyers in a room, you get three versions of something.

5        What is important in this case, ladies and gentlemen, is

6   whether or not the situation involving Jerry Deegan's hiding of

7   evidence ever came out.  Not a single witness, ladies and

8   gentlemen, disputes the fact that a hearing was held before Judge

9   Patrick Quinlan, a judge of Criminal District Court in June of

10  1999.  And at that hearing, everybody got to testify, everybody

11  got to participate, everybody got to say what they did, they

12  didn't do, et cetera.

13       Now, the only thing we know for sure, ladies and gentlemen,

14  is that Jerry Deegan stole the blood evidence and did whatever he

15  did with it.  He probably destroyed it.  We don't know.  But the

16  evidence, ladies and gentlemen, left us because of Jerry Deegan.

17       You heard Michael Riehlmann testify, Jerry Deegan's best

18  friend.  He said his friend was dying of colon cancer and his

19  friend had to confess something to him.  And he told him, I

20  suppressed blood evidence in the John Thompson case.

21       He didn't say, ladies and gentlemen, we suppressed blood

22  evidence.  Mr. Thompson's attorneys would have you believe there

23  is some evidence in this case that somebody found that Dubelier,

24  Williams and others had all been involved in this.

25       Now, initially, there was a conspiracy claimed in this case.

1  There is no longer a conspiracy claimed.  So I suggest to you,

2  ladies and gentlemen, that any contention by Mr. Banks that

3  somehow everybody was, quote, in cahoots against Mr. Thompson is

4  just not the case.

5      Now, what about the policy?  In my opening statement I told

6  you that Mr. Connick's policy was very simple.  His policy was,

7  Obey the law.  If the law requires you to turn over evidence to a

8  defendant, turn it over.

9      Now, everyone who took the stand says they had no policy.

10  The only policymaker was Harry Connick.  When the Judge gives you

11  the jury instructions, he's going to tell you, he has found the

12  only person in the office who was a policymaker was

13  Harry Connick, just like I told you, ladies and gentlemen, in my

14  opening statement.  The only policymaker was Harry Connick.  His

15  policy was, Obey the law.

16      Now, Mr. Banks suggests that Mr. Connick should have had a

17  written policy that says, *Brady* is X.  Well, ladies and

18  gentlemen, you heard from Mr. Lawless, that was the legal expert,

19  the guy from CNN TV.  He testified that *Brady* came into existence

20  in the 1960s and over the course of the years, *Brady* kept

21  changing and changing, got little twists and nuances, okay, and

22  so that the law is an ever-evolving body of work.

23      If Mr. Connick had said, This is *Brady* today, their argument

24  would be, Aha, you didn't change it because *Brady* changed the day

25  after.

1    And I suggest to you, ladies and gentlemen, that

2  Mr. Connick's policy was actually the only policy you can have.

3  Who are we dealing with?  We're not dealing with people

4  unaccustomed to the law.  We're dealing with assistant district

5  attorneys, persons who have spent three years in law school.

6  Persons who have taken courses such as criminal law, criminal

7  procedure, constitutional law, legal ethics, persons who are

8  required to apprise themselves of the law, to research the law,

9  keep current on the law.  That's their job, that's their

10 occupation, that's their profession.

11    So when Mr. Connick says, Obey the law, a lawyer working for

12 him has an obligation to do what?  Not just say, I knew what

13 *Brady* was two weeks ago.  No.  Let me see if there has been a

14 change by the Supreme Court of the United States, by the Supreme

15 Court of the State of Louisiana, by the Fifth Circuit Court of

16 Appeals, by any court.  Let me see on this particular matter I'm

17 dealing with what the law is today.

18    That's why Mr. Connick's policy, ladies and gentlemen, said,

19 Obey the law, and if the law tells you to do something, do it.

20 He did not box himself in because he realized, ladies and

21 gentlemen, he's a very smart man, he realized that the law always

22 changes.  And so you have to look at what the law is at a certain

23 point in time.

24    The other thing that the plaintiffs have to prove, and there

25 has been no evidence of it in this case, ladies and gentlemen, is

1   that Harry Connick was deliberately indifferent.  All right.  He

2   intentionally, willfully decided, training is not important.

3   Monitoring is not important.  Supervision is not important.

4        Now, the evidence shows, ladies and gentlemen, that quite

5   the contrary, when Harry Connick took over as district attorney

6   in 1974 from Jim Garrison, the first thing he did was make major

7   reorganizations of the office.  He told you about them from the

8   stand.

9        One of the things he did was he came in with a screening

10  process.  And if you noticed, he had not just one person doing

11  screening, he had a chief screener, and then underneath that

12  person he had a homicide screener, a robbery screener, other

13  screeners.

14       And the purpose of that, ladies and gentlemen, was to make

15  sure that a citizen was not charged with a crime unless they

16  should be charged with a crime.

17       You heard testimony from Mr. Connick.  He told you from the

18  stand that his predecessor took all the cases that came in.  And

19  they prosecuted about 80 percent of all the cases that came in.

20  With Mr. Connick's screening approach, what happened was this:

21  That dropped down from 80 percent down to 45 or 50 percent.

22  Mr. Connick told you, no one disputed that.

23       Why is that important, ladies and gentlemen?  What happens

24  is this:  People get arrested by the police.  If they can't make

25  bond, they stay in jail until charges are filed.  Under

1   Mr. Connick's system, if it was determined that you should not be

2   sitting in jail, that there was no way to prove a case against

3   you, you were let out and you were free.  Protecting the

4   constitutional rights of citizens.

5        Now, the District Attorney of the Parish of Orleans and

6   every other parish has a lot of discretion.  By discretion,

7   obviously, you know, they have a choice.  They can go left, they

8   can go right.  When Mr. Banks and Mr. Cooney presented evidence

9   to Mr. Connick in April of 1999 showing that one of Mr. Connick's

10  former assistants, Jerry Deegan, had done something bad, and I

11  told you in my opening statement that we admit that Jerry Deegan

12  did something bad, he stole evidence, he suppressed evidence.

13       When Mr. Connick was put on notice of this, the testimony

14  from the witness stand, every witness said, he acted immediately

15  to investigate whether or not the evidence presented by Mr. Banks

16  and Mr. Cooney was legitimate.  And you heard Jerry Glas.  He

17  said when he first heard about it, he thought it was fake.  And

18  to quote him, he said, Well, if they were really serious and had

19  something, they would have been on the steps of the courthouse

20  with the news reporters.  And so he thought that, that, Ah, there

21  is nothing really there.  He thought that maybe somebody had done

22  something to doctor the evidence up.

23       Now, so you needed an investigation and that's what

24  Mr. Connick did.  And it was a quick investigation to determine

25  whether or not action should be taken to do what?  Stop

1   Mr. Thompson's execution.  It said, ladies and gentlemen, that

2   you determine the measure of a person not by what they say but

3   what they do.

4        If Harry Connick was bent on just getting prosecutions and

5   bent on getting people executed, he would not have asked that

6   Mr. Thompson's execution be stopped.

7        Now, not only did he ask that it be stopped, he also

8   marshaled the troops, filed a motion with Judge Quinlan asking

9   that, what?  The armed robbery conviction be thrown out.

10        Now, you've heard testimony, unrefuted testimony about this

11   hearing.  Everybody appeared at the hearing, and at the

12   conclusion of this hearing, which was public, open to the public,

13   contrary to the assertion by Mr. Banks that they were trying to

14   hide and be secretive about it, in a public, open hearing like in

15   this courtroom where people can come in and hear, Judge Quinlan

16   decided to set aside the conviction.

17        Now, at that point, Mr. Connick, the district attorney, had

18   discretion.  Mr. Connick could have re-filed charges and said,

19   Well, let's do it all over again.  But he didn't.  Why?  Because

20   he concluded that the evidence was such that there was a high

21   probability that Mr. Thompson did not commit the offense.  And

22   since there was such a high probability that he didn't,

23   Mr. Connick did the right thing once again and did not re-file

24   charges.

25        Now, comment was made by Mr. Banks about the testimony of

1  Val Solino, and he says, and he refers to Mr. Solino's deposition
2  testimony where Mr. Solino allegedly said he wouldn't turn over
3  certain evidence.  Excuse me.  If you remember, ladies and
4  gentlemen, during Mr. Solino's testimony on the stand, he said,
5  No, wait, stop.  What I meant was, I would not have turned it
6  over right then.  I would have done some additional things.  And
7  then he explained to you that ultimately, he would have turned it
8  over.  So I suggest to you that using his deposition testimony,
9  without presenting to you, ladies and gentlemen, his explanation
10 on the stand is a bit disingenuous.

11      There is no evidence in this case, ladies and gentlemen,
12 that because of policies of Harry Connick, assistant district
13 attorneys did bad things.  Quite the contrary.  The evidence in
14 this case shows that Mr. Connick's policy was to do the right
15 thing.

16      If any assistant district attorney, ladies and gentlemen,
17 any, whether it's Jerry Deegan, whether it's Dubelier, whether
18 it's Williams, anybody, if any assistant district attorney did
19 not turn over *Brady* evidence, they did it in violation of
20 Harry Connick's policies, not implementing his policies.

21      In order to win in this case, ladies and gentlemen, the
22 plaintiffs have to show that Harry Connick had an
23 unconstitutional policy and that the harm that was suffered by
24 the plaintiff resulted from employees of the District Attorney's
25 Office implementing that unconstitutional policy.  They can't

1  show that.  Alternatively, ladies and gentlemen, they have to

2  show that Harry Connick deliberately, was deliberately

3  indifferent with respect to training, that he didn't care about

4  training, that the training that he had was not real training.

5  It was a sham.

6      Well, ladies and gentlemen, if the training that

7  Harry Connick gave was such a sham, how come everybody wanted

8  Harry Connick's employees?  How come the U.S. Attorney's Office

9  wanted Harry Connick's employees after they've served three

10  years?  How come some of these employees have gone on to be

11  judges at the courthouse on Tulane and Broad in New Orleans and

12  at the courthouse over here?  If they are such bad people, ladies

13  and gentlemen, and if Harry Connick's policies are so bad, why

14  did everybody want Harry Connick's employees?

15      They wanted Harry Connick's employees because they were

16  trained, they had a lot of experience trying cases, and they were

17  good and honorable people.

18      Let's talk a little bit about damages.  Dr. Grassian took

19  the stand.  He was the doctor who testified in this case for

20  Mr. Thompson.  And he said that Mr. Thompson had posttraumatic

21  stress disorder.  If you remember, he and I had little exchanges

22  going on when I examined him.

23      And I asked, I said, Well, Doctor, when somebody has

24  posttraumatic stress disorder, can they, can that result in them

25  not being able to function?  He said, Yes.

1      I said, Does John Thompson function?  Yes.

2      He talked about people with posttraumatic stress disorder

3  having delirium.  I said, Does John Thompson have delirium?  No.

4      He talked about psychosis.  I said, Does John Thompson have

5  psychosis?  He said, No.

6      I asked him, I said, Well, people who have posttraumatic

7  stress disorder, can they become addicted to drugs and alcohol?

8  He said, Yes.  I said, Is John Thompson addicted to drugs and

9  alcohol?  He said, No.

10      I suggest to you, ladies and gentlemen, that regardless of

11  whether or not the doctor's diagnosis is correct, John Thompson

12  does not suffer from the bad things that that diagnosis suggests.

13  He doesn't suffer from it.  He copes.

14      The doctor, in his testimony, if you recall, ladies and

15  gentlemen, I asked him, I said, Well, he said that John Thompson

16  was terrified when he was at Parish Prison because he was on the

17  tier with all the prisoners who had nothing to lose.  I said,

18  Well, Doctor, if John Thompson was terrified and fearful and on a

19  tier with all these people that had nothing to lose, how could

20  John Thompson get elected by these dangerous people as the tier

21  representative?  And he laughed, if you recall, he said, Well,

22  that's just John Thompson.  That's how John copes.

23      And we went through other things, and he said every time

24  there is some challenge in his life, John Thompson copes.

25      John Thompson's good friend, Nick Trenticosta, took the

1    stand.   Nick Trenticosta, who was previously a lawyer for

2    Mr. Thompson in this case, as you recall his testimony, Nick

3    Trenticosta on cross-examination by my law partner, Mr. Goins,

4    admitted that six months after John Thompson was released from

5    prison, Mr. Trenticosta was interviewed by *Gambit*, which is a

6    local newspaper here, and told them that he thought Mr. Thompson

7    was mentally healthy.

8         Now, I don't know if you did the calculations, ladies and

9    gentlemen.   Mr. Banks didn't give you the big number.   I think he

10   figured you would have been shocked if you did, but what

11   Mr. Banks said was, you should give Mr. Thompson a thousand

12   dollars a day for every day that he was in prison.   Eighteen

13   years, 365 days, I'm doing the math quick, but it comes out to

14   about $6.6 million.

15        Now, ladies and gentlemen, $6.6 million may be the amount

16   that John Thompson gets from the movie deal that you-all heard

17   about, but clearly, ladies and gentlemen, $6.6 million is just a

18   figure pulled completely out of the air.   This, in terms of

19   damages, is a personal injury case, ladies and gentlemen.   And

20   normally in a personal injury case, the lawyers will present

21   evidence of lost wages, et cetera.

22        Well, we have no legitimate lost wages.   Why?   Because

23   John Thompson, by his own admission, was a drug dealer.   He sold

24   marijuana and PCP.   Ladies and gentlemen, you don't get a W-2

25   when you're a drug dealer.

1     Now, you don't see medical bills in here.  You don't see

2 doctors other than Dr. Grassian saying, John Thompson is really

3 messed up.  He has been seeing me twice a week for the last four

4 or five years since he got out of jail.  You didn't hear none of

5 that.

6     You don't see any doctor saying, Ladies and gentlemen,

7 John Thompson is going to have to see me for the rest of his

8 life, and it's going to cost X amount of dollars per year.  You

9 didn't hear any of that.

10     What did you get from Mr. Banks?  He pulls a figure, ladies

11 and gentlemen, completely out of the air and, ladies and

12 gentlemen, he's scared to multiply it for you and give you the

13 big number, because even he knows, My God, that number has no

14 relationship to anything.

15     Now, I told you in my opening statement, ladies and

16 gentlemen, that we had a figure, the defendants had a figure that

17 we thought John Thompson deserved in the case, and our figure was

18 zero.

19     Now, why did we come up with a figure of zero?  We come up

20 with a figure of zero, ladies and gentlemen, because the

21 plaintiff has not met his burden.  The plaintiff has a burden,

22 and the Judge will instruct you in his jury charges, that the

23 plaintiff must prove his case by a preponderance of the evidence.

24     What that means is that if a fact is at issue, it's more

25 likely than not that that fact is true.  So if you take the

1   scales of justice, ladies and gentlemen, put them even, if it

2   tips one way in favor of the plaintiff, the plaintiff should win,

3   if it tips in favor of the defendant, the defendant should win.

4        Now, what has the evidence shown?  The evidence has shown

5   that Harry Connick had a policy, his policy was constitutional.

6   They have not been able to show that any actions taken were taken

7   because Harry Connick had an unconstitutional policy.

8        The fact that Jerry Deegan, Dubelier, Williams, et cetera,

9   worked for Harry Connick is irrelevant, ladies and gentlemen.

10  What is relevant is whether or not anything that they did, they

11  did because Harry Connick's policy was unconstitutional and they

12  were acting in furtherance of that policy.  Or, ladies and

13  gentlemen, they acted because of the alleged defective training

14  of Harry Connick, the defective monitoring, the defective

15  supervision.

16       Let's talk a little bit about supervision.  In

17  Harry Connick's office, everybody except Harry Connick had a

18  supervisor.  Well, let me change that.  Even Harry had a

19  supervisor.  Harry's supervisor was the voters of the Parish of

20  Orleans.  And he had to be evaluated by them every six years.

21       But below his level, everybody in the office had a

22  supervisor.  They tried to suggest to you that Dubelier and

23  Williams were somehow on their own.  The evidence shows, ladies

24  and gentlemen, that Dubelier and Williams were under the

25  jurisdiction of the first assistant.  Such that, ladies and

1    gentlemen, they could have discussed cases, issues with their

2    what?  Supervisor.

3         This was a very high-profile case.  When Ms. Bane took the

4    stand, what she said, when she was chief of trials, the issue was

5    not whether you won or lost the case, but whether or not you were

6    prepared and you discussed the case with your supervisor

7    beforehand.

8         Sort of CYA as the saying goes.  And I suggest to you,

9    ladies and gentlemen, that these people were smart.  They knew

10   that if they had a high-profile case, the brutal murder of

11   Ray Liuzza, the brutal carjacking of the three LaGarde teenagers,

12   they better to talk to their supervisor before they go into

13   court.  Because if they go into court and the supervisor doesn't

14   know about it and they lose, they had to answer and they had to

15   answer to that man right there:  Harry Connick.

16        Now, ladies and gentlemen, the Judge will tell you in the

17   instructions that if you make an award in this case of a dollar

18   amount, Mr. Connick will not be held personally liable.  He's

19   being sued in this case in his official capacity.  Who will have

20   to pay, however, are the taxpayers through the District

21   Attorney's Office.

22        Why then is Mr. Connick, 80 years old, back here?  If you

23   find fault in this case, it won't cost him any money, ladies and

24   gentlemen.  Why is he here?  Harry Connick was the elected

25   district attorney of the Parish of Orleans for 29 years.

1    Harry Connick did a good job.  Harry Connick is proud of the job

2    he did.  Harry Connick received awards from the Attorney General

3    of the United States and other people.

4        Harry Connick is here, ladies and gentlemen, because this is

5    about Harry's legacy.  This is about Harry's reputation.

6    Mr. Banks made light of the fact that during his testimony,

7    Mr. Dubelier cried.  He cried, if you recall, because he has two

8    children.  And he doesn't want his children to ever think that he

9    did something bad.  That's why he cried.

10       Now, Mr. Connick has two kids.  Mr. Connick has a lot of

11   friends.  A number of them have been coming in and out of this

12   courtroom as the trial is going on.  This is an important case to

13   Harry Connick because this case, ladies and gentlemen, determines

14   how people think of Harry Connick from tomorrow forward.  In

15   terms of John Thompson, ladies and gentlemen, this is about

16   money.

17       And as he testified, he's got a movie deal.  And if you

18   recall, my law partner, Mr. Goins, asked him if he had a movie

19   deal.  And then his attorneys tried to clean it up and said,

20   Well, John, tell the members of the jury, you know, what you got.

21   And at first he said, What I tend to get?  What could I, you

22   know, suggesting overall.  He said, No, no, what have you gotten

23   so far?  I think he said $31,000.

24         Well, ladies and gentlemen, if the script is finalized

25   and they do the deal, I'll let you do the math on how many

1    Benjamins one can make from a movie deal --

2         MR. BANKS:  Your Honor, I can object to this.  There is

3    no evidence.

4         THE COURT:  Sustained.  Sustained.  Absolutely.  There

5    is no evidence of what Mr. Aaron just said, and it's an improper

6    argument to comment on something that's not in evidence.  There

7    is no evidence of that at all.  Okay, go ahead, Mr. Aaron.  I ask

8    the jury to disregard Mr. Aaron's statement.

9         MR. AARON:  And I apologize for that in the heat of the

10   moment.

11        My point is this though, ladies and gentlemen, the evidence

12   with respect to damages shows that John Thompson has gotten out,

13   unlike most prisoners, he's gotten jobs.  Unlike most prisoners,

14   within 44 or 45 days of getting out of jail, he met someone, he's

15   married the person.  His life is stable.  And I suggest to you

16   that he is coping, ladies and gentlemen, with whatever life has

17   thrown to him thus far.

18        Now, after the Judge reads the jury instructions to you and

19   you go back into the jury room to deliberate, you'll be given a

20   special verdict form, and that form, ladies and gentlemen, will

21   ask you three questions.  The first question will be, Was the

22   *Brady* violation in the armed robbery or any infringement of John

23   Thompson's rights in the murder trial substantially caused by an

24   official policy of the district attorney?  I think based on the

25   evidence in this case, ladies and gentlemen, the appropriate

1    answer would be no.

2        The second question you will have to deal with, ladies and

3    gentlemen, is this:  Was the *Brady* violation in the armed robbery

4    case or any infringement of John Thompson's rights in the murder

5    trial substantially caused by the district attorney's failure

6    through deliberate indifference to established policies and

7    procedures to protect one accused of crime from those

8    constitutional violations?  Once again, ladies and gentlemen, the

9    appropriate answer would be no.

10       Finally, ladies and gentlemen, the question states, Please

11   state what sum of money, if any, would reasonably and fairly

12   compensate John Thompson for damages he has actually suffered or

13   is reasonably likely to suffer in the future as a result of the

14   district attorney's policies or deliberate indifference.  I

15   suggest to you, ladies and gentlemen, based on the facts and the

16   evidence in this case, the appropriate amount is zero.

17       Before I sit down, ladies and gentlemen, there are a couple

18   of things that I need to comment on that were made by Mr. Banks.

19   With respect to the murder trial, there was a lot of testimony

20   back and forth about the length of the perpetrator's hair,

21   whether it was short-cropped, it was short, it was a short Afro,

22   whatever.

23       I think what you saw, ladies and gentlemen, is that the

24   evidence in this case shows that at the actual trial itself,

25   Mr. Thompson's court-appointed attorney, Mr. Couhig, in his

opening statement said, ladies and gentlemen, that there's a difference between the length of hair, and I believe he referred to it as bushy, of John Thompson and the length of hair of Kevin -- I think he referred to him as Kojak Freeman.

The evidence will show, ladies and gentlemen, that the witnesses who testified, Mr. Schliffka, who said that the person was six-foot tall with short hair, testified at the trial.  The, Mr. Thompson's attorneys were allowed to cross-examine him on the issue of hair length.

The other thing they suggest, ladies and gentlemen, deals with the award, whether or not there was an award in the case. And I think you'll remember from Mr. Couhig's opening statement to the jury, ladies and gentlemen, he was aware of the fact that there was a reward in the case.

Now, I think I was given about 45 minutes, and, ladies and gentlemen, I don't think I need it all.  On behalf Mr. Connick, on behalf of his defense team, on behalf of the District's Office, I thank you for your time and attention.  I apologize to you and the Court if I said anything that was inappropriate. Don't hold that against my client.  Mr. Connick is a good and honorable person.

And I think, ladies and gentlemen, the evidence in this case has shown that the evidence in this case has shown two things: That Mr. Connick had a constitutional policy and that Mr. Connick had appropriate training, monitoring and supervision.

1     Thank you, ladies and gentlemen.

2          THE COURT:  Thank you, Mr. Aaron.  Mr. Banks.

3                    CLOSING ARGUMENTS

4  BY MR. BANKS:

5     No, Mr. Aaron, I don't agree.  I don't agree that this case,

6  the reason we're here is about Mr. Connick's legacy.  It's about

7  John Thompson.  It's about what happened to John Thompson.  Not

8  Mr. Connick's legacy or not Mr. Dubelier's legacy.  And I don't

9  agree that it's about Jerry Deegan.  I don't believe it.  They

10 are still trying to say Jerry Deegan was the only bad guy and

11 blame him and isolate him.  I can't imagine.

12    I do agree with something Mr. Aaron said, where he said,

13 It's not about what they say; it's about what they do.  He's

14 right.  It's what they did.  It's what they did in 1985.  It's

15 what they did in 1999.

16    In 1999, when they had all the evidence, it wasn't what they

17 were saying to the media when they met with the reporter.  It's

18 what they did.  They shut down the Grand Jury.  Mr. Connick shut

19 it down.  And they continued to punish Mr. Thompson for four more

20 years by fighting every attempt he made to get a new trial.

21    And I agree it's about the policy.  You know, let's talk

22 about the policy for just a moment.  The police reports.  We

23 discussed that.  The policy of not producing the police reports.

24 Mr. Connick said, and this is a quote from his deposition.  When

25 he's on the record in this case, like when he was talking about

1  the crime lab report, he said, "I think photographs and police

2  reports should be shown to the defense."

3       That's a nice statement to make in court.  But it wasn't the

4  policy of his office.  Here's what Mr. Williams said.  I pull his

5  quote, but Whittaker, Solino and Dubelier were identical.

6       I asked Mr. Williams, "For example, things like witness

7  statements, things that witnesses told to the police, were

8  written up and signed.  Those were not typically turned over,

9  were they?"

10       "Answer:  That's correct."

11       "And police reports, things like police reports that showed

12  the history of the police investigation, from the time police

13  started looking at the crime up through the time of the arrest,

14  those reports could be lengthy, right?"

15       "Answer:  Yes."

16       "But they were not typically turned over to the defense by

17  the Orleans Parish District Attorney's Office, were they?"

18       "In 1985, that's correct."

19       And here is the big question:  "And that was because of the

20  policy set at the top of the office by Mr. Connick as the

21  district attorney, right?"

22       "Answer:  That's correct."

23       That was the policy.  It was a policy of nonproduction.  And

24  that policy of nonproduction hid the truth for way too long.

25       Mr. Aaron is right.  The Judge is going to ask you not, Were

1  people good people or bad people?  He's going to ask some

2  standards, some questions based on the law that the Judge will

3  tell you.  And I'm not trying to substitute this for the law, but

4  these are the questions.

5      First, was the DA's failure to train or supervise a

6  substantial factor in causing the *Brady* violation?  And you'll

7  get a written copy of the Judge's instruction after he gives it.

8      Or second, either one of these is a basis of liability.  Was

9  there a policy, a practice, a custom that was a substantial

10  factor in causing the violation?

11      Now, the defendants are liable if the training or

12  supervision was inadequate, the failure to train and supervise

13  was deliberate indifference, and that failure was a substantial

14  factor in the *Brady* violations.

15      Okay, so that's it.  That's the questions.  That's the

16  standard to see if the defendants are liable.  Was the training

17  inadequate?  Was the failure to train deliberate indifference

18  from the top?  Let's go to the next slide.

19      These are the facts that you have.  These are the only

20  facts.  You can't contradict this.  There were stipulations,

21  agreements by everyone in this case, and evidence on the record.

22  There were no *Brady* training sessions.  None.  Not for any of the

23  prosecutors who were involved in the Thompson case.

24      I respect Ms. Bane and maybe she trained some of the juniors

25  at that time, the new kids coming in in '85, but she didn't train

1    the people who were involved in prosecuting Mr. Thompson.

2        There was no guidance, and more importantly, not only did

3    they not tell you what was *Brady* and what wasn't, instead of that

4    cheesy policy they adopted two years later.  There was no

5    message.  None.  There was no training that gave a message that

6    said, Bruce Whittaker, Jim Williams, Eric Dubelier, we really

7    mean it.  This is the law and we really mean it.  You better

8    follow it.  Not just, You went to law school; figure it out, but

9    you better follow it.

10       There was no policy manual at all.  That's stipulated.  It's

11   agreed to.  And finally, two years later, when they did write a

12   policy manual that captures as Mr. McElroy told us, all these

13   memos that had been floating around, it was dead wrong.

14       What does that tell you?  How can they have a policy of

15   complying with *Brady*, when they finally wrote it up and got it

16   wrong?  Doesn't that explain to you why all these witnesses who

17   took the stand here had such different views of what *Brady*

18   required and whether the crime lab report was even *Brady*

19   material?  Because whose training did they get?  They got the

20   Orleans Parish District Attorney's Office training.  They got

21   that policy manual, and that's what they knew.

22       There was no testimony from Williams or Dubelier of any

23   supervision or training.  And the training, whatever they had,

24   was clearly inadequate.

25       This is what I just alluded to.  Mr. Connick said, on the

1    stand, anyway, not in a closed-door room but on the stand, The

2    crime lab report, it's *Brady* even if you don't know

3    John Thompson's blood type.  But Val Solino, the guy who has been

4    in that office and who handled Thompson's case for 14 years, the

5    one that Eddie Jordan sent down as the official representative to

6    state their policy, said the opposite.

7         Now, Mr. Aaron suggested to you, Well, I left out something.

8    Mr. Solino actually testified that he would have gone back and

9    done some spin and maybe done some digging and maybe produced it

10   later.

11        Folks, the crime lab report surfaced two days before the

12   trial.  When does he think it should have been produced?  It's

13   *Brady* material when you find it.  It's a fact the crime lab

14   report shows that scientific evidence was determined based on

15   testing of a fabric that had blood.

16        You can do all the testing you want later.  You can get

17   Mr. Thompson tested later.  You can find out more about where

18   that was, where it was all these years, where it was between

19   January and April of 1985, but what *Brady* says is you turn it

20   over because it's not spin.  It's not lawyer arguments.  It's

21   facts.

22        I talked about how senior DAs were inconsistent.  I told you

23   a little bit about this.  This is more evidence of the confusion

24   at the top of the lack of a policy of deliberate indifference.

25   We talked about the police report containing Paul Schliffka's

1  description.  You saw it, Exhibit 30 and Exhibit 5.  We saw it

2  again and again.  Police documents.

3       And Mr. Cooney, my partner, asked Mr. Connick, Would you

4  have to turn over this stuff?  Would you have to turn over this

5  material?  He actually asked Mr. Connick, Mr. Connick, would you

6  agree with me that the description in the crime lab report,

7  six feet tall with close-cut hair was inconsistent with the

8  picture of Thompson?  I don't need to show you that picture

9  again, that big bushy Afro.

10      And Mr. Connick said, Yeah, that's inconsistent.  But

11  Mr. Dubelier, the number three guy in the office, he stood up on

12  the stand and said, Nope.  Perfectly consistent.  Big bushy Afro.

13  Short-cut hair.  Same thing to him.  And he said you didn't have

14  to turn that over.  Does that tell you that there was a clear

15  policy?  Does that tell you there was training?  It tells you

16  there was deliberate indifference.  There was no supervision

17  here.

18      I talked about this already, the pretrial requirement.  This

19  is part of the standard.  Was there adequate monitoring or

20  supervision?  And it's nice to have pretrials.  It's a wonderful

21  theory.  It's a good idea.  But it doesn't work if the policy is

22  we're not going to train Williams, we're not going to train

23  Whittaker, we're not going to train Dubelier.  It's only a policy

24  if you apply it.  And whatever policy there may have been about

25  pretrials, there were too many people who were excused from it.

1    You're going to hear the Judge tell you something about

2  choice.  Mr. Connick admitted he knew that ADAs, assistant

3  district attorneys, would have to make choices.  They would have

4  to make decisions.  We've all heard that it's not clear, at least

5  to these people, not Jerry Glas, but to these people what *Brady*

6  material is.

7    So you have to make a difficult choice about that.  Not just

8  difficult because you may not know whether it's *Brady* material.

9  It can be a difficult choice because of the pressure on

10  prosecutors to convict.

11    I asked Bruce Whittaker, What was a prosecutor's job?  He

12  didn't say, Do justice.  He didn't say, Get the truth out.  He

13  said, Get convictions.  That was the policy.  The policy in the

14  office was get convictions.  And prosecutors had choices to make.

15  Am I going to get a conviction or am I going to disclose *Brady*

16  material?  And those difficult choices had to be made with no

17  guidance, no instruction, no message that we take this really,

18  really seriously.

19    The Judge will explain that when you're looking for a

20  policy, if you're trying to find one, if there's a policy other

21  than get convictions, don't produce police reports, it's not

22  necessarily what's written up.  It's not that '87 manual.

23    A policy is a custom, it's a practice.  It's when there is

24  similar conduct from multiple actors.  These are words the Judge

25  will use.

1    It's not just a single rogue DA.  What you heard here was a

2  practice.  Dubelier and Williams told you they didn't produce

3  police reports because that was the policy.  That's the way they

4  did it.  And no one had to write it up because they knew it.  And

5  they followed that religiously.

6    All this put together gave us a very toxic mix of

7  ingredients.  The deliberate indifference, the lack of training,

8  the lack of supervision created this little poison stew with no

9  meaningful guidance about *Brady* and utter confusion among the

10  people you heard from.  And no message, We really mean it.

11    You had these untrained, completely untrained, fairly

12  inexperienced DAs, Dubelier, Williams, these guys had been there

13  four or five years at most.  They were in their 20s at the time.

14  And they were extremely powerful.  They had the power because

15  Mr. Connick stopped reading cases, because he didn't train.  He

16  gave them the sole and exclusive authority to determine what's

17  *Brady*.  What are you going to turn over?  What are you going to

18  do to bring the truth out?  That power is extraordinary.  They

19  had the power to hold John Thompson's life in their hands.  And

20  no one told them how to do it the right way.

21    I told you this is about truth.  It is, and truth goes

22  hand-in-hand with something else.  Truth and justice go together.

23    There is another thing that Mr. Aaron was wrong about.  I'm

24  not afraid to tell you what the number is that I think is right.

25  But it's not what I think is right, it's what you think is right.

1   That's really all that matters.  He said I was afraid to put a

2   thousand dollars a day for 6,686 days in front of you.

3   $6.68 million.  I'm not.  What I'm telling you is, I think that's

4   too low.  I told you, I can't imagine for that level of suffering

5   that this would compensate Thompson fairly.  I didn't think a

6   million dollars a year would do it.  But it's not me.  It's you.

7   Because we have this wonderful system here.  We really do.  I

8   don't get to decide this.  Mr. Aaron, Mr. Carver, Mr. Cooney,

9   Mr. Litvin and even Judge Barbier, we don't get to mete out

10  justice.  You do.  You get to decide what's fair, and we're not

11  going to have any more of what happened for so long.  We're not

12  going to have jurors making decisions without the facts.  Because

13  I know you people are fair.  I know you respect justice.  I know

14  you respect the law.  I hope you respect John Thompson.  I hope

15  that you compensate him fairly.  It's a decision for you to make.

16  An important one.  It's not just about the money.  It's about

17  justice.

18       Thank you.

19            THE COURT:  Okay.  Thank you, Mr. Banks.

20            MR. BANKS:  Thank you, Judge Barbier.

21            THE COURT:  Now, we're going to hand out, ladies and

22  gentlemen, copies of my written legal instructions.

23       All right.  Ladies and gentlemen, you have a copy of my

24  legal written instructions.  I'm going to invite you to follow

25  along if you care to.  It's not mandatory.  Some people find it

1   easier to go off and understand if you're not only listening but

2   you're also reading along at the same time.  Whether you do or

3   you don't, you'll be able to take these with you back into the

4   jury room in a few minutes when you go back to deliberate.

5       Members of the jury, you have heard the evidence in this

6   case.  I will now instruct you on the law which you must apply.

7   You are not to single out one instruction alone as stating the

8   law, but you must consider the instructions as a whole.

9       It is your duty to follow the law as I give it to you.  On

10  the other hand, you, the jury, are the judges of the facts.  Do

11  not consider any statement that I may have made in the course of

12  the trial or make in these instructions as any indication that I

13  have any opinion about the facts of this case.

14      You have heard the closing arguments of the attorneys.

15  Statements and arguments of the attorneys are not evidence and

16  are not instructions on the law.  They are intended only to

17  assist the jury in understanding the evidence and the parties'

18  contentions.

19      The verdict must be based only on the evidence in the case.

20  You cannot be governed by sympathy or prejudice or any motive

21  whatsoever except a fair and impartial consideration of the

22  evidence and you must not allow any sympathy that you may have

23  for any party to influence you in any degree in arriving at your

24  verdict.

25      This case should be considered and decided by you as an

 1   action between persons of equal standing in the community and
 2   holding the same or similar stations in life.  A local
 3   governmental office and all other persons are equal before the
 4   law and must be treated as equals in a court of justice.

 5        Now, in determining the weight to give to the testimony of a
 6   witness, you should ask yourself whether there was evidence
 7   tending to prove that the witness testified falsely concerning
 8   some important fact or whether there was evidence that at some
 9   other time the witness said or did something or failed to say or
10   do something that was different from the testimony the witness
11   gave before you during the trial.

12        You should keep in mind, of course, that a simple mistake by
13   a witness does not necessarily mean that the witness was not
14   telling the truth as he or she remembered it, because people may
15   forget some things or remember other things inaccurately.  So if
16   a witness has made a misstatement, you need to consider whether
17   that misstatement was an intentional falsehood or simply an
18   innocent lapse of memory.  And the significance of that may
19   depend on whether it has to do with an important fact or with
20   only an unimportant detail.

21        You may also consider the bias or interest of any of the
22   witnesses who testified.  While you should consider only the
23   evidence in this case, you are permitted to draw such reasonable
24   inferences from the testimony and exhibits as you feel are
25   justified in the light of common experience.  In other words, you

1    may make deductions and reach conclusions that reason and common

2    sense lead you to draw from the facts that have been established

3    by the testimony and other evidence in the case.

4        The testimony of a single witness may be sufficient to prove

5    any fact, even if a greater number of witnesses may have

6    testified to the contrary, if, after considering all the, all of

7    the other evidence, you believe that single witness.

8        A witness may be discredited or impeached by contradictory

9    evidence or by evidence that at some other time the witness has

10   made statements which are inconsistent with the witness' present

11   testimony.

12       If you believe any witness has been impeached and thus

13   discredited, you have the right to give the testimony of that

14   witness such credibility, such believability as you may think it

15   deserves.

16       In addition, although a witness does not deliberately

17   testify falsely, sometimes his or her memory may be unreliable.

18   You may decide to distrust or at least to limit the weight to

19   give to such testimony.

20       Where witnesses disagree as to certain events, you may of

21   course take into consideration the relative opportunity which

22   each witness had to observe the events at issue when they

23   occurred.

24       Certain testimony was presented to you during this trial

25   through what's called a deposition.  A deposition is the sworn,

1   recorded answers to questions asked a witness in advance of the

2   trial.  Under some circumstances, if a witness cannot be present

3   to testify from the witness stand, that witness' testimony may be

4   presented under oath in the form of a deposition.

5       Some time before this trial, the attorneys representing the

6   parties in this case questioned these witnesses under oath.  A

7   court reporter was present and recorded the testimony, and the

8   questions and answers were either shown to you during this trial

9   or read to you during this trial.  This deposition testimony is

10  entitled to the same consideration as if the witness had been

11  present and had testified from the witness stand in court.

12      During the course of the trial, you have heard objections to

13  evidence at certain times.  Sometimes these were argued out of

14  the hearing of the jury.  It is the duty of the attorney on each

15  side of the case to object when the other side offers testimony

16  or other evidence the attorney believes is not properly

17  admissible.  You should not draw any inference against or show

18  any prejudice against a lawyer or his client because of the

19  making of an objection.

20      Upon allowing testimony or other evidence to be introduced

21  over the objection of an attorney, the Court does not, unless

22  otherwise expressed, indicate any opinion as to the weight or

23  effect of such evidence.

24      As stated before, you are the sole judges of the credibility

25  of all witnesses and the weight and effect of all evidence.

1    When the Court has sustained an objection to a question
2    addressed to a witness, the jury must disregard the question
3    entirely and may draw no inference from the wording of it or
4    speculate as to what the witness would have said if permitted to
5    answer the question.

6    When knowledge of technical subject matter may be helpful to
7    the jury, a person who has special training or experience in a
8    particular technical or professional field, sometimes called an
9    expert witness, is permitted to state his or her opinion on those
10   technical matters.

11   However, you are not required to accept that opinion.  As
12   with any other witness, it is up to you to decide whether to
13   reply upon it.  In deciding whether to accept or rely upon the
14   opinion of an expert witness, you may consider any bias of the
15   witness, including any bias you may infer from evidence that the
16   witness has been or will be paid for reviewing the case and
17   testifying or from evidence that he testifies regularly as an
18   expert witness and his income from such testimony represents a
19   significant portion of his income.

20   You should consider each expert opinion received in evidence
21   in this case and give it such weight as you may think it
22   deserves.  If you should decide that the opinion of an expert
23   witness is based upon insufficient education or experience or if
24   you should conclude that the reasons given in support of the
25   opinion are not sound, you may disregard the opinion -- you may

1   disregard the opinion.

2        In summary, you are not bound by expert testimony.  Give it

3   the weight you to which you think it is entitled, whether that be

4   great or slight, and you may reject such testimony entirely if in

5   your judgment the reasons given for it are unsound.

6        Hypothetical questions, that is, questions based upon

7   supposed facts have been propounded to the expert witnesses.  In

8   order for the experts' response to such a hypothetical question

9   to have any value, all of the assumed facts forming the basis of

10  the opinion must be found from the evidence to exist and be true.

11  The truth of each assumed fact in a hypothetical question is for

12  you to determine from the evidence.  If the facts stated in the

13  hypothetical question are established by the evidence, then the

14  opinion based thereon may and should receive such weight and

15  credit as you believe it is entitled to receive.

16       On the other hand, if you find the facts stated in the

17  hypothetical question are not established by the evidence, then

18  the answer based upon that question should not be given any

19  weight by you.

20       Now, during the trial, there were certain stipulations that

21  were read to you, and they are also in written format that we

22  will give to you as part of the evidence in the case.  The

23  plaintiff and the defendants have agreed or stipulated to these

24  certain facts.  That means that there is no need for any further

25  evidence to be submitted by either side as to those facts, and

1  you should accept those facts as proven.  There is no

2  disagreement as to these things.

3      During the trial, I occasionally asked a question of a

4  witness in order to bring out facts that have not been fully

5  covered in the testimony.  You should not assume that I hold any

6  opinion on the matters to which my question or questions may have

7  related.  If you could possibly construe any question or remark

8  that I have made during this trial as a comment on the evidence,

9  then I instruct you to disregard any such comment, for you as the

10 jurors are the sole judges of the facts of this case.

11     I told you at the very beginning of this trial that this is

12 not a criminal case.  This is a civil case.  The burden of proof

13 on a plaintiff in a civil case such as this one is to prove every

14 essential element of his claim against a defendant by what's

15 called a preponderance of the evidence.  And if the proof should

16 fail to establish an essential element of the plaintiff's claim

17 against the defendant by a preponderance of the evidence, then,

18 of course, you should find for the defendant.

19     A preponderance of the evidence simply means a greater

20 weight and degree of credible evidence before you.  In other

21 words, a preponderance of the evidence means the amount of

22 evidence that persuades you that a claim is more likely so than

23 not so.

24     In determining whether any fact has been proved by a

25 preponderance of the evidence in this case, you may, unless

1   otherwise instructed consider the testimony of all witnesses,

2   regardless of who may have called them, and all exhibits in

3   evidence regardless of who may have produced them.

4       A plaintiff need not prove his claim -- let me restate that.

5   A plaintiff need prove his claim only by a preponderance of the

6   evidence.  The plaintiff need not produce every possible witness

7   and he, it should be obviously, he need not prove his case beyond

8   a reasonable doubt as is necessary in a criminal case.  But mere

9   speculation or mere possibility and even unsupported probability

10  is not sufficient to support a judgment in his favor.

11      Now, there are two types of evidence that you may consider

12  in properly finding the truth as to the facts in this case.  One

13  type of evidence is commonly called direct evidence, such as, for

14  example, the testimony of an eyewitness.  The other type of

15  evidence is what's called indirect or sometimes referred to as

16  circumstantial evidence.  That is, the proof of a set of

17  circumstances that indicates the existence or nonexistence of

18  certain other facts.

19      As a general rule, the law makes no distinction between

20  direct and circumstantial evidence, but simply requires that you

21  find the facts from a preponderance of all the evidence, both

22  direct and circumstantial.

23      Now, we allowed you to take notes.  I noticed some of you

24  took notes, some of you may not have taken notes.  For those of

25  you who did take notes, any notes you have taken during this

1    trial are only aides to your own memory.  If your memory differs

2    from your notes, you should rely upon your memory and not on the

3    notes.  The notes are not evidence.

4        If you have not taken notes, you should, of course, rely on

5    your own independent recollection of the evidence.  And you

6    should not be unduly influenced by the notes of other jurors.

7    Notes are not entitled to any greater weight than the

8    recollection or impression of each juror about the testimony.

9        Now, the instructions I've given you thus far have been

10   general instructions that we give pretty much in every civil

11   case.  Now we're getting to the instructions that deal with the

12   claims in this particular case.

13       This is a civil action in which the plaintiff,

14   John Thompson, alleges that the defendant, District Attorney's

15   Office, acting under color of state law, prosecuted him for

16   crimes while withholding evidence that was favorable to him.

17   Mr. Thompson alleges that the District Attorney's Office withheld

18   favorable information pursuant to a policy that failed to meet

19   the minimum constitutional requirements necessary to protect the

20   rights of citizens like himself.

21       Mr. Thompson also alleges that the District Attorney's

22   Office withheld this information or evidence because the district

23   attorney inadequately trained his prosecutors on what the

24   Constitution requires.

25       Mr. Thompson alleges that as a proximate cause or result of

1    the unconstitutional policy or inadequate training he was

2    incarcerated for 18 years and nearly executed.  The District

3    Attorney's Office denies these allegations and maintains that it

4    had a policy in place that its prosecutors must comply with the

5    requirements of the Constitution and that their prosecutors were

6    adequately trained as to what those requirements were.

7        Although you have heard some evidence about what went on

8    back in 1985 in the armed robbery trial and the murder trial in

9    1985, you are not being asked in this case to decide whether or

10   not John Thompson is guilty or innocent of the crimes with which

11   he was charged in 1985.  It is -- and that's because it is

12   undisputed that the armed robbery conviction was, in fact, set

13   aside based upon the scientific blood evidence and that a jury in

14   a second trial ultimately found Mr. Thompson not guilty of the

15   Liuzza murder.  Those issues have already been decided.

16       Now, Mr. Thompson has asserted claims not only against the

17   Orleans Parish District Attorney's Office but also against

18   Harry Connick, Eric Dubelier, James Williams, and Eddie Jordan in

19   their so-called official capacities.

20       A lawsuit against a governmental officer in his official

21   capacity is the same as a suit against the entity of which the

22   officer is an agent or employee.  Thus, the claims against

23   Harry Connick, Eric Dubelier, James Williams, and Eddie Jordan

24   are, in effect, claims against the Orleans Parish District

25   Attorney's Office as an entity.

1    Harry Connick, Eric Dubelier and James Williams are named as

2    defendants because they were government officials at the time of

3    John Thompson's prosecution, and their conduct is alleged to have

4    created a liability for the District Attorney's Office.

5    Eddie Jordan is named because he is the successor district

6    attorney.  There need not be any finding of personal conduct by

7    Eddie Jordan to impose liability on him and the District

8    Attorney's Office.

9    In their official capacities, the named individual

10   defendants cannot be held personally liable.  Any judgment in

11   this case will be recovered from the Orleans Parish District

12   Attorney's Office and not from the individual defendants

13   personally.

14   Now we're getting to the section of law, the particular

15   federal law or statute that applies to this type of case.  It's

16   commonly called Section 1983, which is part of the civil rights

17   statutes.

18   Section 1983 of Title 42 of the United States Code provides,

19   and this is a partial quote from that statute, "Every person who,

20   under color of any statute, ordinance, regulation, custom or

21   usage of any state, subjects or causes to be subjected any

22   citizen of the United States or other person within the

23   jurisdiction thereof to the deprivation of any rights, privileges

24   or immunities secured by the Constitution and laws shall be

25   liable to the party injured in an action at law."

1    Let me explain to you what that means and what are the

2    elements of proof to sustain a claim under this statute.

3    Mr. Thompson must be prove the following elements by a

4    preponderance of the evidence:  First, that the defendants were

5    acting under the color of state law.  Second, while acting under

6    the color of state law, the defendants deprived the plaintiff of

7    a federal right.  Third, that the deprivation of the federal

8    right was caused by the official policy, practice or custom.

9    Fourth, that the violation of plaintiff's federal right caused

10   the plaintiff damages or injury.

11   Because the defendants in this case were each acting in

12   their official capacities as prosecutors for the Orleans Parish

13   District Attorney's Office at the relevant time, I instruct you

14   that they were acting under color of state law.  In other words,

15   this element of Mr. Thompson's claim is not in dispute, and you

16   must find that this element has been established.

17   The second element of Mr. Thompson's claim is that the

18   District Attorney's Office deprived him of a federal

19   constitutional right.  In this case, the constitutional right

20   involved is an accused person's right to have the prosecutor

21   provide to the accused all evidence known to the state that is

22   favorable to the accused in advance of a trial.

23   The prosecution, a prosecutor's failure to produce evidence

24   favorable to an accused violates the Constitution where the

25   evidence is material to guilt or innocence or to punishment or to

1  credibility or sometimes called impeachment of a witness.

2       Such that the suppression of the evidence undermines

3  confidence in the result of the criminal trial.  The good or bad

4  faith of the prosecution does not matter.  The prosecutor's

5  obligation to disclose information is based on what all state

6  officers knew at the time, not just on the information that the

7  prosecutor has in his or her possession.

8       Implied within this obligation is the duty of the individual

9  prosecutor to learn of any favorable evidence known to others

10  acting on the government's behalf in the case, including the

11  police.

12       The prosecutor's duty to produce evidence favorable to the

13  accused is sometimes referred to, and you heard this throughout

14  this trial, the *Brady* doctrine.  This doctrine is named after a

15  decision of the United States Supreme Court called *Brady versus*

16  *Maryland.*  The *Brady* doctrine is based on an evolving series of

17  court decisions and is integral to the justice and fairness of

18  our criminal system.

19       In this case, I have already determined as a matter of law

20  that the nonproduced blood evidence and the resulting

21  infringement of Mr. Thompson's right to testify in the murder

22  case violated his constitutional rights as a matter of law.

23       With regard to the nonproduction of the blood evidence,

24  therefore, the only issue that you need to decide concerns

25  whether a policy, practice or custom of the District Attorney's

1   Office or a deliberately indifferent failure to train the

2   office's prosecutors proximately caused the nonproduction of the

3   evidence.

4       The third element of a Section 1983 claim is that the

5   deprivation of the constitutional or federal right must have been

6   caused by an official policy, practice or custom.  A governmental

7   entity such as the Orleans Parish District Attorney's Office

8   cannot be held liable solely because one of its employees

9   violated Mr. Thompson's constitutional rights.

10      An entity may be held liable under Section 1983 for the

11  constitutional violations of its employees only when an official

12  policy, practice or custom of the entity was a substantial cause

13  of the deprivation of the plaintiff's rights.

14      In this case, there are two ways that Mr. Thompson can

15  satisfy this, what's called the official policy, practice or

16  custom requirement.  First, when a person charged with the

17  responsibility of making policy for the District Attorney's

18  Office promulgates a generally applicable policy, practice or

19  custom, and the act complained of is simply an implementation of

20  that policy, practice or custom.

21      Second, alternatively, another way to prove the official

22  policy, practice or custom requirement is where an official

23  policymaker has failed to act when the need is so obvious and the

24  failure to act so likely to result in the very violation that

25  occurred in this case, that the failure to act rises to a

1   deliberate indifference.

2        Now, as noted, as noted, the District Attorney's Office may

3   be held liable if the deprivation of Mr. Thompson's

4   constitutional rights was caused by actions that implement or

5   execute an official policy.

6        An official policy, for purposes of Section 1983 liability,

7   may be a policy statement, ordinance, regulation or decision that

8   is expressly adopted and promulgated by an official who has final

9   policy-making authority for that entity.

10       I have found in this case as a matter of law that only

11   Harry Connick had final policy-making authority over the issue of

12   producing *Brady* material.

13       In order to satisfy the official policy requirement, there

14   need not be a formal statement of policy.  A persistent,

15   widespread practice of the district attorney or its prosecutors,

16   which, although not authorized by expressly adopted and

17   promulgated policy, is so common and well-settled as to

18   constitute a custom that fairly represents official policy may

19   also qualify.

20       In evaluating this issue, you are not limited to the

21   nonproduced blood evidence and resulting infringement of

22   Mr. Thompson's right to testify in the murder case.  You may

23   consider all of the evidence presented at this trial.

24       The District Attorney's Office may also be liable under

25   Section 1983 when the District Attorney's Office fails through

1  deliberate indifference to establish policies and procedures to

2  protect one accused of a crime from the constitutional violations

3  that occurred in this case.

4     Even a facially valid policy will support liability if it

5  was issued with deliberate indifference to the known or obvious

6  consequences that constitutional violations would result from it.

7     In order to hold the District Attorney's Office liable for

8  the violation of Mr. Thompson's constitutional rights, you must

9  find that Mr. Thompson has proved each of the following things by

10  a preponderance of the evidence:

11     First, that the District Attorney's Office training program

12  was inadequate to train its prosecutors to carry out their

13  duties, or, the District Attorney failed to adequately monitor or

14  supervise its prosecutors in carrying out their duties.

15     Second, the district attorney's failure to adequately train,

16  monitor or supervise amounted to deliberate indifference to the

17  fact that inaction would obviously result in a constitutional

18  violation.

19     Third, the district attorney's failure to adequately train,

20  monitor or supervise proximally caused the violation of

21  Mr. Thompson's constitutional rights in this case.

22     Deliberate indifference requires a showing of more than

23  negligence or even gross negligence.  For liability to attach

24  because of a failure to train, the fault must be in the training

25  program itself, not in any particular prosecutor.

1    In order to find that the district attorney's failure to

2  adequately train, monitor or supervise amounted to deliberate

3  indifference, you must find that Mr. Thompson has proved each of

4  the following three things by a preponderance of the evidence:

5    First, that the district attorney was certain that

6  prosecutors would confront the situation where they would have to

7  decide which evidence was required by the Constitution to be

8  provided to the accused.

9    Second, that the situation involved a difficult choice or

10  one that prosecutors had a history of mishandling, such that

11  additional training, supervision or monitoring was clearly

12  needed.

13    Third, that the wrong choice by a prosecutor in that

14  situation would frequently cause a deprivation of an accused's

15  constitutional rights.

16    In evaluating this issue, you are not limited to the

17  nonproduced blood evidence and the resulting infringement of

18  Mr. Thompson's right to testify at the murder trial.  You may

19  consider all of the evidence presented during this trial.

20    In order to succeed in this matter, the plaintiff must prove

21  that the defendant's official policy was a cause of the damage

22  plaintiff suffered.  By cause of the damage, I mean that the

23  negligence or fault was both a cause in fact and a proximate

24  cause of the damage.

25    And the act or failure to act is a cause in fact of an

1   injury or damages if it appears from the evidence that the act or

2   omission played a substantial part in bringing about or actually

3   causing the injury or damages.

4       An act or omission is a proximate cause of the plaintiff's

5   injuries or damages if it appears from the evidence that the

6   injuries or damages were a reasonably foreseeable consequence of

7   the act or omission.

8       As to the requirement that the plaintiff's damages be caused

9   by the defendants' conduct, I do not mean that the law recognizes

10  only one cause of any damage, consisting of only one factor or

11  thing, or the conduct of only one person or entity.  On the

12  contrary, many factors or things may operate at the same time,

13  either independently or together, to cause injury or damage.

14      You should resolve this question by deciding whether the

15  plaintiff would probably not have suffered the claimed injury or

16  damages in the absence of the wrongful acts by the defendants.

17      Stated another way, Mr. Thompson must prove that the

18  wrongful acts of the defendants were the moving force behind his

19  injuries or damages.  Mr. Thompson must prove that more likely

20  than not the *Brady* material would have been produced if the

21  prosecutors involved in his underlying criminal cases had been

22  properly trained, supervised or monitored regarding the

23  production of *Brady* evidence.

24      Now, if the plaintiff has proven his claim against the

25  defendant by a preponderance of the evidence, you must determine

1  the damages to which the plaintiff is entitled.  You should not

2  interpret the fact that I am giving you instructions about the

3  plaintiff's damages as an indication in any way that I believe

4  that the plaintiff should or should not win this case.  It is

5  your task first to decide whether the defendant is liable.  I am

6  instructing you on damages only so that you will have guidance in

7  the event you decide that the defendant is liable and that the

8  plaintiff is entitled to recover money from the defendant.

9       If you find that the defendant is liable to the plaintiff,

10 then you must determine an amount that is fair compensation for

11 all of the plaintiff's damages.  These damages are called

12 compensatory damages.  The purpose of compensatory damages is to

13 make the plaintiff whole.  That is, to compensate the plaintiff

14 for the damage that he has suffered.

15      You may award compensatory damages only for damages that the

16 plaintiff proves were caused by the defendants' allegedly

17 wrongful conduct.

18      The damages that you award must be fair compensation for all

19 of the plaintiff's damages, no more and no less.  Damages are not

20 allowed as a punishment and cannot be imposed or increased simply

21 to penalize the defendant.  You should not award compensatory

22 damages for speculative damages but only for those damages which

23 the plaintiff has suffered or that the plaintiff is reasonably

24 likely to suffer in the future.

25      If you decide to award compensatory damages, you should be

1   guided by dispassionate common sense.  Computing damages may be

2   difficult, but you must not let that difficulty lead you to

3   engage in arbitrary guesswork.

4       On the other hand, the law does not require that the

5   plaintiff prove the amount of his losses with mathematical

6   precision but only with as much definiteness and accuracy as

7   circumstances permit.

8       You may award compensatory damages for the pain and

9   suffering and mental anguish that Mr. Thompson has experienced in

10  the past or will experience in the future because of the

11  defendants' conduct.

12      No evidence of the value of such intangible things, such as

13  mental and physical pain and suffering has been nor need be

14  introduced.  You are not trying to determine an exact value here,

15  but an amount that will fairly compensate plaintiff for the

16  damages he has suffered.

17      There is no exact standard for fixing the compensation to be

18  awarded for these elements of damage.  Any award you make should

19  be fair in light of all of the evidence.  You should use sound

20  discretion in fixing an award of damages, drawing reasonable

21  inferences where you find them from appropriate -- find them

22  appropriate from the facts and circumstances in evidence.

23      Your verdict must represent the considered judgment of each

24  juror.  In order to reach a verdict, it is necessary that each

25  juror agree; in other words, your verdict must be unanimous as to

1   each of the questions on the verdict form.

2       It is your duty as jurors to consult with one another and to

3   deliberate with a view towards reaching an agreement, if you can

4   do so without violence to individual judgment.  You must decide

5   the case for yourself but only after an impartial consideration

6   of the evidence in the case with your fellow jurors.

7       In the course of your deliberations, do not hesitate to

8   re-examine your own views and change your own opinion if

9   convinced it is erroneous.  But do not surrender your honest

10  conviction as to the weight of the evidence or the effect of the

11  evidence solely because of the opinion of your fellow jurors or

12  for the mere purpose of returning a verdict.

13      Remember at all times that you are not partisans.  You are

14  judges, judges of the facts.  Your sole interest is to seek the

15  truth from the evidence in this case.  When you retire to the

16  jury room in a few minutes to begin your deliberations, you will

17  take with you this copy of my written legal instructions.  We

18  will also send in all of the exhibits that have been placed into

19  evidence, and there is also a set -- in addition to the numbered

20  exhibits, there is also a set of written stipulations that I

21  think we said would be sent to the jury by agreement.

22      You're going to have a verdict form, which I'm going to go

23  over with you in just a minute.  It's only three questions.  Two

24  pages, three questions.  You're going to have a manila envelope,

25  the purpose of which is after the verdict form has been completed

1   and signed, you should insert it in the manila envelope, close it

2   and then let the Court security officer know that the jury has

3   reached a verdict.

4       I suggest to you that the first thing you should do when you

5   get to the jury room in a few minutes is to select one of your

6   number to act as foreperson.  That person's job would be to

7   preside over your deliberations and act as your spokesperson

8   should there be a need to do so.

9       From this point on or from the point that you retire to the

10  jury room in a few minutes, if there arises a need to communicate

11  with me in any way, there is a question or problem or issue that

12  you need to bring to my attention or any of you need to bring to

13  my attention, the procedure is we're going to send you some

14  paper, a form in there for questions or issues to be written out.

15  And you should -- ordinarily the foreperson would be the

16  spokesperson for the jury, but there is nothing to prevent any of

17  you from sending a note or questioning me if you need to.  But

18  write out the question or whatever the issue is or problem is.

19  Sign and date it, and put the time, because you know what the

20  date is, and send it out to me through the Court security

21  officer.

22      When you're back in that jury room deliberating, the seven

23  of you will be in there alone.  No one will be in there with you,

24  but the Court security officer will be right outside the door.

25  And, again, if you have a question or a problem or issue, bring

1   it to his attention.  He'll relay it to me.

2        I am required under the rules of court to let the lawyers

3   have input.  In other words, if you have a question, I will seek

4   input from the lawyers as to how I should respond.  I will

5   respond as promptly as I can.  Sometimes it takes a little while

6   to get that all together for me to be able to respond to your

7   question or problem, but I promise I will do it as quickly as we

8   can.

9        And the way I will respond ordinarily will be by writing my

10  response right below your question and sending the document back

11  in to you.

12       I'm not predicting this will happen in this case.  On some

13  occasions, in some cases, it's sometimes necessary to actually

14  bring a jury back into the courtroom for further instructions.

15       The point I want to make, though, is whether you're

16  communicating with me in writing or whether you're back in the

17  courtroom communicating with me, under no circumstances do I want

18  you to advise me how the jury stands numerically at any given

19  time.  In other words, I don't want you to say so many people are

20  voting this way, so many people are voting that way or whatever

21  the situation might be.  Until, of course, you've reached a

22  unanimous verdict, and the way you then indicate that is by

23  signing, filling out, signing and dating the verdict form.

24       There is only one verdict form.  We don't want seven

25  verdicts because it has to be unanimous, so the answer to each of

1   these questions must be unanimous.

2       As I said, once the verdict form is completed and signed and

3   dated, I believe today is the 9th of February, then again you

4   notify the Court security officer.  And once he tells me the jury

5   has reached a verdict, we will gather everyone back in the

6   courtroom as soon as we can, and we'll bring you in to receive

7   and accept your verdict.

8       Here is the special verdict form.  Question number 1 is as

9   follows:  "Was the *Brady* violation in the armed robbery case or

10  any infringements of John Thompson's rights in the murder trial

11  substantially caused by an official policy of the district

12  attorney?"

13      You answer it yes or no.  You check yes or no.

14      Then you proceed to question 2:  "Was the *Brady* violation in

15  the armed robbery case or any infringements of John Thompson's

16  rights in the murder trial substantially caused by the district

17  attorney's failure through deliberate indifference to establish

18  policies and procedures to protect one accused of a crime from

19  these constitutional violations?"

20      Again, yes or no.

21      And then it has an instruction.  It says, "If you answer yes

22  to either question number 1 or question number 2 or to both of

23  them, then you go on and answer question number 3."

24      If you answer no to both 1 and 2, then you stop there, sign

25  and date the verdict form and notify the Court security from.

1      If you proceed to question number 3, it reads as follows:

2  "Please state what sum of money, if any, would reasonably and

3  fairly compensate John Thompson for damages he has actually

4  suffered or is reasonably likely to suffer in the future as a

5  result of the district attorney's policy or deliberate

6  indifference."

7      And there is a line with a dollar sign, and you fill in

8  whatever amount, if any, you think is appropriate there in

9  accordance with the instructions I've given you.

10      And again, then the foreperson would sign -- only the

11  foreperson signs and dates the form at the conclusion of your

12  deliberations.

13      All right.  At this time I'm going to ask you, ladies and

14  gentlemen, to retire to the jury room.  I suggest you might want

15  to start by selecting the foreperson.  You might want to wait a

16  few minutes to actually start your deliberations because we want

17  to get the bench, the bench, the evidence is going to be in these

18  books, and the exhibits are labeled in accordance with the same

19  numbers that were used during the trial.  I think there is also

20  an index if you need it to help you follow that as you feel the

21  need to.  And there is also the stipulations.

22      And Eileen, here is the verdict form and the envelope.

23      All right.  So at this time I'll ask you to please retire.

24  You can, of course, take your notes with you and your legal

25  instructions.

1        THE DEPUTY CLERK:  All rise.

2        (WHEREUPON, the jury panel leaves the courtroom.)

3        THE COURT:  All right.  The jury has retired to the jury

4    room.  Anybody need to say anything else or put anything else on

5    the record at this time?

6        MR. BANKS:  I think the stipulation is still needed to

7    be provided, and we noted there is a typo in a date.  Maybe we

8    could just hand mark that correction.

9        THE COURT:  That would be fine.  I think that was

10   something that Clay noted, 2004 and it should have been --

11       MR. BANKS:  1984.

12       MR. AARON:  Do you want our cell phone numbers?

13       THE COURT:  Yes.  Give those to Eileen.  Make sure that

14   you're close by, either in the courtroom or outside in the hall.

15   If you're going to be anywhere else, make sure Eileen has a cell

16   phone number or something where she can contact you on short

17   notice and you can get back here on short notice if you need to

18   in case we get a question from the jury.

19       We have already ordered lunch for the jury to arrive at

20   about 11:30.  Between 11:30 and 11:45.  When it gets here, I

21   would say, you know, you could, we'll notify you when the food

22   gets here, and I think then you could safely assume if you want

23   to go off, not an extended lunch, but 30 or 40 minutes, 40 or

24   45 minutes you would be safe.  Again, we should still have your

25   cell phone number.

1        MR. BANKS:  Other than the lunch break, Your Honor, how

2   quickly should we be on notice to be back here?  Five or ten

3   minutes?

4        THE COURT:  Yeah.

5        MR. BANKS:  That's fine.

6        THE COURT:  You don't have to be in here or right

7   outside the door, but if you're not going to be, then be where we

8   can get you back here in a relatively short period of time.

9        Let me -- Mr. Aaron and Mr. Cooney, I just want, let me

10  comment for the record and while the jury is out of the room, I

11  know that this has been a very difficult case in a lot of ways

12  for some obvious reasons, a very emotional case, a very serious

13  case with some serious issues.  My job is just to try to preside

14  fairly over the trial.  I hope I've done that.  I think I've done

15  that.  I obviously am not going to be deciding this case, and I

16  have no idea how the jury is going to decide the case, but all I

17  hope is whatever they do is the right thing and just, whatever

18  that is in this case.

19       Where is Mr. Thompson?  Did he, he's gone?

20       MR. BANKS:  He had to go to the bathroom, Judge.

21       THE COURT:  I wanted to tell both Mr. Thompson and

22  Mr. Connick and the people in his office that --

23       MR. BANKS:  Bring in Mr. Thompson.

24       THE COURT:  Yes.  Is he right outside?

25       Mr. Thompson, I just want to tell you as a plaintiff and

1    Mr. Connick as a defendant, and the other defendants for that
2    matter who are not here, that I think the lawyers on both sides
3    of this case did an excellent job.  They are good lawyers on both
4    sides.  The case was well tried.  I think all the evidence is in.
5    It's not in my hands; it's in the hands of the jury.  I don't
6    have any idea what they are going to do.  I just hope whatever
7    they do that justice prevails.  I want to wish, whatever happens,
8    Mr. Thompson, you know, good luck in the future.  I hope you keep
9    on the positive path that you look like you're on to your great
10   credit since you were released from prison.
11        Mr. Connick, I've known you, not closely but I've known you
12   certainly for many years, and I hope that your life is a good
13   one, too.
14        MR. CONNICK:  Thank you, Judge.
15        THE COURT:  And I'm glad to see you still looking well.
16   You amazed me when I learned you were 81 years old.  I didn't
17   realize that.  So, you know, anyway, good luck to everyone and
18   thank you.
19        MR. BANKS:  Thank you for the privilege of allowing
20   these out-of-towners to appear in this Court.
21        THE COURT:  That's fine.  Thank you, gentlemen.
22        (WHEREUPON, at 10:50 a.m. the Court was in recess for
23   jury deliberations.)
24        (WHEREUPON, at 2:04 p.m. the Court received Question #1 from
25   the jury panel.)

1        THE COURT:  It's now about 2:00 and we have question

2   number 1 from the jury, which reads, "What does deliberate

3   indifference mean?  Does it mean intentional or would failure to

4   monitor be considered deliberate?"

5   Do you want to weigh in on this?

6        MR. COONEY:  Your Honor, we would think that obviously

7   that the Court has given, excuse me, instructions on this point,

8   if the Court were to be inclined to do anything other than sort

9   of reread the instruction on deliberate indifference, we thought

10  that what the Court could consider doing would be to say that

11  deliberate indifference does not require intentional misconduct,

12  and then to pick up the thoughts that you have in your charge

13  already that says deliberate indifference is established if there

14  is a failure to adequately train, monitor and supervise and that

15  you find Mr. Thompson has proved each of the following things by

16  a preponderance of the evidence, and then there are the three

17  things that you listed.

18      I think what they are grappling with is do they have to find

19  intentional misconduct, and I think it's appropriate for the

20  Court to say they don't need to find that.  And I think to direct

21  them to the three things that Your Honor's instruction says they

22  should consider in determining whether or not there is deliberate

23  indifference would be an appropriate way to proceed.

24        MR. AARON:  Your Honor, from the question, I think they

25  are confused as to the difference between intent and negligence.

 1  Because, you know, a failure to monitor would be negligence as

 2  opposed to intentional.

 3       THE COURT:  Failure to monitor, I mean, that could be

 4  intentional.  It could be --

 5       MR. AARON:  But I think, looking at the terms that they

 6  use, I think the, in your charge you say that it can't just be

 7  simple negligence or whatever.  So I think they are grappling

 8  with it's something more than just negligence and that's what it

 9  is, so it could be intent, it could be reckless disregard or just

10  not caring, but it's something higher than negligence.

11       THE COURT:  We all agree with that.  It's a higher

12  standard than negligence but something somewhat less than intent,

13  wherever that falls.

14       MR. AARON:  And so I think then to follow up, then, so

15  if there's a failure to monitor, then it must be a higher

16  standard failure of just, you see what I'm saying?  I don't know

17  if I'm making sense.

18       THE COURT:  No, I think I understand what you're saying.

19       MR. COONEY:  I think the Court's instruction really, the

20  three things that you identified, Your Honor, on pages 26 and 27

21  of your charge are really the things that give the most

22  significant guidance to the jury.  I think that what's important

23  is that the jury understand that they don't have to find

24  intentional misconduct on the part of the policymaker in this

25  instance in order to do that.  And then I think the first and the

1  second and the third points really lay out the factors that the

2  jury can take into account.

3          THE COURT:  Go ahead.

4          MR. AARONS:  I was speaking with Mr. Connick.  I still

5  think the trouble they are having is what level of failure, okay.

6  I think that's why they are saying, do they have to prove intent

7  or could it be something less than intent.

8          THE COURT:  Go ahead.

9          MR. AARON:  So I thought your jury charge hit it, the

10  way you told them.  It's, okay, this is what you said, you said,

11  "Deliberate indifference requires --"

12          THE COURT:  Where are you reading from?

13          MR. AARON:  Page 26, Judge.

14      "Deliberate indifference requires a showing of more than

15  negligence or even gross negligence for a liability to attach

16  because of a failure to train, the fault must be in the training

17  program itself, not in a particular prosecutor."

18      Anyway, then you go into it.  And I guess maybe they are

19  getting confused because remember that thing said train, monitor

20  or supervise, and so they are focusing on monitoring and they are

21  saying, Well, maybe he wasn't watching them carefully enough.

22  But I think it has to be more than just not watching them

23  carefully.  It has to be, you know, if not completely

24  intentional, I think it should be either intentional or reckless

25  disregard, he just didn't care about it.  Yeah.

1          THE COURT:  Yes.  That's the definition of indifference,

2     you're indifferent to it, you're disinterested in it.  So that's

3     the definition, I think, of indifference.

4          Well, maybe what I could do is tell them that it does not

5     necessarily mean intentional but it requires more than mere

6     negligence or even gross negligence like I say here and then tell

7     them to refer to these criteria that are set forth.

8          MR. AARON:  Mr. Connick suggested to me that he thinks

9     the word deliberate means intentional.

10          THE COURT:  It doesn't, though.  Not according to the

11     law.  I think that's pretty clear.  It's something less than

12     intentional.  It's something more than negligence.  That's what

13     the law says.  Yes.  And I think it's fair, since the jury has

14     asked this precise question, does it mean intentional, I should

15     tell them, I mean, the honest answer to that and correct answer

16     is, I believe, no, not necessarily.

17          But on the other hand, just the simple failure to monitor

18     isn't enough itself either, if it's through the negligence.  So

19     that's what I'm grappling with here.  I'm inclined to say

20     something along these lines:  While deliberate indifference does

21     not necessarily mean intentional, it does require a showing of

22     more than mere negligence or even gross negligence.  And then

23     tell them, please refer to the criteria for deliberate

24     indifference on page 26 and 27.

25          MR. AARON:  Now, as to the indifference part, can we say

1  something that it's not caring?  Which is what indifference means

2  because I don't think anywhere in there does it really say that

3  it's not caring.

4       THE COURT:  It tells them what they have to find.  It

5  tells them they have to find these three things.

6       MR. COONEY:  I think that's where the guidance really

7  comes, Your Honor.  I think the approach that you're outlining is

8  appropriate because I think the thing that's most meaningful to

9  them is going to be found in those three criteria.

10       MR. AARON:  I think they are having problems with what

11  the words deliberate and indifference mean.  The words

12  themselves.  They are having problems, what does that mean?

13       THE COURT:  Here is what I'm going to tell them.  I'm

14  sending this in.  Well, let me read it first for the record.

15  I've told them, "Deliberate indifference does not necessarily

16  mean intentional but does require more than mere negligence or

17  even gross negligence.  Please refer to pages 26 and 27 of the

18  legal instructions referred to for guidance."

19       Send that in.  It's now 2:10 p.m.  All right.  Eileen.

20            (WHEREUPON, at 2:13 p.m. the Court was in recess for

21  jury deliberations.)

22            THE DEPUTY:  All rise.

23            (WHEREUPON, at 2:40 p.m. the jury panel enters the

24  courtroom.)

25            THE COURT:  Okay.  Ladies and gentlemen, please be

1   seated.  Let's see.  I'm guessing that, Ms. Dennis, you've been

2   selected foreperson since you're holding the envelope in your

3   hand?

4          MS. DENNIS:  Yes.

5          THE COURT:  Before you hand that up, let me just ask

6   you, has the jury reached a verdict?

7          MS. DENNIS:  Yes.

8          THE COURT:  And is the verdict unanimous in all

9   respects?

10         MS. DENNIS:  Yes.

11         THE COURT:  All right.  Please hand the envelope to my

12  case manager.

13     All right.  I'm going to ask my case manager, Ms. Stensrud,

14  would you read the verdict.

15         THE DEPUTY CLERK:  Number 1, was the *Brady* violation in

16  the armed robbery case or any infringements of John Thompson's

17  rights in the murder trial substantially caused by an official

18  policy of the district attorney?  No.

19     Number 2, was the *Brady* violation in the armed robbery case

20  or any infringements of John Thompson's rights in the murder

21  trial substantially caused by the district attorney's failure

22  through deliberate indifference to establish policies and

23  procedures to protect one accused of a crime from these

24  constitutional violations?  Yes.

25     Number 3, please state what sum of money, if any, would

1    reasonably and fairly compensate John Thompson for damages he has

2    actually suffered or is reasonably likely to suffer in the future

3    as a result of the district attorney's policy or deliberate

4    indifference.  $14 million.

5        Signed at New Orleans, Louisiana, this 9th day of February,

6    2007.  Wendy M. Dennis, foreperson.

7        Ladies and gentlemen of the jury, is this your verdict?

8            THE JURORS:  Yes.

9            THE COURT:  Does anybody wish to poll the jury?

10           MR. AARON:  Yes, Your Honor.

11           THE COURT:  All right.  Ladies and gentlemen, when your

12   name is called by Ms. Stensrud, if you are in agreement with the

13   verdict as it was just read in open court, please answer yes or

14   in the affirmative, or if you disagree in any respect, please

15   answer no.

16           THE DEPUTY CLERK:  Lisa M. Collette, is this your

17   verdict?

18           THE COURT:  You don't have to stand when you respond.

19           MS. COLLETTE:  Yes.

20           THE DEPUTY CLERK:  Lisa M. Nunez, is this your verdict?

21           MS. NUNEZ:  Yes.

22           THE DEPUTY CLERK:  Esquezelda F. Joseph, is this your

23   verdict?

24           MS. JOSEPH:  Yes.

25           THE DEPUTY CLERK:  Casey A. Duhe, is this your verdict?

1          MR. DUHE:  Yes, ma'am.

2          THE DEPUTY CLERK:  Wendy M. Dennis, is this your

3    verdict?

4          MS. DENNIS:  Yes.

5          THE DEPUTY CLERK:  Elsie J. Daniels, is this your

6    verdict?

7          MS. DANIELS:  Yes.

8          THE DEPUTY CLERK:  Fonda A. Garrett, is this your

9    verdict?

10         MS. GARRETT:  Yes.

11         THE COURT:  All right.  Let the jury verdict be received

12   and recorded in the record minutes of the Court.

13         Ladies and gentlemen, let me thank you very much for your

14   time and presence here this week.  It's been somewhat a long

15   trial, and I appreciate it.  It's never easy to call people away

16   from their jobs and lives and ask them to come down here and

17   spend five days, the whole week.  You spent a whole week with us,

18   and I know I appreciate it very much.  And the entire court, our

19   entire court and everyone here appreciates your time and

20   attention to this matter.  You will -- Eileen, do they need to

21   stop on the first floor?

22         THE DEPUTY CLERK:  Yes, they do.

23         THE COURT:  I'm going to invite you, I always do this at

24   the end of a jury trial, it's not mandatory, when I release you

25   in a few minutes you'll be free to leave if you care to, but if

1    any of you want to come back and talk to me, meet with me back in

2    my conference room, I'll be about five minutes after you leave

3    the courtroom, and then I'll be happy to meet with you back in my

4    conference room and I will not ask you anything about, you know,

5    how or why you decided the case.  My only purpose is to ask you

6    about your experience as jurors, good, bad or indifferent so that

7    we can hopefully continue to improve things or make things more

8    comfortable for jurors who are called here in the future.

9         So again, thank you very much and if you are interested in

10   meeting with me, let the Court security officer know on your way

11   out.  Make sure -- where are their cell phones and all, Eileen?

12             THE DEPUTY CLERK:  They are over there.

13             THE COURT:  You'll get your cell phones and personal

14   property.  He'll bring you back to my conference room if you want

15   to.  If you don't care to and you want to go home, it's about,

16   what time is it?  Quarter to three on a Friday afternoon.  That's

17   fine, too.  But in any event, again, I can't tell you how much we

18   appreciate your time and attention to this matter.  The Court

19   will stand in recess.

20             THE DEPUTY CLERK:  All rise.

21             (WHEREUPON, the jury panel leaves the courtroom.)

22             THE COURT:  All right.  We will issue and sign a

23   judgment in accordance with the jury verdict.  And again, thanks

24   to all of you for the professional way in which this case was

25   handled.  I know it got emotional at times from all sides, and

1   but again, I commend the lawyers on both sides for handling their

2   jobs professionally.

3          MR. COONEY:  Thank you.

4          MR. AARON:  Thank you.

5       Judge, in anticipation in view of the size of the amount,

6   the District Attorney's Office will probably be moving for some

7   form of stay.  I don't know normally in cases like this if the

8   Court will grant a stay and waive bonds since it's a government

9   entity.

10          THE COURT:  Obviously I haven't even thought about that.

11  Nothing starts to run until I sign and enter a judgment, so

12  you'll have a while to file.  As I recall under the federal rules

13  is there a built-in delay of, is it 10 days, for which you can

14  request that before, you know, stay the execution of the judgment

15  before it could be executed on anyway, so you'll have time to do

16  that.

17       Anything else?

18          MR. BANKS:  No, Your Honor.

19          MR. COONEY:  No, Your Honor.

20          MR. AARON:  Thank you.

21          THE COURT:  Thank you.

22          (WHEREUPON, at 2:46 p.m. on Friday, February 9, 2007,

23  the proceedings were concluded.)

24                  *    *    *

25

REPORTER'S CERTIFICATE

     I, Cathy Pepper, Certified Realtime Reporter, Registered
Professional Reporter, Certified Court Reporter, Official Court
Reporter, United States District Court, Eastern District of
Louisiana, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and understanding,
from the record of the proceedings in the above-entitled and
numbered matter.


                                    _____

                                    Cathy Pepper, CCR, RPR, CRR

                                    Official Court Reporter

                                    United States District Court